# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| THE SECURITY NATIONAL BANK OF SIOUX CITY, IOWA  as conservator for J.M.K., a Minor,<br><br>     PLAINTIFF,<br>vs.<br><br>ABBOTT LABORATORIES,<br><br>     DEFENDANT. | Case No. C11-4017-DEO<br><br><br>**RESISTANCE TO MOTION TO STRIKE MEGAN SURBER'S SEPTEMBER 19, 2012 AFFIDAVIT AND BRIEF IN SUPPORT OF RESISTANCE**<br><br><br>ORAL ARGUMENT REQUESTED |

1

# TABLE OF CONTENTS

Page

**I.    THE RECORD**............................................................................................. 4

**II.   LEGAL ARGUMENT**......................................................................................14

**III.  CONCLUSION**.............................................................................................17

# TABLE OF AUTHORITIES

**Page**

Baker v. Silver Oak Senior Living Mgmt. Co, L.C.,
581 F.3d 684 (8th Cir. 2009) ... ..........................................................................14, 15

Bass v. City of Sioux Falls, 232 F.3d 615 (8th Cir. 1999) ...............................14, 15

City of St. Joseph Missouri v. Southwestern Bell Telephone,
439 F.3d 458 (8th Cir. 2006) ...........................................................................14, 15

Fast v. Southern Union Co., Inc., 149 F.3d 885 (8th Cir. 1998) .......................14

Helm Financial Corp. v. Iowa Northern Ry. Co.,
214 F. Supp. 2d 934 (N.D. Iowa 2002) .............................................................14, 15

Plaintiff submits this Memorandum in response to Abbott's motion to strike the affidavit of Megan Surber dated September 19, 2012.[1] The affidavit does not conflict with or contradict any portion of Ms. Surber's July 5, 2012, deposition nor any other deposition and discovery response. If oral argument is granted on the Defendant's Motion for Summary Judgment, then Plaintiff requests oral argument on this Resistance to Motion to Strike and further requests that the oral arguments be consolidated.

## I.

## THE RECORD

Without any legal or factual justification, Abbott claims that Megan Surber's September 19, 2012, affidavit is a "sham." The affidavit, however, is not inconsistent with Ms. Surber's deposition testimony. Ms. Surber signed the affidavit in order to provide Plaintiff's experts with additional information that was not contained in her deposition. The information was absent from the deposition transcript because Abbott's attorney had not covered it.[2] The affidavit filled those gaps. In its Motion to Strike, Abbott paraphrases Ms. Surber's deposition testimony in order to skew what was actually said. Plaintiff prefers to quote the affidavit in order to provide the

---

[1] The affidavit in question is Exhibit I of Abbott's submissions. Exhibits cited in this Memorandum from Exhibit A through Exhibit M also refer to the exhibits attached to Abbott's Motion to Strike.

[2] Plaintiff disclosed its experts on October 24, 2012. Plaintiff's experts relied, in part, on the affidavit which was also disclosed on October 24, 2012. Plaintiff's experts requested the information contained in the affidavit because the deposition testimony did not include any information concerning the infant's behavior from the evening of April 23rd until the 8:30 a.m. the following morning.

4

Court with the exact testimony provided by Ms. Surber both in her deposition and her affidavit. The substantive part of Ms. Surber's affidavit states:

> On the evening of April 23rd, around 9:00 p.m. Jeanine had her first bottle of PIF. Jeanine slept after her 9:00 p.m. feeding and her later feedings that night. The evening of April 23rd was routine. Jeanine was somewhat fussy in the evening of April 23rd but it was a normal fussy; Jeanine ate and slept that evening just like any other night. I also slept until Jeanine woke me for her midnight and 4:00 a.m. feedings. Jeanine did not feel warm to me so I did not take her temperature during the night. Jeanine began acting differently around the time of her April 24th bottle at 8:30 a.m.
>
> I recall that I took Jeanine's temperature for the first time during daylight on April 24th because I thought she felt warm. I do not recall for sure whether I took the temperature under the arm or rectally, but I think I took it rectally. I do not recall exactly what the temperature was, but it would have been less than 100 degrees. I recall taking Jeanine's temperature twice during the day on April 24th before taking her to the doctor. I called the doctor later in the day on April 24th because Jeanine was crying, had a slight temperature, would not eat, and I could not comfort her. Jeanine's temperature was not so high that it in itself would have caused me to call the doctor and take Jeanine into the hospital. I did not give Jeanine anything to lower her temperature before taking her to the doctor.

(Exhibit I). At her deposition, Ms. Surber testified as follows:

> Q. Okay. Did you complain about her condition to anyone on the 23rd?
> A. I called my mom.
> Q. Okay. When did you call your mom?
> A. After 9:00, because she started being whiny and fussy, but it was a normal whiny and fussy.
> Q. When did she start being whiny and fussy?
> A. She had her first bottle at 9:00 p.m.; her next one was at midnight; next one was at 4:00.
> Q. A.m.?
> A. Uh-huh (Yes). And that—and then the 4:00 is when she started getting really, really off-the-wall whiny, between 4:00 and 9:00 in the morning of the 24th.
> Q. Okay. So when you say she had her first bottle at 9 p.m. that was the first bottle of powder?
> A. Of powder on the 23rd.

5

Q. 9:00 p.m. Then you called your mom also on the 23rd, sometime between 9:00 and midnight?

A. Yes.

Q. Because she was—

A. Because she was being –

Q. fussy?

A. Just being fussy. Normal fussy.

Q. Okay. Did you tell your mom that she had been crying?

A. Yes.

Q. And so had she been crying?

A. Yes.

Q. And how long had she been crying when you called your mom?

A. Not very long. It was just whiny.

Q. Just whiny. Did you call your mom every time she got fussy?

A. No. No. I was just –

Q. So was there something different about this one?

A. It wasn't different until the 24th.

Q. Okay.

A. Between 4:00 and 9:00 a.m. on the 24th.

(Exhibit N, Surber Depo. at 293-95).[3]

Q. Okay. That last paragraph there, and tell me if I am reading it wrong, it say, I remember Megan called me Wednesday evening, April 23, 2008, to say that Jeanine was crying and crying. Do you see that?

A. Uh-huh (Yes).

Q. Is that what you told your mother that night?

A. Yes.

(Exhibit B, Surber Depo. at 296-97).

Q. 12:00 a.m. –was the formula that you fed her around 12:00 a.m. prepared at some point before 12:00 a.m.?

A. Yes.

Q. Okay. When was that formula prepared?

A. I don't know. I don't know.

Q. Okay.

A. But I had them prepared because it was in the middle of the night, so I didn't have to get up and mix, so it was just ready to go, all I had to do is heat it up.

---

[3] Exhibit N consists of excerpts of the Surber deposition which were not included in Exhibit B which is Abbott's excerpts of her deposition.

6

Q. Okay. So you made several feedings at once?

A. Two.

Q. Two feedings. So the 12:00 and the 4:00?

A. Yes.

Q. And was –did you make those feedings sometime between 9:00 p.m. and 12:00?

A. Yes.

Q. Okay.

A. And stored in the fridge.

Q. Okay got it. Did she eat those?

A. When it came time for her next feeding, yes.

(Id. at 299-301).

Q. Okay. How about after 4:00 a.m., did you try to feed her sometime after that?

A. Just her midnight, her 4:00, the 8:00 – like 8:30, 9:00 the next morning, by the time I prepared the next bottle as I was getting ready to feed her.

Q. So the 8:30 was make it, feed it?

A. Making it and then feeding her at 9:00.

Q. did she eat that one?

A. At 9:00, that's when she started getting really, really, really finicky. She didn't want to eat.

Q. So she was finicky right around 9:00 a.m.?

A. Yes.

(Id. at 301).

Q. So you went to the hospital at 6:00 p.m., around 6:00 p.m.?

A. What time did I call her [Dr. Caldwell]? I said 6:00, right?

….

Q. Did you see someone before you went to St. Luke's and then they sent you to St. Luke's?

A. Dr. Caldwell.

Q. Okay.

A. Because I was so irritated, because – I called her because she wouldn't eat, she wouldn't quit crying, because it was a hyena cry, nonstop.

Q. When did the hyena cry start?

A. About 9:00.

Q. Okay.

A. And then I went to feed her. She didn't want to eat. So I just thought it was just like a – what do you call it—colicky. So I thought she was just colicky

7

and everything else. So I just tried to comfort her. And then I tried to feed her another bottle that I would have prepared—I prepared. And she—

Q. So there was another bottle you prepared after 8:30?

A. 8:30, 9:00, so her feeding would have been at 9:00, so her next one would have been 9:00, 10:00, 11:00, 12:00—1:00.

Q. Did you make that bottle?

A. Yes, I did. Made that bottle as I prepared it, because she didn't drink the other one, so that one got thrown out.

Q. Okay so you threw away the 8:30. She didn't drink that one?

A. She still wouldn't eat. And she got worse.

Q. At 1:00. She's still not eating at 1:00. So she didn't eat the 8:30, and she doesn't eat at 1:00. Did you try to feed her again before you went to the doctor at 1:00 p.m.?

A. No.

Q. Okay.

A. No. And that's when I started getting really tired and cranky myself.

(Id. at 301-04).

Q. Okay. And what did you tell her [Dr. Caldwell] when you called her before you brought her [J.M.K.] to the –

A. She wouldn't eat. She wouldn't—she was crying like a hyena. There is just definitely something wrong. Nothing is comforting her.

Q. And so—

A. And fevers.

Q. And fevers?

A. Yes.

Q. What was her fever?

A. I don't remember, but it was –it was high.

Q. When's the first time—

A. And I—

Q. I'm sorry.

A. I don't remember.

Q. It was just high. When was the first time you checked her temperature? Was it the 23rd ? 24th?

A. I don't remember.

Q. How many times did you check her temperature?

A. I don't remember.

Q. But whatever you told the doctor, by the time you got there, she had decided whatever you told her was enough to get her admitted to the hospital?

A. Yeah.

(Exhibit N, Surber Depo. at 305-06).

8

Abbott also argues that Ms. Surber's affidavit is inconsistent with the Plaintiff's Answers to Abbott's First Set of Interrogatories. That is not accurate. The only Answer to Interrogatories which in any way discusses the same subject matter as Ms. Surber's affidavit provides as follows:

> On April 17th through the morning of April 23rd—J.M.K. was fed Similac Neosure ready to feed from the 6 pack containers as well as the bottle of the Similac Neosure liquid in the larger container from St. Luke's. On April 23rd, J.M.K. was fed her first bottle from the Similac Neosure PIF (from St. Luke's) after that time, her parents had difficulty feeding her. The liquid ready to feed that was in bottle containers were single use. They are stored at room temperature. The larger container of the liquid ready to feed was stored at room temperature and then in the fridge after opening. The PIF was stored at room temperature.
>
> The product was prepared after reviewing the label on each container. The PIF was mixed with tap water and both the utensils and the water was boiled.

(Exhibit E , Plaintiff's Answers to Interrogatories, No. 11).

Abbott inaccurately claims that Ms. Surber's affidavit is inconsistent with Diana Terrell's deposition testimony. Mrs. Terrell's deposition testimony covering the same subject matter as Ms. Surber's affidavit provides as follows:

> Q. Until—Okay. Then the next paragraph says I remember Megan called –I can't read that. Does it say—
> A. Megan called me Wednesday evening –it says—April 23rd to say [J.M.K.] was crying and crying.
> Q. What time did she call you?
> A. Not early evening. Later evening, maybe.
> Q. Well—
> A. 9:00, or so.
> Q. She called you about 9:00?
> A. Yeah.
> Q. And can you remember exactly what she said?
> A. No, I can't remember exactly what she said.
> Q. Can you remember, as best you can, what she told you.

9

A. Just that she was fussy. And she was all tensed up and upset. And just normal, you know, new mom stuff.

Q. And I asked a poor question. When you say she was tensed up, does it she, Megan, was tensed up or she, J.M.K. was tensed up?

A. Megan was nervous because she was crying.

Q. Megan was nervous because the baby was crying?

A. Yes.

Q. Did she describe to you how the baby was crying?

A. She didn't say any particular thing. She just said she was crying.

Q. Was Megan calling to ask you for your advice?

A. I think probably that and just so that she could talk to her mom.

Q. Sure. I mean you have been through this before?

A. Yes.

Q. When she called you and said that the baby had been crying and that she was –she, Megan, was nervous or anxious what did you tell her?

A. I would imagine that I just told her that, you know, babies cry. An, you know, just normal mom stuff that you would say to a daughter that was upset because she was crying and she was worried.

Q. Could you hear Jeanine crying in the background?

A. Not that I remember, no.

(Exhibit C, Diana Terrell Depo. at 56-58).

Q. So my understanding, that's about Wednesday evening at 9:00?

A. Yeah.

Q. Did Megan tell you if she was going to do anything regarding the baby at that time?

A. No.

Q. Did you give her any advice at that time?

A. Not that I remember. Just –no.

Q. The next sentence says she went to the hospital. Did I read that correctly?

A. She went to the hospital Thursday April 24th.

Q. Oh, I see. And what is the rest of that?

A. A.m. to pick up James.

Q. Okay.

A. And took [J.M.K] to the pediatrician's office that same day, still screaming. It says p.m.

Q. And what does that mean?

A. Well, I don't know. I think that –the only thing that I could think of is that I must have talked to her from work and she was still upset because [J.M.K.] was crying.

Q. So when you talked to her—you would have been at work during the day of April 24th?

10

A. Yeah. Yes.

Q. We established that's a Thursday.

A. Yes.

…

Q. Did you know she was going to the pediatrician that day?

A. No, not for sure. Not Wednesday night, no. Is that what you are talking about?

Q. No, I'm talking about on Thursday. Did she tell you on Thursday she had gone to the pediatrician?

Q. The only thing I can really say is that I'm sure that I probably talked to her during the day if [J.M.K.] was still upset, and told her if she was still crying to take her the doctor's office.

Q. All right. Now do you see that last word of the sentence where you have "screaming" and have "p.m." above it?

A. P.M.

Q. Would that indicate that she went to the pediatrician Thursday afternoon?

A. Yeah.

Q. And as best you can remember, recollect the day, is that what she told you, that she took [J.M.K.] to the pediatrician Thursday afternoon?

A. Yes.

Q. Okay. When—Do you think you talked to her during the day while you were at work on Thursday?

A. Yeah, I really think I did.

Q. Do you recall what she told you?

A. No, I don't.

Q. Do you recall even the tone of her voice? Was she upset?

A. I –yeah, I think she was upset. And I may have even suggested that she take her to the doctor's office if she was still crying.

Q. And do you know—can you tell—can you recall whether or not the crying was any worse on Thursday than it had been Wednesday night?

A. I didn't hear her crying, so I don't know.

Q. All right. And did you discuss that with Megan, whether it was worse than it had been the night before?

A. Yeah. When she –she called—yeah. When I talked to her form work, it was still bad.

Q. How did she describe it?

A. I don't remember.

(Id. at 59-63).

Q. And am I correct that Megan called you about 9:00 p.m. on Wednesday night and said the baby was crying, but you didn't hear the baby crying?

A. No. Yes, she called, and no, I didn't hear the baby crying.

Q. And did she describe the crying for you? Was it every once in a while? Was it constant? Was it a pitch? Do you remember anything about the description of the cry?

A. No. Just that she had been crying a lot. I don't know—

Q. Did Megan seem upset because [J.M.K.] had been crying a lot?

A. Yes.

Q. Did Megan ever say to you it sounds bad to me, maybe I ought to do something?

A. No.

Q. Okay.

A. Not that evening, no.

Q. Did she ever say to you that it seemed bad, I ought to do something?

A. I don't remember.

Q. When you talked to her on –you think you talked to her on Thursday, correct?

A. I would assume we talked on Thursday, yes.

Q. And do you recall her describing the crying to you when you talked to her on Thursday?

A. Just that she was still crying.

Q. Did she describe the type of crying she was doing?

A. Well, not just a normal baby cry.

Q. She was worried about the cry?

A. Yes.

Q. Did she ever say she was howling like a hyena?

A. Not that I remember, no.

(Id. at 78-80).

Abbott states that Ms. Surber's testimony contradicts the written statement provided by Mrs. Terrell. This is also not true. The only portion of Mrs. Terrell's written statement that deals with the same subject matter as Ms. Surber's affidavit provides as follows:

> I remember Megan called me Wednesday, April 23, 2008, to say [J.M.K.] was crying and crying. She went to the hospital Thursday April 24[th] to pick up [twin brother] and took [J.M.K.] to the pediatrician's office the same day still screaming p.m.

(Exhibit D.)

12

Finally, Abbott argues that the Surber affidavit is inconsistent with medical records. Some differences between the medical records and Ms. Surber's deposition testimony exist.[4] The medical providers records are vague as to when exactly the baby began not feeding as she normally would. Accordingly, it cannot be determined whether or not the medical records are inconsistent with Ms. Surber's affidavit relating to when feeding activities changed based the contents of the records. The parts of the medical records that discuss taking the baby's temperature are consistent with Ms. Surber's testimony as provided in her affidavit. The medical records also note that the baby was "fussy all the night prior to admission." The only discrepancy between the medical records and Ms. Surber's testimony is that the medical records note that "since last night [the baby] has been fussier than normal." This statement is not accurate. Ms. Surber cannot control what is typed into the medical records. She

---

[4] The admitting records from St. Luke's provide, in part:
> Mom states that since last night she has been fussier than normal. This morning her temperature was 99.1 and this afternoon, her temperature went up to 100.7 degrees rectally. She has been fussy throughout the day. She has not been eating as well as normal.

The relevant portion of the history and physical records from the Omaha Children's Hospital provide:
> The child, was described, had been fussy all the night prior to admission and on the morning of admission had a temperature of 99.1 degree Celsius, which went up to 100.7 degrees Celsius when checked rectally. The child also had been not eating well for the past day.

The relevant portion of the discharge summary records from the Omaha Children's Hospital provide:
> Briefly, the patient was at the time of admission a 12-day-old infant produce of a term twin pregnancy delivered by cesarean section with an unremarkable past medical history. She began not eating well in the 24 hours prior to her admission. She then developed a low grade fever to 100.7 rectally.

(Exhibits F, G and H).

13

has been consistent in her testimony that while the baby was fussy during the evening of April 23rd, it was a normal fussy. Ms. Surber's deposition testimony as it relates to this particular issue has been reproduced herein in full so that the Court may review it in its entirety when considering Abbott's motion to strike the Surber affidavit.

## II.

## LEGAL ARGUMENT

The parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." Bass v. City of Sioux Falls, 232 F.3d 615, 618 (8th Cir. 1999). "District courts, however, must use extreme care in examining such issues and only grant summary judgment where 'the conflicts between the deposition and affidavit raise only sham issues.'" City of St. Joseph, Missouri v. Southwestern Bell Telephone, 439 F.3d 468, 476 (8th Cir 2006). Thus, when a subsequent affidavit supplements, seeks to explain, or adds more detailed the information to the affiant's previous deposition testimony, the affidavit is properly considered on summary judgment. Helm Financial Corp. v. Iowa Northern Ry. Co., 214 F. Supp. 2d 934, (N.D. Iowa 2002) (Judge Bennett), citing Bass, 232 F.3d at 619; see also Fast v. Southern Union Co., Inc., 149 F.3d 885, fn. 7 (8th Cir. 1998) (Judge Heaney determined that affidavit supplementing deposition testimony is properly considered on summary judgment).

A deponent has no duty to volunteer information. Bass, 232 F.3d at 618; Baker v. Silver Oak Senior Living Mgmt. Co., L.C., 581 F.3d 684, 691 (8th Cir.

2009). Therefore, when a subsequent affidavit addresses topics that were not inquired about in the deposition, the affidavit is supplementary – as opposed to contradictory – and may be considered on summary judgment. Id. Moreover, if the subsequent affidavit seeks to explain portions of their previous deposition testimony which is unclear, the district court should not strike the affidavit. Southwestern Bell Telephone, 439 F.3d at 476.

Abbott fails to cite important 8th District cases which directly relate to this issue and must be addressed in order to demonstrate appropriate candor to the Court. For example, Abbott fails to cite Helm Financial Corp. v. Iowa Northern Railway Co., 214 F. Supp. 2d 934 (N.D. Iowa 2002). In that case, Judge Bennett discussed this very issue, stating:

> [T]he 8th Circuit Court of Appeals has also explained that, where the affidavit testimony seems consistent with the affiant's prior deposition testimony, or simply adds more detailed information, the court may properly consider the affidavit on summary judgment. *Bass, 232 F.3d at 619*. Similarly, the court has recognized "that there are 'narrow circumstances' in which a subsequent affidavit is appropriate, such as to explain certain aspects of the deposition testimony or where the prior testimony reflects confusion on the part of the witness." [citation omitted]. In such circumstances, 'It would be for the jury to resolve the discrepancy in the deposition testimony and the affidavit." [citing Herring v. Canada Life Assur. Co., 207 F.3d 1030, 1031 (8th Cir. 2000)].

Helm, 214 F. Supp. 2d at 955. Judge Bennett properly considered the affidavit and denied summary judgment. Abbott also fails to cite Baker, 581 F.3d 684; Bass, 232 F.3d 615; and Fast, 149 F.3d 85.

On a very hot July day, Megan Surber's deposition began at 9:12 a.m. and ended at 5:42 p.m. The transcript contains 422 pages of testimony. During this

marathon, Plaintiff's attorney made exactly four objections. The deposition pitted Abbott's attorney, a Harvard law graduate, against Megan Surber who graduated from high school. It is, therefore, ironic that the affidavit was necessary in order to provide Plaintiff's expert with important information not covered in the deposition: events occurring from 9:00 p.m. until after the 4:00 a.m. feeding. The affidavit provided that information, stating that until 8:30 a.m. events were normal and unremarkable. Mother and baby went to sleep. Baby woke mother at midnight for her feeding. Mother and baby slept until 4:00 a.m. At 4:00 a.m., baby woke mother for her feeding. Mother and baby went to sleep and awoke at a normal time in the morning when the baby's behavior changed. Nothing in the affidavit contradicts the deposition of Megan Surber or her answers to Abbott's interrogatories. Nothing.

Abbott complains that the affidavit contradicts the deposition testimony of Diana Terrell who is Megan Surber's mother. As noted above, no contradiction exists. Even if it did, an affidavit which contradicts the testimony of another person is not a "sham affidavit." It merely demonstrates a difference in recollection.

Abbott, however, stretches its arguments further. It cites hospital records which contain some small differences with Ms. Surber's deposition testimony. This type of contradiction, however, is common in personal injury cases and certainly does not constitute cause for striking an affidavit.

This issue is important because Abbott's medical experts opine that the infant was infected before she ever consumed Abbott's PIF. The fact that mother

and baby had a routine night completely refutes Abbott's experts. In fact, it makes them look silly because it suggests that every baby who cries for no reason in the evening should be rushed to the doctor because they may have a bacterial infection. Abbott's experts make no more sense than this motion.

Abbott suggests that Plaintiff submitted the Surber affidavit in an effort to counter Abbott's argument that the baby had a *Cronobacter* infection before she consumed PIF. As noted above, however, the affidavit was drafted before Plaintiff's experts disclosed their reports in an effort to provide those experts with complete information. Abbott did not disclose its experts until January 2013. It was only then that Plaintiff understood that Abbott would argue that the baby was already sick when she consumed her first PIF.

## III.

## CONCLUSION

For the reasons stated in this Memorandum, Plaintiff respectfully requests that Abbott's motion to strike the Surber affidavit be denied and that the affidavit be considered as part of the record for purpose of the summary judgment motion.

/s/ Stephen C. Rathke
Stephen C. Rathke
**LOMMEN, ABDO, COLE,**
**KING & STAGEBERG, P.A.**
2000 IDS Center, 80 South 8th Street
Minneapolis, Minnesota 55402
Phone:612- 339-8131/Fax:612-339-8064
E-Mail:steve@lommen.com

and

17

Timothy Bottaro
Amanda Van Wyhe
**VRIEZELAAR, TIGGES, EDGINGTON,**
**BOTTARO, BODEN & ROSS, L.L.P.**
613 Pierce Street/P.O. Box 1557
Sioux City, Iowa 51102
Phone:712-252-3226/Fax:712-252-4873
E-Mail:avanwyhe@siouxcitylawyers.com
E-Mail:tbottaro@siouxcitylawyers.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I, Stephen C. Rathke, certify that on the 17th day of May, 2013 I served the foregoing via electronic delivery to all parties that have filed an appearance in this matter at their e-mail addresses on filed with the Court.

June Ghezzi
Gabriel Scannapieco
JONES DAY
77 West Wacker Drive
Suite 3500
Chicago, IL 60601
jkghezzi@jonesday.com
gscannapieco@jonesday.com

John Gray
HEIDMAN LAW FIRM
1128 Historic Fourth Street
P.O. Box 3086
Sioux City, IA 51102
John.Gray@heidmanlaw.com

/s/ Stephen C. Rathke

# EXHIBIT N

## Excerpts from Deposition
## of Megan Surber
### Taken July 5, 2012



COPY                                           1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF IOWA

3                  WESTERN DIVISION

4

     THE SECURITY                ) NO. 5:11-cv-0417-DEO
5    NATIONAL BANK OF            )
     SIOUX CITY, IOWA,           ) VIDEOTAPED
6    as conservator for          ) DEPOSITION OF
     J.M.K., a Minor,            ) MEGAN SURBER
7                                )
          Plaintiff,             )
8                                )
     vs.                         )
9                                )
     ABBOTT LABORATORIES,        )
10                               )
                                 )
11        Defendant.             )
                                 )
12                               )
                                 )
13                               )
                                 )
14                               )

15

16

17        The Videotaped Deposition of

18   MEGAN SURBER taken at 1128 Historic 4th

19   Street, Sioux City, Iowa, on the 5th day

20   of July, 2012, commencing at 9:12 a.m.

21

22

23

24

25

**SCHUETTS REPORTING**
CERTIFIED SHORTHAND REPORTERS

P.O. BOX 1325
SIOUX CITY, IA 51102-1325
PHONE: 712-239-1300

1 don't remember.
2    Q. Okay.
3    A. I just know -- about that big.
4    Q. Okay. And that's about --
5 you're -- it looks like over a foot long?
6    A. Yeah.
7    Q. Was it a plastic bottle or a glass
8 bottle?
9    A. Plastic.
10    Q. Plastic. Was it white?
11    A. Yes.
12    Q. Okay. And between the time that
13 you -- like how many feedings did you get
14 out of that bottle, do you recall?
15    A. I don't remember.
16    Q. About how long did it take to go
17 through the bottle, do you remember that?
18    A. I don't remember.
19    Q. Did it take more than one feeding
20 to go through the bottle?
21    A. I don't remember.
22    MR. RATHKE: Excuse me. More than
23 one feeding to go through the --
24    Q. The big bottle, the -- did you
25 just use it once or did you use it for

1 multiple feedings?
2    A. Oh, multiple feedings.
3    Q. Oh, okay. What I'm asking, so
4 that big bottle, like how many feedings?
5    A. Like a day, day and a half.
6    Q. So somewhere day, day and a half?
7    A. Uh-huh (Yes).
8    Q. And during that day, day and a
9 half, what did you do with the bottle when
10 you weren't pouring formula out of it?
11    A. It was stored in the frig.
12    Q. Okay.
13    A. Because once you open it, it has
14 to be stored in the frig.
15    Q. Okay. So you kept it in the frig?
16    A. Yes.
17    Q. So then we go down to the next
18 paragraph, and then it says on April 24th,
19 2008, JMK mother began feeding JMK the
20 Similac PIF from the PIF contained in the
21 Abbott gift bag received at discharge. Do
22 you see that?
23    A. Yes.
24    Q. And then if you go to the next --
25 Are you okay? Are you all right? You

1 were pulling on the string.
2    A. I was just making sure it wasn't
3 getting caught on my chair.
4    MR. RATHKE: Is that correct?
5    Q. I'm not done.
6    A. You're on No. 17, right?
7    Q. Yes. So it says on April 24,
8 2008, JMK's mother began feeding JMK the
9 Similac PIF from the PIF contained in the
10 Abbott gift bag received at discharge. Do
11 you see that paragraph?
12    A. No. 17, right?
13    Q. Yes. No. 17.
14    A. No. The 23rd.
15    Q. The 23rd?
16    A. Yes.
17    Q. Okay. And why do you think it is
18 the 23rd?
19    A. Because I know that's when it is.
20    Q. Okay.
21    A. The 23rd. Because I called the
22 doctor the next day, the 24th.
23    Q. Okay. Why did you call the doctor
24 on the 24th?
25    A. It was, like, 6:00 in the evening.

1    Q. Okay. And so when you reviewed
2 this before it was filed, that wasn't
3 correct, correct? Is that fair to say?
4    A. Yes.
5    Q. Okay.
6    A. Yes.
7    Q. So then we go to No. 20. And it
8 says on April 24, 2008, after being fed
9 the Similac PIF, JMK began showing signs
10 of a possible infection. Do you see that?
11    A. What number?
12    Q. Twenty.
13    A. Twenty. 24th, after being fed.
14    Q. Uh-huh (Yes).
15    A. She had it the 23rd, and she got
16 it the 24th, and she went in the 24th.
17    Q. Okay. Did you complain about her
18 condition to anyone on the 23rd?
19    A. I called my mom.
20    Q. Okay. When did you call your mom?
21    A. After 9:00, because she started
22 being whiny and fussy, but it was a normal
23 whiny and fussy.
24    Q. When did she start being whiny and
25 fussy?

1    A. She had her first bottle at 9:00
2  p.m.; her next one was at midnight; next
3  one was at 4:00.
4    Q. A.m.?
5    A. Uh-huh (Yes). And that -- and
6  then the 4:00 is when she started getting
7  really, really off-the-wall whiny, between
8  4:00 and 9:00 in the morning of the 24th.
9    Q. Okay. So when you say she had her
10 first bottle at 9 p.m., that was the first
11 bottle of powder?
12   A. Of powder on the 23rd.
13   Q. 9:00 p.m. Then you called your
14 mom also on the 23rd, sometime between
15 9:00 and midnight?
16   A. Yes.
17   Q. Because she was --
18   A. Because she was being --
19   Q. -- fussy?
20   A. Just being fussy. Normal fussy.
21   Q. Okay. Did you tell your mom that
22 she had been crying?
23   A. Yes.
24   Q. And so had she been crying?
25   A. Yes.

1    Q. And how long had she been crying
2  when you called your mom?
3    A. Not very long. It was just whiny.
4    Q. Just whiny. Did you call your mom
5  every time that she got fussy?
6    A. No. No. I was just --
7    Q. So was there something different
8  about this one?
9    A. It wasn't different until the
10 24th.
11   Q. Okay.
12   A. Between 4:00 and 9:00 a.m. on the
13 24th.
14              *  *  *  *
15         (Exhibit 11 was marked.)
16              *  *  *  *
17   Q. I'm handing you what has been
18 marked at Deposition Exhibit No. 11. And
19 this is from the DMV.
20   A. Okay.
21   Q. Okay. It looks like a fax.
22   A. Yeah.
23   Q. And do you see a to/from on that
24 first page of the fax?
25   A. Yes.

1    Q. Okay. And is that name on the
2  front, is that Diana Terrell?
3    A. Yes.
4    Q. Or Terrell?
5    A. Terrell.
6    Q. And that's your mom?
7    A. Yes.
8    Q. Okay. And have you seen your
9  mom's handwriting before?
10   A. Yeah.
11   Q. Okay. If you look through this
12 document here, all these pages, is this
13 your mom's handwriting?
14   A. Yeah.
15   Q. Okay. Okay. So if we look at the
16 second page where it says PLTF 45, do you
17 see that second page at the bottom, PLTF
18 45?
19   A. Yes.
20   Q. Okay. That last paragraph there,
21 and tell me if I'm reading this wrong, it
22 say, I remember Megan called me Wednesday
23 evening, April 23, 2008, to say that
24 Jeanine was crying and crying. Do you see
25 that?

1    A. Uh-huh (Yes).
2    Q. Is that what you told your mother
3  that night?
4    A. Yes.
5    Q. Okay. How long after you fed her
6  the powdered infant formula for the first
7  time at 9:00 p.m. on the 23rd was it
8  between that time and the time you called
9  your mother?
10   A. I don't remember.
11   Q. It was before midnight, right?
12   A. Yeah.
13   Q. Okay. And did you wake your
14 mother up?
15   A. No.
16   Q. Okay. Was she still up? Does
17 your mother usually stay up until
18 midnight?
19   A. Depending on if there is a good
20 show on.
21   Q. Okay. Is that a question to ask
22 your mother as to what time you called
23 her?
24   A. Yeah.
25   Q. Okay. Now you said that there

1 up.
2     Q. So you went to the hospital at
3 6:00 p.m., around 6:00 p.m.?
4     A. What time did I call her?  I said
5 6:00, right?
6     Q. Would it help if I showed you a
7 hospital record that says when you showed
8 up?
9     A. Yes.
10     Q. Okay.
11     A. Yeah.  Because 9:00, I made one.
12         MR. RATHKE:  He's going to show
13 you something.
14     Q. I'm looking for it.  Hold on.
15         Here.  I think I left it at the
16 hotel.  If I told you you went to
17 St. Luke's, you went -- checked in at
18 St. Luke's at 6:15 on the evening of the
19 24th, does that sound correct to you?
20     A. Yeah, that sounds correct.  Yes.
21     Q. Did you go see someone --
22     A. Because it was -- yeah.  Yeah.
23     Q. Did you go see someone before you
24 went to St. Luke's and then they sent you
25 to St. Luke's?

1     A. Dr. Caldwell.
2     Q. Okay.
3     A. Because I was so irritated,
4 because -- I called her because she
5 wouldn't eat, she wouldn't quit crying,
6 because it was a hyena cry, nonstop.
7     Q. When did the hyena cry start?
8     A. About 9:00.
9     Q. Okay.
10     A. And then I went to feed her.  She
11 didn't want to eat.  So I just thought it
12 was just like a -- what do you call it --
13 colicky.  So I thought she was just
14 colicky and everything else.  So I just
15 tried to comfort her.  And then I tried to
16 feed her another bottle that I would have
17 prepared -- I prepared.  And she --
18     Q. So there was another bottle you
19 prepared after 8:30?
20     A. 8:30, 9:00, so her feeding would
21 have been at 9:00, so her next one would
22 have been 9:00, 10:00, 11:00, 12:00 --
23 1:00.
24     Q. Did you make that bottle?
25     A. Yes. I did. Made that bottle as I

1 prepared it, because she didn't drink the
2 other one, so that one got thrown out.
3     Q. Okay.  So you threw away the 8:30.
4 She didn't drink that one?
5     A. She still wouldn't eat.  And she
6 got worse.
7     Q. At 1:00.  She's still not eating
8 at 1:00.  So she didn't eat at 8:30, and
9 she doesn't eat at 1:00.  Did you try to
10 feed her again before you went to the
11 doctor at 1:00 p.m.?
12     A. No.
13     Q. Okay.
14     A. No.  And that's when I started
15 getting really tired and cranky myself.
16     Q. Sure.  Now when you took her to
17 the doctor, did you bring any formula with
18 her -- with you to try to feed her?
19     A. I don't recall.
20     Q. So you don't recall if you made a
21 bottle or --
22     A. I don't --
23     Q. -- or just brought some formula?
24     A. I don't remember.
25     Q. Now when you went to go see the

1 doctor on the 24th, did you bring the
2 formula with you that day to the doctor,
3 the 24th?
4     A. I don't remember, because I called
5 her, made an appointment.  She told me to
6 come in.  Drove all the way across town.
7 Got her out of the car.  Got her in the
8 doctor's office.  Went to get her out of
9 the car seat and they stopped me and said,
10 no, we have you registered at St. Luke's.
11         So Dr. Caldwell didn't even look
12 at her, test her, touch her, didn't even
13 go in the back office.  She immediately
14 let me walk in the door and let me walk
15 right back out and go to St. Luke's.  She
16 already admitted me before I even got to
17 her.
18     Q. Okay.  And what did you tell -- so
19 you had called her before on the 24th?
20     A. At that time, yes.
21     Q. Okay.  And what did you tell her
22 when you called her before you brought her
23 to the --
24     A. She wouldn't eat.  She wouldn't --
25 she was crying like a hyena.  There is

1  just definitely something wrong.  Nothing
2  is comforting her.
3     Q. And so --
4     A. And fevers.
5     Q. And fevers?
6     A. Yes.
7     Q. What was her fever?
8     A. I don't remember, but it was -- it
9  was high.
10    Q. When's the first time --
11    A. And I --
12    Q. I'm sorry.
13    A. I don't remember.
14    Q. It was just high.  When was the
15 first time you checked her temperature?
16 Was it the 23rd?  24th?
17    A. I don't remember.
18    Q. How many times did you check her
19 temperature?
20    A. I don't remember.
21    Q. But whatever you told the doctor,
22 by the time you got there, she had decided
23 whatever you told her was enough to get
24 her admitted to the hospital?
25    A. Yeah.

1     Q. Sight unseen?
2     A. I was in route to her.  She
3  already had me -- so I was quite mad when
4  I got there.  It was like, well, you could
5  have told me that on the phone, I could
6  have went straight to St. Luke's because
7  it was closer.
8     Q. Okay.  Her first powdered infant
9  formula was 9:00 p.m., so when was the
10 last time she had liquid?  Was that three
11 or four hours before?
12    A. Uh-huh (Yes).
13    Q. Okay.  So around 5:00 or 6:00
14 p.m.?
15    A. Yes.
16    Q. Now other than crying and fever
17 between the 23rd and 24th, did anything
18 else change?  Was she nauseous -- Jeanine?
19    A. I don't remember.
20    Q. Did she have any type of diarrhea
21 or anything like that?
22    A. I don't remember.
23    Q. Any other symptoms that you
24 remember seeing other than the crying and
25 the fever between the 23rd and the 24th --

1     A. Just the discomfort.  Not knowing
2  what to do.
3     Q. Okay.  Now at some point that day
4  on the 24th you went to go pick up your
5  son James, correct?
6     A. Yes.
7     Q. When was that?
8     A. Sometime in the morning.
9     Q. Was it after that feeding you
10 tried at 8:30?
11    A. Uh-huh (Yes).
12    Q. Okay.
13    A. I don't remember -- I don't
14 remember.
15    Q. Okay.
16    A. I --
17    Q. Was it in between that feeding and
18 the next?
19    A. At some point I had to leave to go
20 get him.
21    Q. Okay.
22    A. So --
23    Q. But you just don't remember?
24    A. I don't remember what time.
25    Q. Okay.  But you remember there was

1  a period of time that they were home for
2  about six or seven hours together?
3     A. Uh-huh (Yes).
4     Q. Okay.  And so you had already
5  brought James home before then?
6     A. Yes.
7     Q. Okay.  And you brought her to the
8  hospital around 6:00 p.m.?
9     A. Yes.
10    Q. Okay.  So probably sometime in the
11 morning; is that fair to say?
12    A. Yes.
13       MR. SCANNAPIECO:  Okay.  Let's
14 take a quick break.  I could probably
15 shorten some stuff.
16             *  *  *  *
17       (A recess was taken from 3:30 p.m.
18 to 3:39 p.m.)
19             *  *  *  *
20       THE VIDEOGRAPHER:  We're on the
21 record.
22    Q. (By Mr. Scannapieco) Ms. Surber,
23 before we went on the break, you talked
24 about the first call you had to
25 Dr. Caldwell on the 24th.