# EXHIBIT A

Page 1

HIGHLY CONFIDENTIAL


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IOWA
WESTERN DIVISION

-----------------------------------
THE SECURITY NATIONAL BANK OF      )
SIOUX CITY, IOWA, as conservator   )
for J.M.K., a minor,               )
          Plaintiff,               )
                                   )   CIVIL ACTION NO.
     V.                            )   5:11-cv-04017-DED
                                   )
ABBOTT LABORATORIES,               )
          Defendant.               )
-----------------------------------


D E P O S I T I O N
- of -
L. SCOTT DONNELLY, Ph.D.




taken on behalf of the Defendant on Friday,
January 25, 2013, at the offices of Court
Reporters Associates, 148 College Street, 2nd
Floor, Burlington, Vermont, commencing at
8:06 AM.




COURT REPORTER:  JOHANNA MASSÉ, RMR, CRR

1      Q.    Okay.  You're not an expert on FDA laws and

2   regulations, are you?

3      A.    I am -- I have spent most of my professional

4   life in organizations who deal with the FDA and their

5   laws and regulations, so I have a working knowledge of

6   how they are applied specifically to food factories and

7   infant formula factories.

8      Q.    Um-hum.  Okay.  You're not a labeling expert,

9   are you?

10     A.    No.

11     Q.    Okay.  You don't have a psychology degree or a

12   human factors degree?

13     A.    No.  I'm feeling deficient.  Am I -- am I --

14     Q.    No.  I don't, either.  No, no, no.  But you

15   don't have these?  We just have to figure out what

16   you're not doing.

17          You're not a nutritionist, correct?

18     A.    My Ph.D. is in food science and nutrition, so

19   I took a test in nutrition, I have a working knowledge

20   of nutrition, and I -- I worked as -- on teams for

21   product development for different products over the

22   years, so I am -- I am quite knowledgeable about

23   nutrition even though I don't have a specific degree

24   that says that's what I am.

25     Q.    Okay.  Did part of your work involve the

1      Q.   I understand.  I understand.  Okay.  You're
2  not opining on the child's medical course?
3      A.   No.
4      Q.   Right.  Okay.  And you're not opining on
5  medical causation for E. sak infection?
6      A.   No.
7      Q.   Right.  Okay.  And certainly not on the
8  child's prognosis or anything like that?
9      A.   No.  The only thing I will opine on is I'm
10  keenly aware, having worked at Wyeth, that this
11  particular kind of powder intended for low birth weight
12  should not have been fed to this infant.  They should
13  not have been fed a powder.  They should have been fed
14  ready-to-feed liquid.
15          MS. GHEZZI:  Okay.  I'm going to move to
16  strike that as nonresponsive to any question.
17      Q.   You were not asked to opine on an incubation
18  time, either, right?  Incubation time within the child?
19  Incubation --
20      A.   No.
21      Q.   And we already said you're not asked to opine
22  on infectious dose, correct?
23      A.   Correct.
24      Q.   Okay.  Now, from 2001 to -- do you want to
25  take a break?

1    other pieces.

2         Q.   Okay.

3         A.   I'm not a medical doctor, obviously, so --

4         Q.   I understand that.  I just want you to answer

5    my question yes or no.  Were you aware of the fact that

6    one of the twins was in the hospital the first ten days

7    of life while JK, the baby who was ill, was home the

8    first ten days of life --

9         A.   No.

10        Q.   Okay.  You were not aware of that.  All right.

11        A.   Did not factor into my decision or my feedback

12   there.

13        Q.   Were you aware that one baby -- that the

14   babies had completely different sets of caregivers

15   during that period of time leading up to the time when

16   JK became ill?

17        A.   Okay.  I'm just going to say no, I'm not.

18        Q.   Okay.

19        A.   That's not a -- that was not part of my

20   report.

21        Q.   And did you account for the different kinds of

22   exposures that the baby who was still in the hospital

23   would have versus the baby who was home, the

24   exposures -- environmental exposures that the baby

25   would have?  In other words, there's a different water

Page 90

1    source from -- between the hospital and the home

2    environment.  Did you consider that?

3         A.   No.

4         Q.   Were you aware of the fact that in the family

5    home there had been a sewer backup in the basement that

6    flooded the basement and that the little boy, half

7    brother, eight-year-old, had his bedroom down there?

8    Were you aware of that fact?

9         A.   No.

10        Q.   Did anybody tell you that fact, or did you

11   read it anyplace?

12        A.   My focus was on the factory environment, what

13   happened at the factory.

14        Q.   Sure.  I understand.  But -- but --

15        A.   So you -- I'm -- again, my area of expertise

16   is not as a medical doctor.

17        Q.   Right.

18        A.   It's not as causation.  I did not do a review

19   of the family's feeding practice nor the environment

20   that the infant was brought up in.

21        Q.   Right.  Okay.  So you really can't say

22   anything about causation because you're not a causation

23   expert.

24        A.   That's my point, yes, ma'am.

25        Q.   So you're -- you're -- Okay.  Did you

Case 5:11-cv-04017-MWB-CJW   Document 114-2   Filed 07/19/13   Page 6 of 99

# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF IOWA

WESTERN DIVISION


THE SECURITY NATIONAL BANK
OF SIOUX CITY, IOWA, as
conservator for J.M.K.,
a Minor,

      Plaintiff,

                                CASE NUMBER
                                5:11-cv-04017-DEO

    vs.

ABBOTT LABORATORIES,

      Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JOHN J. FARMER, III, Ph.D.

(TRANSCRIPT DESIGNATED HIGHLY CONFIDENTIAL)


February 7, 2013

9:00 a.m.


Suite 800

1420 Peachtree Street, N.E.

Atlanta, Georgia


Richard Bursky, RMR, CRR, CCR-2509

Page 38

1    consumer.

2         Q.  You have never worked for the FDA, right?

3         A.  I was a member of the United States Public

4    Health Service of which FDA is one of the five

5    agencies, but I've never been assigned to FDA as a

6    member of the Public Health Service.

7         Q.  Have you ever reviewed a label for the FDA of

8    any product?

9         A.  No.

10        Q.  Have you ever produced a label for any product

11   on the US market?

12        A.  Yes.

13        Q.  What label was that?

14        A.  These are reprocessed medical devices for

15   Hygia Health Services for which I serve as the director

16   of infection control.

17        Q.  But you haven't created any labels for any

18   food products?

19        A.  No.

20        Q.  You never worked for Codex?

21        A.  Spell.

22        Q.  C-O-D-E-X, have you heard of the Codex?

23        A.  Yes.

24        Q.  Have you ever worked for that?

25        A.  No.  I thought you were saying C-O-T-E-X,

1   which --

2        Q.  No, not Cotex the -- no.

3        A.  Which is a little more interesting.

4        Q.  It is, but I think you have talked about that

5   before in the past.  Have you ever been to a powdered

6   infant formula plant?

7        A.  No.

8        Q.  And that includes Abbott, right?

9        A.  Correct.

10       Q.  Have you ever seen a dry mix manufacturing

11  line?

12       A.  Of powdered infant formula?

13       Q.  I guess of any powdered product.

14       A.  Only in my own kitchen.

15       Q.  But not actually a manufacturing line ever?

16       A.  Not a commercial.

17       Q.  So maybe you have looked at some Bisquick just

18  like I have, but that doesn't make neither of us having

19  actually seen the line, correct?

20       A.  Correct.

21       Q.  So is it fair to say you have never seen a wet

22  mix manufacturing line?

23       A.  A commercial one, no.

24       Q.  How about a spray dryer, have you ever seen a

25  spray dryer that is used in making powdered infant

1    formula?

2        A.  Only in video, never in person.

3        Q.  How about an agglomerator, have you ever seen

4    one of those in person?

5        A.  No.

6        Q.  How about filling equipment used for powdered

7    infant formula, have you ever had the chance to see

8    that type of equipment?

9        A.   In all these questions, you are saying in

10   person; is that correct?

11       Q.  Yes.

12       A.  No.

13       Q.  Have you had the opportunity to go to a

14   company that creates one of the things that is used in

15   powdered infant formula manufacturing, have you ever

16   gone to inspect any of the type of equipment used in

17   powdered infant formula manufacturing?

18       A.  No.

19       Q.  And you have never designed, I take it then, a

20   powdered infant formula manufacturing process?

21       A.  Only in deposition.

22       Q.  So no, you have never done that for any

23   company?

24       A.  Only in deposition.

25       Q.  My question was, have you ever done that for

1    any company?

2         A.   Yes.

3         Q.   Which company did you do that for?

4         A.   I can't say.

5         Q.   In the deposition?

6         A.   Yes.

7         Q.   Did you test it?

8         A.   No.

9         Q.   You don't know if could work?

10        A.   I think it would work.

11        Q.   Do you know how much it would cost?

12        A.   No.

13        Q.   Do you know what types of formula you could

14   make in it?

15        A.   I have some ideas, yes.

16        Q.   But you didn't test that, the possibility to

17   see if it actually worked?

18        A.   I gave them the ideas to let them do it.

19        Q.   Do you know if they did it?

20        A.   No.

21        Q.   You have never designed a powdered infant

22   formula finished product testing process for a

23   manufacturer, have you?

24        A.   No.

25        Q.   So I take it then if you haven't designed one,

1    you haven't tested or validated one either, have you?

2         A.  Not personally, no.

3         Q.  Have you ever designed an environmental

4    testing protocol for a powdered infant formula

5    manufacturer?

6         A.  No.

7         Q.  So then again, if you haven't designed one, I

8    assume you haven't either tested or validated one

9    either?

10        A.  I have only read the validations.  I have

11   never done the validations.

12        Q.  You are not a nutritionist, right?

13        A.  I have no Ph.D. in nutrition, no.

14        Q.  And you have never developed an infant formula

15   of any type?

16        A.  Yes, I have.

17        Q.  You developed an infant formula?

18        A.  For my daughters.

19        Q.  For your dogs?

20        A.  Daughters.

21        Q.  For your daughters?

22        A.  Yes.

23        Q.  What was the infant formula that you gave to

24   your daughters?

25        A.  It was skim milk with added skim milk solids

JOHN J. FARMER, III, Ph.D.                                    February 7, 2013
SNB OF SIOUX CITY, IOWA vs. ABBOTT LABS

Page 44

1      A.  Let me clarify that.  It is probably not an

2  infant formula.  They were probably above the age of

3  infants.  They were probably children, but not infants.

4      Q.  So let's break that down into two questions.

5  Going back to my original question then, is it true

6  that you have never designed an infant formula,

7  correct?

8      A.  Only at deposition.

9      Q.  Just like I can design one now, you have only

10  just thought about how you would design it; you have

11  never actually tried it?

12          MR. RATHKE:  I object to the form of the

13      question.

14          THE WITNESS:  True.

15      Q.  (By Mr. Scannapieco) You have never published

16  any studies on the risks or benefits of powdered versus

17  ready-to-feed formula, have you?

18      A.  Could you repeat the question?

19      Q.  You have never published any studies on the

20  risks or benefits of powdered versus ready-to-feed

21  formula, have you?

22      A.  No.

23      Q.  You have never published any studies on the

24  levels of contamination found in ready-to-feed products

25  when stored after opening, have you?

1    just gotten on the wound?

2         A.  Yes, that's possible.

3         Q.  You weren't asked to opine on damages in this

4    case, were you?

5         A.  Not in my report, no.

6         Q.  You haven't offered any opinions on damages in

7    your report, have you?

8         A.  Not in my report.

9         Q.  You haven't offered any opinions on the

10   child's prognosis?

11        A.  No.

12        Q.  In your report I saw some opinions on the

13   warning label.  You are aware that Plaintiff has

14   withdrawn you as an expert on warning labels; is that

15   correct?

16             MR. RATHKE:  Well, I think what we said was

17        that we do not expect Dr. Farmer to offer any

18        opinions on the label.

19             MR. SCANNAPIECO:  Is he going to offer

20        opinions on the label or not?

21             MR. RATHKE:  We don't expect him to.

22             MR. SCANNAPIECO:  Is that he is not going to?

23             MR. RATHKE:  If Dr. Goldhaber is alive and

24        well and at the trial, Dr. Farmer will not.

25             MR. SCANNAPIECO:  So only if Dr. Goldhaber

1       dies will he offer a labeling opinion?

2           MR. RATHKE:  Dr. Goldhaber is our labeling

3       opinion.  Dr. Jason will speak to the label.

4       Dr. Farmer will not.  That is our plan.

5           MR. SCANNAPIECO:  Okay.

6           MR. RATHKE:  We don't have to be concerned

7       about duplication of expert testimony, so all

8       these things need to be sorted out.

9           MR. SCANNAPIECO:  I know that there can be

10      some duplication, but our understanding is, just

11      like I am not going to expect Scott Donnelly to

12      talk about the label, I am not going to expect Dr.

13      Farmer to talk about it either.

14          MR. RATHKE:  I think those would be

15      equivalent.

16          MR. SCANNAPIECO:  So we are not going to

17      expect him to do that in this case, correct?

18          MR. RATHKE:  That's correct.

19          MR. SCANNAPIECO:  That will save some time

20      today.

21          THE WITNESS:  Label or warning or both?

22          MR. SCANNAPIECO:  Label and warning, both.

23          MR. RATHKE:  You know, he is not going to

24      provide an opinion as to the adequacy of the

25      warning.

Page 49

1          MR. SCANNAPIECO:  All right.

2          MR. RATHKE:  He may have some thoughts, I

3      mean, you know, I don't know.

4          MR. SCANNAPIECO:  Those would be his personal

5      opinions?

6          MR. RATHKE:  He did indicate in his report

7      about a precaution that he thought would be

8      appropriate that has been adopted by the CDC.

9      Q.  (By Mr. Scannapieco) Is this the 70-degree

10  water precaution?

11      A.  70 degree that both, that CDC, FDA and WHO

12  have all written at one time or another.

13      Q.  We will get to that.

14          MR. SCANNAPIECO:  But other than that,

15      nothing, right, Steve?

16          MR. RATHKE:  That's correct.

17      Q.  (By Mr. Scannapieco) You don't offer an

18  opinion on an alternate manufacturing process for PIF,

19  correct?

20      A.  I have a deposition, yes.

21      Q.  But it is not disclosed in any of your

22  reports?

23      A.  I don't think so.

24      Q.  Your reports are not disclosing any opinion on

25  an alternate design of powdered infant formula itself,

# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA


ROCKLAND BURKS and ADRIENNE
LAWRENCE, individually and as
parents and natural guardians
of E.B.,

        Plaintiffs,

                                Civil Action File

    vs.

                                No.: 08-CV-03414-JRT-JSM

ABBOTT LABORATORIES and MEAD
JOHNSON AND COMPANY, LLC,

        Defendants.


HIGHLY CONFIDENTIAL DEPOSITION OF

JOHN J. FARMER, III, PH.D.


February 1, 2012

9:30 a.m.


Suite 800
1420 Peachtree Street, NE
Atlanta, Georgia


J. David Brown, RPR, B-1401

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
CORPORATE SOLUTIONS

1      A.   I keep a file on it.  I'm very interested

2   in the subject.  And I keep computer records on it.

3   I was just looking at the Dasani label as you were

4   asking the question.  So it is certainly a topic of

5   interest.

6      Q.   Do you regard yourself as an expert on

7   food labeling?

8      A.   I don't think if you ask people they

9   would say I was and I don't think I would say I

10  was.

11     Q.   You don't think you are?

12     A.   (Shakes head negatively.)

13          MR. ANSCOMBE:  Could you just read the

14       question back or the response back, please.

15          (Whereupon, the record was read by the

16  reporter.)

17          MR. RATHKE:  And I would say that we're

18       not offering him as an expert on labeling.

19       However, I would not want to disclose --

20          MR. ANSCOMBE:  I'll ask him the next

21       question.  I mean he's given a report.

22     Q.   (By Mr. Anscombe) Dr. Farmer, you

23  previously told me that you weren't an expert on

24  infant nutrition.  Has anything changed since 2010?

25     A.   No.  I'm not a physician and that's not



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1    an area of my expertise.

2         Q.   Are you an expert on health risks

3    associated with the feeding of infant formula?

4         A.   I would say yes.  Particularly in regards

5    to E. sak and clostridium botulinum and other

6    Enterobacteriaceae and certain bacterial pathogens.

7    As far as toxins and malnutrition, no.

8         Q.   In terms of your knowledge about risks

9    associated with the consumption of infant formula,

10   has that been gained solely in the context of legal

11   matters?

12        A.   The vast majority.

13        Q.   What Mead Johnson products did Evan Burks

14   consume?

15        A.   My understanding is -- I think I have an

16   exhibit on there.  Maybe I should refer to that

17   rather than just talking off the top of my head.

18   My thought -- my recollection and what I wrote in

19   my report is that she ingested 39 grams of powdered

20   formula and probably I believe the liquid formula

21   also there was some Mead Johnson product that was

22   liquid although that could have been Abbott.  I'm

23   not sure.

24        Q.   What was the name of the Mead Johnson

25   product?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

234

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA


ROCKLAND BURKS and ADRIENNE
LAWRENCE, individually and as
parents and natural guardians
of E.B.,

       Plaintiffs,

      vs.

ABBOTT LABORATORIES and MEAD
JOHNSON AND COMPANY, LLC,

       Defendants.

Civil Action File

No.: 08-CV-03414-JRT-JSM


HIGHLY CONFIDENTIAL DEPOSITION OF

JOHN J. FARMER, III, PH.D.



February 2, 2012

9:30 a.m.



Suite 800
1420 Peachtree Street, NE
Atlanta, Georgia



J. David Brown, RPR, B-1401

ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1          about it later.

2                  THE WITNESS:  Well, I'm trying to answer

3          fully.

4          Q.    (By Ms. Ghezzi) Have you ever had any

5     training in legal statutes relating to lobbying in

6     the United States?

7          A.    No.

8          Q.    You wouldn't consider yourself an expert

9     in lobbying activities, would you?

10          A.    Not as related to scientific matters.

11          Q.    It is true you've never been on any FDA

12     committee for food safety?

13          A.    True.

14          Q.    And it is true you've never been a member

15     of any Codex committee?

16          A.    True.

17          Q.    I think Steve may have said this

18     yesterday, but I want to get it straight.  Maybe I

19     misunderstood.  You don't intend to give any

20     labeling opinion in this matter, correct?

21          A.    I think in my report I did do some

22     mention.  I don't know if he's -- what he's going

23     to do with them.

24                  MR. RATHKE:  He's not to give any opinion

25          as to the sufficiency of the label.  He may, I



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Case 5:11-cv-04017-MWB-CJW   Document 114-2   Filed 07/19/13   Page 23 of 99

1          don't know whether this will happen, but he

2          may be asked questions about the label.  But

3          as far as giving an opinion as to whether the

4          label was adequate, he will not.

5          Q.   (By Ms. Ghezzi) Let me ask you just a

6     couple of questions.  You're not an expert on FDA

7     labeling requirements, are you?

8          A.   Not an expert, no.

9          Q.   And you have never produced labeling for

10    any marketed product, have you?

11         A.   I can't answer that question.

12         Q.   Have you ever marketed a product?

13         A.   Have I ever marketed a product?

14         Q.   Have you ever marketed a product?

15         A.   No.

16         Q.   Is it still true that you've never been

17    inside a food manufacturing plant?

18         A.   For powdered infant formula, no.

19         Q.   That's correct?

20         A.   Never been in one that made powdered

21    infant formula, that's correct.

22         Q.   And the opinions that you're giving as I

23    read your report are essentially causation,

24    correct?

25         A.   Yes.  I would say if you had to use one



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1    word, that's the word I would use.

2        Q.   So page 3 of your report says the main

3    objective was to determine probable causation and

4    the probable chain of events that led to her,

5    meaning Evan Burks's, infection, correct?

6        A.   That was my understanding as being when I

7    was retained.

8        Q.   You have never conducted a plant audit,

9    right, of powdered infant formula?

10       A.   No.

11       Q.   And you have never designed a plant

12   audit?

13       A.   No.

14       Q.   And you don't know how to make powdered

15   infant formula, right?

16       A.   I know how powdered infant formula is

17   made, but I don't know how to make powdered infant

18   formula.

19       Q.   You know how it is made because you have

20   read about it in these cases, correct?

21       A.   That's correct.

22       Q.   You have no training in making powdered

23   infant formula?

24       A.   Not at the commercial level.

25       Q.   And is it still true that if somebody



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

# EXHIBIT D

1          IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2

3   Kimberly S. SISK,
    individually and as mother
4   and natural guardian of
    S.A.S., a minor,                    Case No.
5                                       1:11-cv-00159-MR-DLH
                      Plaintiff,
6                                       Judge Martin Reidinger
            vs.
7                                       Magistrate Judge Dennis
    ABBOTT LABORATORIES, an             L. Howell
8   Illinois corporation,

9                      Defendant.
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~
10

11

                      DEPOSITION OF
12
            JOHN J. FARMER III, PH.D.
13

14

                      April 4, 2013
15
                      9:34 a.m.
16

17             2700 Centennial Tower
               101 Marietta Street
18               Atlanta, Georgia

19

       Penny McPherson Walker, CCR-B-914, RPR
20

21

22

23

24

25

1    ever been certified by any society as an

2    epidemiologist?

3         A.    No.

4         Q.    Are you a member of any society of

5    epidemiologists?

6         A.    No.

7         Q.    You're not a physician; correct, sir?

8         A.    Correct.

9         Q.    You're not trained in neurology, for

10   example?

11        A.    No.

12        Q.    And you're not trained in pediatrics?

13        A.    No formal training.

14        Q.    You have never designed food safety

15   protocols, have you, sir?

16        A.    Food safety protocols?  No.

17        Q.    Are you familiar with the regulations and

18   statutes that apply to powdered infant formula?

19        A.    I have read some of them, yes.

20        Q.    Would you consider yourself an expert in

21   those regulations?

22        A.    Not an expert, no.

23        Q.    You've never worked for the FDA, right?

24        A.    Well, the Public Health Service -- FDA is

25   one of the five branches.  I've never been assigned

1  to the FDA; that is correct.

2       Q.    You've never created labeling for any

3  products, have you?

4       A.    No commercial product, no.

5       Q.    That was never part of your job with the

6  Public Health Service, correct?

7       A.    Not for commercial food products, no.

8       Q.    Have you ever been inside a food

9  manufacturing plant?

10      A.    A powdered formula or any food?

11      Q.    Any food.

12      A.    Yes.

13      Q.    What type of food manufacturing plant have

14  you been inside of?

15      A.    A brewery, a dairy.

16      Q.    Was that as a visitor, or was that in a

17  scientific capacity?

18      A.    A visitor.

19      Q.    Have you ever been inside a powdered

20  infant formula manufacturing plant?

21      A.    No.

22      Q.    So you've never conducted a plant audit of

23  a powdered infant formula facility?

24      A.    Correct.

25      Q.    You've never designed a plant audit of a

1    powdered infant formula manufacturing facility?

2        A.    No.

3        Q.    Is it fair to say that you don't know how

4    to make powdered infant formula?

5        A.    Not on a commercial scale, no.

6        Q.    That's not an area that you consider

7    within your expertise?

8        A.    Not a commercial area, no.

9        Q.    Again, your expertise is not in designing

10   manufacturing processes for powdered infant formula,

11   correct?

12       A.    Correct.

13       Q.    You don't know how to design a powdered

14   infant formula to make it sterile, right?

15       A.    I have thoughts on that, yes.

16       Q.    But do you -- you actually don't know how

17   to manufacture, you can't tell us the steps that

18   would be necessary to make a powdered infant formula

19   sterile, correct?

20       A.    I could tell you, yes.

21       Q.    What are those steps?

22       A.    Use sterile ingredients carried out in a

23   sterile environment or sterilize it after some -- all

24   the -- once it's in its final container, then

25   sterilize the container.

1     Q.    And how would you sterilize it in its
2    final container, sir?
3     A.    Probably with some sort of high energy
4    radiation-type product.
5     Q.    Has that type of sterilization procedure
6    ever been approved by the FDA with regard to powdered
7    infant formula?
8     A.    I don't know.
9     Q.    Is it fair to say that your ideas as to
10   how powdered infant formula might be made sterile are
11   more in the nature of theories than practical things
12   that you've tried?
13          MR. KING:  Object to the form of the
14          question as argumentative.  You can answer
15          though.
16     Q.    (By Ms. Hirst) You can answer.
17     A.    Certainly part of my role at CDC, we
18   talked about having safer foods, and radiation of the
19   foods was one of the things we talked about to make
20   foods safer, not specifically for powdered infant
21   formula but for foods in general.
22     Q.    But my question was:  Have you ever tried
23   to test any of your theories as to using sterile
24   ingredients, making powdered infant formula in a
25   sterile environment or sterilizing it in some way as

1   a final stage process; have you ever tried to test

2   any of those theories?

3        A.    Not personally or in the laboratory, no.

4        Q.    Dr. Farmer, I'd like to talk a little bit

5   about your causation analysis here.  Probably not a

6   surprise to you that we'll be talking about that.

7              In your report you sort of -- you set up a

8   dichotomy.  You say that there are two logical

9   possibilities here, and the first is that E. sak was

10  in a sealed powdered infant formula when it left one

11  of Abbott's plants or E. sak came from somewhere

12  else.  Is that accurate?

13       A.    I think I left open that it came through

14  the subcontractor of Abbott too that did the

15  packaging after it went through Sturgis.

16       Q.    That was actually a point I wanted

17  clarification on, so I appreciate that, but the way

18  you framed it -- and, actually, let's go to your

19  report.

20             MS. HIRST:  Let's go ahead and mark your

21        declaration as Exhibit 1, please.

22             MR. KING:  We have a copy of what's called

23        the declaration.  It's 86 pages in length.  It

24        bears no Bates number, so we'll have this marked

25        assuming that that's what you're talking about.

# EXHIBIT E

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER


UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
WESTERN DIVISION


THE SECURITY NATIONAL BANK OF
SIOUX CITY, IOWA, as conservator for
J.M.K., a Minor,

    Plaintiff,


vs.                        CASE NUMBER
                        5:11-cv-04017-DEO


ABBOTT LABORATORIES,

    Defendant.

--------------------------/

    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

        The deposition of JANINE JASON, M.D., a
witness in the above-entitled cause, taken
pursuant to Notice and agreement, before Ceil
Weser, Certified Court Reporter and Notary
Public, at the Offices of Coastal Court
Reporting & Video, Inc., 1 Corpus Christi Place,
107 Executive Center, Hilton Head, South
Carolina, on the 12th day of February, 2013,
commencing at or about the hour of 8:13 a.m.

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2        Q    Now, you have never participated in the

3    on the ground investigation of a Cronobacter

4    infection, have you?

5        A    No.

6        Q    And you are not a microbiologist?

7        A    I have done microbiology, but I am not

8    a microbiologist.

9        Q    When it comes to microbiology issues,

10   do you consult with other people like Jim Farmer

11   or the Donnelley's in this case?

12       A    Yes.

13       Q    So you look to them for guidance on

14   those issues?

15       A    Yes.

16       Q    You have never performed a study or

17   published about the sensitivity of any

18   Cronobacter testing methods, have you?

19       A    No.

20       Q    Have you ever tried to compare the

21   sensitivity of any Cronobacter testing methods

22   yourself?

23       A    No.

24       Q    Have you ever sampled for Cronobacter

25   in a manufacturing setting?

```
 1   CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

 2        A    No.

 3        Q    Have you ever sampled for Cronobacter

 4    in any setting?

 5        A    No.

 6        Q    So I take it you have never actually

 7    cultured it?

 8        A    No.

 9        Q    You have never done -- have you ever

10    heard the term PCR?

11        A    Oh, yes, but not for Cronobacter.

12        Q    Unfortunately I will butcher what it

13    means.

14             Do you know what PCR means?

15        A    Polyeresc chain reaction, yes.

16             MR. KING:  Can you spell that for

17        the court reporter?

18             THE WITNESS:  P-o-l-y-e-r-e-s-c

19        and then the word chain and then the

20        word reaction.

21    BY MR. SCANNAPIECO:

22        Q    So you haven't done that, right?

23        A    Not for Cronobacter, no.

24        Q    Not for Cronobacter.

25             You talk about in your report a FDA
```

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2      method for Cronobacter testing?

3          A    Yes.

4          Q    That was the method that was written

5      about I believe it was defined in around 2002?

6          A    Yes.

7          Q    And you have never attempted to

8      actually do that method, have you?

9          A    No.

10         Q    You are a pediatrician?

11         A    Yes.

12         Q    You are not board certified in

13     neonatology, are you?

14         A    No.

15         Q    And you are not board certified in

16     infectious disease?

17         A    No.

18         Q    Have you ever been to a PIF plant?

19         A    No.

20         Q    Have you heard of something called dry

21     mixing process?

22         A    I have not seen it in person, no.

23         Q    But you have heard of something called

24     dry mixing process?

25         A    Yes.

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2        Q    For powdered formula?

3        A    Yes.

4        Q    And you have never seen it?

5        A    No.

6        Q    Have you heard of something called wet

7    mixing process?

8        A    Yes.

9        Q    And I take it you have never seen that?

10       A    Correct.

11       Q    Have you ever seen an open

12   manufacturing line?

13       A    No.

14       Q    Have you ever seen a closed

15   manufacturing line?

16       A    No.

17       Q    So you wouldn't know what the

18   difference is between one and the other by

19   sight?

20       A    Other than photos and maybe a video,

21   no.

22       Q    Have you ever seen a photo of Abbott's

23   manufacturing line?

24       A    I don't think so.

25       Q    Have you ever seen a spray dryer?

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2        A    In person, no.

3        Q    Have you ever seen Abbott's dryer

4    facilities or buildings?

5        A    No.

6        Q    How about an agglomerator, have you

7    ever seen one of those?

8        A    Not in person, no.

9        Q    Have you ever seen a picture of one?

10       A    A photo, yes.

11       Q    Whose?

12       A    Well, if you are -- I don't know.

13       Q    Not Abbott's?

14       A    I don't believe so.

15       Q    Have you ever seen powdered infant

16   formula filling equipment?

17       A    No.

18       Q    And have you ever seen -- so I take it

19   you haven't seen the difference between filling

20   equipment that is used for cans versus filling

21   equipment that is used for foil sticks?

22       A    Correct.

23       Q    Since you have never been to a plant, I

24   assume you have never performed an audit of a

25   powdered formula manufacturer?

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2         A    No.

3         Q    And is it fair to say you have never

4    designed a powdered infant formula manufacturing

5    process?

6         A    Correct.

7         Q    And you have never designed a powdered

8    infant formula finished product testing process?

9         A    Except in theory, yes.

10        Q    Except in theory.

11             But never in practice?

12        A    No.

13        Q    It hasn't gotten any further than what

14   you thought about?

15        A    Yes.

16        Q    No testing?

17        A    No.

18        Q    No verification?

19        A    Correct.

20        Q    No publication?

21        A    Correct.

22        Q    No peer review?

23        A    Correct.

24        Q    No validation?

25        A    Correct.

1   CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2       Q    You have never designed an

3   environmental testing protocol for a powdered

4   infant formula manufacturer, have you?

5       A    No.

6       Q    So the same thing as the finished

7   product testing, no validation, no publication?

8   None of that sort of stuff?

9       A    Correct.

10      Q    You are also not a nutritionist, right?

11      A    Right.

12      Q    So you have never actually developed an

13  infant formula that has gone to market?

14      A    Correct.

15      Q    Have you ever done a study on the

16  levels of contamination found in ready to feed

17  products that are stored after opening?

18      A    No.

19      Q    Have you ever done a study to determine

20  the sources of extrinsic contamination of any

21  food?

22      A    No.

23      Q    So that would include ready to feed

24  formula, powdered infant formula, right?

25      A    You mean -- could you clarify that?

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2    Agar?

3         A    Yes.

4         Q    Is that Druggan-Forsythe-Iverson Agar?

5         A    I think so, yes.

6         Q    So that is not a PCR method?  It is a

7    culturing medium?

8         A    Yes.

9         Q    And when you put different bacteria on

10   it they turn different colors?

11        A    Yes.

12        Q    So if we were to culture E. sak it

13   would turn a different color?

14        A    Correct.

15        Q    Do you think that is an accurate method

16   of testing for E. sak?

17        A    I am not an specialist in that area;

18   but from what I have read, yes.

19        Q    But you are not a specialist in

20   culturing?

21        A    I think Dr. Farmer and Connelly would

22   be -- Actually Dr. Farmer would be better to

23   respond.  But yes, from what I have seen that is

24   accurate -- with limitations.  I mean there are

25   certain strains that are not picked up well, but

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2     it is a very good agar for it.

3         Q    But you are saying I need to look at

4     these other people that are in this case because

5     you are not the expert on all this culturing?

6         A    Exactly.

7         Q    You are not the expert on the BAX

8     testing, PCR testing, anything like that,

9     correct?

10        A    Correct.

11        Q    Now, the FDA tested 17 cans from this

12    batch in the case too, right?

13        A    Correct.

14        Q    And all of those cans were negative for

15    Cronobacter?

16        A    Whatever they tested of them, yes.

17        Q    Again, you don't know how they tested

18    them?

19        A    Correct.

20        Q    Have you ever heard of a test at the

21    FDA called real time PCR?

22        A    Real time or reverse transcriptase?

23        Q    Either one?  RT PCR?  Have you heard of

24    something called RT PCR?

25        A    Oh, yes.

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2    materials reviewed in your report you haven't

3    attempted to contact anyone at the FDA?

4         A    No.

5         Q    You haven't attempted to contact

6    someone at the CDC and say hey, do you know what

7    they are doing at the FDA?

8         A    I don't contact anyone anymore.

9         Q    You used to E-mail the CDC, right?

10        A    I used to, but thanks to Mr. Anscombe

11   (phonetic) I don't E-mail anymore.  I like my

12   privacy.

13        Q    So no communications here, right?

14        A    No.

15        Q    So it would be fair to say you are not

16   really an expert as to the sensitivity of what

17   FDA did in this case, right?

18        A    Correct.

19        Q    Now, in your report you state in

20   paragraph 355 let us take a minute to get there.

21   Sort of that last clause after the semi-colon

22   that:  "There is no indication that the

23   production of those 17 cans were produced in

24   temporal proximity to Jeanine's can, which might

25   have increased the likelihood of detecting a

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2    natural -- not the real world case, but an

3    experimental case where I am going to inoculate

4    and then look at specificity and sensitivity?

5         Q    Sure, I am just asking if you have done

6    any test.  It could be a real world case.  It

7    could be your own test case.  Just anything to

8    try to determine how well FDA's PCR methods

9    work?

10        A    Okay, no, I have not.

11        Q    Is that the same thing, you haven't

12   done anything to determine how good their DFI

13   culturing methods were?

14        A    Directly do it, no.

15        Q    You are relying on the opinions of

16   others?

17        A    Yes.

18        Q    Completely?

19        A    Yes.

20        Q    Now --

21        A    Well, I mean I can judge having done

22   PCR in cultures.  I am just not blindly

23   accepting what people say, but I have not done

24   that research myself.

25        Q    And you haven't done that PCR on

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2         A    Correct.  Very unusual.  It would have

3    to be contamination, but yes.

4         Q    So there would have to be some kind of

5    bacteria, but it doesn't necessarily mean it is

6    looking for the bacteria that you are looking

7    for?

8         A    Well, that is not usually the source of

9    false positive in PCR.

10             The false positive comes if somebody

11   happens to be working in an area that has the

12   organism and then they accidentally contaminate

13   the sample.  It is a very, very specific assay

14   if it is done right.

15        Q    So if you see a positive, if someone is

16   working in the area and they have like three or

17   four samples, they accidentally contaminate them

18   and then you get these positives?

19        A    Yes.

20        Q    Do you know how Abbott's Riboprinting

21   is done?  Its Riboprinting testing?

22        A    Not specifically, no.

23        Q    So you are not an expert in that

24   either, right?

25        A    No.

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2          A    Yes.

3          Q    Have you ever produced labeling for any

4    food product?

5          A    No.

6          Q    Have you ever reviewed the labeling for

7    any food product for any regulatory agency?

8          A    No.

9          Q    Have you ever conducted a focus group

10   regarding powdered infant formula labels?

11         A    I participated in preparing for one and

12   I have monitored them -- oh, I'm sorry, for

13   labels, no.

14         Q    How about any consumer surveys related

15   to impressions about labels, have you ever done

16   one of those?

17         A    No.

18         Q    Had interviews with any nonlitigants

19   about their perception of labels?

20         A    No.

21         Q    Have you -- you have never designed a

22   warning label, right?

23         A    Correct.

24         Q    And you made fun of them before, but

25   you don't have a degree in communications, do

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2     you?

3         A    No, but I headed a communications group

4     at CDC for a while.  Deeply respected all of

5     them, though, I truly did.

6         Q    But they were doing the communications

7     work, that wasn't you directly being --

8         A    No, actually I did -- one of the

9     studies I did myself.

10        Q    For labeling of a food product?

11        A    It was not a label, no.

12        Q    You have an M.D., but that is not like

13    a -- you don't have a psychology degree too, do

14    you?

15        A    No.

16        Q    You are not a human factors expert?

17        A    What is that?

18        Q    That is like the different factors

19    that -- well, you would have to ask Gerald

20    Goldhaber who says he is a human factors expert.

21    But it is in the different factors that people

22    consider when looking at warnings or things like

23    that.

24        A    Like a risk assessment person?

25        Q    Yeah --

```
 1   CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

 2            MR. KING:  I think by the question

 3       we know she is not a human factors

 4       expert.  We will concede that.

 5            MR. SCANNAPIECO:  You guys will

 6       concede that?

 7            MR. KING:  Yes.

 8            MR. SCANNAPIECO:  Great.

 9   BY MR. SCANNAPIECO:

10       Q    Do you consider yourself an expert in

11     food labeling?

12       A    No.

13       Q    Now, you have some in your report and

14     then I think you have been deposed about this

15     before because it is part of your report that

16     has been used before, but you talk about some

17     statements that were made at the International

18     Formula Council?

19       A    Yes.

20            You mean by them?

21       Q    By the International Formula Council or

22     certain individuals that were present, right?

23     In some instances you just say this person said

24     X or Y?

25       A    Or wrote.
```

# EXHIBIT F

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

```
--------------------------------:
  ROCKLAND BURKS and ADRIENNE    :
  LAWRENCE, individually and     :
  as parents and natural         :
  guardians of E.B.,             :
                                 :
          Plaintiffs,            :
                                 :
      vs.                        : No. 08-CV-03414
                                 :
  ABBOTT LABORATORIES,           :
  BRISTOL-MYERS SQUIBB           :
  COMPANY, and MEAD JOHNSON      :
  AND COMPANY, LLC,              :
                                 :
          Defendants.            : Vol. I
--------------------------------: (Pgs. 1 - 244)
```

The deposition of JANINE JASON, M.D.,

called by the Defendant for examination, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions for the purpose of discovery,

taken before JENNIFER L. BERNIER, CSR No. 84-4190,

Notary Public within and for the County of Cook, State

of Illinois, Certified Shorthand Reporter within and

for the State of Illinois, at the offices of SEDGWICK,

LLP, One North Wacker Drive, Suite 4200, Chicago,

Illinois, on February 9, 2012, at 10:05 a.m.

1      A      Boy, you picked the wrong person to pass

2   names by.  I am terrible on names.  I don't think I

3   know who that person is, but that doesn't mean I

4   don't.  But I certainly don't correspond with him.

5      Q      Do you have any business training?

6      A      How do you define that?

7      Q      Have you ever taken a course on business,

8   like how to run a business, business economics,

9   anything like that?

10      A      I'll say, no.  I mean, I suppose, in terms

11   of our company, we've looked at things like LLC books

12   and whatnot.

13      Q      Do you have any training in food science?

14      A      No.

15      Q      Do you have any training in food technology?

16      A      No.

17      Q      Do you have any expertise in consumer

18   behavior?

19      A      Well, yes.  Health consumer, yes.

20      Q      And what's that expertise?

21      A      From, I believe, '90 -- my CV will say it.

22   For about five years I was in charge of the evaluation

23   group for the national AIDS media campaign and, as a

24   result, got very involved in health communications.

1 It was -- actually, it was I was in charge of the

2 group, but the group had a large number of very good

3 professors, communication professors who did

4 sabbaticals to help, who educated me. And I think, in

5 fact, in the report, you'll see a number of

6 publications that dealt with various health

7 communication issues.

8     Q     Have you taken any coursework yourself on

9 consumer behavior?

10     A     Other than communications, no.

11     Q     Have you had any coursework on

12 communications?

13     A     Well, I think one-on-one training from full

14 professors is pretty good.

15     Q     Is that the extent of your training in that

16 area?

17     A     In general, yes.

18     Q     Do you have any expertise on designing

19 environmental monitoring plants?

20     A     No.

21     Q     Do you have any expertise on pulse-field gel

22 electrophoresis?

23     A     I've done them, but I don't -- didn't

24 routinely do them.

1    Q    Do you regard yourself as an expert on

2 pulse-field gel electrophoresis?

3    A    As I say, I've done them.  I am not -- it's

4 not my -- it's not a major area I've worked on.

5    Q    When you say you've done them, what do you

6 mean?

7    A    I mean I've run some.

8    Q    You've actually conducted -- you've actually

9 done that procedure?

10    A    Yes.

11    Q    And where did you do that?

12    A    At CDC and then -- mostly at CDC.

13    Q    Do you regard yourself as an expert on food

14 microbiology?

15    A    Well, again, in terms of expert -- but my

16 short answer would be, no.

17    Q    Okay.  Have you ever prepared a label for

18 any commercial product?

19    A    No.

20    Q    Do you -- I think I asked you this the last

21 time.  Do you regard yourself as an expert on infant

22 nutrition?

23    A    Certain aspects of it.

24    Q    What aspect?

1       A     I'm not sure.

2       Q     Are you an expert on microbiological

3    analytical methods that relate to the detection of

4    Cronobacter?

5       A     No.

6       Q     Are you an expert on biofilm?

7       A     No.  I've looked at -- you know, I've

8    reviewed that literature of that for other reasons,

9    but I wouldn't consider -- again, my definition of

10   expert is have I published in the area, and I have

11   not.

12      Q     Have you ever taught a class that relates to

13   biofilm?

14      A     Specifically on biofilm, no.

15      Q     In the course of your career, outside the

16   context of Cronobacter, have you ever had occasion to

17   consider biofilm?

18      A     In a legal case, yes.

19      Q     Okay.  And what did that case involve?

20      A     Oh, as I say, I've only taken a few legal

21   cases.  It was a malpractice case, which I virtually

22   will never take.  And I agreed to finally read the

23   record.  And the gist of it was this very, very good

24   orthopaedic doc had gotten it in his head that

1     A     Mm-hmm.

2     Q     Do you recognize this as an e-mail that you

3  sent?

4     A     Definitely it's my e-mail.  I don't remember

5  the e-mail; but, yes.  It sounds like me.

6     Q     All right.  So you state here, in the second

7  paragraph, "I'm not knowledgeable in the area and

8  don't claim to be knowledgeable about PIF

9  manufacturing."  I assume that was a true statement on

10 October 17th --

11    A     Well, we talked about --

12    Q     -- 2011?

13    A     -- this.  I've never been in a plant.

14    Q     Okay.

15    A     I wish I could go in a plant; but, no.  I

16 mean, that's what that refers to.

17    Q     So, again, you don't regard yourself as an

18 expert on PIF manufacturing, correct?

19    A     Exactly.

20    Q     Now, what do you mean by -- in reference

21 here to Don Zink?  When you say that you can't stop

22 yourself from fearing that he's been a wolf in sheep's

23 clothing all along, what did you mean by that?

24    A     At that 2003 meeting, when I got that

245

                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF MINNESOTA

--------------------------------:
  ROCKLAND BURKS and ADRIENNE    :
  LAWRENCE, individually and     :
  as parents and natural         :
  guardians of E.B.,             :
                                 :
            Plaintiffs,          :
                                 :
       vs.                       : No. 08-CV-03414
                                 :
  ABBOTT LABORATORIES,           :
  BRISTOL-MYERS SQUIBB           :
  COMPANY, and MEAD JOHNSON      :
  AND COMPANY, LLC,              :
                                 :
            Defendants.          : Vol. II
--------------------------------: (Pgs. 245 - 378)




            Part 2 of the deposition of JANINE

JASON, M.D., called by the Defendant for examination,

taken pursuant to the Federal Rules of Civil Procedure

of the United States District Courts pertaining to the

taking of depositions for the purpose of discovery,

taken before JENNIFER L. BERNIER, CSR No. 84-4190,

Notary Public within and for the County of Cook, State

of Illinois, Certified Shorthand Reporter within and

for the State of Illinois, at the offices of SEDGWICK,

LLP, One North Wacker Drive, Suite 4200, Chicago,

Illinois, on February 10, 2012, at 9:32 a.m.

Case 5:11-cv-04017-MWB-CJW   Document 114-2   Filed 07/19/13   Page 57 of 99

1   Cronobacter meningitis in a clinical setting ever?

2        A     I have not, no.

3        Q     Have you ever worked with E. sakazakii or

4   Cronobacter in a lab?

5        A     No.

6        Q     And it's correct that you don't have a

7   degree as such in epidemiology?

8        A     Well, there really isn't a degree.  I went

9   through the fellowship program at CDC, which is

10  recognized as being one of the very few and a very

11  good program.

12       Q     You did it at CDC.  Did you ever do it at an

13  accredited university?

14       A     Other than doing -- the short answer is, no.

15       Q     Okay.  You already told Mr. Anscombe you

16  don't have a degree in microbiology, correct?

17       A     Correct.

18       Q     Or food microbiology?

19       A     Correct.

20       Q     You don't have any degree in nutrition,

21  right?

22       A     Correct.

23       Q     You don't have a psychology degree or

24  marketing degree?

1    A    Correct.

2    Q    And you're not a neonatologist?

3    A    No.

4    Q    And you never designed any food safety

5 protocols?

6    A    Correct.

7    Q    You've also never worked for the FDA?

8    A    Correct -- well, I'm on one of their boards;

9 but I've never worked for the FDA, no.

10    Q    What board are you on?

11    A    It's one of the immunology boards, review

12 boards.

13    Q    You are not on any food advisory committee

14 for the FDA, are you?

15    A    No.

16    Q    You've never been a member of Codex?

17    A    No.

18    Q    And I think Mr. Anscombe asked you this

19 yesterday, but you've never created or produced any

20 labeling for any product, have you?

21    A    No.

22    Q    You've never designed a warning label?

23    A    No.

24    Q    Okay.  And you're not an expert in

1  manufacturing, correct?

2      A    Correct.

3      Q    You've never designed a plant audit, have

4  you?

5      A    No.

6      Q    Have you ever conducted a plant audit?

7      A    No.

8      Q    Have you ever studied how to treat plant

9  contamination?

10     A    Could you explain that a little more?

11  Actually, no.

12     Q    Okay.  You've never published anything to

13  date on powdered infant formula; is that correct?

14     A    Correct.

15     Q    You've never published anything to date on

16  E. sakazakii or Cronobacter sakazakii, correct?

17     A    Correct.

18     Q    And you've never published anything on

19  powdered infant formula's manufacturing, sampling, or

20  testing, correct?

21     A    Correct.

22     Q    Can you tell me, if you know, how many cases

23  of food poisoning there are in the United States every

24  year?

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA


KIMBERLY S. SISK, individually and as
mother and natural guardian of S.A.S.,
a minor,

    Plaintiff,



vs.                    CASE NUMBER
                          1:11-cv-00159-MR-DLH



ABBOTT LABORATORIES, an
Illinois corporation,

    Defendant.

--------------------------/

        The videoconference deposition of JANINE
JASON M.D., a witness in the above-entitled
cause, taken pursuant to Notice and agreement,
before Cathy M. Knoettner, Certified Court
Reporter and Notary Public, at the Hilton Head
Island-Bluffton Chamber of Commerce, 1 Chamber
of Commerce Drive, Hilton Head Island, South
Carolina, on the 10th day of April, 2013,
commencing at or about the hour of 10:40 a.m.

1   HIRST - JASON (DIRECT EXAMINATION)

2       Q    You don't have a specialty in food

3   safety; correct?

4       A    Correct.

5       Q    You've never designed food safety

6   protocols?

7       A    Correct.

8       Q    You've never tried to design a food

9   safety protocol that would comply with the FDA

10  regulations applicable to powdered infant

11  formula?

12      A    Correct.

13      Q    Dr. Jason, you never worked for FDA,

14  did you?

15      A    I'm on one of their committees, but

16  I've never been employed by them, no.

17      Q    Specifically you never worked for FDA

18  in any task involving food labeling; correct?

19      A    Correct.

20      Q    You're not an expert on the FDA

21  regulation that applies to powdered infant

22  formula?

23      A    Correct.

24      Q    You've never created labeling for a

25  food product?

1   HIRST - JASON (DIRECT EXAMINATION)

2        A     Correct.

3        Q     You've never been consulted by any

4   company that was trying to create a label for

5   its food product?

6        A     Correct.

7        Q     And in this case, the Sisk case, you

8   didn't undertake any independent research about

9   food labeling, did you?

10       A     I did not, no.

11       Q     You've never been inside a food

12  manufacturing plant; correct?

13       A     Correct.

14       Q     You've never attempted to evaluate

15  plant contamination by bacteria?

16       A     I have not, no.

17       Q     You've never conducted a plant audit?

18       A     Correct.

19       Q     You've never designed a plant audit?

20       A     I have not, no.

21       Q     You do not know how to make powdered

22  infant formula?

23       A     That's an interesting question.  I know

24  their description of how.  I could not go out

25  tomorrow and make powdered formula myself, if

1   HIRST - JASON (DIRECT EXAMINATION)

2    that's the question, no.

3        Q    You do not know how to design a

4    manufacturing process to make powdered infant

5    formula?

6        A    I could not design one, no.

7        Q    You've never designed microbiological

8    testing for a manufacturing plant?

9        A    I have not, no.  Except theoretically.

10       Q    But in the course of either your

11   consulting work or your time at the CDC, you

12   were never called upon to design microbiological

13   testing for a manufacturing plant?

14       A    I was not, no.

15       Q    And that wasn't something that you

16   received special training on at any point during

17   your time at CDC?

18       A    Correct.

19       Q    You do not know how to manufacture a

20   powdered infant formula that is free of E.

21   sakazakii; correct?

22       A    Oh, I do have some ideas along that

23   line, yes.

24       Q    Those ideas are theories; correct?

25       A    Correct.

1    HIRST - JASON (DIRECT EXAMINATION)

2        Q    You've never tried to put any of those

3    ideas about how to manufacture a powdered infant

4    formula free of E. sakazakii into practice?

5        A    I've never been in a position to do

6    that, no.

7        Q    You do not know how from a design

8    standpoint if it's the possible to design a

9    sterile powdered infant formula product;

10   correct?

11       A    I do not know for certain, no.

12       Q    You've never designed a warning label,

13   Dr. Jason?

14       A    Not a warning label, no.

15       Q    You don't have a background in

16   communications, right?

17       A    No, that is not correct.  I in fact

18   headed up the communications evaluation program

19   at CDC for the National AIDS Media Campaign and

20   did do communications research.

21       Q    What type of communications research

22   did you do?

23       A    We had a group that looked at

24   educational and media communications concerning

25   HIV and AIDS and evaluated various components,

1   HIRST - JASON (DIRECT EXAMINATION)

2    and in my CV you'll see some publications in

3    that area.

4        Q    You don't have a psychology degree;

5    correct?

6        A    Correct.

7        Q    You don't have a human factors degree?

8        A    I didn't even know there was such a

9    degree.

10       Q    Dr. Jason, if you could look at your

11   report, Defense Exhibit 14.  On page one you

12   stated you were asked to opine whether the most

13   probable source of Slade Sisk's Cronobacter

14   infection was some portion of the Abbott Similac

15   Advance powdered infant formula he received

16   between October 29th and November 10, 2004.  Do

17   you see that?

18       A    Yes, I do.

19       Q    Was that how Mr. Rathke phrased what he

20   asked you to do, or is that your

21   understanding -- your own words describing the

22   task that you were asked to do?

23       A    I think that was pretty close to what

24   he said he wanted an opinion on.

25       Q    Okay.  So you were not asked to offer

# EXHIBIT H

Page 1

HIGHLY CONFIDENTIAL


UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

-----------------------------------
THE SECURITY NATIONAL BANK OF      )
SIOUX CITY, IOWA, as conservator   )
for J.M.K., a minor,               )
          Plaintiff,               )
                                   )  CIVIL ACTION NO.
     V.                            )  5:11-cv-04017-DED
                                   )
ABBOTT LABORATORIES,               )
          Defendant.               )
-----------------------------------


D E P O S I T I O N
- of -
CATHERINE W. DONNELLY, Ph.D.




taken on behalf of the Defendant on Thursday,
January 24, 2013, at the offices of Court
Reporters Associates, 148 College Street, 2nd
Floor, Burlington, Vermont, commencing at
9:04 AM.




COURT REPORTER:  JOHANNA MASSÉ, RMR, CRR

Page 17

```
 1      Q.   Have you had any occasion to have a
 2   conversation with Gerry Goldhaber?
 3      A.   I have not.
 4      Q.   Have you exchanged e-mails with him?
 5      A.   I've been copied on e-mails that have been
 6   shared with experts, but I don't believe I've ever -- I
 7   can't recall having direct communication with him.
 8      Q.   Okay.  And just briefly, we covered a lot of
 9   this in the -- in an earlier deposition, but you are
10   not a statistician?
11      A.   I am not a statistician.
12      Q.   You're not a medical doctor or a neurologist?
13      A.   That's correct.
14      Q.   You're not an epidemiologist?
15      A.   Correct.
16      Q.   You're not offering an opinion on labeling?
17      A.   Correct.
18      Q.   Now, in terms of manufacturing processes, I
19   just want to ask you, you were in the Wyeth plant,
20   correct?
21      A.   That is correct.
22      Q.   Is that in -- in Vermont?
23      A.   It's in Georgia, Vermont.
24      Q.   Georgia, Vermont.  Have you been in any other
25   powdered infant formula manufacturing plant?
```

Page 18

1      A.   That's the only one except that I did a fair

2   amount of international travel, so I was in Wyeth's

3   Askeaton, Ireland, plant.  I was over there for another

4   reason, but because my husband worked for Wyeth, I was

5   in -- the Irish people wanted to be hospitable and make

6   sure I saw that plant, so I was in that one.

7      Q.   Okay.  Obviously you've never designed a

8   powdered infant formula manufacturing process?

9      A.   I have not.

10     Q.   Right.  And you don't consider yourself an

11  expert in that area, do you?

12     A.   Not in infant formula manufacturing plant

13  design, yes, that's correct.

14     Q.   Okay.  Is it also true that you do not know

15  how to design a powdered infant formula that is free of

16  all microbes?

17     A.   Well, there's ready-to-feed formula that would

18  be --

19     Q.   That's liquid.

20     A.   -- sterile, so, yes, powdered, that would be

21  correct.

22     Q.   So to just get an answer to the question, you

23  do not know how to design a powdered infant formula

24  that's free of microbes?

25     A.   Again, I can -- I mean, personally if I -- if

Case 5:11-cv-04017-MWB-CJW   Document 114-2   Filed 07/19/13   Page 71 of 99

Page 19

1    irradiation were allowed, that would be one way to
2    achieve that goal, so --
3        Q.   Okay.  And if we're not talking about
4    irradiating food, is the answer to the question that
5    you don't -- wouldn't know how to do it, how to design
6    it?
7        A.   If we weren't irradiating, let me just think
8    through other ways that we could do this.  Just, you
9    know, with the standard design that's in place at most
10   plants now, you can't have pathogen-free or
11   bacteria-free powdered formula.
12           MR. RATHKE:  I think she's asking you -- she's
13   not confining the question as to what's happening now
14   but she's probing you for ideas as to how it could be
15   pathogen-free.
16           THE WITNESS:  Yeah.
17       A.   And again, as I said, you could -- you could
18   irradiate it.  You can hot box the product, and so that
19   means once the powdered infant formula's in a can, you
20   can store it in a warm warehouse for a period of time
21   and achieve inactivation of the pathogen that way.
22       Q.   Have you ever tried that?
23       A.   Actual -- I personally haven't tried it.
24   However, the Wyeth plant tried that, and they use my
25   lab from time to time for some of these validation

CATHERINE W. DONNELLY, PH.D.  Highly Confidential                    January 24, 2013
**SNB vs. ABBOTT LABS**

Page 20

1    trials, so that work was actually going on in my lab,

2    so I wasn't directly involved, but indirectly I was.

3        Q.   So you have never -- you haven't proposed that

4    to any industry company, have you?

5        A.   No.  No.

6        Q.   And do you know whether or not Wyeth -- by the

7    way, Wyeth itself doesn't produce powder anymore in the

8    United States, does it?

9        A.   That's correct.

10       Q.   Okay.  So when you're talking about working

11   with Wyeth for this, was that prior to 2004?

12       A.   It was -- no.  It was after 2004.

13       Q.   Didn't Wyeth go out of the powdered infant

14   formula business in the United States in 2004?

15       A.   I don't believe so.  I think the Georgia

16   plant, they still had -- I don't -- I think -- I think

17   they still had it, but again, I could be wrong on my

18   dates.

19       Q.   I think they -- I think they sold it then.

20           So if you're talking about the Wyeth plant

21   being a Wyeth plant, would that be prior to 2004?

22       A.   Again, if you think they sold it.  It could be

23   around that time.

24       Q.   So in the last eight years, have you developed

25   any kind of design free -- or designed a powdered

CATHERINE W. DONNELLY, PH.D.  Highly Confidential                    January 24, 2013
SNB vs. ABBOTT LABS

Page 21

1    infant formula that can be free of microbes?

2        A.    I personally have not.

3        Q.    Okay.  Have you -- have you ever done a study

4    on the risks -- the risks versus the benefits of

5    powdered infant formula versus ready-to-feed?

6        A.    I haven't done any kind of study of that

7    nature.

8        Q.    Have you ever done a study on the level of

9    contamination found in ready-to-feed products when

10   stored in a home refrigerator after opening?

11       A.    I have not.

12       Q.    Have you seen any studies of such -- on such a

13   topic?

14       A.    I don't -- I don't believe I've seen those

15   studies.

16       Q.    Okay.  So do you know if anybody anywhere in

17   the United States has ever done a study on the level of

18   contamination found in ready-to-feed products when

19   stored in a home refrigerator after opening?

20       A.    I'm not aware of that work.

21       Q.    Okay.  So you personally would not know what

22   the level of contamination is in such product, right?

23       A.    That is correct.

24       Q.    Is it also true you've never done a study on

25   the relative costs of powdered infant formula versus

# EXHIBIT I

1

HIGHLY CONFIDENTIAL


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

--------------------------------
ROCKLAND BURKS and ADRIENNE      )
LAWRENCE, individually and as    )
parents and natural guardians    )
of E.B.,                         )
          Plaintiffs,            )
                                 ) CIVIL ACTION NO.
     V.                          ) 08-cv-03414-JRT-JSM
                                 )
ABBOTT LABORATORIES and          )
MEAD JOHNSON AND COMPANY, LLC,   )
          Defendants.            )
--------------------------------



D E P O S I T I O N
- of -
CATHERINE W. DONNELLY, Ph.D.


taken on behalf of the Defendants on Thursday,
March 29, 2012, at the Courtyard by Marriott,

25 Cherry Street, Burlington, Vermont,

commencing at 9:15 AM.




COURT REPORTER:  JOHANNA MASS', RMR, CRR

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
CORPORATE SOLUTIONS

1   assistantship taken away.

2       Q.   How about at University of Vermont?  Did you

3   graduate with any honors?

4       A.   I don't believe I did.  I was a member of some

5   honors societies, like Alpha Zeta.

6       Q.   Have you received any formal training in

7   epidemiology?

8       A.   No.

9       Q.   Any formal training in disease investigation?

10      A.   Not formal training.

11      Q.   Do you have any training in medicine?

12      A.   No.

13      Q.   And therefore, is it safe to assume that you

14  don't have any training in pediatric medicine?

15      A.   That's correct.

16      Q.   You don't have any training in infectious

17  disease?

18      A.   No.

19      Q.   Do you have any training in infant nutrition?

20      A.   No.

21      Q.   Do you have any training in relation to infant

22  feeding practices?

23      A.   Other than having been a mom, a mother of two;

24  and I'm in the Department of Nutrition and Food

25  Science; and as part of my degrees, I have taken a lot



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
CORPORATE SOLUTIONS

1      Q.   Did he -- well, strike that.

2           What were his years in Philadelphia?

3      A.   Again, sitting here without a calendar.  So

4   he's probably been retired four or five years, so the

5   last three years of his Wyeth career were in

6   Philadelphia, but he was in charge of global food

7   safety, so he was sort of based in Philly but doing

8   three international trips a month.

9      Q.   Did he continue to do any consulting in

10  connection with the manufacturing facility here?

11     A.   After he retired?

12     Q.   Well, at some point Wyeth sold the plant here

13  in Vermont to PBM, correct?

14     A.   That's correct.

15     Q.   All right.  And at that point your husband

16  remained a Wyeth employee, true?

17     A.   That's true.

18     Q.   After the sale to PBM, did he have any ongoing

19  consulting role in connection with the plant here?

20     A.   Not while he was employed by Wyeth.

21     Q.   Have you ever -- strike that.

22          Do you have any expertise in product labeling?

23     A.   No.

24     Q.   Have you ever written a product label?

25     A.   No.



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1   here?

2       A.   Probably on a regular basis, but that's why

3   you set specifications that you don't want levels to

4   exceed a certain level.

5       Q.   Have you seen any pictures of the ZSP plant?

6       A.   I don't recall if I have.  I don't recall

7   seeing pictures.

8       Q.   Do you recall seeing anything that would tell

9   you what Mead Johnson's north blending room looks like

10  in the ZSP plant?

11      A.   I haven't seen --

12           MR. RATHKE:  Are you inviting us?

13      Q.   Have you -- have you seen any pictures of the

14  ribbon blenders 2 and 3 in the ZSP plant?

15      A.   Again, I don't -- I don't recall.

16      Q.   Have you ever seen a ribbon blender?

17      A.   I don't recall seeing a ribbon blender.

18      Q.   Can you describe the blending process for

19  ProSobee?

20      A.   In general?

21      Q.   Yes.

22      A.   Probably in very general terms.

23      Q.   Okay.  Please do.

24      A.   I believe there is a base that's used that's

25  blended -- let me think about this process for a



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1   minute.  It's a dry blending process, so there is a

2   base and then other parameters that are added.  Again,

3   I don't work in the infant formula industry.  That's

4   not my area of expertise.

5       Q.   Okay.  So as you sit here, would it be fair to

6   say that you don't have any understanding of the

7   mechanical forces that are exerted on formula during

8   blending at the ZSP plant?  Is that a fair statement?

9       A.   Other than statements I've read.  I know Dr.

10  Costerton made some of those statements.

11      Q.   Do you have any basis on which to dispute the

12  accuracy of his description of how the manufacturing

13  process occurs?

14      A.   I -- I -- let's put it this way:  I don't

15  think I'd rely on his description of what actually

16  occurred in that plant.

17      Q.   That wasn't -- that wasn't my -- that wasn't

18  my question.  My question was, Do you have any reason

19  to disbelieve what he says about the mechanical forces

20  applied to powder during the blending process?

21      A.   I don't really have an opinion one way or

22  another on that.

23      Q.   Do you know who Dr. Costerton is?

24      A.   I've read his publications.

25      Q.   Once formula has been blended, can you



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

# EXHIBIT J

# In the Matter Of:

## SISK vs. ABBOTT LABS

1:11-cv-00159-MR-DLH

---

## CATHERINE W. DONNELLY, PH.D.

*June 14, 2013*

---

ESQUIRE

800.211.DEPO (3376)
*EsquireSolutions.com*

1      A.   In 2003, I would probably defer to the FDA on

2   that issue since it was their method.

3      Q.   Okay.  And you would defer to the FDA since it

4   was their method.  Is there any other reason -- had it

5   been implemented yet by FDA?

6      A.   It was guidance for the industry, so yes.

7      Q.   What does that mean?  Had it been used at FDA?

8      A.   Yes.

9      Q.   Okay.  And do you know to what degree of

10  success it had been used at FDA to detect E. sak in

11  2003?

12     A.   I believe it had been used successfully to

13  detect E. sak, yes.

14     Q.   Okay.  I'm not going to go through all of the

15  different qualifications that you've already spent time

16  talking about in your other depositions, okay?  I'm

17  just going to ask you, are they the same?  You're still

18  not a medical doctor, correct?

19     A.   That's correct.

20     Q.   You're still not -- you still have no training

21  in epidemiology?

22     A.   Correct.

23     Q.   And you're not a labeling expert; you never

24  worked for the FDA, correct?

25     A.   Actually, I may have been a temporary

1    government employee for the FDA.

2        Q.   A temporary employee -- okay.  When --

3        A.   Like I do with USDA when I'm serving on grant

4    panels --

5        Q.   Yeah.

6        A.   -- or serving on an expert committee, so --

7        Q.   You didn't create any labeling for any

8    product, right?

9        A.   No.  That's correct.

10       Q.   And you undertook no primary research about

11   labeling per se to reach a conclusion about current

12   labeling for powdered infant formula, right?

13       A.   Correct.

14       Q.   You never designed a warning label?

15       A.   Correct.

16       Q.   Okay.  And you're not giving any kind of an

17   opinion regarding damages or the child's prognosis,

18   correct?

19       A.   That's correct.

20       Q.   Or the adequacy of a warning label?  Correct?

21       A.   That's correct.

22       Q.   Okay.  And you haven't been asked to offer a

23   manufacturing opinion or to offer a design opinion,

24   right?

25       A.   I believe there is a design opinion in -- or a

1    A.   I could go to work for any of the infant

2   formula manufacturers tomorrow and probably do a pretty

3   good job kind of working with them.

4    Q.   Making -- okay.  That's not the question.

5    A.   I mean, I'm not an engineer.

6    Q.   We both know it isn't.

7         Okay.  Do you know what the -- do you know how

8   to make formula?  Do you know what the ingredients are;

9   do you know what the nutrients are; do you know how it

10  has to be made?

11   A.   I understand the process pretty well.

12   Q.   I understand the process pretty well --

13   A.   Um-hum.

14   Q.   -- as a lawyer.

15   A.   Right.

16   Q.   I can't go in and make product.  Are you --

17  are you suggesting that the work that you've done in 30

18  years in Listeria --

19   A.   Um-hum.

20   Q.   -- and the cases that you've done as a legal

21  expert qualifies you to make powdered infant formula?

22   A.   Again, it's -- would I represent that as my

23  expertise?  Absolutely no, I would not.

24   Q.   Okay.

25   A.   Could I do it, I could probably do a pretty

1      A.   We had a dairy processing plant at the

2  University of Vermont when I was an undergraduate.  I

3  donned my little dairy whites and, you know --

4      Q.   And you've made cheese?

5      A.   Exactly.

6      Q.   And you've never made powdered infant formula?

7      A.   I haven't done that, but that wasn't your

8  question.  Could I do that.  Yeah, I could.  I mean --

9      Q.   You could if you had the right training?

10     A.   Absolutely.

11     Q.   And you could if you had the right experience?

12     A.   Absolutely.

13     Q.   And you could if you had the right facilities?

14     A.   Correct.

15     Q.   Okay.

16     A.   Correct.

17     Q.   Well, that certainly doesn't make you an

18 expert in it.  I agree with you.

19     A.   Right.  Totally.

20     Q.   We talked about this in a different

21 deposition, I believe, and you've done it with other

22 people in other depositions in terms of instances of

23 isolated events where the cause of an isolated

24 Cronobacter infection is never known.  And in 50 to 80

25 percent, as the World Health Organization says, the

# EXHIBIT K

```
 1                    CONFIDENTIAL

 2          UNITED STATES DISTRICT COURT

 3        FOR THE SOUTHERN DISTRICT OF IOWA

 4                 WESTERN DIVISION

 5

 6   THE SECURITY NATIONAL BANK      )
     OF SIOUX CITY, IOWA, as         )
 7   conservator for J.M.K., a       )
     Minor,                          )
 8                                   ) Case No.
                 Plaintiff,          ) 5:11-CV
 9                                   ) 04017-DEO
            vs.                      )
10                                   )
     ABBOTT LABORATORIES,            )
11                                   )
                 Defendant.          )
12   -------------------------------)

13

14
          DEPOSITION OF GERALD M. GOLDHABER
15
                 New York, New York
16
              Tuesday, February 5, 2013
17

18

19

20

21

22

23

24   Reported by:
     TAMI H. TAKAHASHI, RPR, CSR
25   JOB NO. 332188
```

```
 1              CONFIDENTIAL - Goldhaber
 2              MR. RATHKE:  A list of articles
 3        relating to?
 4              MS. HIRST:  The scope and nature of
 5        the hazard, being Enterobacter
 6        sakazakii.
 7              MR. RATHKE:  In powdered formula?
 8              MS. HIRST:  Correct.
 9              THE WITNESS:  Sure.
10   BY MS. HIRST:
11        Q.   With the understanding that
12   probably some of the materials are from 2004,
13   the 2006 WHO reports and the Codex materials
14   that you've already talked about.
15        A.   Yes.
16        Q.   So, we can set those aside.
17        A.    Those are here and then the expert
18   reports on the plaintiff's side that I've
19   read, as well as -- with defense reports in
20   these cases, I only read Wood and Campbell.
21   But the other ones, since I relied on other
22   experts who precede me in trial to define in
23   more medical terms or more epidemiological
24   terms or scientific terms the nature and
25   scope of the hazard, as a warnings expert, I
```

```
 1              CONFIDENTIAL - Goldhaber
 2   like to get generally familiar, but I'm not a
 3   medical expert or scientific expert or an
 4   epidemiological expert.  But I do like to
 5   know, as it's part of my due diligence to get
 6   a general handle on what the nature and scope
 7   of the hazard is.
 8        Q.   But as you say, it's not your --
 9   it's not your job to decide on the
10   characteristics of a hazard?
11        A.   That's correct.
12        Q.   That's something you rely on
13   others?
14        A.   That's correct.
15        Q.   And in determining the scope of the
16   hazard, in your view, it's not necessary for
17   you to see the defense causation expert's
18   opinions?
19        A.   Not really.  I'm not here to talk
20   about causation.
21        Q.   You don't think there's any risk in
22   getting a one-sided view of the scientific
23   literature regarding C. sak?
24        A.   The literature is the literature.
25   I don't rely on -- only on what the
```

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
-------------------------------------X
ROCKLAND BURKS and ADRIENNE LAWRENCE,
individually and as parents and
natural guardians of E.B.,

            Plaintiffs,

        vs.                Case No.
                           08-CV-03414-JRT-JSM


ABBOTT LABORATORIES and
MEAD JOHNSON AND COMPANY,
LLC,

            Defendants.

-------------------------------------X




    DEPOSITION OF GERALD M. GOLDHABER, Ph.D.
            New York, New York
         Tuesday, February 14, 2012







Reported by:
JOAN WARNOCK
JOB NO. 325549



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                  G. Goldhaber

2          A.    Probably in May of 2011.

3          Q.    And when were you first retained

4    for any powdered infant formula case?

5          A.    The same time.

6          Q.    Have you been deposed in any other

7    powdered infant formula case?

8          A.    No.

9          Q.    And you don't have any degrees in

10   microbiology or food microbiology or

11   infectious disease; correct?

12         A.    No.

13              MR. ANSCOMBE:  Well --

14         A.    Correct.

15              MR. ANSCOMBE:  Correct.  I was

16        going to say we had a series of double

17        negatives there.

18              MS. GHEZZI:  Right.  That is

19        correct.

20         Q.    And you don't have a degree in

21   biological science or natural science of any

22   kind?

23         A.    Correct.

24         Q.    You don't have any education or

25   training in how to make powdered infant



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1              G. Goldhaber

2        A.    I haven't done any research on what

3   the suggested label impact might have on the

4   health of infants?

5        Q.    Correct.  Or health risks for

6   infants.

7        A.    No.

8        Q.    One of your warnings reports, in

9   fact, from April of 2009 talks about best

10  practices, and one of the best practices that

11  you cite for designing a product warning is

12  how likely an injury was to occur; is that

13  correct?

14       A.    Yes.

15       Q.    You didn't consider in this case

16  how likely an injury was to occur with

17  powdered infant formula in the United States,

18  did you?

19       A.    That's not correct.  Of course I

20  considered it, and it's in my report.

21       Q.    What is the difference between the

22  risk from powdered infant formula in the

23  United States versus worldwide?

24       A.    What's the difference in the risk?

25       Q.    Yes.



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1               G. Goldhaber

2       A.   The risk overall as I reported is

3    about one in a hundred thousand.

4       Q.   And where did you read that?

5       A.    In the file somewhere.  I can't

6    tell you the exact page.

7       Q.   No, no, no, but can you remember

8    the authority where you got that?

9       A.   Not sitting here today, no.

10      Q.   And so overall, it's one in a

11   hundred thousand?

12      A.   That's what I reported.

13      Q.   How does that differ from what it

14   is in the United States?

15      A.    I don't recall the exact numbers.

16   It might be a lower risk in the United

17   States.

18      Q.   How likely is injury to occur with

19   an Abbott powdered infant formula product?

20      A.    I think the risk was looked at

21   overall, if I'm not mistaken.

22      Q.   So you don't know what it is with

23   respect to an Abbott powdered infant product;

24   is that correct?

25      A.    That's correct.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    G. Goldhaber

2        Q.   Are you aware, has anybody made you

3    aware that E.sak or Cronobacter has never

4    been found in an unused can or packet of an

5    Abbott powdered infant formula on the market

6    in the United States ever?

7        A.   I'm not sure about that.  I can't

8    answer that.

9        Q.   Has anybody ever told you that?

10        A.   I don't recall that, no.

11        Q.   Have you ever read it in a

12    deposition transcript?

13        A.   I don't recall.

14        Q.   You talk about market surveys

15    somewhat in your report.  Do you agree that

16    market surveys are not always necessary?

17        A.   Are not always necessary?

18        Q.   Correct.  Not always necessary.

19        A.   I think it depends on the

20    circumstances.  I think in the case here it's

21    ludicrous that comments were made without any

22    data.

23        Q.   There's no literature in your field

24    of expertise that says that market surveys

25    are always necessary; correct?

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com



ESQUIRE
CORPORATE SOLUTIONS

1                   G. Goldhaber
2    that are needed.  As you know, I believe a
3    warning is needed on powdered infant formula.
4    So if you overwarn in society about things
5    that, at least in my opinion, aren't
6    necessary, then when you do warn about things
7    that are necessary, people may be cynical
8    about any warning.  That's the danger of
9    overwarning.
10        Q.   According to your report, you
11   accepted the plaintiff's testimony as true;
12   correct?
13        A.   Yes.
14        Q.   Do you know in what common
15   household products E.sakazakii or
16   Cronobacter, the more current name, have been
17   found?
18        A.   Besides powdered infant formula?
19        Q.   Yes.
20        A.   I thought I had seen some
21   references to other products, but I don't
22   recall now.
23        Q.   I'm going to suggest a few and you
24   tell me whether or not you recall seeing
25   this.  Cereals?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    G. Goldhaber

2        A.    Again, I don't recall the

3   specifics.  I remember in the files that I

4   looked at there were some other products

5   discussed.

6        Q.    They were discussed.  You looked at

7   it.  You didn't take that into account in

8   your report in rendering opinions in this

9   case, did you?

10       A.    No.  I was focused on powdered

11  formula.

12       Q.    Where in the environment has

13  E.sakazakii or Cronobacter been found?

14       A.    In the environment?  I don't know.

15       Q.    Have you ever seen a study that

16  gave a certain percentage of households in

17  which E.sakazakii has been found in the home?

18       A.    I don't recall.

19       Q.    You said in your report that you

20  reviewed the report of Dr. Janine Jason;

21  correct?

22       A.    Yes.

23       Q.    You didn't review Dr. Farmer's

24  report?

25       A.    I don't believe so.  If it's not


ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    G. Goldhaber
2    listed here, then I didn't.  I read some of
3    his deposition, I think, or part of it in --
4    it says partial in Froman.
5         Q.   In Froman, not in this case,
6    though; right?
7         A.   No.
8         Q.   Do you know where Dr. Farmer found
9    E.sakazakii in his house?
10        A.   I don't recall.
11        Q.   He found it in his dog's water
12   bowl.  Does that ring a bell with you at all?
13        A.   No.
14        Q.   Do you know where E.sak or
15   Cronobacter has been found in hospitals, in
16   the hospital environment?
17        A.   No.
18        Q.   Do you know if you can find it in
19   offices on desks?
20        A.   I can't say one way or the other.
21        Q.   Have you seen any documents at all
22   about where else Cronobacter or E.sak has
23   been found?
24        A.   I said I thought I did, but I can't
25   be specific.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com