# EXHIBIT 1

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AO 245F  (Rev. 12/03 - VAW Additions 3/04) Amended Judgment in a Criminal Case for Organizational Defendants
Sheet 1
(NOTE: Identify Changes with Asterisks (*))

# UNITED STATES DISTRICT COURT
## Western District of Virginia

OCT 0 4 2012

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA<br>V.<br><br>ABBOTT LABORATORIES | **AMENDED JUDGMENT IN A CRIMINAL CASE**<br>(For Organizational Defendants)<br>CASE NUMBER: DVAW112CR000026-001<br><br>CASE NUMBER: |

**Date of Original Judgment:** _____
(or Date of Last Amended Judgment)

CASE NUMBER:

Mark Filip, Henry DePippo, Theodore Wells, James Borchin
Defendant Organization's Attorney

**Reason for Amendment:**

☐ Correction of Sentence on Remand (18 U.S.C. § 3742(f)(1) and (2))

☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))

☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))

☒ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))

☐ Modification of Restitution Order (18 U.S.C. § 3664)

## THE DEFENDANT ORGANIZATION:

☒ pleaded guilty to count(s)   One (1) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The organizational defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21:33(a), 333(a)(1),<br>352(a) and 352(f)(1) | Introduction of Misbranded Drug into Interstate Commerce<br>(Misdemeanor) | December, 2006 | One |

The defendant organization is sentenced as provided in pages 2 through    7    of this judgment.

☐ The defendant organization has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are   dismissed on the motion of the United States.

It is ordered that the defendant organization must notify the United States attorney for this district within 30 days of any change of name, principal business address, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant organization must notify the court and United States attorney of material changes in economic circumstances.

Defendant Organization's
Federal Employer I.D. No.: xx-xxx8440

Defendant Organization's Principal Business Address:

100 Abbott Park Road
Abbott Park, IL  60064

October 2, 2012
Date of Imposition of Judgment

_____
Signature of Judge

Samuel G. Wilson, United States District Judge
Name and Title of Judge

10/4/12
Date

Defendant Organization's Mailing Address:

100 Abbott Park Road
Abbott Park, IL  60064

AO 245F    (Rev. 12/03 - VAW Additions 3/04) Amended Judgment in a Criminal Case for Organizational Defendants    (NOTE: Identify Changes with Asterisks (*))
           Sheet 2 - Probation

Judgment-Page __2__ of __7__

DEFENDANT ORGANIZATION:  ABBOTT LABORATORIES
CASE NUMBER:  DVAW112CR000026-001

## PROBATION

The defendant organization is hereby sentenced to probation for a term of :

Five (5) years.
*

AO 245F   (Rev. 12/03 - VAW Additions 3/04) Amended Judgment in a Criminal Case for Organizational Defendants
          Sheet 2B - Probation                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment-Page   3   of   7

DEFENDANT ORGANIZATION:  ABBOTT LABORATORIES
CASE NUMBER:  DVAW112CR000026-001

## SPECIAL CONDITIONS OF SUPERVISION

A. All definitions set forth in the Plea Agreement shall be incorporated by reference and are included in the conditions of probation.

B. The Responsible Entity shall make the following reports to the probation office:

1. Annual Chief Executive Officer ("CEO") Certification: On an annual basis, the Responsible Entity's CEO shall conduct a review of the effectiveness of the Responsible Entity's Compliance Program as it relates to the marketing, promotion, and sale of pharmaceutical products during the preceding twelve-month period. The review shall consist of a review of updates and reports by the Responsible Entity's Chief Compliance Officer and/or a representative from the Responsible Entity's U.S. Pharmaceutical Compliance Committee about the Responsible Entity's Compliance Program and the effectiveness of that program during the preceding twelve-month period. Based on the review described above, the Responsible Entity's CEO shall submit to the probation office a signed certification stating that, to the best of his or her knowledge, during the preceding twelve-month period:

a. The Responsible Entity's Compliance Program continued to include the compliance policies and procedures set forth in the section of this Plea Agreement titled "COMPLIANCE MEASURES," and

b. To the extent that a Reportable Event (as that term is defined below) has been determined to have occurred, the Responsible Entity has fully complied with the Reportable Event reporting requirements of this Plea Agreement.

The CEO's certification shall summarize the review described above that he or she conducted to provide the required certification.

2. Annual Board of Directors Resolution: On an annual basis, the Responsible Entity's Board of Directors ("Board") or a designated Committee of the Board of Directors ("Board Committee") shall conduct a review of the effectiveness of the Responsible Entity's Compliance Program as it relates to the marketing, promotion, and sale of pharmaceutical products. This review shall consist of updates and reports by the Responsible Entity's Chief Compliance Officer and/or a representative from the Responsible Entity's U.S. Pharmaceutical Compliance Committee about the Responsible Entity's Compliance Program and the effectiveness of that program during the preceding twelve-month period. Based on the review described above, the Responsible Entity's Board shall submit to the probation office a resolution adopted by the Board stating that, to the best of its knowledge, the Responsible Entity has had in effect policies and procedures designed to prevent the Responsible Entity from violating 21 U.S.C. §§ 331(a) or (k) by directly or indirectly causing the introduction or delivery for introduction into interstate commerce of any pharmaceutical product that was misbranded within the meaning of 21 U.S.C. § 352 or by directly or indirectly causing any pharmaceutical product to be misbranded within the meaning of 21 U.S.C. § 352 while such product was held for sale after shipment of it or any of its components in interstate commerce. The Board's resolution shall summarize the review described above that it, or the Board Committee, conducted to provide the required statement. If the Board is unable to provide this statement, it shall submit a resolution explaining the reasons why it is unable to provide this statement about the effectiveness of the Responsible Entity's Compliance Program.

3. Reportable Events: Fifteen days after the end of each calendar quarter (that is, by January 15 for the calendar quarter ending December 31, April 15 for the calendar quarter ending March 31, July 15 for the calendar quarter ending June 30, and October 15 for the calendar quarter ending September 30) and 10 days prior to the termination of probation ("Final Report"), the Responsible Entity shall submit a report to the probation office in writing stating whether any Reportable Events have been determined to have occurred during the preceding calendar quarter (or, in the case of the Final Report, during the period since the calendar quarter last covered by a regular quarterly report) and providing updated information about Reportable Events that occurred during any prior calendar quarters. A Reportable Event is any matter that a reasonable person would consider a probable violation of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 331(a) or (k), related to the misbranding of a pharmaceutical product within the meaning of 21 U.S.C. § 352. A Reportable Event may be the result of an isolated event or a series of occurrences. The reporting of a Reportable Event shall not be considered by the Probation Officer as a per se violation of the terms of probation. Instead, other factors will be taken into account, including, but not limited to, whether the Reportable Event violated policies the company has adopted, whether the company provided training addressing the subject matter of the Reportable Event, whether the Reportable Event was an isolated or systemic occurrence, the company's response to the Reportable Event, and any remedial actions taken after the company learned of the Reportable Event. Any Reportable Event determined to have occurred by the Responsible Entity shall be promptly reported to the Responsible Entity's Chief Executive Officer.

4. The first set of annual certifications and reports shall be submitted not more than 350 days after the Responsible Entity is sentenced and shall cover the period of time commencing one month prior to the date of sentencing to the date of submission of the certification and report. Each subsequent set of annual reports and certifications shall be due one year thereafter and cover the one year period that follows the year covered in the prior annual reports and certifications.

5. The probation office may share any information it receives from the Responsible Entity with the United States Attorney's Office.

AO 245F   (Rev. 12/03 - VAW Additions 3/04) Amended Judgment in a Criminal Case for Organizational Defendants   (NOTE: Identify Changes with Asterisks (*))
Sheet 2B - Probation

Judgment-Page ___4___ of ___7___

DEFENDANT ORGANIZATION:  ABBOTT LABORATORIES
CASE NUMBER:  DVAW112CR000026-001

# SPECIAL CONDITIONS OF SUPERVISION

6. For the purpose of this Plea Agreement and the conditions of probation, the following terms shall have the following meaning:
a. The term "Chief Compliance Officer" refers to the person at the Responsible Entity with ultimate responsibility for developing and implementing policies, procedures, and practices designed to ensure compliance with the FDCA and FDA's regulations and guidance documents relating to the marketing, promotion, and sale of pharmaceutical products. During the term of probation, the Chief Compliance Officer shall be a member of the Responsible Entity's senior management and the Responsible Entity's U.S. Pharmaceutical Compliance Committee. Not more than thirty (30) days from the imposition of sentence in this matter, the Responsible Entity shall notify the probation office in writing of the name of the Responsible Entity's Chief Compliance Officer and provide a written description of that person's responsibilities with respect to complying with the FDCA and FDA's regulations and guidance documents relating to the marketing, promotion, and sale of pharmaceutical products. The Responsible Entity shall, in writing, report to the probation office any changes in the identity of or any material changes in the position and responsibilities of the Chief Compliance Officer. This report shall be provided within fifteen (15) days after such a change.
b. The term "U.S. Pharmaceutical Compliance Committee" refers to the committee established or to be established by the Responsible Entity to, in conjunction with the Chief Compliance Officer, assist in the implementation and enhancement of the Compliance Program's policies and procedures relating to compliance with the FDCA and FDA's regulations and guidance documents concerning the marketing, promotion, and sale of pharmaceutical products. During the term of probation, this committee shall, at a minimum, include the Responsible Entity's Chief Compliance Officer and other members of the Responsible Entity's senior management with responsibilities concerning the marketing, promotion, and sale of the Responsible Entity's pharmaceutical products. Not more than thirty (30) days from the imposition of sentence in this matter, the Responsible Entity shall notify the probation office in writing of the names of the Responsible Entity's senior managers on the U.S. Pharmaceutical Compliance Committee and provide a written description of their responsibilities with respect to complying with the FDCA and FDA's regulations and guidance documents relating to the marketing, promotion, and sale of pharmaceutical products. The Responsible Entity shall, in writing, report to the probation office any changes in the identity of or any material changes in the position and responsibilities of these senior managers. This report shall be provided within fifteen (15) days after such a change.
c. The term "Compliance Program" refers to the policies, procedures, practices, and other measures that the Responsible Entity has established or will establish to address regulatory compliance issues, relating to the marketing, promotion and sale of pharmaceutical products, including the Responsible Entity's compliance with FDCA and FDA regulations and guidance documents.
d. The term "pharmaceutical products" means drugs marketed, promoted, or sold in the United States and intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or drugs intended to affect the structure or any function of the body of humans. 21 U.S.C. § 321(g)(1)(B) & (C).
C. The Responsible Entity shall not commit any federal health care fraud offense, any offense under Titles 21 or 42 of the United States Code, or any felony during the term of probation. The commission of an offense shall not be considered by the Probation Officer as a per se violation of the terms of probation. Instead, other factors will be taken into account, including, but not limited to, whether the offense violated policies the company has adopted, whether the company provided training addressing the subject matter of the offense, whether the offense was an isolated or systemic occurrence, the company's response to the offense, and any remedial actions taken after the company learned of the offense.
D. Within 7 days of filing, the Responsible Entity shall submit to the probation office a copy of each Securities and Exchange Commission Form 10-Q.

AO 245F   (Rev. 12/03 - VAW Additions 3/04) Amended Judgment in a Criminal Case for Organizational Defendants
Sheet 3 - Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

Judgment - Page ___5___ of ___7___

DEFENDANT ORGANIZATION:  ABBOTT LABORATORIES
CASE NUMBER:  DVAW112CR000026-001

## CRIMINAL MONETARY PENALTIES

The defendant organization must pay the following total criminal monetary penalties under the schedule of payments on Sheet 4.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 125.00 | $ 500,000,000.00 | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant organization shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant organization makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| **TOTALS** | $0.00 | $0.00 | |

☐ Restitution amount ordered pursuant to plea agreement S _____

☐ The defendant organization shall pay interest on restitution or a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 4 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant organization does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245F    (Rev. 12/03 - VAW Additions 3/04) Amended Judgment in a Criminal Case for Organizational Defendants
           Sheet 3A - Criminal Monetary Penalties                                    (NOTE: Identify Changes with Asterisks (*))

Judgment - Page  6  of  7

DEFENDANT ORGANIZATION:  ABBOTT LABORATORIES
CASE NUMBER:  DVAW112CR000026-001

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

Pursuant to the plea agreement, the additional financial sanction is imposed and payable immediately by Abbott Laboratories:

$1,500,000.00 (One Million Five Hundred Thousand Dollars) to the Virginia Medicaid Fraud Control Unit's Program Income Fund.

AO 245F   (Rev. 12/03 - VAW Additions 3/04) Amended Judgment in a Criminal Case for Organizational Defendants
Sheet 4 - Schedule of Payments                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment - Page  7  of  7

**DEFENDANT ORGANIZATION:** ABBOTT LABORATORIES
**CASE NUMBER:** DVAW112CR000026-001

# SCHEDULE OF PAYMENTS

Having assessed the organization's ability to pay, payment of the total criminal monetary penalties are due as follows:

A ☒ Lump sum payment of $ 500,000,125.00 _____ due immediately, balance due

     ☐ not later than _____ , or
     ☐ in accordance with ☐ C or ☐ D below; or

B ☐ Payment to begin immediately (may be combined with ☐ C or ☐ D below); or

C ☐ Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐ Special instructions regarding the payment of criminal monetary penalties:

All criminal monetary penalties are made to the clerk of the court.

The defendant organization shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant organization shall pay the cost of prosecution.

☐ The defendant organization shall pay the following court cost(s):

☒ The defendant organization shall forfeit the defendant organization's interest in the following property to the United States:
     See attached Agreed Order of Forfeiture entered May 7, 2012.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAY - 7 2012

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| **v.** | : | **Criminal No.** *1:12CR26* |
| | : | |
| **ABBOTT LABORATORIES** | : | |

## AGREED ORDER OF FORFEITURE

**IT IS HEREBY ORDERED THAT:**

1.      As the result of the guilty plea to the Information, the defendant shall forfeit to the United States quantities of Depakote, Depakote ER and Depakote Sprinkle that were misbranded when introduced into interstate commerce, pursuant to 21 U.S.C. § 334 and 28 U.S.C. § 2461

2.      Pursuant to the defendant's plea agreement, the defendant shall forfeit $198,500,000.00 (one hundred ninety-eight million five hundred thousand dollars), in the form of certified funds made payable to the U.S. Treasury Department, or as otherwise directed by the United States, as a substitute asset pursuant to 21 U.S.C. § 853(p).

3.      The Court shall retain jurisdiction to enforce this Order, and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).  Payment shall be made within three days of entry of the defendant's guilty plea.  As payment is voluntarily being remitted to the United States, notice and publication are not required.

4.      Pursuant to Fed. R. Crim. P. 32.2(b)(4), this Order of Forfeiture shall become final as to the defendant upon entry, and shall be made a part of the sentence and included in the judgment.

*Agreed Order of Forfeiture*
*United States v. Abbott Laboratories*

*Attachment C to Plea Agreement*

5.      The Clerk of this Court shall certify copies of this Order to counsel of record and shall certify copies to the United States Attorney's Office, Asset Forfeiture Section, P.O. Box 1709, Roanoke, Virginia  24008.

6.      ENTERED this 7th day of May, 2012.

Hon. Samuel G. Wilson
United States District Judge

# EXHIBIT 2

CLERK'S OFFICE U.S. L.
AT ABINGDON, V.
FILED

MAY 0 7 2012

JULIA C. DUDLEY CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | |
| v. | : | Criminal No. 1:12CR26 |
| | : | |
| ABBOTT LABORATORIES | : | |

### PLEA AGREEMENT

ABBOTT LABORATORIES (EIN: 36-0698440) ("ABBOTT") has entered into a Plea Agreement with the United States of America, by counsel, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."). The terms and conditions of this agreement are as follows:

**1.    CHARGE TO WHICH ABBOTT IS PLEADING GUILTY AND WAIVER OF RIGHTS**

ABBOTT will enter a plea of guilty to Count One of the Information charging it with violating Title 21, United States Code, Sections 331(a), 333(a)(1), 352(a) and 352(f)(1) by introducing and delivering for introduction into interstate commerce and causing the introduction and delivery for introduction into interstate commerce from Illinois and Puerto Rico to various locations throughout the United States, including the Western District of Virginia, of Depakote, Depakote ER and Depakote Sprinkle that were misbranded.

The parties agree and stipulate that the maximum statutory penalty is a fine of $800,000,000.00 (twice the gross gain), pursuant to Title 18, United States Code, Section 3571(d), plus a period of probation of up to five years, pursuant to Title 18, United States Code, Section 3561(c)(2). In addition, ABBOTT's assets may be subject to forfeiture. ABBOTT understands that fees may be imposed to pay for probation and that there will be a $125 special assessment for Count One, pursuant to Title 18, United States Code, Section 3013(a)(1)(B)(iii). ABBOTT's attorneys have informed it of the nature of the charge and the elements of the charge that must be proved by the United States beyond a reasonable doubt before ABBOTT could be found guilty as charged.

ABBOTT acknowledges that ABBOTT has had all of its rights explained to it. ABBOTT expressly recognizes that, as a corporation, ABBOTT may have the following constitutional rights and that by voluntarily pleading guilty ABBOTT knowingly waives and gives up these valuable constitutional rights:

The right to plead not guilty and persist in that plea.
The right to a speedy and public jury trial.
The right to assistance of counsel at that trial and in any subsequent appeal.
The right to remain silent at trial.
The right to testify at trial.
The right to confront and cross-examine witnesses.

*Plea Agreement*
*United States v. Abbott Laboratories*

*Authorized Corporate Officer's Initials*

The right to present evidence and witnesses.
The right to compulsory process of the court.
The right to compel the attendance of witnesses at trial.
The right to be presumed innocent.
The right to a unanimous guilty verdict.
The right to appeal a guilty verdict.

ABBOTT is pleading guilty as described above because ABBOTT is in fact guilty and because ABBOTT believes it is in its best interest to do so and not because of any threats or promises, other than the terms of the Plea Agreement, described herein, in exchange for its plea of guilty. ABBOTT agrees that all of the matters set forth in the Information are true and correct.

ABBOTT understands that the plea is being entered in accordance with Fed. R. Crim. P. 11(c)(1)(C).

## 2.   SENTENCING PROVISIONS

Based upon the evidence currently known to the United States, the parties agree that the 2011 version of the United States Sentencing Commission Guidelines Manual is the appropriate Guidelines Manual to utilize. According to U.S.S.G. § 8C2.1, the organizational fine provisions do not apply to the count of conviction in this case, which is a misdemeanor under 21 U.S.C. § 333(a)(1).

The parties agree that the fine shall be $500,000,000.00 (five hundred million dollars).

The parties agree and stipulate that a term of probation for five years will be imposed subject to modification as set forth in the section of this Plea Agreement titled "SUCCESSION ISSUES." ABBOTT understands and agrees that if its probation is revoked, it may be resentenced and a total aggregate fine up to the statutory maximum of $800,000,000.00 (eight hundred million dollars) may be imposed.

The parties agree that if the Court refuses to accept the Plea Agreement with the agreed-upon sentence, this Plea Agreement will be null and void, and ABBOTT will be free to withdraw this guilty plea. In the event the Court refuses to accept the Plea Agreement with the agreed-upon sentence and ABBOTT withdraws this guilty plea, nothing in this Plea Agreement shall be deemed a waiver of the provisions of Federal Rule of Evidence ("Fed. R. Evid.") 410 and the United States will move to dismiss the Information without prejudice to the United States' right to proceed criminally against ABBOTT or any other entity or individual on any charge.

## 3.   FINANCIAL OBLIGATIONS

The parties agree and understand that any of the money paid pursuant to this Plea Agreement will be returned if, and only if, the Court refuses to accept the Plea Agreement with the agreed-upon sentence and, as a result, ABBOTT withdraws its guilty plea. If the Court rejects the plea agreement, the United States will return all money paid by ABBOTT, without interest, not more than 3 days after ABBOTT withdraws its guilty plea and notifies the United States Attorney's Office for the Western District of Virginia, in writing, that it wishes to have the money returned.

*Plea Agreement*
*United States v. Abbott Laboratories*

Authorized Corporate Officer's Initials: _____

     **a.**    **Criminal Resolution Payments**

Not more than 3 days after the entry of ABBOTT's guilty plea, ABBOTT will make the following disbursements:

          (1)    $125.00 (one hundred twenty-five dollars) to the Clerk, U.S. District Court, Abingdon, Virginia, as payment of the special assessment;

          (2)    $500,000,000.00 (five hundred million dollars) to the Clerk, U.S. District Court, Abingdon, Virginia, as payment of the fine;

          (3)    $1,500,000.00 (one million five hundred thousand dollars) to the Virginia Medicaid Fraud Control Unit's Program Income Fund; and

          (4)    $198,500,000.00 (one hundred ninety-eight million five hundred thousand dollars), made payable to the United States Department of the Treasury, as directed by the United States Attorney's Office as payment of a forfeiture.

     **b.**    **Forfeiture**

ABBOTT agrees to forfeit $198,500,000.00 (one hundred ninety-eight million five hundred thousand dollars), and agrees to sign any documentation necessary to accomplish the forfeiture. ABBOTT agrees to forfeit all interest in these funds and to take whatever steps are necessary to pass clear title of this sum to the United States. These steps include but are not limited to making the sum available to the United States, as directed by the United States. ABBOTT agrees not to file a claim in any forfeiture proceeding or to contest, in any manner, the forfeiture of said assets. ABBOTT understands and agrees that forfeiture of this property is proportionate to the degree and nature of the offense. ABBOTT freely and knowingly waives any and all constitutional and statutory challenges to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. ABBOTT further understands and agrees that this forfeiture is separate and distinct from, and is not in the nature of, or in lieu of, any monetary penalty that may be imposed by the court.

     **c.**    **Restitution**

The parties agree and stipulate, pursuant to 18 U.S.C. § 3663(a)(1)(B)(ii), that no restitution should be ordered.

**4.**    **ADDITIONAL OBLIGATIONS**

Unless the Court rejects this Plea Agreement and, as a result, ABBOTT withdraws its plea, ABBOTT agrees to: (1) accept responsibility for its conduct; (2) not attempt to withdraw its guilty plea; (3) not deny that it committed the crimes to which it has pled guilty; (4) not make or adopt any arguments or objections to the presentence investigation report that are inconsistent

*Plea Agreement*
*United States v. Abbott Laboratories*                    *Authorized Corporate Officer's Initials:*

with this Plea Agreement; (5) comply with its obligations under the Civil Settlement Agreement (attached as Attachment D); and (6) enter into a Corporate Integrity Agreement (attached as Attachment E).

ABBOTT will not (1) make any public statement or (2) make any statement or take any position in litigation in which any United States department or agency is a party, contradicting any statement of fact set forth in the Agreed Statement of Facts (attached as Attachment B). If ABBOTT makes a public statement that in whole or in part contradicts a statement of fact contained in the Agreed Statement of Facts, ABBOTT may avoid being in violation of this Plea Agreement by promptly publicly repudiating such statement. For the purposes of this paragraph, the term "public statement" means any statement made or authorized by ABBOTT's directors, officers, management employees, or attorneys and includes, but is not limited to, a statement in (1) a press release, (2) public relations material, or (3) ABBOTT website. Notwithstanding the above, any ABBOTT entity may avail itself of any legal or factual arguments available to it (1) in defending litigation brought by a party other than the United States or (2) in any investigation or proceeding brought by a state entity or by the United States Congress. This paragraph does not apply to any statement made by any individual in the course of any actual or contemplated criminal, regulatory, administrative or civil case initiated by any governmental or private party against such individual.

5. **WAIVER OF RIGHT TO APPEAL AND COLLATERALLY ATTACK THE JUDGMENT AND SENTENCE IMPOSED BY THE COURT**

If the Court accepts this Plea Agreement, ABBOTT agrees that ABBOTT will not appeal the conviction or sentence imposed. ABBOTT is knowingly and voluntarily waiving any right to appeal and is voluntarily willing to rely on the Court in sentencing it, pursuant to the terms of Fed. R. Crim. P. 11(c)(1)(C). ABBOTT expressly waives its right to appeal as to any and all issues in this matter and waives any right it may have to collaterally attack, in any future proceeding, any order issued in this matter, unless such appeal or collateral attack cannot be waived, by law. ABBOTT understands the United States expressly reserves all of its rights to appeal, but if the United States initiates a direct appeal of the sentence imposed, ABBOTT may file a cross-appeal of that same sentence. ABBOTT agrees and understands if it files any court document (except for an appeal or collateral attack based on an issue that cannot be waived, by law) seeking to disturb, in any way, any order imposed in the case such action shall constitute a failure to comply with a provision of this agreement.

6. **REMEDIES FOR FAILURE TO COMPLY WITH ANY PROVISION OF THE PLEA AGREEMENT OR OVERALL RESOLUTION**

ABBOTT understands that if: (1) ABBOTT attempts to withdraw its plea (in the absence of the Court refusing to accept the Plea Agreement) or fails to comply with any provision of this Plea Agreement prior to the completion of the term of probation; (2) ABBOTT's conviction is set aside, for any reason; (3) ABBOTT fails to execute all required paperwork prior to the imposition of judgment; and/or (4) ABBOTT fails to comply with its obligations under the Civil Settlement Agreement (attached as Attachment D) the United States may, at its election, pursue any or all of the following remedies: (a) declare this Plea Agreement void; (b) file, by

indictment or information, any charges which were filed and/or could have been filed concerning the matters involved in the instant investigation; (c) refuse to abide by any stipulations and/or recommendations contained in this Plea Agreement; (d) not be bound by any obligation of the United States set forth in this Plea Agreement, including, but not limited to, those obligations set forth in the section of this Plea Agreement titled "COMPLETION OF PROSECUTION;" and (e) take any other action provided for under this Plea Agreement or by statute, regulation or court rule.

The remedies set forth above are cumulative and not mutually exclusive. If the United States pursues any of its permissible remedies as set forth in this Plea Agreement, ABBOTT will still be bound by its obligations under this Plea Agreement. ABBOTT hereby waives its right under Fed. R. Crim. P. 7 to be proceeded against by indictment and consents to the filing of an information against it concerning any charges filed pursuant to this section of the Plea Agreement. ABBOTT hereby waives any statute of limitations argument as to any such charges.

## 7.   INFORMATION ACCESS WAIVER

ABBOTT agrees to waive all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

## 8.   DESTRUCTION OF ITEMS OBTAINED BY LAW ENFORCEMENT

By signing this Plea Agreement, ABBOTT consents to the destruction of all items obtained by law enforcement agents during the course of the investigation. However, ABBOTT expressly agrees that, within 30 days of being informed by the United States Attorney's Office that records and/or other items obtained from ABBOTT are available for removal, it will remove, at its cost, all such records and/or other items from the premises designated by the United States Attorney's Office.

## 9.   ATTORNEY CLIENT PRIVILEGE

Nothing in this Plea Agreement shall be construed to require ABBOTT to waive any attorney-client privilege or work-product protection.

## 10.   COMPLETION OF PROSECUTION

Pursuant to Fed. R. Crim. P. 11(c)(l)(A), so long as ABBOTT complies with all of its obligations under the Plea Agreement, the United States agrees that, other than the charge in the attached Information, it shall not further prosecute ABBOTT or its present or former parents, affiliates, divisions, or subsidiaries or their predecessors, successors, or assigns for: (a) any additional federal criminal charges or forfeiture action with respect to the conduct covered by the Information; or (b) any violations of law that were the subject matter of the investigation by the United States Attorney's Office for the Western District of Virginia and the United States

*Plea Agreement*
*United States v. Abbott Laboratories*                    *Authorized Corporate Officer's Initials:*

Department of Justice Consumer Protection Branch or based on facts currently known to the United States Attorney's Office for the Western District of Virginia and the United States Department of Justice Consumer Protection Branch regarding the sale, promotion, or marketing of Depakote, Depakote ER, Depakote Sprinkle, Depacon or Depakene in the United States occurring on or before May 7, 2012.

Nothing in this Plea Agreement affects the administrative, civil, criminal, or other tax liability of any entity or individual and this Plea Agreement does not bind the Internal Revenue Service of the Department of Treasury, the Tax Division of the United States Department of Justice, or any other government agency with respect to the resolution of any tax issue.

The non-prosecution provisions in this Plea Agreement are not binding on the United States with respect to any investigations of ABBOTT, its subsidiaries, affiliates, or parent that are or may be conducted in the future by the Fraud Section of the Criminal Division of the United States Department of Justice regarding possible violations of the Foreign Corrupt Practices Act and related offenses.

## 11.    LIMITATION OF AGREEMENT

This Plea Agreement is limited to the United States Department of Justice and does not bind any other federal, state or local authority.

## 12.    EFFECTIVE REPRESENTATION

ABBOTT has discussed the terms of the foregoing Plea Agreement and all matters pertaining to the charges against it with its attorneys and is fully satisfied with its attorneys and its attorneys' advice. At this time, ABBOTT has no dissatisfaction or complaint with its attorneys' representation. ABBOTT agrees to make known to the Court no later than at the time of sentencing any dissatisfaction or complaint ABBOTT may have with its attorneys' representation.

## 13.    SUCCESSION ISSUES

ABBOTT has publicly announced and represents to the Court that it plans to separate into two publicly traded companies, one a diversified medical products company, which may retain the ABBOTT name, ("Diversified Company") and the other a research-based pharmaceutical company ("Pharmaceutical Company") which will not be a subsidiary or corporate affiliate of ABBOTT (this separation is hereinafter referred to as the "Transaction" and the "Effective Time" shall be the date and time that the Transaction becomes effective). The conduct for which ABBOTT was investigated and that led to this Plea Agreement relates solely to ABBOTT's research-based pharmaceutical products business and not to its diversified medical products business. Upon completion of the Transaction, the assets of ABBOTT's research-based pharmaceutical products business will be transferred, conveyed and/or assigned by it to the Pharmaceutical Company and ABBOTT shall no longer be involved in the marketing or promotion of research-based pharmaceutical products in the United States. As part of the Transaction, ABBOTT agrees that it will include the following in a contract or agreement with the Pharmaceutical Company relating to the transfer, conveyance or assignment of the assets of

*Plea Agreement*
*United States v. Abbott Laboratories*                     *Authorized Corporate Officer's Initials*

the research-based pharmaceutical products business to the Pharmaceutical Company: (a) a provision stating that the Pharmaceutical Company agrees that the conditions of probation and all other provisions of this Plea Agreement are fully binding on the Pharmaceutical Company and (b) a provision stating that the Pharmaceutical Company will be deemed to carry a prior conviction for purposes of Title 21, United States Code, Section 333(a)(2), and waives any right it may have to argue that it does not have such prior conviction.

In the event the Transaction takes place and the Pharmaceutical Company agrees to (a) and (b) in the last sentence of the preceding paragraph, the United States Department of Justice and ABBOTT agree to the following:

A.  The Pharmaceutical Company will be deemed the successor in interest, for purposes of this Plea Agreement, and all of ABBOTT's obligations under this Plea Agreement, including any and all conditions of probation, will become obligations of the Pharmaceutical Company as of the Effective Time of the Transaction. The term of probation shall be modified to three years from the Effective Time.  As of the Effective Time, neither ABBOTT nor the Diversified Company will have any further obligations under this Plea Agreement. The Pharmaceutical Company will be the only entity that will have any further obligations under this Plea Agreement, including any and all conditions of probation, which will be terminated with respect to ABBOTT. Any violation of this Plea Agreement or any term of probation that occurs after the Effective Time shall not be a basis to impose any sanction on ABBOTT, the Diversified Company, or any of their subsidiaries after the Effective Time.  After the Effective Time, all releases that run to the benefit of ABBOTT, including those set forth in the section of this Plea Agreement titled "COMPLETION OF PROSECUTION," will continue to apply fully to ABBOTT, the Diversified Company, the Pharmaceutical Company and their subsidiaries;

B.  ABBOTT will be deemed to no longer carry a conviction by the United States Department of Justice and the United States Department of Justice agrees it will not use the conviction of ABBOTT pursuant to this plea agreement:

  1.  In any future calculation of the Criminal History Category under the United States Sentencing Guidelines in any future sentencing of ABBOTT or the Diversified Company; or

  2.  As a prior conviction for purposes of 21 U.S.C. §§ 331 and 333(a)(2) in any future criminal case against ABBOTT or the Diversified Company.  The United States Department of Justice waives any right it might have to argue that either ABBOTT or the Diversified Company has such a conviction for such purposes.

C.  The Pharmaceutical Company's certification, resolution, and reporting requirements will cover ABBOTT's conduct for any time period for which ABBOTT did not submit a certificate, resolution or report because the Effective Time occurred prior to the due date of the certificate, resolution or report.

*Plea Agreement*
*United States v. Abbott Laboratories*

*Authorized Corporate Officer's Initials:* _____

For purposes of this Plea Agreement and the conditions of probation, the term "Responsible Entity" refers to the corporate entity that bears the obligations of this Plea Agreement, including the conditions of probation.  ABBOTT shall be the Responsible Entity until the Effective Time and Pharmaceutical Company shall be the Responsible Entity after the Effective Time.

14.   **CONDITIONS OF PROBATION**

The parties agree that the following will be included as the only conditions of probation:

   *A.* *All definitions set forth in the Plea Agreement shall be incorporated by reference and are included in the conditions of probation.*

   *B.* *The Responsible Entity shall make the following reports to the probation office:*

     *1.* *Annual Chief Executive Officer ("CEO") Certification: On an annual basis, the Responsible Entity's CEO shall conduct a review of the effectiveness of the Responsible Entity's Compliance Program as it relates to the marketing, promotion, and sale of pharmaceutical products during the preceding twelve-month period.  The review shall consist of a review of updates and reports by the Responsible Entity's Chief Compliance Officer and/or a representative from the Responsible Entity's U.S. Pharmaceutical Compliance Committee about the Responsible Entity's Compliance Program and the effectiveness of that program during the preceding twelve-month period.  Based on the review described above, the Responsible Entity's CEO shall submit to the probation office a signed certification stating that, to the best of his or her knowledge, during the preceding twelve-month period:*

       *a.* *The Responsible Entity's Compliance Program continued to include the compliance policies and procedures set forth in the section of this Plea Agreement titled "COMPLIANCE MEASURES," and*

       *b.* *To the extent that a Reportable Event (as that term is defined below) has been determined to have occurred, the Responsible Entity has fully complied with the Reportable Event reporting requirements of this Plea Agreement.*

     *The CEO's certification shall summarize the review described above that he or she conducted to provide the required certification.*

     *2.* *Annual Board of Directors Resolution: On an annual basis, the Responsible Entity's Board of Directors ("Board") or a designated Committee of the Board of Directors ("Board Committee") shall conduct a review of the effectiveness of the Responsible Entity's Compliance Program as it relates to the marketing, promotion, and sale of pharmaceutical products. This review shall consist of updates and reports by the Responsible*

*Entity's Chief Compliance Officer and/or a representative from the Responsible Entity's U.S. Pharmaceutical Compliance Committee about the Responsible Entity's Compliance Program and the effectiveness of that program during the preceding twelve-month period. Based on the review described above, the Responsible Entity's Board shall submit to the probation office a resolution adopted by the Board stating that, to the best of its knowledge, the Responsible Entity has had in effect policies and procedures designed to prevent the Responsible Entity from violating 21 U.S.C. §§ 331(a) or (k) by directly or indirectly causing the introduction or delivery for introduction into interstate commerce of any pharmaceutical product that was misbranded within the meaning of 21 U.S.C. § 352 or by directly or indirectly causing any pharmaceutical product to be misbranded within the meaning of 21 U.S.C. § 352 while such product was held for sale after shipment of it or any of its components in interstate commerce. The Board's resolution shall summarize the review described above that it, or the Board Committee, conducted to provide the required statement.    If the Board is unable to provide this statement, it shall submit a resolution explaining the reasons why it is unable to provide this statement about the effectiveness of the Responsible Entity's Compliance Program.*

3.      *Reportable Events:  Fifteen days after the end of each calendar quarter (that is, by January 15 for the calendar quarter ending December 31, April 15 for the calendar quarter ending March 31, July 15 for the calendar quarter ending June 30, and October 15 for the calendar quarter ending September 30) and 10 days prior to the termination of probation ("Final Report"), the Responsible Entity shall submit a report to the probation office in writing stating whether any Reportable Events have been determined to have occurred during the preceding calendar quarter (or, in the case of the Final Report, during the period since the calendar quarter last covered by a regular quarterly report) and providing updated information about Reportable Events that occurred during any prior calendar quarters.  A Reportable Event is any matter that a reasonable person would consider a probable violation of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 331(a) or (k), related to the misbranding of a pharmaceutical product within the meaning of 21 U.S.C. § 352.  A Reportable Event may be the result of an isolated event or a series of occurrences.  The reporting of a Reportable Event shall not be considered by the Probation Officer as a per se violation of the terms of probation. Instead, other factors will be taken into account, including, but not limited to, whether the Reportable Event violated policies the company has adopted, whether the company provided training*

*addressing the subject matter of the Reportable Event, whether the Reportable Event was an isolated or systemic occurrence, the company's response to the Reportable Event, and any remedial actions taken after the company learned of the Reportable Event. Any Reportable Event determined to have occurred by the Responsible Entity shall be promptly reported to the Responsible Entity's Chief Executive Officer.*

4.  *The first set of annual certifications and reports shall be submitted not more than 350 days after the Responsible Entity is sentenced and shall cover the period of time commencing one month prior to the date of sentencing to the date of submission of the certification and report. Each subsequent set of annual reports and certifications shall be due one year thereafter and cover the one year period that follows the year covered in the prior annual reports and certifications.*

5.  *The probation office may share any information it receives from the Responsible Entity with the United States Attorney's Office.*

6.  *For the purpose of this Plea Agreement and the conditions of probation, the following terms shall have the following meaning:*

    a.  *The term "Chief Compliance Officer" refers to the person at the Responsible Entity with ultimate responsibility for developing and implementing policies, procedures, and practices designed to ensure compliance with the FDCA and FDA's regulations and guidance documents relating to the marketing, promotion, and sale of pharmaceutical products. During the term of probation, the Chief Compliance Officer shall be a member of the Responsible Entity's senior management and the Responsible Entity's U.S. Pharmaceutical Compliance Committee. Not more than thirty (30) days from the imposition of sentence in this matter, the Responsible Entity shall notify the probation office in writing of the name of the Responsible Entity's Chief Compliance Officer and provide a written description of that person's responsibilities with respect to complying with the FDCA and FDA's regulations and guidance documents relating to the marketing, promotion, and sale of pharmaceutical products. The Responsible Entity shall, in writing, report to the probation office any changes in the identity of or any material changes in the position and responsibilities of the Chief Compliance Officer. This report shall be provided within fifteen (15) days after such a change.*

    b.  *The term "U.S. Pharmaceutical Compliance Committee" refers to the committee established or to be established by the Responsible Entity to, in conjunction with the Chief*

*Compliance Officer, assist in the implementation and enhancement of the Compliance Program's policies and procedures relating to compliance with the FDCA and FDA's regulations and guidance documents concerning the marketing, promotion, and sale of pharmaceutical products. During the term of probation, this committee shall, at a minimum, include the Responsible Entity's Chief Compliance Officer and other members of the Responsible Entity's senior management with responsibilities concerning the marketing, promotion, and sale of the Responsible Entity's pharmaceutical products. Not more than thirty (30) days from the imposition of sentence in this matter, the Responsible Entity shall notify the probation office in writing of the names of the Responsible Entity's senior managers on the U.S. Pharmaceutical Compliance Committee and provide a written description of their responsibilities with respect to complying with the FDCA and FDA's regulations and guidance documents relating to the marketing, promotion, and sale of pharmaceutical products. The Responsible Entity shall, in writing, report to the probation office any changes in the identity of or any material changes in the position and responsibilities of these senior managers. This report shall be provided within fifteen (15) days after such a change.*

c. *The term "Compliance Program" refers to the policies, procedures, practices, and other measures that the Responsible Entity has established or will establish to address regulatory compliance issues, relating to the marketing, promotion and sale of pharmaceutical products, including the Responsible Entity's compliance with FDCA and FDA regulations and guidance documents.*

d. *The term "pharmaceutical products" means drugs marketed, promoted, or sold in the United States and intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or drugs intended to affect the structure or any function of the body of humans. 21 U.S.C. § 321(g)(1)(B) & (C).*

C. *The Responsible Entity shall not commit any federal health care fraud offense, any offense under Titles 21 or 42 of the United States Code, or any felony during the term of probation. The commission of an offense shall not be considered by the Probation Officer as a per se violation of the terms of probation. Instead, other factors will be taken into account, including, but not limited to, whether the offense violated policies the company has adopted, whether the company provided training addressing the subject matter of the offense, whether the offense was an isolated or*

*systemic occurrence, the company's response to the offense, and any remedial actions taken after the company learned of the offense.*

D.     *Within 7 days of filing, the Responsible Entity shall submit to the probation office a copy of each Securities and Exchange Commission Form 10-Q.*

## 15.    <u>COMPLIANCE MEASURES</u>

ABBOTT agrees that, prior to entering its plea of guilty, as the Responsible Entity it has instituted a Compliance Program, under which policies, procedures, practices, and other measures are set forth to address, among other matters, regulatory compliance issues with respect to the marketing, promotion and sale of pharmaceutical products in the United States, including compliance with the Food, Drug and Cosmetic Act ("FDCA") and Food and Drug Administration ("FDA") regulations and guidance documents. The Responsible Entity's Compliance Program includes the policies and procedures relating to pharmaceutical products as set forth below:

A.     The Responsible Entity requires that the compensation (including through salaries, bonuses, and contests) of its United States sales representatives be designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in off-label marketing, promotion, and sales of the Responsible Entity's pharmaceutical products.

B.     The Responsible Entity requires Continuing Medical Education ("CME") grant-making decisions to be approved by the Responsible Entity's financial or other organizations separate from sales and marketing, and requires financial support to be provided only to programs that foster increased understanding of scientific, clinical or healthcare issues. The Responsible Entity requires a third-party CME provider to maintain full responsibility for, and control over, the selection of content, faculty, educational methods, materials and venue for CME programs.

C.     The Responsible Entity requires medical information letters to be accurate and unbiased. The Responsible Entity's policies and procedures prohibit the prompting of requests for medical information letters; and

D.     The Responsible Entity requires clinical trials funded or controlled by the Responsible Entity to be approved by ABBOTT's medical and/or scientific organizations and that the scientific research and any resulting publications foster increased understanding of scientific, clinical or healthcare issues. The Responsible Entity's policies and procedures require that it will not approve scientific research purely for the purpose of developing an article or reprint for sales representative use. The Responsible Entity requires all investigators to disclose the Responsible Entity's support for their research and financial relationships between the Responsible Entity and investigators (including any interest in any Responsible Entity product). The Responsible Entity has a publication policy designed to ensure that the Responsible Entity develops publications in a consistent and transparent manner, reporting complete

and accurate results, presented objectively and with discussion of the strengths and limitations of the study. The Responsible Entity requires that a person can be considered an "author" only if he or she has made substantial contributions to the conception and design of the study, acquisition or analysis of data and has final approval of the version to be published. The Responsible Entity requires acknowledgement in all related scientific publications of its role as the funding source of all research and clinical trials initiated by the Responsible Entity.

The Responsible Entity agrees to maintain the policies and procedures set forth above through the completion of the term of probation.

## 16.    EFFECT OF ABBOTT'S SIGNATURE

ABBOTT understands that its Authorized Corporate Officer's signature on this Plea Agreement constitutes a binding offer by it to enter into this Plea Agreement. ABBOTT understands that the United States has not accepted ABBOTT's offer until the authorized representative of the United States has signed the Plea Agreement.

## 17.    GENERAL UNDERSTANDINGS

ABBOTT understands that a presentence investigation will be conducted and sentencing recommendations independent of the United States Attorney's Office will be made by the presentence preparer.

ABBOTT understands the United States and ABBOTT will be free to allocate or describe the nature of this offense and the evidence in this case.

ABBOTT understands the United States and ABBOTT retain the right, notwithstanding any provision in this Plea Agreement, to inform the Probation Office and the Court of all relevant facts, to address the Court with respect to the nature and seriousness of the offense, to respond to any questions raised by the Court, to correct any inaccuracies or inadequacies in the presentence report, if a report is prepared, and to respond to any statements made to the Court.

ABBOTT willingly stipulates that there is a sufficient factual basis for the Court to accept the plea.

ABBOTT understands that this Plea Agreement does not apply to any crimes or charges not addressed in this Plea Agreement.

ABBOTT has not been coerced, threatened, or promised anything other than the terms of this Plea Agreement, described above, in exchange for its plea of guilty. ABBOTT understands that its attorneys will be free to argue any mitigating factors on its behalf to the extent they are not inconsistent with the terms of this Plea Agreement. ABBOTT understands that ABBOTT will have an opportunity to have a representative address the Court prior to sentence being imposed.

This writing and the Agreed Statement of Facts (attached as Attachment B), Civil Settlement Agreement (attached as Attachment D), Corporate Integrity Agreement (attached as Attachment E), and Agreed Order of Forfeiture (attached as Attachment C) are the complete and only agreements between the United States and ABBOTT concerning resolution of this matter. In addition, ABBOTT has no objection to the filing of the Information (Attachment A) (which

*Plea Agreement*
*United States v. Abbott Laboratories*

*Authorized Corporate Officer's Initials:* _____

will incorporate the Agreed Statement of Facts).  The agreements and documents listed in this paragraph set forth the entire understanding between the parties and constitute the complete agreement between the United States Attorney for the Western District of Virginia and ABBOTT and no other additional terms or agreements shall be entered except and unless those other terms or agreements are in writing and signed by the parties.  These agreements supersede all prior understandings, promises, agreements, or conditions, if any, between the United States and ABBOTT.  ABBOTT consents to public disclosure of all of the agreements and other documents referenced in this paragraph.

ABBOTT has consulted with its attorneys and fully understands its rights.  ABBOTT has read this Plea Agreement and carefully reviewed every part of it with its attorneys.  ABBOTT understands this Plea Agreement and ABBOTT voluntarily agrees to it.  Being aware of all of the possible consequences of its plea, ABBOTT has independently decided to enter this plea of its own free will and is affirming that agreement on this date by the signature of its Authorized Corporate Officer below.

The Authorized Corporate Officer, by her signature below, hereby certifies to the following:

(1)  She is fully authorized to enter into this plea agreement on behalf of ABBOTT;

(2)  She has read the entire Plea Agreement and documents referenced herein and discussed them with ABBOTT's Board of Directors;

(3)  ABBOTT understands all the terms of the Plea Agreement and those terms correctly reflect the results of plea negotiations;

(4)  ABBOTT is fully satisfied with ABBOTT's attorneys' representation during all phases of this case;

(5)  ABBOTT is freely and voluntarily pleading guilty in this case;

(6)  ABBOTT is pleading guilty as set forth in this Plea Agreement because it is guilty of the crime to which it is entering its plea; and

(7)  ABBOTT understands that it is waiving its right to appeal the judgment and conviction in this case.

ABBOTT acknowledges its acceptance of this Plea Agreement by the signature of its counsel and Authorized Corporate Officer.  A copy of a certification by ABBOTT's Board of Directors authorizing the Authorized Corporate Officer to execute this Plea Agreement and all other documents to resolve this matter on behalf of ABBOTT is attached.

Date: 5/1/12 _____

Laura J. Schumacher
Executive Vice-President, General Counsel, and Secretary
of Abbott Laboratories
Authorized Corporate Officer
ABBOTT LABORATORIES

Counsel has fully explained to the Board of Directors of ABBOTT the facts and circumstances of the case; all rights with respect to the offense charged in the Information;

*Plea Agreement*
*United States v. Abbott Laboratories*

Authorized Corporate Officer's Initials: _____

possible defenses to the offense charged in the Information; all rights with respect to the applicability of the Sentencing Guidelines; and the consequences of entering into this Plea Agreement and entering a guilty plea. We have reviewed the entire Plea Agreement and documents referenced herein with my client, through its Authorized Corporate Officer. In our judgment, ABBOTT understands the terms and conditions of the Plea Agreement, and we believe ABBOTT's decision to enter into the Plea Agreement is knowing and voluntary. ABBOTT's execution of and entry into the Plea Agreement is done with our consent.

Date: 5/7/12

Theodore V. Wells, Esquire
Paul, Weiss, Rifkind, Wharton & Garrison
Counsel for Abbott Laboratories

Date: 5/7/12

Mark Filip, Esquire
Kirkland & Ellis LLP
Counsel for Abbott Laboratories

Date: 5/7/12

Timothy J. Heaphy
United States Attorney
Western District of Virginia

Rick A. Mountcastle, Assistant United States Attorney
Randy Ramseyer, Assistant United States Attorney
Carol Wallack, Trial Attorney, U.S. Dept. Of Justice
Lauren Bell, Trial Attorney, U.S. Dept. Of Justice
Jill Furman, Asst. Director, Consumer Protection Branch

*Plea Agreement*
*United States v. Abbott Laboratories*

Authorized Corporate Officer's Initials: ____

Page 15 of 15

## CERTIFICATE

I, John A. Berry, do hereby certify that I am a duly appointed and qualified Assistant Secretary of Abbott Laboratories and acting as such; that Abbott Laboratories is a corporation duly organized and validly existing under the laws of the State of Illinois with its principal office at 100 Abbott Park Road, Abbott Park, Lake County. Illinois; that I am a keeper of its books and records and its corporate seal; that the following resolution is a true, complete and correct copy of the resolution adopted at a regular meeting of its Board of Directors on April 27, 2012; that said meeting was duly called, a quorum was present there at; and that that such resolution is still in effect:

RESOLVED, that the Executive Vice President, General Counsel and Secretary is hereby authorized to enter or cause to be entered on behalf of this Corporation: the Plea Agreement, civil settlement agreements with the federal government and the coordinating states, a Corporate Integrity Agreement with the HHS Office of Inspector General, and all other documents necessary or appropriate to effectuate the settlement of all aspects of the investigation of the Corporation's sales and marketing practices for Depakote from 1998 to 2008 by the United States Department of Justice at any time on or after the date of this meeting.

IN WITNESS WHEREOF, I have affixed my name as Assistant Secretary and have caused the corporate seal of Abbott Laboratories to be hereunto affixed as of this 30ᵗʰ day of April, 2012.

John A. Berry
Assistant Secretary

*Plea Agreement*
*United States v. Abbott Laboratories*

*Attached Board Resolution*

# EXHIBIT 3

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAY 0 7 2012

JULIA C. DUDLEY, CLERK
BY: _____
       DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

UNITED STATES                    :
                                 :
v.                               :    Criminal No. 1:12CR26
                                 :
ABBOTT LABORATORIES              :

### AGREED STATEMENT OF FACTS

#### Introduction

1.     Defendant ABBOTT LABORATORIES ("ABBOTT") is an Illinois corporation,

headquartered in Illinois, which markets and distributes prescription drugs through its

Pharmaceutical Products Division ("PPD").  ABBOTT's PPD is responsible for the unlawful

conduct set forth herein.  PPD's employees include sales representatives who market ABBOTT's

prescription drugs throughout the United States.

2.     ABBOTT markets and distributes several different forms of divalproex sodium,

including Depakote (a/k/a Depakote DR), Depakote ER, and Depakote Sprinkle (hereinafter

collectively referred to as "Depakote").  ABBOTT manufactures Depakote at facilities in Illinois

and Puerto Rico and distributes it throughout the United States, including the Western District of

Virginia.

3.     Over the ten year period from 1998 to 2008, ABBOTT's gross sales of Depakote

were approximately $13.8 billion.

4.     From in or about 1998 to in or about December 2006, ABBOTT introduced and

delivered, and caused the introduction and delivery for introduction, into interstate commerce

Depakote which was misbranded in violation of the Food, Drug, and Cosmetic Act ("FDCA"),

21 U.S.C. §§ 331(a), 333(a)(1), and Section 352(f), in that the drugs' labeling lacked adequate directions for use for the control of agitation, aggression, and other behavioral symptoms exhibited by elderly patients with dementia.  From in or about 2002 to December 2006, ABBOTT introduced and delivered, and caused the introduction and delivery for introduction, into interstate commerce Depakote which was misbranded in violation of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 331(a), 333(a)(1), and Section 352(f), in that the drugs' labeling lacked adequate directions for use for the treatment of schizophrenia.  From December 2004 to December 2006, ABBOTT introduced and delivered, and caused the introduction and delivery for introduction, into interstate commerce Depakote which was misbranded in violation of the FDCA, 21 U.S.C. §§ 331(a), 333(a)(1), and Section 352(a), in that the drugs' labeling was misleading for use for the (a) control of agitation, aggression, and other behavioral symptoms exhibited by elderly patients with dementia and (b) treatment of schizophrenia..

### Statutory Framework

5.     The Food and Drug Administration ("FDA") is the federal agency responsible for protecting the health and safety of the public by enforcing the FDCA and ensuring, among other things, that drugs are safe and effective for each of their intended uses and that the labeling of such drugs bears true, complete, and accurate information.

6.     The FDCA, 21 U.S.C. § 355, prohibits the distribution of a new drug in interstate commerce for any use proposed by the drug's manufacturer until FDA completes an intensive review of the safety and effectiveness of the drug and approves it for the proposed use(s).  Under the FDCA, 21 U.S.C. §§ 331(d) and 355(b), a manufacturer seeking FDA approval to market a new drug is required to submit a New Drug Application ("NDA") that (1) identifies all of the proposed uses of the drug intended by the manufacturer; (2) includes data, generated in

randomized and well-controlled clinical trials, which demonstrates that the drug is safe and effective for each of those uses; and (3) includes proposed labeling setting forth detailed information about the drug with respect to those intended uses. The FDCA, 21 U.S.C. § 355(a), prohibits the manufacturer from introducing the new drug into interstate commerce until FDA approves the NDA and the proposed labeling after determining that the NDA provides sufficient evidence of the drug's safety and efficacy for its intended uses.

7.     The FDA's approval of a drug for one use does not mean that the drug is safe and effective for another use. Uses not approved by FDA are known as "unapproved" or "off-label" uses. The FDCA requires a manufacturer seeking FDA approval for additional uses of a drug to file a new or supplemental NDA that includes the same information described in Paragraph 6 above. The manufacturer can distribute the drug for those additional uses only after FDA (1) concludes that the drug is safe and effective for those additional uses; (2) approves the new or supplemental NDA; and (3) approves revisions to the drug's labeling to describe those additional approved uses.

8.     The FDCA, 21 U.S.C. §§ 331(a) and 333(a)(1), makes it unlawful for a drug manufacturer to introduce, deliver for introduction, or cause the introduction or delivery for introduction into interstate commerce of any "misbranded" drug. Under the law, 21 U.S.C. § 352(a), a misbranded drug includes a drug whose "labeling is false or misleading in any particular." The FDCA provides that determination of whether labeling is "misleading" should "take[] into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling … fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article [which includes a drug] to

which the labeling ... relates under the conditions of use prescribed in the labeling ... or under such conditions of use as are customary or usual." 21 U.S.C. § 321(n). The FDCA also defines "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article [which includes a drug] or any of its containers or wrappers, or (2) accompanying such article [which includes a drug]." 21 U.S.C. § 321(m). "Labeling" does not have to be physically attached to the drug and can include various written, printed, or graphic information that describes the drug and is disseminated by or on behalf of the drug manufacturer. Thus, a manufacturer can violate the FDCA by distributing written, printed, or graphic information about the drug that is false or misleading.

### Depakote's Approved Uses and FDA-Approved Labeling

9.     Depakote was approved by FDA to treat certain types of epileptic seizures and bipolar mania and to prevent the onset of migraines.[1]  FDA has never approved Depakote as safe and effective for the control of agitation and aggression in patients with dementia or for the treatment of schizophrenia. ABBOTT, however, promoted Depakote for these unapproved uses.

10.     The FDA-approved labeling includes information about safety risks associated with use of Depakote, including three "Black Box" warnings, other warnings and precautions, and information about adverse side effects associated with use of the drug. A Black Box warning is the most serious warning that FDA can require be placed on a drug's labeling.

---

[1]   On March 10, 1983, FDA approved Depakote for absence seizures. On May 26, 1995, FDA approved Depakote for manic episodes associated with bipolar disorder. On March 18, 1996, FDA approved Depakote for migraine prophylaxis. On June 20, 1996, FDA approved Depakote for complex partial seizures. On September 12, 1989, FDA approved Depakote Sprinkle for absence seizures. On June 20, 1996, FDA approved Depakote Sprinkle for complex partial seizures. On August 4, 2000, FDA approved Depakote ER for migraine prophylaxis. On December 20, 2002, FDA approved Depakote ER for complex partial seizures and absence seizures. On August 14, 2003, FDA approved Depakote ER for complex partial seizures and absence seizures in pediatric patients. On December 6, 2005, FDA approved Depakote ER for acute manic or mixed episodes associated with bipolar disorder, with or without psychotic features. Depakote, Depakote Sprinkle, and Depakote ER were never approved by FDA for any other uses.

11.     In 1999, after an ABBOTT double-blind multicenter trial of valproate[2] in elderly

patients with dementia (the "Dementia Study") was prematurely terminated due to serious side

effects caused by Depakote, ABBOTT implemented a change to Depakote's approved labeling

to include a warning about somnolence. In 2000, FDA approved the inclusion of the following

warning for somnolence in the elderly as part of the approved labeling:

> In a double-blind, multicenter trial of valproate in elderly patients with dementia
> (mean age=83 years), doses were increased by 125 mg/day to a target dose of 20
> mg/kg/day. A significantly higher proportion of valproate patients had
> somnolence compared to placebo, and although not statistically significant, there
> was a higher proportion of patients with dehydration. Discontinuations for
> somnolence were also significantly higher than with placebo. In some patients
> with somnolence (approximately one-half), there was associated reduced
> nutritional intake and weight loss. There was a trend for the patients who
> experienced these events to have lower baseline albumin concentration, lower
> valproate clearance, and a higher BUN. In elderly patients, dosage should be
> increased more slowly and with regular monitoring for fluid and nutritional
> intake, dehydration, somnolence, and other adverse events. Dose reductions or
> discontinuation of valproate should be considered in patients with decreased food
> or fluid intake and in patients with excessive somnolence.

The dosage and administration section was also updated to include elderly dosing information,

including that: "Dosage should be increased more slowly and with regular monitoring for fluid

and nutritional intake, dehydration, somnolence, and other adverse events."

### Clinical Studies of the Unapproved Use of Depakote for the Control of Agitation and Aggression in Elderly Dementia Patients

12.     Dementia occurs primarily in people older than 65 and arises from various causes

but is most often associated with Alzheimer's disease. Dementia in the elderly often

encompasses a slow, progressive decline in cognitive mental function including memory,

language, thinking, judgment, and the ability to learn new information, and sometimes dementia

patients became agitated and even aggressive. Dementia is a major reason why the elderly are

---

[2]     Valproate is the active ingredient in Depakote.

admitted to nursing homes. Drugs used to control behaviors in elderly dementia patients in nursing homes are sometimes referred to as "chemical restraints."

13.     In 1996, ABBOTT submitted an application to FDA to conduct a 15-patient study of Depakote to treat agitation in elderly dementia patients titled "A Double-Blind Placebo Controlled Study of Valproate in the Treatment of Behavioral Agitation Associated with Dementia" ("M96-491"). In a letter to ABBOTT dated January 28, 1997, FDA expressed its reservations about what inferences could be drawn from the study's outcome.[3] The results of the study showed that the six Depakote-treated patients demonstrated greater mean decreases in activity disturbances and aggressiveness scores over the placebo patients, although this result was not statistically significant. ABBOTT's analysis of the study noted that "No subject died or reported a serious adverse event during the study. One Depakote-treated subject had study drug prematurely discontinued due to a series of adverse events." The same analysis concluded that Depakote was "safe and well-tolerated in the sample of elderly subjects with dementia."

14.     On November 18, 1997, ABBOTT submitted an application to FDA to conduct a study titled, "A Double-Blind Placebo-Controlled Study of Depakote in the Treatment of Signs and Symptoms of Mania in Elderly Patients with Dementia" (hereinafter referred to as "M97-738" or "ABBOTT's Dementia Study" or the "Dementia Study"). In a letter to Abbott dated January 15, 1998, FDA expressed reservations about Abbott obtaining FDA approval of a new or expanded use of Depakote for mania based on this study.[4]

15.     ABBOTT began the Dementia Study in 1998. In March 1999, the study was suspended due to an increased incidence of adverse events in the Depakote treatment group. In

---

[3]     See Attachment 1.

[4]     See Attachment 2.

June 1999, ABBOTT discontinued the Dementia Study. In the study, somnolence and thrombocytopenia (low blood platelet count that may cause easy or excessive bruising, superficial bleeding in the skin, prolonged bleeding from cuts, and spontaneous bleeding from the gums or nose) occurred statistically significantly more frequently with patients given Depakote than with the placebo patients. The results provided evidence that the dosing recommendations set forth in Depakote's labeling were too high and rapid for at least some elderly dementia patients. It was this evidence which resulted in the 1999 revision to the approved labeling referenced in Paragraph 11 above.

16. The results of the Dementia Study also failed to show that Depakote was effective in treating the "signs and symptoms of mania" in elderly dementia patients. ABBOTT concluded that "[t]he lack of effect on mania suggests the manic symptoms of this population may have a different basis than the manic symptoms of bipolar disorder." There were several measurement tools used as part of the Dementia Study to determine if Depakote improved any "signs or symptoms of mania." One of these tools was the Cohen-Mansfield Agitation Inventory ("CMAI"). This was the only measurement tool that showed a positive result. Improvement in the CMAI total score and its verbally agitated behavior subscore was statistically significantly greater for the Depakote treatment group than the placebo group. The data, however, indicated that this typically occurred when patients received the maximum dosage of the drug, a dosage that resulted in an increase in adverse events for many of the elderly patients. In the Clinical Study Report, ABBOTT concluded that the positive CMAI efficacy results "suggest[ed] a drug effect independent of effects of somnolence." Two years later, an associate medical director at ABBOTT expressed his opinion that "somnolence was the true 'treatment' effect for many [of

these patients]."[5]  The results of the Dementia Study were published in a peer-reviewed medical journal in 2001.

17.    In 2000, ABBOTT began another clinical trial – M99-082 – to evaluate Depakote's safety and effectiveness to treat agitation in elderly patients with dementia.  The study protocol called for a lower dose of the drug for some patients than the dose used in the Dementia Study in part because the adverse events experienced by the patients in the Depakote treatment group in the Dementia Study were believed to be dose-related.  ABBOTT started but never completed M99-082.  In June 2003, ABBOTT submitted to FDA a final clinical study report that stated that the "trial was terminated for low enrollment. . . . . The study was seriously underpowered and definitive conclusions from the data were not possible."  The report also stated that the two Depakote treatment groups and the placebo group all showed improvement on the primary and secondary endpoint measures.  It also noted that "study drug was well tolerated by subjects in all 3 treatment groups [that is, the two Depakote treatment groups and the placebo group] and the safety profile was similar to previous Depakote studies in this population," including the Dementia Study.  The data from this study was disclosed to the FDA, but it was not published in a medical journal or disseminated by ABBOTT's sales force.

18.    ABBOTT never conducted another clinical trial of Depakote for the control of agitation and aggression in elderly patients with dementia and never submitted a supplemental new drug application to FDA seeking approval of Depakote for this use.

19.    In two separate peer-reviewed medical journal articles in 2001 and 2003, the results of a 56-patient study called the Rochester Study were reported.  The study was funded by

---

[5]    See Attachment 3.

the Alzheimer Association, the National Institute of Aging, and an unrestricted, investigator-initiated grant from ABBOTT. According to the 2001 article, the results of the first phase of the study "suggest[ed], but did not prove" that the use of Depakote "can be associated with reduced agitation in some patients with dementia in the nursing home." The article stated that "[t]hese results support[ed] a larger, placebo-controlled trial definitively addressing the therapeutic potential of this agent." According to the 2003 article, the results of the second phase of the Rochester Study were consistent with the results of the first phase of the study "which suggested but did not prove that short-term [Depakote] therapy can result in decreased measures of agitation." It stated that the results from a study being conducted at the time by the Alzheimer's Disease Cooperative Study ("ADCS") (discussed below) would "likely further clarify the potential role of [Depakote] for treatment of" agitation in elderly patients with dementia.

20.     A 153-patient, randomized, well-controlled clinical trial of the use of Depakote for the treatment of agitation in elderly patients with dementia was conducted by the ADCS from September 2000 to December 2002 ("ADCS Study"). The results of the study were published in the peer-reviewed American Journal of Geriatric Psychiatry in November 2005 and the authors concluded that "[t]reatment with [Depakote] did not show benefit over placebo in the treatment of agitation associated with possible or probable [Alzheimer's disease] in the nursing home residents included in this trial." The article also discussed the earlier studies, including ABBOTT's Dementia Study and the Rochester Study, and stated that "[n]one of the earlier placebo-controlled studies proved that [Depakote] is efficacious for agitation in dementia, and none were sufficient to define practice."

21.     In May 2003, ABBOTT received an oral report of the preliminary results of the ADCS Study. According to this report, the preliminary results did not show that Depakote

reduced symptoms of agitation and aggression. However, an ABBOTT's Associate Medical Director who received these results questioned whether the study was designed properly to show efficacy, and believed the results could still prove positive for the drug if "a 'trend' for Depakote is shown, that could be seen as favorable data – especially if the safety data looks good."[6] In July 2003, ABBOTT's Associate Medical Director then included in a summary that the ADCS Study lead researcher's "verbal report of the preliminary findings [about the ADCS Study] suggest no evidence of a meaningful treatment difference between the Depakote and placebo groups."[7] In December 2004, ABBOTT received an advance copy of the to-be-published medical journal article about the ADCS Study which included the same conclusions about Depakote's lack of efficacy as well as the conclusions regarding the Dementia Study and the Rochester Study contained in the published article as described in Paragraph 20, above.

### The Off-Label Promotion of Depakote for the Control of Agitation and Aggression in Elderly Dementia Patients

22.     Beginning in or about 1998, and continuing until in or about December 2006, ABBOTT misbranded Depakote by marketing it for the control of agitation and aggression in elderly dementia patients. The off-label promotion of Depakote to control agitation and aggression in elderly dementia patients included:

a.     In June 1997, ABBOTT developed its 1998 Strategic Marketing Plan entitled "Depakote – New Psychiatry Markets."[8]

b.     In early 1998, ABBOTT created a Long Term Care ("LTC") sales force in substantial part to promote Depakote for the control of agitation and aggression in elderly

---

[6]     See Attachment 4.

[7]     See Attachment 5.

[8]     See Attachment 6; see also Attachment 7.

dementia patients in nursing homes. ABBOTT trained its LTC sales force to promote

Depakote to doctors and other healthcare providers as safe and effective for this

unapproved use. For example, ABBOTT gave its LTC sales force a Dementia

Backgrounder, which informed the sales force that Depakote had been shown effective in

preliminary clinical trials to treat behavioral disturbances in dementia patients and that

Depakote did not have some of the same side effects as antipsychotics for this

unapproved use.[9]

    c.    ABBOTT trained the LTC sales force to promote Depakote to healthcare

providers and employees of nursing homes as advantageous over atypical antipsychotics

("ATPs") for controlling agitation and aggression in elderly dementia patients because

Depakote was not subject to certain provisions of the Omnibus Budget Reconciliation

Act of 1987 ("OBRA") and its implementing regulations designed to prevent the use of

unnecessary medications in nursing homes. See, e.g., training material titled

"Maximizing the Long Term Care Market Opportunity."[10] Depakote was not subject to

any specific use restrictions under OBRA Guidelines prior to December 2006. Until

December 2006, ABBOTT trained the LTC sales representatives to state that, by using

Depakote, nursing homes would avoid the administrative burdens and costs of complying

with OBRA regulatory restrictions otherwise applicable to ATPs, namely the prohibition

against giving such patients antipsychotic drugs unless indicated for a specific condition,

the requirement that patients treated with ATPs should have drug holidays and gradual

---

[9]    See Attachment 8.

[10]    See Attachment 9.

Case 5:11-cv-04017-MWB-CJW   Document 118-1   Filed 08/02/13   Page 39 of 58

dose reductions, and the requirement for behavior management rather than ATPs whenever possible.

  d.  ABBOTT paid its LTC sales force bonuses based on its sales of Depakote, which included sales of Depakote for the unapproved use of the drug.

  e.  ABBOTT provided the LTC sales force with materials to promote Depakote for the control of agitation and aggression in elderly dementia patients. For example, in 2001, ABBOTT funded via an unrestricted educational grant, a document called "A Pocket Guide to Dementia and Associated Behavioral Symptoms: Diagnosis, Assessment, and Management" (the "Guide").[11] A private entity, accredited by ACCME, designated the Guide as continuing medical education ("CME"). Physicians and other healthcare providers could earn CME credits free-of-charge by reviewing the Guide and taking a test set forth at the end of the Guide. As early as 2002, ABBOTT began providing the LTC sales representatives with copies of the Guide to promote Depakote to treat agitation and aggression in elderly dementia patients.[12] The sales representatives were instructed to become familiar with the Guide and to provide it to doctors and other healthcare providers to whom they were promoting Depakote. They were also told that the Guide would be a resource that physicians and pharmacists used to obtain additional continuing education credits. The Guide did not disclose the results of the Dementia Study. The somnolence and dosing issues identified by the Dementia Study were disclosed in the approved labeling but the approved labeling was not attached to the Guide and the Guide did not refer healthcare providers to the approved labeling. In

---

[11] See Attachment 10.

[12] See Attachment 11.

addition, the efficacy results of the Dementia Study were not disclosed in the approved labeling or the Guide.

f.      ABBOTT funded and gave the LTC sales force funds for speaker programs promoting the use of Depakote to control agitation and aggression in elderly patients with dementia.

g.      ABBOTT funded and caused the creation of educational programs and materials (such as videos and monographs) promoting the use of Depakote to control agitation and aggression in elderly patients with dementia.

h.      ABBOTT entered into contracts with Long Term Care Pharmacy Providers (LTCPPs) that included provisions regarding the payment of rebates to the LTCPPs based on increases in the use of Depakote in the nursing homes serviced by the LTCPPs.  Under these contracts, ABBOTT paid millions of dollars in rebates to the LTCPPs based on increases in the use of Depakote in these facilities, including the use of Depakote in the treatment of agitation and aggression in elderly dementia patients.

i.      ABBOTT funded and created and caused the creation of programs and materials to train the LTCPPs' consultant pharmacists about the use of Depakote for the control of agitation and aggression in elderly dementia patients and to encourage them to recommend the drug for this unapproved use.

j.      In March 2004, at the request of an LTCPP, ABBOTT sent a check in the amount of $16,250 to fund a letter sent by the LTCPP to 4,000 doctors who prescribed ATPs and 1,000 doctors who prescribed benzodiazepine medications to patients in

nursing homes.[13]  ABBOTT's LTC National Account Manager ("NAM") emailed the LTC sales force stating that this LTCPP had "sent out a targeted Depakote ER mailing to the top 4,000 prescribers of [ATPs] and top 1000 prescribers of benzodiazepines within [the LTCPP's] facilities."[14]  The LTC NAM further stated that "[t]he purpose of the mailing is to help increase the overall use of Depakote ER vs [ATPs] and benzodiazepines for patients with dementia related behaviors" and that the LTCPP's letter to the doctors "strongly position[ed] Depakote ER vs the [ATPs and] emphasize[d] the excellent side effect profile of Depakote ER."

k.      In October 2003 ABBOTT produced its "Depakote Long Term Care – 2004 Strategic Investment Proposal," which included the strategy to market Depakote for this unapproved use in LTC facilities, including nursing homes.[15]

l.      ABBOTT also promoted Depakote as effective to treat "manic-like symptoms" exhibited by elderly dementia patients based on Depakote's efficacy to treat bipolar mania.

23.     In 2001, in anticipation of a review of ABBOTT's policy about the dissemination of clinical data, a staff member in ABBOTT's Regulatory Affairs office prepared a draft slide presentation which stated that ABBOTT's practice at that time did not "explicitly" address the "difference between dissemination and promotion," the "scope of data balance," or "failed studies." These draft slides also stated that ABBOTT needed to revise its practice to "clarify dissemination vs promotion," "assure that dissemination is a balanced representation of known

---

[13]   See Attachment 12.

[14]   See Attachment 13.

[15]   See Attachment 14.

*Agreed Statement of Facts*
*United States v. Abbott Laboratories*

*Attachment B to Plea Agreement*

information," and that the revised practice needed to "define options after failed applications/studies." This same staff member also wrote an earlier memorandum which noted that ABBOTT's then current practice and guidance documents left open several questions, including that:

> [T]here is no direction regarding how we will handle newly generated data related to indications that were the subject of failed applications or failed or disappointing studies. Responsibilities and accountability are not established in [ABBOTT's] guidance. The [guidance] document does not clearly define the difference between dissemination and promotion.

While ABBOTT continued to update and improve its compliance practices in accordance with industry practice and FDA guidance, some of the issues identified in this draft presentation and memo were not specifically addressed until after the time period relevant here.

24.    ABBOTT's LTC sales representatives used reprints of medical journal articles about studies to promote the use of Depakote to control agitation and aggression in elderly patients with dementia, as set forth below:

a.    ABBOTT trained its LTC sales representatives to use a reprint of an article based on a retrospective chart review of 22 nursing home patients in two nursing homes. Although this article was not based on a randomized, blinded, and controlled clinical study, ABBOTT trained its LTC sales representatives to use it to promote Depakote for this unapproved use.

b.    Beginning in approximately 2001, ABBOTT made available to its LTC sales force reprints of the 2001 medical journal article about the Dementia Study and reprints of the 2001 medical journal article about the Rochester Study. ABBOTT trained its sales representatives to respond to inquiries about the Dementia Study's premature termination for safety reasons by advising healthcare providers that the dosages used in

the study were started too high and increased too fast. ABBOTT trained its sales force to promote the use of Depakote to control agitation and aggression in elderly patients with dementia at lower doses.

      c.     In 2003, ABBOTT made reprints of the 2003 medical journal article about the results of the second part of the Rochester Study available to its sales representatives and trained them to use the results of the study to promote the use of Depakote to control agitation and aggression in elderly patients with dementia.

25.     ABBOTT continued to disseminate copies of reprints of the Rochester Study journal article to healthcare providers after receiving a report on the preliminary results of the ADCS Study in May 2003, and after receiving an advance copy of the article about the ADCS study in December 2004. ABBOTT continued to disseminate this article about the Rochester Study without disclosing the conflicting preliminary results of the ADCS Study including:

      a.     In or about December 2004, ABBOTT approved the continued reprinting of the 2003 Rochester Study article for its sales representatives to disseminate to healthcare providers.

      b.     In or about early 2006, ABBOTT provided its sales representatives with promotional materials, including the "T1 2006 Plan- O-Gram," which stated that ABBOTT's core marketing messages included telling nursing homes that Depakote had "broad-spectrum coverage," and listing among the "Core Selling Materials" for use to convey the core marketing messages a reprint of the Rochester Study article. The results of the ADCS study were not included.

      c.     In February 2006, for the first time, ABBOTT provided its sales force with a reprint of the ADCS Study article and marked it "For Representative Education Only."

Accordingly, under ABBOTT's policy, its sales force could not share this reprint with healthcare providers. In March 2006, ABBOTT also discontinued reprinting copies of the 2003 article about the Rochester Study. However, after March 2006, the sales force continued to obtain copies of already-existing reprints of the 2003 article about the Rochester Study from ABBOTT's supply contractor and continued to disseminate those reprints to healthcare providers because they were not directed by ABBOTT to stop distributing existing copies of the reprints.

        d.    ABBOTT's clinical science managers made presentations to healthcare providers about the use of Depakote for agitation and aggression in elderly dementia patients. Prior to April 2006, these presentations did not include any information about the results of the ADCS Study. In or about April 2006, Abbott revised the presentation to include two slides about the ADCS Study. The revised presentation, however, also included approximately a dozen slides about other studies, such as the Rochester Study, and slides about when healthcare providers should use Depakote to treat agitation and aggression in elderly dementia patients and how to dose Depakote for this off-label use.

        e.    ABBOTT sent medical information letters to healthcare providers who requested information about the use of Depakote to control agitation and aggression in elderly dementia patients. Prior to in or about January 2006, these letters did not disclose the results of the ADCS Study.

### Clinical Studies of the Unapproved Use of Depakote for Schizophrenia

26.    Schizophrenia is a common and serious mental disorder. FDA has approved various drugs as safe and effective to treat schizophrenia, including atypical antipsychotics ("ATPs").

27.    ABBOTT conducted two clinical trials studying the safety and effectiveness of Depakote and ATPs together to treat patients with acute exacerbations of the symptoms of schizophrenia. In 1999, ABBOTT submitted an application to FDA to conduct a study (referred to as the "M99-010 Study") of the use of Depakote in combination with certain ATPs to treat acute schizophrenia. In January 2002, ABBOTT submitted the study results to FDA. The results showed that the study failed to meet its primary endpoint in that Depakote in combination with the ATPs did not result in statistically significant improvement in symptoms of psychosis associated with schizophrenia after 28 days of treatment as compared to the results for the ATPs alone. The results did show statistically significant improvement in symptoms as early as day 3 and continuing through day 21. FDA informed ABBOTT that it considered M99-010 a negative study because it failed to meet the predefined efficacy endpoint and, therefore, the results of the study could not be used to support an application for a new indication for Depakote for schizophrenia.

28.    In 2003, the results of the M99-010 Study were published in a peer-reviewed medical journal article. While the article stated that the treatment difference for the primary efficacy endpoint (28 days) did not reach the level of statistical significance between Depakote combined with an ATP compared to an ATP alone, the article did state that the Depakote combination therapy was observed to show statistically significant improvement over ATP monotherapy as early as the third treatment day and persisting through day 21. A summary of a June 2002 meeting with an external consultant stated that the consultant viewed M99-010 Study to be "a positive trial (the effect size is robust)." The consultant also told ABBOTT that while the M99-010 Study "does not support combination use (as defined strictly the combination being

superior to each agent [i.e. ATP] alone), we could still argue for study 010's applicability to add-on" therapy.[16]

29.    In March 2003, ABBOTT conducted another study (referred to as the "M02-547 Study") of Depakote ER combined with certain ATPs to treat acute schizophrenia. The results of the M02-547 Study, which was completed in or about August 2004, did not show a statistically significant treatment difference between Depakote ER combination therapy and the ATPs alone. The data also showed that somnolence, weight gain, and urinary incontinence were significantly higher for patients receiving Depakote ER combined with one of the ATPs than those treated with one of the ATPs alone. Patients treated with Depakote ER combination therapy also had a significant decrease in platelet counts compared to those treated with an ATP alone.

30.    In August 2006, ABBOTT posted a synopsis of the M02-547 Study results on a public website (www.clinicalstudyresults.org). In December 2008, the results of the M02-547 Study were published in an article in the peer-reviewed medical journal, Neuropsychopharmacology. The article stated that there were no significant treatment differences between Depakote ER combination therapy and ATP monotherapy.

31.    ABBOTT never conducted another clinical trial of the use of Depakote to treat schizophrenia and never submitted a supplemental new drug application to FDA seeking approval of Depakote for this use.

### Promotion of Depakote for Off-Label Use in Schizophrenia

32.    Beginning in or about 2002, and continuing until in or about December 2006, ABBOTT misbranded Depakote by marketing it for schizophrenia.

---

[16]   See Attachment 15.

33.   ABBOTT used M99-010 Study's secondary endpoints to promote Depakote to healthcare providers as a treatment for schizophrenia. This included:

a.   ABBOTT's 2001 "010 Communication Plan" set forth ABBOTT's strategies for dissemination of the results of the M99-010 Study,[17] and ABBOTT executed part of this plan by, among other things, providing the favorable results of the study to healthcare providers.

b.   ABBOTT's 010 Communication Plan also included numerous meetings with healthcare providers. In 2002, ABBOTT held a "Depakote Psychosis Speaker/Faculty Development Meeting" to review with physicians the results of the M99-010 Study. The trainers for this meeting included an ABBOTT Product Manager. Physicians were paid $2,500 plus travel and lodging expenses to attend. One of the purposes of the meeting was to present the M99-010 Study data to physicians and on ABBOTT's invitation it noted "[a]fter participation in the meeting, you may be asked to present this data at various medical information programs in 2002."[18] In or about March 2002, ABBOTT provided its physician-speakers with a slide presentation regarding the M99-010 Study data for use in speaking engagements. Also in 2002, ABBOTT organized programs at an American Psychiatric Association ("APA") meeting to provide the M99-010 Study data to promote Depakote for the treatment of schizophrenia.

c.   In 2002, an ABBOTT-funded message recall survey of 76 healthcare providers confirmed that a majority of those providers recalled that, during their most

---

[17]   See Attachment 16.

[18]   See Attachment 17.

recent visit with an ABBOTT sales representative, the sales representative had discussed the off-label use of Depakote as combination therapy for the treatment of schizophrenia.

d.      In 2003, ABBOTT funded and organized "Psychiatry Consultant Meetings," which were used to provide information about the results of the M99-010 Study to healthcare providers.   For at least two of these meetings ABBOTT's sales force helped to target 30 and 45 psychiatrists, respectively, from around the United States. Abbott paid a $500 "honorarium" and travel expenses for each psychiatrist's attendance.

e.      ABBOTT's 2003 "Schizophrenia Strategic Plan" called for the positioning of Depakote as the "ideal 1st line agent for adjunctive therapy for schizophrenia based upon proven clinical efficacy" by, among other things, generating materials or funding programs that communicated the results of the M99-010 Study to doctors; training the sales force about the dissemination of CME materials about the M99-010 Study; and developing a speakers bureau to deliver ABBOTT's message about the efficacy of the adjunctive use of Depakote to treat schizophrenia based on the data from the M99-010 Study.

f.      In February 2003, ABBOTT made available to its sales representatives reprints of the published medical journal article about the M99-010 Study results, instructing its sales representatives that the reprint was approved for "dissemination only," was not for "promotional use," and they should "not discuss the reprint with physicians and customers."

34.      ABBOTT decided not to conduct the two additional clinical trials required to obtain FDA approval of Depakote for schizophrenia, instead deciding to conduct one additional

study, the M02-547 Study, to generate positive data to support ABBOTT's marketing message that Depakote was safe and effective to treat schizophrenia.

        a.      In August 2004, ABBOTT completed the M02-547 Study.  In November 2004, one of ABBOTT's vice presidents sent an email in which he stated that ABBOTT had concluded that the M02-547 Study did not show a statistically significant treatment difference between Depakote ER combination therapy and ATPs alone and in which he further explained:

We are confident that there are no systematic [sic] issues with the study itself . . . [the] overall weight of the evidence from both studies [M99-010 and M02-547] suggest[ed] that there is not an obvious benefit of adding Depakote to ATPs in acute schizophrenia.

        b.      ABBOTT's January 2005 Executive Project Status Report described the M02-547 Study, stating "[t]rial completed. Results negative not confirming -010 trial." This report also described the status of ABBOTT's development of Depakote as a treatment for schizophrenia stating "[a] significant issue has been identified that most likely or definitively will negatively impact critical path, budget, or target product profile."

        c.      In November 2005, ABBOTT approved another reprint of the M99-010 medical journal article and made copies available to the sales force for dissemination to doctors and other customers, but ABBOTT failed to include any information about the results of the M02-547 Study.

        d.      ABBOTT's TI 2006 Plan-O-Gram issued in early 2006 included the reprint of the M99-010 journal article among the "CORE SELLING MATERIALS –

psychiatric resources available to all representatives," without any information about the M02-547 Study.

     e.    In or about August 2006, ABBOTT gave its sales representatives a Depakote ER T3/06 Plan-O-Gram which again included the reprint of the M99-010 medical journal article as an available sales resource, but without any information about the M02-547 Study.

     f.    In or about August 2006, ABBOTT posted a synopsis of the M02-547 Study on the public website clinicalstudyresults.org. The synopsis stated that "Depakote ER in combination with atypical antipsychotic therapy was as well tolerated as therapy with [certain ATPs] alone," despite the fact that the incidence of somnolence in the combination group of patients treated with an ATP and Depakote was more than twice as high as in the ATP monotherapy group and that this difference was statistically significant.

     g.    In or about August 2006, after it posted the results of the M02-547 Study on the public website, ABBOTT notified its sales force of this posting. This notification was the first time ABBOTT advised the sales force that the M02-547 Study had failed and its results were not consistent with the results of the M99-010 Study.[19]

35.    ABBOTT sent medical information letters to healthcare providers who requested information about the off-label use of Depakote for schizophrenia. Through at least 2006, these letters disclosed the results of the M99-010 Study but not the results of the M02-547 Study.

36.    The parties agree to the foregoing Agreed Statement of Facts.

---

[19]    See Attachment 18.

FOR THE UNITED STATES

Date: ___5/7/12___

Timothy J. Heaphy
United States Attorney
Western District of Virginia

Rick A. Mountcastle, Assistant United States Attorney
Randy Ramseyer, Assistant United States Attorney
Carol Wallack, Trial Attorney, U.S. Dept. Of Justice
Lauren Bell, Trial Attorney, U.S. Dept. Of Justice
Jill Furman, Asst. Director, Consumer Protection Branch

FOR DEFENDANT ABBOTT LABORATORIES

Date: ___5/7/12___

Laura J. Schumacher
Executive Vice-President, General Counsel, and Secretary
of Abbott Laboratories
Authorized Corporate Officer

Date: ___5/7/12___

Ted Wells, Esquire
Counsel for Abbott Laboratories

Date: ___5/7/12___

Mark Filip, Esquire
Counsel for Abbott Laboratories

# EXHIBIT 4

| | |
|---|---|
| THE SECURITY NATIONAL BANK OF SIOUX CITY, IOWA, as conservator for J. M. K., a Minor,<br><br>    PLAINTIFF,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>    DEFENDANT | Case No. 5:11-cv-04017-DEO |

## Declaration of John J. Farmer III, Ph.D.

contamination with *P. aeruginosa* or for contamination with dozens of other
pathogenic microorganisms

Abbott produced numerous documents showing contamination of Casa Grande with
bacteria, *Enterobacteriaceae* and *E. sakazakii*. This included numerous contaminated
areas in the production area (Red Zone) that were above the specified allowable limit
of contamination. Contamination was documented on December 8, 2008 which
corresponds to when NeoSure batch 61281RE10 was made and packaged. Two
samples of the dryer were positive for *E. sakazakii* contamination based on the BAC
PCR method. A sample of the agglomeration taken February 19, 2008 was also
positive for *E. sakazakii* contamination based on the BAC PCR method. These
sampling results suggest possible colonization of the production facility with *E. sakazakii* during this period NeoSure batch 61281RE10 was made.

*E. sakazakii* can be traced back to opened cans of powdered formula made by
Abbott. These were described in CDC investigations of *E. sakazakii* infections in
infants who ingested powdered formula.

Abbott will have records stating whether *E. sakazakii* can also be traced back to
unopened cans of powdered formula made at the Casa Grande production facility.

Abbott has released products and then recalled them because of contamination,
including contamination with pathogenic microorganisms. The most recent Abbott
recall covered powdered formula products produced from November 2007 to
September 22, 2010 and involved 117,420,638 containers of Similac powdered
infant formula products that had been produced at its facility in Sturgis, Michigan.
This infant formula was adulterated with adult beetles and beetle larvae. FDA
complaint # 114580 dated May 17, 2010 stated:

> "... from a newly opened can of Similac Sensitive (Orange can)
> powder when {REDACTED} noted a live insect larva on top of
> the formula."

The methods that Abbott used to sample and test batches of powdered formula for
"viable and culturable" bacteria was inadequate to insure that they were free of
contamination with *E. sakazakii*, *Enterobacteriaceae*, other pathogens, and bacteria
which Abbott detected but never tested for their pathogenic potential. The methods
that Abbott used were neither sensitive nor specific.

It is essential for companies that produce powdered infant formula products to test
powdered formula and the production environment for *E. sakazakii–Cronobacter*
contaminants that are in the viable but non-culturable state. I saw no records
stating that Abbott set this up as a general microbiological procedure or that it did a
specific evaluation in its causation analysis of Jeanine Kunkel's case of *E. sakazakii*
meningitis. It should have done both of these. By not doing these studies the
company places neonates and infants at risk of acquiring meningitis and other
infection due to *E. sakazakii–Cronobacter* and infections with other pathogenic
bacteria.

I saw no evidence that Abbott did any tests of NeoSure batch 61281RE10 for *E. sakazakii* in the viable but non-culturable state. This included the time periods
before and after Abbott received the complaint in this case.

http://www.nydailynews.com/news/national/2010/09/23/2010-09-23 similac recalled after insect parts found inside powder baby formula.html

Below are several statements from my *Affidavit* attached as Exhibit 6.

9. Abbott knew that its Sturgis, Michigan production facility had become infested with insects, including but not limited to beetles and beetle larvae, as early as January 3, 2007, more than 1,358 days before it issued a voluntary recall. "Customer Service Reports" from Ecolab, Inc. referenced the term "beetle" 728 separate times (Exhibit 8).

10. Based on several different consumer complaints to FDA, Abbott Laboratories, Inc. knew that its Sturgis, Michigan production facility had come infested with insects, including but not limited to beetles and beetle larvae, as early as May 14, 2010, more than 131 days before it issued a voluntary recall. Insect contamination was appearing in powdered formula and was being detected by customers.

11. Warehouse beetles were noted as early as January 2007. (Ecolab, Inc. Customer Service Report dated January 3, 2007).

12. A customer complaint was made to the FDA on May 14, 2010 documenting "a live insect larva on top of the formula." (Exhibit 5)

13. Abbott apparently did not do an investigation or take corrective action in spite of these early documentations of beetle problems.

The deficiencies of Abbott's manufacturing process were described in detail in the documents above describing the investigation.

If Abbott had problems with insects contamination at Casa Grande this fact would be significant in my causation analysis of Jeanine Kunkel's case. The greatest danger is that when insects come in contact with powdered formula after the final heating step. Insects are known to carry strains of *Enterobacteriaceae* in their intestines, including strains of *Cronobacter/E. sakazakii*. When an insect defecates thousands/millions/billions of viable cells of *Enterobacteriaceae* in the feces are deposited in the environment of the insect. This is a well established mechanism by which *Enterobacteriaceae* contaminate food products and the environment.

**2011**

CDC recorded 13 *E. sakazakii* cases which is a large increase compared to the number typically found each year.
http://www.cdc.gov/foodsafety/diseases/cronobacter/investigation.html

### *E. sakazakii* contamination of other Abbott powdered formulas that are described in CDC records

CDC records state that powdered formula produced by Abbott was tested at CDC and found to be contaminated with *E. sakazakii*. Other CDC records refer to *E. sakazakii* infections in infants after they had ingested Abbott powdered formula products. These investigations do not always state whether the powdered formula was made at Abbott's Casa Grande production facility or a different Abbott production facility.

See previous paragraphs for information about these CDC investigations.

Opinions basis:
- CDC records and attached Exhibits

Additional records from CDC, FDA, Abbott, and others are needed to clarify the information above in the context of Jeanine Kunkel's case.


### *E. sakazakii* meningitis and sepsis in other infants or babies that occurred after ingestion of an Abbott powdered formula product

Other CDC records refer to *E. sakazakii* infections in infants after they had ingested Abbott powdered formula products. These investigations do not always state whether the powdered formula was made at Abbott's Casa Grande production facility or a different Abbott production facility. See previous paragraphs for information about these CDC investigations.

Opinions basis:
- CDC records and attached Exhibits

Additional records from CDC, FDA, Abbott, and others are needed to clarify the information above in the context of Jeanine Kunkel's case.


### Adulteration of Abbott powdered formula products with beetles, beetle larvae and other insects

Abbott had such poor control of one of its manufacturing facilities* that it had to issue a nationwide recall of over 117 millions of units of Similac powdered formula because it was adulterated. Infants who ingested this adulterated powdered formula were at significant risk of canthariasis, several other kinds of intestinal problems and bacterial infections.

* Powdered formula products were made at Abbott's production facility in Sturgis, Michigan.

Powdered formula made at Casa Grande may have had a similar problem of adulteration with insects.

Opinion basis:
- Public and court records
- FDA records
- Abbott press releases and other Abbott records
- J. J. Farmer's feeding experiments involving beetles and powdered formula
- FDA inspection report which give customer Complaint CC # 36135 4/13/06 that stated "found a bug and black particles in formula" (ABT000663). This referred to powdered formula made at Casa Grande.

There are anecdotal reports of illnesses in infants following ingestion of formula adulterated by insects (parents' comments in relation to the recall as posted in on the internet). Insects typically have strains of *Enterobacteriaceae* in their intestinal tract, thus it will be interesting to see the complete CDC and FDA files on illnesses and the microbiological results related to this recall (Exhibit 18).

An outside pest control agency was apparently used (ABT/B000180) at Casa Grande, but neither Abbott nor the contractor produced records about insect contamination at the Casa Grande production facility. These records are not currently available to me.

Ecolabs had a contract as an outside pest control agency (ABT/K00050). Fumigation was done by Karsten Pest Technologies (ABT/K00050). No documents were produced by Abbott for the Casa Grande production facility. Thus, this aspect can not be evaluated in relation to the Abbott recall due to beetle contamination at its Sturgis, Michigan production facility. Insects can harbor *E. sakazakii* and insect contamination is a risk factor for contamination of powdered formula with bacterial pathogens.

## Trace back of *E. sakazakii* to Casa Grande

Jeanine Kunkel was infected with *E. sakazakii*, and *E. sakazakii* can be "traced back" to Casa Grande.

Opinion basis:
- Previous paragraphs
- Written documents produced by Abbott

Abbott did not produce documents in its file that covered *E. sakazakii* testing before October 1, 2005. If it found *E. sakazakii* in powdered formula or the environment of its Casa Grande production facility that would be additional trace backs of *E. sakazakii*.

If Abbott isolated *E. sakazakii* from powdered formula or the environment of its Casa Grande production facility it should have saved these cultures, not destroyed them. Judicial sanction for evidence destruction would presumably apply.

Plaintiff has to ability to generate additional proof of its causation argument by the use of microbial forensic techniques based on Jeanine Kunkel's *E. sakazakii* strain and all *E. sakazakii* related to Abbott.