IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

SECURITY NATIONAL BANK, as      No. C11-4017-MWB
Conservator for JMK, a minor child,

       Plaintiff,           Sioux City, Iowa
                            January 6, 2014
    vs.                        8:03 a.m.

ABBOTT LABORATORIES,            Volume 1 of 10

       Defendant.
_____/


**REDACTED** TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 194 Filed 05/12/14 Page 1 of 118

```
APPEARANCES:

For the Plaintiff:          AMANDA BRANDY VAN WYHE, ESQ.
                            TIMOTHY S. BOTTARO, ESQ.
                            Vriezelaar, Tigges, Edgington,
                               Bottaro, Boden & Ross
                            613 Pierce Street
                            Sioux City, IA 51102

                            STEPHEN C. RATHKE, ESQ.
                            ROBERT J. KING, ESQ.
                            Lommen, Abdo, Cole, King & Stageberg
                            2000 IDS Center
                            80 South Eighth Street
                            Minneapolis, MN 55402

For the Defendant:          JOHN C. GRAY, ESQ.
                            Heidman Law Firm
                            1128 Historic 4th Street
                            Sioux City, IA 51102

                            DANIEL E. REIDY, ESQ.
                            JUNE K. GHEZZI, ESQ.
                            GABRIEL H. SCANNAPIECO, ESQ.
                            KATHRYN L. DORE, ESQ.
                            Jones Day
                            Suite 3500
                            77 West Wacker Drive
                            Chicago, IL 60601

Also present:               Louise Deitloff
                            Daniel Morrison

Court Reporter:             Shelly Semmler, RMR, CRR
                            320 Sixth Street
                            Sioux City, IA  51101
                            (712) 233-3846
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 104 Filed 05/12/14 Page 2 of 118

1          (Proceedings convened outside the presence of the jury

2    venire.)

3          THE COURT:  Okay.  Well, we're getting started late,

4    but we need to get started, so I have a couple of things I need

5    to take up, but I was just advised by Mr. King that he believes

6    there's a problem in the verdict form, so it's a little bit late

7    to be raising it, but let's -- let's hear what the problem is.

8          MR. KING:  Your Honor --

9          THE COURT:  You'll have to turn your microphones on.

10         MR. KING:  I'm new at this.  I'll come up.  Your

11   Honor, I was observing that the verdict form would call for the

12   jury to pass on the plaintiff's theories of design and warning.

13   Integral to those theories are issues that go to state of the

14   art.  And so the jury theoretically could find for the plaintiff

15   on design and answer yes to the state of the art which would be

16   irreconcilable in my view.

17         And I would suggest to the Court that a separate

18   question on the verdict on state of the art is not necessary

19   because the defense is available and can be argued in defense of

20   the design and the warning claims.

21         For example, design and warning each call for

22   reasonable safe alternatives, practical results that are

23   available.  But that's integral to the state of the art defense.

24   So I'm just concerned that we have the potential for an

25   irreconcilable verdict.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 2 of 118

         1          THE COURT:  What's the -- who's going to be responding

         2     for the defense?

         3          MR. REIDY:  Dan Reidy will, Your Honor.  Your Honor, I

         4     believe that we need a separate part of the jury verdict form

         5     that addresses the affirmative defense of state of the art, so I

         6     think we need to have that in here.

         7          THE COURT:  And it seems to me in argument can't the

         8     plaintiff just point out that if they award -- can't you just

         9     point out what the jury should do to avoid an irreconcilable

        10     problem?

        11          MR. KING:  Certainly we can argue it, but sometimes

        12     juries don't understand or don't follow.  And so the point is

        13     that the verdict form gives the jury the ability to answer

        14     questions that are irreconcilable.  That's all.

        15          THE COURT:  Well, I think that's true, but if they

        16     answer it that way, it's not irreconcilable.  You lose.

        17          MR. KING:  So the jury could find a design defect

        18     claim, for example, and still find that the product was made to

        19     the state of the art.  I don't understand how that can square

        20     given the definition --

        21          THE COURT:  Well, because I thought we had all agreed

        22     that the affirmative defenses were going to be carved out in the

        23     verdict form and that I would determine the effect of the

        24     verdict form after the verdict.  I thought that was the

        25     understanding and that's why it was set up this way.  Now, maybe

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 4 of 118

1    I missed something.

2            MR. KING:  I'm not speaking to the learned

3    intermediary issue.  That stays on the verdict form pursuant to

4    your rulings.  But I know that our initial submission on our

5    verdict did not carve out the state of the art defense.  And

6    it's just my experience that you don't have a separate question

7    on that because of this danger.  That's all.  But we can

8    certainly argue it and hope for the best.

9            THE COURT:  Well -- so yeah, I think you make a good

10   point here.  So why do we need it for state of the art?

11           MR. REIDY:  Judge, I think that the statutory Iowa

12   defense of state of the art, that we are entitled to have the

13   jury consider that as an affirmative defense.  And in order to

14   have that reflected on the verdict form, we need it separately

15   addressed on the verdict form.  We can't have it built into

16   whether or not they prove their elements of their claim and then

17   not have the jury addressed -- it's instructed on.

18           THE COURT:  Well, it's instructed on it.

19           MR. REIDY:  Yeah, but --

20           THE COURT:  But there's not a verdict form --

21   well . . .

22           MR. REIDY:  There's essentially, Judge -- on each of

23   the claims, there's a part of the verdict form that addresses

24   each of those, and on each of the affirmative defenses there's a

25   part of the jury verdict form that addresses those.  That was

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 5 of 118

1    the symmetry that I think we agreed upon with the Court to begin

2    with, and I think it's one that we have to have.  We have to

3    have --

4              THE COURT:  Well, you don't have to have it in the

5    verdict form.  You have to have it in the instruction.

6              MR. REIDY:  Yes, although I think --

7              THE COURT:  You cite me a case that says you have to

8    have it in the verdict form.  You don't even have to have a

9    specific verdict form.  I could use a general verdict.  Do you

10   find for the plaintiff?  If so, how much?  I could.  I never do

11   that.  But you cite me a single case from any circuit that has

12   ever said you have to have a separate verdict question for every

13   affirmative defense.

14             MR. REIDY:  I can't do that as I stand here.

15             THE COURT:  Because you know it doesn't exist.

16             MR. REIDY:  Well, I don't know actually whether it

17   does or it doesn't.

18             THE COURT:  Well, what do you think?

19             MR. REIDY:  It may well be that it does not, Judge.  I

20   guess what I'm saying is that in order to have the affirmative

21   defense appropriately considered and to reflect that

22   consideration by the jury, we think it's very important that it

23   be separately addressed on the verdict form.

24             THE COURT:  Well, that's like saying -- the flip side

25   of that is, to show you how ridiculous your position is, it's

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 104   Filed 05/12/14   Page 6 of 118

1  like saying for every one of the plaintiff's theories I have to

2  have a special verdict form on each of the elements to make sure

3  that they've considered it so they answer to each element have

4  you considered this, yes or no.  Why is that any different?

5         MR. REIDY:  I guess, Judge, I think that it's not the

6  same to say that you have to have the verdict form address each

7  element because the elements -- if the Court instructs you have

8  to find all these elements and then on the verdict form they

9  check I find on that claim, then it, of course, is assumed that

10  they found on that element.  I think to remove the affirmative

11  defense of state of the art from the verdict form and then -- I

12  mean, I don't think the instructions then even cover it as

13  they're currently there.

14         THE COURT:  What do you mean the instructions don't

15  cover it?

16         MR. REIDY:  Well, then the Court would have to tell

17  the jury, you know, what the state of the art defense is which

18  it does in its --

19         THE COURT:  Well, I do that.  I instruct on it.

20         MR. REIDY:  Yes, of course.  And then I think it would

21  be very difficult to tell them then how to respond to the -- the

22  jury verdict form, you know, where we have affirmative defenses

23  broken out separately.  And I think that if we're going to break

24  the affirmative defenses out separately which I think is fully

25  appropriate and which the Court had done in its original verdict

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW Document 104 Filed 05/12/14 Page 7 of 118

1  form that it makes sense to have each of them there.  And we can

2  address that.  And if -- I mean, we have time to do this.  We

3  can also have the Court address it in an instruction as far as

4  the risk or any risk of inconsistent verdicts.

5          THE COURT:  Well, I would certainly have to change on

6  page 31 the language in the instruction, not the definition of

7  the state of the art defense but the effect of the state of the

8  art defense.  I'd certainly have to make that change.

9          Mr. Gray, do you have a view on this?

10          MR. GRAY:  I do not, Your Honor.

11          THE COURT:  Well, I think I'll leave it in.  And, you

12  know, it will just be up to the plaintiff to explain it

13  effectively in the closing argument so that there isn't an

14  inconsistency.  You know, if it had been raised earlier, I might

15  have done something else, but, you know, I instruct at the

16  beginning, so we've gotta have these ready to go.

17          There are -- with regard to the instructions, we had

18  inadvertently left out my instruction on questions by the jurors

19  because I do allow the jurors to ask questions.  I've just been

20  doing that for the last year and a half or so.  It's really been

21  great.  I'm not sure I've ever actually had an objection by the

22  lawyers to a question.  Usually average eight to ten questions a

23  trial.  They actually ask some really good questions.  The

24  lawyers often at sidebar will say to me, gee, I wish I had

25  thought to ask that.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 104   Filed 05/12/14   Page 8 of 118

1    And just so you know, here's how it works.  At the end
2    of every witness when the lawyers are done examining, I'll ask
3    the jurors if they have any questions.  If they do, they pass
4    them down to the court security officer.  They give it to me.  I
5    review them, and then I show them to the lawyers up at sidebar.
6    We have a system where all the microphones are shut off.  The
7    noise keeps the jurors from hearing what we have to say.  And I
8    just have you state an objection.  Like I said, I don't think
9    I've ever had one, but if you have an objection, I would just
10   rule on it just like I would any other objection.

11   If I sustain the objection, obviously I'm not going to
12   answer the -- ask the question.  If there is an objection and I
13   overrule it, I ask the questions of the witness.  But after each
14   question -- let's say there are more than one.  Maybe there are
15   three questions.  I ask the question of the witness, and then I
16   give the lawyers the opportunity to ask any follow-up questions
17   directly related to that question.  And I start with the party
18   that has called the witness.  Then I'll ask the next question,
19   give the lawyers an opportunity to ask any follow-up questions.

20   So any other objections or problems with the
21   instructions that you want to make any record on at this time?

22   MR. KING:  Your Honor, for the plaintiff, may I speak
23   from here?

24   THE COURT:  Absolutely.

25   MR. KING:  I think that we're on record on the -- our

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW Document 104 Filed 05/12/14 Page 9 of 118

1  view that there's not an evidentiary basis to support the

2  learned intermediary defense.  And my concern -- I'm aware of

3  your view, and my concern always is unringing the bell.  If you

4  should decide at the time of submission that it shouldn't be in,

5  they will have heard it.  And I would just renew the objection

6  and point out that we know of no evidentiary basis to support

7  it.

8       THE COURT:  Thank you.  And if I ultimately conclude

9  it, then I'll just ask the jury to cross it out.  But I don't

10  buy the ringing the bell theory, so I don't actually buy it in

11  virtually anything including jury selection and everything else.

12  So your objection's overruled, but I appreciate it.

13       Do you want to also -- are you satisfied that you've

14  made a sufficient objection to the state of the art defense

15  verdict form, or do you want to make any other record on that?

16       MR. KING:  It's my view that if you believe there's a

17  basis to submit state of the -- or I'm sorry, state of the art

18  or --

19       THE COURT:  I'm back to the original problem you had

20  with the verdict form with regard to state of the art, and I

21  just want to make sure you've had an adequate opportunity to

22  make any record with regard to your objection on that.

23       MR. KING:  Well, I trust that we've been on the record

24  all along.

25       THE COURT:  Yeah.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 10 of 118

         MR. KING:  And, therefore, I'm satisfied that the
record is complete.

         THE COURT:  All right.  Thank you.

         MR. KING:  Thank you, Your Honor.

         THE COURT:  Which brings me to -- I think you would
all be familiar with this rule, but because there are so many
lawyers in this case, I don't allow tag team lawyering.  You
know, it's not the World Federation of Wrestling.

         So, for example, if Mr. Gray were to blurt out an
objection during one of the plaintiff's witnesses, then he's
going to be the one doing the cross-examination whether he
intended to or not.  And the whole point is that, you know, you
can't have multiple people making objections.  There's one -- I
assume you've assigned one lawyer to each witness, so the lawyer
that's going to be doing the cross-examination is the one that's
going to be doing the objecting.  And we're not trading off, in
other words, so I think you all -- you all understand what I
mean by no tag team lawyering?  Yeah.  And I'm sure you're all
very used to that, so okay.

         You know, the major thing I haven't ruled on is this
motion to seal.  Is that going to come up today?

         MR. REIDY:  We do not anticipate it coming up today,
Judge.

         THE COURT:  Okay.  We are having a hard time
finding -- when you filed the motion, you filed an Exhibit B

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 194 Filed 05/12/14 Page 11 of 118

```
 1   which allegedly said the documents that were subject to it were

 2   filed under seal.  We can't find them anywhere, so do you have

 3   anything that actually lists the -- which exhibits are --

 4             MR. REIDY:  Let me just check, Judge.

 5             THE COURT:  Yeah.

 6             MR. REIDY:  Judge, we can certainly give you a list by

 7   tomorrow morning as well as a set if you would like of the

 8   Exhibit B documents.  I don't think we have them broken up and

 9   at hand.

10             THE COURT:  When do you think we're going to get to

11   them?  Will the plaintiff get to them in their case, or is it

12   going to come up mostly in the defense case?

13             MS. GHEZZI:  Well, Your Honor, we don't really know.

14   I think it's probably going to come up --

15             THE COURT:  In the plaintiff's case?

16             MS. GHEZZI:  Yeah.

17             THE COURT:  Yeah.

18             MS. GHEZZI:  But I don't anticipate today, but it's

19   hard to say.

20             THE COURT:  Okay.

21             MS. GHEZZI:  But probably not.

22             THE COURT:  Okay.  Here's another rule.  You either

23   need to wear a lapel mike or speak directly into the microphone

24   because the acoustics are good with the microphones, but it's

25   such a big barn that without the microphone the court reporter
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 12 of 118

1  and I -- even though you all can hear yourselves, we can't hear

2  you.

3          MS. GHEZZI:  Gotcha.

4          THE COURT:  So it will be hard to get used to.  And

5  it's -- the light means that it's on.  And in some courtrooms

6  the default is on and you have to press the little bar.  Ours is

7  the opposite.

8          MS. GHEZZI:  Okay.  Thank you.

9          THE COURT:  And if you're having a private

10  conversation with the client, I notice the microphone's on, I'll

11  ask you to shut your microphone off because it's hard to pay --

12  you have so many things to pay attention to, it's hard to

13  so . . .

14          You know, I might have been a little precipitous in

15  my -- I mean, I do have this view that most of the claims of

16  trade secrets really aren't.  But I know you have some concerns

17  because you know there's going to be a lawyer from a competitor

18  that may be at the trial.

19          MS. GHEZZI:  Well, I know that there is a lawyer from

20  the competitor who has asked me on several occasions when it's

21  going and stating that they'd like to be there as late as

22  Friday.  I did not answer that e-mail.  But I don't know.  I

23  cannot represent to the Court that I know that somebody from the

24  competitor will be here.  But I can just say that that's what

25  I've been told.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 13 of 118

1      THE COURT: Okay. Let me ask you this. Would it be

2 sufficient do you think -- and please -- you know, you have to

3 protect your client. That's not my job. I'm not looking out

4 for your client's interest, I mean, only as a neutral but not as

5 an advocate.

6      But one of the things I thought of, we could certainly

7 seal any record that you wanted in terms of the court filing and

8 it would be under seal and nobody could go on Pacer and have

9 access to it. Nobody could call the clerk and say, hey, we'll

10 be glad to pay for a copy of that exhibit. And so I'm trying to

11 draw maybe a balance here.

12      But to the extent that witnesses testify about it, I

13 don't mind actually sealing the transcript if you'll tell me

14 when you think it needs to be sealed. We can seal that portion

15 of the transcript so when the case is over and it's on appeal

16 nobody could get access to the transcript. And that would

17 obviate the need of trying to close the courtroom physically and

18 exclude people. But maybe that isn't enough of a protection for

19 you and your client. And you're in a better position to make

20 that judgment really than I am.

21      MS. GHEZZI: You know, Your Honor, I think that as it

22 develops organically we can sort of see. I don't know what

23 they're going to use. And our client is here, and if we see --

24 if I see a lawyer from the competitor that I know, I can point

25 that out. You know, we can do that kind of thing.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW Document 194 Filed 05/12/14 Page 14 of 118

1    THE COURT:  And generally as you can see, we don't

2  have a huge audience watching our trials.

3    MS. GHEZZI:  Yes.  I'm blaming that on the weather.

4    THE COURT:  Well, blame it on lack of interest or how

5  boring our trials are.  I'm kidding.  So if you're comfortable

6  kind of playing it by ear, we can do that.  You know, I don't

7  want to harm your client with the release of any trade secret.

8    MS. GHEZZI:  I understand.

9    THE COURT:  But I'm kind of wondering, even if the

10  lawyer's sitting in the office and somebody's talking, how much

11  of it could he actually take down that would -- I don't know.

12  But I'm open to sealing the courtroom if we have to.

13    MS. GHEZZI:  Okay.

14    THE COURT:  Okay?

15    MS. GHEZZI:  Thank you, Judge.

16    THE COURT:  Because even though I'm skeptical of trade

17  secret claims, you know, this is a product where I could

18  understand that there would be some legitimate trade secret

19  claims.  And I was looking at some documents, but I don't think

20  I looked at the right documents.  And then when I went this

21  weekend to look at the documents you identified in Exhibit B, we

22  couldn't find Exhibit B.  It was probably just -- I don't know

23  what the problem was.  I'm not blaming it on anybody.  But -- so

24  I don't really feel I've reviewed the doc -- I know I haven't

25  reviewed some of the documents, so I'm not really in a position

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 15 of 118

1  to say, hey, they're not trade secrets because I haven't

2  actually reviewed them.  I'm not sure I'd know it even if I did.

3  But -- so I'm more willing to close the courtroom if it'd be

4  relatively limited number of times and on limited evidence.  But

5  you'll -- so we'll just play it by ear, and you'll give me a

6  heads-up; okay?

7           What do you all have on your agenda?

8           MR. BOTTARO:  Your Honor --

9           THE COURT:  It's good practice.  Just look for the

10 light.

11          MR. BOTTARO:  I see.  I thought the light was on.

12 There was a story in the paper this morning.  I don't know if

13 you saw it.

14          THE COURT:  Yeah, I saw that.

15          MR. BOTTARO:  Would you address that with the jurors

16 because I --

17          THE COURT:  Yeah, I will.  Yep.  Let me ask you this.

18 Did both sides have an opportunity to see the story?

19          MR. REIDY:  (Nodded head.)

20          THE COURT:  I saw it, but I just kind of skimmed it

21 real quickly.  Is there anything in the st -- let me ask you

22 this.  Is anybody going to be overly concerned about the fact --

23 actually I think you'll be surprised at how few people read the

24 newspaper.  But if they read the story, is any -- is either

25 party taking a position that the mere reading of the story would

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 16 of 118

1  be enough to exclude someone from the jury?

2         MR. BOTTARO:  Not on the plaintiff's side, Your Honor.

3         MR. REIDY:  Nor on the defendant's side, Judge.  I

4  think that if the Court just satisfies itself and us that the --

5  or I guess itself in this case that the juror --

6         THE COURT:  Well, no, you too because you're

7  ultimately --

8         MR. REIDY:  Yes.  You'll obviously decide that.  But I

9  think we'd be looking, Judge, just to make sure that, you know,

10  it didn't create any predisposition that's a problem.

11         THE COURT:  Right.

12         MR. REIDY:  That's all.

13         THE COURT:  And that's what I'll look for.  Great.

14  But no, I'll be glad to -- I'll be glad to raise that.

15         MR. BOTTARO:  And, Judge, when you ask or when we

16  introduce ourselves and whom we practice with and witnesses that

17  may be called, do you then ask any follow-up on that?

18         THE COURT:  Yeah, I'll ask who they know.  And the way

19  I've got it set up is -- normally -- I was trying to cut down my

20  involvement so that the lawyers would have more time because I

21  really believe in lawyer-conducted voir dire.  So I was just

22  going to kind of introduce the lawyers and then find out if

23  anybody knows anybody.  And then we'll go beyond if they know

24  them how that might, if at all, affect.  And I didn't really

25  have the witnesses in there.  I thought I'd let the lawyers do

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 17 of 118

1    that when I turn it over to you all.  You can go through who

2    your witnesses are and see if any of the jurors know them.  I

3    mean, most -- it seems like a ton of the witnesses are

4    out-of-state experts.  But stranger things have happened

5    actually.

6            MR. BOTTARO:  Right.

7            THE COURT:  So I actually wasn't going to address the

8    witnesses.  I was going to leave that for the lawyers to do.

9            MR. BOTTARO:  And as far as objections or challenges

10   for cause, do you prefer us to stand or remain seated or -- when

11   we address the Court?

12           THE COURT:  I don't care.

13           MR. BOTTARO:  Okay.

14           THE COURT:  I think you can remain seated is fine.

15   But if you want to stand, that's fine.  Doesn't make any

16   difference to me.

17           MS. GHEZZI:  Judge, I have one question.

18           THE COURT:  Yes.

19           MS. GHEZZI:  Do you let them know maybe after they're

20   empanelled that sometimes people at the tables will leave the

21   room and come back?

22           THE COURT:  Yeah.  Thank you.  I think what I'll

23   explain is that while you all can come and go the jurors and I

24   can't.  But that's the rule.  People in those tables, they get

25   to come and go.  Sitting here and sitting there, we stay.  But

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 18 of 118

1  no, that's very -- yeah.  Of course, I'll explain that, and

2  thank you for raising that.

3          Anything -- are there other things we need to talk

4  about or . . .

5          And on the PowerPoint slides, I'm not going to read

6  every -- I'm not going to read every city that Jones Day has

7  offices in, but I don't think it's enough to just say do you

8  know the lawyer -- do you think you know anybody that works for

9  Jones Day because that might not -- so I've got the cities in

10  there.  I'm not going to spend a whole lot of time on it.  I'm

11  just going to say it's a large firm with a lot of offices.  Here

12  are the cities they operate in, just leave it up there for --

13  you know, I'm not going to dwell on it and go through every

14  single city but . . .

15          MR. REIDY:  We understand, Judge.  And if it might be

16  consistent, I think Mr. Rathke's firm has offices in Huron,

17  Wisconsin, and New York City.

18          THE COURT:  Oh, I didn't realize that.

19          MR. REIDY:  So -- I believe I'm right on that.  I

20  looked on their website.

21          MR. KING:  Your Honor, we do have an office --

22          MR. REIDY:  Their website lists those two offices.

23          MR. KING:  We do have an office in New York City.

24  It's about as big as this table, but you're welcome to mention

25  that to the court.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 19 of 118

```
 1              THE COURT:  Okay.  Do you have an office anywhere
 2   else?
 3              MR. KING:  In Hudson, Wisconsin.
 4              THE COURT:  Okay.  I'll just go ahead and add that
 5   physically to my PowerPoint.  Thank you for pointing that out.
 6              MR. BOTTARO:  We don't have any offices in Dakota
 7   Dunes or anything like that so . . .
 8              THE COURT:  Or North Sioux.
 9              MR. BOTTARO:  Or North Sioux, yeah.
10              THE COURT:  Yeah, no tri-state.
11              MR. GRAY:  Your Honor?
12              THE COURT:  Yes.
13              MR. GRAY:  I suppose -- and I'd forgotten it, but we
14   now have just opened an office in South Sioux City.
15              THE COURT:  That -- okay.
16              I want to make sure I can pronounce the lawyers' names
17   correctly.  And let me actually pull up that slide.  So is it
18   Reidy or "ready" or something else?  I'm sorry.  You've said it
19   a number of times for me.
20              MR. REIDY:  First guess was the correct one, Judge,
21   Reidy.
22              THE COURT:  Reidy, thank you.
23              And Ghezzi?
24              MS. GHEZZI:  Yes, Your Honor.  Yes, Ghezzi.  I always
25   like to say it's --
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 20 of 118

```
 1              THE COURT:  And, Gabriel, you're going -- Gabriel,
 2    you're going to really have to help me out on yours so . . .
 3              MR. SCANNAPIECO:  My last name's pronounced
 4    Scannapieco.
 5              THE COURT:  Scannapieco?
 6              MR. SCANNAPIECO:  Yes, Scannapieco.
 7              THE COURT:  Scannapieco.
 8              MR. SCANNAPIECO:  Yes.
 9              THE COURT:  Is that close enough, or is that -- I
10    don't want to get close.  I want to try and get it.
11              MR. SCANNAPIECO:  That's dead on.
12              THE COURT:  Okay.  Thank you.
13              And is Mr. Morrison sitting next to you?  Yes.  He's
14    the Abbott rep?
15              MR. MORRISON:  Good morning, Your Honor.  Yes.
16              THE COURT:  Good morning.  Welcome.
17              MR. MORRISON:  Thank you.
18              THE COURT:  Thank you.  The two-week trial estimate,
19    it's so hard to estimate, particularly the longer the trial
20    the -- you know, it's pretty easy to estimate a two-day trial.
21    The longer you get out, very hard to estimate.  And I'm not
22    super concerned even though I have a patent case that's
23    allegedly starting the day this ends, the next day that starts,
24    and I think we've scheduled it for -- is the 21st a federal
25    holiday?  Yeah.  So I think that's probably supposed to start on
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 21 of 118

1  Tuesday, the 22nd, although maybe we're starting on a federal

2  holiday because I often do.  But you think we'll be done in two

3  weeks or not?  I -- you know, it's an important case.  I was

4  originally going to put you on a time clock.  I don't think

5  I'm -- I'm not going to do that.  But I mostly want to know what

6  to tell the jurors.  I'm less concerned about the patent case

7  because they only have like six witnesses.  So -- yes, Mr. Gray?

8        MR. GRAY:  Your Honor, I think the holiday, wouldn't

9  that be Monday, the 20th?

10        THE COURT:  Okay.  The 20th?

11        MR. GRAY:  Yeah.

12        THE COURT:  Yeah, yeah.  Thank you.  So we're going to

13  start on the 21st I think.  But this case could certainly

14  deliberate or we could have closing arguments on the holiday.

15  We're not going to take the holiday off if this case is still

16  going, but I assume you don't want this case to still be going

17  by then but . . .

18        MR. BOTTARO:  We don't want it, but I think it's

19  probably wise just to say there's a potential that it could go

20  beyond two weeks.

21        THE COURT:  That it could go into the third week,

22  particularly with deliberations.

23        MR. REIDY:  I think that would be the safe course,

24  Judge, as well.

25        THE COURT:  Okay.  Thank you.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 22 of 118

1      MS. GHEZZI:  And Judge?

2      THE COURT:  Yes.

3      MS. GHEZZI:  This might be a good time to raise this.

4  We have one expert witness who is 71.  His wife is about the

5  same age.  She, he informed me recently, is handicapped, and she

6  can't travel alone.  And he has to -- when we -- since August we

7  told all of our people we're going to be on the clock and this

8  is when we're going to go.  And so we had said we're going to

9  put him on early in the case, and we thought we'd put him on

10  right at the beginning of the first -- of the second week.  And

11  so he sort of arranged that with his wife.

12      And he has to travel like from Sioux City back to

13  Florida, pick her up and take her to Chicago because she cannot

14  travel alone.  And so this is the only person we might have an

15  issue with in terms of seeking leave to take him out of turn if

16  he can go on Monday, the 13th.

17      THE COURT:  Absolutely.  Absolutely.

18      MS. GHEZZI:  Okay.  Okay.  Thanks, Judge.

19      THE COURT:  We'll take him whenever -- just give me a

20  heads-up like the day before.

21      MS. GHEZZI:  Okay.

22      THE COURT:  And we'll take him --

23      MS. GHEZZI:  Thank you.  We appreciate that, and he

24  will appreciate it.

25      THE COURT:  Yeah, we do that all the time.  Sure.  Any

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 23 of 118

1  chance you want to call him by video so he doesn't have to

2  travel?

3          MS. GHEZZI:  No, I don't think so.

4          THE COURT:  Okay.

5          MS. GHEZZI:  I think where he is, you know -- yeah.

6          THE COURT:  Yep.  You've got him scheduled, but

7  absolutely, we'll take him out of order.

8          MS. GHEZZI:  Thank you.

9          THE COURT:  And if it comes up for other witnesses

10 too, I know they're expensive to have sitting around, and so if

11 we need to take people out of order, we'll do it to accommodate

12 their schedules, so that's fine.

13         MS. GHEZZI:  We do have one witness who probably will

14 be remote.  But Gabe has worked it out so -- with your staff.

15         THE COURT:  Okay.  That's fine.  Anything on the

16 plaintiff's agenda that we need to talk about?

17         MR. RATHKE:  As the Court knows, we're going to read

18 some depositions.  And my plan is to have people to my left play

19 all of the parts.  I certainly was not going to ask Ms. Ghezzi

20 to read her part, but if she would like to, that would be fine

21 too.

22         MR. BOTTARO:  We could certainly then read our parts

23 if they're doing the same thing with witnesses.

24         THE COURT:  Do you have any desire to read your part?

25         MS. GHEZZI:  No.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 24 of 118

```
 1            MR. REIDY:  Zero.

 2            MR. RATHKE:  Okay.  We'll have someone --

 3            THE COURT:  I like the definitive nature of the

 4   statement.  There's no ambiguity there.

 5            MR. RATHKE:  We'll have someone play Miss Ghezzi.

 6            THE COURT:  Okay.  Anything else from the plaintiff?

 7            Is there -- is there -- like are there lead

 8   counsels --

 9            MR. SCANNAPIECO:  Your Honor?

10            THE COURT:  -- that I -- if I don't know who to call

11   on I should be calling on?

12            MR. SCANNAPIECO:  Excuse me, Your Honor.  For purposes

13   of counter designations, should we be reading those in?  Are

14   you -- at the same time?

15            MR. RATHKE:  We'd be happy to read them in.

16            MR. BOTTARO:  Well, but if they read theirs . . .

17            MR. REIDY:  I think we'll just read -- if it's okay

18   with the plaintiffs, we'd just read the -- whoever's reading it

19   will read both the designations.

20            THE COURT:  Will read both the designations and the

21   counter designations.  Do you have any problem with that?

22            MR. RATHKE:  No.

23            THE COURT:  Okay.  I think that makes the most sense.

24            MR. BOTTARO:  As to your question, Your Honor,

25   Mr. Rathke is the lead counsel on the plaintiff's.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 25 of 118

```
 1              THE COURT:  Okay.

 2              MR. REIDY:  Judge, I'm the oldest lawyer on our side,

 3    so we'll use the oldest test.

 4              THE COURT:  Okay.  Thank you.  Any -- now let's go to

 5    the defense.  Anything on your agenda?

 6              MR. REIDY:  No, Judge, we don't have anything.

 7              THE COURT:  Okay.  Thank you.

 8              You know, it's awkward, but I need to bring it up.

 9    This whole potential sanctions issue, you can look through my

10    record.  I think you can count on less than one hand the number

11    of times I've sanctioned lawyers in 20 years.  I was pretty

12    shocked when I read through the depositions, and just to make

13    sure my views weren't as idiosyncratic as they often are, I ran

14    it by another judge which I never do, Judge Strand, and he was

15    even more incensed than I was.  And lawyers do that because

16    judges look the other way.  And I'm not the type of judge that's

17    willing to look the other way.  But I haven't given you in my

18    view sufficient notice.  I mean, I just thought there were so

19    many obstructionist, frivolous objections that it was beyond

20    anything I have ever seen.

21              And, Mr. Rathke, both Judge Strand and I commented

22    that we don't know how you kept your patience with all that

23    nonsense that was going on because neither he nor I would have

24    put up with it either as a lawyer or as a judge.

25              So I think what I'll do is one -- at the end of the
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 26 of 118

```
 1   day one of these days I'm going to give you some more specific
 2   notice.  I'll probably just pick out one deposition because the
 3   conduct was, I thought, repeated often, but I -- on the other
 4   hand -- well, and then we can hold a hearing maybe next week in
 5   the evening and give you a chance to respond to it.  It's just
 6   not something I think I can overlook so . . .
 7           But I do want to give you more notice, so we'll just
 8   probably have a half-an-hour session one evening, and I'll go
 9   through what I thought the problems were.
10           Okay.  We'll see you at nine.
11           MR. BOTTARO:  Judge, since we're starting at nine this
12   morning, when do you anticipate the mid-morning break?
13           THE COURT:  The mid-morning break will be at 10:30.
14   That's usually when I take the break.  It's a little earlier
15   than normal because people often have had coffee, and so their
16   bladders are -- try and be practical.  Their bladders require an
17   earlier break.
18           Now, when we get -- you know, today we'll probably go
19   till 4:30 or so, quarter to 5, something like that.  Then
20   tomorrow we go to the 8:30-to-2:30 schedule, and we'll be taking
21   the mid-morning breaks anywhere between 10 and 10:15 usually and
22   the afternoon break between noon and 12:15.  And we'll probably
23   take a 25-minute break.  And, you know, you can feel free to
24   have food brought in and eat right at counsel table if you want
25   to.  And the jurors will have goodies downstairs in the jury
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 27 of 118

1    room.

2            MR. RATHKE:  Since we're going to later in the

3    afternoon, will there be a lunch break?

4            THE COURT:  Today?

5            MR. RATHKE:  (Nodded head.)

6            THE COURT:  Intravenous feeding tubes.  You know, it's

7    kind of like on the airline when they ask you to check for the

8    flotation cushion.  Just reach under your -- yep.  You see it

9    there, the feeding tube?

10           MR. RATHKE:  I got it.

11           THE COURT:  Okay.  No.  We'll be taking an

12   hour-and-15-minute lunch break today.

13           MR. BOTTARO:  I'm glad you clarified that.  I thought

14   that was the catheter, so it's the feeding tube.

15           THE COURT:  Oh, right.

16           MR. BOTTARO:  Thank you, Judge.

17           THE COURT:  Or the enema.  Okay.  We'll see you back

18   here at nine.  Thank you.

19           MR. RATHKE:  Thank you, Your Honor.

20           (Recess at 8:40 a.m.)

21           (The jury venire entered the courtroom.)

22           THE COURT:  Good morning, everybody.  How excited are

23   you to be here this morning?  Awesome.  If you'd raise your

24   right hand, I'm going to swear you all in.

25           (The jury venire was sworn.)

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 28 of 118

1          (Voir dire was reported but not transcribed.)

2          (The jury was sworn.)

3          THE COURT:  Okay.  Thank you.  Please be seated.

4  Mr. Sun and Miss Ford, why don't we have you move to the back

5  because we just have two lonely jurors back there.  And that way

6  that will give us four in the front row and four in the back

7  row.  And then why don't you slide down so you can be in the

8  middle.  Yeah, that's fine.  It doesn't have to be -- I guess

9  there's no exact middle but -- Lisa, you want them to move down

10  one?  Miss Kilberg, if you could move down one, that'd be great.

11          And notice there are cup holders.  I'm proud of the

12  fact that we're the first federal courtroom in the United States

13  to have cup holders that I'm aware of, and I'm pretty sure I'm

14  right about that.  And that came about as a result of a juror

15  quite a few years ago raising her hand in the middle of trial

16  and saying why do the lawyers have things to drink, why does the

17  witness have things to drink, why do I have things to drink and

18  we don't have any?  So we changed that.  So you can bring

19  anything you want into the courtroom as long as it's

20  nonalcoholic.  We save the alcohol for the lawyers.  But the

21  jurors, you know -- no, I'm just kidding.  As long as it's

22  nonalcoholic.

23          So here's what we're going to do.  We're going to be

24  in recess until 1:15.  When you come back at 1:15, you will have

25  a set of jury instructions, and then it's my obligation under

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 29 of 118

1  the law to go through these with you which I will.  And then

2  you'll also have a notebook and a pen because you're allowed to

3  take notes if you want to.  I actually have an instruction on

4  note taking.  You don't have to take notes.  Nobody's going to

5  read your notes.  But if you want to take notes, you can.  And

6  sometimes I think it's easier to just take the notes right on

7  the jury instructions if you want to.  But it's really totally

8  up to you whether or not you take notes or you don't take notes.

9          And I wanted to talk to you about the schedule.  Today

10 we're going to go till about somewhere between 4:30 and quarter

11 to 5 if we can have maybe a natural break or are done with a

12 witness.  But our schedule the rest of the week and next week, I

13 hope you'll find it to your liking.

14          When I first started as a federal district court judge

15 20 years ago, I had 2 pretty lengthy trials.  Matter of fact, my

16 first trial was a patent trial.  And I did a questionnaire for

17 the jurors to find out which -- so we went a couple of weeks

18 doing the traditional kind of 9-to-5 which we're doing today and

19 then what I call my alternative schedule where we go 8:30 to

20 2:30.

21          And so that's -- we're going to use the 8:30 to 2:30

22 the rest of this week for 2 primary reasons.  Well, actually

23 there's more than that.  There's really maybe three or four good

24 reasons.

25          Particularly in the winter when it gets dark early, I

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 30 of 118

1   like the jurors to be able to get home early.  I find that more

2   people can serve on juries when they can get home particularly

3   if you have kids, so it works better.  Jurors unanimously like

4   the 2:30-to-4:30 sch -- I'm sorry, the 8:30-to-2:30 schedule

5   better every time I survey jurors, so I know you like it better.

6   I actually don't like it, but it's really efficient, and I have

7   a bunch of things scheduled in the afternoons, criminal cases,

8   sent -- mostly sentencings.  And while I'm sure the defendants

9   aren't that anxious to be sentenced, I'm anxious to get those

10  resolved and have those go on their way.  And so that's another

11  reason but not the primary reason.

12          I also think it's better for the lawyers.  Lawyers

13  work really hard getting ready for trial and really hard when

14  they're in trial.  And so this way they don't have to stay up

15  quite as late at night.  They can -- we have a lot of

16  out-of-Sioux City lawyers.  They can call back to their offices,

17  deal with other client emergencies, and it just I think works

18  better for the lawyers because they're fresher.

19          And it's kind of like skiing for those of you who have

20  been downhill skiers.  You know, about 70 percent of the

21  accidents in skiing happen after 3:00.  And I've often said

22  during jury trials not much good happens after three.  The

23  lawyers are tired.  They get irritable.  I'm always irritable,

24  but I get a little more irritable.  And the jurors, it's just

25  hard to pay attention for that long.  So I think you'll find the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 31 of 118

1   8:30-to-2:30 schedule will work to your benefit certainly on the

2   back end.  You know, you do have to get here a little bit

3   earlier on the front end.

4           And in terms of efficiency -- we've actually tracked

5   it with the transcript pages -- it's just as efficient going the

6   8:30-to-2:30 schedule as doing the longer schedule.  You just

7   compact the time, but you're just more efficient.

8           So you obviously need breaks.  We'll generally take a

9   break anywhere between 10 and 10:15, and that will be a

10  25-minute break, and then we'll take another one between noon

11  and 12:15 in the afternoon, so there will just be two breaks.

12  We should have snacks down there for you, but if you don't like

13  what we bring, there's a refrigerator and microwave, and you can

14  bring stuff if you need to eat.

15          Let's see.  I'm just drawing a blank here.

16          Okay.  Obviously one of the things I'm going to tell

17  you repeatedly during the trial is keep an open mind till you've

18  heard all of the evidence.  It's very important that you do so,

19  and you can't discuss this case among yourselves.  Don't let

20  anybody talk to you about the case.  If they do, report it to

21  me.  And once all the evidence is over and you hear the closing

22  arguments of the lawyers to summarize and interpret the evidence

23  for you, receive my final instruction and go down to the jury

24  room to deliberate, then you can talk about it as much as you

25  want to with each other.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 32 of 118

1    So we will see you back here at 1:15.  It's about five

2 minutes to noon now, and we'll start back at 1:15.

3    Here's what's going to happen this afternoon.  I'll go

4 over the jury instructions with you, and then we'll hear the

5 opening statements of the lawyers.  Opening statements are not

6 evidence, but they're an opportunity for the lawyers to

7 summarize what they think the evidence in the case will be.  And

8 then hopefully we may get through a witness or two or at least

9 start with a witness.

10    And then we'll just go through all the plaintiff's

11 witnesses, then go through all of the defense witnesses, see if

12 the plaintiff has any what we call rebuttal witnesses and then

13 hear the closing arguments of the lawyers and you'll be able to

14 deliberate.  But that's probably not going to be till the end of

15 next week at the very earliest.

16    So congratulations.  That's one of the things I'm

17 going to tell you in the instructions.  You've been selected to

18 serve the United States of America as federal jurors.  It's a

19 very, very important duty.

20    Oh, yeah.  There was one thing I did want to tell you.

21 At the end of the case when you're done with your deliberations

22 and hopefully you've been able to reach a unanimous verdict, you

23 know, one way or the other, I'm going to come down, and I'm

24 going to meet with you, and I'm going to try and answer any

25 questions that you might have.  I've been doing this for 20

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 33 of 118

 1   years.  And I'm going to give you a questionnaire.  And you're

 2   going to get to -- you don't have to fill it out.  We don't keep

 3   you captive, but it's in an envelope, and you'll take it home.

 4   And hopefully most of you or all of you will fill it out.  And

 5   you get to evaluate me as a trial judge, whether I've done a

 6   good job, whether I've been fair to both sides.  You get to

 7   evaluate all of the lawyers in the case on a number of criteria.

 8   And I take that very seriously.

 9           We've made huge changes in how our court does business

10   based on the feedback we get from you.  So it's very important

11   for us to get that feedback, and it's very important for the

12   lawyers because lawyers who try cases in federal court are very

13   dedicated to their craft, and they're always trying to improve

14   and get better.  So honest feedback from you will be very

15   helpful to them.  So hopefully you have that to look forward to

16   at the end of the trial.

17           So we do start -- I think you'll find we start pretty

18   promptly.  And so if you could be back just a couple of minutes

19   early so we could start at 1:15, that would be great.  Thank

20   you.  We'll see you back at 1:15.

21           (The jury exited the courtroom.)

22           THE COURT:  Thank you.  Please be seated.

23           Anything we need to take up from the plaintiff?

24           MR. RATHKE:  Do you want the jury questionnaires

25   returned?  I'd be happy to do it.  I don't want them.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 34 of 118

```
 1              THE COURT:  Yeah, if you don't want them.  We have
 2    a -- recycling, so that'd be great.  You can just give them to
 3    Matt.  If you keep them, you get to come back and try the patent
 4    case.
 5              Mr. Gray, I think I'm going to appoint you to be in
 6    that case, you know.  That will be your third one in a row.
 7              MR. RATHKE:  So how long do you think your
 8    instructions will last?
 9              THE COURT:  Will last?
10              MR. RATHKE:  Yeah.
11              THE COURT:  In perpetuity.
12              MR. BOTTARO:  Will take.
13              THE COURT:  Right.  About 45 minutes probably.  That's
14    just a guess, but, you know, they're pretty lengthy.  Or, you
15    know, instead of me doing it, we could have the lawyers mime
16    them.  I'm real big on miming.  So any volunteers from the
17    lawyers to mime?
18              Mr. King, you want to develop your forensic skills by
19    miming the jury instructions?
20              MR. KING:  I'm rusty.  I'm too rusty.
21              THE COURT:  Okay.  Mr. Bottaro?
22              MR. BOTTARO:  I volunteer Ms. Ghezzi.
23              THE COURT:  There you go.  Oh, yeah, but you can't
24    volunteer the other side.  That's the only thing so -- okay.
25    Anything else we need to take up?  We'll see you back here at
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 35 of 118

1    1:15.  Okay.  Thank you.

2              (Lunch recess at 12:01 p.m.)

3              THE COURT:  Do you know if the jurors are all ready?

4              CSO STECKELBERG:  They're ready.

5              THE COURT:  Okay.  Just a second here.  Okay.  Ready

6    to have the jurors brought in?

7              MR. BOTTARO:  Yes, Your Honor.

8              MR. RATHKE:  Yes.

9              THE COURT:  Okay.

10             (The jury entered the courtroom.)

11             THE COURT:  Thank you.  Please be seated.

12             Members of the jury, I just -- I haven't told you

13   this, but we did talk about a stretch break, and you've had some

14   stretch breaks, and I found that taking stretching breaks helps

15   everybody stay awake and pay attention.

16             So when we do get to the witnesses, we have a rule

17   called sequestration.  It's Federal Rule of Evidence 615.

18   Sequestration's a fancy word meaning that witnesses who are

19   going to testify can't be in the courtroom to hear the other

20   witnesses' testimony, and I think you can figure out the reason

21   for that.  We don't want witnesses to be influenced by what

22   other witnesses testify to.  And there are some exceptions.

23             So, for example, each side gets to have a

24   representative, so the plaintiff has a representative from

25   Security National Bank, and Abbott has a representative from the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 36 of 118

1    corporation.  And they may or may not testify.  But other folks

2    will be excluded once the opening statements and the trial

3    actually begins.

4           So because it takes a moment or two for a witness to

5    get off the witness box and leave and for a new one to come in,

6    for me to swear them in, that's always a good time to take a

7    stretch break.  So I'll try and remind you for a while, but then

8    you'll get in the habit.  As soon as a witness steps down, you

9    can automatically stand up and take a stretch break till that

10   other witness is in the courtroom, I swear that witness in, the

11   witness is seated.  When the witness then is seated, then you

12   can be seated, and that way you get some extra stretch breaks

13   out of the deal.

14          So you should have on your chair the small phone book

15   size set of jury instructions.  I'm just kidding you.  They're

16   really not that long.  And it says on it "Instructions to the

17   Jury," and then it has what we call the caption.  Every case has

18   a caption.  It's just the name of the case.  It's a way that we

19   keep track of our cases.  So this is in the United States

20   District Court for the Northern District of Iowa, Western

21   Division, and the plaintiff, Security National Bank, Plaintiff,

22   as Conservator for J.M.K., a minor child, Plaintiff, Abbott

23   Laboratories, Defendant, says instructions to the jury.  And

24   then you'll see there's a table of contents.  So at any time

25   throughout the trial you want to look up one of the instructions

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 37 of 118

1  or think about it or take notes on it, you'll have a table of

2  contents for you to do that.

3        And then you flip the page, and you notice we have 20

4  instructions, and then we have a verdict form.  And a verdict

5  form is simply how you record your verdict.  But we'll go over

6  that.  So if you flip the next page, then it says number 1,

7  introduction.  And that would be the start of the jury

8  instructions.  I'm going to go over these with you.

9        (The Court read instructions numbers 1 through 19 in

10  open court.)

11        THE COURT:  But I would like you to turn to the page

12  following 44.  It's what we call the verdict form, and this is a

13  three-page document that you'll fill out after you've concluded

14  your deliberations and hopefully reached a unanimous verdict.

15  I'm not going to read the whole verdict form, but I just want to

16  kind of point out what it looks like because it's kind of a

17  snapshot actually of the whole case.

18        Question 1 -- Roman numeral 1, the conservator's

19  claims, step 1, verdicts, and it just gives you an opportunity

20  on who you rule for on the three claims, the conservator or

21  Abbott.  Then if you found in favor of the conservator on the

22  warning claim, then you have an opportunity to check which of

23  the warnings apply.

24        And then step 2, if you found in favor of the

25  conservator on one or more of the claims, you again have an

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 38 of 118

1    opportunity to fill out each form of damages that you've been

2    instructed on.  And then there's a place to total the

3    compensatory damages.

4          And then step 3 is if you found for the conservator on

5    either the design defect claim or the warning defect claim,

6    there's an opportunity to put down punitive damages.

7          And then section 2 would be Abbott's specific

8    defenses.  And it's a question of whether or not they've proved

9    the state of the art specific defense and then whether or not

10   they've proved the intermediary specific defense, place for the

11   date, foreperson will sign it, and the rest of the jurors.

12         Just so you know, the final instruction I give you

13   just tells you that you need to elect one of you as the

14   foreperson so that person can speak for you here in court.

15         So why doesn't everybody take a stretch break.

16         Please be seated, members of the jury.

17         Mr. Rathke, are you ready to proceed with the opening

18   statement?

19         MR. RATHKE:  I am, Your Honor.

20         THE COURT:  Okay.  Thank you.

21         MR. REIDY:  Your Honor, could I have just a moment

22   with Mr. Rathke?

23         THE COURT:  You may.

24         MR. REIDY:  Your Honor, we had an expert witness in

25   the courtroom that should be excluded for the opening

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 39 of 118

1   statements.

2          THE COURT:  Yeah.  Wasn't that the understanding?

3          MR. RATHKE:  I thought the understanding was from

4   testimony, but she'll be happy to.

5          One thing that Judge Bennett said this morning really

6   scared me.  He said that we've got some really good lawyers

7   here, and I hope during the course of the trial that I'll live

8   up to his expectations and yours and present the evidence that

9   you need to decide the case in a fair manner.

10         This story actually begins in 2001 when several babies

11  in a Memphis hospital got meningitis, and some of them died.

12  They determined that the bacteria that caused the meningitis was

13  E. sakazakii.  And they traced that bacteria to powdered infant

14  formula that the hospital was providing for those infants.

15         Because of that very sad incident, the FDA determined

16  that it would do a survey of all the manufacturing companies in

17  the United States, you know, taking random cans of powdered

18  infant formula and test them rigorously for E. sakazakii.

19  Twenty-eight percent of the cans that were tested from all of

20  the manufacturers contained some E. sakazakii.

21         There's a group called the International Formula

22  Council which represents the companies.  It's a trade

23  association, and Abbott and the other companies are members.

24  And they became very concerned about possible regulation which

25  might occur due to this E. sak problem.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 40 of 118

1    But the IFC recognized the reality, and we have some

2  of those internal documents that you'll see and read at least

3  part of it.  They recognized the reality, and so to quote one of

4  the documents -- this is an IFC document -- under current FDA

5  testing procedures, it is anticipated that E. sak will

6  eventually be found in powdered infant formula made by all of

7  the infant formula manufacturers.  They also said in another

8  memo although proactive measures may be taken to reduce the

9  level and frequency and incidents of E. sak in powdered infant

10 formula, total eradication of the microorganism from powdered

11 infant formula appears unfeasible due to the nature of food

12 powder manufacturing.  And they also said in reporting on the

13 extent of the problem they're having the published literature

14 has reported that since 1988 about 10 percent of the powdered

15 infant formula tested positive for E. sakazakii.

16    So this is real.  I'll bet you didn't know that.  This

17 is real.  Powdered infant formula contains this bacteria

18 E. sakazakii.  The question is always how much, but it is there.

19 And that's what this case is about.  This isn't a case about

20 power lines cause cancer, you know, junk science.  This is

21 science.  Powdered infant formula contains E. sak.  E. sak harms

22 babies.

23    Now, Judge Bennett explained to you the reason why we

24 have the name of the case.  The Security National Bank of Sioux

25 City has been kind enough to act as conservator and bring this

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 41 of 118

1 claim on behalf of Jeanine, Jeanine Kunkel. We've been

2 referring to her as J.F.K. or J.M.K. or something like that.

3 Jeanine is the way I will refer to her because that's her name,

4 and she's now five years old. She's severely disabled. She

5 cannot walk. She cannot talk, and she never will. She's fed

6 through a stomach tube and essentially frozen at the capacity of

7 a five-month-old baby and will never go beyond that.

8 Now, how did this happen? How could this happen?

9 Well, it happened because she got a horrible meningitis

10 infection when she was nine days old from the powdered infant

11 formula that she was fed which was contaminated with this

12 bacteria called E. sakazakii. Abbott made this powdered infant

13 formula. The name that it used for selling it is Similac which

14 is a term that they use for all their formula. And this was

15 called NeoSure.

16 NeoSure is a type of powdered infant formula that

17 Abbott markets for babies under the age of 12 years -- or 12

18 months old who were born prematurely, and they call it NeoSure.

19 The bank is bringing this lawsuit on Jeanine's behalf

20 for making this contaminated powdered infant formula, for

21 providing it to parents for babies who should not have been

22 exposed to a product that could be contaminated with E. sak and

23 for not warning parents and their doctors that powdered infant

24 formula could be contaminated so that they could make an

25 informed choice not to feed it to their babies who were so young

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW Document 194 Filed 05/12/14 Page 42 of 118

1    as to be susceptible to infection from E. sakazakii."

2            So what are you in for?  Well, you're in for a biology

3    lesson from a medical doctor and four Ph.D.s, lots of documents,

4    not necessarily in order.  You'll have a fair amount of prior

5    testimony read to you.  Doesn't sound very exciting, but the

6    case is interesting.  It involves bugs and babies.

7            Now, as we start this case, I can understand why you

8    might be skeptical.  You're looking at me and saying, "What?  I

9    never heard of this before.  Why haven't I heard about this

10   before?  Isn't infant formula safe?  Why would Abbott put a

11   product on the market that could make babies sick?"

12           And I understand these feelings and the fact that many

13   people think there's too many lawsuits.  What I would like you

14   to do is really listen to your common sense because that's what

15   this case really comes down to, kind of a common sense, common

16   sense for Abbott, common sense for the mom, common sense when

17   you're listening to the experts.

18           And I think when you do, there may be too many

19   frivolous lawsuits, but this ain't one of them.

20           There's some rules that companies that make powdered

21   infant formula have to -- have to follow.  They've got a

22   responsibility to design a safe product.  And by design, I mean

23   in the large term.  Who is the product intended for?  Should

24   this product, powdered infant formula, be designed for a baby

25   who's under the age of 28 days?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 43 of 118

1           They've got a responsibility to manufacture a safe

2     product, and they agree that if their product contains E. sak

3     that's a bad thing.  They don't intend to have E. sak in their

4     product.  So they have a responsibility to manufacture a product

5     that's safe and is E. sak free.

6           And they've got a responsibility to warn of serious

7     risks so that doctors and parents can make an informed choice

8     about this:  Should we feed this newborn powdered infant

9     formula, or should we instead feed this baby sterile,

10    commercially sterile, ready-to-feed liquid formula, two

11    products, which one should we -- we need enough information to

12    be able to make that choice.

13          Now, the characters -- let me introduce you to the

14    characters here, and things are going to come up just like magic

15    on this screen behind me I hope.  That's just to show you what

16    the words look like.  Enterobacter sakazakii.  It will be

17    referred to a number of ways.  E. sakazakii is a very proper

18    way.  It has a nickname of E. sak.  Sometimes it's referred to

19    as ES.

20          It was first identified by 1980 -- around 1980 by

21    Dr. Jim Farmer.  You'll meet Dr. Farmer because he's one of our

22    expert witnesses.  He named it after a friend of his named

23    Dr. Sakazakii and a fellow scientist.  And yes, Dr. Sakazakii

24    was honored to have this bacteria named after him.

25          Now, all living things are members of families.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 44 of 118

1   You've probably heard that term.  The family -- no, go back.

2   The family is kind of hard to pronounce, but it's --

3   enterobacteriaceae is how it's pronounced.  It's often referred

4   to as EB, and that's the family.  It's got some cousins that you

5   may be more familiar with: E. coli, salmonella.  It's not a

6   good family.

7           However, as if this wasn't complicated enough, they've

8   changed the name.  Next slide.  In 2008 as they learned more

9   about this bacteria, they reclassified it, and they now call it

10  cronobacter, and there are seven species in the group of

11  cronobacter, and they are C. sakazakii, and then there's six

12  more.  And these are important distinctions to make.

13  C. sakazakii and E. sakazakii, however, we're all talking about

14  the same thing.

15          So that's the -- that's the bug.  That's the villain,

16  and now I'll tell you about its ride.  Its ride is powdered

17  infant formula -- or is infant formula, and there's three types

18  of formula.  I don't know if you all know this, but just to make

19  sure everybody's on the same page, there's the ready-to-feed,

20  often abbreviated RTF, which is commercially sterile and liquid.

21  And that is sold in bottles, and at the hospital it is in

22  individual servings.  And it's ready to feed to the infant.

23          The second is concentrates.  I mention that just so

24  you know it exists.  It's also commercially sterile.  And it's

25  also liquid, but you do add water.  It has nothing to do with

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 45 of 118

1    this case.  It's just another type of formula.

2           And then the third is the powdered infant formula, and

3    it is not sterile.  It is not sterile.  Even though many people

4    assume that it is, it is not.

5           And then finally its destination, and these are some

6    terms that will be thrown around, but they all have a very

7    specific meaning.  An infant is a baby less than 12 months old.

8    A neonate -- and that's a term that's going to be used from time

9    to time.  A neonate is a -- set it back, Pat.  Neonate is a baby

10   that's less than 28 days old.  And I think the judge in his

11   instructions used the word newborn, and those terms newborn or

12   neonate are synonymous in this case.  Newborns, neonates, less

13   than 28 days.

14          Then there's some special types of babies.  There's

15   premature.  The line is 37 months (sic).  And this baby was born

16   at 37 months, so it's not premature but right on the line.  And

17   then low birth weight.  Low birth weight is a baby who weighs at

18   birth less than 2,500 grams or less than 5 1/2 pounds.  Jeanine,

19   when she was born, was born at 37 weeks and weighed 4 pounds, 14

20   ounces, so she was a low-birth-weight -- low-birth-weight baby.

21   So those are the characters.

22          Now, I'm going to tell you a little bit about some of

23   the experts that are going to testify here on behalf of

24   plaintiff.

25          One that we're going to start I hope, you know,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 46 of 118

1  tomorrow will be the second witness, is Dr. Scott Donnelly.

2  Dr. Scott Donnelly is a microbiologist who was employed by

3  Wyeth -- that's W-y-e-t-h -- for many years, for 23 years.  And

4  beginning in 2001 when this Memphis outbreak took place, it was

5  his job to keep E. sak out of the powdered infant formula that

6  his company made.

7          He will explain to you how powdered infant formula is

8  made, I mean, kind of a broad overview, not all the details.

9  And he'll tell you that ingredients are all mixed into a liquid;

10  okay?  So you got a liquid which has all the ingredients, and

11  then it's pasteurized, so all the bugs that are in this liquid

12  are dead.  Then it's dried.  The dryer is a six-foot -- it's a

13  huge building.  It's six foot -- six stories tall, six stories

14  tall.  And when it starts at the top, it's liquid; and when it's

15  at the bottom, it's powder.  That's how they convert it.  We are

16  now in what he will call the dry phase.  That's where

17  contamination can occur.  It's in the dry phase.  The dry phase

18  starts with the dryer and ends with the packaging.

19          He will tell you that the only way that you can keep

20  E. sak out of your product is to keep your factory clean,

21  rigorously clean, particularly that portion where the powder is

22  in the dry phase.  That's how you keep E. sak out of your

23  powdered infant formula.

24          And he will testify -- he'll tell you that Abbott's

25  procedure to control E. sak in its factory were deficient in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 47 of 118

1    several respects.  They wet cleaned and then they did not use a

2    sanitary -- the sanitizing risk -- rinse.

3         They also went around and tested various portions of

4    their factory to look for bacteria, particularly E. sak, and he

5    will explain to you that the factory testing -- and it will

6    often be referred to as the environmental testing, testing

7    within the factory -- was deficient in a number of respects.

8         He will also tell you that the finished product

9    testing was deficient and that both could give rise to false --

10   false negatives.  A false negative is when the testing says

11   negative but that's not true.

12        The finished product -- when Abbott makes a batch of

13   powder like this NeoSure, it's a hundred and fifty -- over

14   150,000 pounds is made at one time.  That's a batch.  That's a

15   lot of powder.  That's tons and tons of powder.  And what they

16   test is about -- oh, it's a little less than two pounds.  That's

17   what they test.  And when -- if the test is negative, the

18   product goes out the door and on to the market.

19        And he will tell you that that test is deficient in a

20   number of respects, again leading to false positives -- or false

21   negatives.

22        He will also testify that when you find E. sak in your

23   factory it's a big deal or at least it ought to be, but it

24   wasn't in Abbott.  You see, Abbott found E. sak inside its plant

25   the very day that the batch which was fed to Jeanine, the very

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 48 of 118

1  day that batch was manufactured.  They found it in the dryer

2  area and specifically in two ///// drains.  //////////////.

3  /////////////////////////////////////////////////////.

4  /////////.

5        ///////////////////////////////////.

6  /////////////////.  That's what they test.  They say it's a

7  good indicator.  If it turns out it's negative, then they

8  don't -- that satisfies them.  That actually is invalid.

9        But in this particular case when they were in the

10  ///// drain, they did get a positive, several positives, on

11  their // test.

12        What they do then is they say, okay, now we're going

13  to test for E. sak.  We're going to actually look for the

14  organism that we need to find.  And guess what.  That was

15  positive too.  They found and tested E. sak in their factory in

16  the /////, drain the same day that Jeanine's powder was dried.

17        Then they did something else.  They took that -- you

18  know, the testing is kind of like you might remember chemistry

19  or biology where you put stuff into petri dishes and let them

20  grow.  That really is -- that's how they do it.  And they grew

21  88 colonies.

22        Well, they decided to send them for another test.

23  ///////////////////////////////////////////////////

24  //////////////////////////////////////////////

25  ////////////////////////////////////////////////////:

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 49 of 118

1    86 were not tested the second time. //////////////////////

2    //////// looked at them, says they're negative, and so Abbott

3    said, okay, no problem here. That's what happened. The batch

4    was then released to the market.

5             Another microbiologist who's the specialist in this

6    testing named Catherine Donnelly will explain to you why the

7    first test where they found the positive E. sak is more

8    conclusive than the second test and how all of the cultures or

9    at least most of them should have been //////////////////////

10   tested and that the testing should have sent out bells and

11   whistles.

12            And both Dr. Donnellys -- and they are husband and

13   wife. Both Dr. Donnellys will tell you that if you get a

14   positive test for a bacteria you're looking for like E. sak, a

15   subsequent negative test does not wipe out the positive test.

16   You still have a positive test, and you have to deal with it.

17   It cannot be explained away by "we'll give it another test;

18   turns out negative; no problem." But that's what Abbott did

19   which brings us to Jeanine.

20            You see, the batch -- that batch made it all the way

21   here to Sioux City. Abbott put it in a gift bag. And when the

22   gift bag -- you know, as we've talked about a little this

23   morning, gift bag is when the mom is discharged from the

24   hospital after giving birth, they give a gift bag, and it's for

25   promotional purposes. It has, you know, literature and free

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 50 of 118

1    stuff from the company.

2            And what do you know?  In this gift bag given to

3    Jeanine's mother was a can of powdered infant formula NeoSure

4    and later ended up being fed to Jeanine because this case is all

5    about Jeanine.

6            Jeanine, as I mentioned before, can't do anything.

7    She needs 24/7 care.  She was born a healthy baby on April 14,

8    2008, in St. Luke's Hospital here in Sioux City.  Her mother had

9    had a previous child who is -- who gave birth cesarean.  And so

10   this was a scheduled hospital visit where it's scheduled, you

11   come in this day, and we will do the C-section.

12           Jeanine was a twin, a fact that was known, of course,

13   quite a bit before that, months earlier.  And on April 14, Megan

14   Surber, the mom, gave birth to her twins, Jeanine and James,

15   Jeanine being small not because she was particularly premature

16   although she was on the edge; simply because she was a twin.

17   She was 4 pounds, 14 ounces.  Her brother James was slightly

18   heavier.  But it was over 9 pounds of baby.

19           Jeanine was never breastfed.  Her mother tried to

20   breast-feed her baby, her firstborn, and was unable to do that.

21   So that was contemplated that she would be formula fed.

22           And at the hospital she received NeoSure.  The doctor

23   felt that NeoSure was the appropriate type of formula because it

24   is for premature babies, babies that need a boost of nutrient,

25   and there's -- the doctor is absolutely right.  NeoSure is

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 51 of 118

1   definitely the right product for a baby like Jeanine.

2          And so during the time that she was in the hospital

3   she received NeoSure ready-to-feed in the single service --

4   single serving containers.  She was discharged with her mother

5   at three days.  And that's when she -- her mother received the

6   gift bag.  The gift bag contained, besides promotional material,

7   a bottle of ready-to-feed, so more ready-to-feed and a bottle of

8   powdered infant formula.

9          Jeanine was healthy for 10 days until April 24 when

10  she developed meningitis, E. sak meningitis.  And no one

11  disputes that it's -- E. sak is the bacteria, you know, because

12  they did the culture from Jeanine's body.  They looked at it,

13  identified it as E. sak.  So no one questions that.

14         Our first witness will be Janine Jason, and she'll

15  start this afternoon, and she'll explain to you that E. sak is

16  pretty harmless to most humans.  And humans where it's not

17  harmless are newborns who have no bacteria in their gut to begin

18  with and they don't have stomach acid and they really don't have

19  much of an immune system at birth.  And it's especially harmful

20  to newborns who are premature or low birth weight or have

21  immune -- problems with their immune system.  If E. sak gets

22  into their digestive tract, they have no defenses, no defenses.

23         The E. sak will -- it's -- the perfect environment for

24  E. sak to grow is a baby's gut, and that's where it goes to town

25  and eventually goes to their brain and literally takes out their

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 52 of 118

1    brain.  It enters the -- but it enters the digestive system

2    through the mouth, through the mouth.  It goes into the

3    digestive system, into the blood, into the brain.

4            And this isn't particularly controversial stuff.  The

5    World Health Organization and the entire scientific community

6    agree -- and I'll read you a short statement in a 2004 WHO

7    report, WHO being the World Health Organization.  Amongst

8    infants, those at greatest risk for E. sakazakii infection are

9    neonates, particularly preterm infants, low-birth-weight

10   infants, or immunocompromised infants.  There's no one that

11   disagrees with that statement.

12           As I said, Jeanine was born April 14.  The events 10

13   days later are particularly important, and we'll spend some time

14   on that.  But from birth until the evening of April 23, she was

15   fed ready-to-feed, commercially sterile ready-to-feed.  She got

16   some of the single servings from the hospital which she used up.

17   And then she took the bottle of ready-to-feed and used that up.

18   And on April 23 she had used all of that up and was now turning

19   to the can of powdered infant formula, NeoSure, that Abbott had

20   given her in a gift bag.

21           And the first feeding was at nine o'clock in the

22   evening.  She had been fussy and crying a little earlier that

23   evening but nothing in particular, and you'll learn that in the

24   evenings that's when babies cry more than any other time of the

25   day.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 53 of 118

1        She was fed at nine o'clock, went to sleep.  At

2   midnight she woke her mother because she was hungry, had her

3   second bottle of powdered infant formula, and went to sleep.  At

4   4 a.m., she woke up, had her third bottle of powdered infant

5   formula, and went to sleep.

6        Then on -- some time -- and nobody's really watching

7   the clock at this point.  It's about maybe 6 a.m. on the morning

8   of April 24, and Jeanine is getting fussy again, and the mom

9   will describe that.  Finally, you know, it's time for her

10  feeding.  Her mom gives her her fourth bottle of powdered infant

11  formula, and this time Jeanine's not particularly interested and

12  doesn't finish it.

13        The mom checks her temperature, and she doesn't have a

14  fever.  And so the day goes on.  And as the day goes on,

15  Jeanine's condition worsens.  She doesn't eat her subsequent

16  feedings.  By the afternoon she's developed a fever.  Megan

17  Surber takes her temperature and sees that she's feverish.

18  Megan calls the doctor.  Doctor says bring her into the clinic.

19  The doctor meets her at the clinic and says let's take her right

20  to St. Luke's Hospital.  And that's when she is admitted.  The

21  diagnosis was neonatal E. sakazakii meningitis.  She was two

22  days later airlifted to Children's Hospital in Omaha.

23        Dr. Jason will explain that Jeanine ate sufficient

24  powdered infant formula to consume enough E. sak to cause an

25  infection and that enough time had passed between her first

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 54 of 118

1  feeding and the onset of symptoms.

2          So how do we know the source of the E. sak was

3  powdered infant formula, because that's really the question

4  here?  If it is, they're guilty, they're liable.  If it's their

5  powder -- if it's their E. sak, they've got no defense.

6          Well, first of all, it's the only thing she ate that

7  wasn't sterile.  Megan even boiled the water from her tap before

8  she mixed that water with the formula.  Everything that Jeanine

9  Kunkel consumed prior to 9 p.m. on April 24 was sterile.  The

10  powdered infant formula, not the water, but the powdered infant

11  formula was the first and only nonsterile thing that she

12  consumed before getting sick.  And her mom followed all of the

13  instructions on the label and more.  So that's one reason.  It's

14  the only thing she ate.

15          Second, there's the association, the epidemiological

16  association, that everyone knows exists between E. sak and

17  powdered infant formula.  And when I say everyone knows, you

18  didn't know it, a lot of people don't know it in the public, but

19  the industry knew it.  The industry knew it, and you'll see a

20  lot of documents showing their knowledge of that fact.

21          The third is what I mentioned before, that their plant

22  was contaminated with E. sak the very day this batch went

23  through the dryer.

24          And then a fourth reason is this:  Dr. Jason is not

25  only a medical doctor, but she's also an epidemiologist trained

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 55 of 118

1    by the Centers of Disease Control.  And she studied the

2    approximately 100 cases that -- of E. sak infection in babies

3    and saw that 90 percent of them -- the records demonstrate that

4    90 percent of them and maybe more but 90 percent for sure were

5    fed powdered infant formula.  And this establishes an

6    epidemiological link between powdered infant formula and E. sak.

7    And this and the other factors led her to the firm conclusion

8    that the source of E. sak infection was the powdered infant

9    formula.

10          Now, Abbott doesn't agree.  That's why we're here.

11   Abbott says, well, our powdered infant formula's safe and poses

12   no risk to babies.  That's what it says.  And it will point out

13   to you that the CDC got ahold of the rest of the can that

14   Jeanine was feeding from and tested it for E. sak and did not

15   find any.  The FDA went out and got 17 cans from that -- this

16   huge batch which Abbott had created and tested those for E. sak

17   and found none.

18          And the explanation for that is this, and this will

19   come out and really not be contested.  E. sak clumps.  It's not

20   uniform throughout a batch or even a can.  It's here, and it's

21   not here.  It's not spread evenly.  The clumps are microscopic

22   and can't be seen by the naked eye.  Remember it's pasturized

23   and then dried, and in the factory powdered infant formula will

24   become contaminated when it has contact with surfaces and

25   areas -- or the powdered infant formula will become contacted

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 56 of 118

1  (sic) when it has contact with E. sak in the surfaces or areas

2  that it's in.

3         And this has happened in other cases where the other

4  tests after the child gets ill turn out to be negative.  And

5  scientists at the CDC agree.  But that doesn't mean that the

6  powdered infant formula doesn't cause it.  What it means in a

7  sense is that a baby ate the evidence.

8         Through its IFC, the industry resisted -- and you'll

9  see this -- all efforts to warn parents that powdered infant

10 formula is not sterile.  Now, by 2008 the cans did say it was

11 not sterile in real fine print.  So the industry eventually

12 voluntarily provided that information to parents.  But they

13 continue to oppose informing parents that powdered infant

14 formula may contain E. sak.  In other words, they say it's

15 sterile (sic), but they don't say what it -- what the problem

16 is.  They don't say what the risk is.  They say don't -- be sure

17 to follow our instructions in making it, but they don't explain

18 that there's a bacteria that may be present.  And they don't

19 explain that this risk is greater for neonates and particularly

20 those neonates that are premature or low birth weight.

21        In fact, Abbott makes a formula just for them, a

22 powdered infant formula just for them.  Nothing's wrong with

23 their making the ready-to-feed NeoSure.  It's a fine product and

24 perfectly safe.  Why they make it in powder is hard to explain.

25 Abbott -- but it continues to market powdered infant formula

***Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov***
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 57 of 118

1    even though it sells a perfectly safe alternative, the NeoSure

2    ready-to-feed.

3           Abbott's going to point the finger.  Abbott says not

4    us, not us.  It must be them, them, them, them.  Abbott blames

5    and points the finger at the mom, the dad, the older half

6    brother, all the relatives or friends who might have held the

7    baby, the kitchen, the food in the refrigerator, the family dog,

8    the city water.  They even point the finger at the doctor and

9    say, "Why didn't you tell the mom that our product is unsafe?"

10   Talk about corporate responsibility.  And I haven't even

11   named -- you won't believe the long list of other things that

12   may have caused this.

13          Trouble is -- for Abbott is that there's no scientific

14   evidence, none, to support it.  Iowa health authorities went to

15   the home and tested for E. sak in the kitchen and did not find

16   any.  Moreover, not one single case has ever existed of E. sak

17   infection in babies in which there's been -- it has been proved

18   that the cause was anything other than powdered infant formula,

19   not one.  And it makes no sense.  If babies got E. sak infection

20   from everything under the sun, there'd be a lot more cases.

21   Babies would be dropping like flies.

22          James, the twin brother, stayed at the hospital for

23   ten days because of some unrelated health problems he had.  He

24   came home on April 24, the same day that Jeanine went to the

25   hospital.  Jeanine -- or James was in the same environment.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 58 of 118

1  Same relatives were holding him, same dog.

2         But there's two things different about James.  One is

3  by the time -- he got his gift bag too, of course.  By the time

4  they had run out or were getting -- you know, they fed him the

5  ready-to-feed first and by the -- and while they were feeding

6  him the ready-to-feed, they found out -- you know, that's when

7  Jeanine got sick and was diagnosed and the family understood

8  that powdered infant formula is associated.  They never fed

9  James powdered infant formula.  He never got powdered infant

10 formula.  So that's kind of its own little study.  Jeanine got

11 powdered infant formula and developed an E. sak infection living

12 in the same house, same relatives.  James did not get powdered

13 infant formula, got only the ready-to-feed.  And guess what.  He

14 never got sick.

15        And un -- and unfortunately, the FDA, even though they

16 went -- through the Iowa health authorities went to Megan's

17 house, they never went to Abbott, they never went -- said we

18 want to inspect your plant, we want to test your plant, we want

19 to see if we can find E. sak in your plant.  That never

20 happened.  They didn't even ask for records that would tell them

21 what kind of environmental testing results occurred during the

22 time that this batch was made.  That was never done.

23        If they had, they'd have found out about the /////

24 drains, but they never did find out about the ///// drains, so

25 no official cause was ever determined.  And since it could not

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 59 of 118

1    be certain, nothing happened, there was no recall, and Megan has

2    a sick baby.

3           Although science demands certainty, in a civil lawsuit

4    and in actually most things in human affairs, absolute

5    certainty's pretty hard to find.  And the law doesn't require

6    it.  And keep in mind, you know, a bunch of lawyers have been up

7    here balancing scales.  The question to you, for you will be is

8    it more true that the powdered infant formula was the source of

9    the E. sak than any other source or all the other sources put

10   together?

11          So we're at the beginning of the case, and I've

12   talked -- I'm probably close to 30 minutes.  At the end of the

13   trial I'm going to ask you to reach the only true, logical

14   conclusion that Abbott's powdered infant formula was the source

15   and that we have proved it more likely than not.  Thank you.

16          THE COURT:  Members of the jury, it's 10 minutes to 3.

17   We'll be in recess until 3:15.  Thank you.  And then we'll come

18   back and hear the defense opening.

19          (The jury exited the courtroom.)

20          THE COURT:  Anything we need to take up, counsel?

21          MR. REIDY:  Nothing from us, Your Honor.

22          THE COURT:  Okay.  Thanks.

23          (Recess at 2:53 p.m.)

24          THE COURT:  Ready to have the jurors brought in?

25          MR. RATHKE:  Yes, Your Honor.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 60 of 118

1          MR. REIDY:  Yes, Your Honor.

2          (The jury entered the courtroom.)

3          THE COURT:  Thank you.  Please be seated.

4          Mr. Reidy, any time you're ready.

5          MR. REIDY:  Thank you, Your Honor.  Ladies and

6    gentlemen, I want to take up the circumstances described in 2001

7    in Mr. Rathke's opening just to clarify a few things as to what

8    the proof will show.

9          This is the Memphis Portagen outbreak of 2001.  And in

10   that thing, even though it was not several meningitises -- it

11   was only one, and it was not some deaths; it was just one

12   death -- it was obviously a very serious incident, and there

13   were a number of children who were colonized with E. sak, and

14   so they -- and it was traced back to the powdered infant formula

15   there.

16         But I want to make sure that you understand that the

17   proof is going to show that with respect to that instant the

18   powdered infant formula, of course, was not Abbott's and also

19   that the proof will show with respect to the testing that he

20   talked about where he said 28 percent of subsequent testing,

21   they found it in 28 percent of powdered infant formula samples,

22   it was actually 23 percent which is not too important.  But it

23   may be important that none of it was Abbott's, and all the

24   product was recalled from all the manufacturers who were found

25   to be positive in that study.  And, of course, none of Abbott's

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 61 of 118

1    was recalled at that time.

2         This is not a case about whether or not powdered

3    infant formula manufactured by somebody else at some other time

4    has or can cause E. sak meningitis infections.  It's a case

5    about whether or not this can of powdered infant formula that

6    Jeanine Kunkel had three servings from caused her meningitis

7    E. sak, and that's what the proof will be about.

8         We will talk to you about Abbott's state of the art

9    manufacturing plant, and we'll have a witness, Sharon Bottock,

10   the quality assurance manager from there, tell you about how it

11   works and how things are put together there and how Abbott works

12   to be sure that they have a methodology of both careful

13   manufacture and careful testing to make sure that they don't put

14   powdered infant formula on the streets or for sale that has

15   contamination by E. sak or, for that matter, contamination by a

16   number of other pathogens.

17        Pathogens are, of course -- you know, can be

18   salmonella.  There can be other ones that you have to worry

19   about, so they have to worry about all those, although we'll be

20   talking about E. sak in this case.

21        And she'll tell you how Abbott is dedicated to

22   providing a safe environment for the manufacture of powdered

23   infant formula so that when it leaves Abbott's process it's been

24   both manufactured correctly and then even though manufactured to

25   the state of the art then tested to state of the art so that if

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 62 of 118

1   there is any E. sak in the powdered infant formula it is caught

2   before it gets out for publication or before use.  And that will

3   be shown to you.

4          She'll describe the man -- the way it's manufactured,

5   and it's manufactured in what's called a closed system.  Once it

6   enters the system, it's -- it basically is inside pipes and

7   tubes until it comes all the way down to the dryer.  And so it

8   goes through that system all the way through.  It's an extremely

9   hygienic system.  There's all kinds of cleaning done.  Cleaning

10  is done in place.  The cleaning that's done is appropriate.

11  You'll hear experts take on various battles about that, but it's

12  a highly mechanized process.  It's meant to minimize the amount

13  of individual contact with the powdered infant formula.

14          /////////////////////////////////////////////

15  /////////////////////////////////////////////////////

16  ///////////////////////////////////////////////

17  ////////////////////////////////////////////////////,

18  and it's a highly mechanized, very state-of-the-art process done

19  in very clean places and even isolated from the rooms in which

20  it's in by and large so that it processes through in a tube.  It

21  comes through wherever it is in whatever process it can be so

22  that it's kept as much as possible in a closed system.

23          I do need to talk about these presumptive positives in

24  the drain, and you'll hear about that in great detail.  And

25  you'll see that there's just straight-up disagreement.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 63 of 118

1        The first thing I want to make sure you understand

2   from the facts is that the drain is not in the dryer system

3   itself.  It's in a room in which the dryer system passes

4   through.  I described for you how the system is generally closed

5   with -- it passes through various rooms.  There is a drain.  And

6   Abbott conducts extensive environmental testing.  They test all

7   kinds of things.  They test things that are far, far away from

8   the production.  They certainly test things that are outside of

9   this closed system.  The idea is to really be on top of this

10  possibility of E. sak and to really test as much as you can.

11       So even though the likelihood that a drain in a floor

12  in a room with a system passing through it that is essentially

13  closed to the environment that it's in could contain something

14  so that they go down there and test it and take swabs in there,

15  they do that because they're dedicated to making sure that

16  E. sak doesn't have any chance to get into their stuff and, if

17  it gets in there, that their testing finds it.  And that's why

18  they were down there swabbing this drain, not because it was

19  actually part of the system in which the powder comes in

20  contact.  It's not.

21       With respect to the way that works is they do a test.

22  ////////////////////////////////////////////////

23  ////////////////////////////////  And you'll hear about this.

24  And they do that.  And that will give you information as to

25  whether or not it belongs to this family of cronobacters and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 64 of 118

1 with respect to whether it belongs to that -- or the family of

2 these bacteria.

3         And with respect to whether it belongs to that, you

4 get a -- this looks at some of the DNA. ///////////////////

5 ///////////////////////////////////////////////////////////,

6 ///////////////////. That's what it's looking for.  If it finds

7 it, it registers a presumptive positive.

8         Abbott's procedure which follows what the FDA

9 recommends is they then have their -- that test is then

10 ///////////////////////////////////////////////////////////

11 ///////////////////// because that's what the FDA recommends,

12 /////////////////////////////////////////////////////////

13 //////////. And the ////////// then does a much more

14 extensive look at the DNA, and it comes up with a conclusion as

15 to whether or not you're dealing with E. sak or not.

16         And with respect to the stuff that was down in the

17 drain inside the room with the system passing through it, it

18 determined that that stuff was not E. sak.

19         So the first sort of area of debate that you're

20 hearing about in this prediction by the lawyers as to what the

21 proof is is that even though we're only talking about something

22 in a drain environmentally tested not inside the system in which

23 the powder exists, that as to what was in that drain, this

24 ////////// test /////////////////////// was clearly negative

25 for E. sak.  So it was a bug, but it was not E. sak.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 65 of 118

1    And on our part, our expert, Dr. Martin Wiedmann from

2   Cornell University, will explain to you how this presumptive

3   positive works, what it means, what the ////////// testing

4   means, how it works, and why after the ////////// testing is

5   done Abbott can conclusively conclude and state that it was not

6   E. sak even in the drain in the room through which the system of

7   manufacture processed.

8    The FDA conducts examinations of Abbott's

9   manufacturing plant every year.  They come out and take a look

10  at it, make sure that it's up to snuff, and you'll hear about

11  that during the course of the proof.  We'll have that talked

12  about as well.

13    And Abbott also has a third party who comes in, a

14  scientific group that comes in, and also inspects their

15  processes for safety and for quality and goes through

16  everything.  They also go out to the plant at Casa Grande,

17  Arizona, which is where this can was manufactured, and they look

18  through everything there as well.

19    Abbott's very concerned that the products that come

20  out are healthy and safe and that they don't cause illness, that

21  they help people avoid illness.  NeoSure is a product that's

22  meant to help premature and low-birth-weight babies do well and

23  get back to full weight.  And so obviously they are extremely

24  concerned that it not contain a bacteria which can actually

25  cause great harm to the baby, and they work really hard to make

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 66 of 118

1  sure that doesn't happen, and you'll hear all about that.

2          The other part that I want to talk to you about, the

3  proof that you'll see, is the testing.  And I want to talk about

4  the testing, particularly related to this batch, and that is the

5  batch from which the one can from which the three feedings that

6  were given to Jeanine Kunkel came from, and so it's produced in

7  a large batch.  The batch probably -- you know, it's a

8  commercial size batch.  But they have regularly s -- regularly

9  specified testing with respect to that.

10          So there's two -- two points of testing that I'll talk

11  to you about briefly.  One is the regular testing that's meant

12  to make sure that no product gets out of Abbott's plant with

13  E. sak in it.

14          And the second part of the testing is the specific

15  testing that was done once Jeanine Kunkel was diagnosed as

16  having E. sak meningitis and it was known that she had consumed

17  some Abbott powdered infant formula.  Then there was a bunch

18  more testing both by Abbott and other people, and we'll have a

19  lot of proof about that, and I'll summarize some of it, what I

20  predict you'll see right now.

21          So put up slide 2.

22          Now, you don't need to figure these documents out, and

23  we'll get it up in a second.  I think the blackout might be on.

24  We'll get these -- you don't need to spend time looking at the

25  underlying documents here or trying to figure out what's in the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 67 of 118

1  background.  The point in this case is that Abbott has finished

2  product testing that it did on this batch.

3       Now, this batch actually has two numbers associated

4  with it.  And you'll see that it has the RE00 number at the top

5  of the call-out there and the RE10 number at the bottom of the

6  call-out.  And those two numbers are assigned to this single

7  production batch because some of this product was going to

8  Canada.  And if they change it where there's going to be some to

9  Canada and some to the U.S., they take the one production batch,

10 and they give it two different batch numbers.

11      In this case that also resulted because of the

12 protocols that they follow.  Once they change a batch number,

13 they have to put it through testing so that the normal testing

14 of ////// was actually -- in this batch, this batch was tested

15 for //////, so there was E. sak and other pathogen testing done

16 on //////, twice the normal amount with respect to this

17 particular batch.

18      And in all the testing that was done preshipment, the

19 E. sak was negative as you see in those two call-outs.

20      Let's go to the next one.  So then the next one -- and

21 Mr. Rathke made reference to this which is slide 3 -- I want to

22 make sure the right one's up.  Apparently we're having some

23 technical difficulty.  Later when I'm operating it you'll see

24 real technical difficulty.

25      Okay.  Slide number 3.  And again, you don't have to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 68 of 118

 1   look beyond the documents at this time because you'll get a

 2   chance to see these documents in detail during some of the

 3   testimony that occurs in the case.  But this is the CDC testing

 4   of the can, so the Center for Disease Control which is obviously

 5   interested in outbreaks of disease such as if there could be an

 6   E. sak outbreak because of a contaminated shipment of a

 7   manufacturer's powdered infant formula, the Center for Disease

 8   Control came out and took a look at the can.  And, of course,

 9   they tested it, and it was negative, and they did the testing

10   they felt was appropriate to figure out whether it was in there

11   or not.

12          In addition to that -- you can move to the next

13   slide -- the FDA came out, and they went to the hospital.  The

14   hospital had gotten four cases of NeoSure.  There's six cans in

15   a case.  So the FDA pulled all the other cans that were in

16   there, and they tested 17 cans.  16 of those cans were -- came

17   off the line within 120 seconds or in the same 120-second period

18   I should say as the can manufactured that Jeanine Kunkel used.

19   So each one of these cans gets a minute put on it.  It gets the

20   date, the hour, and the minute put on it as it comes through the

21   production line because if there is a problem, they want to be

22   able to identify where in the line there is a problem.

23          And in this case because the hospital shipment had

24   probably gone to the boxes together, 16 of the 17 cans came out

25   within the same 2-minute period as the can that Jeanine Kunkel

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 69 of 118

1    ate from.  And so those were all tested by the FDA, and as you

2    know, the FDA is charged with responsibility for making sure

3    that there's no products on the market that are adulterated.

4    They have the power to make recalls.  They looked at this can.

5    They looked at 16 of these cans, and they tested them, and there

6    was no sign of E. sak.  It was also negative for that.

7             Next, please.

8             And the final specific test of this batch that I want

9    to talk to you about or an element of this batch is that as

10   Abbott makes a batch and ships all the cans associated with the

11   batch, they keep what's called a library sample, so they keep a

12   library sample from each batch.

13            And after they learned of the breakout -- or I'm

14   sorry, the breakout.  After they learned that Jeanine Kunkel

15   indicated that she had E. sak meningitis and had ingested their

16   formula, they then went back to their library and tested it, and

17   as you see under the number 1 there, it also was negative.

18            So this is an excessive bit of testing, and it's

19   summarized in slide 6 where ////////, twice the usual amount of

20   the batch, are tested in Abbott, all of them negative.  The CDC

21   you'll see in the proof tested the very can, and it was

22   negative.  FDA tested 17 cans of formula, 16 of which came out

23   in the same 2-minute period as the Jeanine Kunkel can, and then

24   Abbott went back and tested its library batch.  Every single one

25   of those was negative for E. sak.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 70 of 118

1    In addition to that, because the FDA did not feel that

2    there was indication that the powdered infant formula was the

3    source of the infection, there was no recall.  There was no

4    diminishment of the amount of the sales.  So this batch contains

5    hundreds of -- 100 -- about 100,000 cans which, depending on the

6    size of the feedings, whether it's a 2-ounce feeding like

7    Jeanine Kunkel was getting at the time or up to a 6-ounce

8    feeding which might be -- it's between a million and four

9    million feedings.  So none of those were recalled off the

10   market.  Those feedings occurred out there, and there were no

11   other reports of E. sak meningitis from that entire batch.

12   Abbott in its testing also went back and did finished

13   product testing for three batches made before and after, three

14   batches before and after this batch was made just to make sure

15   that there wasn't some problem with the system, make doubly sure

16   that there wasn't a contamination.  So they went back and tested

17   other batches.

18   Now, you'll see that the evidence is clear that the

19   FDA and the CDC are very vigilant since the 2001 outbreak where

20   the one meningitis death occurred and several other children

21   were found to be colonized in a single intensive care unit down

22   in Tennessee.  The FDA and the CDC really jump on these things

23   whenever there's a report of E. sak meningitis and infant

24   formula's involved.

25   And so they were all over this, and the evidence will

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 71 of 118

1   show that FDA experts don't agree that it had to be the formula

2   which is what the plaintiff's experts are going to tell you, had

3   to be the formula, it's always the formula when it -- and then

4   it goes. And you'll see what the evidence is on that as it

5   comes in. I don't think that will hold up. But clearly the FDA

6   does not agree with that, and you'll see that evidence.

7        So Abbott's -- you know, other reasons why it's fair

8   that we think the proof will cause you to conclude and the

9   evidence will show you is that Abbott's never had a recall of a

10  PIF product for E. sak that reached the U.S. market. So it's

11  never had a product on the U.S. market with E. sak in it that it

12  had to recall, and E. sak has never been found in any sealed can

13  of Abbott's PIF on the U.S. market ever. So they've never found

14  it anywhere in a sealed can. I say sealed can because sometimes

15  if the can is open in the home and there's contamination there,

16  it can cross-contaminate if there's contamination inside the

17  home. In this case it didn't cross-contaminate into the can,

18  but it's never been found in a sealed can which is the way of

19  establishing whether it came from Abbott.

20       Now, I do need to talk about non-PIF sources of

21  E. sak, and I will talk about it. But what I want to make sure

22  I make clear is that I'm not doing and neither is Abbott doing

23  what was said in the opening of Mr. Rathke which is blaming

24  somebody else for this. This is not blame the mother or blame

25  anybody else.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 72 of 118

1          It is very important from a scientific standpoint that

2     we do talk to you about what the evidence will show with respect

3     to where E. sak has been found, where it can be inside the home

4     so that you have an idea of what the various risks are of where

5     the E. sak came from in this case.  So we're not trying to blame

6     anybody with respect to this.  What we're trying to make clear

7     is that it wasn't Abbott's can that did it; and, therefore, the

8     question is, okay, are there other places it could have come

9     from.  And so that's why we talk about these other sources.

10          So it does exist widely in the environment.  You know,

11     some of the scientific literature talks about it being, you

12     know, essentially everywhere.  It's been in soil, water,

13     vegetation, meats, poultry, cereal, spices just to name a few of

14     the foods.  It's routinely found in home and hospital

15     environments.  Sometimes it's found in sinks, on bottle

16     scrubbers, dust contents.  It's not about just what the baby

17     eats.  That's not what's the case because many things that the

18     baby eats also come into contact with the environment.  Nipples

19     come in contact with the environment.  Bottles in which the

20     formula's developed come in contact with the environment.  The

21     baby him or herself comes in contact with the environment,

22     touching clothing, being touched by others, you know, being

23     around other people who are infected.

24          E. sak is not something that only comes from powdered

25     infant formula.  E. sak infections occur in adults who clearly

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 73 of 118

1   are not eating powdered infant formula.  E. sak occurs in

2   infants who have not been fed powdered infant formula.  So not

3   every infant who has E. sak has -- or who -- has had powdered

4   infant formula.  Lot of people who get E. sak infections don't

5   get meningitis because they're an adult, but E. sak infections

6   come in the environment, and that's be -- they don't get it from

7   powdered infant formula.  They have to get it from all these

8   places.

9        In humans you can find E. sak in catheters, feeding

10  tubes, sputum.  Pneumonia patients produce E. sak in some cases,

11  IV lines, stethoscopes, and there's more reported cases of

12  E. sak infection.  You could encounter E. sak tomorrow.  You

13  might not even get sick.  You could encounter a colony.  It

14  could enter your body.  You might not get sick, just depending

15  on how it affected you because you're an adult and everything

16  else.

17       But of cases where people get sick and where they go

18  in and they find out what bacteria is specifically making them

19  sick as opposed to just giving them a broad-based antibiotic and

20  sending them home knowing it will probably kill whatever

21  bacteria it is, but where they actually define whatever it is,

22  there's many more adults who are identified as having E. sak

23  infections despite their lack of contact with powdered infant

24  formula than there are children.

25       So let's put up number 7 which is up there already.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 74 of 118

1   And that's just a list of various sources in the literature

2   where it can be found.  Has nothing to do with blaming anybody.

3         With respect to the home -- and again, no blame

4   associated with this -- there's a lot of areas in the home that

5   weren't tested, and so we put up the various areas in the home

6   and which ones were tested and which ones were not.  Just go

7   ahead and put it up, fill it in.

8         So there was some limited testing done eight days

9   after Jeanine Kunkel went in the hospital.  At the home they did

10   test the two areas next to the sink and the aerator in the sink,

11   but the many other areas in a home where you could actually have

12   E. sak occurring, not through any fault of anybody and not for

13   anybody to be blamed, you know, homes are not sterile no matter

14   what we do to them, no matter how clean we are.  They're not

15   sterile.  Sterile is a really tough standard.  Not even

16   commercially sterile, they're not sterile at all.  You know,

17   people track things in.  Dogs and pets track things in.  People

18   can also carry E. sak bacteria in their hands, their feet --

19   doesn't have to affect them -- their clothing.  You know, quite

20   a few people had contact with Jeanine Kunkel at the hospital.

21   They had contact with her after she came home.

22         At the same time as Jeanine became ill at home, her

23   father was very ill.  In fact, he went to the hospital on the

24   day after she was admitted, and he had been sick for some time

25   and sick with pneumonia.  And so he went into the hospital at

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 75 of 118

1    the same time.  And so there's illness in the home at the very

2    time.

3           The food we use isn't sterile.  Refrigerators aren't

4    sterile.  She was drinking out of ready-made formula that was

5    being kept in the refrigerator, a 32-ounce bottle.  She was

6    drinking two ounces at a time, so there were bottles that were

7    around for periods of time, used, taken out, put on the

8    countertop, used, put back in.  You know, there's all kinds of

9    possibility of cross-contamination.

10          Now, the CDC did test a couple of areas but -- and

11   they did not find E. sak in the home eight days after the test

12   was done.  But it is important to note that there's -- just like

13   everybody's home, there's bacteria in the home.  They have

14   several cultures, not E. sak, of bacteria that they list as too

15   numerous to count.  They don't give a value to it because when

16   they test the home, obviously there's things that can be in the

17   home and probably would be in my home as well.

18          Now, Abbott's pediatric infectious disease expert,

19   Dr. Shulman, who's been head of the division of pediatric

20   infection dis -- infection and disease at Lurie Children's

21   Memorial Hospital and is the hospital epidemiologist, the guy

22   who's charged in the hospital of figuring out where any bugs

23   come from within the hospital, he'll testify that you don't have

24   to eat bacteria, that this concept that it only comes in through

25   the mouth which it might have and it could have come from

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 76 of 118

1 sources other than the powdered infant formula, but, in fact, it

2 could come into the body in numerous ways, through any of our

3 what's called mucosal openings which include obviously your

4 eyes, nose, mouth, and any opening you might have in the skin.

5 It can even be breathed.  It can be aerosolized by vacuuming or

6 by somebody running a hose or a sharp -- fast water flow, and it

7 can come up into the air.

8           And as I say, infants who've not had any powdered

9 infant formula and adults who have had no powdered infant

10 formula get E. sak-based infections, and they get it from the

11 environment, so we know it is in the environment.  It's simply

12 not the case that if a baby who's fed powdered infant formula

13 gets E. sak it has to have come from the powdered infant

14 formula.

15           There's another reason why the proof will show that

16 the -- none of the three feedings over about six and a half or

17 seven hours that Jeanine Kunkel had from a powdered infant

18 formula can caused her E. sak infection.  And Dr. Shulman, the

19 fellow from Children's Hospital, Lurie Hospital, in Chicago will

20 testify that it takes time after bacteria enters any person,

21 even an infant, before it can cause symptoms and infection,

22 before it can cause infection enough to the point where there

23 are symptoms.

24           And in his expert medical opinion -- you'll hear him

25 say this -- the medical records in this case and includes the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 77 of 118

1   statements of how the baby was doing made to the medical

2   personnel at the time the family brought the baby in, that the

3   medical records in this case will show that Jeanine Kunkel was

4   already showing symptoms of the meningitis infection that she

5   had at the time she received her first feeding from powdered

6   infant formula.

7           Remember as Mr. Rathke told you she came home on the

8   17th.  She went back into the hospital on the 24th.  During that

9   week she received feedings from liquid formula.  Remember I've

10  described the -- sometimes I think she had some ready-to-feed

11  and then she had quart bottles, 32-ounce ready-to-feed which you

12  would use for 2-ounce feedings, put it back in the refrigerator,

13  do whatever one normally does with those things.

14          And what Dr. Shulman will tell you is how ever the

15  infection got into her, how ever it happened, it was already

16  manifesting system -- symptoms at the time that she received her

17  first feeding of powdered infant formula because she only gets

18  her first feeding of powdered infant formula on the night before

19  she goes into the hospital.  He'll describe for you the medical

20  and biological reasons why given the progression of symptoms the

21  Abbott powdered infant formula which is just her last three

22  feedings couldn't have been the source of her meningitis

23  infection.

24          I'm going to talk briefly about the label because this

25  case features most importantly the question whether or not there

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 78 of 118

1  was E. sak in the powdered infant formula that she received

2  which caused her illness.

3          But put the label up if you would.  Good.

4          And this will be discussed at length during the trial

5  because there is a specific warning claim.  Most importantly as

6  you've already heard, it comes into play if and only if there

7  was E. sak in the powdered infant formula that she consumes.

8  Then you look at the label to see whether it's fairly warned for

9  or not.

10         But with respect to this, the most important thing to

11  note about this is that the label does say at the very top --

12  the first thing it says is that it's only to be used under the

13  supervision of a doctor.  There's a couple of other places where

14  it says consult your doctor.  It does say in that first

15  paragraph over on the left -- and I'm not asking you to find it,

16  but it does say that the product is not sterile, and then it

17  provides instructions for how to prepare the product.

18         In this case Dr. Beck who was the pediatrician who

19  Megan Surber was using for her daughter Jeanine did, in fact,

20  order or indicate that NeoSure should be used.  And he didn't

21  specify whether it should be NeoSure powder or NeoSure liquid,

22  and I think the evidence will be he didn't care, he didn't

23  distinguish between the two as creating risk or more safety and

24  so that he ordered it and so that it was under his care that

25  that was ordered.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 79 of 118

1      Now, the FDA regulates powdered infant formula labels.

2  And Abbott's label exceeds -- you know, meets or exceeds the

3  requirements that the FDA have for a label.  They add some

4  things that the FDA doesn't even require for its label.  And

5  you'll hear from warning experts about whether it makes sense to

6  have really dire warnings about things on labels if, in fact,

7  the risk is very, very small, et cetera.  And so you'll hear all

8  about that.

9      But again, even with respect to the labeling claim, it

10  starts with was there E. sak in the powdered infant formula that

11  Jeanine received.

12      So we do have a couple of affirmative defenses that

13  we'll be talking to you about.  And again, those two only --

14  they only come into play again if you find that there was

15  powdered infant formula, so we won't be spending a lot of

16  time on -- I'm sorry, if you find that there was E. sak in the

17  powdered infant formula that Abbott shipped, and so we won't be

18  spending a lot of time on that for sure, but you will hear about

19  it.  And they basically are that the Abbott production facility

20  was state of the art, that it was a state of the art production

21  facility, that both the way they produced it, the way they

22  tested for it, and the design of the system was state of the

23  art, was the -- you know, as good as you can do with respect to

24  making it.

25      Now, you know, you can always test more, you can

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 80 of 118

1   always do more things, but state of the art has a certain

2   meaning.  Some of you will be familiar with it.  And Abbott's

3   plant was state of the art, and there will be expert testimony

4   to that effect.

5        And the other one is that there was a learned

6   intermediary in that Dr. Beck said go ahead and use NeoSure and

7   did not specify or care whether or not it was powdered or not,

8   and so he was well aware of the circumstance with respect to

9   the -- how children, if they consume anything that has E. sak in

10  it, can get an E. sak infection.  He was well aware of that, and

11  yet he prescribed this.  And so there's a learned intermediary

12  defense that you'll hear.

13       I'm not going to talk to you about the damages in the

14  case other than just ask you that during that part of the case

15  pay attention to it and, you know, take your eye to what's being

16  claimed there.  I don't think we're going to get to that if I'm

17  right about what the proof shows as to whether or not there was

18  contamination in the powdered infant formula.

19       So when we finish the evidence -- and the evidence is

20  what matters -- the Court's told you that what Mr. Rathke and I

21  say here is nothing more than lawyers' predictions as to what

22  something might be, and that's certainly true.  But when we're

23  done and the evidence is in, I'm going to come back here, and

24  I'm going to tell you that I think the evidence came in pretty

25  much the way I said it would, that the evidence, in fact, does

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 81 of 118

1   not establish in any way, shape, or form by a preponderance or

2   any other standard that there was E. sak bacteria in Abbott's

3   powdered infant formula that Jeanine Kunkel received.  It will

4   not show that, and I'll come back and talk to you then and ask

5   you for a verdict for the defendant, Abbott.  Thanks very much

6   for your attention.

7           THE COURT:  Okay.  Why doesn't everybody take a

8   stretch break, and then we'll start in with plaintiff's first

9   witness.

10          Mr. Rathke, ready to call your first witness?

11          MR. RATHKE:  I am, Your Honor.

12          THE COURT:  Okay.  Who would that be?

13          MR. RATHKE:  That would be Dr. Janine Jason.

14          THE COURT:  Good afternoon.  If you'd just raise your

15  right hand.

16              JANINE JASON, PLAINTIFF'S WITNESS, SWORN

17          THE COURT:  Thank you.  Please be seated.  You can

18  adjust the chair and the microphones so you can speak directly

19  into them.  And would you state your name, please, and spell

20  your last name.

21          THE WITNESS:  Sure.  Janine Jason, J-a-s-o-n.

22          THE COURT:  Thank you.

23          Mr. Rathke?

24                      DIRECT EXAMINATION

25  BY MR. RATHKE:

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 82 of 118

1  Q.   Would you state your name again one more time into the
2  microphone.
3  A.   Janine Jason.
4  Q.   And how do you spell Janine?
5  A.   J-a-n-i-n-e.
6  Q.   And how do you spell Jason?
7  A.   J-a-s-o-n.
8  Q.   Where do you live?
9  A.   South Carolina.
10 Q.   And where in South Carolina?
11 A.   Hilton Head.
12 Q.   And you flew here to Hilton Head (sic) at our request to
13 testify?
14 A.   Correct.
15 Q.   What has been your involvement in this case?
16 A.   You contacted my company, Jason and Jarvis Associates,
17 about getting expert consulting.
18 Q.   What is Jason and Jarvis?
19 A.   It's a two-person consulting company that my husband and I
20 started ten years ago when we left the U.S. Centers For Disease
21 Control in Atlanta.
22 Q.   And what is your profession and the profession of your
23 business partner?
24 A.   We're both pediatricians, and we're both epidemiologists.
25 Q.   How much of your business in, oh, let's say the last two or

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 83 of 118

1   three years involves litigation, how much of your income?

2   A.   Our income, I would guess -- he's our CFO, so he's better.

3   But I would think about maybe 25 percent.

4   Q.   And who hired you to look at this case?

5   A.   Your firm which is Lommen Abdo.

6   Q.   What did we ask you to do?

7   A.   You asked me to review material and see if I was able to

8   give an opinion on whether Jeanine Kunkel's infection,

9   cronobacter infection, was due to powdered infant formula that

10  was contaminated before it left the factory.

11  Q.   How are you compensated for this task?

12  A.   On an hourly basis.

13  Q.   Does your compensation depend on the outcome of this case?

14  A.   No.

15  Q.   Have you ever testified in a courtroom like this before in

16  front of a jury?

17  A.   No.

18  Q.   Tell the jury your areas of expertise, your specific areas.

19  A.   I am a pediatrician.  I'm an immunologist.  I'm an

20  infectious disease specialist.  I am an epidemiologist.  I have

21  a background in health communications and also in analyzing

22  complex study designs.

23          MR. RATHKE:  Do you think this is loud enough?

24          THE COURT:  Well, are the jurors able to hear the

25  witness?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 84 of 118

1          JUROR FORD:  She should be a little louder.

2          THE WITNESS:  I tend to talk softly.

3          MR. RATHKE:  Does it matter which mike?

4          THE COURT:  No.  And they're cranked up.  Let me make

5  sure I've got them cranked up full tilt.  They are.

6          THE WITNESS:  I'll work hard.

7          MR. RATHKE:  And if you're having trouble . . .

8  BY MR. RATHKE:

9  Q.  Tell the jury about your education.

10  A.  I got my undergraduate degree, my bachelor's, at the

11  University of Chicago with highest honors, went to Harvard

12  Medical School.  Then I went and did my internship and residency

13  at the Children's Hospital of Los Angeles, did a clinical

14  immunology fellowship at Toronto Hospital For Sick Children, and

15  did -- and did the epidemiology fellowship program at CDC.  It's

16  called the Epidemiology Intelligence Service, and I think it's

17  probably the best epidemiology training program in the world,

18  but I'm biased.

19  Q.  Tell us if you will the date you graduated from Harvard

20  Medical School.

21  A.  1975.

22  Q.  And then you've indicated some training and education after

23  that.  Could you kind of give us when about those things

24  occurred.

25  A.  From '76 to '77, those years I did my residency.  The next

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 85 of 118

1    year was my fellowship.  I then was on faculty at Yale doing

2    very basic immunology research for two years.  And then in 1980

3    I left and went to CDC.  I had wanted to do child health and was

4    getting too caught up in basic research.  And so the next two

5    years I did the EIS program, and I stayed on at CDC after that

6    until 2003.

7    Q.   So you were an employee of CDC when you did the

8    epidemiology training?

9    A.   I was an officer in the U.S. Public Health Service assigned

10   to CDC.

11   Q.   What does that mean to be an officer in the U.S. Health

12   Service?

13   A.   It's a uniform service, and it's nonmilitary, but you have

14   a uniform, and it's very much like the military services.

15   Q.   Tell the jury, please, about your career at the CDC.

16   A.   I had a number of different positions at CDC.  I did both

17   epidemiology and laboratory research.  Most of it was with the

18   Center For Infectious Diseases.  The research sometimes was

19   directly in the lab, sometimes was primarily epidemiology and

20   analyses.  I supervised groups doing that work.  For a short

21   spell I supervised a group that assessed the national AIDS media

22   campaign and developed research techniques for communications.

23   And I was involved in public health policy formation, prevention

24   activities, a good deal of teaching and lecturing.

25   Q.   What are your years of employment with the CDC?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 86 of 118

1    A.    1980 to 2003.

2    Q.    Where were you located?  Where was your office?

3    A.    It's the only federal agency that's not in the DC area.

4    It's in Atlanta, Georgia.

5    Q.    Have you covered your CDC years?

6    A.    It's a lot of years.  I think so, yes.

7    Q.    All right.  Now, 2003 you leave the CDC.

8            THE COURT:  Did -- I don't recall that the witness --

9            MR. RATHKE:  I --

10           THE COURT:  Just a second.  I wasn't finished.  I

11   don't recall that the witness ever told the jury what the CDC

12   was.

13           THE WITNESS:  That's important.

14           THE COURT:  Or what the definition of epidemiology is.

15   So I know all the wizards in the courtroom know it, but, you

16   know, we select these folks, and it's helpful if you define the

17   terminology for them.

18           MR. RATHKE:  Thank you, Your Honor.

19           THE WITNESS:  Okay.  CDC's full name -- and its name

20   has changed through the years.  But its current name is the

21   Center -- now you've got me all nervous.

22           THE COURT:  I have a tendency to do that to folks.

23           THE WITNESS:  Oh, goodness.  I'm going to move on to

24   the second part and come back when I'm less nervous.

25           THE COURT:  That's fine.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 87 of 118

1          THE WITNESS:  Epidemiology is the science, the medical

2     science, of looking at diseases in populations and to come up

3     with ways to identify the causes of diseases and to prevent

4     their occurrence.

5          And CDC is the Center for Disease Control and

6     Prevention, but they've stuck with the CDC and left off the P

7     part.

8     BY MR. RATHKE:

9     Q.   In addition to your CDC or as part of your CDC experience,

10    could you tell the jury about your clinical experience.

11    A.   The longest time I've spent clinically is during those 23

12    years at CDC, I was also on faculty at Emory University School

13    of Medicine in the department of pediatric infectious diseases,

14    immunology and epidemiology.  And in that capacity I did what's

15    called attending where you take turns supervising medical

16    students, residents, and fellows.  You provide patient care.

17    You do one-on-one teaching as well as lecturing.  And I did --

18    my focus in this were very sick children and how the immune

19    system responds to various insults and how to deal with that.

20    Q.   And what are you currently doing since 2003 retirement?

21    A.   Since then I work pro bono part time at a free clinic.

22    Q.   Where is that located?

23    A.   On Hilton Head.

24    Q.   Have you been published?

25    A.   I've published or coauthored or authored over a hundred

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 88 of 118

1    scientific peer-reviewed papers, chapters, and one book for

2    parents on parenting premature infants.  That book was published

3    by two big U.S. publishing companies, and then a German

4    publisher published it in Germany.

5          THE COURT:  And, doctor, would you mind defining for

6    us the Latin phrase pro bono?

7          THE WITNESS:  Yeah, it's -- I don't charge.  I've

8    never charged a patient.

9    BY MR. RATHKE:

10   Q.   Do any of your publications relate to E. sak?

11   A.   Yes.  In 2011 and 2012 I did a series of analytic studies

12   looking at invasive cronobacter infection in children, and the

13   results of that were published in a journal called Pediatrics.

14   That's the peer-reviewed journal of the American Academy of

15   Pediatrics.

16   Q.   What was the publication date?

17   A.   It was, I believe, November of 2012.

18   Q.   And generally what did you -- in a very general sense, what

19   was the publication about?

20   A.   The -- well, what I did was I collected all available

21   information on any case of cronobacter that was in a pediatric

22   patient s -- from the beginning, the first reported case which

23   was 1958, through to the end of 2010 and to get the information,

24   I looked at everything ever published.  I contacted the authors.

25   I went through CDC records, FDA records, legal documents,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 89 of 118

1    reports in the literature, basically any source I could find.

2            I then separated off cases that I defined as being

3    invasive, and it was a definition that's consistent with the

4    literature.  But the gist of it was to look at only significant

5    infections.  I characterized those cases, and then I split off

6    the cases that occurred in previously healthy children and

7    analyzed those further.

8            In 2002 the FDA sent a letter out to healthcare

9    providers, and the letter cautioned them about using powdered

10   infant formula which I don't -- I can't talk as quickly as you

11   can.  I call it PIF so I don't get tongue tied.  It cautioned

12   healthcare providers to avoid using PIF in newborns who are in

13   newborn intensive care units or NICUs, and it was specifically

14   because of the problem of cronobacter.

15           Over the next couple of years that information

16   disseminated to the pediatric community.  So my next analysis I

17   looked at cases that occurred before 2004, and I compared them

18   to ones that occurred after 2004 to see if there was any

19   temporal association between -- any temporal changes in the

20   characteristics of the cases that occurred before and after that

21   time period.

22           And then the third analysis looked at the relative

23   costs of ready-to-feed and powdered formulas.

24   Q.   And we'll get into that a little bit later.  But that was

25   what you were researching in your paper.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 90 of 118

1  A.   Correct.

2  Q.   Now, did you review any materials that are specific to this

3  particular case?

4  A.   I would say almost certainly, but if I did, it's not

5  identified in the document, and I'd have to go back and look

6  over my notes.

7  Q.   Okay.  Let me ask you to do this.  Tell the jury what you

8  recall reviewing about this case.

9  A.   For that manuscript?

10  Q.   No, no, no, no, no, no.  In connection with your engagement

11  as an expert.

12  A.   Oh, my goodness.  All right.  Specifically for this case I

13  reviewed CDC records, FDA records, health department records, a

14  number of depositions of the family and of some Abbott

15  employees, the reports and the deposition of the Abbott experts.

16  I don't know if you mean specifically.  I also did an updated

17  literature review to see what else had happened since I last did

18  one.

19  Q.   Did you review any medical records?

20  A.   Oh, yes.  I reviewed the medical records of the -- of both

21  Jeanine, her brother, and her father and her mother.

22  Q.   And did you read a number of depositions from family

23  members?

24  A.   Yes, I read the depositions and the corrections to

25  depositions of the mother, the father, and the maternal

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 91 of 118

1  grandmother.

2  Q.    Did you review any documents generated by Abbott or the

3  industry?

4  A.    Yes.  I reviewed a large number of documents that were

5  related to what's called the Infant Formula Council or IFC.

6  It's my understanding that that is an organization of different

7  formula manufacturers predominantly from North America.

8  Q.    Could the name of that organization possibly be the

9  International Formula Council?

10  A.    That is very possible.

11  Q.    And in addition to the materials that are specific to this

12  case, did you also review some, you know, general literature on

13  the subject because of this case?

14  A.    Because of -- well, yes.  I mean, basically I looked to see

15  what was new since I had already looked at everything for the

16  manuscript.

17  Q.    Do you believe that you reviewed sufficient material to

18  reach an opinion regarding the source and cause of Jeanine's

19  illness?

20  A.    I do.

21  Q.    And do you have an opinion regarding the source and cause

22  of Jeanine's illness to a reasonable degree of medical and

23  scientific certainty?

24  A.    I do.

25  Q.    And what is that opinion?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 92 of 118

1    A.    It's my opinion that it is -- that the truth is more likely

2    than not that Jeanine's invasive cronobacter infection was due

3    to a virulent cronobacter that was in her powdered formula

4    before it was sealed and left the factory.

5    Q.    Why do you rule in powdered infant formula as a source?

6    A.    I think I have a slide for this.

7    Q.    You do.

8    A.    It would be slide 7.  Cronobacter is what's called an

9    enteric bacteria and in --

10   Q.    Excuse me.  Could you say that word a little bit --

11   A.    Enteric?

12   Q.    En --

13   A.    En, enteric, e-n-t-e-r-i-c.

14   Q.    All right.  And you said it was an enteric bacteria, but

15   you need to tell us what that means.

16   A.    I was about to.

17   Q.    Okay.  Sorry.

18   A.    That word comes from the Greek word for intestines, and the

19   reason it's got that name is that is where an enteric bacteria

20   likes to live.  It gets in through the mouth, tries to take up

21   residence in the intestines, and there it will divide.  If it's

22   one that doesn't cause illness, it may actually help us digest

23   food.  If it's one that causes illness, it will keep dividing.

24   Ideally our body will fight back and just get it out of there.

25   If you don't win the battle, it can get through the wall of the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 93 of 118

1    intestines and go to the rest of the body.

2         So by definition this is a bacteria that gets in

3    through the food.  Salmonella is an enteric bacteria.  E. coli

4    is an enteric bacteria.  Jeanine Kunkel was fed ready-to-feed

5    formulas at her birth hospital.  Ready-to-feed formulas or RTF

6    are sterilized.  The manufacturer pasteurizes them, and that

7    kills any bacteria that's in there.  She did perfectly well on

8    that until she was sent home at three days of age.

9         Her mom continued to feed her ready-to-feed formula

10    for the next six days.  And then at 9 p.m. on April 23, she gave

11    Jeanine her first feeding of powdered formula, namely NeoSure

12    22.  Up until then Jeanine was doing fine.  She was thriving.

13    Her powdered formula was literally the only nonsterile thing

14    Jeanine had been fed up until that time.

15         There is a body of research that goes back at least 30

16    years, incredibly elegant epidemiologic research that has shown

17    the relationship between powdered infant formulas and invasive

18    infection with cronobacter in infants.  And by infants I mean

19    very young infants in the first two months of life.

20         The connection has been both looking at it through

21    straight epidemiologic techniques showing that those that have

22    received a certain formula became infected.  Those that did not

23    didn't to a level of significance that's beyond the likelihood

24    of chance.

25         Some studies have in addition cultured the organism

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 94 of 118

1    and matched it to what's in the infants.  But again and again

2    between outbreak investigations and what we call sporadic cases,

3    individual cases, the link is incredibly powerful.  It is the

4    only thing that has ever been shown to cause this infection in

5    infants.

6            And lastly, on the day that Jeanine's product began

7    production in Abbott's Casa Grande plant, Abbott was doing

8    routine environmental monitoring for contamination.  This is a

9    known contaminant in factories.  It's endemic in factories.  On

10   the day her product began to be produced, Abbott had two

11   positive cultures for enterobacter sakazakii which is what it

12   was called back then.  It was in the very place where her

13   product was being produced.

14   Q.   Abbott tested this product, this batch, before it left the

15   plant.  And its testing was negative for E. sak.  Why don't

16   those negative -- and you're aware of that; right?

17   A.   I'm aware of that, yes.

18   Q.   Why is it that that final product testing which was

19   negative for E. sak, why doesn't that rule out E. sak or the

20   powdered infant formula as the source of the E. sak?

21           THE WITNESS:  Pat, could I have slide tw -- slide 8?

22   Q.   Eight.

23   A.   You like 1.  That's the first one.

24           I am sure you're going to hear more about this from

25   other experts.  I could go on and on, but there are people who

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW  Document 194  Filed 05/12/14  Page 95 of 118

1  know more about factories than I do by far.

2          This is the percent of end product that was tested by

3  Abbott before it released the product to the market.  They

4  tested ////////, of the product.  Lots of powdered formula --

5  and I did not know this until I got more involved in this issue.

6  They are massive.  One lot of PIF weighs over 150,000 pounds.

7          The nature of contamination with cronobacter is that

8  it's clumped.  As far back as 2003 at an FDA meeting scientists

9  at that meeting were pointing out that this bacteria was unusual

10 in that it kept clumping.  They had trouble working with it

11 because they couldn't get it to stop clumping so they could work

12 with it.

13         At that very same meeting an FDA staff person who has

14 through the years worked a lot on this topic commented that, of

15 course, the contamination is not homogeneous, that it happens in

16 the dry production point and it's from unintentional contam --

17 an area or a piece of equipment will be contaminated, and

18 inadvertently a clump of contamination will fall into the

19 product.  So it's not spread out evenly throughout the product.

20 But the testing being done makes that assumption.

21         Nothing is a hundred percent even if the testing were

22 done according to the kind of contamination there is.  But when

23 you have this clumped episodic contamination, this amount of

24 testing is simply not going to be able to pick it all up.

25         MR. RATHKE:  You can take that off.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 96 of 118

1    Q.   After Jeanine became sick, the can from which she was fed

2    which had some powder in it eventually found its way to the CDC

3    in Atlanta where it was tested, and it was determined that there

4    was no E. sak or at least they didn't find any E. sak in that

5    opened can.  Why don't those negative results, why don't those

6    rule out the powdered infant formula as a source of the -- of

7    C. sak?

8    A.   I think the glib answer would be because she ate it.  There

9    was f -- I should mention that Abbott's own results, if you look

10   through their records, show that end product testing doesn't

11   necessarily pick up all contamination.  There have been times

12   where they've tested a lot using the routine end product

13   testing, found it to be negative, and then gone back for one

14   reason or another and found it to be positive.

15        A paper came out in 2011 where someone did a huge

16   amount of work looking at not an Abbott lot but a lot of

17   contaminated product that had been released to market.  And it

18   showed what the FDA folks knew back in 2003.  You would have one

19   area with enough clumping that it could, in fact, cause severe

20   disease while the rest of it was either only slightly

21   contaminated or perfectly fine.  And the comment of that author

22   was that in a public health sense the implication was that some

23   poor infant could swallow that one or two clumps and you would

24   have a catastrophe for that one infant.

25        So that's a long way around to the glib answer that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 97 of 118

1  you could have contamination in one small portion of a can and

2  the rest of that can could be perfectly fine.

3          MR. RATHKE:  I would like to mark for evidence a paper

4  that has not been admitted and just display it to the witness

5  for purposes of laying foundation.

6          Pat?  It's Exhibit 151.

7          THE COURT:  Just tell me again what 151 is.

8          MR. RATHKE:  151 is an e-mail.

9          THE COURT:  Oh, right.  Go ahead.

10          MR. RATHKE:  Should I --

11          THE COURT:  Yep.

12          MR. RATHKE:  -- lay foundation?

13          THE COURT:  Exactly.

14          MR. RATHKE:  All right.  Go ahead.  We want to show it

15  on this but not on the screen yet.

16          THE COURT:  Let me explain to the jury what's going

17  on.  Most of the -- I should have told you this at the

18  beginning.  I've been meeting with the lawyers on and off for

19  weeks if not months about the exhibits.  And one of the things I

20  told you in jury selection was that because we try a lot of

21  cases in our district we do things more efficiently than most

22  districts.  So most of the exhibits are already in evidence.

23  We've resolved objections, if any, to them, and they're already

24  in evidence.  There are a few that are not.

25          So in order to determine whether or not I should admit

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 98 of 118

1  the exhibit, they have to show it to the witness.  Lawyers use

2  this phrase they have to lay a proper foundation for it.  In

3  other words, can the witness testify to what it is that would

4  convince me that I should admit it, and that's what's happening

5  right now.

6  BY MR. RATHKE:

7  Q.   Dr. Jason, I've put before you what's been marked as

8  Exhibit 151.  Do you see that in front of you?

9  A.   Yes, yes.

10 Q.   And that -- generally what that is is an e-mail from Anna

11 Bowen identified as a CDC person to an individual named Seth

12 Levine.  Is that correct?

13 A.   Correct.

14 Q.   What's the date of the e-mail?

15 A.   I think it's October 26, 2007.

16 Q.   Do you know who Anna Bowen is?

17 A.   Yes.

18 Q.   Would you tell the judge and the jury who Anna Bowen is.

19 A.   She is a pediatrician and an epidemiologist at CDC.  She

20 worked on enteric infections and has worked for at least eight

21 years on this particular bacteria.  She has published at least

22 one review article and at least one chapter that I know of on

23 this topic.

24 Q.   Does she know anything about E. sak?

25 A.   I would say she's -- in terms of epidemiology, I don't

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 194   Filed 05/12/14   Page 99 of 118

1  think there's anyone who knows more than she does.

2  Q.   And in the e-mail she makes some comments about an

3  investigation that was going on in 2007.  Is that correct?

4  A.   Correct, yes.

5  Q.   And that's not this case at all.  This case had not even

6  occurred; correct?

7  A.   Correct.

8  Q.   Are there some similarities between the facts in this case

9  and the facts in the case that she was commenting about in her

10  e-mail?  Just yes or no.

11  A.   Yes.

12  Q.   And do you agree with the sentiments that she expresses

13  about those similarities?

14  A.   I do.

15  Q.   And do they help -- are they part of the foundation for

16  your opinion?

17  A.   Yes.

18  Q.   Do you recognize this e-mail as a -- you know, I know you

19  were at the CDC.  I don't know if they were doing e-mail then.

20  Probably were.  Is this a CDC e-mail?

21  A.   I'm not that old.  Yes, yes, definitely an e-mail.

22       MR. RATHKE:  All right.  I'd ask that Exhibit 151 be

23  admitted as a relevant business record and foundation for her

24  opinion.

25                        *   *   *   *

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 191  Filed 05/13/14  Page 100 of 118

1          (Exhibit 151 was offered.)

2                    *   *   *   *

3          MS. GHEZZI:  Your Honor, our objection stands.  It's

4   not -- I mean, business record is really not the point.  I mean,

5   we don't have her to cross-examine, and it's a year before --

6   almost a year before the event in this case.  Dr. Jason is not

7   listed on it.  She's not a recipient.  It's not addressed to

8   her.

9          THE COURT:  Actually none of that makes any difference

10  under 703, but he hasn't laid the proper foundation under 703.

11  There's a magic question you need to ask, and you skirted around

12  it.  So do you have your rules with you, or you actually come

13  into a federal court without the rules?

14         MR. RATHKE:  We have the rules.

15         THE COURT:  Well, you haven't asked the proper

16  question under 703.

17         MR. RATHKE:  Oh, I thought I covered it.  Maybe I

18  didn't.

19  BY MR. RATHKE:

20  Q.   Is this something you relied upon when you reached your

21  conclusions?

22  A.   I would have the same conclusion with or without this.  I'm

23  not sure what you're asking.

24  Q.   Is this a document that would be part of -- part of the --

25  that you would have reviewed in the process of reaching your

**Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov**
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 191  Filed 05/13/14  Page 101 of 118

1 opinion?

2 A.   Oh, yes, I did re -- I did see this, yes.

3 Q.   And did you in some measure rely upon that, on this

4 document, in reaching your opinion?

5 A.   I think any intelligent person would feel more secure in

6 their opinion if other intelligent people working in an area

7 agree.

8 Q.   And this is in agreement with your opinion.

9 A.   Correct.

10       THE COURT:  You were warm but no cigar.  Why don't you

11 go back and read the rule.

12 Q.   Is this something that an expert in your field would rely

13 upon?

14 A.   Yes.

15       THE COURT:  You're getting closer.  You don't have the

16 rules with you?

17       MR. RATHKE:  I do but . . .

18       THE COURT:  Well, open it up to Rule 703 and figure

19 out what you need to ask.

20       MR. RATHKE:  Wrong book.

21       THE COURT:  It's in there.

22       MR. RATHKE:  This is the criminal rules.

23       THE COURT:  It doesn't make any difference.  It's in

24 the criminal rules too.  It's the same rule of evidence for

25 criminal and civil cases.  I know you don't do criminal work,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 102 of 118

1  but same rules of evidence apply.

2          Members of the jury, you can stand and take a stretch

3  break.

4          I'll give you a hint.  It's the eighth word of the

5  second sentence of the rule.

6  BY MR. RATHKE:

7  Q.   Would experts in your field reasonably rely upon this type

8  of data in order to reach the conclusion that you've reached?

9  A.   If it's from someone like this, yes.

10         THE COURT:  So what are you looking at me for?

11         MR. RATHKE:  Oh, I'm sorry.

12         THE COURT:  You offering the exhibit?

13         MR. RATHKE:  Yes.

14         THE COURT:  I'm going to sustain the objection.  I

15  mean, she's allowed to testify that she relied on it, but it's

16  not independently admissible as substantive evidence.  She can

17  rely -- she's already testified that she relied on it in giving

18  her opinion, but her opinion would have been the same without

19  it, and that she can testify to under 703.  The underlying

20  document itself is not admissible unless you meet all of the

21  foundation requirements, and you haven't done that.

22         MR. RATHKE:  May I ask her to describe the contents of

23  the e-mail?

24         THE COURT:  Sure.  To the extent that she relied on

25  it, sure.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 103 of 118

1  BY MR. RATHKE:

2  Q.   Go ahead.

3  A.   I'm not sure I understand.

4  Q.   Did -- the subject that we're talking about is the

5  after-the-fact inspection of an open can which is negative for

6  E. sak.  That's the scenario that was presented in the case that

7  involves what's been marked for identification as Exhibit 151;

8  correct?

9  A.   I gather from this conversation, yes.

10 Q.   And what was Dr. Bowen's comment with respect to the fact

11 that the open can tested negative for E. sak?

12          MS. GHEZZI:  Your Honor, excuse me.  I have to object

13 because he's asking her essentially to -- I think to read -- to

14 read the document.

15          THE COURT:  I don't think he's asking her to do that

16 at all.  It's overruled.

17          MS. GHEZZI:  Okay.

18          THE COURT:  She's entitled to read the document.  She

19 relied on it.

20          MS. GHEZZI:  No, she can read it.  I mean read it out

21 loud which is publishing it to the jury.

22          THE COURT:  Well, she can summarize what it is in the

23 document that she relied on.

24          MS. GHEZZI:  Absolutely.

25          THE COURT:  You're right.  She can't just go ahead and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 191  Filed 05/13/14  Page 104 of 118

1  read it and get around my ruling that it's not admissible

2  independently as substantive evidence.  So you can summarize

3  that portion of the document that you relied on in formulating

4  your opinion.

5  A.   That a open can was tested and was found to be negative,

6  but Dr. Bowen indicates to the person at the health department

7  inquiring about the results and what they mean, her response was

8  that this unfortunately does not mean that the infant had not

9  received contaminated material from that can because

10 contamination is clumped, so the rest of the can could have been

11 negative and it still could have been the source of the

12 infection.

13 Q.   Thank you.  Abbott claims amongst other things that

14 Jeanine's home environment including the people that would be in

15 the home could be the source of her C. sak infection.  Why do

16 you rule out those sources?

17 A.   I think that this will come up again later.  Cronobacter

18 does not infect a healthy human being.  Many decades of clinical

19 samples of healthy people who are not hospitalized and not

20 infants, cronobacter never comes up.  Cronobacter can what we

21 call colonize.  It can for a while live in very sick

22 hospitalized people.  Even this is very rare.  We're talking

23 about around the world maybe a hundred a year or something.  But

24 you can occasionally get a positive culture from a very ill

25 hospitalized person, usually elderly, virtually always someone

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 105 of 118

1   who's got some immune problem because they're just so sick in so

2   many ways.  But it does not cause the kind of infection we see

3   in newborn infants.

4          The people that Jeanine came in contact with at home

5   were all younger and healthy people.  These are not people who

6   are going to be carrying around cronobacter.

7          Even more striking is just in the last few years

8   there's been some work that even further supports that these

9   infections come from powdered formula.  And in that -- in some

10  of these studies, what they did was look at the strain, the type

11  of cronobacter, and I think I'll explain this later.  I have

12  some slides.  But even -- for even the very elderly people, it

13  is not the same strain of cronobacter that infects infants.  And

14  when I say infects infants, I mean invasive infection, the kind

15  of infection that leads to death and meningitis.

16  Q.   Going on to another topic, would you tell the jury a little

17  bit more about this bacteria known as enterobacter sakazakii?

18  A.   Sure.  Actually I think its father is going to be here

19  later in the week.  Could I have slide 1, the one that you keep

20  wanting to give me?

21         Enterobacter sakazakii was identified in 1980 by a

22  microbiologist named James Farmer who at the time was working at

23  CDC.  And he characterized the bacteria, recognized its

24  similarities to other enterobacteriaceae, the group that

25  included salmonella and E. coli, and so he put it into the

Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 106 of 118

1 family. And here we're talking about what you call taxonomy.

2 It doesn't change anything about the bacteria. It's just a

3 matter of deciding what family it lives in.

4 And enterobacteriaceae is what's called a genus. And

5 a genus is kind of like an extended family if you were to have a

6 huge family reunion. So he put it in the extended family of

7 enterobacteriaceae. And could I have the next slide?

8 In 2008 mainly because of this issue more and more --

9 we're not talking about a huge number of people, but there's

10 some very good labs now that are looking at cronobacter

11 infections, and in 2008 a number of people working very actively

12 identified so many different variations that they decided it was

13 time to give cronobacter its own family.

14 And so enterobacteriaceae sakazakii which is what

15 James Farmer had called it was given a new name. And the new

16 name was cronobacter. And that name was picked because Crono is

17 a Greek god who ate his own children. And they subdivided the

18 bacteria into seven different species. So species would be like

19 a real family, a father, mother, brother, sisters. So if I

20 could have that slide.

21 So what you have with cronobacter is -- I'm not sure

22 how you do this with -- behind you. I'm new to this. Usually I

23 can look at a slide -- okay. All right. What -- actually you

24 can put that down for one second. I want to show something. Do

25 you see my finger? You don't see anything, do you? Okay.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 107 of 118

1    We're going to have to just kind of picture this.

2         You see seven different clusters there and then little

3    clusters, little circles around those clusters.  The seven big

4    clusters are what we call species, so that would be like your

5    family, your brother's family, your sister's family.

6         The little clusters are clusters that are identified

7    because even within those families we're not alike.

8         The biggest cluster is C. sakazakii, and now you could

9    highlight that.  That's big because the most disease comes from

10   C. sakazakii, so they have the most stored isolates.  Isolates

11   are where you collect a sample, you store it so you can study

12   it.

13        So that's the biggest because that -- it causes the

14   most trouble.

15        What used to be called enterobacter sakazakii now is

16   called cronobacter sakazakii, and all of those are in this

17   family.  The other families -- if you take that down, the other

18   fa -- the others, many of them, most of them don't do anything.

19   They don't get in the human body.  They don't do anything to us.

20   If we ever meet one, it's just going to pass right on through

21   us.  A few of them are the ones that can cause mild problems in

22   old people who are hospitalized and who have bigger problems to

23   deal with.  But when it comes down to invasive infection in an

24   infant, those are -- almost universally with maybe one or two

25   rare cases, mild exceptions, those are all C. sakazakii.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 108 of 118

1  Q.   So what kind of people get cronobacter infections?

2  A.   Okay.  Well, as I've just said, if you are a infant less

3  than two months of age and unlucky enough to come -- and let me

4  take it even one step further.  Within that group that says

5  C. sakazakii, there are not that many of those even that can

6  cause invasive infections.  There is -- one of the labs doing

7  very interesting work now is trying to identify which of these

8  bacteria do cause very bad infections.  And one lab has

9  identified a genetic sequence that they've called sequence type.

10 And they've put different isolates into different groups of

11 sequence types.

12        So, for instance, if you -- it would be like dividing

13 people up into the ones that have blond hair or black hair or

14 gray hair.  And then they look back and say, all right, I've got

15 these into groups.  Is there anything unique about these groups?

16        So let's say I've grouped everybody by hair color and

17 I look at the people with gray hair and I say, oh, they're all

18 old.  Well, that's what they did with the strain type.  They

19 typed out -- and those are the little circles you see.  This

20 is -- that's the lab that made -- that identified all these

21 different groups.

22        Well, within those little groups, there is one that

23 they've numbered ST4.  ST4 and its very close relatives are

24 virtually the only one that causes severe invasive meningitis in

25 very young infants.  Most of the others don't do anything.  A

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 109 of 118

few of the others cause either mild disease or they go along for
the ride with very sick, very old people.

So they have narrowed down the type of cronobacter
sakazakii that causes these very severe infections. And what
they have found is if they look at the isolates, they find that
isolate in two big groups: Very young infants with meningitis
and severe infection and powdered infant formula.

They find these other ones in other foods. It is in
foods. There are certain cronobacter in -- they like cereal.
They like spice. But those are not the ones that infect kids.
Those are generally -- if they're in powdered formula, they
don't cause any harm. So they have narrowed it down to a very
specific family, close, close family of cronobacter.

And if you could put -- I know I didn't tell you this,
but could you put up slide 57? I had a long time sitting
outside, and I saw a couple slides that would hopefully --

MS. GHEZZI: Your Honor, can I just -- I mean, it's a
narrative. I'm fine with that. But is there a -- was there a
question?

THE COURT: That's --

MS. GHEZZI: I mean --

THE COURT: Right. I get your point. It's --
objection's sustained. You don't have to make faces and roll
your eyes. You can just make your objection.

THE WITNESS: So should I stop?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW Document 191 Filed 05/13/14 Page 110 of 118

1    THE COURT:  No.  I was talking to the defense lawyer.

2    You need to ask a question.

3    MR. RATHKE:  All right.

4    BY MR. RATHKE:

5    Q.  Why do they call it ST4?  Could you be a little bit more

6    specific as to what an ST4 -- what that stands for and what that

7    means?

8    A.  ST4, the only -- I think the only way it got to be ST4 is

9    that they happened to -- that may be the fourth one they

10    identified.  It -- in and of itself the 4 doesn't mean anything.

11    Q.  What's the sequence strain?  What does that mean?

12    A.  The sequence type?

13    Q.  Yeah, the sequence --

14    A.  That's the genetic area they were looking at.  And I think

15    we'll get into this later because it's important in terms of who

16    gets infected and how and how much it takes to get infected.

17    But organisms that cause -- or bacteria that cause

18    very bad infections are called virulent bacteria.  And

19    scientists look for what makes one virulent and another one not.

20    The people that are doing the ST4 work know that this sequence

21    is not what makes them virulent.  They just know it's for some

22    reason linked to the bacteria that causes this problem, and

23    that's in terms of everything I've said is not important, but if

24    you were doing research on this topic and you wanted to know how

25    to stop the infection, it would be important.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 191  Filed 05/12/14  Page 11 of 118

1  Q.   Okay.  We've talked about the virulent factor of ST4.  Are

2  there other virulent factor that -- factors involving

3  cronobacter sakazakii which can create more virulent results?

4  A.   Yes.  I don't think I will show you slide 57.  You know

5  what?  If I could have slide 12.  There's a factor that's

6  very -- it's very pertinent to this case because one thing that

7  will come up -- two things that will come up is something called

8  incubation period.  An incubation period is the time between

9  when the bacteria gets into the body and when the person becomes

10 symptomatic.  That's the definition of incubation period.

11         And for this particular -- for the invasive

12 cronobacters, it can be for some strains very, very, very short.

13 The other issue is how much of a virulent bacteria can cause an

14 infection.  It varies from bacteria to bacteria, from strain to

15 strain.  But for some cronobacter, it can take a ridiculously

16 small amount to have an impact.

17         And this is another lab.  So there's one group of labs

18 working on strain type.  Another lab has worked on a protein on

19 the surface of some bacteria.  And they've called it outer

20 membrane protein A or OmpA, and this is a true virulence factor.

21 And you'll see in a minute I'll explain why.

22         But what they did with this is they did an experiment

23 where they took bacteria that had OmpA on their surface and they

24 took bacteria that didn't have OmpA on their surface and they

25 reconstituted powdered formula and they put one or the other

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 112 of 118

1   into the powdered formula. And they put very tiny amounts.

2   We're talking about no more than a hundred cells to a thousand

3   cells so very, very -- something that you would easily have at

4   least that many in a clump of what can get into powdered infant

5   formula.

6           And what they found was -- and they put it into -- the

7   animal model for this infection is a newborn mouse. So they fed

8   it to newborn mice, and what they found was if they fed these

9   very tiny amounts of the bacteria that had OmpA on their

10  surface, within 6 hours it was in their brain. Within 12 hours,

11  the poor little mice were lying on their back with their feet up

12  in the air. They were not dead, but these were not healthy

13  mice. They were not looking good.

14          The mice that got the bacteria without the OmpA on the

15  surface were perfectly fine. They weren't infected at all.

16  They were just -- they were doing very, very well.

17          They then put OmpA on the surface of the bacteria that

18  didn't have it, and the mice got sick just like they did if it

19  was a bacteria that naturally had it. So that's what a true

20  virulence factor is. You know that OmpA is helping that

21  bacteria get where it doesn't belong.

22          And I think in terms of this case it also shows how

23  very little bacteria you need if it's a virulent bacteria to

24  cause a very severe infection and how quickly a very virulent

25  strain can divide in the intestines, get through the intestinal

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 113 of 118

1    wall, and cause severe infection.

2          THE COURT:  Mr. Rathke, I think now would be a good

3    time to -- you're not going to finish your examination in the

4    next 30 seconds I take it.

5          MR. RATHKE:  (Shook head.)

6          THE COURT:  Okay.  Members of the jury, that's going

7    to conclude the evidence for today.  I just wanted to remind you

8    of a couple of things.  We'll be using the 8:30-to-2:30 schedule

9    tomorrow, so we'd ask you to be here a couple of minutes early.

10   You don't have to come super early, but we can't start without

11   all eight.  So we'd like you to be here a few minutes early

12   because I think you'll find that I tend to start on time.

13          It's very important to keep an open mind till you've

14   heard all of the evidence in the case, and that's going to be

15   some time down the road.

16          I brought my jumper cables, so if anybody has a hard

17   time starting your car, you come back to the courthouse, let the

18   court security officers know down at the front station, and

19   either they will take my cables or I will stick around until I'm

20   sure all of you have left because we don't want anybody to be

21   stranded.  So thank you for paying careful attention.  And we'll

22   see you tomorrow morning at 8:30.  Thank you.

23          (The jury exited the courtroom.)

24          THE COURT:  Please be seated.  I expect the lawyers to

25   have the rules handy.  I expect you to know the rules.  You

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 191  Filed 05/13/14  Page 114 of 118

 1    shouldn't even have to open it up, but you ought to have them

 2    handy in the event you don't know the rule.

 3          Miss Ghezzi, you made a speaking objection.  Here's

 4    what you said.  Your Honor, can I just -- I mean, it's a

 5    narrative.  I'm fine with that.  Yeah, really?  You're fine with

 6    that, and that's why you're making the objection.  And then you

 7    go on to say -- let's see.  I lost it here.  I'm fine with that.

 8    But was there a question?

 9          Here's what I expect you to do:  Objection, narrative.

10    That's all you have to say.

11          MS. GHEZZI:  Okay.

12          THE COURT:  And it was a narrative.

13          MS. GHEZZI:  Okay.

14          THE COURT:  And much of her testimony has been a

15    narrative, probably because she's not a professional expert

16    witness like I assume we're going to see later in the case.

17    Well, I don't know who's going to call them, but I'd be

18    surprised if we don't see some experts who make a good chunk of

19    their living from being paid to testify in court.  You almost

20    always see those in products cases.

21          So you're going to need to explain to your witness

22    what it means to go on the narrative, and then you're going to

23    have to do a better job of asking a precise question so that she

24    can answer that question and not go off into what she thinks the

25    next three or four questions you're going to be answering are.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 115 of 118

1          Just for Dr. Jason's benefit, a witness can only

2     answer the question asked, and they can't like go on and do

3     these long explanations.  We call that a narrative.  So -- and

4     it's not necessarily -- I'm not blaming anybody, but if the

5     lawyers ask a very precise question, you can answer that

6     question, then wait for the next question.  And you should be

7     able to get everything you want to get out if they ask the right

8     questions.  But that's up to the lawyers.

9          THE WITNESS:  So if they ask something that would be

10    on a slide, am I allowed to show a slide?

11         THE COURT:  Well, you're allowed to show the slides,

12    but you're not allowed to like keep changing gears and then talk

13    about this study and that study when he hasn't asked you about

14    this study or that study.

15         THE WITNESS:  Oh, okay.

16         THE COURT:  Yeah.  So in other words, from your

17    perspective, you need to listen carefully to the question and

18    answer only the question that gets asked of you.

19         THE WITNESS:  Does he have to ask about a specific

20    study?

21         THE COURT:  Well, not necessarily.  If he asks what's

22    your opinion about this and you rely on several studies, you can

23    talk about them.  But you have to try and be responsive to the

24    question that he asks.

25         THE WITNESS:  Okay.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/13/14   Page 116 of 118

1          THE COURT:  And it just takes some practice so . . .

2          Anything else we need to take up before we see

3    everybody at 8:30?

4          MR. RATHKE:  No, Your Honor.

5          THE COURT:  Anything from the defense?

6          MR. REIDY:  No, Your Honor.

7          THE COURT:  Okay.  We'll see you tomorrow morning.

8    I'll meet with the lawyers.  I'm here very early.  If things

9    arise and there's a problem, then I expect you to send me an

10   e-mail, give me a heads-up, and be here early so we can take it

11   up because at 8:30, I don't care if the earth is falling with

12   regard to some problem you all perceive we're having, I'm

13   bringing the jury in.  If you haven't figured that out yet,

14   that's the trick to getting along with me.  I don't keep the

15   jury waiting, period.  And if you have some new instant

16   emergency that you could have had at four o'clock in the morning

17   and e-mailed me or come into the courthouse, that's your

18   problem.  It's not my problem.  I'm not keeping the jury

19   waiting, period.  So we'll see you tomorrow.

20          (The foregoing trial was adjourned at 4:47 p.m.)
                        CERTIFICATE
21          I certify that the foregoing is a correct copy of the
     transcript originally filed with the Clerk of Court on 3-20-14
22   incorporating redactions of personal identifiers and any other
     redactions ordered by the Court in accordance with
23   Administrative Order 08-AO-0009-P.

24

         S/Shelly Semmler                    4-29-14
25       Shelly Semmler, RMR, CRR              Date

**Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov**
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 191   Filed 05/12/14   Page 117 of 118

## **INDEX**

**WITNESS:**                                                    **PAGE:**

  JANINE JASON
                MR. RATHKE                                          82

                            * * * * *