IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

SECURITY NATIONAL BANK, as            No. C11-4017-MWB
Conservator for JMK, a minor child,

      Plaintiff,                    Sioux City, Iowa
                                      January 8, 2014
    vs.                               7:57 a.m.

ABBOTT LABORATORIES,                  Volume 3 of 10

      Defendant.
_____/


**REDACTED** TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW Document 106 Filed 05/12/14 Page 1 of 203

```
APPEARANCES:

For the Plaintiff:        AMANDA BRANDY VAN WYHE, ESQ.
                          TIMOTHY S. BOTTARO, ESQ.
                          Vriezelaar, Tigges, Edgington,
                             Bottaro, Boden & Ross
                          613 Pierce Street
                          Sioux City, IA 51102

                          STEPHEN C. RATHKE, ESQ.
                          ROBERT J. KING, ESQ.
                          Lommen, Abdo, Cole, King & Stageberg
                          2000 IDS Center
                          80 South Eighth Street
                          Minneapolis, MN 55402

For the Defendant:        JOHN C. GRAY, ESQ.
                          Heidman Law Firm
                          1128 Historic 4th Street
                          Sioux City, IA 51102

                          DANIEL E. REIDY, ESQ.
                          JUNE K. GHEZZI, ESQ.
                          GABRIEL H. SCANNAPIECO, ESQ.
                          KATHRYN L. DORE, ESQ.
                          Jones Day
                          Suite 3500
                          77 West Wacker Drive
                          Chicago, IL 60601

Also present:            Louise Deitloff
                         Daniel Morrison

Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 106 Filed 05/12/14 Page 2 of 203

          1          (Proceedings reconvened outside the presence of the

          2   jury.)

          3          THE COURT:  Please be seated.  Good morning.  Anything

          4   on the parties' agenda that you need to take up before we bring

          5   the jury in?

          6          MR. RATHKE:  No, Your Honor.

          7          THE COURT:  Anybody from the defense?

          8          MR. REIDY:  No, Your Honor.

          9          THE COURT:  Okay.  Well, you should all have a order

         10   to show cause that I entered this morning, and I wanted to talk

         11   to the parties about it but particularly Ms. Ghezzi.  Here's my

         12   view.  I don't want you to have to be concerned about this,

         13   although hopefully you're concerned about it, but I don't want

         14   to take time away from your trial preparation to deal with this

         15   because I don't think that would be fair.  So we need to set up

         16   a procedure to deal with it because I am going to deal with it.

         17   And so here's what I've outlined, and I want to get the reaction

         18   to it.

         19          Seems to me you have two choices:  You can either

         20   agree that a substantial portion of the objections that you made

         21   in the depositions lacked both a legal and factual basis, or you

         22   cannot agree with that.  And if you agree with it, then I would

         23   make a finding that a substantial portion of the objections

         24   lacked a legal and factual basis, and then we would have a

         25   hearing to talk about what the potential sanctions are and what

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 106  Filed 05/13/14  Page 3 of 203

1    the appropriate sanction could be.

2            If you take the position that all of the objections or

3    a substantial portion of the objections had a good-faith legal

4    or factual basis, then I'm going to require you, Miss Ghezzi, to

5    indicate for each objection you've made what the factual basis

6    is.

7            And so, for example, when you make the frequent

8    virtually -- virtually on every page, I mean, hundreds and

9    hundreds of object to the form, you're going to have to indicate

10   what you meant by that.  And let me ask you right now, what do

11   you -- what do you -- what do you consider that objection to

12   include when you object to the form?

13           MS. GHEZZI:  Object to the form is anything in the

14   question that is compound or vague or ambiguous that can be

15   remedied at the time of the deposition so that you don't waive

16   the objection at trial if the deposition is used at trial.

17           THE COURT:  Anything else it includes in your view?

18           MS. GHEZZI:  Well, I mean, Your Honor, I'd have to

19   look at the -- I'd have to look at the --

20           THE COURT:  Well, you make the objection so

21   frequently, so you must know what it includes.

22           MS. GHEZZI:  Well, you know, I mean, Your Honor, I've

23   been practicing for 31 years.

24           THE COURT:  I don't care about that.

25           MS. GHEZZI:  When I was -- well, when I was trained --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 106  Filed 05/12/14  Page 4 of 203

1    I started my career at Sidley and Austin when I was trained as

2    an associate.

3          THE COURT:  Yeah, I don't care about any of that.  You

4    just tell me what you think it means.

5          MS. GHEZZI:  Okay.

6          THE COURT:  Object to the form, I want to know

7    everything you think that means.

8          MS. GHEZZI:  Your Honor, I haven't given it a lot of

9    thought right now.  It's --

10          THE COURT:  Well, I'm asking you to tell me what you

11    think it means.  You certainly --

12          MS. GHEZZI:  It's a pr --

13          THE COURT:  -- are very free to use it in depositions.

14    I mean, that's your mantra.

15          MS. GHEZZI:  I know it when I hear it.  If there's a

16    question and there's an improper -- it's an improper question

17    because it c -- because it's compound or because it is vague or

18    ambiguous or lack --

19          THE COURT:  Actually --

20          MS. GHEZZI:  -- or lack of foundation.

21          THE COURT:  -- there's case law saying that if it's

22    vague or ambiguous that's not a proper objection to the form.

23    But anyway, keep going.

24          MS. GHEZZI:  Well, I'm sorry, Your Honor, but that was

25    my training, that if it's --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 106   Filed 05/12/14   Page 5 of 203

```
 1              THE COURT:  I don't care if it was your training or

 2    not.  I want to know what you understand it to be.

 3              MS. GHEZZI:  That's my understanding.

 4              THE COURT:  Anything else that is included in the

 5    objection to form?

 6              MS. GHEZZI:  Anything -- anything that can be

 7    remedied -- anything that can be remedied at the time of the

 8    deposition so that you do not waive the objection if the

 9    deposition is used at a hearing or trial.

10              THE COURT:  That's your definition.

11              MS. GHEZZI:  That has to do with the form of the

12    question, yes, Your Honor, that's my definition.

13              THE COURT:  And what's your legal basis for objecting

14    to the form of the question?

15              MS. GHEZZI:  The -- I believe the federal rules allow

16    depo -- allows objections to the form of the question.

17              THE COURT:  Where in the federal rules do they allow

18    that?

19              MS. GHEZZI:  Your Honor, I haven't -- I don't know.  I

20    don't have the book.  I haven't prepared for this right now.

21    I've been preparing most of the night and the early morning

22    hours for the trial.

23              THE COURT:  Okay.  Now, if you decide to contest my

24    preliminary opinion that a substantial majority of your

25    objections lacked a good-faith basis in law and fact, then you
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 106  Filed 05/12/14  Page 6 of 203

1  are going to have to give me the good-faith basis.  And you have

2  to do that personally because you're the one that made the

3  objection.  So you can't have associates researching it, have

4  other lawyers in your firm or legal assistants or anyone else

5  read it and suggest what the basis might be for your objection.

6  You have to do it personally.  Doesn't that make sense, because

7  you're the one that made the objection?  You have to personally

8  indicate what the basis for that objection is because you're the

9  one that made it.  Well, that's what I'm ordering you to do.

10  And there will be very severe consequences if you seek any help

11  in doing that because I need to know what your good-faith basis

12  was at the time you made it, and you are the only one that would

13  know that.

14          So you are not allowed to -- in terms of responding to

15  the order to show cause, if you elect to go through every single

16  objection you made and provide what you believe is your

17  good-faith factual basis for it, you need to do that yourself

18  without any outside assistance from any lawyer, legal assistant,

19  human being, legal research service.  It just has to be what you

20  were thinking at the time, what your basis was at the time, and

21  only you are allowed to do that.

22          Now, once you do that, the easiest way to do it might

23  be to go through every deposition and write down leading or

24  compound or whatever it is that you think was objectionable.

25  You can obviously have somebody else transcribe that.  I'm not

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 7 of 203

```
 1   concerned about the transcription of it, but I'm concerned about
 2   that it comes solely from you because you're the one that made
 3   the objection.  Do you have any questions about that?
 4          MS. GHEZZI:  I don't have any questions about it.
 5          THE COURT:  Okay.  Is there anything about it you
 6   don't understand?
 7          MS. GHEZZI:  There isn't anything about it I don't
 8   understand.
 9          THE COURT:  Okay.  Is there a better way to approach
10   this that you're aware of?  Or would you like some time to think
11   about a better way?
12          MS. GHEZZI:  Yeah, Your Honor, I mean, yeah, I think
13   there is, but I'd like to -- I definitely would like some time
14   to think about it.
15          THE COURT:  Okay.  But just give me what you're
16   thinking might be a better way to do it.
17          MS. GHEZZI:  Well, I don't know that going through
18   seven or eight depositions and showing you what my -- you know,
19   why I do it for whatever question, if it's leading, I think if
20   maybe a representative deposition I could do it.  I mean, I can
21   do whatever you order obviously.  You're the judge, but I'm
22   thinking that so you can see what the thought process is and the
23   quality of the questions that we're dealing with and what my
24   thought process is, what the basis of the objection is.  Happy
25   to do it.  I mean, I just don't know that doing it for --
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 106   Filed 05/12/14   Page 8 of 203

1    THE COURT:  Every -- yeah.  That has some appeal to
2  me.  Okay.  At least we could start with that, and that may be
3  sufficient, and that may actually resolve the matter.  But that
4  makes some sense.
5    MS. GHEZZI:  Okay.
6    THE COURT:  As long as I get to pick which deposition.
7    MS. GHEZZI:  Sure.
8    THE COURT:  Okay?
9    MS. GHEZZI:  You're the judge.
10    THE COURT:  Yeah.  No, no, no, that seems very
11  reasonable and less onerous.  So here's what I'd like to do.
12  I'd like -- well, why don't you let me know by the end of the
13  trial -- I'm pretty confident you're not going to concede that
14  you made improper objections.  But in the unlikelihood that you
15  review it and decide that, let me know by the end of the trial,
16  and then if you don't do that, we'll come up with a time frame
17  for you to go through one or maybe two depositions and do what
18  I've indicated, and we'll set that -- we'll set a time frame,
19  but I'm obviously going to defer to you as to how much time you
20  need to do that.
21    MS. GHEZZI:  Yeah, and, Your Honor, I do have another
22  trial starting on March 10 in another state, and, you know . . .
23    THE COURT:  Sure.
24    MS. GHEZZI:  Haven't been able to prepare for that
25  because of preparing for this so . . .

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 106   Filed 05/12/14   Page 9 of 203

1          THE COURT:  Yeah.

2          MS. GHEZZI:  Happy to do it.  And if -- you know,

3    obviously if I look at something and it's -- I don't agree

4    that -- you know, I was wrong to do it, I'll write withdrawn or

5    whatever, but, I mean, for the most part I tend to do how I was

6    trained which was --

7          THE COURT:  Yeah.  Well, that's the sad part, that you

8    were trained to make so many objections like that.  And I notice

9    when I read Scannapieco's defending of a deposition, he learned

10   well from you.  And you know what?  The only reason my order to

11   show cause doesn't include him is because he's a young associate

12   and I assume he was trained to do it that way.  I don't think

13   it's a proper way to take a deposition.  So why don't you let me

14   know at the end of the trial what you want to do, and then we'll

15   come up with a time frame for you to do one, probably two

16   depositions; okay?

17         MS. GHEZZI:  Sure.

18         THE COURT:  Okay.

19         MS. GHEZZI:  Thank you, Your Honor.

20         THE COURT:  Anything the plaintiff wants to add to

21   that?

22         MR. RATHKE:  No, Your Honor.

23         THE COURT:  Okay.  Anything we need to take up now

24   before 8:30?

25         MR. RATHKE:  No, Your Honor.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW Document 196 Filed 05/12/14 Page 10 of 203

```
 1              MR. REIDY:  No, Your Honor.

 2              THE COURT:  How much longer of cross do you think you

 3    have for Dr. Jason?  And I'm not trying to rush you.

 4              MS. GHEZZI:  No.  I know, Your Honor.

 5              THE COURT:  Just curious.

 6              MS. GHEZZI:  No.  I know.  You know, I -- I'm

 7    hoping -- I'm hoping under an hour.  I'm hoping I can do it

 8    between 30 minutes and 45.

 9              THE COURT:  Oh, okay.

10              MS. GHEZZI:  Okay?

11              THE COURT:  Sure.

12              MS. GHEZZI:  I'm hoping.  Fingers crossed.

13              THE COURT:  Sure.  No, no, no.  That's a qualified --

14    you bet.  And given how she responds, it's pretty hard to

15    estimate the time, so I appreciate that.

16              MR. BOTTARO:  I'm just conferring with counsel.

17              THE COURT:  Okay.  Anything you need me for?

18              MS. VAN WYHE:  Your Honor?

19              THE COURT:  Yes.

20              MS. VAN WYHE:  These are the copies and an electronic

21    copy of the depositions that you don't have.

22              THE COURT:  Okay.  Thank you.

23              MS. VAN WYHE:  I noted the ones I think you already

24    have, but I have copies of the ones you --

25              THE COURT:  No, I already have those.  Okay.  Great.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 11 of 203

1    Thank you.  Okay.  We'll see you back here at 8:30.

2              (Recess at 8:10 a.m.)

3              THE COURT:  Ready to have the jury brought in?

4              MR. RATHKE:  Yes, Your Honor.

5              (The jury entered the courtroom.)

6              THE COURT:  Good morning.  Please be seated.  Thank

7    you.

8              And, jurors, you will recall that Ms. Ghezzi was

9    cross-examining Dr. Jason, and that's where we're going to start

10   up.

11             So any time you're ready, Miss Ghezzi.

12             MS. GHEZZI:  Thank you, Judge.  If you give me just a

13   minute to get my papers in order here.

14             THE COURT:  Sure.

15         JANINE JASON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

16                     CONTINUED CROSS-EXAMINATION

17   BY MS. GHEZZI:

18   Q.   Good morning, Dr. Jason.

19   A.   Morning.

20   Q.   You haven't spoken to any of your counsel on any

21   substantive matter since you were on the stand yesterday, have

22   you?

23   A.   No.

24   Q.   Okay.  I'd like to ask you some questions about infectious

25   dose that you talked about and incubation period.  On direct --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 12 of 203

1   and these are from my notes, so they might not be completely

2   verbatim, but I think you said that the time between when the

3   bacteria enters the body and when the person first shows signs

4   of dis -- or symptoms of disease is your definition of

5   incubation period; is that correct?

6   A.   Yes.

7   Q.   Okay.  And you said that you were relying in part on the

8   Mittal study.  That's the scientist's name, Mittal study?

9   A.   Correct.

10  Q.   Okay.  And that when six hours -- after six hours of being

11  inoculated -- not inoculated but gavaged, fed with the bacteria,

12  E. sak bacteria, that the mice pups showed no activity; correct?

13  A.   No, that is not correct.

14  Q.   Okay.  I wrote that down that you said that, but that's

15  okay.  Okay.  So after six hours you said that there was

16  bacteria in the blood.

17  A.   There was bacteria found in the organs including the brain

18  and the liver.

19  Q.   Okay.  And that would be in the blood, right, in the

20  tissues?

21  A.   In the -- well, there's a difference between the blood and

22  the tissues.  They actually found it in the tissue of those

23  organs.

24  Q.   Okay.  Okay.  And then you said within 12 hours they were

25  laying with their feet up in the air; correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 13 of 203

1    A.   They had their -- only the ones with the OmpA on the

2    surface.

3    Q.   They were laying with their feet up in the air.

4    A.   They had their feet in the air, yes.

5    Q.   And you suggested --

6    A.   Oh, I'm sorry.  That was at 12 hours.

7    Q.   That's what I said, 12 hours.

8    A.   Yes.

9    Q.   We're on the same page.  And you suggested that Abbott's

10   expert, Dr. Shulman, who you know to be the head of pediatric

11   infectious disease at the Lurie Children's Memorial Hospital in

12   Chicago, did not know how to read the study; right?

13   A.   I said that that portion appeared to have been

14   misinterpreted, yes.

15   Q.   Okay.  I'd like to have you look at that with me.

16           MS. GHEZZI:  And, Your Honor, this is an article.

17   It's not evidence, so I'm going to -- so you can see it.

18           THE COURT:  Okay.  Thank you.

19           MS. GHEZZI:  I'm going to put it on and then make sure

20   that's blacked out.  I don't know if you can see that, Your

21   Honor, or not.  We're talking about this.

22           THE COURT:  Yes.  Thank you.

23           MS. GHEZZI:  You're welcome, Your Honor.

24   BY MS. GHEZZI:

25   Q.   Okay.  Now, Dr. Jason, let's look at the 12-hour column.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 14 of 203

1  Do you see that?

2  A.    I do.

3  Q.    Okay.  And what this table does, it's an activity score for

4  the animals, for the mice pups, after they have been given the

5  bacteria; correct?

6  A.    Correct.

7  Q.    All right.  And it shows that for the first line there,

8  what you were talking about, OmpA, E. sakazakii -- I'm sorry.

9  There's a plus sign after that, OmpA+, ES, that after six hours

10  their activity level was normal.  Do you see that?

11  A.    Yes.

12  Q.    Okay.  And that would mean that even in these two-day-old

13  mice pups that there was no disease process; correct?

14  A.    That is not correct.

15  Q.    Okay.

16  A.    It takes a while for there to be an impact on activity

17  after the bacteria has spread to, for instance, the brain.

18  Q.    Let me rephrase that.  There was no symptom of disease.

19  A.    There was no gross symptom of disease.  Realize this is not

20  like an infant where you have things like irritability.  On

21  their score they did not pick up this particular symptom at six

22  hours.

23  Q.    Okay.  So the way these scientists were doing it who were

24  actually doing it in the study, they recorded it as normal

25  activity.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 15 of 203

1  A.    Correct, in regard to what they're measuring.

2  Q.    Exactly.  And what they're measuring, because they do this

3  all the time with mice pups, is activity level, and that's how

4  you determine what the disease process is if it's there or not

5  there; isn't that correct?

6  A.    It is what they do all the time, and it's because of the

7  limitations of what you can look at in a mice pup.  So yes, this

8  is the standard approach.

9  Q.    And by the way, you've never done any experiment on mice

10  pups, have you?

11  A.    I've done immune experiments on mice pups but not this sort

12  of experiment.

13  Q.    You've never done any bacterial experiments on mice pups.

14  A.    No.

15  Q.    Okay.  And then -- and let's just go -- and then at the

16  12-hour period, the score goes down to 4, plus or minus 0.  See

17  that?

18  A.    Correct.

19  Q.    Okay.  And on the slide -- I'm sorry.  In the article -- I

20  wish I could read this better, but it says 4, turns upright;

21  right?

22  A.    No, it says turns upright less than 5 seconds.

23  Q.    Turns upright in less than 5 seconds.

24  A.    So in other words, they're over, and it takes them a while

25  to get back up.

1  Q.   Yeah.  But what it shows is that they're on their backs;

2  right?  The way they start this slide -- I mean -- I'm sorry --

3  the way they start this study is they put their animal -- they

4  put the animals on their back, and then they see how long it

5  takes them to right themselves, to get up on their feet.

6  A.   Correct.

7  Q.   Okay.  So at 12 hours right there -- woops.

8  A.   It's the next one up.

9  Q.   Yeah.  I didn't mean to do that actually.  At 12 hours -- I

10 don't know why that keeps going on.  Their activity level says

11 they turn upright in less than 5 seconds; correct?

12 A.   Well, I think our emphasis is different.  It takes them

13 some time to get upright.

14 Q.   Okay.

15 A.   So in other words, they don't pop back up the way a normal

16 pup would do.

17 Q.   Okay.  But the fact of the matter is is that at 12 hours

18 they were not lying with their feet up in the air, were they?

19 A.   They are with their feet up in the air, and it takes them a

20 while to get up.  These are not behaving normally by 12 hours.

21 Q.   But, Dr. Jason, they're put with their feet up in the air.

22 They start with their feet up in the air and then --

23 A.   Well --

24 Q.   Excuse me.  Let me finish, please.  They start with their

25 feet up in the air.  They're turned on their backs, and their

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 17 of 203

1    feet are up in the air, and then the scientists are trying to

2    discover what the activity level is in these 2-day-old mice pups

3    after 12 hours, and they right themselves in less than 5

4    seconds.

5    A.    Which is not normal.  And if you look at 12 hours, you see

6    that there's a progression.  This is not normal behavior, and

7    the symptoms begin by 12 hours.  Again --

8    Q.    Okay.

9    A.    -- they can't measure very subtle things like irritability

10   and feeding issues.  They have a gross measure of something

11   being wrong, and in this case it's that a normal newborn pup who

12   normally would pop right up stays for up to five seconds lying

13   on their back before they can get up.

14   Q.    Well, it doesn't stay for up to -- well, it says less than

15   five seconds.  It could be one second.  It could be two seconds.

16   It could be a half a second.  What they're measuring here is a

17   five second.  It's less than five seconds.

18   A.    And it is not normal to take --

19   Q.    It could be less than a second.

20   A.    The reason they have this measure is that's not normal

21   activity.

22   Q.    Dr. Jason, I wish you would, you know, try and answer my

23   question.  When it says less than five seconds, it can be less

24   than a second; correct?

25   A.    I don't know if it's that accurate, but it is not

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 18 of 203

1    immediate.

2    Q.   Well --

3    A.   I don't know that they can measure it down to a second.

4    They know on their time that it takes -- I think we're not

5    disagreeing --

6              THE COURT:  Dr. Jason, that actually wasn't the

7    question counsel asked you, so try and listen to the question

8    she asks, and try and answer it.  Thank you.

9    Q.   Okay.  Let's look at the next column, 24 hours.  At the

10   24-hour period is when the mouse or the mice pups had no

11   activity, right, coma/death, after 24 hours?

12   A.   By twenty --

13   Q.   Okay.  Is that what it says?

14   A.   Okay.  At 24 hours the average -- the average activity of

15   the mice was that they were comatose or dead by 24 hours.

16   Q.   Right, by 24 hours.  Now, how much does a two-day-old mice

17   pup weigh?

18   A.   I don't know exactly.

19   Q.   Have you ever weighed a two-day-old mice pup?

20   A.   No, I haven't.

21   Q.   Do you know how heavy five grams is?

22   A.   Yes.

23   Q.   Okay.  Is it about the weight of an empty envelope, a

24   little regular letter envelope, about five grams?

25   A.   I don't have a direct comparison.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 19 of 203

1    Q.    Okay.  The baby in this case, Jeanine Kunkel, weighed over

2    2,200 grams; right?

3    A.    Correct.

4    Q.    And there's a correlation between inoculation and the size

5    of humans; correct?

6    A.    Could you clarify that question?

7    Q.    There is a correlation between the bacteria load and the

8    size of a human, any human, a baby, an adult.

9    A.    Are we talking about cronobacter?  Are we talking about --

10   what are we -- what organism are we talking about?

11   Q.    Whatever you know about.  I assume --

12   A.    It varies from organism to organism.

13   Q.    But you've heard of that, right, that it depends on the

14   size of the --

15   A.    That is a potential parameter.  In the case of C. sak, we

16   know that very low doses in an infant can cause infection.

17   Q.    Yeah, let's talk about that.  You said -- you said in your

18   direct testimony that the Mittal study used very small amounts

19   of this OmpA+; right?

20   A.    Correct.

21   Q.    And you said it was between 100 and 1,000 cells; correct?

22   A.    He found that as low as a hundred cells could have

23   infectivity, yes.

24   Q.    Okay.  Now, I want you to look at the page right above that

25   chart if you would.  And what it says there is infection with $10^4$

1  CFU of OmpA+ ES induced a steady increase in the disease

2  severity of the animals which ended in a moribund state at 48

3  hours post-infection.  Do you see that?

4  A.   No, but I recall that sentence.

5  Q.   Okay.  And $10^4$ is how much?

6  A.   $10^4$ is 10,000.

7  Q.   Right.  That's not a hundred, is it?

8  A.   No, but I've actually contacted this author, and also he

9  has --

10  Q.   Okay.  Dr. Jason --

11  A.   -- I believe elsewhere in this publication said he did get

12  infectivity as low as t -- as --

13  Q.   Okay.  This is the activity level that says -- I mean --

14  I'm sorry.  This is the article that you're relying on, and $10^4$

15  is 10,000 cells; right?

16  A.   This is not the only article I'm relying on, and as I say,

17  it is not the article alone, but it's also the communications

18  with this author, his other research that he will cite.  And I

19  think if I read this all the way through in this very article he

20  may point out that as low -- with that low of dose he gets

21  something, but I'd have to read through the specific article

22  then.

23  Q.   Okay.  Well, I don't think it's in there, but, I mean, you

24  know . . .

25          THE COURT:  Now that's testifying.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 21 of 203

1    MS. GHEZZI:  Okay.  I'll withdraw that statement, Your

2  Honor.

3    THE COURT:  Okay.  Thank you.

4  Q.   And then I want you to go down to the next piece right

5  there.  Infection with ten -- I'm sorry.  It's right here,

6  Dr. Jason.  I'm going to write that on -- I'm going to underline

7  that.  Do you see it?  Now you probably -- it's probably worse.

8  I'll take it off.  Do you see where I am?

9  A.   I do, yes.

10  Q.   Okay.  I'm going to take it off so you can actually read

11  it.  Okay.  And there it says that ES -- this OmpA+ ES induced a

12  steady increase in the disease severity injected -- I'm sorry.

13  That's bad -- disease severity in the animals which ended in a

14  moribund state at 48 hours and then infection with $10^5$ CFU of

15  this bacteria induced the disease severity within 16 hours which

16  they didn't put in the chart below, but it says within 16 hours;

17  right?

18  A.   Correct.

19  Q.   And $10^5$ is 100,000 CFUs; right?

20  A.   Correct.

21  Q.   And CFU for the benefit of the jury is what?

22  A.   It's colony forming units.

23  Q.   And a colony forming unit is a cell.

24  A.   Correct.

25  Q.   Okay.  So what this study shows is not that it took 100 or

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 22 of 203

1  a thousand OmpA+ E. sakazakii bacteria to create this activity

2  level in these 2-day-old, 5-gram mice pups but that it took

3  10,000 and then 100,000 cells; right?

4  A.   You're focusing on a phrase.  An infant could have gotten

5  that dose in a clump, and the point is that they did become

6  symptomatic that quickly.

7        MS. GHEZZI:  Judge, I move to strike it.

8  Nonresponsive.

9        THE COURT:  Sustained.  Jury's advised to disregard

10  the last answer of Dr. Jason.

11  Q.   Now, let's go to the second source I think you mentioned

12  yesterday that you were relying on.  It was a case report, the

13  CDC case report; correct?

14  A.   I don't know.  What is that?  I don't know what we're

15  talking about.

16  Q.   When we were talking about the incubation period and you

17  said you relied on some studies and I said is that all and you

18  said no, I relied on a case report from the CDC.  Remember that?

19  A.   What I -- I don't recall that.  I did rely on data from two

20  infants that became infected in Mexico with a U.S. product.

21  Q.   Okay.

22  A.   And I think I did mention that there were several other

23  cases that occurred less than 24 hours after receiving the first

24  powdered formula.

25  Q.   Okay.  You testified that there could be an incubation

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 23 of 203

1   period in an infant of 7 hours; right?

2   A.   I said that there was one invasive case where the PIF had

3   been taken at approximately seven hours before.  But that -- I

4   hope I did not suggest that was my sole source of that --

5   Q.   Okay.  I thought you said that there was this one case

6   report, but let's talk about that one case report because I

7   believe that you -- that's what you mentioned I think in your

8   report and at the time of your deposition.  So let's talk about

9   that one.  That involved an eight-month-old baby; right?

10  A.   Are we talking about the Mexican cases?

11  Q.   We're talking -- no, a California case, eight-month-old

12  baby who had powdered --

13  A.   I would say -- yeah, I would not --

14  Q.   Excuse me.  Can I finish my qu --

15  A.   Sure.

16  Q.   Thank you.  It involved an eight-month-old baby who was fed

17  powdered infant formula seven hours before he showed signs of

18  some infection.  Do you remember that?

19  A.   I know the case you're referring to, but that is not the

20  case I relied on in my opinion.

21  Q.   Okay.  Well, you -- it was in your report; right?

22  A.   It is one of the cases.  I mean, when you --

23  Q.   Okay.  Let's talk about it.

24         MR. RATHKE:  Your Honor, I'm going to object.

25         THE COURT:  You need to put on your microphone.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 24 of 203

```
1          MR. RATHKE:  My objection is that Miss Ghezzi is
2   continually interrupting and in that last question and answer
3   did interrupt the witness when she was trying to answer the
4   question.
5          THE COURT:  Well, they both interrupt each other.
6   We've already tried to address it, and I'll just ask both sides
7   again.  Dr. Jason, you let Miss Ghezzi finish her question, and
8   then you try and answer the question she asks.  And likewise
9   Miss Ghezzi will try not to interrupt you.  But if you interrupt
10  her, then she's got a right to interrupt you.  So that's what --
11  that's where kind of the problem lies.
12  BY MS. GHEZZI:
13  Q.   So, Dr. Jason, you -- you have stated that the incubation
14  period for E. sak in an infant can be seven hours, and you've
15  also testified -- I'm sorry.  You've also -- well, you also hold
16  the opinion that it could be eight months; right?
17  A.   We would need to define what type of infection, but yes,
18  there have been cases that -- well, I'm not sure what the basis
19  of your saying that is.  When we talk about cases that occur
20  eight months, I would have to go back and see if that's eight
21  months after their first feeding of PIF.
22  Q.   Yeah.  And it is.
23  A.   Okay.  In that --
24  Q.   So let's talk about that.
25  A.   In that case, yes, that -- well, let's t -- yeah, I'm not
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 25 of 203

1  sure --

2  Q.   Let me ask a question.

3  A.   -- what exactly you're asking.

4  Q.   Okay.  So this is the eight-month-old baby from California,

5  and this baby had been fed powdered infant formula from birth.

6  And then he was fed it throughout his eight months.  And in the

7  normal course, five, six, seven, eight months, he was also given

8  other foods.  Remember this one?

9  A.   I do.  Actually this is not one I included in my paper

10  because there was other feeding and he had other underlying

11  disorders.  So I don't remember him all that well.

12  Q.   Well, this is something that you talked about in your

13  report, though.  You listed him in your report.  This is what

14  you talked about in an incubation period; right?

15  A.   I did not include him in my analyses, but in the appendices

16  where I described cases, I would have to look, but I could well

17  have included him.

18  Q.   So this is a baby who was fed powdered infant formula from

19  his -- from birth for eight months, and it was your conclusion

20  that the incubation period could be seven hours or it could be

21  eight months because he had powdered infant formula when he was

22  first born, his first -- the first powdered infant formula

23  feeding at birth, and then the last infant formula feeding

24  before symptoms occurred was seven hours so the incubation --

25  the possible incubation period could be as long as eight months;

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 26 of 203

1  right?

2  A.   I would hope I did not give that impression.  If I had that

3  in my report, it was probably in the context of explaining how

4  difficult it is to define incubation period in these cases where

5  infants get repeated feedings of powdered infant formula because

6  you don't know which of those feedings was contaminated.

7  Q.   Yeah.

8  A.   So hopefully that's the context that it was in.  Otherwise

9  I apologize if I was misleading.

10  Q.   Okay.  Well, in that -- in this particular case, the child

11  who was still an infant had been fed -- when he could eat food,

12  he'd been fed vegetables, soups, bananas, pasta, corn, and

13  tortillas; right?

14  A.   As I say, this is not a case I included in my opinion.

15  Q.   No, exactly.  You -- no, you included it in your report in

16  the case, in your opinion, not --

17  A.   I included it in terms of -- I'm sorry.  What can I say?

18  Q.   Okay.  But you didn't consider -- when you were looking at

19  it for your report, not your manuscript, for your report in this

20  case, you didn't consider any of these foods as possible sources

21  of the child's E. sak infection when you were using it to

22  support your opinion in this case about the seven hours -- the

23  seven hours incubation time, did you?

24  A.   I did not specifically say the incubation time was seven

25  hours for this organism.  I was pointing out that the range of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 27 of 203

1  incubation time for some virulent C. sak can be very short, in a

2  matter of hours, not days.

3  Q.   Okay.

4  A.   This particular case I described -- likely I described in

5  my appendix because I tried to describe every case that somebody

6  doing research might be interested in.

7  Q.   Dr. Jason, you continue to talk about your paper.  I'm

8  talking --

9  A.   Because you brought it up.

10 Q.   I know.  But I'm asking you about your report.  We already

11 said it wasn't -- you know, it --

12       MS. GHEZZI:  Strike that, Your Honor, please, or

13 Miss Court Reporter.

14 Q.   In your report on paragraph 187 you say a CDC note

15 unrelated to Jeanine Kunkel suggests cronobacter's incubation

16 period sometimes may be as short as a matter of hours, and this

17 is the case you cite; correct?

18 A.   Yes, I do.

19 Q.   Okay.  Now, you don't put the entire CDC note in your

20 report, but we looked at it, and the entire CDC report in

21 there --

22       MR. RATHKE:  Your Honor, I'm going to object to

23 counsel testifying.

24       THE COURT:  Well, this was prefacing for a question.

25 Q.   So the -- in that report -- and I'm sure you read the whole

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 28 of 203

1  thing -- that the CDC went out or had a local agency go out and

2  surveyed the home, and there were -- this child was living in a

3  bedroom that had multiple -- multiple adults like six adults and

4  other children in the same room; right?

5  A.   Correct.  I just want to emphasize that this case is not

6  the basis of my opinion on incubation period.

7  Q.   Well, it's in your report as substantiating your incubation

8  period testimony.

9  A.   In the context of that case, CDC also considered that as

10  potentially a sign that the incubation period could be that.

11  They as well pointed out that the infant had other food, and the

12  context is how difficult it is to determine incubation period in

13  this kind of setting.

14  Q.   Right, in the --

15  A.   Which is why when they have other foods you really don't

16  know what's going on.

17  Q.   Well, let's see what else was going on.  In this case the

18  mother was cleaning the water jugs.  She made the bottles from a

19  water jug.  And she refilled with fresh water from the water

20  station, and she cleaned the jugs by adding soap and water and

21  pinto beans to the jug and agitating it, and that's how she

22  cleaned the jug.  Did you remember that?

23  A.   I agree that that is not a clean case which is why I did

24  not include it in terms of my opinion.

25  Q.   Well, it's not a clean case.  It's not a clean case because

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 29 of 203

1    it shows that there are all sorts of other environmental issues

2    in that family and in that home environment that could have

3    infected this baby's food or this baby, correct, or --

4    A.    No, that is not correct.  The infant had had other foods

5    that were not sterile that certainly could have contributed.  We

6    don't know what kind of cronobacter that infant had.  We don't

7    know if it was a virulent form.  But we do know that that infant

8    indeed was exposed to other food sources that could potentially

9    have had cronobacter.

10   Q.    Right.

11   A.    Not necessarily around the house but other food unlike the

12   younger infants who have nothing but formulas.

13   Q.    But there is -- but, but, there -- there are bacteria in

14   those other foods, right, that aren't sterile including what she

15   ate?

16   A.    Correct.

17   Q.    Vegetables --

18   A.    Correct.

19   Q.    -- soups, bananas --

20   A.    Which is why --

21   Q.    Excuse me, excuse me.  Bananas, pasta, corn, and tortillas;

22   correct?

23   A.    Correct.

24   Q.    And if those are in your house and there can be bacteria in

25   there and they are bacteria -- and there are bacteria in there,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 30 of 203

1   there can be cross-contamination; right?

2   A.   I disagree.  The likelihood of cross-contamination and

3   those materials infecting an infant is extremely low.

4   Q.   And that's your opinion.

5   A.   If we are talking about more likely than not, I would say

6   that is less likely by far than it being from what the infant

7   was actually fed.

8   Q.   And that's your opinion.

9   A.   That is my opinion.

10  Q.   Okay.  But you didn't consider any of these foods as a

11  possible source of the child's E. sak when you were using this

12  case to support your opinion in your report; right?  You didn't

13  take it out of the report.  It wasn't good enough to put in your

14  article, but you put it in the report in this case to support

15  your opinion in this case.

16          MR. RATHKE:  Your Honor, I object as multiple

17  questions.

18          MS. GHEZZI:  I'll rephrase it, Your Honor.

19          THE COURT:  Okay.  Thank you.

20          MS. GHEZZI:  Uh-huh.

21  BY MS. GHEZZI:

22  Q.   You didn't -- you kept it -- you put it in -- that was

23  terrible.  I'm going to start over.

24          You put it in this report to support your theory about

25  very low hours of incubation between bacteria that you say is in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 31 of 203

1  powdered infant formula and the onset of symptoms; right?

2  A.   If that is how you read it, I would have taken it out of my

3  report.  My recollection was I put it in there in terms of

4  describing how difficult it is to determine how low -- how short

5  the period could be.  So hopefully I have corrected whatever

6  confusion.

7  Q.   Okay.  Now, in your article --

8         MS. GHEZZI:  One moment, Your Honor.

9  Q.   There were limitations to your analysis in your article,

10  and you mentioned what they were.  And we talked about one of

11  them yesterday.  Do you remember that?

12  A.   Yes.

13  Q.   Okay.  And another one that you mentioned in your article

14  as being a limitation of your analyses was that reporting may be

15  biased in regard to case characteristics and information

16  collected; correct?

17  A.   Correct.

18  Q.   And another one of your limitations that you noted was that

19  information concerning feeding, preparation, and storage

20  techniques was not provided in response to standardized

21  questionnaires and, therefore, is incomplete and varies between

22  records; correct?

23  A.   Correct.

24  Q.   And we talked about this yesterday.  I'm not going to spend

25  a lot of time on it.  But in order to get your paper published,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 32 of 203

1   you had to submit it and get reviewers' comments; right?

2   A.   Correct.

3   Q.   Okay.  And one of the criticisms indicated that she,

4   meaning the author, does not address the point that 16 percent

5   of infants in the 2003 and 2008 time period were not exposed to

6   powdered infant formula and, therefore, that other vehicles must

7   exist.  Readers will appreciate a more balanced discussion of

8   this.  That was a reviewer's comment; right?

9   A.   And that was one that I responded to.

10  Q.   Exactly.  And in order to get your paper published, you had

11  to actually do a supplement to it in order --

12  A.   Oh -- I'm sorry.  Finish.

13  Q.   -- in order to show all the cases that you had excluded

14  from your analysis; isn't that correct?

15  A.   That is absolutely incorrect.

16  Q.   Okay.

17  A.   And, in fact, I did not have to change anything in response

18  to -- when reviewers review articles, they can make suggestions.

19  They don't require changes.  And as I recall, I didn't make a

20  whole lot of change except telling that reviewer and explaining

21  what I did.  Appendices I had ready to go.  I wanted them as

22  part of the primary article because to me they were one of the

23  most important things.

24  Q.   Okay.

25  A.   That way other researchers could use them.  I had a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 33 of 203

1   3,000-word limit, and so what we agreed was I could go ahead and

2   put all that in as appendices.

3   Q.   Okay.

4   A.   That was me proactively.  That was not in any sense a

5   requirement.

6   Q.   Okay.

7   A.   They would have been glad to have published it without

8   that.

9   Q.   Well, okay.  I'll take your word for it.

10          In your supplement you talked about limitations to

11  microbiological testing in connection with these kinds of cases;

12  correct?

13  A.   Yes.

14  Q.   Okay.  And one of them was, speaking of the environment in

15  which the baby is found, microbiologic and/or environmental

16  testing was often not done and, when done, information

17  concerning the testing was often absent, incomplete, or unclear;

18  correct?

19  A.   Correct.

20  Q.   Excuse me.  I apologize for that.

21          And then you also say product testing, when done, was

22  often not of material from an unopened -- unopened containers.

23  That's not the case here, is it?

24  A.   No, it is not.

25  Q.   And you said product testing, when done, often used a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 34 of 203

1  sample size and/or culture techniques not consistent with FDA or

2  CDC protocols; right?

3  A.   Correct.

4  Q.   And that's not what happened in this case, is it?

5  A.   Are we talking about end product testing?

6  Q.   We're talking about product testing, product testing, when

7  you're testing the product that the baby ate, CDC, FDA, whatever

8  testing you're talking about.

9  A.   I'm going to leave that one to the other experts.

10 Q.   Well, you wrote it here.  You put it --

11 A.   Are we talking about -- you just asked me about this

12 particular case.

13 Q.   No.  I'm asking -- oh, I'm sorry.  You're right.  But when

14 you wrote it here, you were talking about when you're looking at

15 case reports and you're doing an analysis of a case, this is

16 something that is a limitation, and in this case it's not a

17 limitation; right?

18 A.   The appendices were not limitations.  I wanted to give

19 additional information.  That does not affect any of my

20 analyses.

21 Q.   Okay.  I think we're talking past each other, but let me

22 try and clarify.  You write above this that there are a number

23 of limitations that should be considered in interpreting

24 microbiologic testing related to cases of invasive cronobacter

25 infection, and these include the following.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 35 of 203

1  A.   So that is my -- my caution to the reader to be aware.

2  Q.   Right.

3  A.   That is not a limitation of my study.

4  Q.   No.   That's fine.   That's what -- you're telling them that

5  that is a limitation.

6  A.   Correct.

7  Q.   And so what didn't happen in this case is that the product

8  that was tested was not -- was not a sample size or culture

9  technique not consistent with FDA or CDC protocols.

10  A.   And I'm deferring in terms of this specific case to the

11  other specialists, the other experts.   You asked me --

12  Q.   Okay.

13  A.   -- if that was followed.   I'll let them answer.

14  Q.   Okay.   Well, the FDA follows its own protocols, right, when

15  it tests?   Would you assume it does?

16  A.   I presume it does.

17  Q.   And the CDC follows its own protocols when it tests?

18  A.   Correct.

19  Q.   Okay.   And then it says sometimes the testing was not done

20  at a laboratory experienced in isolating the organism from

21  nonclinical, dry, stressed samples and always assumed a

22  homogeneous distribution of contamination.   Now, that doesn't

23  relate to the FDA testing of the infant formula from the batch

24  at issue in this case; correct?

25  A.   Again, I'm going to leave that to the other experts.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 36 of 203

1   Q.   Okay.  And you also said testing often did not include all

2   products and materials fed to the infant.  And certainly that

3   didn't happen here.  The baby had had between 68 and 80 feedings

4   before she had her 27 grams of powdered infant formula feedings;

5   right?

6   A.   Could you word that another way?

7   Q.   The baby had a lot of other feedings that weren't tested in

8   this case.

9   A.   She had a number of feedings of sterile, ready-to-feed

10   formula that were not tested, yes.

11   Q.   Yeah, but it's not sterile once it's opened to the

12   environment; right?

13   A.   It may or may not be.

14   Q.   Okay.  So it may not be sterile, and none of that was

15   tested here; right?

16   A.   It was not tested.

17   Q.   Okay.  And when -- the material remaining in the can used

18   by the infant, the amount was often insufficient for adequate

19   analysis, and that didn't happen in this case either, did it?

20   A.   I'll leave that to the other experts.

21   Q.   Okay.  And then you say as a limitation of microbiological

22   testing, when the lot was tested, the production time in

23   relation to the can in question was not noted.  It does not

24   appear that attempts were made to test product that approximated

25   the production time of the powdered infant formula fed to the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 37 of 203

1 infant, and that's not this case either, is it?

2 A. Again, I'm going to leave that to the other experts.

3 Q. Okay.  So when you were doing your -- when you were coming

4 to your conclusions and you -- in this case and you were

5 concluding that there was powdered infant formula in the can --

6 I'm sorry, that there was E. sakazakii in the can of powdered

7 infant formula that was fed to Jeanine Kunkel --

8    MS. GHEZZI:  That's a terrible question, Your Honor.

9 Can I start over?  Let me start over.

10 Q. When you were doing your report -- I mean when you were

11 making your conclusions in this case, you reviewed the testing

12 results of the FDA and the CDC; correct?

13 A. Correct.

14 Q. Okay.  And you did that because you wanted to see whether

15 or not the tests were positive; right?

16 A. And what was done, yes.

17 Q. Okay.  Because if the tests were positive that the FDA and

18 the CDC had done, then you could say, you know, it is more

19 likely than not that the powder -- that the powder that the

20 infant got contained E. sak.  You would say that; right?

21 A. I say that anyway, yes.

22 Q. You do say that anyway.  And all the testing was negative.

23 A. Correct.

24 Q. Okay.  And so when you were looking at the testing results

25 of the FDA according to see whether or not there were any

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 38 of 203

1  limitations of that testing, did you, in fact, go back and see
2  what the production time was in relation to the can in question?
3  A.   I would have to go back and look at my notes.
4  Q.   And are you aware that the can in question was tested --
5  that the can in -- that the can in question was tested along
6  with 7 -- 16 other cans that were made within 120 seconds of
7  that can?  Are you aware of that?
8  A.   Yes.
9  Q.   Okay.  Okay.  Now, the federal government investigates
10  instances of E. sakazakii infections; right?
11  A.   Pardon?  What was that?
12  Q.   The federal government, the CDC, investigates instances of
13  E. sakazakii infection in infants; right?
14  A.   I don't know that it investigates all cases.  It tries to
15  investigate them either itself or in collaboration with a local
16  health department.
17  Q.   Okay.  And when it does in collaboration with a local
18  health department, it looks for sources of infection other than
19  infant formula, does it not?
20  A.   Yes.
21  Q.   Okay.  And it tries to test potential environmental sources
22  in the home environment; correct?
23  A.   Correct.
24  Q.   And when it tests the kitchen, if it's allowed to go in and
25  test the kitchen instead of the county, it tests in the kitchen

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 39 of 203

1  the floor, the refrigerator where the formula is stored,

2  cabinets where the bottles are stored, the sink, the dish rack,

3  the sponges, the towels, the utensils used, the counters, and

4  the drains; correct?

5  A.  I don't know that CDC has a standard protocol.  They're --

6  they're -- various cases had things recommended, but I don't

7  know if it's a standardized protocol.

8  Q.  They have a standard questionnaire.

9  A.  They do have a standard questionnaire.

10 Q.  Okay.  And so they tell people that this is the kind of

11 thing that they want tested?

12 A.  Exactly, yes.

13 Q.  Okay.  So all of those areas that I just mentioned are

14 potential sources of contamination in the eyes of the CDC;

15 right?  That's why they want them tested.

16 A.  Well, but contamination can go either way, from powdered --

17 from powdered formula to something else or vice versa.  But yes,

18 those are all areas they look at.

19 Q.  Okay.  And they will sometimes sample areas where the

20 infant slept; right?

21 A.  I'd have to go back and see if they've done that.

22 Q.  Well, they certainly sample areas where the child had spent

23 time in the home; right?

24 A.  I was thinking through cases.  I don't recall.  They

25 prob -- maybe -- from what you're saying, I assume they've done

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 40 of 203

1   that in one case or another.  I don't recall that as a routine.

2   Q.   Well, sometimes they will sample the areas where the baby

3   sleeps and where the baby has been fed; right?

4   A.   Certainly where the baby has been fed.  And I'll take your

5   word that there must have been some cases that make you say

6   that.

7   Q.   Yeah.  And sometimes they have sampled things like the

8   baby's toys and a pacifier.

9   A.   Correct.

10  Q.   And they -- and E. sakazakii has been found on a baby's

11  pacifier; correct?

12  A.   There was a single case; and, of course, one question is

13  was that contaminated from the same source as the baby or not.

14  And it's no way to sort that out.

15  Q.   Well, you say there was a single case.  I mean, it's

16  reported in one that you looked at; correct?

17  A.   One case that I know of, yes.

18  Q.   Okay.  And you would agree that looking at all potential

19  sources absolutely needs to be done; right?

20  A.   Within reason.  I would not do a source -- facilities and

21  resources are finite, so absolutely.  And let me give an

22  example.  In the early cases --

23          MS. GHEZZI:  Your Honor, I'm going to have to

24  interrupt her for the narrative.  She just answered the

25  question.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 41 of 203

1          THE COURT:  Yeah.  You need to try and answer the

2    question directly asked of you and not volunteer additional

3    information.

4    BY MS. GHEZZI:

5    Q.   So let's talk about when you were on direct several days

6    ago, I think -- well, even maybe yesterday it was -- you were

7    asked about you could rule out certain areas in the home as not

8    being the source here; correct?

9    A.   Correct.

10   Q.   All right.  And the baby spent a couple of days at

11   St. Luke's Hospital, didn't she?

12   A.   Yes.

13   Q.   And no one tested the hospital or the hospital environment

14   or the people who came in contact with her on the hospital staff

15   for E. sak, did they?

16   A.   They did not.

17   Q.   And there was no testing of the single-use bottles and

18   nipples that were used at home to feed Jeanine Kunkel between

19   April 17 and April 21; right?

20   A.   I doubt those were even available.  No, they were not

21   tested.

22   Q.   Okay.  But you ruled them out.

23   A.   Yes.

24   Q.   Okay.  And there was no testing of the large bottle of

25   ready-to-feed that was used to feed Jeanine Kunkel between April

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 42 of 203

1   21 and April 23; correct?

2   A.    Correct.

3   Q.    And you ruled that out.

4   A.    As far less likely than powdered formula.

5   Q.    Yeah, but you ruled it out.

6   A.    Yes.

7   Q.    And that's the one that gets opened every single time the

8   mother has to make a new bottle; right?

9   A.    Mother had to take the lid off and pour it, yes.

10  Q.    And handle it and put it in the refrigerator and take it

11  out of the refrigerator and open the refrigerator handle door;

12  correct?

13  A.    Well, as a friend said to me what is -- you pour it and you

14  put it back.  Yes, she had to take it out, pour it, put the lid

15  back on, and put it back.

16  Q.    And there was no testing of the store-bought bottles or the

17  hand-me-down bottles and nipples that were used to feed Jeanine

18  Kunkel the 32-ounce ready-to-feed; right?

19  A.    The ones that had been boiled, no.

20  Q.    Well, her testimony was she didn't boil those.  Are you

21  familiar with that testimony?

22  A.    No, I was not familiar that there were things she did not

23  ever boil.

24  Q.    Okay.  But at any rate, you rule those out as a possible

25  source; correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 43 of 203

1  A.  Relative to PIF, yes.

2  Q.  Relative to PIF where the testing was all negative.

3  A.  Yes.

4  Q.  So where there isn't any testing, you rule it out.  And

5  where all the testing is negative, you rule it in.

6  A.  You --

7  Q.  Is that correct?

8  A.  In looking at probability of that being the source, yes.

9  Q.  Okay.  Now, the -- our understanding which I'm sure is the

10  same as yours is that when the -- is that the mother stored the

11  formula that she wasn't using before it was opened under the

12  crib in the nursery on the carpet; right?

13  A.  We're -- we're talking about the liquid formula?

14  Q.  All of it before it was opened.

15  A.  Okay.  Yes.

16  Q.  Yeah.  And there was no testing of the carpet; right?

17  A.  Correct.

18  Q.  And they had a dog at the time, little dog named Lola?

19  Remember that?

20  A.  I don't remember the name of the dog.  I know they had a

21  dog.

22  Q.  And that dog had flea issues.  Do you remember that?

23  A.  I don't remember that, but I don't -- I don't think that

24  affects my opinion.

25  Q.  Okay.  And the dog lived in the house with them, went in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 44 of 203

1   and out of every room; right?

2   A.   I don't know that detail.

3   Q.   Okay.  In any event, the dog was never tested for E. sak.

4   A.   Correct.

5   Q.   All right.  And there was no testing of the refrigerator

6   where the large bottle of ready-to-feed was stored or where the

7   bottles of the reconstituted powdered infant formula were stored

8   for that one -- that one -- the early morning hours of April 24;

9   correct?

10  A.   My understanding, yes.

11  Q.   Okay.  And you ruled that out as well.

12  A.   Yes.

13  Q.   And there was no testing of the kitchen cabinet where the

14  infant's mother stored the bottles that were used to feed the

15  infant.  You ruled that out too; right?

16  A.   Yes.

17  Q.   And there was no testing of the sink in the kitchen, the

18  sink in the kitchen, sink per se, and you ruled out the sink;

19  right?

20  A.   The sink area was tested and was --

21  Q.   Not the sink, though; correct?  We're going to get to what

22  was tested.  But the sink itself was not tested; right?

23  A.   Correct.

24  Q.   Okay.  And there was no testing of the walls in the kitchen

25  or the floor in the kitchen or the backsplash around the sink in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 45 of 203

1   the kitchen; correct?

2   A.   Correct.

3   Q.   And you ruled those out too.

4   A.   Yes.

5   Q.   And there was no testing of the bottle brush, and you ruled

6   that out too.  Right?

7   A.   If the bottle brush were positive, you wouldn't know which

8   way the contamination went.  I do agree it was not tested.

9   Q.   Right.  And so if it were on the bottle brush because

10  somebody used the bottle brush to wash a pan that they had just

11  cooked chicken in or spaghetti in, then you wouldn't be able to

12  say that it didn't come from that, right, from the chicken or

13  the pasta?

14  A.   And I wouldn't be able to say it didn't come from the

15  powdered infant formula.

16  Q.   But you are telling us that you can rule it out for the

17  bottle brush as a whole even though it wasn't tested?

18  A.   That the bottle brush was the source?  Yes.

19  Q.   No, that the bottle brush wasn't tested -- yes, I'm sorry,

20  and you ruled it out as a source.

21  A.   I did.

22  Q.   Okay.  Now, there was no testing of the bottle rack where

23  the baby bottles were dried; right?

24  A.   Correct.

25  Q.   And you ruled that out?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 46 of 203

1    A.    Correct.

2    Q.    And there was no testing of the utensils that were used to

3    prepare the feedings, and you ruled that out.

4    A.    Correct.  They could be contaminated from the formula more

5    likely than the other way around.

6    Q.    But they weren't tested, so nobody knows if there was

7    E. sak on them or not; right?

8    A.    And how would that change the source?

9    Q.    I'm just asking you the question.  You don't get to ask me

10   a question back.

11   A.    Okay.  Could you repeat the question?

12   Q.    That's okay.  We'll move on.

13         Now, there was no testing of the home's vacuum cleaner

14   bag contents; right?

15   A.    I believe not, no.

16   Q.    Right.  And you ruled those out.

17   A.    The vacuum cleaner, yes.

18   Q.    And there was no testing of sponges and towels used to

19   clean the kitchen.  You rule those out; right?

20   A.    As a source, yes.

21   Q.    And there was no testing of objects that came into contact

22   with Jeanine Kunkel:  Her pacifiers, her baby blankets, her crib

23   sheets, a rattle that was near her mouth; right?  Ruled all

24   those out.

25   A.    Correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 47 of 203

1  Q.   There was also no testing of the baby's bathtub.

2  A.   Correct.

3  Q.   And you ruled that out.

4  A.   Correct.

5  Q.   Or the bath water itself.

6  A.   Correct.

7  Q.   And you ruled that out.

8  A.   Yes.

9  Q.   And there was no testing of the nursery environment at all;

10  right?

11  A.   Correct.

12  Q.   And when the baby first came home, when Jeanine first came

13  home, she slept in the same room, as you indicated yesterday,

14  with her mother and father; right?

15  A.   Yes.

16  Q.   Okay.  And there was no testing of the remainder of the

17  home environment; right?

18  A.   Correct.

19  Q.   Okay.  And that includes their unfinished basement that

20  leads up to the kitchen; right?  That wasn't tested either.

21  A.   Correct.

22  Q.   And you remember in the deposition testimony of the mother

23  and the father that that basement was wet and damp.

24  A.   Yes.

25  Q.   Right?  And that the little brother Kevin who was eight

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 48 of 203

1  years old at the time, he had a bedroom down there.  That's

2  where he slept; correct?

3  A.   Correct.

4  Q.   And the parents testified that they had to pull up a lot of

5  different carpets and rugs that were down there because he'd

6  spill and he'd have food down there and he just -- it would be

7  too messy to keep them around; right?

8  A.   That makes it sound very messy, but yes.

9  Q.   Okay.  Well, he's eight.

10  A.   Exactly.

11        THE COURT:  Miss Ghezzi, could I give everybody a

12  stretch break now?

13        MS. GHEZZI:  Oh, absolutely.

14        THE COURT:  Thank you.

15        Thank you.  Please be seated.

16  Q.   Now, the basement had had some flooding over the years;

17  right?

18  A.   Correct.

19  Q.   Okay.  And there were laundry machines in the basement too,

20  right, where the -- where -- not right where Kevin, the little

21  brother, slept but over -- there were -- a different area was a

22  laundry area; right?

23  A.   Correct.

24  Q.   Okay.  And over by that area there had been some sewer

25  back-up; right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 49 of 203

1    A.    Correct.

2    Q.    Okay.  But you ruled out the basement as a possible source;

3    correct?

4    A.    This is an enteric organism, so yes.

5    Q.    Well, there's nothing special about an enteric organism in

6    terms of being able to be cross-contaminated; right?

7    A.    You still have to get it into that mouth into the food.

8    Q.    You do.  You do.  And do you know what the most common

9    source of salmonella bacteria infection is in infants?

10   A.    Well, there have been outbreaks from formula.

11   Q.    Do you know what the most common is?

12   A.    Go ahead and tell me.

13   Q.    It's feces.

14   A.    Yes.  Well, yes, indirectly because salmonella is in feces.

15   Cronobacter isn't in normal human feces.

16   Q.    Indirectly in the sense that when the mother changes the

17   diapers or changes -- or -- changes the diaper and then

18   contaminates something --

19   A.    But she has to have the cronobacter.

20   Q.    No, we're talking about salmonella.

21   A.    Yes, with salmonella, yes.

22   Q.    Okay.  Now, there was no testing of the parents or Kevin or

23   any visitor to the home on those days when Jeanine Kunkel was

24   home from the hospital; right?

25   A.    Correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 50 of 203

1   Q.   And there was no testing of anyone's clothing or shoes;

2   right?

3   A.   Correct.

4   Q.   And you ruled all of that out.

5   A.   Yes.

6   Q.   Okay.  And then let's talk about the dad, Troy Kunkel.

7   Okay.  You described him as a healthy young man; right?

8   A.   Correct.

9   Q.   And you testified that shortly before Jeanine became ill he

10  was diagnosed with diabetes mellitus?

11  A.   Mellitus, yes.

12  Q.   Mellitus, thank you.  How shortly before was he diagnosed?

13  A.   Within the month.

14  Q.   Within the month.  So some time within April you say he was

15  diagnosed with diabetes mellitus, mellitus; correct?

16  A.   Correct.

17       MS. GHEZZI:  Excuse me, Your Honor.

18  Q.   You reviewed -- excuse me.  You reviewed the medical

19  records for Troy Kunkel; right?

20  A.   Yes.

21       MS. GHEZZI:  And, Your Honor, for the record I'm

22  putting up Exhibit 1005A.

23       THE COURT:  Thank you.

24       Matthew, can you be of assistance?  I'm not sure what

25  the problem is, but I don't think it's -- I think it may be a

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 51 of 203

 1   projector problem.

 2           THE CLERK:  It's a projector problem, Your Honor.

 3           THE COURT:  It was feeling neglected and has an

 4   automatic shutoff after a certain number of hours, so I'm

 5   assuming that may be what happened.  We'll see.  It takes a few

 6   minutes for it to warm up.  So why doesn't everybody take a

 7   stretch break.

 8           You know, members of the jury, it is -- could be a

 9   more serious technical problem, so I think I hate to take our

10   break an hour earlier.  It means we're going to have to take yet

11   another break, but we're going to be in recess.  It's 9:30.  And

12   we'll be in recess for 20 -- well, let's try 15 minutes.  Then

13   you'll get a longer break later on.  But let's take a 15-minute

14   recess until 9:45.  Thank you.

15           (The jury exited the courtroom.)

16           (Recess at 9:30 a.m.)

17           THE COURT:  Okay.  Looks like we have the problem

18   fixed.  Ready to have the jury brought in?

19           (The jury entered the courtroom.)

20           THE COURT:  Thank you.  Please be seated.

21           Thanks to our crackerjack IT staff, we got the problem

22   which we've never had before -- in the 15 years we've had a

23   high-tech courtroom, we've had problems but not that problem.

24   But we were able to get it fixed.

25           So, Miss Ghezzi, please proceed with your

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 52 of 203

1    cross-examination.

2              MS. GHEZZI:  Thank you, Your Honor.

3    BY MS. GHEZZI:

4    Q.    Okay, Dr. Jason.  Okay.  This is a hospital record from

5    St. Luke's Hospital on April -- dated April 2, 2008; right?

6    A.    Correct.

7    Q.    And that was shortly before the birth of Jeanine Kunkel and

8    her twin brother.

9    A.    About two weeks before, yes.

10   Q.    Okay.  And this says -- and I'm going to highlight this for

11   you -- the patient is a 24-year-old male who presents with a

12   complaint of vomiting.  The onset of the vomiting has been acute

13   and has been occurring in a persistent pattern for days.  The

14   course has been increasing.  The vomiting is characterized as

15   bilious and has blood with pieces of pinkish flesh.  The

16   symptoms have no aggravating factors.  The symptoms have no

17   relieving factors.  The symptoms have been associated with chest

18   pain, fever, and weight loss.  He's down nine pounds from

19   yesterday.  Do you see that?

20   A.    Yes.

21   Q.    Okay.  And then if you go down to past medical history,

22   this says that on March 18 of 2008 -- do you know what SURMC is

23   right there?

24   A.    No, I don't.

25   Q.    It says he's got gastroenteritis; correct?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 53 of 203

```
1    A.    Correct.

2    Q.    That's a GI infection; right?

3    A.    That's back in 2008, yes.

4    Q.    Yeah.

5    A.    Right.

6    Q.    March of 2008.  That's when the baby was born.

7    A.    Right, yes, uh-huh.

8    Q.    And dehydration, hyperglycemia, known diabetes; right?

9    A.    Yes.

10   Q.    Okay.  So his diabetes was known in March of 2008; right?

11   A.    Correct.

12   Q.    And he had hyperthyroidism; correct?

13   A.    Correct.

14   Q.    Now, does that say he was discharged on 3-19-08?

15   A.    Yes.

16   Q.    So was he in the hospital from 3-18 to 3-19?

17   A.    Yes, he was there I think overnight probably for

18   observation.

19   Q.    Okay.  And then if you look at the next past medical

20   history, you see he's got an admission in December of 2004;

21   right?

22   A.    Yes.

23   Q.    And it says diabetic ketoacidosis; right?

24   A.    Yes.

25   Q.    So he had diabetes at least by December of 2007.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 54 of 203

1    A.    Well, within -- yes, a few months earlier was diagnosed.

2    Q.    Right.

3    A.    Yeah.

4    Q.    Not the same month.  He wasn't diagnosed the same month as

5    when Jeanine was born.

6    A.    No, no, it was a few months earlier.

7    Q.    Yeah.  And there he has thyrotoxicosis; right?

8    A.    Correct.

9    Q.    And new -- new onset diabetes mellitus type 2; right?

10   A.    That's what they have there.  It's neither here nor there.

11   I think they bounce around between wondering if it's type 1 or

12   type 2, but he's insulin-dependent diabetic.

13   Q.    Okay.  And then let's look at the hospital admit for July

14   of 2006.  That's just he was in an accident and he fractured

15   something.

16   A.    Correct.

17   Q.    Okay.  And then you testified that he had spherocytosis;

18   right?

19   A.    Correct.

20   Q.    And that is -- we call it congenital or --

21   A.    Hereditary.

22   Q.    Hereditary, thank you, hereditary spherocytosis, and you

23   explained that with Mr. Rathke yesterday, but there's a problem

24   with the red blood cells.

25   A.    They are not shaped normally.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 55 of 203

1  Q.   Right.  And, in fact, his was so severe that he had a

2  splenectomy, didn't he, when he was eight years old?

3  A.   I don't know that severe is the term.  It was causing

4  enough problems that -- what happens is that if cells aren't

5  shaped normally the spleen can pick them up, and so that's -- he

6  had a splenectomy.

7  Q.   Right, he had a splenectomy, and they took out part -- a

8  little bit of his pancreas at the time; right?

9  A.   Yes.

10  Q.   Okay.  And that was on April -- I mean that hospital record

11  is April 2.  Okay.  And then on April 25 he went back to the

12  hospital; correct?

13  A.   Correct.

14  Q.   And this is the hospital, St. Luke's, which is where

15  Jeanine was taken on the 24th; correct?

16  A.   Correct.

17  Q.   Okay.  And so I want you to look at that highlighted

18  portion there, and it says reason for admission.  This is a

19  25-year-old male who has a history of insulin-dependent diabetes

20  mellitus.  He was admitted for fever with stiff neck and rule

21  out meningitis; right?

22  A.   Correct, and they ruled it out.

23  Q.   I'm sorry to do this to you, but I want to -- I missed

24  something in there, and I -- you see right in there, this is

25  from the April 2 hospital admission, and his past medical

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 56 of 203

1  history -- I just want to show you this, the hyperthyroidism,

2  you see that?

3  A.   Yes.

4  Q.   And he had an ablation on March 31, 2008; right?

5  A.   Yes.

6  Q.   And that was to take out a goiter; right?

7  A.   To take out thyroid tissue that was -- appeared as a

8  goiter, yes.

9  Q.   Okay.  I'm going to show you Exhibit 105B (sic), page 6.

10  And you can't see the date very well, but -- because there's a

11  three-hole punch there, but this is the same day, the same

12  hospitalization, April 25, 2008; right?

13  A.   Correct.

14  Q.   Okay.  And this talks about the patient is a 25-year-old

15  male who presents with a complaint of headache, headache notes.

16  He comes in with complaint of headache and states that his new

17  daughter has meningitis.  Patient states he has a fever of 103.1

18  the last night and fever has been up.  Nausea and vomiting on

19  and off for the last three days.  See that?

20  A.   Yes.

21  Q.   And down for the last three days.  States he has a severe

22  headache, body aches, neck pain, and severe, sharp, stabbing

23  pain on the left side of neck and jaw.  Patient complains of

24  severe night sweats and BGMs, bouncing up and down rapidly.

25  What's BGMs?  Do you know?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 57 of 203

1   A.   I don't know.

2   Q.   Okay.  And patient also complains of severe thirst.  See

3   that?

4   A.   Yes.

5   Q.   And, Dr. Jason, now I want to show you from the same

6   Exhibit 1005B.

7            MS. GHEZZI:  Okay.  Thank you.  Thank you.  I got it,

8   Matt.  Thanks.

9   Q.   Okay.  And this is another medical record from the same

10  hospitalization.  You see this right here?

11  A.   Yes.

12  Q.   Admit date?  Okay.  April 25, 2008.  And once again, it

13  talks about patient is a pleasant 25-year-old gentleman who was

14  admitted to the hospital with a history of fevers at 103, body

15  aches, neck pain with sharp stabbing pain and so on.  You see

16  that?

17  A.   Yes.

18  Q.   His past medical problems include insulin-dependent

19  diabetes, recent history of Graves' disease with radio ablation

20  of a goiter.  You see that?

21  A.   Yes.

22  Q.   And he was admitted for further evaluation.  And then it

23  says one of his set of twin daughters has proven bacterial

24  meningitis; right?

25  A.   Correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 58 of 203

1   Q.   And then this doctor writes assessment and plan,

2   25-year-old gentleman with a lot of medical problems for someone

3   his age.  See that?

4   A.   Yes.

5   Q.   You don't dispute his medical records, do you, Dr. Jason?

6   A.   No, I think he has a lot of issues, but he's young, and

7   he's dealing with them.

8   Q.   You wouldn't describe him as a healthy person, would you,

9   at that -- in April of 2008?

10   A.   Well, when he's a ketoacidotic, he's not healthy, but he is

11   in general a healthy individual.

12   Q.   Now, you said he didn't have any GI problems; right?

13   A.   At the time of that admission, no.

14   Q.   At the time of that admission?

15   A.   Well, he had no intestinal problems, no diarrhea.  When you

16   get ketoacidosis, you vomit.

17   Q.   Okay.  And I'm showing you from Exhibit 1005B page 12.  And

18   tell me if you can't read this; okay?  But I'm going to put

19   this -- can you read it?  Okay.  Gastrointestinal, you see that?

20   Here's the date, April 25.  Do you see that?

21   A.   Right.

22   Q.   Patient states it has been a long time since he has passed

23   a regular form stool.  Currently he is passing runny or soft

24   stool.  You see that?

25   A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 59 of 203

1  Q.   Okay.  We call that -- generally we call that diarrhea;

2  right?

3  A.   Yes.

4  Q.   One last point with you, Dr. Jason, for me anyway is --

5  well, I just want to say Troy Kunkel certainly had contact with

6  his daughter when she was home; right?

7  A.   Limited, yes.

8  Q.   Limited.  There were many times when Megan Surber, the mom,

9  left the home to go and visit the twin, James, in the NICU

10  during that week that Jeanine was home; right?

11  A.   But by her history he never fed Jeanine.

12  Q.   Okay.  I didn't ask you that.

13  A.   Okay.

14  Q.   Okay.  He was left at home with Jeanine all the times when

15  Megan Surber, the mom, went to the hospital to see James in the

16  NICU; correct?

17  A.   Yes.

18  Q.   Okay.  And it certainly had to happen that he touched the

19  baby, had contact with the baby; right?

20  A.   Yes.

21  Q.   Okay.  And he was in and out of the rooms where Jeanine

22  slept.  He slept in the same room that she did; right?

23  A.   Correct.

24  Q.   And he was the one who was in charge of preparing the

25  family meals for Megan and for Kevin when Megan came home;

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 60 of 203

1  right?

2  A.    Correct.

3  Q.    And he was the one who was in charge of cleaning the

4  kitchen.

5  A.    Yes.

6  Q.    And he was the one who was in charge of doing the laundry;

7  right?

8  A.    Yes.

9  Q.    Okay.  But you ruled him out as a source.

10  A.    On his April 25 admission after observing him overnight,

11  they found him not to have been infected with any significant

12  organism other than a virus, and yes, I did.

13  Q.    Actually he was placed on antibiotics which you don't get

14  for a virus; right?

15  A.    Yes, but they do give them anyway, and if you read the

16  note, they thought it was probably a virus.

17  Q.    Well --

18  A.    And generally what happens is they go ahead and cover with

19  antibiotics since you can't be sure.

20  Q.    He was diagnosed with pneumonia at the time, wasn't he?

21  A.    A probable viral pneumonia.

22  Q.    And he was talking about coughing up and spitting up green

23  stuff?

24  A.    And cronobacter is not a respiratory pathogen.

25  Q.    It's been found in sputum?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 61 of 203

1   A.   Of intubated people, yes.

2   Q.   Of pneumonia patients?

3   A.   Hospitalized patients with pneumonia.

4   Q.   It's been -- okay.  And Troy Kunkel was in the hospital on

5   April 25, wasn't he?

6   A.   He was admitted overnight for observation.

7   Q.   And he was in the hospital on April 2, wasn't he?

8   A.   Yes.

9   Q.   Okay.  And then just finally there -- the CDC did send

10  somebody in there and the Iowa -- actually University of Iowa

11  folks collected the samples.  But the only samples that were

12  collected were from a spot on the left side of the counter and

13  the right side of the counter, on either side of the sink;

14  right?

15  A.   You mean in terms of the sink?

16  Q.   Yes.

17  A.   Yes.

18  Q.   And then the other thing that was sampled was the aerator

19  on the faucet, that little piece that comes down; and the

20  faucet, that was tested.

21  A.   Correct.

22  Q.   Okay.  And water samples on May 8 I think it was when they

23  went in, May 6 or May 8?

24       MS. GHEZZI:  May 7, Gabe?  May 2, thank you.

25  Q.   May 2, 8 days after she left the house, just the water from

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 62 of 203

1   that sink faucet on May 2 was tested; right?

2   A.    Correct.

3   Q.    Okay.  And even on those samples the CDC found so much

4   bacteria they classified it as TNTC, too numerous to count;

5   right?

6   A.    Correct.

7   Q.    And the water's home supply tested positive for -- I'm

8   going to butcher this name, so maybe you can help me out.  But

9   it's pseudomonas aeruginosa?

10  A.    Pseudomonas is very commonly found in water, yes.

11  Q.    So it was found in water?

12  A.    Which is not unusual, yes.

13  Q.    And that's a pathogen, is it?

14  A.    No, not necessarily.

15  Q.    Okay.  You would agree with me that the family kitchen was

16  not a sterile environment.

17  A.    Correct.

18  Q.    Right.  And nobody's kitchen is a sterile -- has a sterile

19  environment; right?

20  A.    Correct.

21  Q.    So it doesn't matter if you're a middle-income or a

22  low-income American living in Tennessee in that study that you

23  talked about about where they found bacteria.  If somebody went

24  to your home in Hilton Head, you wouldn't have -- you wouldn't

25  have a sterile kitchen either, would you?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 63 of 203

1  A.   No, but the pattern of bacteria will vary with, for

2  instance, what people are eating, things like that.

3  Q.   Okay.  But your kitchen's not sterile.

4  A.   No.

5  Q.   And I said finally before, but this is finally.  You said

6  something about the brother James, you know, well, he didn't get

7  sick, and the only thing that was different was he wasn't fed

8  powdered infant formula; correct?

9  A.   That is the major difference, yes.

10  Q.   Okay.  Well, the other major difference is he didn't live

11  in the Kunkel home the first ten days of his life, did he?

12  A.   No, but that is where he went home to that very day that

13  she became ill.

14  Q.   And he didn't live there the first ten days of his life,

15  did he?

16  A.   No.

17  Q.   And Troy Kunkel never visited him in the NICU, did he?

18  A.   I don't know.

19  Q.   Do you remember Megan saying she's the only one who went

20  there after Jeanine got home?

21  A.   No, I don't.

22  Q.   Okay.  And he hadn't been around the family pet or the

23  visitors or the rest of the family; correct?

24  A.   Well, he was certainly around the father when he came home.

25  Q.   No, no, he wasn't actually because the father was gone for

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 64 of 203

1   two months to Omaha with Jeanine.

2   A.   Well, he was in -- well, he had come in contact with his

3   father.

4   Q.   Not in the two months that Troy Kunkel and Megan were in

5   Omaha with Jeanine.  They didn't come back and forth; right?

6   A.   But he did have contact with his father.

7   Q.   When?

8   A.   His father never saw him or held him?

9   Q.   His father saw him when he was born, and then he went in

10  the NICU, and then Jeanine went home two days later.

11  A.   So he did have contact with his father.

12  Q.   What was it?  Do you know?

13  A.   Of his father seeing him when he was born and being with

14  him?

15  Q.   Yeah.

16  A.   The question is?

17  Q.   The question is he hadn't been around the family pet, the

18  visitors, or the rest of the family; correct?

19  A.   Correct.

20  Q.   Okay.  And his formula in the NICU was not stored on the

21  floor under his crib, was it?

22  A.   I don't know.

23  Q.   And when he got home, he was taken care of by his aunt and

24  his grandmother because his parents went to Omaha for two months

25  with Jeanine; correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 65 of 203

1    A.    Yes.

2              MS. GHEZZI:  Okay.  Your Honor, I pass the witness.

3              THE COURT:  Mr. Rathke, you may do your redirect.

4              MR. RATHKE:  Thank you, Your Honor.  I'll be brief.

5                        REDIRECT EXAMINATION

6    BY MR. RATHKE:

7    Q.    Why do you rule out all of those areas that Ms. Ghezzi

8    pointed out were not tested?

9    A.    There has never been a single case of E. sak or C. sak

10   infection found to be associated with any of those sources.  It

11   is an enteric bacteria.  It occurs in very young infants and in

12   people who are severely ill in the hospital.  And when it occurs

13   in severely ill people, it is not as severe as infants.

14   Q.    Ms. Ghezzi took you through Dr. Mittal's -- and that's

15   M-i-t-t-e -- or a-l?

16   A.    Yeah, yes.

17   Q.    -- article, and I've got it right here.  Is there any of

18   the points that she pointed out in the article that causes you

19   to change your opinion?

20   A.    No.

21   Q.    Is it appropriate to -- is it medically appropriate to rely

22   on the information provided by the patient or in this case the

23   mother rather than secondhand accounts in medical documents?

24   A.    Yes.

25   Q.    Why is that?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 66 of 203
To purchase a complete copy of the transcript

```
 1   A.   Because medical documents can be inaccurate.  They don't
 2   have firsthand knowledge, and it's a little bit like a game of
 3   telephone.  You write down what you hear or what you hear
 4   somebody has heard.
 5   Q.   And that's what I asked you to do; correct?
 6   A.   Correct.
 7   Q.   But you would have done it anyways; correct?
 8   A.   Yes.
 9   Q.   In fact, one of the medical records that the defense points
10   out says that Troy Kunkel has a set of twin daughters.  Did you
11   catch that?
12   A.   Yes.
13   Q.   That's not accurate either.
14   A.   I thought that when I read it.
15   Q.   Hardly likely that Troy Kunkel said he had a set of twin
16   daughters; correct?
17   A.   Correct.
18           MR. RATHKE:  Thank you.  Nothing further.
19           THE COURT:  Any recross?
20           MS. GHEZZI:  Nothing.  No, Your Honor.
21           THE COURT:  Okay.  Now, do the jurors have any
22   questions for Dr. Jason?  Okay.  You can just pass -- I'll give
23   you a minute to write out any additional questions.  And I see
24   we've got one.  We'll see if there are any more.  Doesn't look
25   like there are any more.  Okay.  Thank you.  Oh, we have
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 67 of 203

1    several.  Excellent.

2                  Okay.  Invite the lawyers up at sidebar to take a look

3    at the questions.  We don't need 84 lawyers.  Just pick one or

4    two.

5                  (At sidebar off the record.)

6                  (At sidebar on the record.)

7                  THE COURT:  This is the microphone that's activated.

8    Does anyone have any objections to any of the three questions?

9                  MS. GHEZZI:  No, Your Honor.

10                  MR. RATHKE:  No, Your Honor.

11                  THE COURT:  Okay.  Thank you.

12                  MS. GHEZZI:  You're welcome.

13                  (The sidebar was concluded.)

14                  THE COURT:  Okay, Dr. Jason.  I'm going to ask these

15    in no particular order.  Describe the amount and nature of

16    contact you have had with J.K. and her mother.

17                  THE WITNESS:  I've never met Jeanine Kunkel.  I was

18    introduced to her mother the day I came for the trial and shook

19    hands with her and asked how Jeanine was doing.

20                  THE COURT:  Okay.  Any follow-up questions by the

21    plaintiff?

22                  MR. RATHKE:  No, Your Honor.

23                  THE COURT:  Any by the defense?

24                  MS. GHEZZI:  No, Your Honor.

25                  THE COURT:  Okay.  Second question, in FDA testing of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 68 of 203

1   facilities that make PIF, how many have been found to have ES

2   contamination since 2000?

3           THE WITNESS:  I can't answer that because I don't have

4   access to those records.  I only have things related to these

5   individual cases.

6           THE COURT:  Any follow-up questions by the plaintiff?

7           MR. RATHKE:  No, Your Honor.

8           THE COURT:  By the defense.

9           MS. GHEZZI:  No, Your Honor.

10          THE COURT:  Okay.  Third question, what kind of

11  environment is required for ES to survive in various

12  environments such as hands, dry surfaces, et cetera, then

13  parentheses, environments outside the body, parentheses?

14          THE WITNESS:  It generally will not survive in a

15  viable state for terribly long.  It responds pretty well to

16  cleaning and to just everyday antiseptic use.  It certainly will

17  not divide, so even if, you know, let's say a bit of it gets on

18  something, if it's not in something it can grow on, it's just

19  going to sit there and not reach sizable numbers.

20          THE COURT:  Any follow-up questions by the plaintiff?

21          MR. RATHKE:  No, Your Honor.

22          THE COURT:  By the defense?

23          MS. GHEZZI:  No, Your Honor.

24          THE COURT:  Okay.  You may step down.  Thank you.

25          Are you ready to call your next witness?

1          MR. RATHKE:  I am.  Scott Donnelly.

2          THE COURT:  Everybody can take a stretch break till

3    the next witness is sworn in if you like.

4          Would you raise your right hand, please.

5           SCOTT DONNELLY, PLAINTIFF'S WITNESS, SWORN

6          THE COURT:  Please be seated in the witness box.  You

7    can adjust the chair and the microphones so you can speak

8    directly into the microphones.  And would you please tell us

9    your full name and spell your last name, please.

10          THE WITNESS:  My full name is Leonard Scott Donnelly.

11   Last name is D-o-n-n-e-l-l-y.

12          THE COURT:  Thank you.

13                        DIRECT EXAMINATION

14   BY MR. RATHKE:

15   Q.   And where do you live?

16   A.   I live in Burlington, Vermont, at 347 South Union Street.

17   Q.   Do you go by Leonard or Scott?

18   A.   I prefer Scott.

19   Q.   What's your current employment?

20   A.   I currently am a consultant on food safety issues in the

21   food industry.  I do a number of different things.  I have a

22   contract with a large company in -- that's based in Chicago,

23   Silliker.  I do training through that company where I train food

24   companies in sanitation.  I'm HACCP certified.  I teach HACCP in

25   both the public and private setting.  I'm safe quality food

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 70 of 203

1    certified which means I'm able to perform safe quality foods

2    consulting and help folks become safe quality foods consult --

3    or safe quality food certified.  I'm a safe quality food

4    certified trainer which means I can teach the course that's

5    involved with that particular certification program.  I am

6    involved in any number of sort of normal food industry problems

7    where they have a particular microbiological problem and they

8    want an outside pair of eyes to look at it and give them advice.

9         Recently I've been involved with doing that with

10   companies that want to manufacture powdered infant formula and

11   they're looking for somebody with experience in that area and

12   able -- with a goal of producing a safe and compliant product.

13        That's sort of the base -- the nuts and bolts of it.

14   I've also been involved extensively through the last year in

15   doing what are called due diligence evaluations of food

16   factories where the factories will be sold and then I'm asked to

17   come in and provide a evaluation of the factory, is it capable

18   of providing safe products or not.

19        So we look at sort of everything from how they make it

20   to how they sanitize it to how they do everything related to

21   making a safe product that the risk can be assessed for the

22   purchase.  That's pretty much my background and what I do.

23   Q.   You mentioned some teaching and some consulting.  Who hires

24   you generally?  What kind of people hire you to do those things?

25   A.   Well, for example, I'm on the calendar for the end of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 71 of 203

1  February to teach Silliker's public food microbiology course.

2  It's a three-day course, and I'm the instructor, so we get

3  people from the food industry.  Other industries come in, and

4  they want to have some basic knowledge about food microbiology

5  so that they can in turn go back and either make appropriate

6  decisions, organize their companies appropriately so they can

7  make safe foods.

8  Q.   Normally I wouldn't ask this, but who's your wife?

9  A.   I'm married to what's sometimes referred to as the other

10 Dr. Donnelly.  That's usually me, but my wife, Dr. Catherine

11 Donnelly, is a professor at the University of Vermont.  And she

12 has a area of expertise in the organism listeria which is an

13 environmental contaminant very similar to cronobacter which

14 we're talking about in this case.  She is --

15 Q.   And she's testifying in this case.

16 A.   She's testifying in this case, yes, sir.

17 Q.   Okay.  How is it that you got involved in this case?

18 A.   In this case I got involved through Cathy who --

19 Q.   Who hired you?

20 A.   Well, you hired me, Lommen and Abdo, yes.

21 Q.   What did I ask you to do?

22 A.   You asked me to take a look at what was going on inside the

23 factory and look at all the records and try to assess the

24 factory from my point of view and experience in manufacturing

25 powdered infant formula and how -- basically to essentially do

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 72 of 203

1   an assessment related to the risk of contamination of the

2   product for cronobacter.

3   Q.    What factory are you talking about?

4   A.    In this case it's Casa Grande.

5   Q.    Cas -- and where is that located?

6   A.    That's in Arizona.

7   Q.    And who runs that factory?

8   A.    Abbott.

9   Q.    How are you paid for this work?

10  A.    I'm paid by the hour, so it's either remote work preparing

11  expert reports, or in this case I'm testifying.  I've been

12  deposed in this case, so that's all paid by the hour.

13  Q.    And you're paid by the hour regardless of the outcome.

14  A.    Correct.

15  Q.    What percent in the average -- in the last couple years of

16  your annual pen -- or annual income comes from being an expert

17  in legal cases?

18  A.    Just as a guess, I'd say 20 percent.

19  Q.    Have you ever in your life testified in a courtroom?

20  A.    No.  This is a first for me, so I'm -- I'm finding it

21  interesting.

22  Q.    How would you define your expertise?

23  A.    Well, when I -- my -- when I took early retirement from

24  Wyeth which was --

25  Q.    You're telling us too much.  Just tell us your expertise.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 73 of 203

 1  We'll get to the other things later.

 2  A.   I'm an expert in food safety.  I have a substantial primary

 3  expertise in how to inactivate microorganisms using both wet and

 4  dry heat.  I've got publications in that area with spore

 5  formers.  My Ph.D. research was funded by Abbott and involved a

 6  spore spoilage problem that they had at the company at that

 7  time.

 8  Q.   What -- tell us your education and, you know, where you

 9  went to school, what degrees you got, and when you graduated.

10  A.   I went to school as an undergraduate at St. Olaf College,

11  double major in biology and English, went to Iowa State

12  University for two years, and I was a -- obtained a master's

13  degree in microbiology from that institution.  Then I went to

14  the University of Minnesota, and I obtained my Ph.D. in food

15  science with a specialization in food microbiology.

16  Q.   What year did you get your Ph.D. from the University of

17  Minnesota?

18  A.   I think I officially graduated in '81.

19  Q.   Give your -- in summary fashion give us your employment

20  history since your graduation from University of Minnesota.

21  A.   I worked for a brief period in Brookings, South Dakota, at

22  South Dakota State for a couple years as -- in an academic

23  position.  I had a position at Clemson University for a short

24  period of time as well where I was basically the food

25  microbiologist there.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 74 of 203

 1          And then I took employment in 1983 with the company

 2   Wyeth who was building what at that time was -- it's called a

 3   Greenfield site.  They're building a factory that was going to

 4   make powdered infant formula, and I was hired.  I was the 12th

 5   person hired.  And I was the one that was --

 6   Q.   Excuse me.  And Wyeth, is it W-y-e-t-h?

 7   A.   That's correct, W-y-e-t-h.  Sort of the succinct version of

 8   this is Wyeth was purchased by Pfizer which is -- purchased the

 9   nutritional business unit which is now Nestle, so it went Wyeth,

10   Pfizer, Nestle.  This is like years ago.

11          So I was hired to implement the microbiological

12   systems, and as I had a Ph.D., at the Greenfield site -- it was

13   the showpiece factory at that time in the Wyeth network, and I

14   was always looked at as the -- as the person that was going to

15   provide leadership and oversight for product safety issues.  So

16   I held a variety of positions.

17   Q.   Where was the Wyeth plant located where you worked?

18   A.   So the factory is located in Georgia, Vermont, which is

19   about 30 miles north of Burlington.

20   Q.   And what did that factory manufacture?

21   A.   We made a -- strictly powdered infant nutritional products,

22   a range of those.  The product that it's most well known for as

23   I ended my career there and which is still known today, they

24   make Parents' Choice which is the Wal-Mart product.  The brand

25   name Wal-Mart product is Parents' Choice.  That product's made

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 75 of 203

1  up in Georgia, Vermont.

2  Q.   Is that powdered infant formula?

3  A.   That's powdered infant formula.

4  Q.   Did it make -- and you held this -- you worked at the plant

5  for Wyeth until 2001?

6  A.   Correct.  I was based there --

7  Q.   Okay.  Thank you.

8  A.   Yes.

9  Q.   We're good.  We need to move this along.

10  A.   Yes.

11  Q.   After you -- in 2001 what position did you take?

12  A.   At that point I became involved with the corporate groups.

13  I had a series of positions, and the factory itself was in the

14  process of being sold, so it was sold to Paul B. Manning, and

15  now it's Perrigo.

16       My position migrated to corporate, and I went through

17  a succession of promotions, ending up being director of product

18  safety which was my position when I left and took early

19  retirement in 2007.

20  Q.   And since 2007 have you been doing the consulting that you

21  described earlier?

22  A.   Yes.  I took a very brief period off, and then it's been --

23  I've been very, very busy.

24  Q.   Now, the University of Vermont is located in Burlington;

25  correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 76 of 203

1    A.    It is.

2    Q.    Have you had any teaching positions with the University of

3    Vermont?

4    A.    Over the years, particularly in the '90s, I taught the food

5    microbiology course there as an adjunct faculty member, so that

6    was a 3-credit course with a lab.  So the -- I taught that for

7    years.  I -- I -- it was sort of a extension of what I'd done

8    when I was at Clemson University, and I enjoyed doing it, and I

9    did it more as -- I did it because I enjoyed doing it, liked

10   interacting with the students.

11   Q.    Okay.  Now, tell me -- we're going to go back to your

12   employment at Wyeth.  Did it produce powdered infant formula

13   during the entire period of time that you worked there from 1983

14   to 2001?

15   A.    Yes.

16   Q.    And what -- tell the jury what your involvement with

17   E. sakazakii was in connection with your employment at Wyeth

18   plant.

19   A.    Okay.  Well, the ES -- the enterobacter sakazakii issue

20   became something that was visible to everyone in a series of

21   conference calls in 2002 because of the outbreak of ES as

22   associated with Portagen.  And Portagen was a powdered product

23   that Mead Johnson manufactured, and there was an absolutely

24   clear link genetically between the organism that eventually

25   killed -- killed the infant and they found the genetic match

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 77 of 203

1  with a -- in a can of Portagen powder so --

2  Q.   So that involvement started in about 2001, 2002?

3  A.   Correct.

4  Q.   And so from 1983 until then, that wasn't something that was

5  on your radar screen?

6  A.   In the late '90s it was on the radar screen.  There was

7  enough publications out there that you were aware that there was

8  an issue.  But this -- this came home to be a significant

9  problem for us in 2002.

10 Q.   Okay.  So now we can -- we can narrow this down by -- I'll

11 ask you to describe your involvement with E. sak issues from

12 2002 to the time you left working for the plant.

13 A.   Okay.  I'll -- so in 2002 there's a number of things that

14 occurred relative to ES out of the Portagen issue.  The FDA

15 wanted to take what are called field samples.  They announced

16 that they were going to do a field survey, so that means during

17 their normal visit to you every year they were going to take

18 samples.

19 Q.   Before you get to the field survey and the history of it,

20 just tell the jury, though, what your job at the plant was with

21 respect to E. sak.

22 A.   Well, okay.  I was involved with essentially every -- well,

23 I was -- I was involved with lab operations, directly involved

24 with laboratory operations both on the chemical side,

25 particularly on the microbiology side, so I was the one that was

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 78 of 203

1   responsible for how the methods were carried out, if they were

2   carried out right, what you do with data that's out of

3   specification, how you retest samples, things of that nature.

4   Q.   Were there programs adopted for product and environmental

5   testing for E. sak?

6   A.   Well --

7   Q.   Just yes or no.

8   A.   Yes.

9   Q.   And were you involved in the creation and maintenance of

10  those programs?

11  A.   Both creation and maintenance.

12  Q.   Did you provide any training with respect to E. sak to your

13  employees?

14  A.   I provided several different kinds of training, both how

15  to -- training in how to test, and I conducted what was called

16  awareness training at all of the Wyeth factories globally where

17  we explained what the ES issue was, why it was important, why it

18  was important that the factory workers understood what the

19  problem was so that we could make safe product that wouldn't

20  injure our consumers.

21  Q.   What was your involvement with sanitation and cleaning

22  programs at the plant to address this?

23  A.   Well, as we were -- as I was involved with implementing and

24  assessing the data for my environmental monitoring program where

25  we go out to the factory and we sample for specific

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 79 of 203

1   microorganisms including salmonella and ES or cronobacter, so I

2   provided guidance in how to best sanitize the factory

3   environment to eliminate those organisms, and that includes both

4   the general factory environment and the equipment that was used

5   to manufacture the product.

6   Q.   Did you do any -- during that time period, did you do any

7   training of Wyeth people outside of the plant?

8   A.   At that point in time -- we're going to go up a little bit

9   in the 2003 era, but yes, I provided external training for

10  several boards of health where we wanted to show these -- show

11  folks what we were doing both from a testing and a control point

12  of view to provide product that we were going to import into

13  their country and show them how -- what we were doing so that

14  they would be assured that it was safe.

15  Q.   Reference in this trial has already occurred to the

16  International Formula Council or IFC.  During the time that you

17  were employed at the Wyeth plant in Vermont, did you have

18  involvement with the IFC?

19  A.   I was -- there was a continuing series of usually telecon,

20  sometimes meetings.  I was the -- not the leader at Wyeth in

21  that movement, but I was always the microbiological technical

22  resource that was representing Wyeth on the calls.

23  Q.   Tell the jury what your understanding of IFC's function was

24  during the -- during -- you know, beginning with 2001.

25  A.   Well, at 2001 Wyeth at that point was -- had dropped their

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 80 of 203

1    membership to IFC, and with the generation or with the Portagen

2    outbreak, IFC took on the role as an industry voice for the

3    particular cronobacter issues that resulted.

4    Q.    Did Wyeth rejoin?

5    A.    Wyeth rejoined at the end of the year, yes.

6    Q.    Who were the members of the IFC?

7    A.    What are -- what would have been called at that point the

8    big four:  Wyeth, Nestle, Abbott, and Mead Johnson.

9    Q.    And all four of those manufacture infant formula in the

10   United States?

11   A.    Yes, they do.

12   Q.    How did the IFC generally communicate with its members?

13   A.    In -- well, in general it was e-mails.  That's basically

14   what it was is e-mails.

15   Q.    And when it would send e-mails, would it also distribute

16   documents, attachments?

17   A.    Right, there was attachments.  They want -- they would have

18   draft letters they wanted commentary on.  They would have this

19   proposal or that proposal, various things that they were wanting

20   feedback on.

21   Q.    And were there -- were there teleconferences?

22   A.    Yes.

23   Q.    How would those get set up?

24   A.    They would be set up through e-mail.  You'd sort of get

25   a -- you know, they'd get an appointment.  Everybody would

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 81 of 203

1   acknowledge the fact that we were available, and there would be

2   a call-in number, and away you went.

3   Q.   And generally speaking when the IFC would send out an

4   e-mail, would that be sent to someone in each of the four

5   companies?

6   A.   Yes.

7   Q.   And when they hold the teleconferences, someone would be on

8   the line for each of the four countries -- companies.

9   A.   Yes, yes.

10  Q.   And that would include Abbott.

11  A.   That would include Abbott.

12  Q.   Okay.  Let's pull up Exhibit 73.  And what you'll see --

13  give the full page.  Do you recognize that?

14  A.   Yes.

15  Q.   What does MMWR mean?

16  A.   Morbidity and mortality weekly report.

17  Q.   Did you say weekly report?

18  A.   Yep, that's the W.

19  Q.   And who issues -- who issues those MMWRs?

20  A.   It's the CDC I believe.

21  Q.   What's the date of that particular one?

22  A.   April 12, 2002.

23  Q.   And would you read the headline?

24  A.   Enterobacter sakazakii infections associated with the use

25  of powdered infant formula, Tennessee, 2001.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 82 of 203

1    Q.   Is that the Portagen outbreak that you referred to a few

2    moments ago?

3    A.   Yes.

4    Q.   And -- and the company that had made the powdered infant

5    formula involved in the Portagen incident was Mead Johnson.

6    A.   Correct.

7    Q.   What impact did this MMWR and the Portagen outbreak itself

8    have on the industry and any regulators?

9    A.   Well, the -- you know, two questions.  In the industry it

10   engendered sort of complete and utter panic, particularly on the

11   IFC side.  The regulators sort of got into a situation where

12   they had a -- they needed to do something.  They had a -- they

13   had a death, a preventible death, from a contaminated can of

14   infant formula, and they wanted to make sure that this didn't

15   happen again.

16   Q.   And when you say regulator, you're specifically referring

17   to whom?

18   A.   The FDA.

19   Q.   Seventy.  I'm putting before you Exhibit 70 which is an

20   e-mail of July 2002 from the FDA to various -- to the formula

21   companies.  Let me -- before I -- just to orientate the jury,

22   the "from" is from -- in that particular case is from the FDA;

23   correct?

24   A.   Yes.

25   Q.   And then the "to," it's got a whole bunch of e-mail

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 83 of 203

1   addresses, but within those e-mail addresses, do you recognize

2   representatives to IFC from all of the four manufacturers?

3   A.   I'm not sure -- I'm not -- the -- for example, the person

4   it went to at Wyeth was Ray Maggio, so he was compliance at the

5   time.

6   Q.   So he got that for Wyeth.

7   A.   Yes.

8   Q.   Do you see on the last line of the "to's", do you see

9   Pamela Anderson?

10  A.   Yes.

11  Q.   And her -- it says Ross Nutrition.  Actually who is that?

12  A.   That's Abbott.

13  Q.   And what does this e-mail ad -- from the FDA advise the

14  companies of?

15  A.   They're saying that when they visit -- and typically the

16  FDA visits powdered infant formula factories on a yearly

17  basis -- they said they're going to sample finished product and

18  raw materials.

19  Q.   And did that occur?

20  A.   It did.

21  Q.   Was that a concern to the industry?

22  A.   This came out the 29th.  Wyeth was the first company they

23  visited.

24  Q.   No.  Was it a concern to the industry, though?

25  A.   I'm answering your question.  Yes, it was a concern to the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 84 of 203

1  industry.

2  Q.   Let's pull up 110.  I'm showing you Exhibit 110.  Do you

3  recognize that as a copy of an e-mail from -- well, the "from"

4  is from a Mardi Mountford, and he's got his e-mail address up

5  there.  Who is that?

6  A.   Say again.  Who is Monty or --

7  Q.   Yeah.  Who's Mardi Mountford, and who's he with?

8  A.   That's IFC.

9  Q.   So that's from the IFC.

10  A.   Yep.

11  Q.   And the e-mail was sent to you along with other -- along

12  with that same Pam Anderson.

13  A.   Right.

14  Q.   And then there's copies to other people as well; correct?

15  A.   Yes.

16  Q.   And it references a conference call with Mike Doyle on

17  February 21 at -- in 2003; correct?

18  A.   Correct.

19  Q.   And the IFC is -- who's Mike Doyle?

20  A.   Mike Doyle's a very well-respected food microbiologist at

21  that time at the University of Georgia.

22          MR. RATHKE:  Call up the third paragraph.  Next one.

23  Q.   And do you see where it says, "We also want to get his,"

24  Mike Doyle's, "reaction to the statements, 'Under current FDA

25  testing procedures, it is anticipated E. sak will eventually be

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 85 of 203

1  found in powdered product made by all the infant formula

2  manufacturers.  Unless this issue is addressed rationally,

3  powder product may no longer be affordable or continue to be

4  marketed'"?  Do you see where it says that?

5  A.   Yes.

6  Q.   Whose statement is that?  I mean --

7  A.   That's the IFC's statement.  That's -- they were coming up

8  with a series of bullet points that they wanted to get -- to put

9  forth, and they wanted someone credible to back up these

10 statements.

11 Q.   When they say will eventually be found, are they referring

12 to the survey that was going on?  Do you know?

13 A.   I do not know that for a fact.

14 Q.   All right.

15 A.   They are -- I think when I read that even originally, my

16 interpretation was that it will eventually be found in some

17 testing -- testing venue whether it's the field survey or

18 others.

19 Q.   In 2003 is it true the statement that's on the memo that ES

20 will be found in powder -- or E. sak will be found in powdered

21 infant formula made by all companies?  Is that a true statement?

22 A.   Yes.

23      MR. RATHKE:  Would you pull up 93.

24 Q.   Again, an e-mail from IFC in March 2003 to the formula

25 companies.  And it's a forwarded e-mail from the FDA, and the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 86 of 203

1   e-mail that's being forwarded is sent to the IFC from the FDA

2   and says that we are sending several slides relative to FDA's

3   field survey of powdered infant formula.  Do you see that?

4   A.    Yes.

5   Q.    Okay.

6          MR. RATHKE:  Go ahead and go to page 7 of the exhibit.

7   Q.    Now, before you is page 7 which is a portion of what was

8   sent to IFC from the FDA.  Could you go through and explain to

9   the jury what the FDA field survey results are on this chart?

10  A.    Yes.  The -- so what you have is a sample type, so finished

11  product would be powdered infant formula.

12  Q.    Okay.  So the line that we want to look at is the first

13  line, finished product.

14  A.    Right.  And then they were also looking at -- if you may

15  remember in the first -- one of the first exhibits they were

16  looking at raw materials as well, so they looked at

17  carbohydrates; they looked at protein; they looked at fat.

18  Q.    Well, let's just look at finished product.  Explain that

19  line.

20  A.    So they had 22 samples tested.  They tested 5.  At that

21  point they were running I think what everybody -- is still a

22  very confusing test and test result, but anyway, they were -- 5

23  out of the 22 were positive.  5 out of the 22 contained

24  E. sakazakii which is now known as cronobacter.

25  Q.    And explain what's under the column test results.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 87 of 203

1    A.    That gets to my statement about the test itself.  The FDA

2    when they started the field survey did not know how many

3    E. sak -- I keep going back, E. sak, cronobacter.  It's the same

4    organism.  So I think I'll focus on cronobacter.  They didn't

5    know the numbers of cronobacter, so they developed a test that

6    would allow them to come up with a number.  It's called a

7    multiple -- the most probable number test.

8    Q.    Is that what MPN stands for, most probable number?

9    A.    Right.  So from a -- the easiest way to look at it is that

10   it gives you a number, and the sensitivity of the test is .36, a

11   fraction of a microorganism per hundred grams.  So the whole

12   thing works out to having -- or to having a testing sensitivity

13   of 1 organism per 333 grams.

14   Q.    That's the way it works.

15   A.    I think that's -- that's a -- you know, I'm trying to sort

16   of help everybody understand what can be a confusing thing, and

17   that's the best way to look at it I think.

18   Q.    One organism with -- in 333 grams.

19   A.    Right.  So that's what they ended up testing.  They test --

20   Q.    An organism could be just a cell.

21   A.    Yes.

22   Q.    And if there are less than 1, is that going to test

23   positive, 1 per 333 grams?

24   A.    Well, that's where it gets confusing.  In this test, yes.

25   Q.    Pardon me?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 88 of 203

1  A.    In this test, yes, because the sensitivity is .36 so . . .

2  Q.    So even if it had 1 every 333, it would -- I'm not sure I

3  understand.

4  A.    You said what would it be per hundred grams.

5  Q.    I'm sorry.  If it had less than 1 colony of E. sak in 333

6  grams, would the test be negative?

7  A.    Yes.

8  Q.    So a quantity of PIF larger than 333 grams would test

9  negative even though there might be a cell within it.

10  A.    That is correct.

11  Q.    Go to the next page, page 8.  Could you explain that chart.

12  A.    Again, so we're talking about whether -- you've got the

13  type of product, so --

14  Q.    Let's just talk about full-term formulas.  What's meant by

15  a full-term formula?

16  A.    This would be a formula that is intended to be consumed by

17  an infant that was born at a normal birth weight and had no

18  medical issues.

19  Q.    And what does it mean to be 4 of 14 or 28 percent?

20  A.    That means that 4 out of the 14 samples or products they

21  tested that met that definition were positive.

22  Q.    And that comes to 28 percent; correct?

23  A.    Correct.

24  Q.    Let's go to the next page, page 9.  There's some bullet

25  points there.  The first bullet point, that's something that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 89 of 203

1  you've already explained; correct?

2  A.   This is what I attempted to get into with explaining what

3  the 0.36 MPN per hundred grams, yes.

4  Q.   Hopefully we explained it correctly or in a manner that

5  people can understand it.  What's the second point make?

6  A.   They tried to determine whether there was a correlation

7  between the positives and manufacturing practices.  One of the

8  manufacturers in the United States is a dry blender, and that's

9  a different process than Abbott, Wyeth, and Nestle were using,

10 so they wanted to see if there was a -- the process itself was a

11 contributor to whether it was ES positive or not.

12 Q.   So what you're saying is companies use different processes

13 to produce the powdered infant formula?

14 A.   Correct.

15 Q.   No matter what the process is, there was no correlation

16 between that process and the results?

17 A.   Not in this field survey, no.

18 Q.   And then the third bullet point?

19 A.   And then they got into a -- they wanted to know if there

20 was a relationship between product type, particularly soy versus

21 milk.  And I'll answer your question and just end it at that.

22 No relationship.

23 Q.   Now, we've talked about a hundred grams and 333 grams.  Can

24 you convert that to us -- for us to ounces?  How much is a

25 hundred grams, how many ounces?  Do you know offhand?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 90 of 203

1    A.    Well, let's look at this can of product.  It's 12.8 ounces.

2    That's 363 grams.  16 ounces is 463.  I don't know.  We can --

3    I'm not a whiz at math but . . .

4    Q.    Would a hundred grams be about three and a half ounces?

5    A.    Be about a quarter of a pound, 20 percent of a pound.

6    Q.    Now, these results do not tell us how much was -- you know,

7    how the individual companies fared; correct?

8    A.    No, they didn't.  They tried to hide that.

9    Q.    Now, you worked for Wyeth.

10   A.    Yes.

11   Q.    But there's three other companies.  Did -- do you know --

12   did you know then or do you know now what the results were per

13   company?

14   A.    No.

15   Q.    Did the FDA ever release that information?

16   A.    No.

17   Q.    Now, did you -- as working for Wyeth, did you find out what

18   the results were with Wyeth?

19   A.    Yes.

20   Q.    And did one of your samples fail?

21   A.    Yes.

22   Q.    Where was that batch when the FDA determined that it

23   failed?

24   A.    It was within our control so it was --

25   Q.    It was on the market.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 91 of 203

1  A.   No, no, no, no, no.  It had not reached the market yet.

2  Q.   So it wasn't --

3  A.   No.

4  Q.   So what did you have to do with that batch?

5  A.   Well, we kept it under our control, and we began an

6  investigation, and investigation went in a number of different

7  directions.  And we tried to determine the length of time over

8  which --

9  Q.   So you did an investigation --

10  A.   Yes.

11  Q.   -- to determine how it got contaminated?

12  A.   Yes.

13  Q.   And whatever happened to the batch?

14  A.   Oh, it's destroyed.

15  Q.   Now, that -- since the batch never left Wyeth, there was no

16  necessity for a recall; correct?

17  A.   No.

18  Q.   That would be a rejection.

19  A.   That would be a rejection.

20  Q.   If that batch had been on the market, then there would have

21  had to have been a recall?

22  A.   Yes.

23       MR. RATHKE:  Seventy-four.  Zoom in, too, please.

24  Show us who's sending the letter.

25  Q.   Okay.  Is that the IFC letterhead?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 92 of 203

1  A.   Yes.

2  Q.   And this is a letter on July 3, 2003, directed to someone

3  at the FDA?

4  A.   Yep.

5  Q.   Christine Taylor will pop up from time to time.  Who is

6  she?

7  A.   She was one of the officials at the FDA that was involved

8  in this.  I forget exactly what her role and her title was.

9  Q.   But she worked for the FDA.

10  A.   Worked for the FDA, yes.

11  Q.   If we were to look at that letter, it would tell us that

12  this was -- that it attaches the -- a paper to it which is on, I

13  think, the next page, page 3.

14         MR. RATHKE:  Is there a heading to that?

15         MR. PERSONS:  No.

16         MR. RATHKE:  I'm sorry.  Go back to page 2.

17  Q.   On the top on page 2 which is an attachment it says

18  proposal for microbiological testing of powdered infant formula.

19  Is that an area that's within your bailiwick?

20  A.   Yes.

21  Q.   I'm going to skip that document.  We haven't got enough

22  time.  Let's go to 75.

23         You see on page 75 is a letter on IFC stationery

24  addressed to a Jeffrey Kornacki.  Do you see where it says that?

25  A.   Yep.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 93 of 203

1    Q.    Who is Mr. Kornacki?

2    A.    Jeff is a food industry consultant.  He's somebody that

3    I've worked with.

4    Q.    And then there's some language on page 1 that I'd like to

5    bring to your attention making reference to -- in the second

6    paragraph, after also -- it was also learned.  Do you see where

7    it says that the IFC is telling Dr. Kornacki it was also learned

8    that the agency has no intention to move away from their zero

9    tolerance policy for this organism?  By testing in this manner,

10   FDA is implying that E. sak belongs in the same category as

11   frank or true pathogens such as salmonella.  However, based on

12   the literature, E. sak is an opportunistic pathogen with little,

13   if any, risk to healthy infants.  If repeated, the level of

14   testing earlier utilized by FDA would unjustifiably cause

15   economic hardship on companies as well as consumers as a result

16   of product rejections, recalls, and possible shortages of

17   formula in the marketplace.  Do you see where it says that?

18   A.    Yes.

19   Q.    The word frank, do you know what they're talking about

20   there?  Or is that a -- some kind of a typo or something?

21   A.    They are -- yes, I know what the frank means.  They're

22   afraid that ES will be regulated in the same way that salmonella

23   is.

24   Q.    The sentence that starts with the word "however" appears to

25   draw a distinction between salmonella and E. sak.  Could you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 94 of 203

1  define for us what the point is made in that sentence, what

2  point the IFC is making?

3  A.  Well, they're really not making any point at all.  They're

4  expressing several fears, and the entire statement including

5  basically all of it is their opinion.  At this particular point

6  in time -- this is before the FAO World Health Organization 2004

7  risk assessment which actually addressed all of these issues.

8  So they're stating this.  There's nothing behind any of these

9  statements, and they're largely -- they're largely expressions

10  of concern and fear.

11  Q.  Is there any difference in your opinion between the

12  bacterias E. sak and salmonella?

13  A.  There's several very different -- yes.

14  Q.  In what respect from a regulatory perspective?

15  A.  Well, from a regulatory perspective, you can find

16  salmonella in a wide variety of foods and in a -- a wide variety

17  of foods, as everybody kind of has a feeling, everything from

18  peanuts to chicken to even occasionally vegetables, tomatoes,

19  things that you wouldn't expect to find it.

20       Enterobacter sakazakii cronobacter is norm -- is

21  associated with powdered infant formula.  That's the food that

22  it is associated with.  That is the food it's associated with

23  injuries and deaths with is powdered infant formula.

24  Q.  The sentence that starts if repeated the level of testing

25  earlier utilized by FDA and it goes on from there, is that a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 95 of 203

1    reference to the FDA study?

2    A.   No, it's a reference there -- it was -- the FDA started

3    testing using the MPN method, and we described the sensitivity

4    of the test.  So it's a sensitive test.  And as they're saying

5    in this particular statement, if they test our products using

6    that sensitivity, we think we're going to have lots of product

7    that's going to be rejected.  It's going to cost us lots of

8    money.

9    Q.   Do product rejections and recalls cost a lot of money?

10   A.   Yes, they do.

11          MR. RATHKE:  Would you go to 76.

12   Q.   I know it's hard to read because someone has stamped

13   confidential across it.  But you'll see that the e-mail says

14   attached are the IFC's comments on the above docket, and they're

15   sending it to someone.  Do you see where it says that?

16   A.   Yeah.

17   Q.   And do you know what this document is?

18   A.   I don't remember this document, no.

19   Q.   Okay.

20          MR. RATHKE:  Go to page 4.

21          MR. PERSONS:  What number was that?

22          MR. RATHKE:  76.  Go to page 4.  Go to the page before

23   that, the page before that.  Is there a page before that?

24   Q.   Part of the document from the IFC, it says IFC would like

25   to emphasize there's no need to establish a specific

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 96 of 203

1  microbiological requirement for E. sakazakii.  Do you see where

2  it says that?

3  A.    Yes.

4  Q.    What's that mean?

5  A.    They didn't want to have a specification for E. sak with

6  powdered infant formula.  They didn't want to have -- they did

7  not want to have the FDA requirements to test powdered infant

8  formula for ES or cronobacter as a release requirement, in other

9  words, you can't put it on the market unless you test for that

10 organism first.

11 Q.    So FDA has the power and authority to say you cannot

12 release powdered infant formula to the market unless it passes

13 certain specifications which we write; correct?  They've got the

14 right to do that.

15 A.    There's a pathway for them to do that, yes.

16 Q.    And F -- as far as that's concerned, FDA is opposed to that

17 or IFC is opposed to that; correct?

18 A.    They are.

19 Q.    And did the FDA ever establish specific microbiological

20 requirements for finished product for E. sakazakii?

21 A.    The FDA specifically never promulgated or they did not

22 write regulations to my knowledge, and I -- and that's -- so

23 we're talking 2014.  What they did do was they made it ever so

24 clear in verbal discussions that they wanted all lots of

25 powdered infant formula that fall under the Infant Formula Act

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 97 of 203

1   to be tested for ES as a release requirement.  In other words,

2   they wanted it tested and the product held, not put on the

3   market until the results were back.

4   Q.   So they told the companies what they ought to do, but there

5   was not a legal requirement.

6   A.   No.

7   Q.   And then the companies could determine what to have for

8   microbiological specifications?

9   A.   Well, they're the specifications that are part of the

10   Infant Formula Act of '80, and then they did a revision in '96

11   that again was never codified.  So the companies were internally

12   running some version of those specifications.

13   Q.   Go to page 8 of this document, this exhibit.  On this page

14   the IFC tells the -- or takes the position that although

15   proactive measures may be taken to reduce the level, frequency,

16   and incidence of E. sakazakii in powdered infant formula, total

17   eradication of the microorganism from powdered infant formula is

18   not currently technically possible given the nature of food

19   powder manufacturing.  Do you see that?

20   A.   Right.  And I also see the second word is IFC believes

21   this.  So there's no data to -- there's nothing to attach to

22   this other than their belief that this was true.

23   Q.   But that was the belief of the IFC.

24   A.   Well, they were fervently wanting to have anything happen

25   except testing finished product for E. sak.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 98 of 203

1  Q.   Can -- is it possible to totally eradicate E. sak from

2  powdered infant formula?

3  A.   It's possible to manufacture product which does not contain

4  ES, yes.

5  Q.   And briefly how do you do that?  What do you have to set up

6  to produce powdered infant formula that doesn't have E. sak in

7  it?

8  A.   They're on the right track.  You basically need to have

9  what are called -- we talked a little bit about Hazard Analysis

10  at Critical Control Points as one of my areas of expertise.

11  Most food factories have a HACCP plan.  They analyze the risk

12  for safety relative to how they make their products, and then

13  they try to establish points where you can control that risk.

14  Q.   What is HACCP?  And I know you'll refer to it from time to

15  time.

16  A.   It's called Hazard Analysis At Critical Control Points, and

17  typ --

18  Q.   And that's mentioned actually in the third line of this --

19  A.   Right, right.  So --

20  Q.   So there's a HACCP plan?

21  A.   Correct.  And at this point in time the vocabulary was --

22  they called them prerequisite programs, but they were the

23  programs that you would have to flesh out your HACCP plan.  So,

24  example, you have what's called an SSOP, a sanitation standard

25  operating procedure.  You're making a food product.  In order to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 99 of 203

1    do that safely, you need to be able to sanitize your equipment.

2    So they sort of get there a little bit.

3    Q.   Would it be fair to say that the essence is having a clean

4    plant and clean equipment?

5    A.   It is.  That's what they're trying to do.  What they're

6    wanting to do is they want to -- they are in a sense a little

7    bit ahead of the curve here, but they want to use the

8    prerequisite control -- they want to use the prerequisite

9    control programs to produce ES-free product, but at the same

10   time they don't want to do what's called verification testing,

11   that is, testing the finished product to verify that these

12   programs actually work.  Sort of go hand in glove.

13   Q.   Now, in terms of -- how does a factory know whether or not

14   its equipment and surroundings are clean?

15   A.   They -- again, this is sort of a vocabulary word, but it

16   involves what's called environmental monitoring.  And this

17   can -- you can take samples of air.  You can take samples of

18   water.  In the food industry it usually involves taking either

19   something like a Q-tip swab or more appropriately now --

20   Q.   Well, let's just stay with generalities, but it's swabbing.

21   A.   It's swabbing.  You go out in the environment, and you swab

22   it, and you test that swab to see if you have the microorganism

23   you're interested in in it.

24   Q.   And is that part of a HACCP plan, or is that kind of --

25   A.   That's a key part of the HACCP plan.

**Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov**
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB   Document 196   Filed 05/13/14   Page 100 of 203

```
1              THE COURT:  Mr. Rathke, would now be an okay time to
2     take a break?
3              MR. RATHKE:  Certainly.
4              THE COURT:  Okay.  Members of the jury, we'll be in
5     recess till 11:25.  Thank you.
6              (The jury exited the courtroom.)
7              THE COURT:  Anything we need to take up?
8              MR. RATHKE:  No, Your Honor.
9              MR. REIDY:  No, Your Honor.
10             THE COURT:  Thank you.
11             (Recess at 11:07 a.m.)
12             THE COURT:  Ready to have the jury brought in,
13    Mr. Rathke?
14             MR. RATHKE:  Yes, Your Honor.
15             (The jury entered the courtroom.)
16             THE COURT:  Thank you.  Please be seated.
17             Mr. Rathke?
18             MR. RATHKE:  Thank you.
19    BY MR. RATHKE:
20    Q.   Exhibit 82 is in front of you already, and you'll see that
21    that's an e-mail from Rachel Spector.  And is that the IFC?  Is
22    that the IFC?
23    A.   Yes.  I'm sorry.
24    Q.   Okay.  And that's an e-mail that was sent to -- did you get
25    that one?  Yeah, you got that one, and people from the different
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 101 of 203

1  companies got it?

2  A.    Yes.

3  Q.    And it says the message -- well, the subject is IFC to WHO,

4  FAO, slash, WHO, call for data.  And then the message is for

5  your information the attached documents were sent to WHO this

6  evening.  As earlier agreed, the attached documents were also

7  provided to those copied on the letter.  Do you see where it

8  says that?

9  A.    Yes.

10  Q.    Do you see where it says that?

11  A.    I see where it says that.

12  Q.    Go to the next page.  And IFC letterhead; correct?

13  A.    Correct.

14  Q.    And that's being sent to a Peter Embarek of the World

15  Health Organization in Geneva, Switzerland, and they identify

16  him as a doctor.  Do you see where it says that?

17  A.    Yes.

18  Q.    And it says the letter is in response to FAO and WHO.  WHO

19  is the World Health Organization.

20  A.    Correct.

21  Q.    What's FAO?

22  A.    It's escaping me right this second.

23  Q.    It appears --

24  A.    I think it's the Food and Agricultural Organization, World

25  Health Organization.  I think that's the acronym.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/13/14  Page 102 of 203

1   Q.   Okay.

2        MR. RATHKE:  And would you turn to page 3, page 3 of

3   the document.  And the second paragraph, highlight that.  First

4   sentence of the second paragraph.  You got it.

5   Q.   Do you see where IFC is informing WHO, the World Health

6   Organization, that since 1988 the published literature has

7   reported that about 10 percent of the tested powdered infant

8   formula has tested positive for E. sak?  Do you see where it

9   says that?

10  A.   Yes.

11  Q.   Is that a true statement?

12  A.   I'd say yes.

13  Q.   How would you characterize that result, that 10 percent of

14  the tested powdered infant formula for E. sak has tested

15  positive?  What does that tell you?

16  A.   That tells me that a good portion of the formula on the

17  market contains ES, and that's what the Infant Formula Council

18  is saying as well.

19  Q.   Exhibit 113.  You'll see in Exhibit 113 is an e-mail from

20  that same person with the IFC to people of -- from the different

21  companies.  And the message is, "Attached for your information

22  is the finalized Q and A document for Dan March to use at his

23  preparation for the WHO workshop regarding E. sak next week,

24  February 2-5."  And you were given that as well; correct?

25  A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 103 of 203

1  Q.   And then if you'd turn to page -- bottom of page 2, I just
2  want to point out question 5.  The question in the Q and A
3  prepared -- oh, I should ask, who's Dan March?
4  A.   Dan March was the director of compliance at that --
5  probably product safety at that point in time for Mead Johnson.
6  Q.   Okay.  And you said compliance; right?
7  A.   Well, that was his last position.
8  Q.   But I mean it sounded like clients, but it's compliance.
9  A.   Compliance, right.  So he was the lead person from Mead
10 Johnson on the ES issues.
11 Q.   And is that kind of a counterpart to your position with
12 Wyeth?
13 A.   Yes.
14 Q.   Okay.  So that's the question prepared by IFC, and then go
15 to the next page for the A part.  And highlight that.  It says
16 FDA's current position, that is, that the presence of E. sak is
17 a concern, even at a very -- at the very low level of
18 detectability, has resulted in costly product recalls for some
19 U.S. manufacturers.  It has also resulted in rejections of
20 entire batches of raw material and of finished infant formula by
21 all manufacturers.  The U.S. industry's costs related to these
22 recalls and rejections have already amounted to millions of
23 dollars.  Do you see where it says that?
24 A.   Yes.
25 Q.   And is that statement literally true?  In other words,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/13/14  Page 104 of 203

1   there has been this cost?

2   A.   Yes.

3   Q.   85.  85 is a document about the same date, January 30,

4   2004.  It's an e-mail from IFC to the -- to you and

5   representatives of the companies.  Do you see that?

6   A.   Yes, yes.

7   Q.   And it says attached for your information are the paper and

8   PowerPoint presentation of -- I think it's Jean-Louis Cordier.

9   A.   Correct.

10  Q.   Will provide to WHO at the workshop in Geneva next week,

11  and it gives that same date.  First, who's Mr. Cordier?

12  A.   Cordier is a very well-respected technical resource that

13  works for Nestle, so when you're talking about powdered dairy

14  products or powdered infant nutritionals, he's considered

15  very -- very credible in the industry.

16  Q.   Okay.  Go to the next page, the first page of the

17  attachment.  And that's what's attached; correct?

18  A.   Correct.

19  Q.   Now, is that kind of a practice of IFC that when somebody's

20  going to give a presentation from one of the companies like

21  Mr. March or Dr. Cordier that the IFC floats it to all -- you

22  know, to all the companies so they get a chance to see an

23  advanced copy?

24  A.   Yes.

25            MR. RATHKE:  And go to page 2.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 105 of 203

1              MR. PERSONS:  We're on page 2.

2    Q.   At the bottom it says other heating steps are typically

3    applied in a wet-mix process.  Now, I know we're jumping in kind

4    of in the middle of this and this hasn't been thoroughly

5    explained, but real quick, what's the killing step that occurs

6    when powdered infant formula is made?

7    A.   In the process that my company used and the process that

8    Abbott used, they have a -- they make a liquid mix, and they put

9    it through a pasteurizer, essentially a killing step where the

10   liquid is heated to a temperature where it will kill

11   microorganisms.

12   Q.   And it's in liquid at that point, of course.

13   A.   It's liquid at that point.

14   Q.   And it will kill all organisms.

15   A.   It won't kill every microorganism, but it will kill the

16   pathogenic microorganism.

17   Q.   It will kill all the E. sak for sure.

18   A.   It will kill all the E. sak, all the salmonella.  They will

19   be killed.

20   Q.   All right.  That's the context.  And then he says other

21   heating steps are typically applied in the wet mix process, and

22   he identifies numbers of them, a preheating of the liquid

23   formula in particular after an intermediate storage and, two,

24   the actual spray drying.  And we'll go to the top of the next

25   page to finish that paragraph.  And then in describing those

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 106 of 203

1  two, he says although they may have some killing effect in
2  particular, these two steps are performed for technological
3  reasons and are not considered as critical control points.  Do
4  you see where it says that?
5  A.    Yes.
6  Q.    What's he mean?
7  A.    He means that the actual -- well, he's talking about two
8  things.  One, he's talking about heating up the liquid prior to
9  introducing it to the dryer and saying that there might be some
10 kill there, but it's not something that can be quantified.
11 There's not a way of providing a read-out that says that all of
12 the product got that temperature.  And then once the product's
13 injected into the dryer, you're exposing it to dry heat and high
14 temperatures, and there's potentially some amount of kill there,
15 but again, it's not sufficient to be used as a critical control
16 point where you can control, reduce, or eliminate the pathogen.
17 It won't do that.  There will be microorganisms that will work
18 their way around both of these treatments.
19 Q.    So the heating processes, these two heating processes, are
20 simply part of the process of --
21 A.    Correct.
22 Q.    -- of manufacturing.
23 A.    Correct.  They're part of the manufacturing process.
24 Q.    And is Dr. Cordier correct in his description?
25 A.    Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 107 of 203

1  Q.   Now, you read the deposition of Sharon Bottock who's

2  quality control or has some similar title at Casa Grande for

3  Abbott.

4  A.   Yes.

5  Q.   And do you recall that Ms. Bottock identified the spray

6  drying process as a killing point?

7  A.   Yes.

8  Q.   Is that accurate?

9  A.   No.

10 Q.   Why not?

11 A.   The -- there's a little bit of background here.  This is

12 dry heat, not wet heat.  So dry heat is not nearly as efficient

13 in killing microorganism.  If anybody's ever had a steam burn,

14 you're aware of the fact that steam is like much more powerful

15 than just dry air.  You can stick your hand into an oven in the

16 kitchen, but you don't want to stick it into a stream of hot

17 steam, sort of the same thing.

18 Q.   You're talking about in the dryer.

19 A.   In the dryer.  It's hot air.  And the other way to look at

20 this is the scientific term is latent heat evaporation.  You

21 stick liquid in there with the hot air, and as it evaporates,

22 you use a certain amount of heat energy to evaporate the water

23 off which keeps the powder particles cool, so the powder ends up

24 looking more like my glass here than the color of this little

25 speaker cover.  If there was truly heat that would inactivate

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 108 of 203

1  microorganisms, the powder would be black, not white.

2  Q.   Page 5.  Page 5, Dr. Cordier says the processing

3  environment is not sterile.  That's, of course, a true

4  statement.  And then he goes on to say that enterobacteriaceae

5  has been traditionally used as indicators to assess for

6  deviations in the high hygiene area.  Okay.  Let's talk about a

7  couple terms there.  What's he mean by an indicator?

8  A.   Well, the food and dairy industry have for years before

9  there was technological means to directly test for an organism

10 used microorganisms that were easy to grow and count in a

11 relatively unsophisticated laboratory as a way to provide an

12 indicator of whether a pathogen is tested -- is present or not.

13         A good everyday example is testing drinking water or

14 when you go to the beach they tell you, oh, we tested the water

15 and it's got coliforms in it so you can't swim there.  Okay.

16 Well, the coliforms are an indication that there might be

17 pathogens like E. coli or salmonella that might make you sick,

18 so that's the concept of an indicator.

19 Q.   It indicates.

20 A.   It indicates and --

21 Q.   At least it's supposed to.

22 A.   It's supposed to.

23 Q.   He also -- there's a term in there, high hygiene area.

24 What's that mean?

25 A.   In factories that are making sensitive foods -- and Abbott

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 109 of 203

1    Casa Grande's making the sole source of -- ready-to-eat sole

2    source of nutrition for an infant, so in certain areas where the

3    product is exposed to the factory environment, you have to be

4    very careful about whether you contaminate the product as it's

5    in those areas.  You don't want a factory contaminant to go into

6    that ready-to-eat food for the infant.

7    Q.   So they zone the factory?

8    A.   They zone the factory.  Some areas are high hygiene.  Some

9    are low.  Warehouse would be considered a dirty area.  The dryer

10   tower, the packaging areas would be high hygiene areas.

11   Q.   And is his observation correct that enterobacteriaceae or

12   EB has had at least at that point been traditionally used as an

13   indicator to find deviations in the high hygiene area or what's

14   sometimes called the red zone?  I mean, is that a factual

15   statement?

16   A.   In Dr. Cordier's Nestle world, that statement would be

17   true.  Nestle was known for using EB as an indicator of whether

18   their process areas were microbiologically clean or not.

19   Q.   Well, I don't think he's saying it's always used, but it

20   was used.

21   A.   It was used, yes.

22   Q.   And in 2008 at Casa Grande --

23   A.   They were --

24   Q.   -- what was Abbott's practice?

25   A.   Abbott was using //// as a way to evaluate their high hygiene

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 110 of 203

1 areas.

2

3

4 Q.   Is EB -- when you test for EB, is that a reliable indicator

5 for the presence of E. sak?

6 A.   No.

7 Q.   Why not?

8 A.   It's kind of a -- when you look at the definition of

9 enterobacteriaceae, it's kind of a seemingly intuitive thing to

10 do.  It's like, okay, you've got this family of microorganisms.

11 There's salmonella in there.  There's E. sak.  There's E. coli.

12 There's a whole host of things.  And if we just look for EB

13 which is pretty easy to do, we can give us -- we can provide

14 some indication of whether the pathogen is present or not.

15        And it's -- the problem is that both -- particular ES

16 has a much different competitive profile in a dry powder factory

17 than a lot of other EBs do.  So there really isn't any

18 correlation between EB in the factory environment or EB in

19 finished product.

20        And that was actually one of the -- one of the areas

21 that was addressed in the 2006 risk assessment and was -- the

22 connection between using EB as a indicator for pathogens was

23 conclusively put to rest as not being correct.

24

25

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 111 of 203

1   Q.   No.  I mean now, now, at the present time, or has that all

2   been changed because of subsequent knowledge?

3   A.   It depends.  The means are there to directly test for the

4   pathogen, and that's what most people do.

5   Q.   Okay.  Is there any doubt in the scientific community that

6   EB is not a reliable indicator for E. sak?

7   A.   No, it's settled science.

8   Q.   He -- Dr. Cordier also says on page 6 that under such

9   conditions the control over the presence of water, and then in

10  paren, infiltrations, condensations, cleaning water, et cetera,

11  becomes even more important and critical.  While the presence of

12  water does not necessarily -- has not necessarily an immediate

13  impact on the presence of salmonella, it has an immediate effect

14  on the increase of enterobacteriaceae.  Such increases can only

15  be prevented by thoroughly reviewing all process steps,

16  procedures, running of services such as air, by strengthening

17  the dry cleaning procedures, et cetera, to maintain populations

18  consistently at the low levels indicated above.  Do you see

19  where it says that?

20  A.   Yes.

21  Q.   Is Dr. Cordier correct when he says that?

22  A.   He's -- he's got one particular thing completely right, and

23  that is in a dry powder factory -- in fact, I'll give everybody

24  sort of the key piece of information is you need to follow the

25  water.  So water in a dry powder factory is like pouring

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 112 of 203

1   gasoline on a fire.  However, that's what you need to control.

2   Whether there's EB or not really doesn't reflect.  You need to

3   control the water.  If you control the water --

4   Q.   What happens when water meets the product in the dry area?

5   A.   You got water, you got food.  You can potentially get

6   something to grow.  Microorganisms are very small.  They're

7   about one micron in size.  You can't see them with the naked

8   eye.  Factories are factories.  They got cement floors.  They

9   got tile floors.  They got cracks.  They got crevices.  It's

10  very easy to have what's called a microbiological niche.  You

11  get a little bit of water, you get a little bit of food, and you

12  can have the organism growing.

13  Q.   Then also on page 6, Dr. Cordier says in the last sentence

14  there the sample size analyzed will normally depend on the type

15  of infant formula, that is, products for premature or newborn

16  babies versus products for older infants.  Do you see where it

17  says that?

18  A.   Uh-huh.

19  Q.   What's -- is that -- is that a true statement?

20  A.   Yes.

21  Q.   And could you explain it to the jury.

22  A.   Well, there's -- the whole FAO WHO process was aligned or

23  set up in a way that it was trying to attach a risk to -- to the

24  possibility of ES infections from particular products.  And some

25  products are more -- they're going to be consumed by infants

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 113 of 203

1  which are at higher risk such as infants that are less than six

2  weeks of age or they're of low birth weight or they have other

3  issues and n --

4  Q.   Would an example -- would an example of a product like that

5  be --

6  A.   NeoSure.

7  Q.   -- Abbott NeoSure?

8  A.   Right.  So the --

9  Q.   Okay.  So what is Dr. Cordier saying what you gotta do if

10  you're manufacturing a product like NeoSure?

11  A.   He says a sample size for the higher risk products should

12  be larger.

13  Q.   The -- larger than for more mainstream formula?

14  A.   Correct.

15  Q.   And when he says sample size, what's he -- what's that

16  making a reference to?

17  A.   It's not within the context of that statement.  But I

18  believe he's referring to the number of samples.  Factory

19  contaminants like salmonella and E. sak are heterogeneously

20  distributed.  That is, they kind of are -- they happen.  They're

21  random.  But they're not homogeneous.  So for a heterogeneous

22  contaminant, you need lots of samples.  For a homogeneous

23  contaminant, you can take a relatively few number of samples and

24  get the same result.

25  Q.   So did you see anything in this case in the deposition of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 114 of 203

1  Sharon Bottock or anyplace else that Abbott used any type of

2  enhanced testing when it was making its NeoSure product?

3  A.    No.

4  Q.    Exhibit 90.  Exhibit 90 is a paper entitled Powdered Infant

5  Formula Industry Practices and Standards in the United States of

6  America.  And it's directed to the WHO workshop, the one we've

7  been talking all along about in February 2004, and it's authored

8  by Daniel March.  Do you see where it says that?

9  A.    Yes, yes.

10 Q.    And we don't need to go through the whole paper, but I will

11 hand you the paper, and you'll see that in the paper Dr. March

12 has headings entitled the Manufacture of Powdered Infant Formula

13 on page 2.  He's got another chapter or heading In-Process

14 Control Program/GMP, and that's on page 3.  Do you see where

15 that is?

16 A.    Yes.

17 Q.    What's GMP mean by the --

18 A.    Good manufacturing practices.

19 Q.    So Dr. -- is it Dr. March or --

20 A.    No, it's --

21 Q.    Okay.  Mr. March.  Mr. March sets out some standards.  Now,

22 you've reviewed this paper before, have you not?

23 A.    Yes.

24 Q.    Do these papers -- does this paper and Dr. Cordier's paper

25 that we just went through, do they provide appropriate industry

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 115 of 203

standards for that time period in connection with the

manufacture and control of -- manufacture of powdered infant

formula and control of E. sak?

A.   Yes, yes, they provide a adequate description of industry

practices.

Q.   And were those industry standards and practices generally

the same in 2008?

A.   Yes.

Q.   And when you reviewed this case, did you have those

standards and practices in mind?

A.   Yes, I did.

Q.   101.  101 is an e-mail from the IFC to you and various

other people in the industry including Abbott, and it says for

your reference the attached letter providing IFC comments

relating to this code -- well, that's what's attached.  Do you

see where it says that and there you'll see a letter to

Dr. Farber?  Do you know -- who's Dr. Farber?

A.   He's -- as you can see, at that point he was director of

Bureau of Microbial Hazards in Canada.  So he was the one that

was heading up the practices effort for CODEX.

Q.   On page 3 you'll see where the IFC in its letter to

Dr. Farber makes the point that the safety of foods for infants

and children is not the sole responsibility of manufacturers.

Thus, emphasis should be placed on education for consumers and

healthcare professionals.  And then it indicates that he's

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 196 Filed 05/13/14 Page 116 of 203

1  enclosing a brochure developed by the IFC to address preparation

2  and handling of powdered infant formula.  Do you see where it

3  says that?

4  A.   Yes.

5  Q.   What -- and -- what is your reaction to the IFC taking that

6  position?

7  A.   The IFC was pretty early on as a industry voice trying to

8  deflect blame and responsibility and --

9         MR. REIDY:  Your Honor, if I may, I would interpose an

10  objection to the witness testifying to the intention of the IFC.

11        THE COURT:  I think you can give a -- well, why don't

12  you lay a better foundation for it.  I'm going to sustain the

13  objection.

14        MR. RATHKE:  I'm going to withdraw the question.

15  BY MR. RATHKE:

16  Q.   And actually I'm going to ask the same question, but listen

17  to it.  What is your reaction?  I wanted your reaction, not

18  necessarily the IFC's position.  Tell us what your reaction is.

19  A.   I didn't agree with it.

20  Q.   And why not?

21  A.   To my point of knowledge working within a company and

22  working to control ES and make safe products, it's possible to

23  do so, and it's possible to do so so that -- I mean, this is

24  blaming the consumer and that's -- you make a safe product, and

25  you put it on the market.  You don't make a product that's not

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 117 of 203

```
 1   safe and expect a consumer to do something else that's going to
 2   make it safer.  That's -- ES in this particular case is
 3   preventible, and this kind of attitude suggests that it's not.
 4   Q.   104, please.  104 is a e-mail from -- well, IFC e-mail to
 5   its contacts including board of directors.  And it says that on
 6   January 17 IFC people had a very productive meeting with
 7   Dr. Anna Bowen and some others with CDC and somebody from the
 8   FDA to discuss E. sak issues.  Do you know who Dr. Anna Bowen
 9   is?
10   A.   Yes.
11   Q.   And who's she?
12   A.   She was the one that was on the CDC side of things keeping
13   track of ES outbreaks and was trying to push the FDA along for
14   stronger enforcement.
15        MR. RATHKE:  And could you highlight that part
16   about . . .
17   Q.   Do you see where it says of particular interest?
18   A.   Yes, yes.
19   Q.   It says of particular interest, Dr. Bowen -- or Drs. Bowen
20   and somebody else disagreed with IFC's citation that, quote, FDA
21   is not aware of E. sak infections among healthy, full-term
22   babies in home settings.  Do you see where it says that?
23   A.   Yes.
24   Q.   They, referring to Dr. Bowen and her colleague, noted that
25   there had been a number of cases that had occurred in the home
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 118 of 203

1   with healthy infants.  Do you see where it says that?

2   A.   Yes.

3   Q.   And then it goes on to say we acknowledge there have been

4   some mention of these cases at a recent IFC meeting with FDA.

5   Do you see where it says that?

6   A.   Yes.

7   Q.   Do you agree with Dr. Anna Bowen's observation about

8   healthy, full-term babies?

9   A.   I agree with -- I have no data to back that up.  In my

10  memory -- I have a memory of the meeting, and I have memory of

11  her providing some details about infections related to term

12  infants and older, healthier infants, and I just have to take

13  her at her word.

14        MR. RATHKE:  And then the next, we noted, we noted.

15  Second sentence.  You got the right paragraph.

16  Q.   Do you see where the memo goes to say we, meaning the IFC

17  people, noted there are manufacturing and financial aspects

18  surrounding the production and consumption of powdered infant

19  formula around the world and expressed potential difficulty in

20  trying to reduce PFI (sic) use?  Do you see where it says that?

21  A.   Yes.

22  Q.   Then it goes on to say that one of the CDC doctors

23  expressed a strong need to make PIF sterile which would

24  eliminate almost all negative aspects of PIF use.  He added it

25  is unacceptable.  There is no way to make PIF sterile, could not

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 119 of 203

1  believe that this could not be accomplished and suggested

2  industry consider providing funding or incentives to

3  universities in an effort to produce sterile powdered infant

4  formula.  Do you see where it says that?

5  A.    Yes.

6  Q.    Can it be made sterile?

7  A.    In my -- I was -- in the last year of my time with Wyeth,

8  we had formed a team to do just exactly that.  The goal was to

9  provide -- to produce sterile PIF.

10 Q.    Do you know what the financial considerations that the IFC

11 makes to the CDC?  Do you know what they're referring to?

12 A.    Well, they're -- they're --

13        MR. REIDY:  Your Honor, I would impose an objection

14 again unless he had some role in this letter or some

15 understanding of what the IFC was thinking.

16        THE COURT:  He can answer if he knows.

17 A.    The IFC is always concerned about communicating that if the

18 FDA or regulations came out that they didn't agree with it would

19 likely drive up the cost of product, and that's what -- that's

20 what they're saying here as well.  They're concerned about the

21 money.

22 Q.    And then to 107.  107 is another e-mail from IFC to

23 industry people, and it indicates that on April 19 I, meaning

24 presumably Rachel Spector, met with Dr. Anna Bowen and Dr. Chris

25 Braden, CDC, for two hours to present the presentation -- or

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 120 of 203

```
 1   discuss the presentation Bugs and Babies -- Bugs and Baby

 2   Bottles, E. sak Disease in Powdered Infant Formula, given by

 3   Dr. Bowen at a meeting.

 4              MR. RATHKE:  Could you call out -- I guess it's on

 5   page 2.

 6   Q.   And they're kind of summarizing the meeting.  Dr. Braden,

 7   one of the CDC doctors, acknowledged the work the industry has

 8   done addressing this issue but clearly does not believe the

 9   issue is only a function of proper preparation and handling of

10   the reconstituted product -- or formula.  Do you see where it

11   says that?

12   A.   Yes.

13   Q.   Do you agree with Dr. Braden?

14   A.   Yes.

15   Q.   Brandon?

16   A.   Yes.

17   Q.   And then further on, page 3.  Do you see where it says the

18   reason why the CDC is focusing on E. sakazakii infection?

19   A.   Yes.

20   Q.   Even though it is so rare is because of the high mortality

21   rate and the belief that this infection is preventible.  Do you

22   see where it says that?

23   A.   Yes.

24   Q.   Do you believe it's preventible?

25   A.   Absolutely.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 121 of 203

1  Q.   So how can you -- how can you make E. sak -- or powdered

2  infant formula E. sak-free?

3  A.   There's -- pretty much as you led in with Dr. Cordier and

4  Dan March's paper, there's some relatively simple industry

5  standard methods for doing that.  One is you have your factory

6  hygienically zoned in an appropriate manner.  You have a

7  sanitation program that's effective and is verified to be

8  effective, so that's the sanitation pre -- microbiologically

9  clean factor.  You have an environmental monitoring program

10  that's effective and used to verify the sanitation program and

11  whether your manufacturing environment is suitable for the

12  manufacture of these high-risk products.  I think those are the

13  three big reasons, ways to do it.

14  Q.   Exhibit 109.  You see that Exhibit 109 is an e-mail from

15  IFC to -- this e-mail is to Dan March, but it forwards an e-mail

16  from IFC to representatives of the industry including Russell

17  Merritt of Abbott.  And it's entitled the six-month global

18  strategy plan -- do you see where it says that? -- and dated

19  August 2005.

20  A.   Yes.

21  Q.   Okay.  Let's go to page 2 where the paper discusses

22  possible negative outcomes.  And listed there is required

23  inappropriate warning statements on powdered and possibly liquid

24  infant formula products.  That's one of the possible negative

25  outcomes.  Do you see where it says that?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 122 of 203

1    A.    Yes.

2    Q.    Restrictive legislation in the United States and globally

3    further impacting the labeling, promotion, sampling, and

4    availability of infant formula.  That's a negative for the IFC;

5    correct?

6    A.    Correct.

7    Q.    A shift and restriction in availability whereby infant

8    formula becomes a commodity or prescription-only product.

9    That's a negative thing there.  Were these concerns of the IFC?

10   A.    Yes.

11   Q.    And then to page 4.  And I think we'll find on page 4, it

12   starts out at the bottom of that paragraph, it says examples of

13   negative action.

14           MR. RATHKE:  And then highlight -- you're right there.

15   Q.    Examples of negative action and then the bullet points.

16   There's a few bullet points listed there.  But I'm going to

17   center on the last one.  A possible negative action would be the

18   WHO resolution passed by the World Health Assembly encourages

19   manufacturers to inform healthcare professionals, parents, and

20   other caregivers through an explicit warning on packaging that

21   powdered infant formula may contain pathogenic microorganisms

22   and must be prepared and used properly.  Do you see where it

23   says that?

24   A.    Yes.

25   Q.    Was that a concern of the IFC?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196   Filed 05/12/14   Page 123 of 203

1    A.    Very much so.

2    Q.    Did the IFC regard that type of requirement as a negative

3    action?

4    A.    Yes.

5    Q.    Okay.  Thank you.  I'm --

6              MR. RATHKE:  Just to inform the Court, I'm going to a

7    different subject, so shall I just proceed?  I just want you to

8    know, if you wanted to take a break or a stretch break.

9              THE COURT:  Oh, okay.  I didn't know what you were

10   talking about.  I'm not clairvoyant.  Yeah, we can take a

11   stretch break.

12             Thank you.  Please be seated.

13   BY MR. RATHKE:

14   Q.    What Abbott records did you review in connection with your

15   engagement to analyze their process?

16   A.    I reviewed the batch records relative to this product and

17   many other records relating to their procedures for testing it

18   and a whole host of documents related to the manufacture.

19   Q.    And that would include the environmental testing results?

20   A.    Yes.

21   Q.    Now, after Jeanine's illness was reported to Abbott, there

22   was an investigation.  Did you review those records?

23   A.    Yes, I did.

24   Q.    And did you review any policies and procedures that Abbott

25   provided describing their policies at that -- during that time

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 124 of 203

1  period?

2  A.    Relative to -- be more specific there.

3  Q.    Relative to manufacture and testing.

4  A.    Oh, yes, yes, of course, went through the whole --

5  Q.    And HACCP and cleaning and so forth?

6  A.    Yes.

7  Q.    And did you also review depositions of various Abbott

8  employees, personnel that were deposed?

9  A.    Yes.

10  Q.   Did you reach any opinions to a reasonable degree of

11  certainty in your field regarding the manufacturing and testing

12  process?

13  A.    Yes, I did.

14  Q.   Could you tell those in summary fashion at first.

15  A.    Well, the manufacturing and testing was defective,

16  negligent and defective.

17  Q.   Did it conform to the standards of the powdered infant --

18  industry in respect to manufacture and testing?

19  A.    No.

20  Q.   What do the batch records tell us regarding this particular

21  batch that's the subject batch in this case as to time and

22  process of production, and I think that's something you want to

23  refer to your report on?

24  A.    Right.  I -- that's the easiest way to do it.  The product

25  was dried on January 8 of 20 -- of 2008, and it was packaged a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 125 of 203

1   couple days later, and it ended some time on 1-11.  So it began

2   drying on 1-8 and then finished packaging on 1-11.

3   Q.   Were you able to determine how big this lot was?  And why

4   don't we identify the number of the lot.  Do you have that in

5   front of you?

6   A.   No, I don't.

7   Q.   Okay.  Well, go ahead.  How big was this lot?

8   A.   The lot was -- so I guess it depends -- there was

9   essentially two lots.  One piece was shipped to Canada.  The

10  other piece was marketed in the United States.  Each of them had

11  about -- one had a little bit more than 13,000 6-packs cases.

12  The other one had about 12,000.  So at the end of the day,

13  you've got 2 lots of product that are roughly 70,000 cans of

14  12.8 ounces each.

15  Q.   Is there anything in particular about the significance of

16  the size of this lot, particularly in relation to what's

17  typically manufactured?

18  A.   The two lots com -- well, any lot when you got 70,000 cans

19  is a large lot.  If you combine them as a total with 140,000

20  cans, that's a very, very, very large lot of product.  It makes

21  it a production entity that becomes difficult to do a whole

22  number of things that you might need to do with it.  It's going

23  to be difficult to reject simply because it's large and the

24  monetary value is so large, so there's a -- working in one of

25  these companies, I can tell you there's a process you go through

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 126 of 203

1   that does include that evaluation.

2           And the other piece is once it's on the market that's

3   a lot of product out there, so it's tough to get it back if you

4   want to get it back. So in a way it's too big to fail.

5   Q.  How should the equipment and factory areas after drying be

6   kept clean? How do you clean them?

7   A.  After the drying in the dry areas, there's generally a

8   physical cleaning either through sweeping or for vacuuming.

9   We're talking about the factory areas now, not the equipment.

10  And for modern factories, the factory environment itself is also

11  sanitized. In other words, there's a sanitizer used. There's a

12  number of commercially available sanitizers. The food industry

13  in general uses what are called quaternary ammonium compounds

14  for these. These are -- they're called quats, and they're a

15  wide -- they kill all kinds of different bacteria, and they're

16  widely used in the factory environment for that purpose. So

17  that is how you would maintain microbiological control in your

18  factory environment itself. You would sanitize it.

19  Q.  You know, I should have asked this question before, so I'll

20  ask it now. Could you give us some kind of an overview as to

21  how Abbott produced their powdered infant formula at the Casa

22  Grande site? And I think we're going to pull up a slide to help

23  do that. Is that the slide that helps do it?

24  A.  That's the slide that helps do it.

25  Q.  Okay. Let's do that then.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 196 Filed 05/13/14 Page 127 of 203

1  A.   I actually modified this from a slide that I'd produced for

2  Wyeth.  The processes are very similar.  And as I -- as I was

3  intimating earlier, in dry factories -- this is a dry powder

4  factory.  Water's the enemy.  So you've got typically what's

5  called the wet side and the dry side.

6        The wet side is everything that's where it's liquid.

7  And usually the wet side ends right after it goes through the

8  evaporator.  In this case -- excuse me, the pasteurizer.  In

9  this case it's going to go through the evaporator and probably

10 dryer heat -- dryer preheater and go up to the dryer.

11 Q.   Now, tell us about this dryer.

12 A.   Right.  So the --

13 Q.   It turns it from a wet mixture to a dry mixture.

14 A.   So the -- these are little boxes, and they kind of --

15 they're gross oversimplification as to what's going on here.

16 But the dryer piece of it is they're taking liquid mix, and it's

17 a large building.  I think the -- it's like 16 levels, eight or

18 nine stories.  It's a gigantic -- it's a gigantic stainless

19 steel tube, so they're shooting in the liquid on the top, and as

20 it's falling to the bottom, it's drying into powder.  And it's

21 a -- it's a big piece of equipment.  And it's -- there's lots of

22 stuff going on.  It's not just that.  You've got an exhaust

23 stack at the top that's pumping out hot air.  You've got

24 cyclones that are attached that are knocking the powder out of

25 the hot air on the bottom.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 128 of 203

1 ////////////////////////////////////////////
2 /////////////////////////////////////////////
3 /////////////////////////////////////////////
4 //////////////////// --

5 Q.   Let me stop you there.  How does then that dryer work?  It
6 starts at the bottom and goes -- how does it get dry?  How does
7 it dry the powder?

8 A.   It's like drying clothes.  It's evaporation.  You put it --
9 you put the liquid in at the top, and as it falls -- it's misted
10 in there, and as it falls, it dries.  Kind of like overspray.
11 If you're painting a car or something or a fence, you get the
12 overspray as the particles dry and stick to things.

13 ////////////////////////////////////////////
14 /////////////////////////////////////////////
15 /////////////////////////////////////////////
16 /////////////////////////////////////////////
17 /////////////////////////////////////////////
18 ///////////////////////////////////////////
19 ////////////////////////////////////////////
20 /////////////////////////////////////////////
21 /////////////////////////////////////////////
22 /////////////////////////////////////////////
23 /////////////////////////////////////////////
24 /////////////////////////////////////////////
25 /////////.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 129 of 203

1 ///////////////////////////////////////////////

2 ///////////////////////////////////////////////.

3 ///////////////////////////////////////////////.

4 ///////////////////////////////////////////////.

5 ///////////////////////////////////////////////.

6 ///////////////////////////////////////////////.

7 ///////////////////////////////////////////////.

8 ///////////////////////////////////////////////.

9 ///////////////////////////////////////////////.

10 ///////////////////////////////////////////////.

11 ///////////////////////////////////////////////.

12 //////////////////////////.

13 ///////////////////////////////////////////////

14 ///////////////////////////////////////////////.

15 ///////////////////////////////////////////////.

16 /////////////.

17      In a more typical situation in 2014 you'd have a dryer

18 that did the drying and the agglomerating piece all at once, so

19 you don't have these two pieces of equipment. You have one

20 piece of equipment.

21      So any time you have a extra process on this red side

22 of the process which is the dry side, you introduce the chance

23 of the product being contaminated either by worker intervention

24 or by unclean equipment. There's all kinds of different things

25 that can happen on the dry side, so it's just one more big piece

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW Document 196 Filed 05/13/14 Page 130 of 203

1 to what's going on.

2 Q.   Some people have described this process and this equipment

3 as state of the art.  Was this state of the art in 2008?

4 A.   I -- from a how you make the powder point of view, no, it's

5 not state of the art.

6 Q.   What part of it is not state of the art in 2008?

7 A.   I have -- I've got -- I have personal experience because

8 Wyeth when I had -- /////////////////////////////////////////

9 /////////////////////////////////////////////////////////////

10 ////////, And the new dryers we put in in Mexico and in

11 Singapore in -- when was it? -- 2010, the Greenfield site that's

12 now Nestle in China all had -- had dryers where this occurred.

13       MR. REIDY:  Your Honor, I object to 2010 changes as an

14 expression of what the state of the art was in 2008.

15       THE COURT:  Sustained.  The jury's advised to

16 disregard the last answer of the witness.

17 Q.   Yeah.  We just want to know what was available in 2008.

18 A.   Okay.  Well, this is 1994 technology, so 2008 this

19 technol -- this technology had been removed from Wyeth factories

20 and was not something that was, from my considerable experience,

21 something that was done in the industry in general./

22 //, ////////////////////////////////////////////////////////

23 ///////////////////////////////////////////////////////

24 // ̀/////////////////////////////////////////////////////

25 /////////////////////////////////////////////////////////

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 131 of 203

454

////////////////////////////////////////////////////
////////////////////////////////////////////////////
////////////////////////////////////////////////////
////////////////////////////////////////////////////
////////////////////////////////////////////////////
////////////////////////////////////////////////////
///////////////////////
            //////////////////////////////////////
////////////////////////////////////////////////////
////////////////////////////////////////////////////
////////////////////////////////////////////////////
/////////////////////////////// All kinds of things can happen.

And on the packaging side, this is where the powder's actually being put in the can, so, of course, it's completely exposed to the factory environment because you're putting powder into a can and then putting not the top on it but the lid on it. And that's happening -- there's many things that can happen in the packaging environment. They can have jams. They can have all kinds of things.

One unfortunate practice I've seen many times is topping off low-weight cans where you'll actually have a human being that will be used to take cans that are low weight and put a little spoon of powder in it to get it up to weight. These kind of things happen in powdered infant formula factories and

1  all contribute to the reasons why this dry side is a area that

2  is of concern for ES.

3       The other piece that contributes to this -- well . . .

4  Q.   How -- how do you control bacterial problems in the dry

5  side of the process?

6  A.   Okay.  You've got to do -- control particularly of ES in

7  these areas is -- is severalfold.  The key thing is you need to

8  control the use of water, and then when you do use water to

9  clean, it has to be followed with a sanitizer; okay?  And I'll

10 repeat that.  It has to be followed with a sanitizer.  Otherwise

11 what happens is enterobacter sakazakii, it's a unique little

12 thing that it has in the world that makes it different from

13 other bacteria is it resists drying.  It's called dry stress

14 resistant, but it just resists drying better than other

15 bacteria.

16      So if you wet clean something, you don't sanitize,

17 you're going to provide a competitive opportunity for this

18 organism to grow and to establish a presence.

19      And I have personal experience with the larger pieces

20 of equipment that are cleaned in place such as the agglomerator

21 in particular and the dryer.  If these larger pieces of

22 equipment are not treated with a sanitizer as a final rinse,

23 they will produce product that's ES positive from time to time.

24 It's something that is needed to control ES as the question was

25 phrased on the dry side.  If you have to take something apart to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 133 of 203

1  clean it, that gets to be a different deal.  That you really

2  have to be careful about.  It's gotta be done in a very

3  controlled manner.  And again, you need a sanitizer at the end

4  of the process for pieces of equipment they have to take apart.

5     And so all of these things that connect up, ////

6  /////////////////////////////////////////////////////////

7  //////////////////// a lot of this equipment, it's big.  You

8  can't really take it somewhere.  You can't put it in a

9  dishwasher somewhere.  If it can't be cleaned in place, you've

10  gotta take it apart and do it right there in the factory.  So

11  that's what happens as well.

12  Q.  Can you tell us a little more about this sanitizer?  You

13  know, what is it, what does it do?

14  A.  Well, there's -- the sanitizer for the clean in place is --

15  there's a number of different brands, but I talked about

16  quaternary ammonium sanitizer for the general factory

17  environment.  These things are called peroxyacetic acids,

18  hydrogen peroxide.  It's hydrogen peroxide is what it is.  So

19  it's an oxidizing agent that basically chews up the bacteria.

20  And it's no rinse because the hydrogen peroxide just basically

21  goes away as it's sitting in the -- it's not something that's

22  going to be transferred to the product, so you don't have to

23  rinse it like you would with a chlorine sanitizer.

24  Q.  Was this process of using the sanitary rinse that you've

25  been describing, was that industry standard in 2008?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 134 of 203

1   A.   It was.  And I work with so many industries.  In the

2   powdered infant formula industry, yes.  And almost --

3   Q.   And I meant -- I should say in the powdered infant formula

4   industry.

5   A.   Yes, yes.

6   Q.   And is that described by March and Cordier in the papers

7   that we've looked at?

8   A.   They talk about using appropriate sanitation procedures.

9   They don't get as detailed as I do, but that's what they talk --

10   you need to sanitize the equipment.

11   Q.   And did Abbott depart from this method that you've

12   described as optimum and industry standard?

13   A.   Well, from the description their expert gave for their CIP

14   process, /////////////////////////////////////////////

15   ////// and there is no sanitizing rinse.

16   Q.   There was no sanit --

17   A.   No sanitizing rinse.

18   Q.   Let's move to environmental testing, in particularly the

19   environmental testing that occurs in the dry side.  Why does a

20   company want to test the factory environment and equipment for

21   bacteria?

22   A.   Okay.  This is -- this is something I'm really passionate

23   about because I end up working with folks both that have

24   problems and try to do things.  But the way it works is if you

25   don't have the pathogen in your raw materials and it's not

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/13/14  Page 135 of 203

present in your factory environment, intuitively you can't

contaminate product.  So in this case with this process, you're

going to provide a inactivation step that will keep -- take the

raw material piece out of it.  That's -- you're going to

inactivate any cronobacter that were in the raw materials.

Q.    That's by pasteurizing.

A.    That's by pasteurizing.  Dry side, however, is a different

story.  And in order to control both salmonella and cronobacter,

cronobacter in particular, these are factory contaminants.  They

contaminate the product as it's going through this process on

the dry side of the factory.  The only way that you know if

you're in control of your factory is to test the factory

environment directly for the organism, for cronobacter in this

case.

        And that's stated in the industry practice, in the

2000 CODEX.  They want folks to have an environmental sampling

plan.  That goes back to the early stuff from Cordier and March

where they wanted environmental sampling plans as well.  You

need to have information on whether the organism is in your

factory and it tells you if your sanitation program is working;

okay?  If you're out there sanitizing and you've got organisms,

okay, well, you need to do something different.  You need to

control your factory environment.  You need to sanitize it

properly, so that's the purpose of the environmental monitoring

program.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 196  Filed 05/12/14  Page 136 of 203

1  Q.    What was Abbott -- when they took environmental samplings,

2  what were they testing for?

3  A.    They were testing for ///////////////////////. So the

4  technologically appropriate thing would be to directly test for

5  the pathogen instead of an indicator.  They certainly had the

6  capability.  The use of ////////////////////// will

7  drastically -- really won't give you very much good information

8  about your factory environment relative to contamination with

9  cronobacter.  If you do find it with the methods they were using

10  which are not very sensitive, if you do find it, it tells you

11  that the environment is thoroughly contaminated, not just a

12  little bit, but like if you look hard with the right

13  methodology, you're likely to find it in many, many, many more

14  samples throughout the factory.

15  Q.    If you use ////////// sample is negative, can you miss

16  E. sak?

17  A.    Yes.

18  Q.    What was Abbott doing if it found //?

19  A.    They had a -- they had a program where they -- it was a

20  written program -- on whatever day they came out and they

21  sampled whatever place they were sampling.  ///////////////////

22  ////////////////////////////////////////////////////////////

23  //////////////////////////////////////////////////////

24  /////////////////////////////////////////////////////////////

25  //////////////////////////////////////////////////////////

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 137 of 203

/////////////////////////////////////////////////

/////////////////////////////////////////////////

/////////////////////////////////////////////////

///////////////. It was more than they wanted to see in their

program.

Q.    Incidentally, is this area of how to test, what to look

for, you know, the actual testing procedure, is that -- is that

an area in which your wife, Catherine Donnelly, would have more

experience or expertise?

A.    She's got expertise on that.

Q.    Okay.

A.    On the methodology.

Q.    All right.  So let's -- so we'll cover that with her, and

we'll just cover some more broad points with you.

        THE COURT:  Yeah, but before we do that, Mr. Rathke,

I'm going to give the jury the last break for the day.

        So, members of the jury, it's about 12:32.  We'll be

in recess until 5 minutes to 1.  Thank you.

        (The jury exited the courtroom.)

        THE COURT:  Anything we need to take up?

        MR. RATHKE:  No, Your Honor.

        MR. REIDY:  No thank you.

        (Recess at 12:32 p.m.)

        THE COURT:  Bring the jury in, please.

        (The jury entered the courtroom.)

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 138 of 203

```
 1              THE COURT:  Thank you.  Please be seated.

 2              You may continue, Mr. Rathke.

 3              MR. RATHKE:  Thank you, Your Honor.

 4   BY MR. RATHKE:

 5   Q.   Dr. Donnelly, did you review Abbott records to determine

 6   the method that they used to collect the environmental samples?

 7   A.   Yes, I did.

 8   Q.   And what was that method?

 9   /// ///////////////////////////////////////////////////

10   //////////////////////////////////////////////////////

11   //////////////////////////////////////////////////////

12   /////////////////////////////////////////////////////

13   /////////////////////////////////////////////////////

14   /////////////////////////////////////////////////////// --

15   Q.   Let's talk about what they did first.

16   A.   Okay.

17   Q.   Have you described it completely?/

18   /// ///////////////////////////////////////////////////

19   /////////////////////////////////////////////////////

20   /////////////////////////////////////////////////////

21   ///////////.

22   Q.   Does that make a difference?

23   A.   It makes a huge difference, and the reference I'm using is

24   the FDA method. //////////////////////////////////////////

25   /////////////////////////////////////////////////////.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 139 of 203

1   The other --

2   Q.   Why is that?  What's the diff -- what happens at one

3   temperature but not the other?

4   //. ///////////////////////////////////////////////////

5   ////////////////////////////////////////////////////////

6   ////////////.

7          ////////////////////////////////////////////

8   ////////////////////////////////////////////////////////

9   ////////////////////////////////////////////////////////

10  ///////////////////////////////////////////////////////.

11  ///////////////////////////////////////////////////////.

12  ///////////////////////////////////////////////////////.

13  ////////.

14          /////////////////////////////////////////////.

15  ///////////////////////////////////////////////////////.

16  ///////////////////////////////////////////////////////.

17  ///////////////////////////////////////////////////////.

18  //////////.

19  Q.   The idea of the testing, once you've collected the sample,

20  is to grow the bacteria.

21  A.   Correct.

22  Q.   And the difference in the methodology affects whether the

23  bacteria will grow.

24  A.   It does.

25  Q.   Now, Abbott doesn't want to find bacteria in its factory;

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 140 of 203

1    correct?  I mean, no infant manufacturer wants to find bacteria.

2            MR. REIDY:  Your Honor, I object to leading.  I object

3    to leading, Your Honor.

4            THE COURT:  Sustained.

5    BY MR. RATHKE:

6    Q.   And then before you went off on another topic, we were

7    talking about the collection -- you described the way that they

8    collected it.  Is there anything wrong with the manner they

9    collected it from the surface itself?///

10   ///  ///////////////////////////////////////////////////////

11   //////////////////////////////////////////////////////////,

12   ////////////////////////////////////////////////////,

13   //////////// The typical thing that's done with the sponge

14   swabs is you try to -- you try to swab as large a area as you

15   need.  If you're going after a drain, you take the drain apart,

16   and you get in there, and you go after all the different parts

17   of the drain and get down to where the lip is between the pipe

18   and the drain.

19           And what you do then is you are interested in finding

20   out if you've got one organism and if -- ///////////////////

21   ////////////////////////////////////////////////////,

22   ///////////////////////////////////////////////////////////,

23   //////////////////////// If you were to use a preenrichment

24   technique which is -- again, the industry standard is to take

25   the sponge and put it in a nonselective medium such as lactose

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 141 of 203

1 broth.  You let it go for 24 hours plus or minus 2, and then you

2 can link it to whatever detection system you have.

3 ////////////////////////////////////////////

4 /////////////////////////////////////////////

5 //////////////////////////////////////////////

6 ///////////////////////////////////////////

7 /////////////////////////////////////////////

8 /////////////////////////////////////////////

9 ////////,

10 ///////////////////////////////////////////

11 ///////////////////////////////////////////

12 //////////////////////////////////////////////

13 ///////////////////////////////////////////

14 ///////////////////////////////////////////

15 //////////.

16 Q.   What does the term preoptional -- preoperational inspection

17 mean?

18 A.   Preop inspection is an evaluation of the manufacturing

19 environment prior to manufacturing product.  And this can be

20 visual.  It can be microbiological.  You can take swabs of your

21 factory environment, test them, see what the results are prior

22 to manufacturing in that environment.

23 Q.   What procedure starts this preoperational inspection?

24 A.   Usually with preops it's what you do after you do a wet

25 clean.  We're talking specifically about the Abbott factory in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 142 of 203

1  Casa Grande. ///////////////////////////////////////
2  ///////////////////////////////////////////////////////
3  ///////////////////////////////////////, Something was going on
4  out there.  And you -- an appropriate procedure would have been
5  to take samples, /////////////////////////////////////////
6  /////, As I said, I would have preferred to see them testing
7  directly for the pathogen.  If they're testing for //, you're
8  testing for //, but you're evaluating the factory environment to
9  see whether it's in control to manufacture a sensitive product
10 like the NeoSure.
11 Q.   When you're doing this inspection that you've just now
12 described, is the factory running?
13 A.   The factory -- this should be done before the factory's
14 running.  In some instances you actually release the factory
15 area back to operations, like actually get the test results back
16 and then release it back.  In some instances the manufacturing
17 folks will start up and start making product and they'll make it
18 at risk, but they won't put it in a package until they get the
19 environmental sampling results back.
20 Q.   Did Abbott -- when you reviewed your records, was there any
21 evidence that Abbott did any kind of a preoperational inspection
22 prior to the manufacture of this batch of NeoSure?
23 A.   It was kind of -- it was kind of the opposite. /////////
24 ///////////////////////.  What they did is they took environmental
25 samples while the product was being manufactured //////////,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/13/14  Page 143 of 203

1 //////////////////////////////////////////////////

2 //////////////////////////////////////////////////

3 drains in their dryer tower, and they just kept making product.

4 They didn't use that information to do anything.  They didn't

5 shut down to clean.  They just -- they -- they didn't do

6 anything.

7 Q.   Except make product.

8 A.   Except make product.

9 Q.   Okay.  And you already started on this.  My next question

10 was going to be did you review any environmental test results

11 that connect to the batch of powdered infant formula NeoSure

12 that Jeanine consumed?

13 A.   They -- so they had //////////hygiene environmental

14 samples that were taken on January 8.  Nine were out of

15 specification from the Abbott point of view.  In other words,

16 they were unacceptable from their testing standard.  Two of the

17 samples, drains // and //, reported as having E. sakazakii.

18 Q.   When those kinds of findings are made, what should be the

19 proper response to those running a powdered infant formula

20 factory?

21 A.   The -- well, it -- the real simple answer is you need to do

22 something.  And the do something can be a number of different

23 things.  You can shut down and clean.  That's the obvious one.

24 You can -- if you got product that's going on, probably the more

25 normal approach would have been to shut down, clean, try to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 144 of 203

1    bracket the product that was coming out of that area that was

2    dirty, and then perform some enhanced way of evaluating that

3    product to see if it's safety immunocompromised or not.

4    Q.    What do you mean by an enhanced way?

5    A.    You can test more samples.  You can look at all your

6    production logs and see if there's things going on that might

7    have really led the product to being contaminated.  You can go

8    out and test your environment more to find out how contaminated

9    it really is to see what your risk is.  There's a number of

10   different ways.  None of these are very pleasant at this point

11   in time, but that's why it's better to do this before you make

12   the product instead of during or after.

13   Q.    Now, you indicated you reviewed the review that Abbott

14   conducted of this time period after they were notified that

15   Jeanine got sick.  Was there anything unusual in the production

16   process that you saw in the information that you were provided?

17   A.    Well, one of -- well, what I did is on the investigation

18   piece, I tried to put together a time line, and I'm kind of

19   operating at a disadvantage since I'm not part of Abbott.  I

20   can't lay my hands on logs, and I gotta sort of figure this out

21   from the records about what was -- what was going on.  But

22   suffice it to say you can sort of get a rough feeling for what's

23   happening.  The product is obviously dried on the 8th.  It was

24   packaged the succeeding two days.  When it was packaged, there

25   was like a two-hour gap, and the packaging line was shut down

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196-1   Filed 05/13/14   Page 145 of 203

1  for some reason.  That's the piece that I sort of saw that sort

2  of raised some flags in my mind.

3  Q.   Well, what -- why does -- why does a two-hour shutdown

4  raise flags with you?

5  A.   Well, these are big lots.  We're talking about -- what'd I

6  say? -- about somewhere in the neighborhood of 140,000 cans, and

7  it's plus or minus, so it's a lot of cans to package in a

8  relatively short period of time.  The factories I've known, I

9  mean, the best you could do is maybe 40,000 in a -- in 2 shifts.

10 I mean, they were packing a lot of cans really fast.  So having

11 that amount of downtime, they wouldn't want to do it.  They did

12 it for a reason.  Something happened.  I mean, I don't know.

13 It's just -- it's just -- it's a gap.

14 Q.   In your experience what -- what happens when there's

15 downtime?

16 A.   Well, the obvious thing is it's down so you gotta start it

17 up, you gotta shut it down.  It means all the equipment has to

18 be turned back on again.  You got -- you know, this is not a

19 small process.  I mean, this is a big factory.  Lots of stuff

20 have to be turned on and off again.  People -- they may have had

21 a jam.  Something may have broken.  You don't know what's going

22 on.  But it usually involves worker contact which provides the

23 opportunity to contaminate the product with a factory

24 contaminant like E. sak.

25 Q.   Let's go to the finished product testing.  How did Abbott

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 146 of 203

1  test its finished product?

2  A.   They had a -- they had their own way of doing this, so

3  they -- the Infant Formula Act requires that you take sixty

4  25-gram samples, 60 cans, 25-gram sample from each can, per lot

5  of product.  And you need to test that for salmonella.  And you

6  can divide that up to four 375-gram chunks.  So it's like

7  fifteen 25-gram samples, fifteen 25-gram samples, like 4 of

8  these.

9           ///////////////////////////////////////.

10  //////////////////////////////////////////////////////

11  /////////////////////////////////////////////////////

12  //////////////.

13           ////////////////////////////////////////

14  ////////////////////////////////////////////////////

15  //////////////////////////////////////////////////////

16  ////////////////////////////////////////////////

17  //////////////////////////////////////////////////

18  /////////////  So I'm not arguing about that.

19           The problem is these folks just weren't using the

20  right /////////////////.  I mean, the FDA has what's called

21  the Bacteriological Analytical Manual, and it sets out in

22  ever-so-clear wording what you need to do when you test powdered

23  infant formula.  You test it in lactose broth, not ////////,

24  //////////////.  This is a fundamental mistake.  /////////////

25  ////////////////////,  So for salmonella they're using the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 147 of 203

1   wrong stuff. For E. sak they were really using the wrong stuff.

2   The FDA method of 2002 was put the product in sterile distilled

3   water. The ISO method that came out in 2006 used phosphate

4   buffered water, and that's basically what the FDA BAM method

5   that was published as chapter 29 required. /////////////////

6   ////////////////////////////////

7         /////////////////////////////////////////////

8   //////////////////////////////////////////////////////////

9   /////////////////////////////////////////////////

10   //////////////////////////////////////////////////////////

11   //////////////////////////////////////////////////////

12         ///////////////////////////////////////////

13   //////////////////////// I was astounded. I really was. I had

14   no -- I had no idea that -- once I looked at their -- at their

15   records and I could see the /////////////////////////////////

16   //////////////////////////// I went, oh, my God, this is --

17   it's a fundamental mistake.

18   Q. Did -- ///////////////////////////////////////// That

19   would be a total of how many grams that would have been tested

20   for E. sak?

21   A. Okay. /////////////////////////////////////////////

22   //////////////////////////////////////////////////////////

23   //////////////////////////////////////////////////////////

24   //////////////////////////////////////////////////////////

25   ////////////////////.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW Document 196 Filed 05/13/14 Page 148 of 203

1  Q.   Is that enough finished product to test to -- considering

2  the size of the lot and the specialty of the product?

3  A.   Finished product testing -- the short answer is no.

4  Finished product testing is for what is called verification.  At

5  this point if the product --

6  Q.   First you're -- what's the purpose then of the finished

7  product?  Is that what you're going to go into?

8  A.   Yes.

9  Q.   Okay.

10  A.   So finished product testing is for verification.  It's a

11  fancy word, but it means it should tell you what you already

12  know; right?  You made the stuff.  It shouldn't have the

13  organism in it.  In this whole ES cronobacter FDA thing, the

14  testing ended up taking on a connotation of almost being a

15  critical control point.  And that's not the case.  You can't

16  test -- //////////////////////////////////////// from a

17  70,000-can lot and have it tell you anything meaningful about a

18  factory contaminant that's completely heterogeneous.  In other

19  words, there may only be one can that was contaminated that

20  injured Jeanine Kunkel, but it happened.  And that's -- but

21  you're not going to -- the odds of you finding it in a testing

22  scheme are just -- they're not there.  And couple that with the

23  fact that the testing scheme itself is incorrect and going to

24  lead to false negatives, you're never, ever going to find it.

25           So the point being what you really need to do is to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 149 of 203

1  look at your factory environment.  That's what's going to tell

2  you whether your factory has -- whether the product's going to

3  be contaminated with enterobacter sakazakii or not.

4         And in Abbott's it's written right there.  They have

5  cronobacter in the dryer tower the day that product was dried.

6  So their testing doesn't tell them anything.  Their defective

7  environmental sampling program said yeah, it was contaminated

8  with E. sak, and it was in my opinion thoroughly contaminated to

9  get results using the methodology they were using.

10 Q.   How about the size of the sample itself?  Accepting the --

11 what you've just testified that this is a verification, was

12 there a big-enough sample tested for E. sak to accomplish that

13 goal?

14 A.   Well, okay.  So then it gets -- so theoretically yes.

15 They -- the way the FAO risk assessments eventually came out is

16 that you needed to take 30 grams -- or 30 cans per lot. ////////

17 ///////////////////////  I think there needs to be a little

18 bit of a practical piece of this in that these are very large

19 lots.  The lots that I was testing were much smaller, and, of

20 course, that meant we just had many more tests for ES per lot of

21 product or per lot of product as compared to what Abbott was

22 doing.

23        It's just -- I think I've answered that question.

24 Q.   And you're aware of the CDC testing of the open can --

25 A.   Uh-huh.

***Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov***
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 196 Filed 05/13/14 Page 150 of 203

1  Q.   -- being negative.

2  A.   Yes.

3  Q.   And you're aware of the FDA collection of cans from the

4  same batch, many of them manufactured at about the same time as

5  the can that Jeanine consumed.  You're aware of th -- and that

6  was negative.

7  A.   That was negative, yes.

8  Q.   Does any of that change any opinions that you've given here

9  today?

10  A.   No, and I -- as I stated with my credentials, I do -- I

11  teach folks.  Companies hire me to teach them about food

12  microbiology, about environmental sampling as well.  And what I

13  found is that many -- some of the companies that I work for are

14  finding that their customers are demanding that environmental

15  sampling data is provided with the COA.  In other words, just

16  the testing the product for salmonella isn't what they want.

17  They want to see environmental sampling data for when the

18  product was manufactured.  That's -- that's the way things have

19  progressed to the point where people are understanding that

20  testing the finished product is verification and it doesn't tell

21  you whether that product is safe or not.  You're just meeting a

22  compliance requirement.

23  Q.   One last question.  Do you have any -- any views or

24  opinions with respect to the practice of manufacturing NeoSure

25  in powder as opposed to not manufacturing in powder and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 151 of 203

1  manufacturing it only as ready-to-feed?

2  A.   I do.  Abbott had a ready-to-feed product, a commercially

3  sterile product, and they were also selling a powdered product.

4  As the IFC paper Steve went through -- he didn't put this in big

5  block letters, but powdered infant formula is not commercially

6  sterile.  It contains microorganisms.  It can contain pathogenic

7  microorganisms.  The industry as a whole does not want consumers

8  to know that.  Abbott knows this.  For them in my opinion to be

9  making a powdered product that could contain ES at -- when

10 they're selling an RTF product, a commercially sterile product,

11 the very same product, I just -- I think it's irresponsible.

12 That's my opinion.

13          MR. RATHKE:  No further questions.

14          MR. REIDY:  May I just have a moment, Your Honor?

15          THE COURT:  You may.

16                    CROSS-EXAMINATION

17 BY MR. REIDY:

18 Q.   Dr. Donnelly, my name's Dan Reidy.  We've not met; is that

19 right?

20 A.   That's correct.

21 Q.   Now, as you come here to testify, you came to testify

22 fairly; right?

23 A.   Correct.

24 Q.   You're going to have to lean forward to the microphone a

25 little bit more.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 152 of 203

1    A.    Yes.

2    Q.    And you worked very hard to get your facts right that had

3    anything to do with any of the opinions you offered here today;

4    right?

5    A.    Yes.

6    Q.    And do you have your facts right?

7    A.    I believe so.

8    Q.    And you've been in the industry for a long time with

9    respect to working in powdered infant formula, is that right, or

10   at least as of 2007 when you left Wyeth?

11   A.    Yes.

12   Q.    And you began in 1983 I think working at Wyeth?

13   A.    Yes.

14   Q.    And you worked at their Vermont plant; is that right?

15   A.    Yes.

16   Q.    And that produced powdered infant formula the whole time

17   you were working there?

18   A.    Yes.

19   Q.    And did you produce a powdered infant formula that was

20   equivalent to NeoSure, that is, for preemies?

21   A.    Yes.

22   Q.    And you also produced other kinds of powdered infant

23   formula such as healthy baby powdered infant formula; right?

24   A.    Yes.

25   Q.    And you were the lab operations quality assurance manager

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 153 of 203

1   at that Georgia plant for a while?

2   A.    Correct.

3   Q.    And you had that position in 2002?

4   A.    I don't believe so.  I think I was at -- I was working for

5   corporate at that time.

6   Q.    Beginning when?

7   A.    I can't remember.  It was right in the transition period

8   there.  It's like -- there was a period of time when I was --

9   for almost three years where I was a corporate resource but I

10  was located at the Georgia factory.

11  Q.    And what period of time was that precisely?

12  A.    Somewhere between 2001 and 2003.

13  Q.    And when you were working as a corporate resource, did you

14  have anything to do with the safety of the powdered infant

15  formula at Vermont?

16  A.    Yes.

17  Q.    And was it still your responsibility?

18  A.    It was technically not.  I had oversight for it, yes.  The

19  answer is yes.

20  Q.    So you oversaw the people with the direct responsibility.

21  A.    Yes, yes.

22  Q.    But you still maintained responsibility for the safety, the

23  bacteriological safety, of the products that were coming out of

24  the plant; right?

25  A.    That's correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 154 of 203

1  Q.    Now --

2           MR. REIDY:  Excuse me one minute.

3  Q.    So you talked in your direct testimony about the Portagen

4  outbreak problem in Tennessee with the Mead Johnson product;

5  right?

6  A.    Correct.

7  Q.    And when that happened, you were -- had responsibility for

8  quality assurance, the microbiological quality assurance, at the

9  plant at which you were working; right?

10  A.    Yes.

11  Q.    And you talked in your testimony about how the FDA came out

12  and they announced that they were going to come to each of the

13  powdered infant formula manufacturers and do an inspection; is

14  that right?

15  A.    That's correct.

16  Q.    And in due course they came to Wyeth to do an inspection;

17  right?

18  A.    They did.

19  Q.    How'd you do?

20  A.    We were the first one they visited, and it was like right

21  around September there.

22  Q.    I'm sorry.  How did you make out?  Did your inspection

23  pass, or were you found to have E. sak?

24  A.    Our product contained E. sak in one sample.

25  Q.    And was it a single lot that contained E. sak?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 155 of 203

1    A.    Yes, that the FDA took at that time, a single lot.

2    Q.    And when you say the FDA took at that time, you mean the

3    FDA came in, found that single lot containing E. sak, and when

4    you say took it, you mean they told you you couldn't ship it.

5    A.    No, they didn't tell us that.  They reported the results as

6    positive, and we agreed that we would not ship it.

7    Q.    So what did you mean when you said took it?

8    A.    I guess I -- I'm . . .

9    Q.    Okay.  No significance, in other words.

10   A.    No significance.

11   Q.    Okay.  So that was a product I think you indicated during

12   your direct examination that had never shipped; is that right?

13   A.    That's correct.

14   Q.    So did you then start looking at other lots that you'd

15   produced under your supervision?

16   A.    We did.

17   Q.    Did you find any other E. sak?

18   A.    The -- we being Wyeth, yes.

19   Q.    And did you do a class 1 recall?

20   A.    I believe at the end of the time period when we were

21   investigating we did take the product back out of the market in

22   a class 1 situation.

23   Q.    And class 1 means what?

24   A.    You want to get it out there because you think there's a

25   potential safety problem with the product.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 156 of 203

1  Q.  And your potential safety problem was you had shipped

2  product which contained E. sak.

3  A.  We had shipped product, yes.

4  Q.  Were there other recalls, class 2 recalls?

5  A.  You're going to have to help me out here.  Other -- when?

6  I mean, I don't know.

7  Q.  I'm sorry.  Right in that time frame when the E. sak thing

8  was breaking, did you have to take -- you took the one -- you

9  didn't ship the one lot that the FDA found had E. sak in it

10 while you were there; right?

11 A.  Correct.

12 Q.  And then you found another lot that you had to go out and

13 pull back off the shelves because it had E. sak in it; right?

14 A.  Yes.

15 Q.  Did you find any other lots with E. sak in them?

16 A.  There was a considerable amount of product, almost three

17 months' worth, that was in our control.

18 Q.  And it had E. sak in it; right?

19 A.  Different pieces, parts, but yes.

20 Q.  And so you had basically three months of product that had

21 E. sak in it that you had to get back off the market or take

22 off --

23 A.  No, no, no, no, sir, that's not correct.

24 Q.  So let me -- okay.  Let me split it up then so that I do

25 this right.  You found some product such as the one that the FDA

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 157 of 203

1  discovered in their exam.  That was in your product still --

2  still hadn't shipped when the FDA found that it had E. sak;

3  right?

4  A.   The FDA found the original positive.  We conducted a

5  thorough investigation, and the investigation ultimately

6  included looking at some product that had already shipped to

7  market which got us into the position where we wanted to get the

8  product back.

9  Q.   Okay.  So the FDA's finding of the E. sak in your product

10  was on product that hadn't yet shipped, so you were able to

11  reject that.

12  A.   Right.  So more to the point, actually the recall --

13  Q.   Actually the point's in answering just the question I put

14  to you.  So my question to you was the FDA, when they found the

15  E. sak, that was in a lot that you hadn't shipped yet, so you

16  could reject it; right?

17  A.   Correct.

18  Q.   And when you did more investigation of your own lots, some

19  of those also hadn't shipped; right?

20  A.   Correct.

21  Q.   That is, some of those lots that you found E. sak in;

22  right?

23  A.   Correct.

24  Q.   And then you also found E. sak in some lots that had

25  shipped, and you recalled it; right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 158 of 203

1   A.   Correct, and that was Wyeth found that, not the FDA.

2   Q.   Correct.  So the FDA only finds it in one.  Wyeth then

3   looks at the rest and acts appropriately; is that right?

4   A.   Tells the FDA that we're responsible citizens and we think

5   we should recall the product.

6   Q.   Sure, because it had E. sak in it; right?

7   A.   We were -- we were very concerned about the safety of our

8   consumers.

9   Q.   You found E. sak in the product; right?

10  A.   Which is why we recalled it.  Yes.

11  Q.   Thank you.  After that flurry of activity in 2001, 2002,

12  you still maintained responsibility for quality at the Vermont

13  plant; right?

14  A.   No, I was much -- after 2002 -- by 2003 I was pretty much a

15  corporate resource.  I had oversight for all of the Wyeth

16  factories and labs from an oversight point of view.

17  Q.   Oversight for quality assurance on microbiological purity?

18  A.   Product safety, yes, the lab ops piece, anything to do with

19  micro.

20  Q.   So you were responsible for product not only in Vermont but

21  at other places.

22  A.   In the way you're terming it, yes.

23  Q.   Well, you term it any way you want.  Were you -- did you

24  have responsibility for product safety in the Vermont plant and

25  beyond?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 159 of 203

1   A.   Yes.

2   Q.   Now, at the time of the recalls, both the FDA-instigated

3   recall and your own instigated recalls in 2002 from the plant,

4   did you find environmental positives for E. sak?

5        MR. RATHKE:  I'm going to object to the question as

6   misstating the evidence.

7        THE COURT:  Overruled.

8   A.   Did we find environmental positives?  Yes.

9   Q.   What kind of environmental positives did you find?

10  A.   I don't know how to respond to that.

11  Q.   Where'd you find them?

12  A.   We found them in wet areas relative to the dryer.  It

13  was -- it was surprisingly harder to find the organism than it

14  would appear.

15  Q.   And where -- and more specifically, can you tell me where

16  you found it?

17  A.   I really don't remember.

18  Q.   And you had -- the FDA obviously gave you an EIR, right,

19  Wyeth?

20  A.   Correct.

21  Q.   And what's an EIR?  Can you tell the ladies and gentlemen

22  of the jury?

23  A.   It's called an establishment inspection report.

24  Q.   And that's sort of the follow-up to them finding E. sak in

25  your product?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 160 of 203

1  A.   Right.

2  Q.   By the way, when they found E. sak in your product, that

3  was after Portagen; right?

4  A.   That was.

5  Q.   And they sent you a note saying they were coming to inspect

6  your plant; right?

7  A.   They did.

8  Q.   So it wasn't a surprise that E. sak was really important at

9  the time after the Portagen outbreak and after you had notice

10  that the FDA was coming to look at your plant for E. sak; right?

11  A.   You -- no.

12  Q.   Now, specifically as you reviewed the reasons why under

13  your supervision E. sak had been found in a bunch of lots in

14  2002 of Wyeth's powdered infant formula, did you find that there

15  was a problem with the agglomerator process?

16  A.   Yes.

17  Q.   And was the specific problem that during the agglomerating

18  process you had people, workers, open up a access panel into the

19  agglomerator and put their bare hands in and manipulate the

20  powder?  Is that what you found?

21  A.   No.

22  Q.   What did you find?

23  A.   We found that the agglomerator was not receiving a

24  sanitizing rinse and that you could quite easily track

25  contaminated product to wet cleaning cycles of the agglomerator

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/12/14  Page 161 of 203

1    and that once the sanitizing rinse was used the ES contamination

2    disappeared.

3    Q.    And did you have circumstances where it was routine during

4    the Wyeth manufacturing process for workers to open a panel in

5    the agglomerator and put their bare hands in there?

6    A.    No.

7    Q.    Did you ever have that?

8    A.    No.

9    Q.    So it was never a circumstance where workers opened a panel

10   in the agglomerator and reached in and manipulated the powder?

11   A.    I -- I mean, I was at the company a long time.  I think

12   I've observed that as a training exercise at one point, but as a

13   routine thing, no.

14   Q.    So you saw people being trained to reach into your

15   agglomerator with their bare hands and manipulate the powder.

16   A.    It was more like when the agglomerator was first -- was

17   first commissioned they had some crews from Ireland that were

18   familiar with operating it, and they were trying to show people

19   what the proper powder would actually look like.  You know, it's

20   gotta have a certain powder -- the particles have to be a

21   certain size and so on.

22   Q.    But you were aware that people had opened -- during

23   processing that people had opened that, stuck their bare hands

24   in, and manipulated the powder; right?

25   A.    In what time frame?  Like 1980 -- 1990 something.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 162 of 203

1  Q.   And had that been stopped since 2002?

2  A.   Yes.

3  Q.   And you had stopped it?

4  A.   Well, I wasn't responsible for production activities, but

5  yes, that was not a practice that I observed at that time.

6        MR. REIDY:  One moment, Your Honor.

7  Q.   Well, let me ask you this.  During the rest of the time

8  that you remained at Wyeth, were there occasions when you found

9  E. sak in finished product?

10 A.   Occasions.  Yes.

11 Q.   And is your best estimate that it was -- well, can you give

12 me an exact number how many times you found it there?

13 A.   No.

14 Q.   And this was under circumstances where you caught the

15 E. sak in the finished product before it was shipped so you

16 didn't have to do a recall; is that correct?

17 A.   Yes.

18 Q.   So there were no more recalls while you were there, but

19 your finished product testing did identify E. sak on some

20 occasions.

21 A.   Correct.

22 Q.   And what did you do when you found the E. sak in the

23 finished product?

24 A.   It was destroyed.

25 Q.   And how many times did that happen?  Do you have a number

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/13/14  Page 163 of 203

1   you can estimate?

2   A.   I have no -- I don't.  No, I have no memory of that.

3   Q.   So the estimate you gave in your deposition, was it not,

4   was zero to ten, some number between zero and ten?

5   A.   Some number.  I don't know.  I don't know.

6   Q.   But you remember that it did happen.

7   A.   It wasn't a hundred.  It wasn't zero.  I don't know.

8   Q.   It's kind of a big event when you have to destroy a whole

9   lot because somebody finds E. sak in the finished product;

10  right?

11  A.   Oh, it gets to be painful.  It wasn't that frequent.

12  Q.   But you know it was some number of times that it happened;

13  right?

14  A.   We've agreed to that, yes.

15  Q.   And by the way, when that happens according to your

16  testimony this morning, that means there's something very wrong

17  with your production process at Wyeth; right?

18  A.   There would have been a complete investigation to find what

19  the cause was, yes.

20  Q.   So there would have been something very wrong with your

21  process if you find it in your finished product.

22  A.   Things go wrong in processes.  That's why you have all the

23  quality systems in place you have.  The whole idea is to make

24  safe product.

25  Q.   Something was very wrong for E. sak to get into your

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 164 of 203

1  finished product; right?

2  A.   I wouldn't use the terms very wrong.  Something was wrong,

3  yes.

4  Q.   And you told us that the finished product testing isn't any

5  kind of a control point where you check on things that you can

6  really -- you're not relying on that in order to make safe

7  product; right?

8  A.   That's correct.

9  Q.   So in your case, though, had you not done the finished

10  product testing, you would have shipped product with E. sak;

11  right?

12  A.   We had done -- probably, yes.

13  Q.   Sounds like kind of a pretty controlled -- critical control

14  point to me.  Does it sound like a critical control point to

15  you?

16  A.   No, it's not.  Doesn't meet the definition.

17  Q.   Okay.  But if we're talking about just laymen's terms, it

18  was a pretty good thing for the public that you guys did a

19  finished product test before you shipped the stuff that had

20  E. sak in it; right?

21  A.   Yes.

22  Q.   Now, do you know that Abbott did not have any E. sak

23  discovered in its plant when the FDA came through it in 2002?

24  A.   I have no knowledge of that.

25  Q.   And did Abbott inspect -- or I'm sorry.  Did the FDA in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 165 of 203

1  2002 inspect the plants of all the powdered infant formula

2  manufacturers?

3  A.    They do on a yearly basis.  I have no direct knowledge of

4  what happened at the other factories than the one that I was

5  based at.

6  Q.    And you put up some -- or Mr. Rathke put up and asked you

7  about some documents that the FDA sent around about that; is

8  that right?

9  A.    That's correct.

10  Q.    And this was one of the documents that you went through; is

11  that right?

12  A.    Yes.

13  Q.    And it lists product types; is that right?

14  A.    Yes.

15  Q.    And among the product types it lists are preterm formulas;

16  right?

17  A.    Yes.

18  Q.    And the preterm formulas, that means formula that is --

19  product -- powdered infant formula that is prepared for

20  premature infants; is that right?

21  A.    Yes.

22  Q.    And Wyeth had such a product; right?

23  A.    Yes.

24  Q.    And you're the one of the four there, aren't you?

25  A.    I don't know.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 166 of 203

1    Q.   Well, do you recall that of the various products that

2    were -- or the various lots that were recalled one of them was

3    your product for --

4    A.   I don't recall.

5    Q.   -- premature infants?  I'm sorry.

6    A.   I don't recall.

7    Q.   Okay.  You probably should wait till we finish so that we

8    don't talk over each other for the court reporter.  But over on

9    the right-hand side as far as the full-term formula, do you

10   recall whether Wyeth's full-term formula was one of the products

11   you had to recall?

12   A.   Honestly don't remember what the product was.

13   Q.   Now, a significant part of your direct testimony was

14   criticizing Abbott's processes; is that correct?

15   A.   I'm not sure how to answer that.  I mean, a significant

16   portion of my testimony was responding to comments about the IFC

17   papers and some of those things.

18   Q.   Well, you talked about Abbott's processes; right?

19   A.   I did.

20   Q.   And you were critical of them, weren't you?

21   A.   Yes.

22   Q.   So a big hunk of your testimony was criticizing Abbott's

23   processes, wasn't it?

24   A.   In your words, yes.

25   Q.   And before you did that, you made sure you had your facts

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 167 of 203

1  right.

2  A.   I tried to.

3  Q.   Now, by the way, while -- let's say after the 2002 problems

4  at Wyeth and the recalls, after that, did you get to where you

5  had it figured out how to make powdered infant formula without

6  E. sak in it?

7  A.   What's the time frame again, please?

8  Q.   After the 2002 -- actually let's set aside both the 2002

9  problems and this number of times when you caught it yourself in

10  the finished products, and let's only address circumstances

11  about products shipping.  So after that flurry of activity in

12  2002, what's your level of confidence that Wyeth didn't ship

13  powdered infant formula with E. sak in it?

14  A.   High.

15  Q.   And have you indicated that your confidence was a hundred

16  percent?

17  A.   I know what we released, and it didn't contain E. sak.  I

18  know I was doing product compliance, so I know we had no adverse

19  complaints for that for infections relative to the organism, so

20  I would say yes, I'm confident.

21  Q.   And you've -- well, let me put it this way.  You're 100

22  percent confident that you didn't ship any product with E. sak

23  in it; right?

24  A.   Yes.

25  Q.   Okay.  So it's definitely possible to have a plant with

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 168 of 203

 1   powdered infant formula where you can, despite the risks,

 2   proceed in such a way that a highly qualified quality engineer

 3   such as yourself and microbiologist -- I'm sorry, and food

 4   science Ph.D. can be 100 percent confident that the powder

 5   shipped did not contain E. sak.

 6   A.   Okay.  You're drawing me into the hundred percent thing.  I

 7   don't think you can be a hundred percent certain of anything.

 8   Q.   But you've testified previously that you were a hundred

 9   percent sure, haven't you?

10   A.   Again, you'd have to read the depositions.  If I have said

11   that, I will stand by the statement.

12            THE COURT:  Just a second.  You can certainly use the

13   deposition to impeach him.  I'm not going to allow you to put it

14   on the screen unless you --

15            MR. REIDY:  I'm taking it off this screen, Judge.

16            THE COURT:  Okay.  Thank you.  Thank you.

17            MR. REIDY:  For sure I understand.

18   BY MR. REIDY:

19   Q.   I'm going to show you page 68 of your deposition.

20            THE COURT:  Yeah, that's exactly what I wasn't going

21   to let you do.

22            MR. REIDY:  Oh, I'm sorry.

23            THE COURT:  And here's why.  Unless it's isolated --

24   and lawyers have done it before.  But the problem is it's never

25   isolated to just the question and answer.  If it was, I wouldn't

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 196 Filed 05/13/14 Page 169 of 203

1   have a problem with it.

2           MR. REIDY:  Sure.

3           THE COURT:  So the jurors then can read other portions

4   of the depositions.  That's why.

5           MR. REIDY:  And I completely agree, Judge.  I meant to

6   hit blackout.

7           THE COURT:  Okay.  Thank you.

8           MR. REIDY:  No problem at all.

9   BY MR. REIDY:

10  Q.   So I'm going to see if we can get this so that you can read

11  page 68.  Why don't you read that to yourself starting at . . .

12  A.   Okay.  So what are you asking me about?

13  Q.   Just hold on a second if you would.  Actually let me take

14  you over to -- takes a while to track the question.

15          MR. REIDY:  One moment, Your Honor.

16          THE COURT:  That's fine.

17  Q.   Okay.  So on page 68 at line 16, do you see that beginning

18  really at line 15?

19  A.   Okay.

20  Q.   Read lines -- read that to yourself, and then I'll turn the

21  page for you, and you can read the top line of the next page.

22  A.   Okay.

23  Q.   And then at the top of the next page, do you see that

24  question, and do you see that answer?

25  A.   Yeah.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 170 of 203

```
 1   Q.   So now I ask you again do you have 100 percent certainty
 2   that after the recalls of 2002 Wyeth under your supervision did
 3   not ship any product with E. sak in it to a 100 percent level of
 4   certainty?
 5   A.   The best of my knowledge.
 6   Q.   And that's because you did it the right way at Wyeth;
 7   right?  That's why you're confident?
 8   A.   We may -- I had a -- I was lucky in having a committed
 9   management, and we made every effort possible to produce safe
10   product.
11   Q.   Now, you've referred I think several times during your
12   direct examination to the number of cans in the lot from which
13   the can which Jeanine Kunkel got was taken; is that right?
14   A.   Yes, yes.
15   Q.   And you said it was split because part of it was sent to
16   Canada and part of it was sent to the U.S.; is that right?
17   A.   From the records that I had looked at, that would be
18   correct.
19   Q.   And you described that as a very, very large shipment; is
20   that right?
21   A.   Yes.
22   Q.   And you approximated it at 2 shipments of about 70,000
23   cans; right?
24   A.   It's a ballpark figure based on the cases, but yes, I think
25   that would be roughly correct.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 171 of 203

1  Q.   And you went so far as to say that that was too big of a
2  shipment from a safety standpoint; is that right?
3  A.   No.
4  Q.   Well, didn't you say that it's a bad practice to have such
5  large shipments?
6  A.   No.
7  Q.   Didn't you say the shipment was too big to fail?
8  A.   Yes.
9  Q.   And when you say something is too big to fail, you mean
10 that it's so big that people might overlook problems with it
11 rather than suffer the economic loss of having to crater such a
12 large shipment; right?
13 A.   That's your words.
14 Q.   What did you mean by too big to fail?
15 A.   It was a large entity of product that would present
16 problems internally for how to deal with it if there are quality
17 issues.
18 Q.   And I'm pretty sure that means what I just asked you;
19 right?  That means you're saying it was so large that people
20 might resist shutting it down if it had a problem; right?
21 A.   Okay.  Yes.
22 Q.   When you say okay, is that your testimony?  My testimony is
23 unimportant.  Is it your testimony when you said the lot of
24 140,000 cans was too big to fail that that meant that it posed
25 an additional risk that because of its size and the economic

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/13/14  Page 172 of 203

1    consequence of that size people might not treat it the same way

2    they should with respect to safety issues?

3    A.    Yes.

4    Q.    I'm going to take Exhibit 2052, Defendant's Exhibit 2052,

5    and I'm going to go to page 5 of that exhibit.  Can you see that

6    on your screen?

7    A.    Yeah.

8    Q.    And does it indicate what the size of the two segments of

9    batch 61281 was?  See the batch size number over there?

10   A.    Yeah, I know.  Is that cases or cans?  What is that?

11   Q.    That's cans.

12   A.    Okay.  So you got 20,000.  You got almost 80,000.  So you

13   got 100,000.

14   Q.    So where did you get the number 140,000 in your

15   too-big-to-fail lot?

16   A.    When we were looking at the shipping records, it appeared

17   that there was like 12,000 cases that were shipped to Canada and

18   like 13,000 in the U.S., so I just sort of figured 6 cans per

19   case and came up with it that way.  It was a rough calculation.

20   Q.    If this document in front of you is accurate as to how many

21   cans there were, your rough calculation was an exaggeration of

22   40 percent; right?

23   A.    Yes.

24   Q.    And do you have any reason to believe that that number, the

25   hundred thousand you see there, is inaccurate?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196   Filed 05/13/14   Page 173 of 203

1  A.   You're -- I -- you're providing me with this information.

2  I have to assume it's correct.

3  Q.   Okay.  I just put on the screen the document you were using

4  earlier; right?

5  A.   Yes.

6  Q.   And that's what I think you described correctly as a rough

7  schematic as to how the process works as you understand it at

8  Abbott; right?

9  A.   Yes.

10  Q.   And you've divided the wet side and the dry side into

11  colors; right?

12  A.   Yes.

13  Q.   And have you put all of the critical kill points on here?

14  A.   I put the -- I attempted to put in there where I thought

15  your pasteurization process was, so that would be the steam and

16  the arrow and the 250.

17  Q.   And do you know whether or not there's another heating of

18  the liquid that gets up to a point that would kill bacteria?

19  A.   You're going to have to be -- help me out here.  You need

20  to be more specific.

21  Q.   Well, do you know as you sit there looking at this diagram

22  if there's anyplace else on this diagram where the liquid is

23  brought to a temperature of, say, ///////// something like that?

24  A.   Do I know of a place on this diagram where the liquid's

25  brought to a temperature of /////////,  I could guess and say

**Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov**
**to purchase a complete copy of the transcript.**

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/13/14  Page 174 of 203

1   perhaps there are places.

2   Q.   But when you were putting the diagram together, you didn't

3   look for those.

4   A.   No, I read the material that I had from both your expert

5   who evaluated the process and the material that I was provided

6   that described your process, and that's how I constructed the

7   flow diagram from.

8   Q.   And did you have some testimony about dry heat and how it

9   doesn't kill?

10  A.   I did.

11  Q.   And what was the point of that testimony?

12  A.   Point was that dry heat does not kill in the same manner

13  that wet heat kills.

14  Q.   And did you testify about any misunderstanding that Abbott

15  had about that?

16  A.   I did.

17  Q.   And what was your testimony about the misunderstanding?

18  A.   The misunderstanding was that inlet temperature heat is

19  sufficient to kill bacteria in the way that a -- your

20  pasteurization step does.

21  Q.   And who had that misunderstanding?

22  A.   Sharon Bottock did.

23  Q.   Okay.  Now, I'm going to give you a different

24  pronunciation.  Sharon Bottocks.

25  A.   Okay.  Sharon Bottocks.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/13/14  Page 175 of 203

```
1   Q.   Bottock, sorry, no s.  As you can imagine, it's a delicate
2   subject.
3           So you said that Sharon Bottock seemed to think that
4   the heat in the dryer would be a kill step?  Is that what you
5   were saying?
6   A.   I never said that.
7   Q.   Okay.  I'm sorry.  What did you say her misunderstanding
8   was?
9   A.   I don't know if there's a transcript, read it back.  I
10  don't know what I said exactly relative to that.  The
11  information was provided during my earlier testimony today
12  that -- about the use of dry heat as a critical control point in
13  a powdered manufacturing process and the fact that it could not
14  be used as a critical control point because it wasn't killing
15  all of the bacteria.  It wasn't something that was sufficient to
16  do that, and I believe I was pretty clear in describing it in
17  that way.
18  Q.   And your point was that Sharon Bottock did not correctly
19  understand that; is that right?
20  A.   From what I read in the deposition, no.
21  Q.   And can you give me any idea in the deposition where you
22  were talking about that she seemed to misunderstand that dry
23  heat would kill the bacteria?
24  A.   I don't have the deposition in front of me.
25  Q.   Can you tell me what she was describing?  Was she
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 176 of 203

1   describing something in the dryer process?

2   A.   My recollection, it was the -- they were talking about

3   inlet temperatures to the dryer which are high.  They're very

4   large numbers.  It's like your oven at home.

5   Q.   And so this caused you to conclude that she did not

6   understand that high dry heat temperature wouldn't kill the

7   bacteria in the way that high temperatures applied to the

8   product when it was in liquid form; is that right?

9   A.   Correct.  That's a physical law.

10  Q.   Okay.  And so that was one of your criticisms is that the

11  quality assurance manager at Casa Grande didn't seem to

12  understand that the high temperature at the head of the dryer

13  wouldn't be a bacteria kill point.

14  A.   Your words.  I never said that.

15  Q.   Okay.  I'm sorry then.  What was your point in describing

16  her misunderstanding?

17  A.   That it was -- that it wasn't sufficient, that they seemed

18  to think that that was going to create a clean and a dryer that

19  was E. sak free, the high temperatures.

20  Q.   And that's what you thought she was saying in her

21  deposition.

22  A.   Yes.

23  Q.   I'm going to see if I can find the part where that

24  discussion was occurring.

25          MR. REIDY:  Excuse me one moment, Your Honor.  I just

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 177 of 203

1  have to come up with a clean copy.

2         THE COURT:  That's fine.  Thank you.

3  Q.  All right.  I'm going to show you page 45 through 48.  I'll

4  direct your attention to part of it.  Can you see it on your

5  screen?

6  A.  Okay.

7  Q.  Can you read it?

8  A.  Yeah, I can.  Where are we?

9  Q.  Let's go to page -- the bottom of 47 -- I'm sorry -- yeah,

10  the bottom of 47.  And why don't you read to yourself from line

11  20 on the bottom of 47 down to line 17 of 48 and see if that was

12  any part of what gave you the understanding that Miss Bottock

13  did not understand the -- the dry heat and heat in the dryer

14  wouldn't kill bacteria.

15  A.  It seems that's what she's saying.  She's saying if there's

16  bacteria --

17  Q.  I don't want you to read it.  Is this part of -- is this

18  part of what you came to the conclusion that she thought the dry

19  heat would be part of that?

20  A.  Yes.

21  Q.  Okay.  And can you read that one again?  Actually I can

22  probably make it a little bit bigger.

23         MR. RATHKE:  Where are we?

24         MR. REIDY:  I'm sorry.  We're at 98.

25  Q.  So if you can, read beginning at line 21 on 97 and going

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 178 of 203

1  down through the bottom of 98.  And then I'll actually give you

2  a little bit of 99 to look at.

3  A.   Okay.  Okay.

4  Q.   And then just read the top few lines on 99.

5  A.   Yeah.  Okay.

6        THE COURT:  Dr. Donnelly, when you respond, could you

7  get a little closer to the microphones?  Thank you.

8  A.   Okay.  What was the question?

9  Q.   Okay.  Now -- my question now is do you now have a better

10 understanding that Miss Bottock was talking about ///////////

11 ////////////////////////////////////?

12 A.   I just read all that, and I didn't come away with that at

13 all.

14 Q.   All right.  Well, let me ask you a different way.  Do you

15 know from your study -- well, let me strike that.

16        You put on a high temperature point on the liquid side

17 of things in your diagram, the one that says 250 degrees there;

18 right?

19 A.   Okay.  I'm -- I'll answer your questions.  What is it

20 you're asking me?

21 Q.   You put on your diagram a kill point, a high temperature

22 point, on the liquid side of the process at 250 degrees there

23 between the second and third blue box; right?

24 A.   That is -- that should be -- and like I say, I haven't

25 walked your process, but that would be your Pasteurized Milk

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 179 of 203

1  Ordinance legal pasteurization step.  That is your critical

2  control point that's in your HACCP plan.

3  Q.   Okay.  And did you see a critical control point that's

4  further down the process?

5  A.   No.

6  Q.   So you didn't see then -- if we look at your diagram and

7  you look right where the line comes through between the

8  evaporator and the dryer, you see that?

9  A.   Yes.

10  Q.   And did you understand the testimony of Miss Bottock to be

11  that you just read that /////////////////////////////////////

12  ///////////////////////////////////////////////////////

13  ///////////////////////////.  Did you understand that?

14        MR. RATHKE:  Object to the question.  Hearsay.  It's

15  Miss Ghezzi that's doing all the talking there.

16        THE COURT:  Overruled.

17  A.   Okay.  What are you asking me again?

18  Q.   Did you -- do you now recall -- having refreshed your

19  recollection from the Sharon Bottock deposition that you were

20  basing your testimony on, do you now recall that Miss Bottock

21  described /////////////////////////////////////////////////

22  /////////////////////////////////////////////////////////

23  /////?

24  A.   No.  I cannot make heads or tails out of what was said in

25  that deposition relative to that subject.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 180 of 203

1  Q.   Okay.  So you were -- you thought you understood it well

2  enough to come in here and tell the ladies and gentlemen of the

3  jury that she was wrong because she thought hot air killed the

4  bugs.

5          MR. RATHKE:  Objected to as argumentative.

6          THE COURT:  Overruled.  You may answer.

7  A.   I -- that's -- not only that, but your -- Dr. Wiedmann also

8  referenced the dry/hot air in his expert report.

9  Q.   We're talking about the misunderstanding that you ascribed

10 to Sharon --

11 A.   I --

12 Q.   You have to wait till I finish my question.  We're talking

13 about the misunderstanding that you said the head of quality

14 assurance had at Casa Grande with respect to whether or not

15 there was a /////////////////////////////////////////////////.

16 Now, didn't you come and testify to that?

17 A.   Okay.  So you're asking me if I said that the Casa Grande

18 quality head did not understand that there was a dry heat kill

19 step in the Abbott process.

20 Q.   No, that's not what I said.  I'll try again if you can't

21 keep track of my question.

22 A.   I can't.

23 Q.   Okay.

24 A.   I can't read the deposition.  I can't make heads or tails

25 out of that line of questioning, and where you're going with

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 196   Filed 05/13/14   Page 181 of 203

1  this I don't have any idea.

2  Q.   Well, let's go to that since you've said that.  It's not

3  important that you know where I'm going either.  Let's go back

4  to the part about where you can't make head or tails out of that

5  testimony.  Is that your testimony now?  You couldn't make head

6  or tails about what the testimony was about Sharon Bottock

7  talking about the ////////////////////////////////

8  A.   The exchange that I read in the deposition was very hard

9  for me to follow technically.  I could not make a clear under --

10  clear -- ///////////////////////////  To me my interpretation

11  was it was dry.  I -- it's very hard even seeing it again to

12  figure out exactly what was said.

13  Q.   Okay.  So in a state of confusion as to what Sharon Bottock

14  was saying in the deposition, you felt it was clear enough so

15  that you could come and tell us and this jury that she didn't

16  understand how her process worked; right?

17  A.   Your words.

18  Q.   No, no.  Those were your words this morning.  Isn't that

19  your testimony this morning?

20  A.   I never testified that she did not understand her process.

21  Q.   You didn't.

22  A.   I did not do that.  I said that she -- my comments related

23  to understanding the difference between wet and dry heat.

24  Q.   I see.  So what you said was she didn't understand that the

25  temperature just as it was going into the dryer, the dry heat,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 182 of 203

1  that she misunderstood that that was a kill step; right?

2  A.   Okay.   You're completely leaving me behind here.   What goes

3  in the dryer is liquid product.   Air interacts with product

4  after the liquid is in the dryer; okay?   If you're talking about

5  things that --

6  Q.   I'm going to interrupt you --

7  A.   If it goes to an evaporator, that line probably includes

8  some kind of a dryer preheater, so you're not going to dry

9  product that's cold.   So, I mean, that would be my understanding

10  of a process.

11  Q.   So is it possible that when Miss Bottock was describing in

12  the deposition the //////////////////////////////////////

13  ////////////////////////////////////////////////////

14  ////////////////////////////////////////////?

15  A.   I don't know.   I cannot understand that interaction and

16  determine what technically was said or what was not said

17  relative to that.   I had one interpretation.   There are probably

18  others.   It wasn't a very coherent description of the process.

19  Q.   So you took the one interpretation that was that she didn't

20  know what she was talking about and came in and testified to

21  this jury about it.

22  A.   And it's also the one that your expert Martin Wiedmann said

23  in his report.

24  Q.   I didn't ask anything about the expert.   I'm talking about

25  what you said about Sharon Bottock this morning.   So --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 183 of 203

1    A.   I didn't say anything about Sharon Bottock this morning.

2    Q.   Now, if, in fact -- I'm sorry.  You said there is no

3    critical control point of liquid heating just before the product

4    goes into the dryer in the Abbott process; is that right?

5    A.   That's correct.

6    Q.   And you studied Abbott's critical control points because

7    you were critical of them; right?

8    A.   Okay.  That sounds like --

9    Q.   It's two uses of the word critical.  Want me to move it

10   around?  Let me withdraw the question.

11   A.   The --

12   Q.   I've withdrawn the question, so I'll put another question,

13   try and make it clearer for you.  Do you know if there is a

14   critical control point where the liquid is heated to a point

15   high enough to kill bacteria in the dryer building before the

16   liquid is sprayed into the dry heat of the dryer?

17   A.   No, I don't.

18   Q.   And you studied Abbott's critical control points, did you

19   not?

20   A.   I -- the information I was given was not incredibly

21   detailed in nature, but I looked at the process again as I've

22   explained to you.  I can only look at what you folks give me,

23   and I came up with this as a in-general description of your

24   process.

25   Q.   And did you get enough information so you could figure out

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 184 of 203

 1  what the critical control point was for the heating of the

 2  liquid to kill the bacteria?

 3  A.   Like I say, my understanding is that your ///////////

 4  ///////////////////////////////////////.

 5  Q.   Okay.//

 6  //  ///////////////////////////////////////////////

 7  ////////////, I'm not knowledgeable about that.//

 8  //  ////////////////////////////////////////////////////

 9  ////////////////////////////////////////.

10  //  /////////.

11  Q.   How much -- how many grams of the finished product of the

12  lot which eventually ended up producing the can that was fed to

13  Jeanine -- or part of which was fed to Jeanine Kunkel, how many

14  grams was in finished product testing?//

15  //  /////////.

16  Q.   And how do you know that?

17  A.   I read your salmonella procedure and your compositing

18  scheme, and that's where you're taking ////////////////, Are

19  you suggesting it's different?

20  Q.   Once again, I get to ask the questions.

21  A.   Okay.  Go.

22  Q.   So what you're saying is that the reason you believe ////

23  /////, of the lot relative to Jeanine Kunkel's can was tested is

24  because that's what you read in the procedures.

25  A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 185 of 203

1    Q.   Did you study the lot records of the specific lot that

2    you're talking about?

3    A.   We looked at it.  There would have been -- as you pointed

4    out, they had a Canadian lot and a American lot.  So ////////

5    would have been tested for each of those.

6    Q.   So the production lot included both those; right?

7    A.   Okay.  We're going to have to decide what a definition of a

8    lot is.  And from Abbott's point of view, it's either what --

9    it's when they changed over to package for Canada they created a

10   new lot, so there's two lots here.  From a production point of

11   view, from a drying the powder point of view, it all came out of

12   the same drying lot.

13   Q.   So I use the term production lot to cover both the Canadian

14   and the -- the parts of the lot that were eventually shipped to

15   Canada and the U.S.  Is that okay with you for vocabulary?

16   A.   Yes.

17   Q.   So the production lot from which Jeanine Kunkel's can came,

18   how many grams were tested of that in finished product testing?//

19   ///  /////.

20   Q.   And with respect to your earlier testimony, you were

21   critical that //////// of finished product testing is

22   insufficient; is that right?

23   A.   The industry standard as espoused by Dan March for a

24   presence/absent test was 1,332.

25   Q.   1,332 grams?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/13/14  Page 186 of 203

1   A.   Correct, yes, per lot.

2   Q.   And this morning I recall correctly that you did come and

3   say that the testing of the Abbott lot that went to Jeanine

4   Kunkel was inadequate because ///////////// were tested; right?

5   A.   That's one of the reasons, yes.

6   Q.   And you've now acknowledged to us that, in fact, from the

7   production lot from which Jeanine Kunkel's can came, the amount

8   tested was actually //////////; right?

9   A.   Yes.

10  Q.   And ////////////////////// -- what was your number?

11  A.   1,332.

12  Q.   Was ////////////// right?

13  A.   Except they should have tested 1,332 for each lot.  You had

14  2 lots.  You needed to test 1,332 for each lot.  //////////

15  //////////////////////////// You're doing it on a lot

16  that's going to market.

17  Q.   So it's written somewhere that the 1,332 is not based on a

18  production lot, it depends on where you send your cans?

19  A.   It isn't your batch records.  If they're doing a separate

20  test for each lot, you should be doing the same separate test.

21  Q.   In the case of the production lot of the amount -- well,

22  strike that.

23          The 1,332, that's talking about production lots,

24  right, the standard of 1,332 being the number of grams that

25  should be tested?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 187 of 203

1    A.    When I see lot -- when I think of a lot, it's what you use

2    as a release entity, what are you releasing based on, and that

3    would be 1,332 per quantity that you're releasing to the market.

4    So you had 2 quantities that you released to the market.

5    Q.    So you're saying that the 1,332 is controlled by whether we

6    send some of our cans to Canada and some of them to the U.S. as

7    opposed to what was the entire production lot inside our system?

8    A.    That's Abbott's quality system, not mine.  I mean, it's

9    what they do.  I mean, that's the way the batch records are set

10   up.

11   Q.    Okay.  But you would agree with me that for the production

12   lot from which Jeanine Kunkel's can came, ////////// were

13   tested at Abbott.

14   A.    Yes, for the gross lot of powder that was dried, we tested

15   //////////.

16            MR. REIDY:  One moment, Your Honor, please.  I'll only

17   tell Your Honor that I'm skipping a couple of things which

18   should be good news for everybody.

19   Q.    You offered criticism of Abbott's HACCP program, did you

20   not?

21   A.    In my original written report I did, yes.

22   Q.    And did you say anything this morning about it?

23   A.    No.

24   Q.    And with respect to Abbott's production facilities, they

25   are inspected by the FDA, are they not?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 188 of 203

1    A.    They are.

2    Q.    And they're inspected on at least an annual basis?

3    A.    Correct.

4    Q.    And you've seen records of FDA inspections of the Abbott

5    powdered infant formula plant at Casa Grande?

6    A.    I've read several.

7    Q.    And in addition to that, Abbott has inspections from Cook

8    and Thurber too as well; right?

9    A.    That's correct.

10   Q.    And they had inspections from Cook and Thurber in 2007 and

11   2008, say our relevant time period for this case; right?

12   A.    If you say so, yes.

13   Q.    If you don't know, you can say you don't know.  You don't

14   have to accept --

15   A.    I haven't reviewed that information specifically, but yes,

16   I believe that's the case.

17   Q.    Okay.  And in your view Cook and Thurber is the gold

18   standard of third-party auditors; right?

19   A.    They're well recognized for performing audits, yes.

20   Q.    And you, in fact, have referred to them as the gold

21   standard for third-party audits.

22   A.    Okay.  Yes.

23   Q.    That's what you think; right?

24   A.    Yes.

25   Q.    Okay.  I'm going to put up what's been marked as Exhibit

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 189 of 203

1    1012A -- I'm sorry, 1012B.  And, Dr. Donnelly, do you recognize

2    that as a Cook and Thurber audit report?

3    A.    Okay.  Yes.  Yes.

4    Q.    And you're familiar with Cook and Thurber?

5    A.    Yes.

6    Q.    And until 2007 when you left Wyeth, had they done audits of

7    Wyeth's powdered infant formula?

8    A.    I don't know.

9    Q.    You don't know whether they ever did?

10   A.    Don't know.

11   Q.    Okay.  And they audit a number of things when they come in;

12   is that right?

13   A.    Well, yes, they -- yes.

14   Q.    Okay.  And do you know how they're sent in?  I think are

15   they sometimes sent in by large customers?

16   A.    Yes.

17   Q.    And I think you referenced -- well, maybe you did, maybe

18   you didn't.  But they're often sent in by very large purchasers

19   of powdered infant formula; right?

20   A.    If you say so.

21   Q.    Well, do you know?

22   A.    I believe I know, yes.

23   Q.    Okay.  So what do you know?

24   A.    I know that Cook and Thurber came in to audit the factory

25   originally for Costco.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 190 of 203

1    Q.    At Wyeth or at Abbott?

2    A.    Abbott.

3    Q.    And Costco would fit my description of a large purchaser of

4    powdered infant formula.

5    A.    It would.

6    Q.    Turning to page 2 of the audit, that's Cook and Thurber's

7    scoring of the audit?

8    A.    Uh-huh.

9    Q.    And with respect to those numbers, section B is the HACCP

10   management; right?

11   A.    Yes, yes.

12   Q.    And I'm not sure we've done this.  Will you describe what

13   HACCP stands for, the acronym?

14   A.    Hazard Analysis and Critical Control Point.

15   Q.    Okay.  And so we were discussing earlier the heat point

16   being a critical control point for microbiological control.

17   That would be what we mean by a critical control point; right?

18   A.    That's a critical control point.

19   Q.    Okay.  And when they say critical control point, they mean

20   something that is where you're relying on it to accomplish

21   whatever it is it's supposed to be accomplishing.

22   A.    Critical control point is a point in your process where you

23   can reduce, eliminate, or control the hazard.

24   Q.    And in the case of a microbiological hazard, at least while

25   it's in the liquid form, heating the liquid above the level that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 191 of 203

1  the microbe can survive is, therefore, a critical control point;

2  right?

3  A.   If you're able to document that, yes.

4  Q.   And ordinarily in the course of a processing of a batch,

5  you'd expect to find documentation of the temperatures; correct?

6  A.   No.  On a critical control point you actually need

7  monitoring data.  You have to have data indicating that in

8  this -- whatever your heat -- whether it's going to be a

9  combination of both time and temperature that it was delivered

10 to the liquid as it's supposed to to control, reduce, or

11 eliminate the hazard.

12 Q.   And Cook and Thurber gives the Abbott Casa Grande powdered

13 infant formula plant or infant formula plant a 97 percent in

14 HACCP management; right?

15 A.   That's what it says.

16 Q.   And you know 97 percent to be a pretty good score; right?

17 A.   I disagree with that.

18 Q.   Okay.  What do you think?

19 A.   I think for the industry leader that's part of a

20 pharmaceutical company they should be having hundreds across the

21 board here pretty much.

22 Q.   And I think I asked you this already, but do you have any

23 familiarity with Cook and Thurber scoring and reports at Wyeth?

24 A.   No.

25 Q.   And have you seen Cook and Thurber's scoring reports at

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 192 of 203

1   other infant formula plants?

2   A.   No.  I'm pretty -- I'm familiar with these kind of audits,

3   and actually one of my client activities is getting them

4   prepared to go through some of these audits.  I know what they

5   look for.  I'm just saying I'm not impressed by that.  I'm

6   particularly not impressed if you go back and you read this

7   report and the previous one, 85's a fail.  Their first Cook and

8   Thurber audit, they had a 92 across the board which is like

9   barely getting your nose above the -- above the -- above

10  passing.  So you're asking me if I'm impressed.  I'm not

11  impressed.

12  Q.   And with respect to the 97 that we were talking about here,

13  you don't think that's meant to be a good score.

14  A.   It -- usually if you're -- there's another 3 percent out

15  there.  They're wanting more.

16          And then the other piece with these audits is they're

17  not content driven.  They're just looking to see do you have one

18  and how is it written and are you following, you know, usually

19  your procedures.  There's not a lot of content going into that.

20  They're just checking to see if you've got a pest control

21  program, if you have a sanitation program.  They're not looking

22  at the content part of it.

23  Q.   So according to you, they don't look at all of the content

24  of your HACCP program?

25  A.   Not all of it, no.  They don't do a hard review of it.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 193 of 203

1    Q.   And what experience do you have with Cook and Thurber doing

2    an examination of a powdered infant formula plant?

3    A.   With a specific Cook and Thurber audit doing a powdered

4    infant formula plant?

5    Q.   Yeah.

6    A.   I don't think I've been there when they've --

7    Q.   So zero?

8    A.   Your words, yes, zero.

9    Q.   You talked about Abbott having a liquid version of NeoSure;

10   is that right?

11   A.   Correct, correct.

12   Q.   And you said that you thought it was inappropriate for a

13   company with a liquid version of NeoSure to be involved in

14   producing powdered NeoSure.  Is that -- did I read that

15   correctly?

16   A.   That's essentially my opinion, yes.

17   Q.   And your thinking there is that because you can get to

18   commercially sterile in liquid form that you shouldn't be

19   working with powder at all; is that right?

20   A.   Correct.

21   Q.   And until 2007 you worked at a company that made powdered

22   infant formula; is that right?

23   A.   Yes.

24   Q.   And did you think it was immoral of the company to make

25   powdered infant formula?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 194 of 203

1    A.   Excuse me?

2    Q.   I'm sorry.  Let me change the word.  Did you think it was

3    inappropriate that Wyeth had a product infant f -- or a -- in

4    fact, strike that.

5         Wyeth made a powdered infant formula for preemies;

6    right?

7    A.   We made low-birth-weight powder, yes.

8    Q.   And that was continuing up until the time you left in 2007?

9    A.   It was.  They were -- yes.

10   Q.   Okay.  And was it also inappropriate for Wyeth to be making

11   powdered infant formula for premature infants?

12   A.   I expressed that opinion.

13   Q.   You expressed it inside Wyeth?

14   A.   Oh, yes.

15   Q.   But you continued to work and supervise that activity;

16   right?

17   A.   Well, we also had launched a product to make a liquid

18   version of our LBW that was going to replace it.

19   Q.   So is it okay for a company to have the powder if they

20   don't have the liquid?

21   A.   I just -- I don't think the powdered forms of this product

22   are things that should be marketed, especially the way I know

23   that they're marketed so . . .

24   Q.   And until the time you became a consultant and were

25   available to be testifying in things, you worked at a company

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 195 of 203

1   that made that kind of powdered infant formula including for

2   premature infants; right?

3   A.   Correct.

4   Q.   And while you were working there, you personally believed

5   that you had things working well enough so that you were a

6   hundred percent sure that you never shipped infant formula with

7   E. sak in it; right?

8   A.   That would be my -- what I remember from my time there,

9   yes.

10  Q.   So it's not really inappropriate to be shipping a product

11  that's a hundred percent sure not to have E. sak in it, is it?

12  A.   Okay.  I'm not exactly certain what the question is stating

13  but --

14  Q.   Well --

15  A.   -- it sounds sort of okay.

16  Q.   You said it was inappropriate for Abbott to be making and

17  shipping a powdered infant formula because they had a liquid

18  alternative; right?

19  A.   Right, and that opinion's based on other things other than

20  safety.

21  Q.   I'm sorry.  I thought it was related to safety.  It wasn't

22  related to safety?

23  A.   It is related to safety, but there's other considerations

24  as well.

25  Q.   Okay.  Well, sticking with the safety considerations, once

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 196 of 203

1  you're a hundred percent sure just on the safety aspect of why

2  it's appropriate or inappropriate, once you're a hundred percent

3  sure you're not shipping product with E. sak in it or other

4  contam -- other pathogens in it, then it's okay to be shipping

5  the product; right?

6  A.   Yes.

7  Q.   Now, you talked in your direct testimony about the

8  inadequacies of Abbott's cleaning process; is that right?

9  A.   Yes.

10 Q.   And you also talked about the inadequacies of Abbott's

11 /////////////////////////////////////////////?

12 A.   Your clean-in-place process is ///////////////////// no

13 sanitizing rinse.

14 Q.   Would you describe to the ladies and gentlemen of the jury

15 what clean in place means?

16 A.   Means that the equipment is cleaned without taking it

17 apart, so you usually have pumps that force liquids at a

18 relatively good pressure through nozzles so the inside of the

19 equipment's sprayed.  So typically you'll start out with caustic

20 which is designed to get -- hot caustic which is designed to get

21 the protein off the equipment, and you may or may not use acid

22 every time, but the acid is designed to get minerals.

23 Q.   Now, in the course of the testing of the production

24 facilities at Abbott, do they test any areas that you did not

25 test when you were at Wyeth?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 196 Filed 05/13/14 Page 197 of 203

1   A.   I have no idea.

2   Q.   Well, before you came here to criticize Abbott's testing

3   processes, you studied them; right?

4   A.   Their testing pr -- I've looked at their E. sak method,

5   their salmonella method, what they do for environmental

6   sampling.  That's pretty much it.

7   Q.   And so in that content then, just in those areas, does

8   Abbott do testing that you didn't do at Wyeth?

9   A.   We -- okay.  The one test that we weren't doing was

10  testing in the environment.

11  Q.   How about spots that are tested?  Did Abbott test places

12  that Wyeth did not test?

13  A.   I don't know.  I don't have a complete list of the

14  locations and where they went.

15  Q.   What if we divide the world into contact and noncontact

16  areas?

17  A.   Okay.

18  Q.   And by that, why don't we explain -- why don't you explain

19  to ladies and gentlemen of the jury what we mean by contact and

20  noncontact.

21  A.   Well, the gentleman's trying to say product contact.  So

22  the idea is that you've got surfaces that are exposed to product

23  and then you've got surfaces outside that that are not exposed

24  to contact.

25  Q.   And Abbott tests its product contact areas; right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 198 of 203

```
1    A.    I'm assuming they do, yes.

2    Q.    And Wyeth did not test their product contact areas; right?

3    A.    Yes, we did.

4    Q.    So you ran /// -- or rather E. sak testing on your product

5    areas?

6    A.    Okay.  You're --

7    Q.    Product contact areas.

8    A.    You're losing me here.  Okay.  So the --

9           THE COURT:  Can we hold that thought till tomorrow

10   morning at 8:30?

11          MR. REIDY:  I'm sure we can, Your Honor.  Thank you.

12          THE COURT:  Would that be okay?

13          MR. REIDY:  Thank you.

14          THE COURT:  Thank you.  Members of the jury, it's

15   2:30, so please keep an open mind.  Don't read anything in the

16   newspaper, and we'll see you back here at 8:30 tomorrow morning.

17   Thank you.

18          (The jury exited the courtroom.)

19          THE COURT:  Please be seated.  Yeah, the witness can

20   step down.

21          Mr. Reidy, about how much more time do you have on

22   cross?

23          MR. REIDY:  I was just discussing that with

24   Mr. Rathke, Judge.  I would say in the neighborhood of an hour

25   and 15 or an hour and 30 and I'll be done.  And I also promised
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 199 of 203

1  Mr. Rathke that I would work to make it shorter rather than

2  longer.

3          THE COURT:  Well, I appreciate that, and that's fine.

4  You know, given the length -- you know, I kind of look at the

5  length of direct, and yeah, I don't have any problem.

6          MR. REIDY:  I'll certainly be in that parameter.

7          THE COURT:  Sure.  That's fine.  You have a lot of

8  material to cover.

9          Mr. Rathke, are your wheels turning on coming up with

10  a plan, because at this rate we'll be well into February?

11          MR. RATHKE:  Well, I . . .

12          THE COURT:  You may be well into February.  I won't be

13  here.  I mean, with all due respect, in 36 years in this

14  business, I've never seen a lawyer take so long on direct

15  examination of an expert.  And if you think that's helping your

16  case with the jury, I suggest I'd give you an enrollment to

17  dental school at the University of Minnesota because it just

18  isn't.  So I don't know -- you know, I like to let lawyers try

19  their case and all, but, you know, I made a commitment to the

20  jury.  And, you know, if I thought for a second that the

21  examination except for Mr. Bottaro's which was right on point

22  was going to be so convoluted, so poorly organized, and take so

23  long, I would have had a chess clock out here so fast your head

24  would be spinning.  It just -- I've never seen anything like it

25  in 36 years.  I'm just telling you.  Just -- as they say, just

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196-2   Filed 05/13/14   Page 200 of 203

1  sayin'.

2        So you can try it any which way you want.  But, you

3  know, you essentially told me you were going to get done by

4  Friday.  And at this rate it's going to be Friday, but it's

5  going to be a week from this Friday.  I don't even think you'd

6  get done by then at this rate.

7        MR. RATHKE:  I'm going to continue to try to cut this

8  down and be as efficient as possible.

9        THE COURT:  So are you still holding to your position

10  you'll be done by noon on Monday?

11        MR. RATHKE:  I think that that is possible, and

12  that's -- that will be my goal from -- it has been my goal, and

13  it will continue to be my goal.

14        THE COURT:  Well, wait a minute.  Your goal was to be

15  done on Friday.  That was your goal.

16        MR. RATHKE:  But I never -- I always express -- you

17  know, I never . . .

18        THE COURT:  You always what?  Excuse me?  Well, I

19  would think lawyers -- I would think lawyers would estimate on

20  the high side or on the long side, particularly knowing I've got

21  a complex patent case with all kinds of experts ready to go to

22  trial the day this ends, and you knew that.  So when you gave me

23  the estimate you were going to be done by Friday, I took you at

24  face value because I assume you estimate too long so that I'd be

25  happy rather than, oh, gee, we're really not making progress,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 196  Filed 05/13/14  Page 201 of 203

```
1   because what judge gets happy about that?

2           Oh.  So anyway, you know, it's hard to ask the defense

3   how long you think your case is going to be because we have no

4   idea when the plaintiff is going to be done, so, you know, this

5   is a hypothetical.  Well, do you think you can put your case on

6   in five days?  Is that what you're planning?

7           MR. REIDY:  We are planning that, Your Honor.

8           THE COURT:  Yeah, and that's what you told me

9   originally, five days.  Okay.

10          MS. GHEZZI:  Your Honor, I just want to remind you.

11          THE COURT:  Yes.

12          MS. GHEZZI:  About on Monday we have the one

13  Dr. Shulman who has to be done out of order.

14          THE COURT:  Yes, yes, yes.  No, that's fine.

15          MS. GHEZZI:  Okay.

16          THE COURT:  Yeah, I'll do everything I can to

17  accommodate out-of-order witnesses.  I always do in every trial.

18  That's not a problem.

19          Okay.  We'll see you tomorrow morning at 8:30.  I'll

20  just check with you a few minutes early.  If anything comes up,

21  let me know.  We'll be here.  So you need to come early or

22  e-mail me.  And we'll see you at 8:15 tomorrow morning.  Thank

23  you.

24          (The foregoing trial was

25          adjourned at 2:36 p.m.)
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/12/14   Page 202 of 203

```
1                         CERTIFICATE

2          I certify that the foregoing is a correct copy of the

3    transcript originally filed with the Clerk of Court on 3-20-14

4    incorporating redactions of personal identifiers and any other

5    redactions ordered by the Court in accordance with

6    Administrative Order 08-AO-0009-P.

7

8

9       S/Shelly Semmler                    4-29-14
         Shelly Semmler, RMR, CRR              Date
10

11

12

13
                              INDEX
14
     WITNESS:                                        PAGE:
15
         JANINE JASON
16          MS. GHEZZI                                334
            MR. RATHKE                                388
17
         SCOTT DONNELLY
18          MR. RATHKE                                392
            MR. REIDY                                 474
19
                           * * * * *
20

21

22

23

24

25
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 196   Filed 05/13/14   Page 203 of 203