IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

SECURITY NATIONAL BANK, as
Conservator for JMK, a minor child,

No. C11-4017-MWB

      Plaintiff,

        vs.

ABBOTT LABORATORIES,

      Defendant.

Sioux City, Iowa
January 10, 2014
8:15 a.m.

Volume 5 of 10

_____/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 208 Filed 10/15/14 Page 1 of 225

APPEARANCES:

For the Plaintiff:        AMANDA BRANDY VAN WYHE, ESQ.
                          TIMOTHY S. BOTTARO, ESQ.
                          Vriezelaar, Tigges, Edgington,
                             Bottaro, Boden & Ross
                          613 Pierce Street
                          Sioux City, IA 51102

                          STEPHEN C. RATHKE, ESQ.
                          ROBERT J. KING, ESQ.
                          Lommen, Abdo, Cole, King & Stageberg
                          2000 IDS Center
                          80 South Eighth Street
                          Minneapolis, MN 55402

For the Defendant:        JOHN C. GRAY, ESQ.
                          Heidman Law Firm
                          1128 Historic 4th Street
                          Sioux City, IA 51102

                          DANIEL E. REIDY, ESQ.
                          JUNE K. GHEZZI, ESQ.
                          GABRIEL H. SCANNAPIECO, ESQ.
                          KATHRYN L. DORE, ESQ.
                          Jones Day
                          Suite 3500
                          77 West Wacker Drive
                          Chicago, IL 60601

Also present:             Louise Deitloff
                          Daniel Morrison

Court Reporter:           Shelly Semmler, RMR, CRR
                          320 Sixth Street
                          Sioux City, IA  51101
                          (712) 233-3846

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 268   Filed 10/15/14   Page 2 of 225

1    (Proceedings reconvened outside the presence of the

2    jury.)

3    THE COURT:  Okay.  I'd like to go on the record.

4    First why don't we take up where we are in terms of the length

5    of the trial.  And so does the -- you know, I told the jury I

6    was going to let them know today, and really what I want to let

7    them know is what's the likelihood it's going to go into the

8    third week.

9    I believe that Monday -- you know, it's going to

10   create a lot of complications not only for the jury but for

11   the -- I'm going to have to move that patent trial, and we've

12   got expert witnesses from all over the country scheduled to fly

13   in.  And neither this case nor that case were my cases.  I just

14   took them over to be a nice guy.

15   So I really need to know a pretty firm estimate.  And

16   we'll pr -- I'm probably going to see if I can order the

17   courthouse to be open on that Monday which is a federal holiday.

18   It used to be very easy when we were relatively flush with cash.

19   Now after the sequester -- because our court has to pay for the

20   power, has to pay the overtime for the court security officers.

21   There are a number of financial implications for opening the

22   courthouse that day to the public.  I and my staff are here, but

23   when we open to the public, it costs our court a lot of money.

24   But I'm going to see if I can do it because we just need to get

25   this case resolved.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 268   Filed 10/15/14   Page 3 of 225

1            So what's the plaintiff's best estimate now of when

2    you're going to be finished?

3            MR. RATHKE:  Your Honor, I believe we will -- well, I

4    know we will rest on Monday hopefully after a half day on

5    Monday.  Best-case scenario would be after 15 minutes on Monday.

6            THE COURT:  Okay.  And what's the defense position?

7            MR. REIDY:  Judge, we'll -- we still believe we can do

8    it in five days.  Our goal, assuming they finish up fairly early

9    on Monday -- and obviously depending on length of crosses and

10   things we can't predict -- we would love to conclude our

11   evidence by Thursday if we possibly can.

12           THE COURT:  Do you actually think you may be able to

13   do that?

14           MR. REIDY:  I think we might be able to finish by

15   Thursday, Judge.  Yeah -- you know, we're doing what we can to

16   trim it and to make the examinations pithy.

17           THE COURT:  Sure.

18           MR. REIDY:  And so I think it's probably -- if we were

19   to start in the, you know, second hour or something on Monday, I

20   think we're better than even money to finish on Thursday or

21   maybe even a little bit before but probably --

22           THE COURT:  And then arguing it on Friday.

23           MR. REIDY:  Yes.

24           THE COURT:  Yes.  I always like to give the lawyers

25   some time to argue -- you know, I don't expect to finish the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 268  Filed 10/15/14  Page 4 of 225

```
 1   evidence, have you argue in a half an hour or hour or so.  If
 2   we're most of the way through the day, I usually just -- if the
 3   lawyers prefer, which they almost always do, just say I'll send
 4   the jury home early and you can argue it in the morning.
 5   Everybody's fresh that way, and I don't like to submit a case
 6   late in the afternoon because I think there's just a temptation
 7   to rush through it where if the jurors have to come back in the
 8   morning, they're more likely to spend the time.  So, you know,
 9   that sounds great.  Sounds like the worst-case scenario might be
10   maybe closing arguments on the following Monday, but that would
11   probably be the worst-case scenario.
12           MR. REIDY:  I think that's probably correct, Judge.
13           THE COURT:  Yeah.  And if we were to finish the
14   evidence like on Friday in the middle of the day, I'd probably
15   just bring them back Monday for closing arguments for the very
16   reason I just talked about.
17           MR. REIDY:  And I can tell you that personally I like
18   your reasoning on having a little break before close.
19           THE COURT:  Yes.  Well, I just think it's only fair.
20   And I tell the jurors it's really for their benefit because the
21   arguments tend to be better, even shorter.  If you make somebody
22   go without having a chance to really work through it the last
23   time, they're usually longer, so I think the jurors get that and
24   understand it.
25           I've just got to take an e-mail here.  I had an
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 208 Filed 10/15/14 Page 5 of 225

1    emergency late last night involving a sentencing today.

2         Oh, great.  Okay.  Okay.  The other matter I'd like to

3    take up and then we'll see if there's anything on the lawyers'

4    agenda, at the end of the day yesterday we were talking about

5    what, if anything, to do with the deposition of Sharon Bottock

6    because of the confusion of the first Dr. Donnelly that

7    testified.  I've read and reread and reread the pages 95 through

8    100 and a couple of pages before that and a couple of pages

9    after that.  Actually I'd read the whole deposition last week.

10        I didn't see anything remotely improper.  And yeah,

11   I -- while I'm critical of some of the things Miss Ghezzi did in

12   depositions -- and that's to come -- I wasn't really critical of

13   anything in this portion, and I think she did exactly what she

14   said she did yesterday afternoon.  She was trying to assist with

15   the exhibit numbers and all and just trying to move things

16   along.  And that was one -- and had a form objection in there,

17   but I thought it was one of the few that actually had some basis

18   in fact.  So I didn't see anything improper at all.

19        Seems to me the way to have handled the situation was

20   when Dr. Donnelly was testifying, he could have gone into more

21   detail about what allegedly about those objections confused him.

22   Personally I didn't find anything confusing about it when I read

23   those pages.  It was a little disjointed, but that's -- there

24   wasn't anything improper about it being disjointed.  And I

25   didn't have any hard time following it.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 208  Filed 10/15/14  Page 6 of 225

```
 1              I think what may have confused him was the lack of
 2    follow-up questions by the plaintiff for additional information
 3    that would have been helpful, but that's certainly not the
 4    defense fault.
 5              So that's my take on it.  So I appreciate you raising
 6    it.  But that's my take on it.  Any -- anything you don't
 7    understand about what I've said?
 8              MR. BOTTARO:  (Shook head.)
 9              THE COURT:  Okay.  Great.
10              MR. BOTTARO:  Thank you, Your Honor.
11              THE COURT:  And do the parties have anything they'd
12    like to discuss this morning?
13              MR. REIDY:  No, Your Honor.
14              MR. RATHKE:  No, Your Honor.
15              THE COURT:  Okay.  I failed to give you an opportunity
16    to object on the record the fact that I baked cookies for the
17    jury before.  I -- actually in one case, a civil case, the
18    defense did object to it.  So, you know, I should have asked you
19    ahead of time, but for the life of me I can't see anything wrong
20    with it.  I'll probably do it again next week for them.  And I'm
21    even going to do something for the lawyers.  I'm going to bake
22    you some cookies too so -- but if you want to make a record on
23    it, you know, I want to make sure everybody has an opportunity
24    to make any record on any matter they want to make.
25              MR. REIDY:  No record to be made, Judge.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 208   Filed 10/15/14   Page 7 of 225

1          THE COURT:  Thank you.

2          MS. GHEZZI:  Well, Your Honor, the only objection was

3   not offering us some cookies because we have a lot of sweet

4   teeth on this side.

5          THE COURT:  You know, and I thought about that.

6          MS. GHEZZI:  We have to eat all the cookies over here.

7          THE COURT:  I thought about that, and I was just too

8   tired to make a double batch because it came up kind of late at

9   night, and I'm an early-to-bed person.  I thought, you know, the

10  polite thing to do would be to make it for the lawyers.  But I'm

11  going to do that next week.  And I'll be even solicitous of the

12  lawyers.  So you can request a certain type.

13         Now, I may add my own flare to it because I tend not

14  to follow recipes, but, you know, at the end of the day today

15  you can give me a suggestion of what you would like.  And the

16  big thing is whether you like them thick and chewy or thin and

17  crispy because I'm pretty good at that.  Fortunately I'm married

18  to a former food editor of Better Homes and Gardens who has a

19  master's degree in food science, so I know the tricks on how to

20  make any recipe thick and chewy or thin and crispy.  So I'll be

21  glad to take suggestions for what you like in your cookies.

22         Mr. Rathke.

23         MR. RATHKE:  Thank you.  Your Honor --

24         THE COURT:  Do you have a more substantive topic you'd

25  like to take up?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 268   Filed 10/15/14   Page 8 of 225

```
 1              MR. RATHKE:  Slightly.

 2              THE COURT:  Okay.

 3              MR. RATHKE:  There was some testimony read into the

 4    record from Summer Johnson about conditions at the home years

 5    later, and the Court did issue a decision on the admissibility

 6    of that holding that it was inadmissible to -- for purposes of

 7    establishing the condition of the house in 2008 but that it

 8    would be admissible as foundation for Dr. Olson's supplemental

 9    opinion.

10              And I'm wondering, you know, I'm just saying that

11    there needs to be a limiting instruction in accordance with the

12    Court's previous order, and the plaintiff would request that.

13              THE COURT:  And what was the name of the deponent?

14              MR. RATHKE:  Summer Johnson.

15              THE COURT:  Yeah.  Does the defense have any objection

16    to me giving a limiting instruction?

17              MR. REIDY:  We do not, Your Honor.

18              THE COURT:  And she testified about the condition of

19    the home in 2012; is that correct?

20              MR. RATHKE:  It was at least 2012.  I think it was

21    also 2010 and 2011.

22              MR. SCANNAPIECO:  It was 2010 and 2012.

23              THE COURT:  Thank you.

24              Mr. Rathke?

25              MR. RATHKE:  Yes, sir.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 268 Filed 10/15/14 Page 9 of 225

```
1              THE COURT:  I have a question for you.  I'll be glad
2    to do that now.  But it seems to me the better time would be to
3    do it with regard to the expert who's going to be testifying
4    about the condition of the home and how that affects his opinion
5    about future placement for J.M.K., but I can give it both places
6    so . . .
7              MR. RATHKE:  Well, we're calling two additional
8    therapists in order to get this film in.  I mean, it's just
9    simply to lay foundation for the video.  And I don't know
10   whether the defense will have similar questions with the other
11   two therapists.  So keeping that in mind, this may reoccur both
12   this morning and first thing Monday morning.
13             THE COURT:  Okay.  So --
14             MR. SCANNAPIECO:  Your Honor?
15             THE COURT:  -- every time it occurs you'd like me to
16   give a -- that's fine.
17             MR. RATHKE:  I would.
18             THE COURT:  Okay.
19             MR. RATHKE:  Thank you.
20             THE COURT:  Okay.  Great.  Well, we'll see you in two
21   minutes.
22             MR. REIDY:  Judge, just for --
23             THE COURT:  Yes.
24             MR. REIDY:  -- point of information, we won't be
25   asking those questions today, so you don't have to be on
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 10 of 225

1  stand-by.

2          THE COURT:  Okay.  Thank you.

3          (Recess at 8:28 a.m.)

4          THE COURT:  Let's see.  Where were we?  Oh, you're

5  ready to call a new witness, or is it going to be a depo read or

6  what?  What's going on?

7          MR. RATHKE:  No, we've -- Lisa Fullenkamp.

8          THE COURT:  Okay.

9          MR. RATHKE:  And, Judge, to our surprise, Jessica

10  McHugh who said she couldn't be here today and had to come

11  Monday, she's here today too, so we're going to take her as

12  well.

13          THE COURT:  Oh, okay.  She didn't even make it on to

14  your --

15          MR. RATHKE:  Well, she had --

16          THE COURT:  -- professionally drafted supplemental

17  witness list.

18          MR. RATHKE:  She had told me she couldn't come till

19  Monday, but she's here, so we're going to do her.

20          THE COURT:  Okay.

21          (The jury entered the courtroom.)

22          THE COURT:  Good morning.  Thank you.  Please be

23  seated.

24          Members of the jury, I just wanted to kind of give you

25  an update because we're now -- you know, by the end of the day

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 11 of 225

1    today, we will have finished week one.  Here's my take on it.

2    We're a little behind schedule, but that schedule is shifting

3    and changing.  There's some possibility we will have closing

4    arguments next Friday and we'll be on schedule.  There's also

5    some possibility that we may go into the third week, but it

6    would only I think be a day at most.

7              And so that third week, the Monday, that Monday --

8    what's that date?  The 20th or the 21st, something like that.

9              THE CLERK:  20th.

10             THE COURT:  20th.  I believe that's a federal holiday,

11   but we're -- I'm going to make every effort to go on that day

12   because I start this patent case the next day that you all have

13   no possibility of serving on, so that's the good news.

14             So, you know, I think we're pretty much going to

15   finish when we thought we would.  We might be a day later.  It's

16   very, very hard to estimate the length in a two-week trial.  So

17   I just wanted to give you a heads-up if you have personal plans

18   that you need to make.

19             The other option which I've done would be going on a

20   Saturday, but I assume that has very little appeal to jurors, so

21   we can kind of take that up later in the week, and that's one

22   thing you could discuss among yourselves, but I'm just kind of

23   assuming most jurors -- it's already a great sacrifice to spend

24   two weeks here, and to give up a Saturday would be too much.

25   But we can take that up later.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 12 of 225

```
 1              Ready to call your next witness?

 2              MS. VAN WYHE:  Yes, Your Honor.  Thank you.  We would

 3    call Lisa Fullenkamp.

 4              THE COURT:  Okay.  If you would just please come

 5    forward, I'll swear you in.  Good morning.  Would you raise your

 6    right hand, please.

 7               LISA FULLENKAMP, PLAINTIFF'S WITNESS, SWORN

 8              THE COURT:  Okay.  Please be seated in the witness box

 9    there.  You can adjust the chair and the microphones so you can

10    speak directly into the microphones.  And would you tell us your

11    name, please, and spell your last name.

12              THE WITNESS:  My name is Lisa Fullenkamp, F as in

13    Frank u-l-l-e-n as in Nancy k-a-m-p.

14              THE COURT:  Thank you.

15              Counsel?

16              MS. VAN WYHE:  Thank you Your Honor.

17                          DIRECT EXAMINATION

18    BY MS. VAN WYHE:

19    Q.   Miss Fullenkamp, what do you do for a living?

20    A.   I'm a speech language pathologist.

21    Q.   And where do you work?

22    A.   At Able Kids Pediatric Therapy in Sioux City, Iowa.

23    Q.   How long have you worked there?

24    A.   Since October of 2011.

25    Q.   And was Jeanine Kunkel your client while you were working
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 13 of 225

1  at Able Kids?

2  A.    She was.

3  Q.    When did you start providing services to Jeanine?

4  A.    It was on January 18 of 2012.

5  Q.    And are you still providing services to Jeanine?

6  A.    She is currently on hold with speech therapy.

7  Q.    When did you stop providing services?

8  A.    In February of 2012.

9  Q.    During January --

10  A.    I'm sorry, 2013.

11  Q.    Between January 2012 and February 2013, about how often did

12  you see Jeanine?

13  A.    It was very infrequent.  She missed many appointments due

14  to illnesses and other unknown reasons.

15  Q.    Okay.  I want to show you a video that's marked as Exhibit

16  2B from the time stamp 11:12 to the end of the video.  During

17  the course of your speech therapy with Jeanine, do you recall

18  that one of your sessions was videotaped?

19  A.    Yes.

20  Q.    Okay.  And that occurred on January 25, 2012; is that

21  right?

22  A.    That's correct.

23  Q.    Was the videotaping of a typical speech therapy session at

24  that time?

25  A.    Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 14 of 225

1   Q.   Okay.  Do you recall talking during the taping and kind of

2   explaining what you were doing?

3   A.   Yes.

4           MS. VAN WYHE:  One moment.

5           THE COURT:  Okay.  While we're having another

6   technical glitch, I'm going to catch up on something that I was

7   supposed to tell you before we started this witness and I

8   forgot.

9           You will recall yesterday -- well, you'll recall --

10  you may recall in my instructions I told you that sometimes

11  evidence is offered for a limited purpose and not for other

12  purposes, and that actually happened yesterday when the

13  deposition of Summer Johnson was read to you and there was some

14  discussion about the condition of the family home in 2010 and

15  2012.

16          And that testimony is not being offered to show the

17  condition of the family home in 2008 but was being offered as

18  what we call foundation information for the testimony of an

19  expert down the road who will be testifying about the potential

20  placement options for J.M.K.  And there may be similar evidence

21  that you may or may not hear before we get to that testimony.

22  So I wanted to give you a limiting instr -- what we call a

23  limiting instruction.

24          You may pro -- are you ready to go technologywise?

25          MS. VAN WYHE:  Thank you, Your Honor.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 15 of 225

1    BY MS. VAN WYHE:

2    Q.   Miss Fullenkamp, when the video was being taken, was that

3    to your knowledge, the video, displaying an accurate depiction

4    of what was going on at that time in terms of the therapy you

5    were providing?

6    A.   Yeah, yes.

7              MS. VAN WYHE:  Your Honor, I have no further

8    questions.  We'll wait to play the video until the other

9    therapist testifies.

10             THE COURT:  Oh, okay.

11             Counsel, you may cross-examine.

12                         CROSS-EXAMINATION

13   BY MR. SCANNAPIECO:

14   Q.   Good morning, Miss Fullenkamp.  My name is Gabe

15   Scannapieco.  I represent the defendant in this case.

16             You first met Jeanine Kunkel on January 18, 2012?

17   A.   That's correct.

18   Q.   Okay.  And I've looked at some of your records, and I

19   notice that in your initial evaluation there's a comment about

20   the parents alleging that her condition was caused by using

21   powdered infant formula?  Do you recall that?

22   A.   That's correct.

23   Q.   And that's just something -- is that something that

24   Mrs. Surber told you?

25   A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 16 of 225

1  Q.   Okay.  That's not something that you determined on your

2  own, is it?

3  A.   I had no knowledge at all of her suspicion.

4  Q.   Okay.  So you didn't perform an investigation of her

5  condition or anything like that.

6  A.   I did a speech language pathologist examination.

7  Q.   So if we look in -- if we see in your medical records at

8  some point during this trial any comments about the powdered

9  infant formula, that's not an opinion you had of the source of

10  her illness, is it?

11  A.   No.  It's just part of her history.

12  Q.   And the video that was recorded of Jeanine Kunkel with you

13  on January 25, that was a week after you met her?

14  A.   Yes.

15           MR. SCANNAPIECO:  Okay.  Thank you.

16           THE COURT:  Any redirect?

17           MS. VAN WYHE:  No, Your Honor.

18           THE COURT:  Okay.  Any questions from the jury for

19  this witness?  Okay.  Doesn't look like it.

20           You may step down.  Thank you.

21           MR. RATHKE:  Diana Terrell.

22           THE COURT:  Thank you.  Good morning.  If you'd just

23  come forward into the middle part of the courtroom, I'll swear

24  you in.  Would you raise your right hand, please.

25           DIANA TERRELL, PLAINTIFF'S WITNESS, SWORN

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 17 of 225

1          THE COURT:  Thank you.  Please be seated in the

2    witness box.  And you can adjust the chair and the microphones

3    so you can speak directly into the microphones.

4          THE WITNESS:  That's good, isn't it?

5          THE COURT:  Pardon me?

6          THE WITNESS:  Is it good?

7          THE COURT:  Well, you need to be a little closer, so

8    scoot that chair up.  And you can pull those microphones a

9    little closer I believe.

10          THE WITNESS:  Okay.

11          THE COURT:  Okay?  Would you tell us your name and

12    spell your last name, please.

13          THE WITNESS:  Diana Terrell, T-e-r-r-e-l-l.

14          THE COURT:  Thank you.

15          Mr. Rathke, you may proceed with your examination.

16          MR. RATHKE:  Thank you -- thank you, Your Honor.

17                       DIRECT EXAMINATION

18    BY MR. RATHKE:

19    Q.   Where do you live?

20    A.   In Sioux City.

21    Q.   And is -- what's your relationship to Megan Terrell?

22    A.   Megan is my daughter.

23    Q.   Do you have other children?

24    A.   Yes, I have another -- two more daughters.

25    Q.   Could you list them in chronological order.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 18 of 225

1  A.    Megan's the oldest.  Nicole is the middle, and Letitia is

2  the youngest.

3  Q.    Okay.  Letitia is L-e-t-i-t-i-a?

4  A.    Yes.

5  Q.    And grandchildren?

6  A.    Five.

7  Q.    Where do you work?

8  A.    For Woodbury County motor vehicle department.

9  Q.    What do you do for them?

10 A.    Title clerk.

11 Q.    Now, going back into 2008, could you tell the jury how

12 often you would visit or telephone your daughter Megan?

13 A.    Oh, at least twice a week, sometimes every day depending on

14 what was going on.

15 Q.    Would those be visits or phone calls?

16 A.    Mostly phone calls.

17 Q.    Did she normally call you, or did you normally call her?

18 A.    She usually called me.

19 Q.    And when Megan was in the hospital having her twins, did

20 you visit her at the hospital?

21 A.    Yes.

22 Q.    Did you hold Jeanine at the hospital?

23 A.    Yes.

24 Q.    Did you put anything in her mouth like your fingers or

25 anything like that?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 19 of 225

1    A.    No.

2    Q.    To your knowledge what other people visited Jeanine when

3    she was at her hospital after she was born?

4    A.    My father was with me.  I think my aunt Mary was there at

5    one point, my other two daughters.  Blake was there, Megan --

6    Q.    Excuse me?

7    A.    Blake was there.

8    Q.    Blake is?

9    A.    Troy's friend, one of Troy's friends, Blake.

10   Q.    Okay.

11   A.    Troy's mom and dad were there for like maybe five minutes

12   and Megan's step-mom, Janice and her friend Patty I think her

13   name was.

14   Q.    And was Troy there as well?

15   A.    Yes.

16   Q.    And do you remember any of the people that you've listed

17   holding Jeanine other than yourself?

18   A.    I don't remember that --

19   Q.    And Megan, of course.

20   A.    I didn't think that I gave her up to anybody, no.

21   Q.    Did you observe anybody put anything into the baby's mouth?

22   A.    No.

23   Q.    Did you also visit James when he was at the -- during this

24   same period of time that both of the twins were in the hospital?

25   A.    Yes, both of the twins were in the room the day they were

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 20 of 225

1   born together in the afternoon, yes.

2   Q.   So did James have the same contact with these other people

3   as Jeanine?

4   A.   Yes, he did.

5   Q.   Now, Megan got out of the hospital, the records show, on

6   the third day along with Jeanine.  Did you visit their house,

7   Megan and Jeanine's house, before Jeanine got sick?

8   A.   Not during the week because I worked the rest of the week.

9   I was there on the weekend.

10  Q.   So there was an intervening weekend.

11  A.   Yes.

12  Q.   Do you remember when that visit occurred?

13  A.   Not for sure which day, but my dad went with me.

14  Q.   And did you hold Jeanine then as well?

15  A.   Yes.

16  Q.   And did your dad?

17  A.   Yes.

18  Q.   Did you see anybody put anything into Jeanine's mouth?

19  A.   No.

20  Q.   How did the -- as far as tidiness and cleanliness, how'd

21  the house look when you visited their house that weekend?

22  A.   It was always pretty tidy.  They vacuumed every day.

23  Q.   Was Megan a good housekeeper in terms of keeping the house

24  clean?

25  A.   Yes, always has been.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 21 of 225

1  Q.   Now I'm going to take you to April 23 which is a Wednesday

2  evening, so after work.  You're at home?

3  A.   Yes.

4  Q.   Now, had you talked to Megan any time earlier that day that

5  you recall?

6  A.   Not that day probably, no.

7  Q.   So you're at home.  And did Megan call you?

8  A.   Yes, she called that evening.

9  Q.   Do you have any idea as to what time of the evening it was?

10  A.   Probably late evening, not early evening.

11  Q.   By late do you mean nine or --

12  A.   Nine -- between nine and ten probably.

13  Q.   All right.  And I want you to tell the jury as much as you

14  can recall about the telephone conversation that you had with

15  Megan at that time.

16  A.   Well, she just called because the baby was fussy and she --

17  just a new mom and just a little upset and just normal new mom

18  stuff.

19  Q.   Did she use the word crying or just fussy?

20  A.   Fussy.

21  Q.   Did she say crying?

22  A.   I don't know.  She may have.

23  Q.   Okay.  And could you hear -- on the other end, could you

24  hear the baby crying?

25  A.   No, I didn't.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 22 of 225

Q. What'd you tell her?
A. I just said, well, maybe she needs her pants changed or maybe she needs to burp or maybe she was a little colicky or something, just, you know, normal new baby things.
Q. And then how long do you think the conversation lasted?
A. Oh, maybe 20 minutes, half hour maybe.
Q. Did you talk about other things?
A. Probably. I can't remember everything.
Q. All right. When's the next time you talked to Megan?
A. She called me at work the next day, said she was going to take Jeanine -- that Jeanine was real fussy and more than she was the day before. And I said, well, if she doesn't get --
Q. Let me ask you this. Do you remember about what time that telephone call came?
A. No, I don't. I was at work. I don't know for sure what time. After lunch.
Q. It was after lunch.
A. Yeah.
Q. And then when do you -- when does work end for you?
A. Quarter to five.
Q. And anything else you remember about what Megan told you on this phone call?
A. Well, I knew she was going to pick up James, and then I said, "Well, maybe when you get done getting James home, then you should call the doctor's office and see what they say."

```
1    Q.    Anything else you recall about the conversation?

2    A.    No, just that she was crying and still real fussy.

3    Q.    Who was crying?

4    A.    Jeanine.

5    Q.    Megan was --

6    A.    I'm sorry.  Not Megan.  Jeanine.

7    Q.    When's the next time you talked to either Megan or Troy?

8    A.    It was after I got off work.  Megan said that she had taken

9    her to the doctor's off -- Jeanine to the doctor's office and

10   they sent her to St. Luke's and she wanted to know if I could go

11   stay with James that night, so I did.

12   Q.    We're talking about Thursday night.

13   A.    Thursday night, yes.

14   Q.    All right.  And was any -- Thursday night did anybody else

15   spend the night there besides you and James?

16   A.    I don't remember that anybody did, no.

17   Q.    And what happened on Friday?

18   A.    Friday I had to call in work and say that I wasn't coming,

19   and I stayed with James on Friday.

20   Q.    How long was it that you ended up taking care of James?

21   A.    The kids got home from Omaha June 6, and I went -- I stayed

22   out of work till June 9.

23   Q.    So you were out of work the rest of April, all of May, and

24   then part of June?

25   A.    Yes.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 24 of 225

1  Q.   And did you for the most part stay at Megan and Troy's

2  house?

3  A.   Yes, unless I had to take James to the doctor's office or

4  to the WIC clinic we went one day.

5  Q.   Did you at some point find out that Jeanine was no longer

6  at St. Luke's but had been transferred?

7  A.   I believe Saturday morning the kids came home and said they

8  were taking her to Omaha.

9  Q.   Now, starting Thursday night and for the next couple days,

10  what did you feed James?

11  A.   James still had the little courtesy bottles from the

12  hospital, probably two six-packs I think.

13  Q.   All right.  So you had those to start with.

14  A.   Yes.

15  Q.   After those ran out, what did you do for formula?

16  A.   Well, Jeanine was already in Omaha and diagnosed, so I went

17  to Wal-Mart, and I bought cans of the ready-to-feed formula for

18  James.

19  Q.   Now, did you have to make any special arrangements in order

20  to satisfy WIC?

21  A.   In order for WIC to supply their customers with liquid

22  ready-to-feed formula, you have to have a doctor's prescription

23  which I received when I took him to the doctor's office.

24  Q.   What doctor?

25  A.   Dr. Beck was his pediatrician, is still I think.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 25 of 225

1 Q.   And that prescription permitted or satisfied WIC so that

2 James was provided with ready-to-feed.

3 A.   Yes.

4 Q.   Did James ever, ever consume powdered infant formula?

5 A.   No.

6 Q.   Now, you named a number of relatives that had visited

7 Jeanine and James at the hospital.  During the five or six weeks

8 that you cared for James, did James have contact with these same

9 relatives?

10 A.   Yes.  Both of my daughters, my dad.  I went from Megan's --

11 because I live with my father who's elderly, and we went back

12 and forth from Megan's house to check on Dad probably a couple

13 times a week.

14 Q.   And for the most part, though, James lived at the house

15 where Megan and Troy lived.

16 A.   Yes.

17 Q.   And would have been in the same kitchen as Jeanine?

18 A.   Yes.

19 Q.   Same living room as Jeanine?

20 A.   Yes.

21 Q.   Was there a dog?

22 A.   Yeah.

23 Q.   Same dog as when Jeanine was there by herself?

24 A.   Yes.

25 Q.   Same dog bowl?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 26 of 225
To purchase a complete copy of the transcript.

1   A.   Yes.

2   Q.   Is there anything about the environment that James lived in

3   that was different than the environment that Jeanine lived in

4   until she went to the hospital?

5   A.   No.

6   Q.   Now, did -- did Troy -- I know they were at the hospital in

7   Omaha, but did Troy ever come home during that five- or six-week

8   period and spend time with James?

9   A.   Yes, both of the kids came home a couple different times

10  and got clean clothes and left dirty clothes and . . .

11  Q.   So occasionally the parents would --

12  A.   Yes.

13  Q.   And they would have contact with James as well; is that

14  correct?

15  A.   Yes, Megan especially.

16  Q.   Within a couple weeks after you began -- or within a week

17  or two after you became (sic) taking care of James, did you have

18  some visitors from the county health department?

19  A.   Yes.

20  Q.   Could you tell us about that.

21  A.   Well, they came and they tested all the bottles and all the

22  nipples that I had been using, and they checked the taps and the

23  drains and all the countertops.

24  Q.   Now, did you watch them when they were doing whatever they

25  were doing?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 27 of 225

```
1   A.   Yes, most of the time.

2   Q.   Where did -- did you see them take samples or swab

3   different locations?

4   A.   Yes.

5   Q.   What were some of the locations that you recall?

6   A.   I remember the drains for sure and the tap, inside the tap,

7   countertops, the dish drainer, the bottles and the nipples.

8   Q.   Did you let them do whatever they wanted to do?

9   A.   Yes.

10              MR. RATHKE:  Okay.  Thank you.  No further questions.

11              THE COURT:  Mr. Gray, you may cross-examine.

12              MR. GRAY:  Thank you, Your Honor.

13                          CROSS-EXAMINATION

14  BY  MR. GRAY:

15  Q.   Mrs. Terrell?

16  A.   Yes.

17  Q.   You and I have met once before?

18  A.   Yes.

19  Q.   How are you this morning?

20  A.   Fine.

21  Q.   We've assumed -- I don't think anyone has testified to

22  this -- is Troy Kunkel the father of James and Jeanine?

23  A.   Yes, he is.

24  Q.   And you referred to your daughter as Megan Terrell, but

25  she's also known as Megan Surber?
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 28 of 225

1   A.   Her name is Surber.

2   Q.   Okay.

3   A.   Her ex-married name, yes.

4   Q.   Very good.  To assist us a little bit with the calendar, am

5   I correct that you had at least two conversations with your

6   daughter?  One of those would have been on Thursday, April 24,

7   and the other on Wednesday, April 23?

8   A.   Yes.

9   Q.   Okay.  And when you spoke about coming in the intervening

10  weekend, would that have been April 19 being the Saturday and

11  April 20 being the Sunday?

12  A.   If that's the right dates, yes.  I don't know if that's the

13  right dates for Saturday and Sunday then or not.

14  Q.   And I'll help you if I can.  If the Wednesday is the 23rd,

15  would it be fair to say Tuesday would be the 22nd?

16  A.   Yes.

17  Q.   And Monday the 21st?

18  A.   Yes.

19  Q.   Sunday then being the 20th?

20  A.   Yes.

21  Q.   And Saturday the 19th?

22  A.   Yes, it was.

23  Q.   You had a conversation with your daughter after 9:00 on

24  Wednesday, April 23; isn't that correct?

25  A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 29 of 225

1    Q.    And at that time did she tell you that Megan had been

2    crying and crying?

3    A.    Not Megan.

4    Q.    I'm sorry.

5    A.    Jeanine.

6    Q.    Did Megan tell that you Jeanine had been crying and crying?

7    A.    Yes, fussy.

8    Q.    Well, didn't she actually say Jeanine was crying and

9    crying?

10   A.    I don't remember if she exactly said that.  I knew she said

11   she was fussy and crying, but yes.

12   Q.    Do you recall having your deposition taken in this case?

13   A.    Yes, I do.

14   Q.    And do you recall being asked in your deposition at page

15   56, lines 18 through 23 -- and I'll hand those to you.

16   A.    What am I looking for?

17   Q.    Would you look, please, at page 56 of what I've just handed

18   you.

19   A.    Okay.

20   Q.    And would you look, please, at lines 18 through 23.  And

21   please let me know when you've read those.

22   A.    Okay.

23   Q.    Okay?  And does the question read at page -- line 18,

24   until -- okay.  The next paragraph says I remember Megan called.

25   I can't read that.  Does it say -- and your answer beginning on

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 30 of 225

1  page 21 -- line 21 of page 56, Megan called me Wednesday

2  evening -- it says eve -- April 23 to say Jeanine was crying and

3  crying.  Now, was that your testimony at the time of your

4  deposition?

5  A.   Yes, it was.

6  Q.   And certainly, ma'am, at that time that was under oath and

7  you were telling the truth?

8  A.   Yes.

9  Q.   And so would it be fair to say she also told you that

10  Jeanine had been crying a lot?

11  A.   I would say that that would mean the same thing, yes,

12  fussy.

13  Q.   Did your daughter tell you, Mrs. Terrell, that Jeanine's

14  crying was making her nervous and upset?

15  A.   Yes, I'm sure she did.

16  Q.   And then the following day when you spoke to your daughter,

17  did she tell you that she was worried about the crying of

18  Jeanine?

19  A.   As much as I can remember at work, I would assume yes, that

20  she did.  She was concerned because she was -- had been crying

21  all day.

22  Q.   And that's probably -- is it your understanding that's one

23  of the reasons she took the child to the doctor?

24  A.   Yes.

25  Q.   I'd like to ask you some questions now, Mrs. Terrell, about

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 31 of 225

1   what your observations were when the county public health folks

2   came to do the inspection at their house.

3   A.   Okay.

4   Q.   All right.  This is at the house on McKinley Street, is it

5   not?

6   A.   Yes.

7   Q.   And is it fair to say that the entire inspection lasted

8   approximately 45 minutes?

9   A.   Approximately, yes.

10  Q.   And it's also fair to say, isn't it, that you observed some

11  of the investigation that was done by the county health

12  officials?

13  A.   Yes, because I was sitting at the kitchen table.

14  Q.   Okay.  And you know that they did not sample any areas in

15  the house other than parts of the kitchen.  That's correct,

16  isn't it?

17  A.   I don't remember that they went anywhere else, but I was

18  taking care of James too, so I don't know.

19  Q.   Okay.  As we sit here today, you would have to say I don't

20  know of any other parts of the house that they investigated.

21  A.   That's exactly right.

22  Q.   When you were in the kitchen, you did not see them check on

23  any pots or pans that were used in making formula, did you?

24  A.   I -- whatever was on the counter they checked, and I don't

25  recall whether there was pots and pans or not.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 32 of 225

1   Q.   All right.  So you just don't -- you don't know whether

2   they checked any pots and pans, do you?

3   A.   I don't remember if there were pots and pans on the counter

4   at the time, no.

5   Q.   And you do not recall seeing whether they checked the

6   kitchen floor, do you?

7   A.   Yes, they did.

8   Q.   You don't remember them testing any mixing utensils, do

9   you?

10  A.   I don't remember what was on the counter that they tested.

11  Q.   And, in fact, you don't remember them testing the top of

12  any countertop, do you?

13  A.   Yes, I do.  They tested the countertops.

14  Q.   You remember having your deposition taken.  I'm going to

15  show you page 89 of your deposition.  When I return I'll tell

16  you which lines to look at.  I'd like you to look, please,

17  Mrs. Terrell, at lines 15 through 18 of page 89, and please let

18  me know when you've read those.

19  A.   Okay.

20  Q.   Was the question at page 89, line 15, as follows?  Do you

21  remember if they tested the top of cabinets in addition to

22  underneath the cabinets?  And do you see your answer at line 18?

23  A.   Yes.

24  Q.   Was your answer I don't remember?

25  A.   Yes.

1   Q.   And when I took your deposition, did you tell me the truth,
2   that you did not remember at that time?
3   A.   Yes.
4   Q.   And you certainly don't remember -- would that also be your
5   answer today that you simply don't remember?
6   A.   I don't remember what was on the counter when they checked
7   it.
8   Q.   And you don't remember, do you, ma'am, based upon the
9   answer you gave in that deposition whether they actually checked
10  the top of the counter; isn't that correct?
11  A.   When I gave the deposition, I guess that's what I answered,
12  but they did check the tops of the counters.
13  Q.   Okay.  So what you're telling the jury is that when you
14  gave your deposition under oath on the 23rd day of August, 2012,
15  you were sworn to tell the truth; correct?
16  A.   Yes.
17  Q.   And you attempted to tell the truth, did you not?
18  A.   Of course, I did.
19  Q.   And that was almost a year and a half ago; correct?
20  A.   Yes.
21  Q.   And at that time it was much closer to the time of the
22  actual occurrence than it is today; isn't that correct?
23  A.   Yeah.
24  Q.   And so at that time you gave your best recollection to me
25  while under oath that at that time you do not remember whether

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 34 of 225

1  or not they tested the countertops; isn't that correct?

2  A.   This does not say countertops.  It says if they tested the

3  tops of the cabinets in addition to underneath the cabinets.

4  That's not the same as countertops.

5  Q.   You believe the cabinets are different than the

6  countertops?

7  A.   It says underneath the cabinets, not the countertop.  So

8  yes, to the best of my knowledge I know they checked the

9  countertops but not underneath the cabinet.  I don't know.

10  Q.   All right.  Did they -- and the folks who did the

11  investigation, they took the samples.  You didn't look at the

12  samples, did you?

13  A.   (Witness shook head.)

14        MR. GRAY:  Thank you very much.

15                    REDIRECT EXAMINATION

16  BY MR. RATHKE:

17  Q.   Just one quick follow-up question.  When you -- when Megan

18  called you that Thursday and said that Jeanine was at the

19  hospital and asked you to come over and take care of James and

20  you came over and did that, who was taking care of James?

21  A.   Troy and Blake were there.

22        MR. RATHKE:  Thank you.  Nothing further.

23        THE COURT:  Mr. Gray, anything further?

24        MR. GRAY:  Nothing, Your Honor.

25        THE COURT:  Okay, members of the jury.  Are there any

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 35 of 225

1   questions for Miss Terrell?  Some are still taking notes, so it

2   doesn't look like it.  Okay.  No questions?

3          Thank you, ma'am.  You're free to leave.

4          THE WITNESS:  What should I do with these?

5          THE COURT:  Good morning.  Would you raise your right

6   hand, please.

7           JESSICA MCHUGH, PLAINTIFF'S WITNESS, SWORN

8          THE COURT:  Thank you.  Please be seated.  And you can

9   adjust the chair and the microphones so you can speak directly

10   in them.  So could you scoot up just a little bit more?  And

11   would you please tell us your name and spell your last name.

12          THE WITNESS:  Jessica McHugh, M-c-H-u-g-h.

13          THE COURT:  Thank you.

14          Counsel?

15          MS. VAN WYHE:  Thank you, Your Honor.

16                  DIRECT EXAMINATION

17   BY MS. VAN WYHE:

18   Q.  Miss McHugh, what do you do for a living?

19   A.  I am an occupational therapist, and I am the owner of Able

20   Kids Pediatric Therapy.

21   Q.  How long have you been at Able Kids?

22   A.  We opened in January 2010.

23   Q.  And was Jeanine Kunkel a client of yours?

24   A.  Yes.

25   Q.  When did you start providing services to Jeanine?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 36 of 225

1  A.   Through Able Kids I started with her in January of 2010.  I

2  did work with her with a different company, with Sioux City

3  Physical Therapy, prior to that I believe starting in 2009.

4  Q.   And are you still providing services to Jeanine?

5  A.   My clinic is, but I am not her current therapist.

6  Q.   Later we're going to put into evidence a video that's

7  marked as Exhibit 2B from time stamp 5:30 to 11:20 -- or 11:12,

8  sorry.  During the course of your occupational therapy with

9  Jeanine, do you recall any of your sessions being videotaped?

10 A.   Yes.

11 Q.   And that occurred on January 25, 2012?

12 A.   Yes, I believe so.

13 Q.   And was the taping -- to the best of your recollection, was

14 the taping of a typical session at that time?

15 A.   Yes, it was.

16 Q.   Do you recall explaining on camera what you were doing

17 during the session?

18 A.   Yes, I did.

19 Q.   And were the statements that you made on camera truthful?

20 A.   Yes.

21 Q.   Do you recall that the video is an accurate depiction of

22 what was occurring while the video was taking place?

23 A.   Yes, it was.

24 Q.   And have you had any therapy sessions with Jeanine since

25 the video was made?

1    A.   I saw her approximately two more times after that myself,

2    and then I transitioned her to another therapist.

3    Q.   And that was another therapist at Able Kids?

4    A.   Yes, yep.

5             MS. VAN WYHE:  I have no further questions.

6                         CROSS-EXAMINATION

7    BY MR. SCANNAPIECO:

8    Q.   Good morning, Miss McHugh.  My name's Gabe Scannapieco.  I

9    represent the defendant in this case.

10            So if I understand correctly, you stopped working with

11   Jeanine some time in 2012?

12   A.   It was actually beginning of 2013.

13   Q.   2013?  So it's been about a year?

14   A.   Yes, that I was her personal therapist.

15   Q.   Okay.  And one of the things that we've seen in this case

16   besides the video are some medical records or some therapy

17   records from Able Kids.  Are you familiar with those?

18   A.   Yes.

19   Q.   And in some of those records there's a mention of the

20   parents, I believe Megan Surber, saying that she believed that

21   powdered infant formula contributed to Jeanine's condition.  Are

22   you familiar with those records?

23   A.   Yes.  I don't believe it was my records but I think another

24   therapist.

25   Q.   Okay.  So you've never made a medical record that had that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 38 of 225

1  information in it?

2  A.   I'm not sure if I have or not.  I may have said that Mom

3  believed that --

4  Q.   Okay.

5  A.   -- it was in the formula, but I'm not certain if I did.

6  Q.   Sorry.  I almost stepped over you there.  And when you made

7  that record, that's just something that the mother would have

8  told you?

9  A.   Yes.

10 Q.   And that's -- you didn't do any sort of independent

11 investigation as to what caused her condition.

12 A.   No, we did not.

13 Q.   Okay.  That's not something that you would ever do as a

14 physical therapist?

15 A.   Correct.  As an occupational therapist, it's not part of my

16 practice.

17         MR. SCANNAPIECO:  Thank you very much.

18         THE COURT:  Any redirect?

19         MS. VAN WYHE:  No, Your Honor.

20         THE COURT:  Thank you.  Any questions from the jury?

21 Doesn't look like it.

22         Thank you.  You're free to leave.

23         THE WITNESS:  Thank you.

24         MR. RATHKE:  Your Honor, actually the therapy video is

25 Exhibit 143, and we would show it now, but I understand the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 39 of 225

1    equipment's down, and so we'll show it later.

2              THE COURT:  Okay.  Oh, the equipment is down?

3              THE CLERK:  Yes.

4              THE COURT:  Okay.  Sorry.

5              MR. RATHKE:  Megan Surber.

6              THE COURT:  Okay.  Thank you.  Please come forward,

7    and I'll swear you in.  Would you raise your right hand, please.

8              MEGAN SURBER, PLAINTIFF'S WITNESS, SWORN

9              THE COURT:  Okay.  Thank you.  Please be seated in the

10   witness box.  And you can adjust the chair and scoot up so you

11   can speak directly into the microphones.  And would you please

12   tell us your name and spell your last name.

13             THE WITNESS:  My name is Megan Surber, M-e-g-a-n

14   S-u-r-b-e-r.  Can you hear me?

15             THE COURT:  I think you need to get a little closer to

16   the microphones.

17             THE WITNESS:  Okay.

18             MR. RATHKE:  Either one will work.

19             THE WITNESS:  I guess it doesn't matter.  My name is

20   Megan Surber, M-e-g-a-n S-u-r-b-e-r.

21                       DIRECT EXAMINATION

22   BY MR. RATHKE:

23   Q.   Is it all right if I call you Megan?

24   A.   Yes.

25   Q.   Okay.  Megan, where were you born and raised?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 40 of 225
*To purchase a complete copy of the transcript.*

```
 1   A.    Sioux City, Iowa.

 2   Q.    What was your birth name?

 3   A.    Maiden name?

 4   Q.    Yeah.

 5   A.    Terrell.

 6   Q.    And Diana Terrell is your mom?

 7   A.    Yes.

 8   Q.    And what was your dad's name?

 9   A.    Alan Terrell.

10   Q.    And what was he -- what was his work?

11   A.    He was in construction.

12   Q.    Did you graduate from high school?

13   A.    Yes.

14   Q.    What high school?

15   A.    East High School.

16   Q.    And that's here in Sioux City?

17   A.    Yes.

18   Q.    What year did you graduate from high school?

19   A.    1993.

20   Q.    Could you tell the jury briefly what types of employment

21   you've had since high school.

22   A.    I have multiples.  I've done housekeeping.  I've done data

23   entry.  I've done -- worked at Concord Components for -- just

24   doing data entry.

25   Q.    Have you ever been married?
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 41 of 225

```
1   A.   Yes.

2   Q.   Who did you marry?

3   A.   Jeff Surber.

4   Q.   And that's why you still have -- that's why you have the

5   last name Surber.

6   A.   Yes.

7   Q.   What year did you get married?

8   A.   2 -- 1999.

9   Q.   And did you have any children, you and Jeff?

10  A.   Yes.

11  Q.   And what's the name of that child?

12  A.   His name is Kevin Surber.

13  Q.   When was he born?

14  A.   In 2000.

15  Q.   When he was born, where were you living?

16  A.   We were living in New York.

17  Q.   Is that New York City or someplace other than that?

18  A.   Long Island which is Syosset.

19  Q.   What were you doing in New York?

20  A.   Jeff decided to move out to New York to work for a company

21  for his brother which is Harry Krantz, and I moved with him.

22  Q.   You better spell that.

23  A.   Huh?

24  Q.   Harry?

25  A.   Harry Krantz.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 42 of 225

1   Q.   Okay.  K-r-a-n-z?

2   A.   K-r-a-n-t-z.

3   Q.   T-z.  Okay.  So he went out there to work, and you went

4   with him.

5   A.   Yes.

6   Q.   Now, was Kevin born naturally or cesarean?

7   A.   Cesarean.

8   Q.   Was that a planned cesarean, or did it just suddenly

9   happen?

10  A.   It was not planned.

11  Q.   How old is Kevin now?

12  A.   He is 13.  He will be 14 on Sunday.

13  Q.   In 2008 when the twins were born, how old was Kevin?

14  A.   He would have been 8, around 8.

15  Q.   Was he living in the same house as you?

16  A.   Yes.

17  Q.   All right.  We'll get to that in a minute.  How was Kevin

18  fed when he was a baby?

19  A.   When he was a baby, he was fed by bottle.

20  Q.   Did you attempt to breast-feed?

21  A.   Yes, I did.  I attempted.

22  Q.   Was it -- were you able to successfully do that?

23  A.   No.

24  Q.   Were there times that he was breastfed, or was it just

25  unsuccessful from the git-go?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 43 of 225

1    A.    It was unsuccessful from the git-go.

2    Q.    Now, we know there's two types of -- at least two types of

3    formula, ready-to-feed and powdered infant formula.  What was

4    Kevin fed?

5    A.    Powdered.

6    Q.    Was he fed powdered at the hospital?

7    A.    I don't recall.

8    Q.    All right.  But when you took him home, you fed him powder.

9    A.    Yes.

10    Q.    And before you fed him, did you read and follow the

11    directions?

12    A.    I don't recall.

13    Q.    How long did you live in New York?

14    A.    1999 and Kevin was born in 2000, and then about 4 months

15    later I decided I wanted to go back home.

16    Q.    So you moved back to Sioux City.

17    A.    Yes.

18    Q.    Did you take Kevin with?

19    A.    Yes.

20    Q.    What about Jeff?

21    A.    We all went home.

22    Q.    Oh, you all went home.

23    A.    We all came back to Sioux City.

24    Q.    All right.  When did the marriage to Jeff end?

25    A.    I left him in 2002 with Kevin and filed a divorce, and the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 44 of 225

 1    divorce was final in 2004.

 2    Q.   After you left Kevin, where did you live with -- or excuse

 3    me.   After you left Jeff Surber, where did you live?

 4    A.   I went back home with my mother for a few months, and then

 5    I went to -- got my own place.

 6    Q.   When you say got your own place, what'd you do for that?

 7    A.   What did I do?

 8    Q.   Yeah.  Did you get an apartment or house or --

 9    A.   Oh.  Yeah.  No.  I went and got an apartment.  I got some

10    housing help.

11    Q.   And then what?

12    A.   Moved in, and it was just me and Kevin.

13    Q.   Okay.  Did you eventually buy a house?

14    A.   Eventually, yes.

15    Q.   What's the address of that house?

16    A.   2005 McKinley Street.

17    Q.   Do you still live there?

18    A.   Yes, I do.

19    Q.   Do you remember what year you bought the house?

20    A.   I moved in end of 2004 to first part of 2005, been there

21    ever since.

22    Q.   What kind of a house is it?  One story, two story?

23    A.   I would say one story.

24    Q.   There's a second story, but that's an attic?

25    A.   Basement, main floor, and then an attic that you don't get

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 45 of 225

1    into.

2    Q.   What area of Sioux City is your house at 2005 McKinley?

3    A.   Located in Riverside.

4    Q.   And Riverside is where?  Is it north of Sioux City, or

5    whereabouts is it?  It doesn't matter.  Is it within the city

6    limits of Sioux City?

7    A.   Yes.

8    Q.   Now, at some point in time, did you meet Troy Kunkel?

9    A.   Yes.

10   Q.   And at some point in time, did he move in with you and

11   Kevin to 2005 McKinley?

12   A.   Yes.

13   Q.   Whenabouts was that?

14   A.   Troy moved in around 2007.

15   Q.   Have you been together ever since?

16   A.   Been together ever since.

17   Q.   Have you ever married?

18   A.   No.

19   Q.   From 2007 to present time, has Troy been employed?

20   A.   Off and on.

21   Q.   What kind of jobs has Troy had?

22   A.   As of right now, none.

23   Q.   What -- when he works, just describe essentially what kind

24   of work he's done.

25   A.   Cooking in a restaurant or doing construction.  He likes to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 46 of 225

1  learn different things.

2  Q.   Does he have any health problems?

3  A.   Yes, he does.

4  Q.   What do you understand to be his health problems?

5  A.   He's got diabetes which is type 1, uncontrollable.  So he

6  does do two types of insulin, one during the day for eating and

7  one for continuous at night.  He does have or had Graves'

8  disease.  He's --

9  Q.   What's your understanding of Graves' disease?

10  A.   I never did understand that one.

11  Q.   What does it affect?

12  A.   I never did understand any of that.

13  Q.   All right.  Any other health problems that he's had other

14  than diabetes and Graves' disease?

15  A.   I know his thyroid was melted out.

16  Q.   So he's got a thyroid problem.

17  A.   So he takes a pill every day in place of his thyroid.

18  Q.   Anything else you -- anything else, or is that about it?

19  A.   I think that's about it.  I think that kind of sums it --

20  Q.   All right.

21  A.   Oh, sorry.  Spherocytosis.  He does have a hereditary of

22  spherocytosis which is removal of his spleen.

23  Q.   Now, since 2007 when you moved into -- or excuse me,

24  2005 -- 2004 when you bought the house at 2005 McKinley, have

25  you done any work?  Have you worked?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 47 of 225

1   A.   Yes, I have worked.

2   Q.   What kind of work have you had?

3   A.   Two thousand --

4   Q.   Well, since you moved back to Sioux City.

5   A.   Since I moved back to Sioux City?

6   Q.   Right.

7   A.   I've worked at Concord Components.

8   Q.   What do you do for them or have you done for them?

9   A.   I have done data entry which I don't deal with the rest of

10  the company.  I always done data entry which was pretty much put

11  computer parts, part numbers into a computer database.

12  Q.   Is that something you do from home, or would you go into --

13  A.   I've done that at the company, and then I've also done it

14  at home.

15  Q.   Since Troy moved in, how do the two of you divide up the

16  cooking and cleaning?

17  A.   Whoever wants to do what, but no.  We kind of pick and

18  choose what we want during -- throughout the days.

19  Q.   Is there a consistent job that somebody has, or does it go

20  back and forth?

21  A.   It goes back and forth, but most of the time it's

22  consistent.

23  Q.   And what's consistent about it?  I mean, who -- who's doing

24  it?

25  A.   I pretty much do laundry and clean up, dust, clean while he

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 48 of 225

1  does dishes, garbages.  It's like a routine.

2  Q.   Does he cook sometimes for the home?

3  A.   He cooks more than I do.

4  Q.   Okay.  And he's cooked for a living too; correct?

5  A.   Yes.  That's kind of one of his specialties.

6  Q.   Now, at some point in time did you find out that you were

7  pregnant?

8  A.   Yes.

9  Q.   And whenabouts -- well, there's a medical record that you

10  visited Dr. Hamburger on October 1, 2007.  Was that at the point

11  you discovered you were pregnant?

12  A.   Yes.

13  Q.   And tell the jury the name -- the full name of the doctor

14  and the clinic that you went to for your pregnancy.

15  A.   The doctor was Dr. Hamburger, and he works at Siouxland

16  Women's Healthcare.

17  Q.   Siouxland?

18  A.   Siouxland Women's Healthcare.

19  Q.   At some point during the pregnancy did you find out that

20  you were going to have twins?

21  A.   Not at first, and then -- then they did an ultrasound and

22  said that I was having twins.

23  Q.   Did you know whether you were going to give birth to your

24  twins C-section or natural birth?

25  A.   Since I had a C-section with Kevin in 2000, it was pretty

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 49 of 225

1    much planned for a second one.

2    Q.   What was your plan with respect to feeding the infants once

3    they were born?

4    A.   I never did have a plan.  Go to the hospital.  You feed

5    them, and then . . .

6    Q.   Well, what I mean is were you going to try to breast-feed

7    again, or was it --

8    A.   No.

9    Q.   Did you always know they were going to be formula fed?

10   A.   It was going to be formula fed.

11   Q.   Other than the fact that you were going to have twins

12   instead of a single birth and a C-section, was there anything

13   unusual about your pregnancy?

14   A.   No.

15   Q.   During the time you were pregnant, did you have any

16   significant illnesses or get sick?

17   A.   No.

18   Q.   Did you use alcohol during the time you were pregnant?

19   A.   No.

20   Q.   Or any kind of drugs.

21   A.   Smoking.

22   Q.   Okay.  We'll get to that in a moment.  But any drugs, legal

23   or illegal?

24   A.   No, no drugs.

25   Q.   Before you became pregnant, were you a smoker?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 50 of 225

1  A.    Yes.

2  Q.    How long you been a smoker?

3  A.    Since I was 18.

4  Q.    Prior to your pregnancy, approximately how many cigarettes

5  would you have a day or how many . . .

6  A.    At least a pack a day.

7  Q.    When you found out you were pregnant, did you try to do

8  anything about your smoking?

9  A.    I tried to quit many times.

10  Q.    And were you successful --

11  A.    No.

12  Q.    -- during your pregnancy?

13  A.    No.

14  Q.    Were you able to cut back during your pregnancy?

15  A.    Yes.  I've tried, and I succeeded a couple times.

16  Q.    Now, your C-section, was that a scheduled C-section, or

17  were you to come in whenever you felt that the baby was on its

18  way?

19  A.    No.  It was scheduled.

20  Q.    So you woke up then on April 14, 2008, knowing you were

21  going to have your twins.

22  A.    Yes.

23  Q.    Where did you go to have your twins?

24  A.    I went to St. Luke's.

25  Q.    Who was the doctor that delivered your twins?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 51 of 225

```
 1   A.   Dr. Hamburger.

 2   Q.   And tell us about the birth.  Which one was born first?

 3   A.   Jeanine Kunkel was born first, baby girl.

 4   Q.   And do you remember how -- what she weighed at birth?

 5   A.   4-14.

 6   Q.   4 pounds, 14 ounces?

 7   A.   Yes.

 8   Q.   And then James was born?

 9   A.   Yes.

10   Q.   And do you remember how much he weighed when he was born?

11   A.   5 pounds, 9 1/2 ounces.

12   Q.   James was a little bigger than Jeanine.

13   A.   Just a little.

14   Q.   Are you familiar with the term low-birth-weight baby?

15   A.   Yes.

16   Q.   And what does that have to do with your twins?

17   A.   Well, I had twins, and they were 37 weeks, and they were

18   only so many pounds.

19   Q.   Was one of them a low-weight baby, low-birth-weight baby?

20   A.   Yes.

21   Q.   And that would be Jeanine?

22   A.   That would be Jeanine.

23   Q.   How about James, born at 5 pounds, 9 1/2 ounces?  Was he --

24   do you know whether he was considered to be low birth weight?

25   A.   I don't recall.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 52 of 225

1  Q.   And you just mentioned but why don't you tell us again what

2  week did this occur in your pregnancy?

3  A.   What week?

4  Q.   The kids were born at what -- how many weeks were you

5  pregnant?

6  A.   Oh.  37 weeks.

7  Q.   Now, what was your understanding as to, you know, the

8  number of weeks that factor into being either premature or not

9  premature?

10 A.   I don't understand.

11 Q.   Well, were James and Jeanine premature?

12 A.   No.

13 Q.   And that was your understanding at the hospital was they

14 were not premature.

15 A.   No.

16 Q.   How were the twins fed during the first three days of their

17 life?

18 A.   Ready-to-feed bottles from the hospital.

19 Q.   And how -- tell me the process or your part of the process

20 in making the decision as to what types of -- what type of

21 formula or what brand of formula to feed them.  What do you

22 recall?

23 A.   I don't recall discussing exactly what we were supposed to

24 be feeding them.  I don't understand the question.  Sorry.

25 Q.   Okay.  Do you know how Abbott NeoSure was selected for the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 212  Filed 10/15/14  Page 53 of 225

1    twins?

2    A.    Doctor prescribed it.

3    Q.    And you were fine with that?

4    A.    Yeah.

5    Q.    Do you ever recall talking to the doctor about that?

6    A.    I don't recall.

7    Q.    Okay.  Would you have talked to one -- to maybe some of the

8    nurses about that?

9    A.    Yes.

10   Q.    And did you feed Jeanine at the hospital?

11   A.    Yes, I did.

12   Q.    Describe how that worked.  You know, what were you given,

13   and how did you open it and . . .

14   A.    We were given bottles that were this big, like one, two

15   ounces that are ready to feed.  You open the cap.  You also have

16   a nipple that you also open, put it together, screw it on, and

17   you feed the baby.

18   Q.    And that was the same way that the baby was fed all during

19   the three days that you were at the hospital?

20   A.    Yes.

21   Q.    And then it was on the third day that you were discharged.

22   A.    Yes.

23   Q.    Was there anything unusual with Jeanine during the time

24   that she was -- those three days when you were at the hospital

25   with her?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 54 of 225

```
 1    A.    No.

 2    Q.    Was she discharged with you?

 3    A.    Yes.

 4    Q.    How about James?

 5    A.    No.

 6    Q.    What was wrong with James?

 7    A.    They said that he needed to stay a little bit longer for

 8    jaundice.

 9    Q.    Had you fed James at the hospital?

10    A.    Yes.

11    Q.    Was he fed the same thing as Jeanine?

12    A.    Yes.

13    Q.    Now, as you -- when you left the hospital on the third day,

14    did you receive something from hospital personnel?

15    A.    Yes.

16    Q.    And what did you receive?

17    A.    I received a gift bag.

18    Q.    Do you recall -- was there anything on the bag that

19    identified the company or anything like that?

20    A.    It was a black bag that says Similac.

21    Q.    And you understand Similac is a Abbott brand.

22    A.    I didn't at the time, no.

23    Q.    Okay.  But . . .

24    A.    Yes.

25    Q.    Did it have Abbott -- the word Abbott on the label or on
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 55 of 225

1  the bag, do you recall, or was it just Similac?

2  A.   Similac.

3  Q.   And what was in the bag?

4  A.   You would have some paperwork.  You would have --

5  Q.   When you say paperwork, what kind of paperwork?

6  A.   There was like a little book like a journal.

7  Q.   All right.  Any promotional materials?

8  A.   I don't recall.

9  Q.   What else was in the bag besides some paper and the

10 journal?

11 A.   You had a can of formula and also a bottle of liquid

12 formula.

13 Q.   And what kind of formula was that?

14 A.   NeoSure.

15 Q.   Same -- the same type of formula that you were serving the

16 two at the hospital.

17 A.   Yes.

18 Q.   And by the way, James did have NeoSure as well?

19 A.   Yes.

20 Q.   Did the hospital give you any single-serving NeoSure?

21 A.   The little ones, yes.

22 Q.   Was that part of the gift bag, or was that kind of

23 separate?

24 A.   That was separate.

25 Q.   How many -- do you have any idea how many single-serving

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 56 of 225

1   NeoSure that you got from the hospital?

2   A.   No.

3   Q.   While you were at the hospital, you know, with Jeanine, did

4   you have any friends and relatives visit?

5   A.   Yes.

6   Q.   Can you remember the people who would have visited and

7   particularly would have visited when -- you know, when Jeanine

8   was out?  Let me -- let me ask you first, when -- you had a

9   hospital room; correct?

10  A.   Yes.

11  Q.   Were James and Jeanine kept in the same room?

12  A.   Yes.

13  Q.   So when somebody would visit, they would be visiting all

14  three of you.

15  A.   Yes.

16  Q.   All right.  Who do you recall coming to visit during your

17  three-day stay at the hospital?

18  A.   I recall my mother, of course, my sisters Nikki and Titia,

19  and Blake Verschoor.

20  Q.   Excuse me?

21  A.   Blake.

22  Q.   And who's Blake?

23  A.   Blake is a friend of Troy's.

24  Q.   And Troy.

25  A.   And, of course, Troy was there, my grandfather.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 57 of 225

```
 1   Q.   When you say your grandfather --
 2   A.   Great grandpa.
 3   Q.   Who is that?
 4   A.   My grandfather, grandfather of the children.
 5   Q.   Right.  And is that --
 6   A.   My mom's --
 7   Q.   -- Diana's --
 8   A.   My mom, Diana Terrell's, father.
 9   Q.   Okay.  Anybody else you can recall now as to who visited at
10   the hospital?
11   A.   Troy's mom and dad, James and Debra, and Janice Rider and
12   her friend Patty.
13   Q.   Who is Janice and Patty?
14   A.   Janice is or was my father's girlfriend at the time.
15   Q.   And did your father come and visit?
16   A.   No.  My dad was incarcerated.
17   Q.   All right.  Anybody else?
18   A.   Nobody else that I can recall.
19   Q.   Did -- do you know -- of the people that you have listed,
20   do you know which ones might have held either James or Jeanine?
21   A.   I would recall my mom holding them both, of course, and
22   myself and my two sisters, Nikki and Titia, and Troy, of course.
23   Q.   Do you recall any of the other people actually holding the
24   babies?
25   A.   No, I don't recall.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 58 of 225

1  Q.   Do you know if any of these people that ever visited you at
2  the hospital were ill?
3  A.   Were ill?
4  Q.   Were sick.
5  A.   No.
6  Q.   During the time that you and Jeanine were at the hospital,
7  do you know of anybody that might have stuck their fingers in
8  Jeanine's mouth?
9  A.   No.
10 Q.   Was there a pacifier at the hospital?
11 A.   Yes.
12 Q.   Do you know whether or not the pacifier was ever in
13 Jeanine's mouth when she was in the hospital?
14 A.   I don't recall.
15 Q.   Do you know whether -- did Jeanine develop the ability to
16 keep the pacifier in her mouth ever?  I mean before she got
17 sick.
18 A.   Before she got sick?
19 Q.   Before she got sick.  Well, let me -- when you took Jeanine
20 home, did you have a pacifier?
21 A.   Yes.  Sorry.
22 Q.   All right.
23 A.   Yes.
24 Q.   And either at the hospital or at home before Jeanine got
25 sick, do you know if Jeanine ever kept the pacifier in her

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 5:11-cv-04017-MWB-CJW Document 213 Filed 10/15/14 Page 59 of 225
*To purchase a complete copy of the transcript*

1    mouth?

2    A.    Yes.

3    Q.    So you left the hospital, and you went home with Jeanine.

4    A.    Yes.

5    Q.    So now who lives in the house?

6    A.    Troy, me, Kevin, and Jeanine.

7    Q.    Did you have anybody -- did anybody come over to help out,

8    again, before Jeanine got sick?

9    A.    Yes.

10   Q.    Who was that?

11   A.    My sisters.

12   Q.    Do you know if your mother came home?  To your house I

13   mean.

14   A.    Yes, my mother.

15   Q.    Did you have any other visitors from the time you got home

16   until the time that Jeanine got sick?

17   A.    Yes, I believe so, yes.

18   Q.    Your mom, your two sisters, and who else?

19   A.    Blake probably would have been there too.

20   Q.    Anybody else you recall?

21   A.    I don't recall anybody else.

22   Q.    Do you know if at any time when you were home before she

23   got sick that anybody put their fingers in Jeanine's mouth?

24   A.    No, I don't recall.

25   Q.    Did you ever see anybody doing that?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:11-cv-04017-MWB-CJW Document 213 Filed 10/15/14 Page 60 of 225
To purchase a complete copy of the transcript

```
1    A.    No, I don't recall.

2    Q.    When the pacifier was not in Jeanine's mouth, where was the

3    pacifier?

4    A.    It would be on the floor or it would be getting washed.

5    Q.    Excuse me?

6    A.    On the floor --

7    Q.    Or --

8    A.    Right next to her or it would be getting washed.

9    Q.    And how did you wash the pacifier?

10   A.    I would wash it under hot water.

11   Q.    How often would you do that?

12   A.    If it wasn't in her mouth, it would be getting washed

13   before it went to her mouth.

14   Q.    So what you're telling us then is that every time she had

15   the pacifier in her mouth prior to that it had been washed.

16   A.    Yes.

17   Q.    How was Jeanine fed from the time you got home from the

18   hospital until she got sick?

19   A.    How was she fed?

20   Q.    Yeah.  What'd you feed her?

21   A.    Liquid.

22   Q.    What did --

23   A.    Ready-to-feed.

24   Q.    Pardon me?

25   A.    Ready-to-feed.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 213 Filed 10/15/14 Page 61 of 225

1  Q.   What did you start feeding her with as soon as you got home

2  from the hospital?

3  A.   I would start with the smaller bottles that I had which

4  were the ready-to-feed smaller bottles.

5  Q.   And were those the same bottles that you had fed her at the

6  hospital?

7  A.   Yes.

8  Q.   And where were those stored?

9  A.   Those were stored on the floor under her crib standing

10  straight up.

11  Q.   Had you done any -- what room are we in?

12  A.   We are in the big bedroom.

13  Q.   Okay.  So that's where you and Kevin slept as well -- or

14  Troy.

15  A.   Troy and I.

16  Q.   All right.  So Jeanine is in -- in the -- in your bedroom.

17  A.   Yes.

18  Q.   Had there been any cleaning before -- of that room before

19  you went to the hospital?

20  A.   Yes.

21  Q.   Tell us about that.

22  A.   Just your normal cleaning getting ready to bring a child

23  home.

24  Q.   And what kind of a bed did she sleep in?

25  A.   She was in a crib.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 62 of 225

```
1   Q.   So the formula was underneath that crib.

2   A.   Yes.

3   Q.   And were the bottles attached like six-packs?

4   A.   Four-packs.

5   Q.   Four-packs.

6   A.   Yes.

7   Q.   And they were standing straight up until they were

8   consumed?

9   A.   Yes.

10  Q.   And then after -- after you'd open one, you'd feed it to

11  Jeanine.

12  A.   Yes.

13  Q.   Did she always consume the whole bottle, or was there

14  sometimes some left over?

15  A.   Sometimes some leftovers.

16  Q.   What would you do with the leftover?

17  A.   I'd disregard it.

18  Q.   So every time Jeanine was fed from the single service, the

19  bottle was opened right before it went into her mouth.

20  A.   Yes.

21  Q.   Do you recall how many days you were able to last on the

22  single-serving NeoSure?

23  A.   I don't recall.

24  Q.   After the -- after you'd use all the single serving --

25  single-service NeoSure, what kind of formula did you feed her
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 63 of 225

1  next?

2  A.   Then I went to the bigger bottle of the ready-to-feed which

3  is also liquid.

4  Q.   Do you recall how many ounces that bottle had?

5  A.   32 ounces.

6  Q.   How was the bottle shaped?  Was it --

7  A.   About that big.

8  Q.   A round bottle?

9  A.   Uh-huh, yeah.

10  Q.   Do you remember was there a handle to it?

11  A.   No.

12  Q.   Okay.  How did it -- how would you have opened it the first

13  time?

14  A.   Take the top off, and on the top there's also a little

15  sharpener.  You turn it over and cut the seal with it.

16  Q.   So it was sealed when you got it.

17  A.   Yes.

18  Q.   And you would have had to break the seal to have access to

19  the liquid?

20  A.   Yes.

21  Q.   Now, did you have bottles and nipples in order to feed her

22  from the -- I guess we'll call it a jar of the ready-to-feed?

23  A.   Yes.

24  Q.   Where had you gotten those bottles and nipples?

25  A.   They would have been either hand-me-downs, or they were

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 64 of 225

1  brand new bottles boughten in a package.

2  Q.   Do you have any idea how many bottles you would have had

3  between the ones you had bought and the ones that you'd received

4  from others?

5  A.   I would say around 24 approximately.

6  Q.   Did you do anything with the bottles before -- bottles and

7  nipples before you used them to feed Jeanine from the jar of

8  ready-to-feed?

9  A.   Yes.

10 Q.   Tell us about that.

11 A.   I would take all of them, nipples, bottles, inserts,

12 anything to do with the bottle.  I would boil them all until

13 they were sterilized.

14 Q.   Did you boil all 24 at the same time, or did you boil them

15 in batches?

16 A.   First time around it was in a batch.

17 Q.   All 24?

18 A.   Uh-huh.  I used a big roaster pan.

19 Q.   And that was done before Jeanine was fed any -- from any of

20 them?

21 A.   Yes.

22 Q.   Okay.  And then did you do any reboiling of the empty

23 bottles and nipples before Jeanine was fed from them?

24 A.   Yes.

25 Q.   Tell us about that.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 65 of 225

1   A.   When it's time for a bottle, I would go get a bottle out of

2   the cupboard, and then I would sterilize that bottle before I

3   would use it to feed my daughter.

4   Q.   So each bottle was sterilized once, one time all together,

5   and then one time before that bottle and nipple's singular use.

6   A.   Yes, because it was sitting in a cupboard, in the kitchen

7   cupboard.

8   Q.   What would you use when you were bottle -- when you were

9   sterilizing the bottle the second time, what would you use?

10  What kind of pan or pot?

11  A.   A regular saucepan.

12  Q.   And you'd bring it -- I mean, you'd bring it to a boil.

13  A.   The bottle, yes.

14  Q.   After you would pour from the jar of ready-to-feed into the

15  sterilized bottle and attach the sterilized nipple, what would

16  you do with the jar?

17  A.   After it was opened, made a bottle.  Then it's to be in the

18  refrigerator.

19  Q.   Okay.  Before it was opened, where was the jar of

20  ready-to-feed?

21  A.   It was also stored under her crib in the bedroom standing

22  straight up.

23  Q.   But after the seal was broken, it was stored where?

24  A.   In the refrigerator.

25  Q.   Now, that would mean, would it not, that when it was time

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 66 of 225

1    to prepare a bottle from that jar that you would take the jar

2    out of the refrigerator and pour it into the bottle?

3    A.    Yes.

4    Q.    And that would be cold formula, the same temperature as the

5    refrigerator; correct?

6    A.    Yes.

7    Q.    Did you do anything to warm that -- the bottle before you

8    would give it to Jeanine?

9    A.    Yes.  I would warm it.

10   Q.    How would you warm it?

11   A.    I would bring the bottle -- outside of the bottle to a

12   boil.  I would boil the . . .

13   Q.    Now, you've already told us that you boiled the water and

14   nipples, so you boiled that in a single pot.  Would you be using

15   the same pot then to warm the formula after it was added to the

16   bottle?

17   A.    I -- it's confusing.

18   Q.    Okay.  We're still with the liquid ready-to-feed in the

19   jar.

20   A.    Okay.

21   Q.    And before you would fill the bottle, you would boil the

22   bottle and the nipple; correct?

23   A.    Yes.

24   Q.    When you would fill the bottle then with formula, you

25   needed to warm it.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 67 of 225

1   A.   Yes.

2   Q.   And would you be using the same water that you'd already

3   heated up for the empty bottle?

4   A.   No.

5   Q.   So you'd have another pan of boiling water.

6   A.   Yes.

7   Q.   And your idea then was to warm the formula to -- so that it

8   was a high enough -- or to raise it to room temperature.

9   A.   Yes.

10  Q.   Was it ever your intent to boil the formula?

11  A.   No.

12  Q.   Was -- sometimes when you would do that process, would the

13  water boil, in other words, water boiling around the bottle?

14  A.   Yes.

15  Q.   How many bottles approximately do you think you would have

16  fed Jeanine from that refrigerated ready-to-feed jar, or how

17  many days did you use it, whatever works -- whatever's easiest

18  for you?

19  A.   Few days.

20  Q.   32 ounces; right?

21  A.   Yeah.

22  Q.   And how much formula are you using for each feeding?

23  A.   Four ounces.

24  Q.   So it would last at least that long.

25  A.   Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 68 of 225

1  Q.   You sure it was four ounces or two ounces at the very

2  beginning?

3  A.   Two ounces.  Sorry.

4  Q.   Okay.  And you used it all up.

5  A.   Yes.

6  Q.   And every time you used formula from the refrigerator water

7  to feed -- or ready-to-feed, every single time you would warm it

8  up in hot water.

9          MS. GHEZZI:  Objection.  Leading.

10         THE COURT:  Sustained.

11 BY MR. RATHKE:

12 Q.   Did you follow that process that you've described of

13 warming the refrigerated formula every time?

14 A.   Yes.

15 Q.   Until the bottle was consumed?

16 A.   Yes.

17 Q.   Did -- how good did you get at estimating how much time you

18 had to have it in the hot water in order to bring the

19 temperature up to the appropriate time?

20 A.   Got pretty good at it.

21 Q.   Now, after you felt it had been in the hot water long

22 enough to warm the formula to room temperature, did you do

23 anything to test the temperature of the water?

24 A.   Yes.

25 Q.   Excuse me, of the formula.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 313   Filed 10/15/14   Page 69 of 225

1  A.   Yes.

2  Q.   What would you do?

3  A.   I would test it on my wrist.

4  Q.   And what were you testing it for?

5  A.   Make sure it wasn't hot, too hot.

6  Q.   Were there occasionally times -- was there ever a time that

7  you tested it on your arm and it was too hot?

8  A.   Yes.

9  Q.   And then what would you have to do?

10  A.   I would run it under cold water, try and cool it down.

11  Q.   As you went through that bottle, did you learn as to how

12  long it would have to be in the pan of hot water in order to go

13  up to the right temperature?

14  A.   Yes.

15  Q.   You had done this over and over again.

16  A.   Yes.

17  Q.   Eventually -- eventually you ran out of the jug of

18  ready-to-feed.

19  A.   Yes.

20  Q.   So what did you do then?

21  A.   I would have to go to a powdered formula can that was in

22  the gift bag.

23  Q.   Had you used powdered formula -- or prepared powdered

24  formula since Kevin was eating it eight years ago?

25  A.   Since eight years ago, yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 70 of 225

1   Q.   What did you -- when was it that you first fed Jeanine

2   powdered infant formula?

3   A.   Very first bottle?

4   Q.   Right.

5   A.   Yes.  The night of the 23rd.

6   Q.   Would that be a Wednesday night?

7   A.   Yes.

8   Q.   About what time was it that you prepared the first powdered

9   infant formula?

10   A.   Around 9:00 p.m.

11   Q.   Before you prepared it, did you look at the label?

12   A.   Yes.

13   Q.   Did you read the label?

14   A.   Yes.

15   Q.   And did the label tell you how to prepare it?

16   A.   Yes.

17   Q.   Did you follow all of the instructions on the label?

18   A.   Yes.

19   Q.   So what's the first thing you do when you're preparing the

20   powdered infant formula at 9 p.m. on April 23?

21   A.   First thing you do is you grab a bottle, you grab the can.

22   All right.

23   Q.   Let me take you back because we have the label.  Do you

24   remember reading this panel of the label?

25   A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 71 of 225

1   Q.   If that panel that you read had -- or if any part of the
2   can had said that the formula was only appropriate for babies
3   that were at least one month old, would you have fed it to
4   Jeanine on April 23?
5   A.   If it said . . .
6   Q.   If it said don't use this formula until your baby's one
7   month old.
8   A.   No, I wouldn't have.
9   Q.   On one of the panels it says 0 to 12 months.  Do you see
10  where it says that?
11  A.   Yes.
12  Q.   Do you remember reading that?
13  A.   Yes.
14  Q.   Did you presume that because it said 0 to 12 months and
15  because you'd gotten it in the gift bag that it was suitable to
16  feed your daughter?
17  A.   Yes.
18  Q.   If on this panel and/or on this panel which has the
19  instructions it had stated that this formula may contain a
20  bacteria that could harm your baby, would you have fed it to
21  Jeanine?
22  A.   No, I would not.
23  Q.   What would you have done because you did -- you were
24  running out of formula?  What would you have done?
25  A.   I would be sending myself or Troy out to get some more

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 72 of 225

1   liquid.

2   Q.   Now, take us through the process slowly as to how you

3   prepared that first serving of powdered infant formula for

4   Jeanine.

5   A.   That night I would make very first bottle at 9:00 at night.

6   I would get the bottle out of the cupboard.  I would have two

7   separate pans, one pan for the bottle because it was in the

8   cupboard so I'm sterilizing the bottle and the nipples.  I would

9   have a separate pan ready.  I would open the can, take the seal

10  out, and take the scoop out.  When the first pan was done being

11  boiled, sterilized, then I would have -- I'll let that cool.  I

12  would let that pan cool.  Then once it was cool enough, I would

13  put the formula in it.

14  Q.   Formula in the --

15  A.   In the bottle.

16  Q.   In the bottle.

17  A.   After it was cooled down.

18  Q.   First you'd put the dry formula or the water?  Do you

19  remember which you put in first?  Maybe you don't.  It's not

20  that important but . . .

21  A.   No.

22  Q.   Okay.  Now, the water that you're adding into the bottle,

23  where had that been?

24  A.   That was in the separate pan that was also being warmed up.

25  Q.   Did you boil that water?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 73 of 225

```
 1   A.    No.

 2   Q.    Okay.  Where did you get the water?

 3   A.    From the tap, my tap water.

 4   Q.    Did you boil the tap water before you added it to the

 5   bottle?

 6   A.    Yes.

 7   Q.    Now, why did you -- we can see the directions which have

 8   already been displayed to the jury.  When it says here consult

 9   your baby's doctor about the formula appropriate for your baby,

10   comma, the need to use cooled boiled water for mixing, and the

11   need to boil utensils, bottles, and nipples in water before use,

12   do you see where it says that?

13   A.    Uh-huh, yes.

14   Q.    You went ahead and you testified you did this, you boiled

15   the utensils, bottles, and nipples, and that you boiled the

16   water you mixed with the formula.  Why did you do that?

17   A.    Bottle --

18   Q.    Why did you boil the bottles and the water that you got

19   from the tap?

20   A.    Because it was from the tap water.

21   Q.    Had you had any -- you were on city water there, aren't

22   you?

23   A.    Yes.

24   Q.    Had you had any problem with your water?

25   A.    No, not that I recall, no.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 74 of 225

```
1   Q.   Okay.  Let's take up where we left off.  You've added --
2   you've put the formula in the bottle and the water that you had
3   boiled in the bottle.  What next did you do?
4   A.   Then I shook it up.
5   Q.   Okay.
6   A.   Then I tested it.
7   Q.   For what?
8   A.   Make sure it wasn't hot.
9   Q.   All right.  And do you remember whether you had to --
10  whether -- what the results of that test was?  Was it suitable
11  or not?
12  A.   No.  I would have had to run it under water to cool it
13  down.
14  Q.   To cool it down?
15  A.   Uh-huh.
16  Q.   When you say run it under water, describe that process.
17  A.   I'm getting confused here.
18  Q.   Okay.  How would you cool the bottle if you felt that the
19  formula in the bottle was too warm?
20  A.   I would run it under cold water.
21  Q.   From the tap.
22  A.   From the tap.
23          THE COURT:  Mr. Rathke, I'd like to give everybody a
24  stretch break.  Then we'll go about another 15 minutes before we
25  take our recess.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 75 of 225

1          Okay.  Please be seated.

2    Q.    After you felt that the bottle you prepared was the right

3    temperature, what did you do then?

4    A.    Then I would feed Jeanine.  Then I would feed Jeanine.

5    Q.    And did she consume that bottle?

6    A.    Yes.

7    Q.    Now, had there been some crying that evening?

8    A.    Normal, normal baby crying.

9    Q.    When had that occurred?  I mean before or after you fed her

10   the bottle?

11   A.    Well, crying before because she's hungry and afterwards.

12   Q.    Was there some crying afterwards?

13   A.    No.

14   Q.    So the crying that took place was before she was fed.

15   A.    Yes.

16   Q.    Was she crying a little differently than what she had --

17   how she had cried the previous days after she'd gotten home?

18   A.    Repeat that question, please.

19   Q.    Let me try this.  Did you at some point call your mom?

20   A.    Yes.

21   Q.    How often do you call your mom?

22   A.    As often as I can.

23   Q.    How many times a week on an average would you call your

24   mom?

25   A.    I'd say at least a few times a week.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 76 of 225

1  Q.   Do you call your mom always with some purpose in mind, or

2  do you sometimes call just to talk to her?

3  A.   Sometimes I call just to talk to her.

4  Q.   And when you made that call that evening, what were you

5  doing?

6  A.   When I called my mom?

7  Q.   Yeah, when you called your mom.

8  A.   Oh.  Just wanted to talk to her and just kind of tell her

9  what Jeanine was doing.

10  Q.   Did you go outside while you were talking to her?

11  A.   Yes.

12  Q.   Why did you do that?

13  A.   Because she was being fussy.

14  Q.   And what were you doing outside?

15  A.   Taking a break.

16  Q.   Did you have a cigarette?

17  A.   Yes, I did.

18  Q.   Okay.  Do you have one of those devices where it's like

19  a -- where you can hear your baby inside, you know, kind of a

20  remote?

21  A.   Baby monitor, yes.

22  Q.   Baby monitor?  Did you take that outside as well?

23  A.   Yes.

24  Q.   So tell us about the conversation with your mom while

25  you're outside.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 77 of 225

1  A.   That she was crying and fussy and didn't know what was

2  wrong or if anything was wrong.

3  Q.   And do you remember what your mom said?

4  A.   It's probably just being normal, she needs her butt

5  changed, she needs to burp or just maybe colicky.

6  Q.   After the telephone call, what did you do?

7  A.   After I talked to my mom, I went and -- back and went and

8  held my daughter and kind of checked her out, see what was going

9  on.

10 Q.   What happened first?  The call to your mom or feeding

11 Jeanine?

12 A.   Are we still at 9:00 --

13 Q.   Right.

14 A.   -- here?

15 Q.   Right, in the evening.  I mean, had you fed Jeanine when

16 you made the call or not?

17 A.   I would have fed her first before I called my mom.

18 Q.   Okay.  So after you fed her, what happened then, or after

19 you made the call?  Did Jeanine go to sleep?

20 A.   Yes, she did.

21 Q.   How far -- when she's asleep in her crib, how far is she

22 away from you?

23 A.   Arm's length.  Crib's right next to my bed.

24 Q.   Did she go to sleep?

25 A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 78 of 225

```
1   Q.   Did you prepare any additional bottles before you went to

2   bed?

3   A.   Yes, I did.

4   Q.   Tell us about that.

5   A.   I prepared two more bottles for the next two feedings which

6   would have been the midnight and the 4:00.

7   Q.   When you prepared those bottles, did you need to warm up

8   the bottles after you had put the formula in it?

9   A.   I would warm them up, yes.

10  Q.   Okay.  Did you warm them up, though, before you put them in

11  the refrigerator?

12  A.   No.

13  Q.   So they were sitting in the refrigerator as soon as they

14  were made.

15  A.   Yes.

16  Q.   Do you remember what time about you went to bed?

17  A.   Not too long after Jeanine fell asleep so I could get some

18  sleep.

19  Q.   All right.  When's the next time you woke up?

20  A.   She woke me up because she was hungry.

21  Q.   About what time was that?

22  A.   About midnight.

23  Q.   And tell us what you did then to prepare another bottle.

24  A.   I would get up, go to the fridge, get a pan of water, and

25  warm it up.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 79 of 225

1  Q.   Could you have brought the water to a boil?

2  A.   I could either warm the pan up just to make sure it comes

3  to room temperature, or I would -- or I would bo -- boil the

4  water first and let it cool, then put the bottle in there.

5  Q.   The formula's already in the bottle.

6  A.   Yes.

7  Q.   Why are you putting the bottle in the water?

8  A.   To warm it up because it's cold from the refrigerator.

9  Q.   And after you would warm it -- is this the same procedure

10  you used when you made ready-to-feed?

11  A.   Yes.

12  Q.   And after it had been in the water for a while, what did

13  you do then?

14  A.   I would test it to make sure it was at room temperature.

15  Q.   And then what?

16  A.   Then I would feed her.

17  Q.   And did she -- did she eat her midnight feeding?

18  A.   Yes.

19  Q.   And what happened after that?

20  A.   Got her butt changed, and she was ready to go back to sleep

21  again.

22  Q.   Did she go back to sleep?

23  A.   Yes.

24  Q.   When's the next time -- did you go back to sleep?

25  A.   I went back to sleep as much as I could after she did.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 80 of 225

```
 1   Q.   And when did she next wake up?

 2   A.   Around four o'clock.

 3   Q.   Why did you wake up at four o'clock?

 4   A.   Because she was hungry.

 5   Q.   So what did you do then to feed her?

 6   A.   I did the same thing as I did at midnight.

 7   Q.   Same thing.

 8   A.   Yes.

 9   Q.   And after you fed her and changed her -- well, did she

10   consume that bottle?

11   A.   Yes.

12   Q.   Now, at any time when you were holding her at 9:00, at

13   midnight, at 4 a.m., did she appear warm or feverish?

14   A.   No.

15   Q.   Did you have any need to take her temperature during that

16   time?

17   A.   No.

18   Q.   After you fed her at 4 a.m. and changed her, did she go

19   back to sleep?

20   A.   Yes.

21   Q.   Did you go back to sleep?

22   A.   Yeah.

23   Q.   When do you think you woke up?

24   A.   After the 4:00 --

25   Q.   Right, after the 4:00 feeding.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 81 of 225

1   A.   I'd say probably about around eight or so.

2   Q.   Excuse me?

3   A.   Around eight.

4   Q.   Were you keeping track of the time?

5   A.   No.

6   Q.   Why did you wake up -- whenever you woke up, why did you

7   wake up?

8   A.   Because she woke up.

9   Q.   And what did you do after the two of you are awake?

10  A.   I would check her because she was just crying and wanting

11  to know what was going on.  Then about that time I would check

12  to see if she was warm, make sure -- didn't know what, you know,

13  so I just took her temperature.

14  Q.   When she woke up -- when she woke up that morning after the

15  4:00 feeding, how was Jeanine behaving?

16  A.   She's fussy, fussy.

17  Q.   Had she been fussy when she had woke you up at midnight and

18  4 a.m.?

19  A.   Yes.

20  Q.   Fussier than normal or what?

21  A.   She was fussy, and then it got to be fussier than normal.

22  Q.   When did it come to be fussier than normal?

23  A.   After -- after the 4:00.

24  Q.   Some time after the 4:00 feeding?

25  A.   Yeah.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 82 of 225

1   Q.   When you made -- for the morning feeding at -- when do you

2   think you fed her in the morning after she woke up?

3   A.   8:30, 9:00.

4   Q.   Did she consume that feeding?

5   A.   No.

6   Q.   Had she ever not taken a feeding before?

7   A.   Before the four or after the four?

8   Q.   Well, you just said that she didn't take her feeding at

9   9:00 or 8:30 or whenever you fed her that morning of April 24,

10  and I'm just wondering if that was something that had happened

11  before, or was this unusual?

12  A.   This one was unusual.

13  Q.   What was unusual about it?

14  A.   Because she wasn't eating.

15  Q.   How was she behaving?

16  A.   Being fussing, crying.

17  Q.   Did you at some time that morning take her temperature?

18  A.   Yes.

19  Q.   How did you do that?

20  A.   Either rectal or under the arm.

21  Q.   Do you remember which or . . .

22  A.   No, I don't recall.

23  Q.   All right.  And what was her temperature at that point

24  whenever it was that you took her temperature?

25  A.   I'd say probably just under a hundred.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 83 of 225

1    Q.   The hospital records have you reporting that her

2    temperature was 99.1.  Does that sound accurate to you?

3    A.   Sounds about right, yeah.

4    Q.   After you fed her at about 8:30 or so, did she go back to

5    sleep at that point?  I'm talking about 8:30 in the morning.

6    A.   No.

7    Q.   As the day progressed, how was Jeanine behaving?

8    A.   Being fussier.  Nothing would satisfy her, keep her

9    comfortable.

10           THE COURT:  Mr. Rathke, I'd like to take our

11   mid-morning recess at this time.

12           Members of the jury, it's about 10:17.  We'll be in

13   recess until 10:45.  Remember keep an open mind until you've

14   heard all of the evidence.  Thank you.

15           (The jury exited the courtroom.)

16           THE COURT:  We're going to try and reset the

17   equipment, but there's obviously no guarantee.  It was reset

18   last night, and it worked early this morning in testing, and

19   then it went off the -- it's going to take a full day, and that

20   will happen tomorrow, and hopefully we'll have it back up and

21   running by Monday.  I don't know what else to tell you, so

22   thanks.

23           MR. KING:  Your Honor, with the Court's permission, we

24   could bring a screen and a projector just to show this

25   day-in-the-life video this afternoon, or I should say later in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 84 of 225
*To purchase a complete copy of the transcript.*

```
 1   the -- later in the court session today unless the Court would

 2   object to that.

 3            THE COURT:  You can't wait till Monday to show it?

 4            MR. KING:  Sure, we can.  Yeah, we can wait till

 5   Monday if you'd rather.

 6            THE COURT:  Yeah, I think it'd make more sense.

 7            MR. KING:  That's fine.

 8            THE COURT:  Okay.  But if you have to show it today,

 9   you're welcome to bring in a projector and a screen.

10            MR. KING:  Monday's fine.

11            THE COURT:  Okay.

12            (Recess at 10:20 a.m.)

13            THE COURT:  The technology report is not good.  Even

14   more of the system is down now and hope to have it up and

15   running this weekend.

16            Ready to have the jury brought in?

17            MR. RATHKE:  Yes, Your Honor.

18            (The jury entered the courtroom.)

19            THE COURT:  Thank you.  Please be seated.

20            Mr. Rathke, you may continue your direct examination.

21   BY MR. RATHKE:

22   Q.   So, Megan, have you ever testified in court before?

23   A.   No, sir.

24   Q.   How do you feel?

25   A.   Very nervous.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 85 of 225

```
1    Q.   Are you scared?

2    A.   Yeah.

3    Q.   On April 24 when the day starts, where is James?

4    A.   James is not at home.

5    Q.   When does he come home?

6    A.   Comes home -- he comes home the 24th.

7    Q.   How'd you get him home?

8    A.   I had to go get him.

9    Q.   Who -- who was with Jeanine when you went and got her --

10   got him?

11   A.   Troy would be home.

12   Q.   And had it been planned that James would be released on

13   April 24?

14   A.   Yes.

15   Q.   By the afternoon of April 24, how's Jeanine?

16   A.   Being fussy.

17   Q.   Is her fussiness on the afternoon of the 24th the same as

18   it was on the morning of the 24th?

19   A.   Getting a little bit different, fussier.

20   Q.   In what way?

21   A.   Nothing was soothing her.

22   Q.   Did you try --

23   A.   Crying.

24   Q.   Did you try to feed her at noon or about noon?

25   A.   I tried to.  She wouldn't eat.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 86 of 225

1  Q.   Did you try to feed her later than noon that day?

2  A.   I would try around the 4:00 one, and she still wouldn't

3  eat, be fussy, screaming, crying.

4  Q.   Did you at any -- did you talk to your mother that day?

5  A.   Yes.

6  Q.   About -- when was it that you talked to her?

7  A.   I'd say probably mid-morning.

8  Q.   And did -- was that the only time you talked to her that

9  day or . . .

10 A.   Once.

11 Q.   Okay.  Did you eventually at some time take her temperature

12 a second time?

13 A.   Yes, I did.

14 Q.   And what was -- what was the result of that temperature?

15 A.   That one was higher than the first one.

16 Q.   Do you remember how high it was?

17 A.   I remember around 100.7.

18 Q.   Okay.  Did you eventually call the clinic?

19 A.   Yes, I called the doctor.

20 Q.   What doctor are you calling?

21 A.   I called Dr. Caldwell at Prairie Pediatrics.

22 Q.   Do you have any idea when you called her?

23 A.   Approximately around 5:00.

24 Q.   That's 5 p.m.?

25 A.   Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 87 of 225

1   Q.    And what did you tell the doctor?

2   A.    That she was fussy, didn't know what was wrong with her,

3   she was crying uncontrollably, and it got to a point to where

4   she was crying like a hyena.  That's the only thing I could

5   describe it.

6   Q.    Is that what you described to the doctor?

7   A.    Yes.

8   Q.    Did you also tell the doctor of the latest temperature?

9   A.    Yes, because she would ask me.

10  Q.    What did the doctor -- pardon?

11  A.    She would ask me eventually, so I told them.  I usually --

12  when I call them, I let them know what's going on.

13  Q.    What did the doctor tell you to do?

14  A.    She told me to bring her in.

15  Q.    Bring her in where?

16  A.    To the clinic at Prairie Pediatrics.

17  Q.    Where is that clinic located?  Be sure to talk -- your

18  voice is still very soft.  Talk right into those.  Where is the

19  clinic?

20  A.    Clinic is in Morningside.

21  Q.    So -- now, by that time James is home?

22  A.    Yes.

23  Q.    Who'd you leave James with when you went to the clinic?

24  A.    Troy.

25  Q.    What happened when you got to the clinic?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 88 of 225

1    A.   I no longer got to the clinic, got her out of the car, got

2    her into the clinic room, and I started to get her out of the

3    car seat, and the doctor says, "I need you to take her back to

4    the car and take her to St. Luke's.  I already admitted her."

5    Q.   And so did you do that?

6    A.   Yes, I did.

7    Q.   What happened then when you got to St. Luke's?

8    A.   When we got to St. Luke's, she was already admitted.  All I

9    can remember is going there and being -- going up to a room that

10   they already had her committed -- admitted to.

11   Q.   Now, there's a record that shows that you signed a consent

12   to have Jeanine admitted at 6:15 p.m.  How -- presuming that

13   time to be correct, how long -- do you know how long you'd been

14   at the hospital before you actually signed that document?

15   A.   No, I don't recall.

16   Q.   So then what do they tell you at St. Luke's that evening or

17   that night?

18   A.   When I got to St. Luke's, we went straight up to a room,

19   and before we even got settled into a room, Jeanine's already

20   being transferred to another room.

21   Q.   Now, eventually what do the doctors at St. Luke's tell you

22   about what's wrong with Jeanine?

23   A.   They said that they did a spinal tap and -- which is fluid

24   from her spine and said that she's got meningitis, but they

25   didn't know what type.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 89 of 225

1   Q.   How long did Jeanine stay at St. Luke's?

2   A.   We were at St. Luke's the 24th, and then she was

3   transferred to Children's Hospital in Omaha on the 26th.

4   Q.   How did Jeanine get to the Children's Hospital in Omaha?

5   A.   She was -- first she was life flighted and then ambulance.

6   Q.   Did you go with her, or did you and -- did you drive?

7   A.   I had to drive.

8   Q.   So when you arrived at Children's Hospital in Omaha, was

9   she already there?

10  A.   Yes.

11  Q.   At Children's, did you learn anything more about what was

12  wrong with Jeanine?

13  A.   By the time I got there, they already knew that she had the

14  meningitis, and they knew exactly what type it was.

15  Q.   What did they tell you what type it was?

16  A.   That it was E. sakazakii.

17  Q.   Had you ever heard of that before?

18  A.   Never.

19  Q.   Was there a discussion at the hospital about powdered

20  infant formula?

21  A.   Asked me what she was fed, and I told her formula, and I

22  had the can, and I no longer said that and they took it.

23  Q.   So you'd brought the can with you to Children's?

24  A.   Yes.

25  Q.   And they took it.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 90 of 225

1   A.   Yes.  And that was the last time I seen it.

2   Q.   Do you remember how much was left in the can?

3   A.   I would say over half.

4   Q.   Okay.  Let's see if we can figure out how many feedings

5   that were used up in that can.  We've got the 9:00, the

6   midnight, the 4 a.m., and the 8:30; correct?

7   A.   Yes.

8   Q.   And then how many times do you think you tried to feed her

9   formula on the 24th before taking her to St. Luke's?

10  A.   24th it would have been the 8:00 and -- 8, 8:30.  It would

11  have been the noon and then another one at 4.

12  Q.   So that'd be about seven feedings?

13  A.   About seven feedings, yes.

14  Q.   How long was Jeanine at Children's Hospital in Omaha?

15  A.   Till June or July.  It was a long time.

16  Q.   Weeks.

17  A.   Weeks.

18  Q.   What did you and Troy do during those weeks that Jeanine

19  was at Children's Hospital?

20  A.   Well, in between looking at my daughter in a big huge bed,

21  we named her Peanut because she looked like a peanut in a big

22  old bed with all these wires and tubes.  And in between being

23  there we also stayed at a Rainbow House which is in conjunction

24  with the hospital.

25  Q.   For parents that have sick children?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 91 of 225

1  A.   Yes.

2  Q.   Did you get to go home and see James much during that time?

3  A.   No.

4  Q.   Eventually she was discharged from Children's.  And then

5  you took her home?

6  A.   Yes.

7  Q.   Let's talk about surgeries that she's had.  She's had a

8  shunt placed.  We heard about that yesterday.

9  A.   Yes.

10  Q.   And how is that working?

11  A.   It has not malfunctioned since it was put in.

12  Q.   And then there was some -- I think there was some testimony

13  about a G button.

14  A.   Yes.

15  Q.   Do you remember when she got the G button?

16  A.   Let's see.  Shunt would have been put in 2008 before she

17  left Children's, so around 2010 she would have had the G button

18  put in.

19  Q.   What problems was she having that led to the G button?

20  A.   I was home pureeing foods, and she wouldn't eat much, so

21  she wasn't gaining any weight.  So the next best thing, Dr. Beck

22  at Prairie Pediatrics suggested to have a gastro.

23  Q.   When you look at Jeanine's stomach, what do you see?

24  A.   I see a plastic tube in her stomach.

25  Q.   So the tube -- does the tube protrude from her stomach?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 92 of 225
*To purchase a complete copy of the transcript.*

1   A.    Yes.

2   Q.    And then describe what you do then to feed her.

3   A.    To feed her I would have to hook up a specific feeding tube

4   to it, and then she has a feeding bag which I have to hook that

5   tube up to the tube that connects to her stomach.

6   Q.    How many times a day do you have to do that?

7   A.    Every time she eats which is four times a day.

8   Q.    And you've been doing that personally yourself?

9   A.    Yes.

10  Q.    Tell me about the cleaning that has to occur about that G

11  button.

12  A.    You gotta constantly flush it in between feedings because

13  it does get clogged.  And then you look for the redness around

14  her stomach area, and you take a cream and clean it.

15  Q.    Do you know whether or not she's ever going to eat without

16  the G button?

17  A.    No, I don't.

18  Q.    She's still feeding from the G button.

19  A.    Yes.

20  Q.    Does she go to school?

21  A.    Yes.

22  Q.    Tell us about that.

23  A.    She goes to school in the afternoons, and she has a nurse

24  that goes along with her for her feedings and diaper changes and

25  to also overlook if she has any seizures or anything.  Then the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 93 of 225

 1   teachers take over.  They pretty much teach her what she needs
 2   to be taught.
 3   Q.   I want to -- well, do you remember in January 2012 you got
 4   a visit from a crew that took a video of you and Jeanine?
 5   A.   Yes.
 6   Q.   And you've had a chance recently to look at the video that
 7   was put together and I believe entitled Day in the Life.
 8   A.   Yes.
 9   Q.   What does that video show you doing?
10   A.   That shows me, the daily routine that I do with my
11   daughter.
12   Q.   And you're talking during that video; correct?
13   A.   Yes.
14   Q.   Is it an accurate video?
15   A.   Yes.  To my knowledge, yes.
16   Q.   And as you're talking and describing Jeanine and describing
17   what you're doing, you are telling the truthful account of the
18   daily routine; correct?
19   A.   Yes.
20   Q.   And that would be as of January 2012.
21   A.   Yes.
22   Q.   Has that routine materially changed since then?
23   A.   No.
24   Q.   So it's about the same routine if we were to go to your
25   house today?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 213  Filed 10/15/14  Page 94 of 225

```
1   A.   Yes.
2           MR. RATHKE:  Your Honor, we have a doctor witness, and
3   with the Court's permission, we'd like to interrupt Ms. Surber's
4   testimony and take Dr. Beck.
5           THE COURT:  That's fine.
6           MR. RATHKE:  Okay.
7           THE COURT:  Ma'am, you may step down.
8           MR. KING:  I spoke with defense counsel, and we'll
9   follow Dr. Beck with Lisa Pollard immediately and get them both
10  on their way home, and counsel has no objection.
11          THE COURT:  Okay.  Thank you.  Thank you, Mr. King.
12          Good morning.  If you'd raise your right hand, please.
13            PATRICK BECK, PLAINTIFF'S WITNESS, SWORN
14          THE COURT:  Thank you.  Please be seated.  And you can
15  adjust the chair and the microphones so you can speak directly
16  into the microphones.  And would you tell us your name minus
17  your title and spell your last name, please.
18          THE WITNESS:  Patrick Brian Beck, B-e-c-k.
19          THE COURT:  Thank you.
20          Mr. King?
21          MR. KING:  Thank you, Your Honor.
22                      DIRECT EXAMINATION
23  BY MR. KING:
24  Q.   Dr. Beck, what is your profession?
25  A.   I'm a pediatrician.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 95 of 225

```
1   Q.   Where do you practice, please?

2   A.   At Prairie Pediatrics here in Sioux City, Iowa.

3   Q.   When did you start your practice?

4   A.   I started practice in Mason City, Iowa.

5   Q.   I'm sorry.  When did you start your practice?

6   A.   When.  I'm sorry.  In 1989.

7   Q.   And have you practiced in pediatrics continuously since

8   that time?

9   A.   Yes, I have.

10  Q.   And are you board certified as a pediatrician?

11  A.   Yes, I am.

12  Q.   Where did you take your medical education and training?

13  A.   I did my basic medical training at University of Iowa.  I

14  did my residency in Richmond, Virginia.

15  Q.   Thank you.  I'm going to direct your attention to Jeanine

16  Kunkel.  You have been a caregiver to her, have you not?

17  A.   Yes, I have.

18  Q.   Were you involved in caring for her immediately after her

19  birth while still in the hospital?

20  A.   Yes, that was me.

21  Q.   And did you care for her throughout her time at the

22  hospital?

23  A.   Yes, I did.

24  Q.   And for a number of months or years thereafter?

25  A.   Correct.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 96 of 225

1  Q.   In the hospital -- strike that.

2          Was there any problems or trouble for her in

3  connection with her birth?

4  A.   She was a twin and also very small.  She was early.  40

5  weeks is normal term.  She was 37 weeks.

6  Q.   Was there some question as to whether it might have been

7  even 36 weeks?

8  A.   There was some question of that, yes.

9  Q.   Explain that to the jury, please.

10 A.   There was -- because of the small size for both of the

11 babies, they were considered to be 37 weeks or term -- 36 weeks

12 is preterm -- but considered to have intrauterine growth

13 retardation, or they were small for age.  So the question is

14 were they really small for age or were they just even earlier

15 than what was anticipated.

16 Q.   Do you remember what Jeanine's birth weight was?

17 A.   Her birth weight --

18 Q.   You're free to look at your records if it will help you.

19 A.   Okay.  Her birth weight was 4 pounds, 14 ounces.

20 Q.   Would that qualify for low birth weight?

21 A.   Yes, that would.

22 Q.   Was she otherwise healthy?

23 A.   Yes, she was otherwise healthy.

24 Q.   As of the time of her discharge some three days later, had

25 she had any medical problems?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 213   Filed 10/15/14   Page 97 of 225

1    A.    No, she did not.

2    Q.    Did you write an order prior -- perhaps prior to her birth

3    as to her feeding?

4    A.    She was initially started on the standard formula which is

5    24-calorie regular formula or 20-calorie regular formula, excuse

6    me.

7              MR. KING:  May I approach, Your Honor?

8              THE COURT:  You may.

9    BY MR. KING:

10   Q.    Dr. Beck, I'm going to show you page 19 of Exhibit 121

11   which is from Jeanine's hospital record from her birth.  And

12   there's a section there called diet.  Do you see that?

13   A.    Yes, I do.

14   Q.    And the second to the bottom entry, read that to us,

15   please.  Use mother's --

16   A.    Use mother's preference for formula.  If no preference, use

17   formula rotation schedule.  Feed on demand.

18   Q.    What is the significance of this notion of a formula

19   rotation schedule?

20   A.    The hospital does not want to show a preference over one

21   company versus another.  So they will rotate usually on a yearly

22   basis one formula and then go with the next company.

23   Q.    We know that Jeanine was fed an Abbott product during that

24   time, so would that have been Abbott's year if you will?

25   A.    Yes, that would have been.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW  Document 212  Filed 10/15/14  Page 98 of 225

1   Q.   And then did you change the order at some point as to what

2   she should be fed?

3   A.   Yes, I did.

4   Q.   What did you change it to?

5   A.   Due to her inability to take in full amount of feeds that

6   would be needed for her to grow, we switched her to 22-calorie

7   formula which would have been the NeoSure.

8   Q.   Did you specify liquid or powder?

9   A.   No, I did not.

10  Q.   And do you know whether she was fed liquid or powder in the

11  hospital?

12  A.   It is the hospital's policy to be feeding liquid because

13  they do not have a -- an area that would be designated for

14  mixing of formula.

15  Q.   All right.  As of that time did you have any knowledge that

16  there might be an association or a risk of E. sak meningitis in

17  low-birth-weight or premature children who are fed a powdered

18  infant formula?

19  A.   I know that there was a -- something published in 2001

20  concerning a specialty formula, did not know the specifics of it

21  so did not know even if it were associated with a powder versus

22  a liquid but do know of a case of infection from that.

23  Q.   Did you have any greater knowledge than that?

24  A.   No.

25  Q.   Had you ever received any communication from any product

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 99 of 225

1  manufacturer, Abbott included, on that topic?

2  A.    No.

3  Q.    There's been some evidence that the FDA wrote a letter

4  directed to the care of neonatal intensive care unit babies back

5  in the early 2000s on this topic.  Do you have any recollection

6  of ever having seen that letter?

7  A.    No, I have not seen that letter, and it has not changed the

8  practice for the neonatologists.

9  Q.    Are you a neonatologist?

10  A.    No, I'm not, but I know that the neonatologists do not

11  change.  They send them home on powdered formula also.

12  Q.    Say that again.

13  A.    The neonatologists send them home on powdered formula also.

14  Q.    Does the hospital intensive care unit use liquid formula

15  then?

16  A.    They use liquid formula for the same reason we do.

17  Q.    Now, when did you last see Jeanine even approximately?

18  A.    Approximately -- excuse me.  Wrong one.  April of 2011 is

19  what I see.

20  Q.    Tell the jury just in general terms what her condition or

21  limitations were at that time.

22  A.    At that time she was basically at the developmental stage

23  of a four-month-old.  She had no ability to roll over.  She was

24  not able to sit on her own.  She had no words.  She was not able

25  to do anything for her own cares.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 100 of 225

1          MR. KING:  Thank you.  That's all I have.

2          THE COURT:  Miss Ghezzi, you may cross-examine.

3          MS. GHEZZI:  Thank you, Your Honor.

4                     CROSS-EXAMINATION

5    BY MS. GHEZZI:

6    Q.   Still morning.  Good morning, Dr. Beck.

7    A.   Morning.

8    Q.   We've never met before, have we?

9    A.   No, we have not.

10   Q.   But we've spoken on the phone, remember, about August 15 of

11   2013?

12   A.   Yes, we did.

13   Q.   And I asked you some questions, and Mr. King was on the

14   line as well.

15   A.   Correct.

16   Q.   Okay.  The incident that you'd heard about with -- you knew

17   about E. sakazakii before 2008; correct?

18   A.   Correct.

19   Q.   And that was in connection with a publication about a

20   Tennessee outbreak in a neonatal intensive care unit in about

21   2001?

22   A.   Correct.

23   Q.   And were you aware that that was about -- that product fed

24   there was not an Abbott product?

25   A.   Correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 101 of 225

1    Q.    Okay.  And then had you also heard about another incident

2    involving E. sak some time later but before 2008?

3    A.    No.

4    Q.    Okay.  Do you remember telling me it had something to do

5    with Enfamil?

6    A.    I thought I heard, but again, I could not specifically say

7    that it was, so that's why I said I thought I heard about

8    another one, but I wasn't -- I don't remember the article and

9    don't remember that it was specifically that formula.

10   Q.    Okay.  And then you had also seen reference to E. sak in a

11   journal, and I think you described it on our phone call as a

12   throw-away journal?

13   A.    Correct.

14   Q.    Okay.  Would that have been like a letter to somebody or

15   brochure?  What's a throw-away journal?

16   A.    It is something that does have some published articles in

17   it but is something that we don't pay for.  It comes more like a

18   magazine, and so it's something that you can find out what's

19   new, but it's something that you really don't save as journal

20   articles.

21   Q.    Okay.  And that contained something about E. sakazakii.

22   A.    Correct.

23   Q.    Okay.  Now, you were aware, of course, that Jeanine Kunkel

24   was diagnosed with meningitis in April of 2008.

25   A.    Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 212  Filed 10/15/14  Page 102 of 225

1  Q.   Okay.  And you didn't do any investigation into the source

2  of the E. sakazakii bacteria that caused her infection, did you?

3  A.   I did not.

4  Q.   And you don't have any opinion on the origin of the

5  E. sakazakii bacteria that caused her illness, do you?

6  A.   No, I do not.

7  Q.   And you're familiar with the NeoSure 22 cal. when you made

8  the order upon discharge for Jeanine Kunkel; right?

9  A.   Correct.

10  Q.   And you've ordered that formula for newborns in the

11  hospital?

12  A.   Yes, I have.

13  Q.   And you've also ordered it for newborns when they leave the

14  hospital?

15  A.   Yes.

16  Q.   And you order NeoSure based on the infant's nutritional

17  needs.

18  A.   That is correct.

19  Q.   Okay.  And that depends on the infant's weight and the need

20  for them to gain more calories; correct?

21  A.   That is correct.

22  Q.   And after you switched Jeanine to NeoSure in the hospital,

23  she began feeding better; isn't that correct?

24  A.   That is correct.  Gaining weight better I should say.

25  Q.   Gaining weight better.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 103 of 225

1   A.    Yes.

2   Q.    And in your practice, is it -- you treat numerous infants

3   in the hospital right after they're born; right?

4   A.    Yes.

5   Q.    And, in fact, you were present at the birth of Jeanine and

6   James Kunkel; right?

7   A.    That's correct.

8   Q.    And how did that occur?

9   A.    Because of their being early and twins, they call us to

10  attend the delivery to make sure that the babies do well at the

11  time of the delivery.

12  Q.    And so you saw both Jeanine and James at the time of their

13  birth.

14  A.    Yes, right.

15  Q.    And Jeanine was in -- and do you interact with the

16  newborn's parents when you see them?

17  A.    Yes, I do.

18  Q.    And during those interactions with the newborn's parents,

19  do you give them information about the medical condition of

20  their child?

21  A.    Yes, I do.

22  Q.    And in many of those interactions, do you provide parents

23  recommendations about the care of the newborns after discharge

24  from the hospital?

25  A.    Yes, I do.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 104 of 225

```
1    Q.    Okay.  And does some of that include feeding?

2    A.    Yes.

3    Q.    And what to feed and how to feed?

4    A.    Correct.

5    Q.    And did you do anything differently with Megan Surber in

6    this instance than you do with any other parents of -- or mother

7    of a newborn in the hospital that you've been treating?

8    A.    No, I did not.

9    Q.    And when Jeanine Kunkel was in the hospital from her birth

10   on April 14 until her discharge on April 17, did you see her

11   each day?

12   A.    Yes, I did.

13   Q.    And did you see her mother each day --

14   A.    Yes, I did.

15   Q.    -- as well?  And during those visits you had conversations

16   with her mother?

17   A.    Yes, I did.

18   Q.    And during those conversations, did you talk about formula

19   feedings?

20   A.    Yes, I did.

21   Q.    And when you had those conversations, did you talk about

22   what to watch out for, whether the feedings were agreeing with

23   the baby and so on?

24   A.    Yes, I did.

25   Q.    And knowing what you know about formula in your -- and
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 212 Filed 10/15/14 Page 105 of 225

1 formula feeding of newborns in your 23 or maybe it's 24 years of

2 experience now, you did not feel that it was necessary to tell

3 Megan Surber to use only liquid ready-to-feed with Jeanine when

4 she took her home.

5 A.    No, I did not feel the need to.

6 Q.    And you did not feel it was necessary to tell Miss Surber

7 that she should not use powdered infant formula with Jeanine

8 when she took her home.

9 A.    Right.

10 Q.    Right?  And you ordered Jeanine's dismissal to home on

11 April 17; correct?

12 A.    Correct.

13 Q.    And in that order you specified that Jeanine was to use

14 NeoSure 22 cal. formula; right?

15 A.    That is correct.

16        MS. GHEZZI:  And just for the record, Your Honor,

17 because we can't publish it, it's just Exhibit 1,000C, discharge

18 note.

19 Q.    And does the hospital also provide a discharge instruction

20 report to new mothers and fathers?

21 A.    Yes, they do.

22 Q.    Okay.  And this is Exhibit 1,000D.  If you can't remember,

23 I'll show it to you, but if you can remember, we can avoid it

24 all.  And your order on there under diet and fluids for Jeanine

25 said bottle feed NeoSure every three to four hours as needed;

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 218  Filed 10/15/14  Page 106 of 225

1  right?

2  A.   That's correct.

3  Q.   And the hospital provides a copy of this to the family

4  before discharge?

5  A.   Correct.

6  Q.   Okay.  And the hospital requires that parents read and sign

7  the instructions before discharge; is that right?

8  A.   That is right.

9  Q.   Okay.  Now, one of the instructions that's pretty standard

10 is to wash the umbilical cord every day; right?

11 A.   Yes.

12 Q.   And it indicates that when you do that there might be a

13 small amount of bleeding.

14 A.   Right.

15 Q.   And why is that, doctor?

16 A.   Because the blood vessels that supply the umbilical cord

17 eventually will shrink off, but they can still cause some

18 bleeding.

19 Q.   Okay.

20 A.   And so you want to watch to make sure that it doesn't get

21 irritated too much and also watching for signs of bleeding

22 because of infection.

23 Q.   And what kind of infection would that be?

24 A.   It could be any type of skin infection.

25 Q.   Okay.  And can -- as far as you know, can bacteria from the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 107 of 225

1   caregiver's hands infect the baby?

2   A.   Yes, they can.

3   Q.   And the discharge instruction report also says to bathe the

4   baby in warm water and may give tub bath after the cord falls

5   off; right?

6   A.   Correct.

7   Q.   Okay.  And it also says to wash the head and the bottom

8   daily.

9   A.   Right.

10  Q.   Okay.  And why is that?

11  A.   Those are areas that often get dirty, the bottom

12  especially, the head because everybody touches the head and

13  kisses on the head.

14  Q.   Okay.  And that's a concern because that can spread germs

15  to the baby?

16  A.   Correct.

17  Q.   Now, you had a -- there was also an instruction to check

18  back with your office which is Prairie Pediatrics; is that

19  correct?

20  A.   That's correct.

21  Q.   Three to five days after birth?

22  A.   Right.

23  Q.   And in this case that didn't occur; right?

24  A.   I know they came back.  I'm not sure if it was three to

25  five days.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 108 of 225

1    Q.   That's okay.  We can look at it.  In your experience,

2    during discharge procedures does the hospital nurse also talk

3    to -- just as a matter of course, does the hospital nurse also

4    talk to the parents of a newborn about feeding and correct

5    feeding?

6    A.   Yes, they do.

7    Q.   And that's a routine practice for all newborns at

8    St. Luke's Hospital here in Sioux City?

9    A.   That is correct.

10   Q.   And for formula-fed babies, will that discussion include

11   instructions on how to mix the formula?

12   A.   Yes.

13   Q.   Okay.  And the twin of Jeanine, James, was also under your

14   treatment; correct?

15   A.   Correct.

16   Q.   Okay.  And he was initially in the well baby nursery and

17   then was moved to the neonatal intensive care unit or NICU.

18   A.   Correct.

19   Q.   And is there a heightened sense of -- or heightened

20   requirements for hygiene in the NICU than in the well baby

21   nursery or no?

22   A.   There is a heightened sense in that all the parents have to

23   wash their hands upon entry into the NICU.

24   Q.   Are visitors restricted?  Can any visitor get in there?

25   A.   Visitors are somewhat restricted, yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 109 of 225

1  Q.   Okay.  And when James was discharged from the hospital, you

2  gave him a prescription for NeoSure as well; correct?

3  A.   He was discharged home on NeoSure, correct.

4  Q.   Yes.  And it was -- he could -- or the parents could get

5  that at WIC; right?

6  A.   That is correct.

7  Q.   And you didn't specify on the prescription whether it

8  should be ready-to-feed liquid or powdered infant formula;

9  right?

10 A.   The discharge should have been through the neonatologist,

11 but they did not make that distinction either.

12 Q.   Right.  They didn't make that distinction either.

13 A.   Right.

14 Q.   Okay.  And to your knowledge WIC provides -- at least in

15 Sioux City here, WIC provides powdered formula unless liquid is

16 specified on the prescription; correct?

17 A.   That is correct.

18 Q.   And so you would have suspected that WIC would have

19 provided PIF, powdered infant formula, when presented with

20 James' prescription; correct?

21 A.   Correct.

22 Q.   And did you have any concern about that?

23 A.   No, I did not.

24 Q.   Even though he was just leaving the NICU?

25 A.   That is correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 110 of 225

1  Q.   Okay.  Now, doctor, what's the purpose of a three- to
2  five-day well baby visit after birth?
3  A.   The purpose is to make sure that they are gaining weight
4  appropriately and that there is no other concerns or problems
5  with the baby.
6  Q.   Okay.  And is that a requirement that you're suggesting or
7  a requirement that you put on all of your discharges with a
8  brand new baby?
9  A.   That is what is suggested at -- for all the babies, yes.
10  Q.   Standard medical practice?
11  A.   Exactly.
12  Q.   Okay.  Now, Jeanine Kunkel was admitted for her bacterial
13  meningitis at St. Luke's on April 24, 2008; correct?
14  A.   Yes.
15  Q.   And after her diagnosis, she was transferred to Children's
16  Hospital in Omaha and treated there?
17  A.   Yes.
18  Q.   Okay.  And then when she returned from that hospital to
19  Sioux City with her parents, you treated her at that time;
20  right?
21  A.   Yes.
22  Q.   And she was about two months old at that time?
23  A.   Yes.
24  Q.   Okay.  And at that time Jeanine was being fed 24-calorie
25  formula with Polycose added to make it approximately 27-calorie

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 111 of 225

1  formula; correct?

2  A.    That is correct.

3  Q.    Okay.

4        MS. GHEZZI:  Is this Exhibit 127?  Okay.  For the

5  record, Your Honor, it's Exhibit 127.

6  Q.    And that is a powdered product, is it not?

7  A.    Polycose, yes.

8  Q.    And you mix it into prepared formula.

9  A.    Yes.

10 Q.    And what's the purpose of it?

11 A.    To add extra calories.  Because the baby is not able to

12 take in enough in the liquid form, they need to make it stronger

13 so that the baby can take enough to get calories for growth.

14 Q.    And the baby, Jeanine, had been fed the Polycose supplement

15 in the Children's Hospital at Omaha; right?

16 A.    Yes.

17 Q.    And so you continued that treatment when she came to --

18 back to Sioux City.

19 A.    Yes.

20 Q.    Okay.  And as far as you know, is that -- Polycose powdered

21 supplement, is that a sterile product, or don't you know?

22 A.    I don't know.

23 Q.    Okay.  Now, did you know whether or not Jeanine's parents

24 were adding the Polycose powder to a liquid formula,

25 ready-to-feed, or to a reconstituted powdered infant formula?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 112 of 225

1  A.    I know they stated that there was concern, so I do believe

2  they were using a liquid formula at that time.

3  Q.    Okay.  But did it matter to you what they used one way or

4  the other?

5  A.    No.

6  Q.    And why not?

7  A.    Because it was standard to be using powdered formula.

8  Q.    Okay.  And you continued to -- so you continued to

9  prescribe the Polycose powder to Jeanine after that visit;

10 right?

11 A.    Yes.

12 Q.    And are you aware that was an Abbott product?

13 A.    Yes.

14 Q.    And the formula that they were adding it to was NeoSure;

15 correct?

16 A.    That is correct.

17 Q.    And that was your recommended formula for her; correct?

18 A.    That is correct.

19 Q.    Okay.  And you continued to prescribe the addition of

20 Polycose powder to Jeanine through at least her six-month

21 check-up; is that right?

22 A.    That is right.

23 Q.    Now, you had been Jeanine's treating physician from her

24 birth until I believe you said April of 2011; is that right?

25 A.    That is right.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 318   Filed 10/15/14   Page 113 of 225

1  Q.   Okay.  And after that time the family stopped bringing her

2  to see you; is that right?

3  A.   That's right.

4  Q.   Okay.  And the reason they stopped coming to see you, as I

5  understand it from you, is because you had a disagreement over

6  the amount of outside care that they thought Jeanine needed

7  while she was at home; right?  They thought she needed -- they

8  wanted 60 hours --

9  A.   Yes.

10 Q.   -- of in-home treatment per week.  And what was your

11 judgment of that?

12 A.   My recommendation was 24 hours per week mainly for respite

13 care.  The daily cares, because neither parent worked so both

14 parents were at the home, felt that there was enough that they

15 could care for the baby but to be able to have some time where

16 they had some time for themselves that we'd give 24 hours.

17 Q.   Okay.  So neither parent was employed at the time.

18 A.   That is correct.

19 Q.   And they were getting -- they were getting 24 hours a week

20 respite care from a nurse?

21 A.   They were getting -- they had approval for 60, between 60

22 to 80, and I had suggested that we go 24.

23 Q.   Okay.  And did you know after they left you that in May of

24 2011 they filed a lawsuit?

25 A.   No, I did not.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 114 of 225

1   Q.   Now, you've known that Jeanine -- you've known about

2   Jeanine Kunkel's E. sakazakii infection in 2008; correct?

3   A.   Correct.

4   Q.   And since then you've also learned about the allegations in

5   this case; correct?

6   A.   Correct.

7   Q.   And knowing that, you have continued to prescribe NeoSure

8   formula for newborns?

9   A.   That's correct.

10  Q.   And when you make out your orders and prescriptions, you

11  don't specify whether it should be powdered infant formula or

12  liquid formula; is that correct?

13  A.   That is correct.

14  Q.   And you continue to have no concerns about newborns using

15  powdered infant formula when they are discharged from the

16  hospital; is that correct?

17  A.   That is correct.

18  Q.   And that includes newborns who are discharged from the

19  neonatal intensive care unit; is that correct?

20  A.   That's correct.

21          MS. GHEZZI:  Thank you, Your Honor.  Thank you,

22  Dr. Beck.

23          THE COURT:  Mr. King?

24                      REDIRECT EXAMINATION

25  BY MR. KING:

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 115 of 225

1    Q.    Dr. Beck, you mentioned some throw-away journals and

2    something about Enfamil in terms of a general topic of E. sak.

3    A.    Correct.

4    Q.    Do you remember any detail of the E. sak discussion in

5    those sources?

6    A.    The throw-away journal was related to the initial case of

7    2001.

8    Q.    We're calling that the Portagen outbreak.  Does that ring a

9    bell?

10   A.    That's correct.

11   Q.    Okay.

12   A.    The one for Enfamil, like I said, was more of a word of

13   mouth, so I did not see anything written up on that one.

14   Q.    Do you remember the detail, though, of the word of mouth

15   Enfamil E. sak?

16   A.    No, I don't.

17   Q.    And the conversation that you would have had with the

18   mother in the hospital about feedings, do you remember that as

19   you sit here today?

20   A.    Yes.  It's standard that I talk to all the mothers about

21   the same type of thing.

22   Q.    I don't question that.

23   A.    Okay.

24   Q.    But do you remember as you sit here the conversation with

25   this mother on that day?  I know you can tell us you would have

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 116 of 225

1   had it, but do you remember it as you sit here?

2   A.   To say that I remember the exact conversation, no.  To say

3   that I gave her the same talk that I give to every mom that's in

4   the hospital, yes.

5   Q.   I accept that.

6   A.   Okay.

7   Q.   And in that standard conversation, do you discuss liquid

8   versus powder?

9   A.   No, I do not.

10  Q.   Is it more about the issue of being sure you get adequate

11  nutrition to your child and that you provide the child the

12  product prepared as it's meant to be prepared?

13  A.   Exactly.

14  Q.   And there were questions about what nurses may have said to

15  the mother at discharge.  I'm sure there's a standard practice

16  on that too.

17  A.   Yes.

18  Q.   You don't know, in fact, what was said in this case.

19  A.   No, I don't.

20  Q.   Again, does it go to the same notion, be sure you're

21  getting enough food to your child, be sure you prepare the

22  product properly?

23  A.   Correct, and what to watch for for signs of intolerance.

24  Q.   There wouldn't be any discussion about powder versus

25  sterile liquid product, would there?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 117 of 225

```
1   A.    No.

2   Q.    Do you know if E. sak is an enteric pathogen?

3   A.    That I don't know.

4   Q.    What is an enteric pathogen?

5   A.    Enteric pathogen is a bacteria that's normally found in the

6   gut.  So as far as I know, no, it is not.

7   Q.    Okay.

8   A.    It's usually found through contamination.

9   Q.    If, in fact, the NeoSure product provided to the hospital

10  on the label would have had a warning not to use it for children

11  under one month of age because of the risk of an E. sak

12  infection with meningitis or even death, if, in fact, the label

13  had included that message, might that have influenced your

14  decision making?

15  A.    Yes.

16            MR. KING:  Thank you.

17            THE COURT:  Miss Ghezzi, anything further?

18            MS. GHEZZI:  Just one question.

19                      RECROSS-EXAMINATION

20  BY MS. GHEZZI:

21  Q.    Do you know whether Enfamil is a nonAbbott product?

22  A.    Enfamil is a nonAbbott product.

23            MS. GHEZZI:  Okay.  Thank you, Your Honor.

24            MR. KING:  Nothing further, Your Honor.

25            THE COURT:  Members of the jury, do you have any
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 118 of 225

1  questions for the doctor?  Doesn't appear to be so, so thank

2  you.

3            THE WITNESS:  Thank you.

4            THE COURT:  Everybody can take a stretch break.

5            And ready to call your next witness?

6            MR. KING:  Yes, Your Honor.  We're going to call Lisa

7  Pollard who is a life care planner.  She's in the hallway coming

8  in now.

9            THE COURT:  Good morning.  Would you raise your right

10  hand, please.

11            LISA POLLARD, PLAINTIFF'S WITNESS, SWORN

12            THE COURT:  Okay.  Thank you.  Please be seated in the

13  witness box.  And you can adjust the chair and the microphones.

14  And you need to scoot up pretty close to those microphones for

15  the sound system to work fully.  And you can take some time and

16  get organized here.  And now would you tell us your name,

17  please, and spell your last name.

18            THE WITNESS:  My name is Lisa Pollard, P-o-l-l-a-r-d.

19            THE COURT:  Thank you.

20            Mr. King?

21            MR. KING:  Thank you, Your Honor.

22                      DIRECT EXAMINATION

23  BY MR. KING:

24  Q.  Ms. Pollard, what is your occupation?

25  A.  I'm a registered nurse and a nationally certified life care

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 119 of 225

1    planner.

2    Q.    What is a life care planner?

3    A.    A life care planner is a professional who is contacted and

4    assesses and develops a plan for somebody who's had a

5    catastrophic injury.

6    Q.    And what training have you had to do that work?

7    A.    I'm a registered nurse, and I have a bachelor's of science

8    in nursing that I received in 1988.  And in 1997, I started

9    classes to get certified as a life care planner.  It entails 120

10   continuing hours of education, and in 1998 I sat for an

11   examination, passed that, and got certified.

12   Q.    Do you have to take classes or credits to maintain your

13   certification?

14   A.    I do.  I need to do 50 credit hours every -- they've just

15   changed it.  I think it's every 5 years now.

16   Q.    All right.  What kind of nursing work did you do early on?

17   A.    Originally when I got out of nursing school, I was employed

18   with St. Joseph Hospital in Omaha, and I worked as a staff nurse

19   in the labor and delivery and maternal child unit.

20   Q.    Okay.  Now, life care planners, I know that you work

21   assisting attorneys; correct?

22   A.    Correct.

23   Q.    Is it -- are there other categories of clients that you

24   have, or is it pretty much litigation focused?

25   A.    The majority is litigation focused.  There have been some

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 120 of 225

1   insurance companies who want to know about setting aside

2   reserves for somebody that they are offering coverage for.  And

3   sometimes they'll ask for a five-year window of time just to try

4   to set aside reserves for that person.

5   Q.    Okay.  We retained you in this case, did we not?

6   A.    You did.

7   Q.    And tell the jury what steps you took to prepare yourself

8   to express opinions just in general terms.

9   A.    As a life care planner, there's a methodology to life care

10  planning.  It's a document that's prepared.  It's considered an

11  educational guideline, if you will.  And it is a living

12  document, so it can be changed and updated.  But there's a

13  methodology to how the plan is set aside.

14        So I'm contacted about a case.  Generally medical

15  records are provided, and following that review then I usually

16  schedule an appointment to go out and see the injured

17  individual.  They should be seen in their home setting so that

18  you can see how they function within their home setting.

19        And then it's about gathering the information to start

20  looking at what their needs are going to be, and you make those

21  projections through the rest of their life.

22        So in getting the information through the interview

23  and the medical records, then I talk to treating care providers

24  and start doing research to look at what all the cost estimates

25  are that are associated with this person's future needs.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 121 of 225

1  Q.   Did you have communication with some of Jeanine's

2  caregivers?

3  A.   I did.

4  Q.   What is your understanding or description of Jeanine's

5  medical limitations or needs generally speaking?

6  A.   At this point I think that I've, you know, heard the word

7  "profound" expressed a few times.  In looking at her needs,

8  there's communication needs.  There's obvious health needs from

9  a medical standpoint.  There's emotional needs, and the family

10 tried to provide for those, although they also state that it's

11 very difficult at times to see what she's wanting or needs.

12 There's home modification needs.  And there's supportive needs

13 for the family as well.

14 Q.   Okay.  And did you come to a conclusion as to whether and

15 to what extent she will have future needs?

16 A.   I do.  And that's part of the life care plan.  It's a

17 guideline.  It sets out the recommendations, and it -- there are

18 associated dollar figures that have been researched, and the

19 average of those coupled with the frequency of recommendation

20 are entailed in the life care plan.

21 Q.   I'll ask you specific questions about that, but let me ask

22 you this question.  In your opinion are her needs related to her

23 meningitis brain injury?

24 A.   Yes.

25 Q.   Okay.  So tell the jury what categories of needs you've

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 122 of 225

1  identified, and then we'll identify the cost that you associate

2  with those categories.

3  A.   Okay.  In the life care plan, there's a narrative there

4  that kind of goes through my interview process with her.  But

5  the numbers are held back in the summary of future cost portions

6  of my document.

7       And the first category that would be addressed for

8  Jeanine is projected evaluations.  And those are going to be

9  evaluations that are going to occur one time only or yearly or

10 even biannually.  So they're periodic, but they're not going to

11 be a consistent monthly or weekly type frequency.

12      So in her case there's a psychological evaluation that

13 we put in for both of the parents because as caregivers, we need

14 to try to avoid burnout for them.  And with constant care and

15 those provisions, they need to be able to have a resource to

16 support them as well.

17      In addition, there's occupational, physical, and

18 speech therapies that would be evaluations that would occur one

19 time a year, possibly more, but at this point in time we're

20 being conservative in saying at least once a year.

21 Q.   For the parents is there going to be more than one

22 psychological evaluation for each of them?

23 A.   It would be one psychological eval. per person, so yes, one

24 for Mom, one for Dad to get them established with a provider.

25 Q.   All right.  And what cost did you assign to the parents'

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 123 of 225

1   psychological evaluations?

2   A.   The initial evaluation would be $200 as a flat fee, and

3   that is that initial intake evaluation with a therapist.

4   Q.   And on occupational therapy, what is your opinion?

5   A.   When I talked to the therapy providers at -- it was at Able

6   Kids at the time when Jeanine was there -- they all indicated

7   one time per year.  It may be necessary to have another

8   evaluation but at least one time a year.  For occupational

9   therapy, the evaluation is approximately $265.

10  Q.   Starting at what age, please?

11  A.   That's going to start at age 22, and it goes 22 to life

12  because they know that up until the point of 21, 22, they expect

13  to work with her consistently.

14  Q.   All right.  How about physical therapy?

15  A.   After that physical therapy would be 155 for an evaluation.

16  Q.   Once per year?

17  A.   Once per year.

18  Q.   Starting at age 22 again?

19  A.   Again, uh-huh.

20  Q.   Speech therapy again, please.

21  A.   That's going to, again, be starting at age 22 so once she

22  reaches adulthood.  It would be one time per year, and it would

23  be an evaluation of 275.

24  Q.   All right.  Does that cover the -- that category of needs?

25  A.   It does.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 124 of 225

1  Q.   What would be the next category, please?

2  A.   The next category, a lot of it is going to relate to --

3  Q.   What do you call the category, please?

4  A.   Pardon?

5  Q.   What do you call the category, please?

6  A.   It's called the projected therapeutic modalities.

7  Q.   All right.  And what --

8  A.   These are the therapies, and so they are in direct

9  correlation with what we just talked about for evaluation.  So

10  counselling for Mom and Dad is listed as anywhere from zero to

11  tw -- four times per year, so that comes down to they may not go

12  at all one month, but then some months they may have two visits.

13  The average unit cost is $140 per session.

14  Q.   What about for the child?

15  A.   For the child at this point in time, I hate to say, but

16  physicians and when I ask them felt that at this point in time

17  they didn't think that Jeanine would be able to participate in

18  counselling.

19  Q.   No, no, not counselling.  How about the child's therapeutic

20  modalities?

21  A.   Oh, I'm sorry.  So that's going to be the therapies, and

22  it's going to coordinate with those initial evaluations.  So

23  occupational therapy for her age now through age 21, she would

24  have one session per week and an average of $90 per session for

25  occupational.

 1          For physical therapy she's going to have one session

 2   per week, and that's now to age 21, and that's going to be $90.

 3          And the speech language to age 21 is, again, an

 4   average of one session per week, and that one is $270 per

 5   session.  And that one also tends to incorporate some of the

 6   augmentative communications so some of the technologies that she

 7   might be able to use:  Buttons, switches, Dynavoxes, something

 8   like that.

 9   Q.   How about the future?

10   A.   Future, in -- you'll see where age 21 to life, they say 2

11   to 8 sessions per year.  So when they do an evaluation, if it

12   looks like she needs a little bit of -- a few sessions to kind

13   of concentrate and kind of improve her abilities or teach her

14   something new if there's new technology, two to eight sessions

15   have been allotted per year for all three parameters:

16   Occupational, physical, and speech therapy.

17   Q.   From age 21 to life.

18   A.   From age 21 to life.

19   Q.   And, again, at $90 unit cost.

20   A.   Unless it's speech therapy, and then that's 270 at this

21   point.

22   Q.   Thank you.  And then what is the next category of needs?

23   A.   The next category is the wheelchairs and the accessories

24   and maintenance for those items.  And Jeanine has a manual

25   wheelchair that she uses.  It was obtained in 2010, but an

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 126 of 225

pull

1  average replacement factor for a wheelchair is five years at

2  this point in time.

3  Q.   And the cost of that, please?

4  A.   For her right now it would be approximately $7,500.

5  Q.   And how often will she need to replace that on average?

6  A.   That will be replaced every five years, and that's a

7  parameter that actually Medicare sets.

8  Q.   Okay.  And then what else in this category?

9  A.   There's a wheelchair backpack because kids, adults,

10 everybody have a few things that they want to carry with them,

11 so there is a wheelchair backpack that fits over the railings

12 that is appropriate for her to carry.  Those are $48, and

13 maintenance on the wheelchair if it needs to be done is

14 generally around the 500, 550 mark for labor.

15 Q.   Per year?

16 A.   Per year.

17 Q.   All right.  What's the next category, please?

18 A.   The next is orthopedic equipment needs.  So this category

19 is going to be looking at some of the positioning equipment that

20 she might be able to use or some of the other walkers, standers.

21 She would benefit from having floor mats and positioning

22 bolsters because they do do therapy at home, and those items can

23 be replaced every five years.  And right now what's being

24 allotted is $150.

25       She utilizes a gait trainer and a walker, and at this

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 127 of 225

1    point in time she's been utilizing it at school.  And her mom

2    says that she does really well in it but she can get floppy and

3    get tired, but we also talked about the fact that it might be

4    nice to have one at home just for the fact that she can practice

5    and continue to build some of those muscle structures if

6    possible.

7              And so a gait trainer and walker is $2,280.  And

8    again, that's equipment.  It's a five-year replacement.

9              And then finally, a pediatric stander.  When I was

10   there to see Jeanine, she had a standing unit but was growing

11   out of it.  And it did not fit appropriately.  So a replacement

12   on a stander with growth parameters would be every three to five

13   years.  That growth para -- or the stander is going to allow a

14   child to stand, and it is going to put some stress on the

15   muscles and the joints, and that actually helps to keep them

16   healthy and keep them stronger so that you're not looking at any

17   brittle aspect to bones starting to occur, so osteoporosis.

18   Q.   And the cost of the pediatric stander is what?

19   A.   That's 3,836 as an average, and then I also have an adult

20   stander, and that adult stander is going to be $6,500, and it

21   can be replaced every ten years.

22   Q.   Okay.  And then what is your next category, please?

23   A.   Following this is the orthotics and prosthetics.  So this

24   category deals with the braces that somebody may need to wear

25   for proper limb alignment.  And in Jeanine's case she needs to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 128 of 225

1    have ankle-foot orthosis, so a brace that is going to kind of

2    cup her calf and come down around the ankle and the foot to hold

3    it stable.

4           Up until age 18 the orthotic specialist said one time

5    per year would replace -- would be a replacement factor that's

6    appropriate.  It would be -- her bill has been 2,844 to have the

7    orthotics specially made for her.  As an adult once she's 19

8    past those growth parameters, they think every 2 to 3 years if

9    she's maintaining the same level of immobility.  Then again that

10   2,844 is a representative number.  It may be more expensive

11   because they're larger and have to be custom made.  But this is

12   conservative, and this is what we know the cost is for now.

13   Q.   Okay.  The next category, aids for independent function,

14   what's that about, please?

15   A.   Aids for independent function are items that help someone

16   function within their environment and help to offer a sense of

17   independence for a person.  And for Jeanine her biggest sense of

18   ability would be trying to promote communication for her.  And

19   so in this -- in this area there's a stipend that I put in

20   because we just don't know what she's going to be able to use as

21   she's getting older.  And so right now she does use some push

22   buttons and switches, and she can get some reaction and

23   cause/effect that she sees happening with items there.  But

24   later on it may be something as expensive as a Dynavox which is

25   something that she can go through and push certain buttons to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 129 of 225

1   have certain words be voiced, so I have a stipend of $1,500.

2   Q.   How often?

3   A.   Yearly.

4   Q.   All right.

5   A.   Actually I'm sorry.  It's every two years for her.

6   Q.   The next category, home furnishings and accessories, tell

7   us about that, please.

8   A.   This is -- this is the category that has the durable

9   medical equipment that they use and that would be helpful in the

10  future.  So it has the personal lifts.  It has the body slings

11  that they would put under her as she gets heavier and in order

12  to transport her.  It talks about the shower wheelchair in order

13  to get her into showering and things when -- again, she's

14  getting heavier and bigger.  And it's difficult for parents to

15  lift her.

16          There's an electric bed so that the head and the foot

17  can go up.  Jeanine has issues with secretions and has to be

18  suctioned frequently, so being able to get the head of the bed

19  up in order to help her manage those secretions is important.

20          It talks about the feeding pump that she uses on a

21  daily basis, pulse oximeter to make sure she's getting enough

22  oxygen to circulate, and the nebulizer to deliver aerosol

23  medications that she breathes in.

24  Q.   Okay.  So for the electric personal lift, what's the cost

25  and the frequency, please?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 130 of 225

1   A.   That's going to be replaced on average every six years.

2   Q.   What cost?

3   A.   At 1,850, so $1,850.

4   Q.   And the body slings for lifting her when she gets larger.

5   A.   Right.  We have two allotted so that if one's being washed

6   the other can be used, and those are 337 for the pair, and they

7   would replace every 2 years.

8   Q.   All right.  And the wheel -- the shower chair, commode

9   chair.

10  A.   Right.  That's going to be replaced, again, with durable

11  medical equipment about every 5 years, and it's at a cost of

12  $507.

13  Q.   The electric bed?

14  A.   It's going to be 2,500, and that's replaced every 10 years.

15  Q.   Feeding pump?

16  A.   The feeding pump is ongoing.  It would replace every 2

17  years, and it's $1,087.

18  Q.   Suction machine?

19  A.   Suction for the respiratory program is $285.

20  Q.   How often, please?

21  A.   Pardon?

22  Q.   How often?

23  A.   Oh.  We're going to replace that every two years as well.

24  Q.   Pulse oximeter.

25  A.   Pulse oximeter can be replaced every 5 years, and it's

1  going to be 1,120.

2  Q.   What is a concentrator?

3  A.   That's for oxygen use.  A lot of physicians have gone to

4  concentrators instead of, you know, full tanks of oxygen because

5  a concentrator will take in room air and concentrate down the

6  oxygen, and then that's what's delivered to the individual.  And

7  so people don't have to store oxygen tanks and, you know,

8  portable, all of that.

9  Q.   And the cost of that, please?

10  A.   That is going to be replaced every 5 years, and it's 1,916.

11  Q.   And the nebulizer.

12  A.   Nebulizer for those aerosol medications is going to be

13  replaced every 5 years, and it's at a cost of 95.

14  Q.   Okay.  Now, the next item in this category you've

15  characterized is a barrier-free home.  Tell the jury about that,

16  please.

17  A.   Given all of the equipment, given the fact that wheelchairs

18  don't deal well with stairs, the -- Jeanine's family needs to

19  have a barrier-free home which is going to translate to a

20  ranch-style home that has enough bedrooms so that she can have

21  her own bedroom.  Currently she's been sharing with her brother,

22  and he tends to wake up any time she needs care.  They need to

23  have room to store equipment.  The small bits of equipment, the

24  suction, the pulse ox, those kind of things can be in the room

25  with her because they're smaller and they're used all the time.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 132 of 225

 1   But some of the larger pieces of equipment, the lifts, things

 2   like that, need to be stored in another room.  And so there is a

 3   range of where houses were at the time that I put this cost

 4   estimate in.  I talked to a real estate agent, and the cost of

 5   homes were ranging anywhere from 185 to 290,000 in the Sioux

 6   City area for a ranch-style home.

 7          And I do clarify down below because we live in an area

 8   that has inclement weather and sometimes people have to access

 9   basements, and so even if a basement is there, she would either

10   need to have a platform lift that would allow a wheelchair to

11   get on to it and have battery access to get down and/or an

12   elevator lift if it's appropriate for the structure of the home.

13   Q.   You're talking about tornados?

14   A.   Yes.

15   Q.   All right.  Are those costs incorporated in the figure that

16   you gave us for the home?

17   A.   No.  Those would be in addition, and a platform lift is

18   going to be replaced about every ten years.  It's a little over

19   $11,000.  If they do a home elevator -- and it would be one or

20   the other, not both -- that would be approximately $25,000.  And

21   replacement factors on those were given to me at 15 years.

22   Q.   All right.  How about the residential generator?

23   A.   Because she has feedings that can run on battery for a

24   little while but not long-term feeding pumps because she has

25   suction equipment that she has to use multiple times per day, a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 133 of 225

1   residential generator has been recommended every 10 years, and

2   that's at a cost of $5,750.

3   Q.   Okay.  What is the next category, please?

4   A.   These are the medications and supplies that Jeanine would

5   need to use.  So it goes through each of her medications, for

6   antiseizure medications, muscle relaxants, her gastrointestinal

7   issues, and the bowel/bladder program.

8   Q.   Just give us a list of the different medications here,

9   please.

10  A.   She has been on phenobarbital, topiramate, clonazepam,

11  Lasoprol, MiraLAX.  She gets a Fleets pediatric enema

12  periodically.  Albuterol sulfate is one of the medications that

13  she breathes in to help her lungs stay open and work.  She uses

14  sterile water and PediaSure.  And then other items are the

15  feeding pumps, the G button that needs to be replaced

16  periodically, and the tubing that corresponds with that as well

17  as the mouth swabs and the suction wands, suction canisters,

18  suction tubings that allow that suction machine to work.  She

19  also is still wearing diapers, and so there are diaper wipes,

20  gloves, and there's a stipend for cleaning agents, bleach,

21  Purel, those kind of things too.

22  Q.   Have you -- rather than go through all of these, have you

23  totaled them up by chance?

24  A.   I actually don't have a total.  I would guess Jerry Sherman

25  had that.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 134 of 225

1  Q.   Okay.  Well, we'll look to Dr. Sherman's summary chart for

2  that.

3  A.   And that would be for those medication and supply totals.

4  Q.   What's your next category, please?

5  A.   This is the category that talks about home or facility care

6  for an individual who needs personal assistance.  So I have a

7  couple of options here.  Right now Jeanine's family does a lot

8  of her care, but she does have nurses that come in, therapists

9  that work with her.  Option 1 in the life care plan is looking

10 at a licensed practical nurse which is an L.P.N. and providing

11 home healthcare for Jeanine eight to ten hours per day five to

12 seven days per week.  So that's an average of nine hours, six

13 days a week.

14         When I called for facilities, I got an average of $41

15 per hour.  And that translates to $115,128.  It also needs to be

16 coupled with respite services for this family.  Because they

17 take so much care of Jeanine and they are up at night and they

18 have daytime care, evening care, they need to have respite

19 services of at least 48 hours per month when they are away from

20 child care, caregiving activities.  And that would require an

21 L.P.N. to come in, again, at $41 per hour, and that's 23,616 per

22 year.

23 Q.   Okay.  So that's option 1?

24 A.   That's option 1.

25 Q.   And what is option 2, and how do they differ in concept?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 135 of 225

1    A.    Option 2 is if we have parents who are unavailable, if

2    something happens to the parents or if they are burned out and

3    know that, you know, they just don't feel like they can continue

4    providing care, then that means care needs to come in to Jeanine

5    full time which is going to be 24 hours a day.  She needs care

6    arbitrarily at night at any given point in time.  She needs it

7    through the day.  She has to have a caregiver with her at

8    school.  So this is going to be 24-hour care 7 days a week.

9    Again, it needs to be a licensed practical nurse, and it's $41

10   an hour, and that translates to $359,160 per year.

11   Q.    And both options would be for her life, would they not?

12   A.    They would be.

13   Q.    Okay.  And then your next category.

14   A.    This is her future medical care that is routine care.  So

15   this does not include any surgeries that may occur.  For

16   instance, you would know she had a shunt placed.  If a shunt

17   needs to be placed, that is not included here because that would

18   be something that would occur at any given point in time, and at

19   this point in time they have not had to do that.  So this is

20   where I've talked to some of the primaries and asked about how

21   often they would continue to see her as a patient in their

22   clinic.  And her pediatric doctor who's her primary said that he

23   would probably see her three to four times per year and as

24   needed so there are other visits that may be required in there.

25              Average cost was $70 per visit, and so that translates

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 136 of 225

1   to $245 per year.

2   Q.   Don't all children have to see their pediatrician?

3   A.   They do.

4   Q.   So does this pay for that or not?

5   A.   This is actually -- when I asked the questions, it was

6   beyond the parameters of normal healthy child care maintenance.

7   Q.   All right.  How about the dentist charges you have here?

8   A.   The dentist, I did clarify that.  Two times per year he

9   said would still be fine, and because that's routine care for a

10  child and also for us adults, then I do not have charges set

11  aside there.

12          However, he did say that she would probably need

13  additional restorative care.  It can be done on an outpatient

14  basis, but it does include anesthesia so she would be calm

15  enough for him to work and help restore those teeth.  He's

16  estimating that probably at the age of 8 and then again every 3

17  to 5 years.  As long as she's still getting good oral hygiene at

18  home, probably they would have to do it again.  And right now

19  that's currently running at $10,650.  That includes the dental

20  fees.  It includes the facility and the anesthesia fee.

21  Q.   Is this a need that she has that ordinary children wouldn't

22  have?

23  A.   Correct.

24  Q.   Why?

25  A.   You know, she has so many secretions that she has a hard

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 137 of 225

1  time managing that it's very difficult to keep her mouth clean.

2  She is tube fed primarily, but she will do some small bites of

3  food during the day.  But again, that is debris then that has to

4  be cleaned from the mouth that she's incapable of doing on her

5  own.  So she needs to have somebody provide that for her in the

6  meantime.

7  Q.   You have a line for gastroenterologists.  Why is that

8  there?

9  A.   You know, gastroenterology, it's two times per year, and I

10  did just do another follow-up with Megan, and so it may be one

11  to two times per year at this point mostly because she has that

12  gastro button that the feedings go through.

13  Q.   What is a gastro button?

14  A.   It's a little device that sits up on the top of the

15  stomach.  It actually goes down into the stomach with tubes and

16  provides those feedings.  The feedings are connected to it by

17  tube each day, and they are provided through that pump.  And so

18  she needs to maintain that.  It can be --

19  Q.   Is that a lifetime need?

20  A.   At this point in time, yes.  They told me that they don't

21  anticipate that it would be removed.  And so I have indefinite

22  there, and, again, it would be one to two times per year, and

23  the visits are 500 each time, and that's for the physician's

24  office to replace that button.

25  Q.   You have optometrist.  What about her illness creates a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 138 of 225

1  special need for optometry care?

2  A.   When I talked to them, they had said that because she has

3  some astigmatism and she does wear glasses, she's a child.  She

4  tends to get those glasses easily.  But they talked about the

5  fact that he should see her at least once a year where normal

6  care would be, you know, every two years most people would go in

7  to see or go in to have an eye exam.  But he said that through

8  the age of 29 he would see her one time per year, after the age

9  of 30 every 2 years for routine care.  There's no charge for the

10  adult routine care, but the extra visit of one time a year is

11  $83 per year.

12  Q.   Neurosurgery.

13  A.   Neurosurgery is indefinite, and that is for evaluations to

14  check that shunt placement, and then neurology is also another

15  component that would be 2 to 3 times per year at a charge of 296

16  per visit or 740 per year, and that's -- they're going to check

17  some medication blood levels to make sure that her meds are, in

18  fact, meeting her needs, particularly through growth parameters.

19  Q.   All right.  Medical case manager, explain that, please.

20  A.   A medical case manager is usually in the nursing field who

21  is going to come out and help provide communications to the

22  various providers, help ensure that Jeanine's family is getting

23  to, getting from, getting access to the resources that they need

24  and in and out of appointments, kind of keep everybody on the

25  same page if you will.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 139 of 225

1  Q.   And the cost?

2  A.   We estimate at this point in time 1 to 5 hours per month,

3  and it would be $85, so it would be just a little over 3,000 per

4  year.

5  Q.   Okay.  For life.

6  A.   For life.

7  Q.   And the next category, please.

8  A.   This is travel and transportation.  So it's looking at

9  vehicles in order to meet Jeanine's needs.  She's getting to the

10 point and -- you know, where she's getting heavier to lift and

11 can't necessarily be lifted from a wheelchair into a car seat.

12 So when the family makes that choice that they're done doing

13 that and need to have a vehicle that they can get a wheelchair

14 into with Jeanine still in it, it would look at a modified

15 vehicle.  A van is usually the most appropriate.  The life care

16 plan knows that most people have a purchasing power of having a

17 vehicle.  So it's not the cost of the vehicle but the cost of

18 the modifications that are included in the life care plan.  So

19 whether it's a lowered floor, a raised roof, an electric ramp to

20 come down so they can get her on, wheelchair tie-downs, those

21 are all necessary and required in order to get her into that

22 van, provide the safety, and be able to transport her.

23 Q.   The cost, please.

24 A.   Approximately every 7 years, and that's just because they

25 kind of look at new car replacement on an average of 7, and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 140 of 225

1  that's $20,000 for modifications.

2  Q.   So Mom and Dad buy the vehicle, but this buys the

3  modification.

4  A.   This takes care of modifications, and I will say 20,000 --

5  I write a conservative life care plan.  At this point in time

6  I'm seeing 25 to 30 more commonly.

7  Q.   All right.  The next category.  Maybe this is the last

8  category.

9  A.   This is health and strength maintenance.  And it kind of

10 addresses those emotional needs as much as you can.  It's a

11 stipend.  It's every year.  It's $1,200.  And that's going to

12 allow to replace items that Jeanine plays with most frequently,

13 some of those items that help her communicate or can facilitate

14 her being out in the community with a caregiver.  That will help

15 offset some of those costs.

16 Q.   Have you made any judgment or reach any opinion about her

17 life expectancy?

18 A.   I would leave life expectancy up to physicians, and I did

19 not have physicians, treating physicians, when I talked to them

20 that stated what it would be to me.

21 Q.   So no matter how long she lives, these are her needs.

22 A.   These are her needs, and, again, it's conservative, so

23 there may be more that comes into play that we just can't

24 foresee at this point in time.  But that life care plan can be

25 adjusted for those things as needed, and that's why it's nice

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 141 of 225

1    for the treating professionals to have them and work with them.

2    Q.   Now, the issue about the home facility care, the ranch home

3    and what have you, did you consider the option of Jeanine simply

4    going into some sort of an institution, institutional setting?

5    A.   I know sometimes people ask if that's something that I

6    figure into a life care plan, and I don't.  And the reason for

7    that is is that most of the time when I'm talking to parents and

8    I'm asking about their goals and what they'd like, they don't

9    bring up the fact that they would like to see their child in a

10   facility.  They want to keep caring for the child in the home

11   even if it means bringing people in.  And if Mom and Dad are not

12   available, in this case Jeanine also has brothers, one that's

13   the same age, one that's older, and if she needs to have private

14   care in her own setting, that care can come in, and that's part

15   of that option two, and somebody to oversee would be brothers as

16   they get older.

17   Q.   Are you aware of any research or data on how people do

18   relatively in an institution versus a home setting?

19   A.   You know, I can't speak to specific data, but I would say

20   that I think we all know that just from everything we hear, see,

21   and read that, you know, it's not a preference to be in a

22   nursing home facility.  And assisted living is a great resource,

23   and people are very pro assisted living, but that's also people

24   who are independent and still get to make decisions and things

25   like that.  And in Jeanine's case that's not how it would go.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 142 of 225

1   Q.   Have we covered all of your opinions and conclusions?

2   A.   We have.

3            MR. KING:  Thank you very much.

4                         CROSS-EXAMINATION

5   BY MR. GRAY:

6   Q.   Ms. Pollard, my name is John Gray.  We haven't met, at

7   least recently, have we?

8   A.   No.

9   Q.   All right.  I'm just -- I'd just like to ask you a few

10  questions to clear up your qualifications.

11  A.   Okay.

12  Q.   Do I understand you left the day-to-day staff nursing care

13  in about 1997?

14  A.   I did.

15  Q.   Okay.  And so you don't provide direct nursing care any

16  longer; is that correct?

17  A.   No.  I rely on my nursing education, and I do maintain an

18  active license.

19  Q.   Now, since 1997, you have done life care planning, but have

20  you also done other types of case management, for example, in

21  worker's compensation?

22  A.   I have done some case management.  I don't do it as a rule.

23  I have a couple of cases that I had worked with from when I was

24  with Stricklett and Associates, and they are long-term cases, so

25  it's really just maintaining that file.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 143 of 225

1   Q.   You're not a medical doctor; is that true?

2   A.   Correct.

3   Q.   And you don't prescribe any medications; correct?

4   A.   Correct.

5   Q.   You're certainly not an expert in infectious disease.

6   A.   No.

7   Q.   And you don't perform investigations of the illness for

8   which you provide a life care plan, do you?

9   A.   As far as if I'm not familiar with it, I do try to read

10  some about it.  But I am doing research on what the needs are

11  from the time that I go out and see someone in their home and

12  those projections and coordinating with their care providers.

13  Q.   So, for example, you don't -- as in this case you wouldn't

14  be offering an opinion as to the cause of Jeanine Kunkel's

15  condition.

16  A.   No.  I won't speak to causation.

17  Q.   I was curious.  You said you have done a life care plan.

18  Am I correct that the life care plan you're talking about here

19  today was done on August 31 of 2012?

20  A.   It was done August of 2012.  And I have touched base with

21  Mom again just to make sure that we were still pretty much on

22  point with it.

23  Q.   All right.  But it's fair to say as you said in your direct

24  testimony I believe that the life care plan can be changed and

25  updated.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 144 of 225

1    A.    It certainly can.

2    Q.    All right.  And that would be because certainly sometimes

3    the underlying facts can change.

4    A.    If -- from my standpoint, if there are medication changes

5    that are drastic, there may be some subtleties there, but what I

6    have is still representative at this point but equipment and

7    things like that.  And if there's another situation that has

8    come up, then that can be addressed at the time as well.

9    Q.    Well, I would certainly think that since 1997 there have

10   certainly been changes and advancements in how medications are

11   prescribed.  Is that fair to say?

12   A.    Sure.

13   Q.    And certainly differences in the way that people are taken

14   care of for different conditions in the 17 years you've been

15   doing this.  There have been advances, haven't there?

16   A.    In medicine in general.

17   Q.    Sure.  And certainly there have been changes in costs, some

18   higher, some lower as time goes on.

19   A.    True.

20   Q.    Now, since the time of your life care plan in August of

21   2012 -- and I think you've just said this -- that the

22   medications could have changed and the costs could have changed.

23   Is that fair to say?

24   A.    They can change.  When I spoke with Mom, we went through

25   the list, and she agreed that those were still appropriate.  And

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 145 of 225

1  most of the costs when I went through and was spot checking

2  looked like they were still pretty good.  There are times when

3  costs can change and reduce only because something may go

4  generic and that may take place.  But by and large medical costs

5  tend to inflate at a higher rate so . . .

6  Q.   Very good.  You would agree with me too that at the time

7  you did your life care plan in August of 2012 you had some

8  one-time costs; correct?

9  A.   As far as the projected evaluations specifically, yes.

10  Q.   Sure.  And if those had been done since the time of your

11  life care plan, those would be now past costs rather than future

12  costs; correct?

13  A.   If the psychological evaluations have taken place, then at

14  that point in time they can come out of the life care plan

15  unless there's a period of time when they're not doing

16  counselling at all, and then a provider would expect to have

17  another evaluation in place.

18  Q.   The largest part of your life care plan would be this

19  discussion about the home facility care.  That would be correct,

20  wouldn't it?

21  A.   Yes.

22  Q.   All right.  And if I understand correctly, there were two

23  options you posited -- you suggested.  One of those is fairly

24  similar to what's occurring with the family at the present time.

25  That's option number 1?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 218  Filed 10/15/14  Page 146 of 225

1   A.   It's similar, yes.

2   Q.   And I think the difference was the amount of in-home

3   nursing care you suggested versus what Dr. Beck suggested, for

4   example.

5   A.   And at this point in time -- Dr. Beck was no longer

6   providing care for Jeanine.  She had moved to Dr. Joyce.  But

7   yes, this is the time factor that's a little bit broader than

8   what she was getting at the time.  I believe they were doing

9   approximately six hours a day at that time.

10  Q.   And, Ms. Pollard, that option number 1, though, is

11  certainly much closer to what's occurring with the family today

12  than option number 2.

13  A.   At this point in time, yes, it is.

14  Q.   In option number 1, Jeanine lives at home.  Her family

15  takes care of her.  A licensed practical nurse provides some

16  in-house care, and there is some respite treatment; correct?

17  A.   Correct.

18  Q.   And what you're suggesting would be pretty much the same

19  thing, although you would increase the amount of nursing care

20  and the amount of respite.  Do I understand correctly?

21  A.   Respite is typically recommended at -- for life care

22  planners at a minimum of 48 hours per month.  I did extend the

23  daily time because I think for a family they need that.  You've

24  got to be able to try to avoid burnout with a family, and so you

25  need the supportive services which includes additional home care

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 147 of 225

1  coming in as well as some of the counselling provisions in order

2  to avoid that burnout if at all possible.

3  Q.   Now, your second option, if I understand correctly, that's

4  if the family is no longer willing or able to provide care to

5  Jeanine.

6  A.   Correct.

7  Q.   And in your second option, that involves only Jeanine

8  receiving care in her home with either the family gone or

9  uninvolved with her; is that correct?

10 A.   It actually can be either.  I mean, Mom and Dad can be at

11 home or coming and going from home, and Jeanine would need to

12 have somebody with her to provide care 24 hours a day.  They

13 could make that option now.  But also as they get older and if

14 someone gets hurt or is unavailable, then it becomes of

15 paramount importance to have 24-hour care available for her

16 needs.  So whether it's in that home or if it's -- if it's in a

17 separate home as she's an adult, then 24-hour care can be

18 provided.

19 Q.   And that would cost I think by your testimony about

20 $359,000 per year; is that correct?

21 A.   I'll double-check.

22 Q.   Thank you.

23 A.   Yes.

24 Q.   And if I understand from your math, that's about 85 percent

25 of the costs that you project per year for Jeanine Kunkel;

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 148 of 225

1  correct?

2  A.    I'm not sure of the exact percentage.  I leave that up to

3  the economists because they look at the inflation factors.

4  Q.    Now, you and Mr. King had a discussion about group homes.

5  I understand that you don't like group homes; is that right?

6  A.    You know what?  It comes down to almost always when I talk

7  to parents that is not a goal that they seek for their child.

8  They want to keep their child in the home or have someone

9  provide care to their child in a home setting, not in an

10  institution.

11  Q.    And let's break that down.  Many times the parents would

12  like to have the child in the home with them; correct?

13  A.    Yes.

14  Q.    And sometimes the parents are unable to have the child in

15  the home with them.

16  A.    True.

17  Q.    And at that point group home might be an option; correct?

18  A.    It's an option.  It just doesn't tend to be the one that

19  people will agree to because they would rather have 24-hour care

20  for that child, individual right there.  They feel like it's

21  better quality care.

22  Q.    Okay.  Maybe we're at cross purposes.  I think what I'm

23  saying is the parents have made the decision they no longer can

24  or will take care of the child.  At that time wouldn't group

25  home care be a reasonable option?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 149 of 225

1  A.   It is an option, and again, when I've talked to people

2  about that, that's not an option that they voice that they want

3  to do, though.

4  Q.   Well, there are group homes available in Sioux City, are

5  there not?

6  A.   There are -- there are group homes available.  It depends

7  on how severe the person is as to, you know, qualifications in

8  order to get into them.

9  Q.   And group homes are certainly less expensive than option

10 number 2, are they not?

11 A.   Last time I checked options for group homes, they were

12 getting more and more expensive.  It may be less than option 2,

13 but it's going to be closer to option 2 than option 1.  They're

14 raising their rates consistently too.

15 Q.   Are you familiar with Camp High Hopes here in Sioux City?

16 A.   I am aware some of High Hopes, uh-huh.

17 Q.   And what is your understanding what Camp High Hopes

18 provides?

19 A.   I think that it's more community-based living if I'm

20 thinking of the right place.

21 Q.   Well, I don't know that you are.

22 A.   Okay.

23 Q.   But group home care facilities often have multiple

24 caregivers on staff, don't they?

25 A.   Frequently.  The ones that I've checked do.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 150 of 225

1   Q.   And group home care provide 24-hour care and monitoring?

2   A.   They can, yes.  I mean, it depends because some of them

3   have people that are there and providing care within a home

4   setting or within that group home setting and they have multiple

5   people in that home who live there.  But then they may have day

6   facilities that they go out to within the community.

7   Q.   When you talk about respite, sometimes respite is provided

8   by group homes, is it not?

9   A.   There can be day programs that I've seen that provide some

10   respite care.

11   Q.   And oftentimes these group homes provide transportation for

12   the individuals that are residents of the group home?

13   A.   Some of them that I've checked do.  I can't say that they

14   all do but . . .

15   Q.   And don't you -- would you agree with me that in your

16   research you've found group homes that provide transportation

17   for their residents to doctor appointments, to school?

18   A.   Some of them do, yes.

19   Q.   And that would give -- in a group home the individual who

20   has a disability has the opportunity to interact with other

21   persons with disabilities.  Is that fair to say?

22   A.   Generally speaking, yes, within that group.

23   Q.   Now, I thought I heard you say in your testimony that the

24   public school system or the state through the public school

25   system provides services to Jeanine Kunkel at least until the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 151 of 225

```
1  age of 22.  Is that accurate?
2  A.   I believe it's 21.
3  Q.   21.
4  A.   Uh-huh.
5  Q.   Until she turns 22?
6  A.   Yes, through 21 to age 22.
7  Q.   Are you familiar with --
8        MR. GRAY:  Or, Your Honor, may I approach with Exhibit
9  141?
10       THE COURT:  You may.  Thank you.
11 BY  MR. GRAY:
12 Q.   And, Miss Pollard, I'd just ask you to look at the very
13 first page of Exhibit Number 141.
14 A.   Okay.
15 Q.   And could you tell us is that a letter, ma'am?
16 A.   It is.
17 Q.   And that's -- and who is the letter from?
18 A.   It is from the Iowa Department of Human Services.
19 Q.   And what was the date on the letter again, please?
20 A.   November 21, 2013.
21 Q.   And does that letter state the amount of expenditures that
22 have been incurred on behalf of Jeanine Kunkel?
23 A.   It does.
24 Q.   And what is that amount, ma'am?
25 A.   The amount of medical expenditures to date is $303,736.50.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 152 of 225

```
 1              MR. GRAY:  Thank you, Your Honor.  At this time I have
 2    no further questions for this witness.
 3              THE COURT:  Thank you, Mr. Gray.
 4              Mr. King?
 5              MR. KING:  Nothing further, Your Honor.
 6              THE COURT:  Okay.  Are there any questions from the
 7    jurors for this witness?  Doesn't look like it.
 8              You're excused.  Thank you.
 9              Mr. King, would now be an okay time to take our last
10    recess for the day?
11              MR. KING:  It's a perfect time.
12              THE COURT:  Okay.  Thank you.  Members of the jury,
13    we'll be in recess until 12:45.  Thank you.
14              (The jury exited the courtroom.)
15              THE COURT:  Anything we need to take up?
16              MR. KING:  No, Your Honor.
17              THE COURT:  Okay.  Thank you.
18              (Recess at 12:18 p.m.)
19              THE COURT:  Okay.  Ready for the jury?
20              MR. RATHKE:  Yes, Your Honor.
21              THE COURT:  Okay.  Thank you.
22              (The jury entered the courtroom.)
23              THE COURT:  Thank you.  Please be seated.
24              And, Mr. Rathke, you may continue your examination.
25              MEGAN SURBER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 218  Filed 10/15/14  Page 153 of 225

                        CONTINUED DIRECT EXAMINATION

1

BY MR. RATHKE:

2

Q.  Miss Surber, I'd like you to take us right to the present

3

time, and I'd like you to tell the jury what Jeanine can do and

4

what she can't do.  And let's start out with the subject of

5

movement.  What parts of her body can Jeanine move in a

6

purposeful manner?

7

A.  Her movements, she can move her left arm.  She can

8

constantly go like this.  She can grab anything, whatever she

9

wants.  If she does grab it, she doesn't hold it very long.

10

        Sorry.

11

        THE COURT:  Thank you.

12

A.  Sorry.  I'm trying to show --

13

        THE COURT:  Right.  It's hard with the microphones in

14

front of you.

15

A.  -- and talk at the same time.  Can you hear me?  Okay.  She

16

can move her left arm whichever way she wants.  If she wants to

17

grab something, she'll grab it.  If she has a good vision to it,

18

she'll grab it.  She'll let go of it for a little while.  She

19

can do that all day long.

20

        Her eyes, her eyes bounce when she looks this way or

21

this way.  Her eyes kind of go different ways so they have a

22

bouncing to them, so she has to have like a good eye level to

23

you so she can actually see you.  And when she does connect to

24

you, she smiles.  She smiles all the time no matter what the

25

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 318   Filed 10/15/14   Page 154 of 225

1    circumstances.

2            Her legs, she can constantly kick, and that is the

3    strongest on that little girl.

4            She cannot sit on her own.  She cannot sit up on her

5    own from a laying position to a sitting position.  She has to

6    have help.  She cannot talk.  She cannot -- sorry.  She cannot

7    walk.  She cannot do anything on her own.  And this is a

8    continuous every day.  Every day she gets older, heavier, and

9    stronger in certain areas.

10   Q.   If -- if somebody puts her upright without any devices and

11   just holds her hands, you know, some six-month-old babies can do

12   that.  Can she stand up as long as she's being balanced?

13   A.   Not a full balance.  If you're holding her, she will

14   extend, and then she'll slump.  She doesn't -- she cannot -- on

15   her own she cannot.

16   Q.   When she's lying down, can she roll over?

17   A.   No.

18   Q.   To what extent can she talk or make sounds that have a

19   purpose?

20   A.   If -- purpose is if she wants to be in the conversation or

21   what's going on, she coos.  She has no words.  She coos, smiles,

22   or she'll coo louder than us normal talking so we can get her

23   attention.

24   Q.   Does she have any word at all?

25   A.   No.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 155 of 225

1   Q.   Like for food or water or anything?

2   A.   No.

3   Q.   Have you ever had a chance that she would -- recognizes

4   words that you use such as "Jeanine"?

5   A.   I believe so.  I believe she recognizes her own name and

6   certain things.

7   Q.   Now, does she go to school?

8   A.   Yes.

9   Q.   Tell us about her school at the present time.

10  A.   Well, I'm not in the classrooms with her so . . .

11  Q.   Well, I understand, but where does she go?

12  A.   She goes to Spalding School on Gordon Drive; off Gordon

13  Drive I should say.

14  Q.   And is she capable of learning anything at the school?

15  A.   I think she's capable of anything that she would like to

16  learn.  If you put something in front of her, she would be

17  certainly glad to try it.  As f -- it's kind of hard to . . .

18  Q.   Can she recognize letters or shapes?

19  A.   No.

20  Q.   Now, the school she goes to, that's a regular school?

21  A.   Yes.

22  Q.   And it has a special needs component?

23  A.   Yes.

24  Q.   How about her disposition?

25  A.   Rephrase that.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 156 of 225

1    Q.   Her mood.

2    A.   Her moods?

3    Q.   Is she happy, sad, angry?

4    A.   Oh, it varies throughout the day.  She's happy, and she

5    goes to school.  She's -- I'm told by the nurse that she's --

6    they're active, so they keep her active.  If she doesn't like

7    something or she's tired, she'll let you know.

8    Q.   How will she let you know?

9    A.   She will not focus on what they're trying to teach her.

10   She'll just ignore them, or she'll cry or just ignore them most

11   of the time.

12   Q.   What kind of devices do you have in the home now to help

13   with Jeanine?

14   A.   The only device we have in the home is her wheelchair and a

15   lift for the nurse and me to lift her from where we need to lift

16   her from, point A to point B.

17   Q.   So does the lift assist in getting out of bed and into the

18   wheelchair?

19   A.   Not very easily.  Yes.

20   Q.   You mentioned she's getting heavier.  How heavy is she now?

21   A.   She's 63 pounds.

22   Q.   And she's -- when will she reach six years old?

23   A.   She will be 6 years old April 14.

24   Q.   In a few months.

25   A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 157 of 225

```
 1   Q.   Is her size normal for a five-year-old girl?

 2   A.   Me personally, no.

 3   Q.   Do you think she's bigger or smaller?

 4   A.   She's growing too fast.

 5   Q.   Do you have any way of comparing her with other

 6   five-year-olds to . . .

 7   A.   Just with her brother.

 8   Q.   Okay.  What does she -- how does she differ in size from

 9   her twin brother?

10   A.   Oh, she's taller and heavier.

11   Q.   What problems are caused by her growing?

12   A.   Problems?  She has seizures.  She has growth problems that

13   we don't know of --

14   Q.   I mean for you in order --

15   A.   Oh, for me?

16   Q.   Yeah.

17   A.   Problems, she is too heavy to lift.  She's too heavy to

18   hold.  I can barely hold my own daughter.

19   Q.   What kind of vehicle do you have available?

20   A.   I have a van.

21   Q.   Has it been handicapped --

22   A.   Accessible?  No.

23   Q.   So when she's in the van, what's she sitting in?

24   A.   She sits in her car seat which she barely fits into.

25   Q.   Is that a regular conventional car seat for a
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 158 of 225

1  five-year-old?

2  A.   Yes.

3  Q.   Have any problems come to the fore of an unusual nature

4  recently?

5  A.   As to -- what are you saying?

6  Q.   As to her -- some hormone difficulties.

7  A.   Yeah.  I believe she's growing up too fast, and she's

8  developed quite soon to my knowledge.

9  Q.   Tell us exactly what you're talking about.

10 A.   Puberty.  She's -- her face is breaking out.  Her skin

11 breaks out.  She is developing boobs, and she has hair.

12 Q.   Pubic hair?

13 A.   Pubic hair.

14 Q.   Are you going to see somebody about that?

15 A.   Yes, I am.

16 Q.   Tell us about that.

17 A.   That was a long process.  Between talking to the

18 neurologist, just asking questions and he couldn't really answer

19 them, so he asked a friend of his, another doctor,

20 endocrinologist, to take an X-ray of her wrist to see what her

21 growth plates are.  And then we went home, and later for quite

22 some time I didn't hear nothing.  Went back to the doctors again

23 for a routine check-up and asked them again about the problem

24 and what to do with it.  And then he decided to get an

25 endocrinologist.  And then by the time I got an endocrinologist

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 159 of 225

1  and getting it all set up to an appointment, you're looking at

2  months that I could have done something.

3  Q.   So when's your appointment?

4  A.   Our appointment is on Monday.

5  Q.   Switching to another topic -- well, is there anything else

6  of significance that you think the jury should know about

7  Jeanine and her condition, present condition?

8  A.   Present condition?  You have to be aware of whether or not

9  she's having a seizure.  She does -- she doesn't eat by mouth,

10  so she does have -- she pretty much chokes on her own saliva.

11  She coughs a lot.  So we don't feed her by mouth.

12  Q.   Do you have anything to help her saliva, the saliva issue?

13  A.   Just make sure she's upright and just kind of watch her so

14  she does not aspirate because she will.  It's easily to do.

15  Q.   Can you tell when she's having a seizure?

16  A.   Not always.

17  Q.   Does she have seizures now?

18  A.   She hasn't had one in a while, so they've been sustained.

19  Q.   How long of a while?

20  A.   It's been a little while.

21  Q.   Twelve months?

22  A.   I'd say at least over a few months or so.

23  Q.   When she was having seizures, what would you see?

24  A.   She would tense up really bad top to bottom.  Her hands

25  would go like this, and her legs would just cringe.  She would

1  have -- her eyes would bounce, every -- her face would just be

2  all stiff, eyes would bounce, and then you would have to make

3  sure she's not choking so you would have to turn her over on her

4  side so the saliva could just run out.  First time I was scared,

5  didn't know what was going on.  So I did, you know, just what I

6  thought was right, turn her to the side and just made sure

7  everything was okay, and then she came out of it.

8  Q.   Does she take medication for her seizures?

9  A.   She takes two of them.

10 Q.   When she has a seizure, after the seizure's over, is there

11 any change in her abilities or moods?

12 A.   Yeah.  She slows down like she's gotta start all over.

13 Q.   Yesterday -- well, has Troy worked in a hotel?

14 A.   Yes, he has.

15 Q.   Yesterday one of the defense attorney brought up bedbugs in

16 your house.  When -- did you have some bedbug problems?

17 A.   Yes, I did.

18 Q.   When did that start?

19 A.   Do I really have to remember that?

20 Q.   Well, was it -- maybe how -- let's do this.  How old was

21 Jeanine when that occurred?

22        MS. GHEZZI:  Objection.  Leading.

23        THE COURT:  Overruled.

24 Q.   How old was Jeanine when you got the bedbugs?

25 A.   Let's see.  She's five now, so two years ago.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 161 of 225

```
1   Q.   Okay.  How long did that go on?

2   A.   Six months or more.

3   Q.   Would it be fair to say that that was quite the

4   inconvenience?

5   A.   Yeah.

6   Q.   Were you ever able to determine where the bedbugs came in

7   on?

8   A.   No.

9   Q.   Have you got -- did you get rid of them?

10  A.   Yeah.

11  Q.   Okay.  The defense attorney also thought it would be

12  appropriate to bring up the subject of head lice.  Did Jeanine

13  have some head lice?

14  A.   No, she did not.

15  Q.   Also brought up was the subject of fleas.  Did you have

16  some fleas in your house?

17  A.   Yes.

18  Q.   To what would you attribute that?

19  A.   One summer it was bedbugs.  The summer before the bedbugs

20  was fleas.

21  Q.   Do you have any idea where the fleas came from?

22  A.   No.  Well, animals.

23  Q.   An animal of yours or --

24  A.   Animals and outside.

25  Q.   Pardon me?
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 162 of 225

1    A.    Animals and outside.  It can be outside in your backyard.

2    Q.    Do you want to continue caring for Jeanine in your house?

3    A.    Yes, I do.

4    Q.    How long do you want that to continue?

5    A.    Until I die or she dies.

6    Q.    The defense attorneys have brought up the subject of a

7    group home.  Got any thoughts about a group home?

8    A.    No, absolutely not.  That is my daughter.

9    Q.    Is it possible for you to be employed while you're caring

10   for your daughter?  Can you work and still take care of your

11   daughter?

12   A.    No.

13   Q.    One of the defense experts is going to come in here and say

14   because of the bedbugs and Troy leaving for a while and so forth

15   that you're not capable of taking care of Jeanine.

16         MS. GHEZZI:  Objection, Your Honor.  Lacks foundation

17   on what someone's going to come in and say.

18         THE COURT:  Well, are you assuring me they're not

19   going to say that?

20         MS. GHEZZI:  I have to -- I have to confess I can't

21   remember exactly what he just read.  Can I look at it?

22         THE COURT:  Sure.  One of the defense experts is going

23   to come in here and say because of the bedbugs and Troy's

24   leaving for a while and so forth that you're not capable of

25   taking care of Jeanine.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 163 of 225

1  MS. GHEZZI:  That is not correct at all.  No one is

2  going to say that.

3  THE COURT:  Okay.  Well, I guess you could ask it as a

4  hypothetical question.  Or you know what?  Why don't you just

5  move on to another area.

6  MR. RATHKE:  All right.

7  BY MR. RATHKE:

8  Q.   Do you believe that you are capable of taking care of

9  Jeanine?

10  A.   Yes, I do, and I've been doing it for the last five years.

11  Q.   What kind of help do you need as you see the future?

12  A.   She's going to need --

13  Q.   No.  I mean you.

14  A.   Me?  I am gonna need some help.

15  Q.   What kind of help?

16  A.   In the expertise area that I don't know of.  I do know my

17  daughter, but I do -- I'm not -- I'm not medically.

18  Q.   Okay.  What kind of help are you getting now?

19  A.   The help that we have is a ill and handicapped waiver which

20  they provide me with an ultimate nursing, so I do have a nurse

21  during the day from 8:00 in the morning till 4:00 in the

22  afternoon, and they do take care of her.  At the same time I'm

23  learning, but again, I'm not a medical person.  I am not an

24  expert.  I know my daughter.

25  They also provide me, if it's capable, to upgrade the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 218  Filed 10/15/14  Page 164 of 225

1    home to suit her handicappedwise.

2    Q.   Could you use some changes in your home to make it easier

3    for you?

4    A.   Yeah, enough rooms so she could be able to be comfortable

5    by herself.

6    Q.   Have you made any modifications to the house to accommodate

7    Jeanine's special needs?

8    A.   What we could on our own.

9    Q.   What kind -- excuse me.  What kind of further modifications

10   do you need?

11   A.   We're going to need more space just for her.  She needs to

12   have a comfortable bed that is easily to get her in and out of.

13   She needs -- she needs equipment, things that I don't have right

14   now.

15   Q.   Okay.

16           MR. RATHKE:  I have nothing further.

17                     CROSS-EXAMINATION

18   BY MS. GHEZZI:

19   Q.   Good afternoon, Miss Surber.  We've never met before, have

20   we?

21   A.   No.

22   Q.   My name is June Ghezzi, and I represent Abbott in this

23   case.

24   A.   Okay.

25   Q.   I want to ask you a couple of questions related to the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 165 of 225

1   questions that your -- Mr. Rathke asked you this morning.  Can

2   you tell me how old are your sister's children?

3   A.   One is 14, and the other one, I believe, is 10.

4   Q.   And the one who's 14, is that a boy or a girl?

5   A.   Both, both of them are boys.

6   Q.   Oh, boys.  Okay.  And is the 14-year-old then older than

7   James?

8   A.   Yeah.

9   Q.   Okay.  I'm sorry, not James.  Forgive me.  Kevin.

10  A.   Yes.

11  Q.   Older than Kevin.

12  A.   Only by a few months, yes.

13  Q.   Okay.  Now, when your sister had her son who is 14, did you

14  ever feed him?

15  A.   I don't recall.

16  Q.   Okay.  I believe you testified that the baby -- Jeanine

17  slept in the nursery which was in the front room of the house;

18  correct?

19  A.   Yes.

20  Q.   Okay.  And I'd like to show you just a design sort of taken

21  from your hand sketch at your deposition.

22  A.   Yes.

23  Q.   Okay.  Have you had a chance to look at that?

24  A.   Yeah.

25  Q.   Does that resemble and is it similar to the design of your

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 166 of 225

1 home in 2008?

2 A.   Yes.

3 Q.   Okay.

4        MS. GHEZZI:  And, Your Honor, since we don't have --

5 this is a demonstrative, and it's not going to go back to the

6 jury, and since we don't have a projector, I'm wondering if I

7 can publish it to the jury by just showing it to them.

8        THE COURT:  It's demonstrative?

9        MS. GHEZZI:  Yes.

10       THE COURT:  Sure.

11       MS. GHEZZI:  I don't have a lot of copies, so I'll

12 maybe just . . .

13       THE COURT:  When you walk away from the podium, we

14 can't hear it, and the court reporter can't take it down.  Thank

15 you.

16       MS. GHEZZI:  Thank you, Your Honor.

17       THE COURT:  Matthew, can you help with the lavaliere

18 mike?  I think you have to have some magic or something.  He

19 seems to be the only one that can get it going.

20       MS. GHEZZI:  I'll just stand there and won't speak if

21 I walk.

22       THE COURT:  He's got it going.  Thank you.  That's

23 what it took.

24 BY MS. GHEZZI:

25 Q.   Okay.  And so, Miss Surber, if you look at that diagram in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 167 of 225

1  front of you, if we're looking at the front door, do you see

2  that?

3  A.    Yes.

4  Q.    The bedroom to the right, is that the big bedroom where you

5  slept with the -- Troy Kunkel, Jeanine's dad?

6  A.    Yes.

7  Q.    And then Jeanine was also in there?

8  A.    Yes.

9  Q.    Okay.  And then the kitchen is on the other opposite side

10  of the house; is that right?

11  A.    Yes.

12  Q.    Okay.  And then the basement, the way to get down to the

13  basement is that -- is that -- what looks like a break in the

14  outline on the left side of the kitchen; right?

15  A.    Yes.

16  Q.    And those lines going down, those are stairs going down to

17  the basement?

18  A.    Yes.

19  Q.    And so on the left side, the picture on the left side of

20  this page are the stairs going down to the basement; is that

21  right?

22  A.    Yes.

23  Q.    Okay.  So your older son Kevin had his bedroom down in the

24  basement; right?

25  A.    Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 168 of 225

1  Q.   Okay.  And when he came upstairs, he had to -- the only way

2  he could come upstairs is to come upstairs and then go through

3  the kitchen to go to the rest of the home; right?

4  A.   Yes.

5  Q.   Okay.  Now, I'm going to switch gears a little bit and go

6  back to when Jeanine was born and was in the hospital and she

7  had the visitors that you talked about earlier today.  Did your

8  sisters and did the relatives kiss Jeanine?

9  A.   I would imagine, yes.

10 Q.   Okay.  And I'm sure her dad, Troy Kunkel, kissed her;

11 right?

12 A.   Yes.

13 Q.   And you and Mr. Kunkel took Jeanine home on the afternoon

14 of April 17, 2008, to your home on McKinley Street; is that

15 correct?

16 A.   Yes.

17 Q.   Okay.  And I would like to show you just a little map we

18 have of your home at 2005 McKinley Street in Sioux City.  Is

19 that correct?

20 A.   Yes.

21 Q.   And does this dot here approximate -- and arrow approximate

22 where your house is?

23 A.   Yes.

24 Q.   And it's sort of near the corner of Hornick Street and

25 McKinley; right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 169 of 225

1   A.   Yes.

2   Q.   And the river as it says there that's depicted in this is

3   the Big Sioux River; correct?

4   A.   Yes.

5   Q.   Okay.  And you can see what you call the line dike from

6   your back -- the back of your house?

7   A.   Yes.

8   Q.   And do you know what the purpose of the line dike is?

9   A.   To keep the water in there.

10  Q.   Yeah.  Has it ever flooded since you've been in the home,

11  the river?

12  A.   No.

13  Q.   Has the river ever overflowed?

14  A.   Not to my knowledge, no.

15  Q.   Okay.  Now, your home that you -- you bought the home in

16  2004.  That was an older home, right, not a new home?  It was an

17  older home.

18  A.   New to me.

19  Q.   New to you, but the home itself was old.

20  A.   Old, yes.

21  Q.   Yeah.  Do you know when it was built?

22  A.   I believe papers say 1920s.

23  Q.   Okay.  And did you do any renovations in the home before

24  April of 2008?

25  A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 170 of 225

```
1    Q.    Before 2008, in other words, before Jeanine came home.

2    A.    On this diagram?

3    Q.    Yes.

4    A.    In the kitchen.

5    Q.    Okay.  And what did you do in the kitchen?

6    A.    That's a wall; right?

7    Q.    Which side are you pointing to?  Opposite the stairs?

8    A.    Uh-huh.

9    Q.    Okay.  Did you take down a wall?  You just can't keep --

10   you don't know what the date is.

11   A.    No.

12   Q.    Okay.  That's fine.  But at some point -- at some point --

13   at some point you did renovation.

14   A.    Yes.

15   Q.    Okay.  But when you moved in to the house, between 2004 and

16   2008, you didn't change out any of the carpeting, did you?

17   A.    2004, 2008.

18   Q.    That was the original carpeting?

19   A.    Yeah, yes.

20   Q.    Okay.  And Jeanine stayed in the home on McKinley Street

21   the whole week from April 17 through April 24; right?

22   A.    Yes.

23   Q.    Yeah.  You never took her out.  Okay.  And you were home

24   unless you went to visit James, Jeanine's twin, in the hospital.

25   A.    Yes.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 171 of 225

```
 1    Q.    Okay.  And so Troy Kunkel was home the entire week.

 2    A.    Yes.

 3    Q.    And he was there with Jeanine the whole week?

 4    A.    Yes.

 5    Q.    And he stayed at home almost the whole time?

 6    A.    Yes.

 7    Q.    Okay.  And when he was home, he picked her up and would

 8    hold her and cuddle her at times; is that correct?

 9    A.    Well, you're a parent.  You're gonna hold your kids.

10    Q.    Sure.  And he did.

11    A.    Yes.

12    Q.    Yeah.  And did he at some point give her any feeding?

13    A.    No.  He's never fed her.

14    Q.    He's never, ever fed her?

15    A.    No.

16    Q.    So you had just had a C-section, and you just had twins,

17    and you did every single feeding including all the night

18    feedings?

19    A.    He never fed her.  I can tell you that.  But as far as

20    myself, if I had somebody in the house, it wouldn't be him.

21    Q.    Yeah.  So somebody else --

22    A.    I --

23    Q.    Are you saying --

24    A.    Point is it wasn't him.

25    Q.    -- somebody else -- I'm sorry.  I keep talking over you.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 172 of 225

1   Please.

2   A.   Huh?

3   Q.   No.  Go ahead.  You said if you had somebody else in the

4   house?

5   A.   That would more than likely be my mother.

6   Q.   Oh, okay.  So your mother might have fed her?

7   A.   Might have.

8   Q.   Okay.

9   A.   I don't recall.

10  Q.   Okay.  Well, and when you went out to the NIC -- when you

11  went to the NICU to visit James, is it possible that either your

12  mother or maybe your sister fed her?

13  A.   No.

14  Q.   It's not possible?

15  A.   No.

16  Q.   And you went to see James three or four times that week in

17  the NICU?

18  A.   I would probably make sure it was times that I would feed

19  her before I would go.

20  Q.   Okay.  Now, I just want to get some of the family here.

21  Your -- is your -- is your mother's father still living?

22  A.   Yes.

23  Q.   And he lives with her; correct?

24  A.   She lives with him.

25  Q.   Oh, she lives with him, okay.  And how old is he now?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 173 of 225

1  A.   Old.

2  Q.   Do you know how old he is?

3  A.   No.

4  Q.   No?  Okay.  Now, when you went to Omaha to be with Jeanine,

5  Troy and you went with her; correct?

6  A.   No.  She was being life flighted while we went home,

7  packed, and drove.

8  Q.   Right.  And I misspoke, so I apologize.  After she was

9  there.

10  A.   After she was there it was me and Troy.

11  Q.   Right.  And James was back at home on April 24.

12  A.   Yes.

13  Q.   And your mother was -- was your mother staying with James

14  in your house, or did she take James --

15  A.   Yes.

16  Q.   -- to your -- to your grandfather's house?

17  A.   No, he stayed at home.

18  Q.   Okay.  And he stayed --

19  A.   He stayed at my house.

20  Q.   Your grand --

21  A.   My mother stayed at my house to take care of my son.

22  Q.   And so your grandfather stayed alone.

23  A.   Yes.

24  Q.   Okay.  During the first week home, you gave Jeanine one

25  bath; is that right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 174 of 225

1    A.    Sponge baths.

2    Q.    Bunch of baths, okay.  And her tub was on the kitchen

3    counter; right?

4    A.    Yes.

5    Q.    And you filled the tub using the water from the kitchen

6    faucet.

7    A.    Yes.

8    Q.    And you didn't sterilize that water before you bathed her;

9    right?

10   A.    No.

11   Q.    And the rest of the days you cleaned her with a washcloth

12   on her head and her bottom?

13   A.    Yeah.

14   Q.    And did you do that in the kitchen in the tub, or did you

15   do it someplace else?

16   A.    Kitchen.

17   Q.    Okay.  And when you did it in the kitchen, was she on the

18   kitchen counter in a tub?

19   A.    On the counter in the bathtub, yes.

20   Q.    Okay.  Now, James was in the NICU from -- I don't know if

21   you're going to remember these dates or not so -- April 16 until

22   he came home April 24; right?

23   A.    I believe to my knowledge of remembrance when it was time

24   to come home he ended up staying there from the 17th.

25   Q.    Okay.  So 17th to the 24th?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 175 of 225

```
1    A.    To my knowledge.

2    Q.    Okay.  And on the 24th that he came home was the same day

3    that you took Jeanine back to St. Luke's Hospital.

4    A.    Yes, yes.

5    Q.    And when you went to Omaha to stay with Jeanine, you and

6    Troy stayed there the entire time Jeanine was there; right?

7    A.    Yes.

8    Q.    You didn't come back and forth.  You stayed there with her.

9    A.    No, we stayed.

10   Q.    So on April 23, the evening of April 23, you knew that you

11   were going to go and pick James up the next morning from the

12   hospital; right?

13   A.    Yes.

14   Q.    Okay.  And who was going to go and pick him up?

15   A.    Me.

16   Q.    And that was prearranged.

17   A.    Uh-huh.

18   Q.    Okay.

19   A.    Yes.

20   Q.    And Troy was going to stay home with Jeanine.

21   A.    Yes.

22   Q.    Okay.  So you were up at midnight and 4 a.m. and then was

23   trying to feed Jeanine at 8:30 in the morning, and you went to

24   pick up James at what time on the 24th of April?

25   A.    Some time mid-morning.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 176 of 225

1    Q.    Okay.  Now, I want to -- let's go back to the diagram of

2    the home if you would, and I just want to ask you a few

3    questions about this.  The living room and the bedrooms on that

4    first floor were all carpeted; is that correct?

5    A.    Yes.

6    Q.    Okay.

7    A.    Yes.

8    Q.    All right.  And you didn't steam clean any of the carpets

9    before you brought Jeanine home, did you?

10   A.    I vacuumed but no steam clean.

11   Q.    Okay.  And you stored the vacuum cleaner in that storage

12   room off the bathroom that shows there as a closet?

13   A.    Yes.

14   Q.    Okay.  And there were also clothes stored in that closet;

15   right?

16   A.    Yes.

17   Q.    Yeah.

18   A.    Yes.

19   Q.    Okay.  And your kitchen doesn't have a dishwasher; right?

20   A.    No.

21   Q.    You have to do all the washing by hand in the kitchen sink.

22   A.    Yes.

23   Q.    And you never used a floor mop.  You used a Swiffer.

24   A.    Yes.

25   Q.    Okay.  And you kept the Swiffer by the refrigerator.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 218  Filed 10/15/14  Page 177 of 225

1  A.   Yes.

2  Q.   And then you had the dog's water bowl and food bowl on sort

3  of the other side of the kitchen up against a cabinet or

4  refrigerator maybe; right?  Let me show you -- excuse me.  I'm

5  going to hand you a diagram.  And after you've had a chance to

6  look at that, Miss Surber, can you tell me is that a depiction

7  of your kitchen in or about April of 2008?

8  A.   It's a kitchen but not my kitchen.

9  Q.   Well, is that the layout of your kitchen?

10 A.   Somewhat, yes.

11 Q.   Okay.  So the refrigerator's on the left side of the

12 kitchen.

13 A.   Yes.

14 Q.   And you have the cabinets above.

15 A.   Yes.

16 Q.   The countertop.  And there's a window over the sink.

17 A.   Yes.

18 Q.   You have a double sink; correct?

19 A.   Yes.

20 Q.   And then there's space on the countertop between the left

21 side of the sink and the refrigerator.

22 A.   Uh-huh.

23 Q.   Right?

24 A.   Yes.

25 Q.   And then you have cabinets underneath the sink.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 318   Filed 10/15/14   Page 178 of 225

1   A.   Yes.

2   Q.   And then there's an L-shaped countertop that goes from the

3   right side of the sink to the left side of the stove/oven;

4   right?

5   A.   Yes.

6   Q.   Then you've got the stove/oven; yeah?

7   A.   Yeah.

8   Q.   And then the dog bowl, the water bowl, and the food bowl

9   are right there sort of by the stove; is that correct?

10  A.   I wouldn't have it by the stove because that's the walk

11  area.

12  Q.   Okay.  Where do you think it was then?  We'll move it.

13  A.   Over by the fridge.

14  Q.   Okay.

15       MS. GHEZZI:  Your Honor, may I publish this to the

16  jury?  You'll have to pass it around.

17  Q.   Now, Miss Surber, that's the kitchen layout.  Let's just

18  talk a little bit then also about the basement which is on the

19  other demonstrative.  And the basement has a laundry area with a

20  washer and dryer; is that right?

21  A.   Yes.

22  Q.   Okay.  And you had -- in the area in the basement that you

23  set up for Kevin's bedroom, you had at some point carpets that

24  you had to pull up; right?

25  A.   Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 179 of 225

1   Q.   And you had some rugs, and you had to pull them up as well?

2   A.   Yes.

3   Q.   And this is all before Jeanine came home?

4   A.   Yes.

5   Q.   Okay.  And the reason why you had to pull them up is

6   because why?

7   A.   Because they would get dirty.

8   Q.   Did they get --

9   A.   And stained.  You're looking at a child in a basement.

10  Q.   Yeah.  And your basement was damp and wet; correct?

11  A.   Yes.

12  Q.   Okay.  And you also kept a freezer in the laundry room;

13  right?

14  A.   Yes.

15  Q.   And you stored food in the freezer including bread, meats?

16  A.   Yes.

17  Q.   And so when you brought them upstairs, you'd walk through

18  the basement, up the stairs, and into the kitchen and put them

19  in the refrigerator; right?

20  A.   Yes.

21  Q.   Okay.  Now, at some point in time, your house had mold

22  problems, right, mold in the walls?

23  A.   Around windows.

24  Q.   Okay.  And at some point in time when you took a wall out,

25  did you find mold all behind the wall?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 180 of 225

1   A.   Around windows when they leak and because they are cold

2   during the winter, I cover them with plastic.

3   Q.   Oh, okay.

4   A.   So it holds the moisture.

5   Q.   And so that creates the mold.

6   A.   Yes.

7   Q.   Okay.  And was that the situation in 2008?  Let's say from

8   2004 since you moved in until present day.

9   A.   We've done construction, yes.

10  Q.   Okay.  And in 2012 when the home video was done, you had

11  some plastic up on the walls and the doors, the openings?

12  A.   During constructions, yes.

13  Q.   Oh.  Is that when the construction was?

14  A.   During constructions we would have plastic up around doors

15  so when we were doing construction nothing would get out of that

16  room.

17  Q.   Okay.  And one of the -- one of the walls that you found

18  mold in was the bedroom where -- in the front of the house;

19  right?

20  A.   Yes.

21  Q.   Okay.  And that's the house -- I mean that's the bedroom

22  where Jeanine also slept.

23  A.   Yes.

24  Q.   Okay.  And in April of 2008 you had the pet terrier named

25  Lola?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 181 of 225

1    A.    Yes.

2    Q.    Okay.  And she stayed in the house.  She lived in the

3    house; right?

4    A.    Yes.

5    Q.    And she came and went in and out of every room.

6    A.    Yes.

7    Q.    Okay.  And she had flea issues, and you gave her up at some

8    point after Jeanine came home, right, after Jeanine came home

9    from Omaha?

10    A.    Some point after, yes.

11    Q.    Okay.  And back in 2006 you had -- tree roots broke into

12    your sewer line, is that right, in the basement, caused a little

13    backup in the laundry room?

14    A.    Yeah.

15    Q.    Okay.  And that was around the laundry drain, laundry room

16    drain; is that right?

17    A.    Yes.

18    Q.    Okay.  And did it go -- did it spread out beyond the

19    laundry room drain on the floor?

20    A.    In the area where it was supposed to.  If it goes overflow,

21    it stays in a certain area, groove as you put it.

22    Q.    Yeah.  And were you responsible for cleaning it up?  Did

23    you get a professional cleaner?

24    A.    You call a -- Roto-Rooter.

25    Q.    Yeah.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 182 of 225

1   A.   Yes.

2   Q.   To clean out the line.

3   A.   To clean out the line.

4   Q.   Yeah.

5   A.   I didn't --

6   Q.   But not to clean the floor.  I don't think they do that.

7   A.   No, I would be.

8   Q.   You'd have to do it, okay.

9   A.   Yes.

10  Q.   So you didn't have a professional come and clean the floor.

11  A.   No.

12  Q.   And I know it's a long time.  Do you remember what you

13  cleaned the floor with in the basement?

14  A.   I don't recall.

15  Q.   Okay.  Do you clean the basement floor a lot?  Like do you

16  go down there and wash it every month or . . .

17  A.   Sweep maybe.

18  Q.   Okay.  Your home uses the Sioux City municipal water;

19  right?

20  A.   Yes, yes.

21  Q.   And you never had the water quality in your home checked

22  before the twins were born, did you?

23  A.   No.

24  Q.   Okay.  And you had received orders from the city to boil

25  your water before April of 2008; right?

```
1    A.    I don't recall.

2    Q.    Do you recall being asked that question in your deposition

3    on July 5, 2012?

4    A.    I don't recall.

5    Q.    Okay.

6    A.    If you can show me.

7    Q.    I will.  I'm going to get it for you.

8             MR. RATHKE:  Page?

9             MS. GHEZZI:  124 and 125.

10   Q.    This is 124 and 125 if you just want to read it to

11   yourself, and I'll ask you questions.  It's on 124, and it's

12   lines 16 through 22.  And I'll just read it.  Does it say have

13   you ever had any -- sometimes -- this is the question.  My aunt

14   just got a notice that said for the next three days make sure

15   you boil your water.  Have you ever had something like that

16   happen while you were at the house?  Answer, oh, yeah.

17             Do you remember giving that answer to that question

18   when you were deposed?  The next question, 23 through 2, so

19   there had been times that the county or whoever tells you that

20   there needs to be something done to basically clean up the water

21   a little bit?  Answer, yes.

22   A.    Yes.

23   Q.    Okay.  Did you give those answers under oath on that day

24   during your deposition?

25   A.    Yes.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 212  Filed 10/15/14  Page 184 of 225

```
 1   Q.   Okay.  You can put it down.  Thanks.  And we learned this
 2   morning that Troy Kunkel is the cook in the family; right?
 3   A.   Yes.
 4   Q.   And the week that Jeanine first came home, Troy cooked all
 5   the meals; right?
 6   A.   Yes, yes.
 7   Q.   And you would typically eat a lot of meats, pork,
 8   hamburgers, steaks, chops, that kind of thing?
 9   A.   Yeah.
10   Q.   And that meat was kept in the refrigerator before cooking
11   it; right?
12   A.   Yes.
13   Q.   Okay.  And that's the same refrigerator that you would
14   store the bottles to feed Jeanine; right?
15   A.   Yes.
16   Q.   Okay.  And when you came home from the hospital after your
17   C-section, Troy and your son Kevin were in charge of the
18   cleaning of the home; right?
19   A.   Yeah.
20   Q.   And they cleaned the kitchen and the bathroom?
21   A.   Yes.
22   Q.   Okay.  And Troy and Kevin were also in charge of the
23   laundry in the basement.
24   A.   Yes.
25   Q.   Okay.  And they were also in charge of, I guess, cleaning
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 185 of 225

1   Jeanine's laundry, cribs, crib sheets, that kind of thing?

2   A.   Yes.

3   Q.   Okay.

4   A.   And they'd do it separately.

5   Q.   Okay.  Not at the same time as you'd wash the other

6   clothes.

7   A.   Yes.

8   Q.   Okay.  Now, Troy was sick in April of 2008; correct?

9   A.   I believe.

10  Q.   Yeah?

11  A.   Yeah.

12  Q.   Do you remember that before taking Jeanine in he was going

13  in, too, to St. Luke's around that time, April 24, 25?

14  A.   Him getting sick and going in there?

15  Q.   Right.  Do you remember that?

16  A.   Vaguely.

17  Q.   Okay.  And do you remember that he had a stomachache or

18  whatever and that when Troy got to the hospital Jeanine was

19  there as well and that they said that they were thinking he was

20  the host so they quarantined him?  Do you remember that?

21  A.   Yes.

22  Q.   And when you say host, you mean the host of the bacteria

23  that infected her?

24  A.   They assumed, yes.

25  Q.   Yeah.  And he was diagnosed with pneumonia at that time;

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 186 of 225

1  right?

2  A.    I believe so.

3  Q.    And when you say he had a stomachache, had he been

4  complaining of the stomachache?

5  A.    I believe so.

6  Q.    Now, I'm going to move on to something else.  When Jeanine

7  was discharged from the hospital, you were going to rely on

8  whatever formula the hospital gave you for her; right?

9  A.    Yes.

10  Q.    Yeah.  And you hadn't purchased any formula to use at home

11  before the twins were born.

12  A.    No.

13  Q.    And you didn't get any formula from anybody else to use

14  before the twins were born.

15  A.    No.

16  Q.    And so you were going to give them whatever the hospital

17  gave you.

18  A.    Yeah.

19  Q.    And do you remember that the ready-to-feeds -- the

20  ready-to-feed bottles were either -- in the hospital they were

21  in an eight-pack?  Do you remember that?  While she was being

22  fed in the hospital, they were in an eight-pack?

23  A.    Four-packs.

24  Q.    Okay.  I don't think we made four-packs.  Do you think it

25  could be a six --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 187 of 225

```
1              MR. RATHKE:  Your Honor --

2              THE COURT:  Yeah.

3              MS. GHEZZI:  Okay.

4              THE COURT:  That --

5              MS. GHEZZI:  All right.  I'll withdraw it.

6  BY MS. GHEZZI:

7  Q.   Could it be a six-pack?

8              THE COURT:  Well, wait a minute.  The jury's

9  admonished to disregard the statement of the lawyer.

10 Q.   Miss Surber, do you think it could be a six-pack?

11 A.   My knowledge is a four-pack.

12 Q.   Okay.  And they're four-packs of two ounces?

13 A.   One to two ounces ready-to-feeds, single use.

14 Q.   Okay.  And do you know how many four-packs you were given?

15 A.   I don't know exactly how many, no.

16 Q.   All right.  And during the week of April 17 when you were

17 home with Jeanine, you never purchased any additional formula;

18 right?

19 A.   No, I did not.

20 Q.   Okay.  And no -- neither you nor Troy went to WIC to get

21 additional formula.

22 A.   No.

23 Q.   And I believe this morning you said that you fed -- you

24 were feeding Jeanine about 7 times in a 24-hour period; right?

25 A.   Roughly.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 188 of 225

1 Q.   Okay.  And the ready-to-feed two-ounce bottles, before you

2 opened them, you stored them under the crib in the nursery in

3 the front of the house there; right?

4 A.   Yes.

5 Q.   And that was carpetted; right?

6 A.   Yes.

7 Q.   And that's where you stored the packages of the nipples as

8 well before you opened them?

9 A.   Yes.

10 Q.   Okay.  And the 32-ounce bottle that you used after you

11 finished up the single-feed bottles, you also stored that under

12 the crib in the nursery?

13 A.   Yes.

14 Q.   Before you opened it obviously.

15 A.   Yes.

16 Q.   And you prepared the feedings from the large bottle in the

17 kitchen; correct?

18 A.   Yes.

19 Q.   And it took you about 30 minutes to make the bottles?

20 A.   From the 32 ouncer?

21 Q.   Yes.

22 A.   Approximately.

23 Q.   Okay.

24 A.   Long enough to open it, open the seal.  It's already room

25 temperature.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 189 of 225

```
 1   Q.   Uh-huh.  And the bottles, some of the hand-me-down bottles

 2   you got, did you get them from your sister?

 3   A.   Sisters, yes.

 4   Q.   Your sisters?

 5   A.   Sister.

 6   Q.   And you -- for the 32-ounce feeds, you washed the bottles

 7   with hot tap water and soap using a bottle brush that you stored

 8   behind the sink; is that correct?

 9   A.   Yes.

10   Q.   Okay.  And that bottle brush that you stored behind the

11   sink was up against the back splash behind the sink; right?

12   A.   Or hanging up, yes.

13   Q.   And the sink is not stainless steel, is it, in your

14   kitchen?

15   A.   The ring of it.

16   Q.   The rim is?

17   A.   The rim is.

18   Q.   Yeah.  The sink itself is white, isn't it?

19   A.   Yes.

20   Q.   And what's the material?  Do you know?

21   A.   Ceramic?  I don't know.

22   Q.   Do you have the same sink today that you had in 2008?

23   A.   Yes.

24   Q.   Do you have the same back splash behind the sink?

25   A.   Yes.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 190 of 225

1  Q.   Do you have the same faucet and the same faucet handles?

2  A.   As of today, no.

3  Q.   You changed the faucet handles and faucet?

4  A.   Uh-huh.

5  Q.   Okay.  When did you change those?

6  A.   In the last few months.

7  Q.   Okay.  So after 2012 when the video was taken in your home.

8  A.   Yes.

9  Q.   Okay.  And you had the same window in 2008 that you had in

10 2012 when the video was taken in your home in the kitchen?

11 A.   When the video was taped, yes.

12 Q.   Okay.  Now, when Jeanine was in Omaha, you had a

13 conversation with someone from the Nebraska Department of Health

14 and Human Services; correct?

15 A.   I recall talking to somebody.

16 Q.   Yeah.  And that was -- and you were in Omaha at the time,

17 and Jeanine was in Omaha; right?

18 A.   Yes.

19 Q.   Okay.  And during that conversation, that person from the

20 department -- the Nebraska Department of Health and Human

21 Services asked you certain questions about the circumstances

22 surrounding Jeanine's infection including her feeding and how

23 you prepared your formula feedings; is that right?

24 A.   I remember the phone call, but I don't remember exactly all

25 the details.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 191 of 225

```
1   Q.   Okay.  Do you remember that you told the investigator over
2   the phone that you boiled tap water before mixing with the
3   formula inside the bottle and then you mixed the formula in the
4   bottle and then you reheated it in a pan to a boil?  Do you
5   remember telling him that?
6   A.   Do you have a document --
7   Q.   Uh-huh.
8   A.   -- I can see, please?
9            MR. RATHKE:  Exhibit number?
10           MS. GHEZZI:  I'm going to tell you right now.  It's
11  Exhibit 2012, and the page is 2012-006.
12           THE COURT:  Why doesn't everybody take a stretch
13  break.
14           Thank you.
15           MS. GHEZZI:  And, Your Honor, may I -- this is an
16  exhibit.  May I publish this to the jury since they can't see it
17  or no because it's going back?
18           THE COURT:  No.
19           MS. GHEZZI:  Okay.  Thank you.
20  BY MS. GHEZZI:
21  Q.   Okay, Miss Surber.  Have you had a chance to review that
22  document on the bottom?
23  A.   Okay.
24  Q.   And can you see what it says there, boiled water and let
25  come back to room temp and then added the formula mix and then
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 192 of 225

1  reheated to a boil and cooled to -- it looks like it's supposed
2  to say room temp?  Do you see that?
3  A.    I'm reading it.
4  Q.    Yeah.  I'm just saying do you see it?
5  A.    I see that, yes.
6  Q.    Okay.  And is that what you think you --
7  A.    I don't recall saying that at all.
8  Q.    Okay.  So the -- do you think that the department of -- the
9  man from the Department of Health and Human Services wrote that
10 down incorrectly?
11 A.    I believe so.
12 Q.    Okay.  Can you turn to page -- the bottom right-hand
13 corner, 2012-011.  Do you remember Mr. Rathke asking you some
14 questions about after you prepared some of the -- I think two of
15 the -- the nighttime feeds of powdered infant formula, one at
16 midnight and one for 4 a.m. in the morning, that you put it in
17 the refrigerator?  Do you remember giving that testimony?
18 A.    I don't recall, no.
19 Q.    And on page 2012-011, this says that --
20 A.    I would never boil formula.
21 Q.    This isn't about boiling formula.
22 A.    Anything -- I don't recall talking about any of this.
23 Q.    Okay.  This has to do with if given by bottle, the maximum
24 duration between refrigerator and completion of infant food, and
25 it says zero minutes.  Do you see that?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 193 of 225

1  A.    I see it.

2  Q.    Okay.  And did you tell the investigator that you did not

3  refrigerate the bottles that you made?  In other words -- in

4  other words, you fed them immediately after you made them, you

5  didn't store anything, you didn't store the powdered infant

6  formula in the refrigerator.  Did you say that?

7             MR. RATHKE:  If this is impeachment, I object.

8             MS. GHEZZI:  I'm just asking her if she remembers.

9  A.    I -- I don't recall writing anything.  I don't recall any

10  of this.

11  Q.    Okay.  That's fair enough.  I'm going to go to the 4 a.m.

12  feeding on the morning, early morning hours, of April 24.  Was

13  Jeanine -- did Jeanine become really off-the-wall whiney by 4:00

14  a.m. on the morning of April 29 (sic)?

15  A.    No.

16  Q.    Okay.  Do you have your deposition in front of you, a copy

17  of it?  I'm going to ask you to turn to page 294, please, and

18  lines -- are you on the -- let me know when you get there.  294,

19  and it's lines 5 through 8 or 1 through 8.  I'm going to read

20  it.  The answer, she had her first bottle at 9 p.m.  Her next

21  one was at midnight.  Next one was at 4.  Question, a.m.?

22  Answer, uh-huh, yes, and that -- and then the 4 is when she

23  started getting really, really off-the-wall whiney between 4 and

24  9 in the morning of the 24th.

25             See that?  Did you say that on that date, July 5,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 194 of 225

1  2012, when you were deposed in the case?  Is that what you said

2  on that date, Miss Surber?

3  A.   On that day.

4  Q.   Okay.

5  A.   Yes.

6  Q.   And then I'm going to go to 9 a.m. in the morning, and

7  that's when Jeanine refused the feeding, her first feeding;

8  right?  She refused to take her 9 a.m. feeding in the morning,

9  a.m.?

10 A.   What day are you talking about?

11 Q.   April 24.  She took the 4 a.m. feeding, and she didn't take

12 the next feeding or she -- right?

13 A.   8:30 in the morning on the 24th.

14 Q.   Right.

15 A.   She got up.  I fed her.  She was whiney, whiney than

16 normal, fussier than normal.

17 Q.   Did you state in your -- have you ever stated before today

18 that she didn't take her 8:30, 9:00 feeding?  You tried to feed

19 her and she wouldn't take?

20 A.   She ate.

21 Q.   A little bit.

22 A.   Yeah.

23 Q.   Okay.  She ate a little bit.

24 A.   She ate.

25 Q.   Okay.  And then at 9 a.m. in the morning on the 24th, she

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 195 of 225

1  started crying -- doing a hyena cry; correct?  I'm going to ask

2  you to turn to page 303.

3  A.   I know I've done corrections.

4  Q.   Corrections to your deposition?

5  A.   Yes.

6  Q.   Yeah.

7  A.   I had that opportunity, and I did so.

8  Q.   And so on page -- let's start with page 302, line 23 going

9  down to line 8 at 303.  And were you asked this question, and

10 did you give these answers?  Or were you asked these questions,

11 and did you give these answers?  Did you see someone before you

12 went to St. Luke's and then they sent you to St. Luke's?

13 Answer, Dr. Caldwell.  Question, okay.  Answer, because I was so

14 irritated because I called her because she wouldn't eat, she

15 wouldn't quit crying, because it was a hyena cry, nonstop.  When

16 did the hyena cry start?  About nine.  And did you mean 9 a.m.

17 or 9 p.m. the night before?

18 A.   I --

19 Q.   Do you know?  Well, let me just ask you this.  It doesn't

20 say p.m. or a.m.  It says about 9 a.m.  Did you give those

21 answers on January (sic) 5, 2012?

22 A.   I gave those answers, yes, but if I've -- I corrected them

23 after the fact.  You're looking at a whole sheet here.  I've

24 corrected many.

25 Q.   Okay.  I'm going to hand you your corrections, and I'm

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 196 of 225

1  going to ask you --

2          MS. GHEZZI:  You can't hear?  Can't hear?  Oh, I'm

3  sorry.

4  Q.  I'm going to ask you to look at your corrections that you

5  tendered to your deposition and ask you whether or not there is

6  any for page -- pages 302 and 303.

7          THE COURT:  While she's doing that, would you have any

8  objection if I explained the correction process to the jury?

9          MS. GHEZZI:  Sure.

10          THE COURT:  I mean, we all --

11          MS. GHEZZI:  No, I don't have any objection.

12          THE COURT:  Pardon me?

13          MS. GHEZZI:  No, I don't have any objection.

14          THE COURT:  Okay.  After someone has their deposition

15  taken, it will take a while for the court reporter to transcribe

16  it, and then they have a right to review the deposition and make

17  any corrections in it that they feel weren't taken down

18  correctly by the court reporter.  They don't have to do that,

19  but they have the right to do it.

20  BY MS. GHEZZI:

21  Q.  Have you had a chance to review that page, Miss Surber?

22  A.  Yes.

23  Q.  And there's no correction on page 302 or 303; is that

24  correct?

25  A.  No, not on here, no.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 218 Filed 10/15/14 Page 197 of 225

1  Q.   Okay.  Thank you.  Now, you called Jeanine's doctor, Susan

2  Caldwell, at around 5 or 5:30 in the afternoon on the 24th;

3  correct?

4  A.   After the 4:00 feeding when -- that's when she was a hyena.

5  She wouldn't eat.

6  Q.   And do you remember --

7  A.   I called the doctor, explained everything to her, what was

8  going on.  And when I called the doctor, she knew what

9  temperature she was at.

10  Q.   Okay.  And so --

11  A.   Because I told her because she asked.

12  Q.   Okay.  And so the first time you tried to -- that was the

13  first time you called the doctor that day; right?

14  A.   Yes.

15  Q.   Okay.  And -- and as you just said, you told her the

16  sympt -- you told her what was going on.  You told her Jeanine's

17  symptoms, right, Dr. Susan Caldwell?

18  A.   Yes.

19  Q.   And this is in Exhibit -- in evidence, 1000G.  And the

20  history that Susan Caldwell gives for April 24, 2008, says this

21  is a 10-day-old infant who was brought in, Mom, because of fever

22  and irritability.  Did you take her in alone?  Did you take her

23  in alone?

24  A.   Yes.

25  Q.   Okay.  Mom states since last night she has been fussier

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 198 of 225

```
 1    than normal.  This morning her temperature was 99.1.  And she
 2    has been fussy throughout the day; correct?  Let me show it to
 3    you.  It's right here on the top.  Do you see that?  Mom states
 4    since last night?
 5    A.    Mom states since last night.
 6    Q.    She has been fussier than normal; right?
 7    A.    Fussier, yes.
 8    Q.    Than normal.
 9    A.    Yes.
10    Q.    Okay.
11    A.    But not a hyena.  Hyena was not until after 4:00.  That's
12    the reason why I called her.
13    Q.    You called her at 4 p.m. in the afternoon on the 24th?  Is
14    that what you're saying?
15    A.    Yeah.
16    Q.    Okay.  And then when she -- when Jeanine was transferred to
17    Omaha, you talked to the doctors there as well; right?
18    A.    When I got to Omaha?
19    Q.    Yeah.
20    A.    They already had her history from St. Luke's to there, so
21    she was already -- she was already being worked on, and they
22    were already assessing what the problem was.
23    Q.    Did you speak to her doctors there?
24    A.    Dr. Macfadyen.
25    Q.    Yeah.  This is Exhibit 1001A.  I'm going to hand it to the
```

1  witness.  And if you'd just read along with me there, it says

2  this is a 12-day-old infant who was most recently admitted to

3  St. Luke's Hospital in Sioux City, Iowa, for fever and

4  irritability two days ago -- and by the way, the date is April

5  26, 2008 -- and admitted to St. Luke's Hospital was on April 24,

6  2008; is that correct, Miss Surber?

7  A.   Yes.

8  Q.   Okay.  And it says the child was described, had been fussy

9  all night prior to admission and on the morning of admission had

10  a temperature of 99.1 degrees; right?  It says that?

11  A.   In the morning, yes.

12  Q.   Yeah.  And then the last sentence says the child also had

13  been not eating well for the past day, and that was correct;

14  right?

15  A.   On the 24th, not eating well.

16  Q.   Okay.  And then let me show you one more.  Jeanine was

17  discharged on June 2, 2008; right?  Is that correct?

18  A.   Yes.

19  Q.   Okay.  And if you look down at the second half of that

20  page, it says reason for admission.  Do you see that?

21  A.   Yes.

22  Q.   And it reads briefly the patient was at the time of

23  admission a 12-day-old infant product of a term twin pregnancy

24  delivered by Cesarean section with an unremarkable past medical

25  history; is that correct?  I mean that's -- did I read that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 200 of 225

1   correctly?

2   A.    You're reading it correctly.

3   Q.    Okay.

4   A.    But . . .

5   Q.    And she began not eating well in the 24 hours prior to her

6   admission.  She then developed a low-grade fever to 100.7

7   rectally.  Does it say that?

8   A.    Yes.

9   Q.    Okay.  And if you go to the last page of that one, the

10  doctor is Dr. Joseph Snow.  Do you know who Dr. Joseph Snow is?

11  A.    Yes, yes.

12  Q.    Okay.  Did you ever talk to Dr. Joseph Snow?

13          MR. RATHKE:  Where are we?

14          MS. GHEZZI:  Last page of that same exhibit.

15          MR. RATHKE:  101A?

16          MS. GHEZZI:  1000B -- 1001B.  Here, Steve, I have one.

17  BY MS. GHEZZI:

18  Q.    Miss Surber, I'm just going to move to something else right

19  now.  Your sister's children were also fed powdered infant

20  formula; is that right?

21  A.    To my recollection I have no idea.

22  Q.    Okay.

23  A.    This is not for my sister's kids.  I'm here for my

24  daughter.  Thank you.

25  Q.    Well, you fed Kevin powdered infant formula from birth;

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 201 of 225

1  right?

2  A.    Yeah.

3  Q.    Okay.

4  A.    Thirteen years ago.

5         MS. GHEZZI:  That's all I have, Your Honor.

6         THE COURT:  Thank you.

7         MS. GHEZZI:  Thank you.

8         MR. RATHKE:  You done?

9         THE COURT:  Any redirect?

10        MR. RATHKE:  Very brief.

11                    REDIRECT EXAMINATION

12  BY MR. RATHKE:

13  Q.    One of the exhibits that Ms. Ghezzi asked you about was

14  Exhibit 2012 which has been admitted, and it is what's called an

15  E. sakazakii outbreak form.  Do you have it in front of you?

16  Maybe you don't.  It doesn't matter.  Do you remember -- when

17  you were at Children's, do you remember somebody from the

18  government calling you up and asking you questions over the

19  phone?  Do you just remember the con -- you know, I'm just

20  asking if you remember the phone call.

21  A.    I had many phone calls.

22  Q.    Do you remember that one?

23  A.    Do I remember talking to a government agent?  No, I do not.

24  Q.    And so you don't remember anything about the telephone

25  call.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 202 of 225

```
 1    A.    Or details on anything.

 2    Q.    One of the exhibits that you were shown is 1001A.  Do you

 3    have that one in front of you?

 4    A.    I don't think I have that one anymore.

 5    Q.    Okay.  Here's a copy.  And Ms. Ghezzi identified this

 6    exhibit as an admission to Children's in Omaha; okay?

 7    A.    Okay.  I have it.

 8    Q.    It also says --

 9    A.    Oh, no, she took that one.

10    Q.    Would you read that sentence on the first page of the

11    exhibit?

12    A.    Past medical history?

13    Q.    Yeah, where it says -- starts with birth weight.

14    A.    Birth weight was 4 pounds and 2 ounces.

15    Q.    Is that correct?

16    A.    No.

17    Q.    Is there any possibility you could have ever told somebody

18    that the birth weight was 4 pounds, 2 ounces?

19    A.    No.

20    Q.    Now, when you went into St. Luke's, they took -- at some

21    point they sat you down and asked you questions and took a

22    history; correct?

23    A.    At some point.

24    Q.    Did you ever see what they were writing?

25    A.    No.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 203 of 225

1  Q.   Until you brought this case, did you ever get a chance to

2  see what their version of what you said was?

3  A.   No.

4  Q.   Do you remember what you told them?

5  A.   No, I don't remember.

6  Q.   When you went to Children's, did you have to go through

7  that same procedure of having to give a history?

8  A.   No.

9  Q.   Do you have any idea where they get the idea that the birth

10  weight was 4 pounds, 2 ounces?

11  A.   No, I do not.

12  Q.   Miss Ghezzi showed you page 294 of your deposition.  By the

13  way, when did that deposition begin in the morning?

14  A.   9:12 -- 9:12 a.m.

15  Q.   And when did it end?

16  A.   Not till like 6:00 in the evening.

17  Q.   Had you ever gone through an ordeal like that?

18  A.   Never in my life.

19  Q.   What time of the afternoon was it before anybody started

20  asking you one single question about what happened on April 23

21  and April 24?

22  A.   About two to three hours before we were done at six.

23  Q.   How'd you feel by then?

24  A.   Tired, nervous, frustrated, exhausted.

25  Q.   Okay.  Now, on page 294 -- do you have that in front of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 204 of 225

1   you?

2   A.   Yes.

3   Q.   Got it now?  Okay.  And the answer to the question on lines

4   5 through 8 was this.  And that -- and then the 4:00 is when she

5   started getting really, really off-the-wall whiney between 4 and

6   9 in the morning of the 24th.  Do you see where it says that?

7   A.   Yes.

8   Q.   By 9 a.m. that morning, was she beginning to get off the

9   wall?  By 9 a.m. --

10  A.   9 a.m.

11  Q.   By 9 a.m., was she beginning to be off-the-wall whiney?

12  A.   Not off the wall but whiney.

13  Q.   So at 4:00 when you fed her, after you fed her at 4:00,

14  what did she do?

15  A.   She ate and went to sleep.

16          MR. RATHKE:  Okay.  I have nothing further.

17          THE COURT:  Miss Ghezzi, anything further?

18          MS. GHEZZI:  No, Your Honor.

19          THE COURT:  Okay.  Let's see if the jurors have any

20  questions.  Doesn't look like it, so you may step down.  Thank

21  you.

22          And it's been a long week for everybody.  Do you have

23  another witness you can put on in 18 minutes or less?

24          MR. RATHKE:  Actually we could -- if you wanted to, we

25  could read Pam Anderson's deposition, and we'd be done by 2:30.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 205 of 225

1          THE COURT:  Is that a promise?  Scout's honor?  Okay.

2   Everybody stand up, take a break, and then we'll do one

3   deposition.  Help us get that much closer to the end.

4          Okay.  Please be seated.

5          And, Mr. Rathke, why don't you inform us of who's who

6   in the deposition read.

7          MR. RATHKE:  Yes, Your Honor.  This is the deposition

8   of Pamela A. Anderson taken on September 30, 2011.  I am asking

9   questions, and Pam Anderson is answering them.  And Attorney

10  Ghezzi is the -- representing Abbott.  And I will say that some

11  of these -- some of these excerpts were designated by Abbott and

12  some by us, and I'll just read them all.

13         THE COURT:  Any objection to proceeding that way?

14         MS. GHEZZI:  No, Your Honor.

15         THE COURT:  Okay.  And I'm assuming, Mr. Rathke, that

16  this is not the Pam Anderson we've seen on TV because we all

17  would have expected you to call her live if that's the case.

18         MR. RATHKE:  No, but she's a very nice lady, and she

19  went to school in Duluth.

20         THE COURT:  Okay.  But she doesn't dive into oceans

21  with her little board and rescue people on the beach.  No.

22  Okay.  You may proceed.  Thank you.

23         (Deposition designations of Pamela Anderson were read

24  in open court.)

25         MS. GHEZZI:  Your Honor, may I interrupt for just a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 218  Filed 10/15/14  Page 206 of 225

1  second?

2       THE COURT:  Yes, you may.

3       MS. GHEZZI:  While we appreciate the fact that

4  plaintiff's counsel is excising out portions of it, we weren't

5  allowed to see it ahead of time, so we may have wanted to

6  designate some of the information that he already designated,

7  and so -- if that makes any sense.

8       THE COURT:  But I -- I thought we went through all

9  that.

10      MS. GHEZZI:  Well, he's just doing it on the fly right

11 now.  He's just excised things.

12      THE COURT:  Okay.  You know what?  It's not something

13 I can take up in the presence of the jury, but I appreciate you

14 raising it.  So we'll take it up after I send the jury home.

15      And, members of the jury, please remember to keep an

16 open mind till you've heard all of the evidence.  I want to

17 thank you so much for paying such good attention.  You'll notice

18 that I've had a few attempts at humor from the moment I walked

19 into the courtroom for jury selection throughout the trial.

20 This is a very serious case, and so I wouldn't want you to think

21 that just because I made a joke about Pam Anderson or anything

22 else that I'm not taking it seriously and that you're not taking

23 it seriously.  Obviously we know the lawyers and the parties

24 take it very seriously.  I've always been of the view that you

25 can have a sense of humor and still take things seriously.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 207 of 225

1    So don't read anything about the case or do any

2  research on it over the weekend or talk to anybody about the

3  case or let anybody talk to you about the case or start your

4  blogs about the case.  Obviously when the case is all over you

5  can do that to your heart's content.  Drive safely.  It may be a

6  little slick out there.  And we'll see you back here Monday

7  morning at 8:30.  Thank you very much.

8    (The jury exited the courtroom.)

9    THE COURT:  Please be seated.  We have a verdict.  No,

10  I'm just kidding you.  A note from a juror.  Thank you for the

11  cookies.  It was thoughtful of you to share them with us.  They

12  were very delicious.  Thanks again.

13    MR. RATHKE:  Well, isn't that sweet?

14    THE COURT:  I've got a new career waiting for me.

15  That's hopeful.

16    I was a little bit surprised when the objection was

17  read because we did have this discussion about generally we

18  don't read objections, and then how I remember our discussion

19  was but there were some you wanted to read because Miss Ghezzi

20  was actually reframing the question and you wanted that question

21  in there.  That isn't what happened when that objection was

22  read.  That was just a plain objection.  So I was confused about

23  that.

24    And then we have this new issue which I'm not sure I'm

25  fully up to speed on about you were kind of reading things on

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 218  Filed 10/15/14  Page 208 of 225

```
1   the fly that weren't designated, or did I misconstrue that?
2           MS. GHEZZI:  No, no, Your Honor.  He was just cutting
3   it, and so we didn't have a chance -- we don't mind him cutting
4   it.  We just want to see it ahead of time and if we want to
5   designate anything that he had designated that we didn't
6   designate because he had designated it.
7           THE COURT:  He had designated it.
8           MS. GHEZZI:  That's it.
9           THE COURT:  Sure.  And you have a -- that's a
10  perfectly reasonable request.
11          MS. GHEZZI:  You know, we just want to see it, and
12  we'll work it out, and if we want any -- I mean, I'm happy to
13  have him excise whatever he wants.
14          THE COURT:  But you want to know about it ahead of
15  time.
16          MS. GHEZZI:  Yeah.
17          THE COURT:  Absolutely.
18          MR. RATHKE:  We'll send that to them this afternoon.
19  I took out some minor part.  I didn't think --
20          THE COURT:  Yeah.  Well, that's the problem.  See, it
21  may be minor to you, but they may have felt it was important.
22  Probably not.  But the point is well taken.  When you designate
23  something, the other side's going to rely on that's the full
24  designation.  I'm sure you were doing it to move things along
25  and be helpful.  But they have a right to see what you're taking
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 212 Filed 10/15/14 Page 209 of 225

```
 1   out.  So why don't you clarify that.  And then you want to just
 2   start over with the depo on Monday?
 3            MR. RATHKE:  Whatever --
 4            THE COURT:  Okay.  But are we starting with one of
 5   your docs Monday morning or no?
 6            MR. RATHKE:  No.  No.  Oh, her doctor.
 7            THE COURT:  Yeah, I meant the defense.  I didn't --
 8   I'm sorry.  I was looking at you, and I was thinking defense.
 9            MS. GHEZZI:  I would -- I mean, if you have somebody
10   that's real small --
11            MR. RATHKE:  Here's what we have left.
12            THE COURT:  That would be under three feet, six
13   inches.  We only allow those size witnesses to testify Monday
14   mornings.  Didn't you see it in our local rule?
15            MS. GHEZZI:  That was Mr. Gray's omission.
16            THE COURT:  That's right.  Absolutely.  Mr. Gray,
17   that's your job to point that out.
18            I don't care what you want to do Monday morning, but
19   just work it out and let me know so I can tell the jury if we're
20   taking somebody out of order.  And I assume, Mr. Rathke, you're
21   going to cooperate if they need a witness out of order.
22            MR. RATHKE:  Absolutely.
23            THE COURT:  Yes.  Okay.  Now, is there anything else
24   we need to take up?
25            MR. REIDY:  No, Your Honor.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 210 of 225

 1          THE COURT:  Okay.

 2          MR. RATHKE:  Your Honor, there is one thing that I

 3  thought of.  It's not a big deal.  But Exhibit 167 is the life

 4  care planner's chart which Mr. King went through today.  He

 5  intended to put it up, but he couldn't.

 6          THE COURT:  Right.

 7          MR. RATHKE:  Which happens.  And I'm just asking the

 8  Court if it would consider admitting 167 as a 1006 summary.

 9          THE COURT:  I'd have to take a look at it first, but,

10  Mr. Gray, can you grab a microphone too, please?

11          MR. GRAY:  I can, Your Honor.

12          THE COURT:  Thank you.

13          MR. GRAY:  You know, we objected to the exhibit as an

14  exhibit when it first came in, and the objection was sustained,

15  and I don't see any --

16          THE COURT:  Let -- I'm sorry.

17          MR. GRAY:  I don't see that there's any change or

18  reason to admit the exhibit at this time.

19          THE COURT:  But how about this?  I think you're right.

20  But how about this?  What's the number?  167?

21          MR. RATHKE:  Yes.

22          THE COURT:  Would you have any objection -- it's a

23  chart or it's a summary?

24          MR. RATHKE:  It's a chart, summary of her life care

25  categories.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 211 of 225

          THE COURT:  Okay.  Would you -- well, let me ask you

this.  Well, let me look at it first.

          MR. RATHKE:  We wouldn't object to you putting yours

in.  See, the objection was hearsay, and I understand that, and

so I'm offering it for a different purpose which is a 1006

summary.

          THE COURT:  Well, were all the underlying -- in order

for it to be a 1006 summary, you know, there are specific

requirements under the rule.  And I know you probably wouldn't

be familiar with that because you don't have a rule book very

close.  But were all the underlying documents given in advance

to the other side?

          MR. RATHKE:  Oh, absolutely.  It's been an exhibit.

It was an expert report.  They've had it for years.  And the

underlying report is the narrative of the expert report, so

they've had all that.  The writer of the exhibit testified and

went through it, so it not only -- it certainly covers Rule

1006, and it covers -- we've covered every special requirement

by some of the Eighth Circuit court decisions which the Court

noted before when we discussed medical summaries.

          THE COURT:  Well, let me ask the defense.  Why doesn't

it qualify as a summary under Rule 1006?

          MR. GRAY:  Well, Your Honor, a couple of reasons I

believe.  One is it's a 24-page document that I believe is

actually greater in length than the testimony of the testifying

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 212 of 225

1  witness.  We also were not provided with the underlying

2  documents.

3        THE COURT:  Just a second.  Let me -- yeah.  It

4  doesn't make any difference what the length of the witness is.

5  There's no case that holds that.  But you're right.  It has to

6  be -- you know, let's say, for example, it's longer than all the

7  underlying documents.  Then it's hardly a summary.  They claim

8  they gave you the underlying documents, and I interrupted you,

9  but I think you were about to say you didn't have all the

10 underlying documents?

11       MR. GRAY:  No, sir.  The only thing we have, I

12 believe, is Exhibit 167 and not the documents in support of the

13 testimony contained in this, Exhibit 167.  And I said there were

14 24 pages.  It looks like there are actually 15.

15       THE COURT:  Well, now, you know, it's been a while.  I

16 actually have looked at some case law because every once in a

17 while there's an Eighth Circuit case on point a -- I mean that

18 discusses the rule.  But it does say the proponent must make the

19 originals or duplicates available for examination or copying.

20 So you had to know their underlying documents that supported

21 this exhibit.  You've known about the exhibit for a long time.

22 They just have to make it available.  It doesn't say they have

23 to force it down your throat.  So did you ever request the

24 originals or duplicates to examine or copy?

25       MR. SCANNAPIECO:  Your Honor, the document that

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 213 of 225

 1   they're trying to admit is the expert report that we were

 2   provided.  We have document requests for materials that are used

 3   by the experts, and nothing else was provided in response to

 4   this, so there's an outstanding document request.  They didn't

 5   produce anything, but if she went and did research and all these

 6   things, we don't have it.

 7           THE COURT:  Are you saying there's a specific document

 8   request for the underlying data that forms the basis for Exhibit

 9   167?

10           MR. SCANNAPIECO:  The documents that they would be

11   relying on to do it, and, I mean, there's also an outstanding

12   obligation on both sides to produce the documents that people

13   have supported or to at least identify --

14           THE COURT:  Yeah, but there's been no motion to

15   compel, and your motion must have been filed before the close of

16   discovery.  Discovery's been closed for how long?  Probably a

17   year or so?  I'm just -- I don't know, but it's been closed for

18   a long time.  It was closed before the time for filing summary

19   judgment motions.  So once -- once the motion -- I mean once the

20   discovery deadline passes and you haven't -- and they -- and

21   they haven't produced what you claim you actually asked for,

22   nothing I'm going to do about it because the time for a motion

23   to compel is long since gone so. . .

24           Yes.

25           MR. GRAY:  Sir, one of the things I would point out if

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 214 of 225

1    I could direct the Court's attention to page 15 of the exhibit,

2    there are in this section called additional considerations some

3    comments in this summary which were never testified to in this

4    courtroom today.

5         MR. RATHKE:  If that's the case, we'll be happy to

6    redact it.

7         THE COURT:  Well, let's look at this in another way.

8    Would you have any objection -- well, let's back up.  So you're

9    saying that it doesn't meet the requirements of a summary under

10   Rule 1006 because . . .

11        MS. GHEZZI:  Your Honor, it's her entire report.  June

12   Ghezzi.  It's her entire report.

13        THE COURT:  Yeah.  Well, you know, labeling it like

14   that doesn't really make a difference to me.

15        MS. GHEZZI:  Really?  I mean --

16        THE COURT:  Yeah.  Now -- yeah, it really doesn't.  I

17   don't think that gets you anywhere.  I think what might get you

18   somewhere is if there are no underlying documents, then it can't

19   possibly be a summary of it whether you label it her report or

20   whatever you want to label it.  You know, for it to be a

21   summary, there has to be underlying voluminous writings,

22   recordings, or photographs; right?  And you have a right to

23   examine those or have copies or both but it seems to me only if

24   you request it.

25            But let me suggest an alternative, and we can -- you

**Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov**
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 212  Filed 10/15/14  Page 215 of 225

1    know, I can -- I'm sure you have associates working 24 hours a

2    night that would love to brief this.  And that'd be fine.  And

3    we can -- and I don't have to decide right away.  But I was just

4    trying to think of a simple solution.

5         And a simple solution might be that they could use

6    something in closing argument as a demonstrative exhibit.

7    They'd be nuts to use this document because you'd spend your

8    whole closing argument trying to explain it.  You'd be -- you'd

9    have a minute left to talk about liability.

10        But if they maybe prepared a summary -- I mean, I

11   heard you're all getting realtime transcripts.  So if they made

12   a summary of the actual testimony and put that into some kind of

13   chart or a PowerPoint slide, first of all, nobody's going to go

14   through this thing and add it up.  You know, if you expect the

15   jury to do that, I guarantee you they're not going to do it.  So

16   couldn't you come up with some kind of a summary of what the

17   witness has testified to and use that in closing argument?  And

18   if the other side thinks it's not accurate, they can object, and

19   I'll tell the jury I don't know if it's accurate or not; use

20   your own recollection of what the witness has testified to.

21   Wouldn't that solve the problem and be a better solution than

22   haggling over it so -- whether it's a 1006 document or not?

23        MR. KING:  Your Honor, that would be something that

24   either party could do in the ordinary course, and that would

25   certainly be an alternative.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 216 of 225

```
 1              THE COURT:  So here's the question.  Are you pursuing
 2   your argument that this should be admissible as a summary under
 3   1006?
 4              MR. KING:  I'm agreeing that you've proposed a good
 5   solution if you deny our request.
 6              THE COURT:  That's good.  That's good.  Gotta admire
 7   that, I'll tell you.  That's good.  Okay.
 8              MR. KING:  Trying to end the week on a high note here.
 9              THE COURT:  Are there underlying documents to the
10   document?
11              MR. KING:  Your Honor, I don't believe so.  I don't
12   think that this was an expert that was deposed by the choice of
13   the defense, so I don't know what is in her file.  I've frankly
14   not seen it.  I've gotten her report, and I've talked to her.
15   That's what I know.
16              THE COURT:  Okay.  But if you can't assure me that
17   there are underlying voluminous documents, then how can it
18   possibly be a Rule 1006 summary?
19              MR. KING:  Fair question.  Fair question.
20              THE COURT:  Who's going to step up to the plate?
21   Mr. Bottaro, you're brave.
22              MR. BOTTARO:  I can certainly confirm it over the
23   weekend, but my experience with life care planners and
24   Miss Pollard is there's a tremendous amount of work that she
25   does background, notes as she testified to about talking to
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 217 of 225

1  doctors and people in their offices and all that.  I'm sure the

2  file is voluminous.  I can't explain why we didn't get it.  But

3  I know just based upon her testimony and working with life care

4  planners their files, I mean, they talk to all kinds of people.

5  She talked about that.  And she didn't just commit it to memory.

6  She's got a file.  I don't know why we didn't get it necessarily

7  but --

8          MR. RATHKE:  The reality is they choose who they want

9  to schedule depositions, and then they give me a document

10  request for the experts they want to depose.  Had they wanted to

11  depose Lisa Pollard, I would have also gotten a big old

12  document, and we'd have done that.  I never got a document

13  request on Lisa Pollard.  I know I did not because they chose

14  not to depose her.

15          THE COURT:  Well, the two aren't coterminous by any

16  means but . . .

17          MR. BOTTARO:  Here's what I understand, Your Honor.

18          THE COURT:  Yeah.

19          MR. BOTTARO:  If we failed to get the underlying

20  documents that are there, I don't believe we were ever

21  requested, you know, in follow-up, hey, from the defense where

22  is this.  And as you said, there certainly wasn't a motion to

23  compel.  But I'm a little bit -- since I'm local counsel, I

24  don't know everything that's gone on in this case obviously.

25  But it seems to me I do know I haven't seen anything, a motion

1  to compel saying, hey, where's that Pollard stuff or Jerry

2  Sherman or whomever.

3          THE COURT:  So it seems to me, assuming that's true,

4  that -- well, it would be -- well, it's hard for me to believe

5  you didn't ask for it because in most cases parties ask for so

6  many things they don't need, so it would seem implausible that

7  you would ask for something that actually might come up in

8  trial.  But if you did ask for it -- so assuming you did ask for

9  it, you never got it apparently, and you didn't get it, I guess,

10 because you didn't file a motion to compel so the Court could

11 rule on it.

12          MR. SCANNAPIECO:  Your Honor?

13          THE COURT:  Yeah.

14          MR. SCANNAPIECO:  Your Honor, however, there was no --

15 they didn't interpose an objection saying we're not going to

16 produce certain documents from Mrs. Pollard.  So, I mean, to the

17 extent that we make a request, at least we would expect before

18 we have a motion to compel given the local rules that there has

19 to be a meet and confer and something to talk about --

20          THE COURT:  Well, you might expect --

21          MR. SCANNAPIECO:  -- to identify it.

22          THE COURT:  -- that, but the reality of stuff is you

23 had an available option to get these underlying documents if you

24 wanted them bad enough.

25          MR. GRAY:  Your Honor, can I just talk about two

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 218  Filed 10/15/14  Page 219 of 225

1 practical things I think?

2         THE COURT: Absolutely.

3         MR. GRAY: One, you asked Mr. King who answered. He

4 said, you know, I think that's a good solution, and I think that

5 is a good solution, and I think the defense would agree with it,

6 using it in closing argument. So that's one point.

7         The second point is we were at a little bit of

8 disadvantage in the cross-examination of Lisa Pollard. Had --

9 there was no offer of the exhibit at that time. And we did not

10 even know that they were attempting to use this as a summary

11 rather than as a report. You know, when they first -- excuse

12 me, when they introduced this exhibit at the time, it was not

13 told to us that it was a summary. It was told to us it was her

14 report. We objected on the basis it was her report, not on the

15 basis that it was a 1006 summary. And we were unable to

16 cross-examine her or even to request those underlying doc -- or,

17 you know, insist to have the underlying documents to

18 cross-examine her because we did not know this was going to be a

19 summary. Those are the two major pragmatic points as I see

20 them.

21         THE COURT: Okay. Well, let's explore it. You could

22 have anticipated at the time she testified that they were going

23 to offer it as a summary. I mean, you didn't apparently, but

24 you could have anticipated that. So my question is had they

25 offered it at the time as a Rule 1006 summary, what would you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW Document 218 Filed 10/15/14 Page 220 of 225

1    have done that you're precluded from doing now because the

2    witness has been excused?

3           MR. GRAY:  I suppose, Your Honor, if I had known prior

4    to today that the witness was going to be -- this was going to

5    be a summary, we would have subpoenaed the witness to bring her

6    file with her so we could have examined the documents at the

7    time of the cross-examination.  That would be one thing we would

8    have done.

9           THE COURT:  And maybe here's another way of looking at

10   it that nobody's raised.  At the time of the pretrial order when

11   you listed the exhibits and you came up with your objections and

12   I sustained those objections, that would have been the time for

13   them to come and say, hey, wait a minute, we weren't offering it

14   for that purpose, it's a Rule 1006 summary.  And then, you know,

15   quite a while ago, we could have fought that out.

16          MR. GRAY:  Yes, sir, that is correct.

17          THE COURT:  And that would have certainly been the

18   most appropriate time for them to assert to try and get around

19   your objection that it's hearsay, that it's a Rule 1006 summary,

20   and they never did that.

21          MR. GRAY:  That would have been the fair way to do it,

22   yes, sir.

23          THE COURT:  I'm going to sustain that argument that I

24   just made.  So now you're back to my proposal about you ought to

25   come up with some kind of accurate summary based on the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 221 of 225

 1  witness's testimony and use it in closing argument.

 2          MR. KING:  We'll take you up on that.

 3          THE COURT:  Okay.  What else do we need to take up?

 4  Anything?

 5          MR. RATHKE:  I think we've resolved at least one of

 6  the issues I brought up yesterday.  The only other remaining

 7  thing is the last three exhibits.  I think they're 172, 173, and

 8  174, the web pages.  We've offered.  They've objected.

 9          THE COURT:  Well, you're going to try and lay a

10  foundation through their ex -- through their witnesses from

11  Abbott?

12          MR. RATHKE:  Well, I think their objection was hearsay

13  I believe, and they're public statements by Abbott.  That's all

14  I can say.  That's what they are.  You know, maybe I can get

15  them in through one of their witnesses.  I'll certainly try.

16          THE COURT:  Or impeach them with it.

17          MR. RATHKE:  Yeah.  I'll keep working on it.

18          THE COURT:  Okay.

19          MR. RATHKE:  Okay.

20          THE COURT:  You keep working on it.  I'm not going to

21  be working on it.

22          MR. RATHKE:  All right.

23          THE COURT:  Are you all flying back to Chicago

24  or . . .

25          MR. REIDY:  No.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 218   Filed 10/15/14   Page 222 of 225

         1          MS. GHEZZI:  No.  John's taking us out for an

         2    elaborate dinner.  He doesn't know it yet.

         3          THE COURT:  Well, he knows all the good Sioux City

         4    dives of which there many, many, many dives.

         5          MR. GRAY:  Miles Inn is probably the --

         6          MR. BOTTARO:  That's where we went for lunch

         7    yesterday.

         8          THE COURT:  Classic.  Yep.  Classic.

         9          MR. BOTTARO:  There weren't any of our jurors there,

        10    but there were a cross-section of the jurors.

        11          THE COURT:  When I first started, I came up with a

        12    review of all my favorite dive restaurants, and we wanted to

        13    post it on our website for out-of-state lawyers.  Got an ethics

        14    opinion:  Couldn't do it, I was endorsing a private entity, and

        15    that was a no-no, so -- I had written like restaurant reviews of

        16    them and everything.  It was really kind of cute but . . .

        17          MR. GRAY:  We hit the highlights of Seventh or I asked

        18    them to go to Seventh Street to hit the two that I like there.

        19          THE COURT:  Yeah, yeah, that's great.  You're doing

        20    well.  You're doing very well.  There's a new -- you know where

        21    the old Italian restaurant was in South Sioux across from the

        22    dome that then moved downtown?

        23          MR. GRAY:  Yes.

        24          THE COURT:  That is now a Mexican seafood restaurant,

        25    and they only serve seafood.  I think they have one nonseafood

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 212   Filed 10/15/14   Page 223 of 225

```
 1   thing on the menu.  For Sioux City it's a little pricey, but by
 2   Chicago standards it's shockingly inexpensive.  And we took
 3   another couple out a week or so ago there.  It was awesome.
 4           MR. GRAY:  Huh.
 5           THE COURT:  Just incredible seafood, you know, mostly
 6   shrimp.  And if you go on a Friday, Saturday, or Sunday, they
 7   get their fresh seafood on Thursday.  So I highly recommend it
 8   if you like seafood.  I mean, portions are huge.  It's really
 9   good.  But you can't quote me on that because that's an ethics
10   violation.
11           MR. GRAY:  I will steal that remark, Your Honor.  Go
12   to that seafood place.
13           THE COURT:  There you go.  Yep.  You know exactly
14   where it is.
15           MR. GRAY:  I do.
16           THE COURT:  Well, have a great weekend.  Minneapolis
17   folks sticking around town, or you going home?
18           MR. RATHKE:  I am.
19           MR. KING:  I'm going up and back.
20           THE COURT:  Well, good luck.  I hope the roads are
21   safe.  I had lawyers coming in from Cedar Rapids and Rock Island
22   for a criminal sentencing today.  We had a Rock Island assistant
23   U.S. attorney because it involved a matter that happened in the
24   courtroom with our other judge over in Cedar Rapids.  And they
25   both said the weather was really bad so . . .
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 212  Filed 10/15/14  Page 224 of 225

1          MR. KING:  Thank you, Your Honor.

2          THE COURT:  Drive safe.

3          (The foregoing trial was

4          adjourned at 2:45 p.m.)

5                    CERTIFICATE

6     I certify that the foregoing is a correct transcript

7  from the record of proceedings in the above-entitled matter.

8     ___S/Shelly Semmler___          9-4-14
          Shelly Semmler, RMR, CRR         Date
9                          **INDEX**

10
**WITNESS:**                                    **PAGE:**
11

12     LISA FULLENKAMP
          MS. VAN WYHE                          699
          MR. SCANNAPIECO                       702
13     DIANA TERRELL
          MR. RATHKE                            704
14        MR. GRAY                              714
          MR. RATHKE                            721
15     JESSICA MCHUGH
          MS. VAN WYHE                          722
16        MR. SCANNAPIECO                       724
       MEGAN SURBER
17        MR. RATHKE                            726
       PATRICK BECK
18        MR. KING                              781
          MS. GHEZZI                            787
19        MR. KING                              801
          MS. GHEZZI                            804
20     LISA POLLARD
          MR. KING                              805
21        MR. GRAY                              829
       MEGAN SURBER
22        MR. RATHKE                            840
          MS. GHEZZI                            851
23        MR. RATHKE                            888
       PAMELA ANDERSON
24        deposition                            892

25                    * * * * *