IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

SECURITY NATIONAL BANK, as                    No. C11-4017-MWB
Conservator for JMK, a minor child,

       Plaintiff,                         Sioux City, Iowa
                                              January 13, 2014
   vs.                                    8 a.m.

ABBOTT LABORATORIES,                          Volume 6 of 10

       Defendant.
_____/


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 269 Filed 10/15/14 Page 1 of 150

```
APPEARANCES:

For the Plaintiff:        AMANDA BRANDY VAN WYHE, ESQ.
                          TIMOTHY S. BOTTARO, ESQ.
                          Vriezelaar, Tigges, Edgington,
                             Bottaro, Boden & Ross
                          613 Pierce Street
                          Sioux City, IA 51102

                          STEPHEN C. RATHKE, ESQ.
                          ROBERT J. KING, ESQ.
                          Lommen, Abdo, Cole, King & Stageberg
                          2000 IDS Center
                          80 South Eighth Street
                          Minneapolis, MN 55402

For the Defendant:        JOHN C. GRAY, ESQ.
                          Heidman Law Firm
                          1128 Historic 4th Street
                          Sioux City, IA 51102

                          DANIEL E. REIDY, ESQ.
                          JUNE K. GHEZZI, ESQ.
                          GABRIEL H. SCANNAPIECO, ESQ.
                          KATHRYN L. DORE, ESQ.
                          Jones Day
                          Suite 3500
                          77 West Wacker Drive
                          Chicago, IL 60601

Also present:            Louise Deitloff
                         Daniel Morrison

Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 209 Filed 10/15/14 Page 2 of 150

         1          (Proceedings reconvened outside the presence of the

         2   jury.)

         3          THE COURT:  Okay.  Could we get started on a few

         4   matters this morning?  I understand that the plaintiff thinks

         5   they may rest between like 9:30 and 10 this morning?

         6          MR. RATHKE:  Yes, Your Honor.

         7          THE COURT:  Okay.  How extensive is your Rule 50

         8   motion going to be?  Are you going to go -- I mean, I haven't

         9   granted one in 20 years.  I'm not going to grant one in this

        10   case I can tell you right now, so I know you want to make -- it

        11   depends on how extensive of a record you want to be will dictate

        12   when I will have you do it so . . .

        13          MR. REIDY:  Judge, I think we'll file a one-page piece

        14   of paper referring to our summary judgment argument and call it

        15   a day.

        16          THE COURT:  Okay.  So you don't actually want to make

        17   any oral motion?

        18          MR. REIDY:  I don't want to take up the Court's time.

        19          THE COURT:  Okay.

        20          MR. REIDY:  Unless the Court wants to hear from us.

        21   My sense is that that would be taking up time that doesn't

        22   matter.

        23          THE COURT:  Yeah, I appreciate that, but I don't want

        24   you to have waived it in any way, so I'm a little bit worried

        25   you might have to -- why don't we do this.  I mean, we can do it

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 209   Filed 10/15/14   Page 3 of 150

1   a couple of different ways.  If it's just going to be very short

2   like we reurge all the arguments in our summary judgment motion

3   and add a couple things, if we can do it in like five minutes or

4   less, we could do it on the first break.  Or what I usually do

5   is -- but only if it's going to be a little more extensive,

6   we'll make a record now that whenever you make -- I keep

7   thinking Rule 29 motion because we do so many criminal cases

8   more than civil.  It's a Rule 50 motion for judgment as a matter

9   of law.

10          MR. REIDY:  Rule 50.

11          THE COURT:  When you make your Rule 50 motion, why

12  don't we do it tomorrow morning, but we'll make a record now

13  that it will be deemed having been given at the close of the

14  plaintiff's case and that you're not waiving anything by

15  accommodating the schedule by making it tomorrow morning outside

16  the presence of the jury, and I'm going to do that for a couple

17  reasons.  I don't want it to eat up into your very limited

18  break, and I don't want to take the time when the plaintiff

19  rests to send the jury out.  I just want to start in on the

20  defendant's case.

21          MR. REIDY:  That'd be fine, Judge.

22          THE COURT:  And you can file anything in writing you

23  want, and it will be deemed having been submitted at the close

24  of the plaintiff's case.

25          MR. REIDY:  We'll give your staff something this

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB   Document 209   Filed 10/15/14   Page 4 of 150

1    morning, Judge, and we'll just have it -- what we've done,

2    Judge, is just reinvoked our causation expert arguments.  I

3    don't actually believe that I need to make a record.  I think

4    Your Honor understands our arguments.  The only difference is

5    that Your Honor has now seen their experts.

6              THE COURT:  Yes.

7              MR. REIDY:  And so we expect that Your Honor would be

8    able to understand the arguments that we would make which is

9    that just as we predicted, you know, based on their depositions.

10   So as far as we're concerned, we'll file that this morning, and

11   then Your Honor does not have to set aside a time for argument.

12             THE COURT:  Okay.

13             MR. REIDY:  Unless you want to hear from us.

14             THE COURT:  No.  I appreciate that, Mr. Reidy, and

15   that's fine.  That's a fine way to proceed with it.

16             You know, I was thinking about this case over the

17   weekend which is always a mistake, but I've thought there was an

18   evidentiary problem.  I thought I had admitted some of the

19   underlying studies, but I actually hadn't admitted those.  They

20   were never even offered -- well, you tried to offer one as an

21   exhibit, and I denied it.  So it must have been -- must have had

22   it marked.

23             But I thought I had -- in the pretrial order because

24   we went through so many iterations of the exhibit list, it was a

25   little bit confusing, and maybe I was thinking about another

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 209   Filed 10/15/14   Page 5 of 150

1    case or about one of the earlier exhibit lists.  But I thought

2    you had a number of the studies on it that the experts had

3    relied on.  They're hearsay, but they can rely on it.  We've

4    been through that.  But you don't so -- and they're not

5    admissible as substantive evidence.  I thought I had

6    inadvertently admitted some, so I was just going to unadmit them

7    because the jury really hasn't seen them other than to the

8    extent that they were on slides which were demonstrative.

9           But when I was reviewing the witness list this

10   morning, I don't recall that any of the studies were being

11   offered by either party.  So am I correct on that, that nobody's

12   tried to offer the underlying studies?

13          MR. REIDY:  I believe that's right, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          MR. RATHKE:  I think the exhibit that you have in mind

16   is an e-mail from Anna Bowen to somebody in Virginia that came

17   up during the Jason testimony, and you did not admit that.

18          THE COURT:  Okay.  Moving on to the next matter, I

19   think -- is the defense calling a video conference witness on

20   Thursday that we're going to do by video?

21          MR. REIDY:  Judge, I think that may be on Tuesday

22   rather than Thursday because of the schedule of the witness.

23          THE COURT:  Okay.  And do you have a time on Tuesday?

24          MR. REIDY:  If you can give us maybe until the first

25   break to reconnoiter --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 209 Filed 10/15/14 Page 6 of 150

```
1              THE COURT:  Sure, sure.

2              MR. REIDY:  -- at the end of the first break, we'll

3    give the Court a time.

4              THE COURT:  And I think the reason is our tech people

5    want it because I think they want to try and do a -- we always

6    make a connection to see that everything's working properly.

7              MR. REIDY:  We'll try -- we'll get --

8              THE COURT:  But are you leaving today, Dave?

9              MR. JONES:  No, I'll probably stay around.  But we

10   have to make a bridge call for this because it's an outside

11   source, so we have to have a time to pull up bridge and make

12   that connection, and then they'll connect into the bridge, so we

13   kind of need a roundabout area.

14             THE COURT:  Okay.  So maybe you all can confer and

15   confer with your witness and just get us a time.

16             MR. REIDY:  We'll do that, Judge.

17             THE COURT:  Great.  Okay.  And were we taking a

18   witness out of order this morning?  Wasn't there some talk about

19   a defense witness that was going -- or is that the one we're

20   talking about that we're doing on Tuesday now?

21             MS. GHEZZI:  No, no, Your Honor, you're correct.  But

22   based on our conversations over the weekend, if the plaintiff

23   rests at 9:30 or 10, we're going to take Dr. Shulman.

24   Dr. Shulman is the one who has to get on and get off today

25   because of his wife.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 209   Filed 10/15/14   Page 7 of 150

1      THE COURT:  Okay.  Okay.  Great.

2      MS. GHEZZI:  Thank you.

3      THE COURT:  Thank you.  Anything else on the parties'

4  agenda?

5      Oh, you raised that issue -- I don't think the defense

6  has responded to it yet -- with regard to the photographs that

7  were -- and the testimony of Summer Johnson that were

8  basically -- that were alleged to be foundation for the expert

9  that you deposed on Friday, something like that?

10      MR. RATHKE:  Your Honor, just to give it a name, the

11  bedbug evidence came in on Summer Johnson, and the Court gave a

12  limited instruction.  After deposing Dr. Olson, it does not

13  appear that any of all -- any of that was of any importance to

14  him.  So what we would request is that the Court --

15      THE COURT:  Well, is Olson going to be testifying live

16  or by a prior depo?

17      MR. REIDY:  He's the potential video witness, Judge.

18      THE COURT:  Okay.

19      MR. REIDY:  So live in essence.

20      THE COURT:  Yeah.

21      MR. RATHKE:  So we feel that -- and we did object to

22  the evidence coming in on the Summer Johnson deposition, and

23  then the Court made its ruling.

24      THE COURT:  But that ruling was predicate I think on a

25  representation by the defense that the doctor was relying on

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 209  Filed 10/15/14  Page 8 of 150

1   that.

2           MR. RATHKE:  Exactly, exactly.  And so now it's clear

3   that the doctor isn't relying on it.  The evidence has come in

4   subject to one limited instruction.  We would request that the

5   Court exclude it entirely, instruct the jury that they are to

6   disregard it, indicate in its instructions that the reason they

7   heard it was based on a representation by the defense which

8   turned out not to be the case.

9           THE COURT:  Yeah, I'm not going to do that.  I

10  appreciate that, but anyway, let's -- what's the defense

11  position?

12          MR. REIDY:  Judge, I think we can advance the ball in

13  significant part in that we're not going to attempt to lay a

14  foundation and offer the outtake photographs of the home in the

15  later year that was the subject of some debate.

16          THE COURT:  Yes.

17          MR. REIDY:  We've now decided not to do that.

18          THE COURT:  Okay.

19          MR. REIDY:  With respect to the rest of this, I'd

20  actually have to defer to my colleague Mr. Scannapieco if I may.

21          THE COURT:  Sure.  Thank you.

22          MR. SCANNAPIECO:  So, Your Honor, when we submitted

23  our response to their initial objection on this issue, Olson

24  relied on a variety of records that were provided including the

25  Able Kids records.  And if you review his submission to --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 209   Filed 10/15/14   Page 9 of 150

1    THE COURT:  I did, and basically he said he relied on

2  it, but it didn't make any difference to his opinion so . . .

3    MR. SCANNAPIECO:  The point is is that he was saying I

4  looked at these circumstances, they are not either exceptional

5  in one direction or the other.  So, for example, he's not saying

6  the circumstances that, you know, only in this case would you

7  have a group care home.  But on the opposite end, if there were

8  testimony that -- which they ended up not introducing that the

9  family said we're in an exceptionally unique position to care

10  for Jeanine in the home whereas other people would not be in

11  that position, his opinion is is that by looking at those

12  records there are -- you know, he's seen some problems with the

13  family that have existed over time.  They're not exceptional,

14  but they are typical of what happens with these types of

15  families.  So he looked at it in that sense, not to say, well,

16  I'm --

17    THE COURT:  Yeah, but what's that got to do with the

18  bedbug evidence?  I think we're talking about the bedbug

19  evidence here, so here's my take on it.  You tell me if I'm

20  wrong, or maybe one of the other lawyers can chime in too.  He

21  reviewed it, but he didn't actually rely on it for his opinion

22  because it made no impact.  It had no impact on his opinion.

23  And isn't that correct?

24    MR. SCANNAPIECO:  That's what he testified to.

25    THE COURT:  Yeah.  So you may have only told me he

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW  Document 219  Filed 10/15/14  Page 10 of 150

1    reviewed it.  I don't remember exactly what you told me.  But

2    you knew he had reviewed it when we were arguing about it

3    earlier when I admitted it.

4         What's your position now with regard to the bedbug

5    evidence?  I take it you're not going to try and -- you're not

6    going to -- you're not going to ask the expert about that.

7         MR. REIDY:  And we're not going to argue it, Judge.

8         THE COURT:  And you're not going to argue it.  So the

9    only thing is what, if anything, I should do about the fact that

10   it came in with regard to Summer Johnson; right?

11        MR. REIDY:  And we're sort of open, Judge.  Since

12   we're not going to argue it --

13        THE COURT:  You don't --

14        MR. REIDY:  -- if the defense (sic) thinks it

15   underlines it to tell the jury to forget about it, then they

16   don't have to do that.  If they would rather tell the jury to

17   forget about it, that's fine with us.  We're not going to argue

18   it.

19        THE COURT:  Yeah.  Well, I mean, one way to do it

20   would be to ask the doctor when he testifies did that have any

21   impact on his opinion, no.  Or you can just have me -- because

22   they're not going to raise it with the doctor, maybe you don't

23   want to raise it again with the doctor, call more attention to

24   it.

25        So would you like me to just say -- tell them that I

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 11 of 150

1    previously gave them an instruction that it was offered for a

2    limited purpose and now there's no purpose for which it was

3    offered so it's been stricken, something like that?

4            MR. RATHKE:  Yes, Your Honor.  That would be the

5    bedbugs, the fleas, and the baby not being hygiene -- proper

6    hygiene.

7            THE COURT:  Well, let's -- yeah.  Are some of your

8    experts going to testify about all the hygiene issues that you

9    raised with the mother?  I assume that, that --

10           MS. GHEZZI:  Well, I mean, Your Honor, his experts

11   talked about it.  Janine Jason talked about it.  Megan Surber

12   talked about it.  The fleas are in.  They had the dog in 2008.

13   He's going too far.  The bedbugs are one thing.  But the other

14   stuff, it's come in through Megan Surber, and it's come in

15   through Janine Jason as well.

16           THE COURT:  So is there anything besides -- do you

17   agree that it would be okay to tell the jury that they should

18   just disregard the bedbug evidence?

19           MS. GHEZZI:  Yes, Your Honor.

20           THE COURT:  Okay.  Is there anything else you're

21   asking me to tell them to disregard?

22           MR. RATHKE:  Well, yes.  The not -- I mean, bedbug is

23   one way of summarizing it, but it wasn't just bedbugs.  It was

24   that the dog had fleas in 2011.  That's what he testified to or

25   that's -- that was part of it and that the baby was in a -- not

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW Document 219 Filed 10/15/14 Page 12 of 150

1  in a clean state when visited by Summer Johnson.  The reason

2  Megan testified about bedbugs is it was already in there, so I

3  needed her to explain it.

4          THE COURT:  Miss Ghezzi?

5          MS. GHEZZI:  Your Honor, if he's talking about fleas

6  in 2011 or 2012, that's fine.  But there's evidence in the case

7  about fleas in 2008 when Jeanine came home.  That's in the

8  record through the mother and through Janine Jason.  That's

9  there.  So I don't know that the jury's going to be able to

10  differentiate fleas in 2008 between fleas in 2011 and 2012.  Our

11  understanding is they got rid of the dog -- you know, they

12  didn't have a dog in 2010 and 2011 and 2012.  They had a dog in

13  2008 with fleas and flea infestations.  That's in the record.

14          MR. KING:  Your Honor, may I speak to the issue just

15  briefly?

16          THE COURT:  Sure.

17          MR. KING:  We have no objection to evidence

18  contemporaneous with this child's illness.  Clearly that's

19  relevant.  That's fine.

20          But the evidence later through the physical therapist

21  about the child's condition being unclean, about fleas, about

22  all that stuff, that's prejudicial evidence that has nothing to

23  do with this case.  It's in solely on the representation of the

24  defense that their expert needed it when, in fact, he doesn't.

25  It should never have been heard by this jury.  We're very

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 13 of 150

1 troubled that it prejudices this jury against this case. That's

2 what -- that's why we're talking about it.

3         The 2010, 2012, the baby's not clean, there's fleas,

4 there's et cetera, et cetera, et cetera, years after the onset

5 of the illness, pure prejudice, no purpose for it. They could

6 have asked their expert and clarified. They didn't. The expert

7 said, "I don't care about that stuff." It never should have

8 been heard by this jury. That's what we're troubled by.

9         And I'm not sure how to fix it, frankly. The jury

10 clearly has to be told it shouldn't have been in the case, they

11 shouldn't have considered it for any purpose at a minimum.

12         THE COURT: Yeah, but exactly what I'm going to tell

13 them about what evidence is troubling, and I don't want to do

14 that on the fly. So here's what I suggest. There's -- do you

15 think you could work out a -- agreed language? That would be

16 the best thing to do rather than to have me just

17 extemporaneously -- and I might not correct --

18         MR. KING: We'll attempt to do that. Yeah, we'll work

19 at that.

20         THE COURT: Okay. And then if -- you know, there's, I

21 think, a fair chance you won't be able to agree, and I

22 understand that. And that's not a criticism. Then I'll decide

23 exactly what to say, but we'll have some more precise language,

24 and I'll hear from both sides as to what that language should

25 include or what it shouldn't include, and then I'll decide, and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 14 of 150

1    then I'll tell the jury.

2            But I'm not going to get into the representations and

3    whose fault it is.  That's -- that would be prejudicial in my

4    view.  So I'm just going to say I made a mis -- some probably --

5    I made a mistake in admitting -- I don't know if I'll say that.

6    I probably will but that -- or I'll just tell them to disregard

7    it.  But why don't you try and come up with language so they'll

8    know what it is they're allegedly disregarding; okay?  Anything

9    else?

10           MR. RATHKE:  We did agree on the Exhibit 141 to redact

11   and readd, recalculate.  But I won't have that by 10:00, but I

12   assume that that's not a problem.

13           THE COURT:  Just refresh my recollection.  What is

14   141?  Is that that Medicare summary?

15           MR. RATHKE:  Yes.

16           THE COURT:  Okay.

17           MR. RATHKE:  Then on 160, I'm still waiting for a

18   response from the defense, but as I understand it, they will

19   agree to a stipulation as to the last sentence.

20           MR. SCANNAPIECO:  Yeah, we're just waiting for them to

21   send us the stip.

22           MR. RATHKE:  I already sent you --

23           MR. SCANNAPIECO:  We're just waiting --

24           MR. RATHKE:  The last sentence.

25           MR. SCANNAPIECO:  Okay.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 15 of 150

```
1            THE COURT:  They're objecting to the last sentence

2    or . . .

3            MR. SCANNAPIECO:  No, no, no.

4            THE COURT:  No.

5            MR. RATHKE:  That's the stip.

6            MR. SCANNAPIECO:  We're coming up with a stipulation

7    for the last sentence.  We asked that it get sent over.  I was

8    waiting for that, but we can --

9            MR. RATHKE:  It's the quote from the last sentence.

10   You've already got it.

11           THE COURT:  Hey, don't be arguing with each other in

12   front of me.

13           MR. RATHKE:  Okay.  Then the last evidentiary issue --

14           THE COURT:  You can go out behind the building and do

15   that but . . .

16           MR. RATHKE:  The last evidentiary --

17           THE COURT:  I get to argue with you, but you don't get

18   to argue with each other.

19           MR. RATHKE:  The last evidentiary issue would be

20   Exhibits 171, 172, 173, and those are the web pages.  The

21   objection is relevance, not foundation, not hearsay.  The

22   objection is relevance.  That's -- they cite various provisions

23   of Rule 4-0 this and 4-0 that, and that's what's cited for their

24   objection in the documents that they submitted for the final

25   pretrial order.  That being the objection, it's clear that the
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 16 of 150

 1    three items are relevant.

 2              THE COURT:  Well, how are you going to -- well, are

 3    you going to have their witnesses talk about them?

 4              MR. RATHKE:  Well, they're just -- they're just

 5    evidence that they say is not relevant.  We don't have a witness

 6    to put them through.  They didn't ask for -- they did not object

 7    on foundation.  Had they objected on foundation, we'd have to

 8    re -- we'd have to reach that issue.  Their only objection is

 9    foundation -- or excuse me, is relevance.  The items are clearly

10    relevant, so, therefore, they should be admitted.

11              MS. GHEZZI:  And, Your Honor, our position was that

12    they dated from 2009 to 2011 and they're not relevant to what

13    the mother or the father saw before they used the powdered

14    infant formula and nor did any of the treating physicians.  They

15    had absolutely no evidence in the record to connect those

16    websites up to something that predated 2008 or that occurred in

17    2008.  They just pulled it off a website dated 2009 up through

18    2011, so that was our objection to relevance.

19              THE COURT:  And, you know, I haven't read it all.

20    What's the relevance of it?

21              MR. RATHKE:  Exhibit 171 provides some history of the

22    development of the powdered products.  Exhibit 172 --

23              THE COURT:  Yeah, and why does that help your case

24    with the jury just out of curiosity?

25              MR. RATHKE:  Just gives them some background.  It's

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 17 of 150

1    not critical.  Exhibit 172 relates to NeoSure and its history.

2    And Exhibit 173, amongst others, talks about Abbott being a

3    leader in the industry.

4         THE COURT:  Well, there are going to be Abbott people

5    testifying.  Can't you get most of this stuff in through them?

6         MR. RATHKE:  The witnesses that they're calling,

7    Sharon Bottock is not going to be conversant.  When I asked her

8    any such questions at her deposition, she didn't know.

9         MS. GHEZZI:  Well, Your Honor, in terms of 171, I

10   mean, this is a fact sheet.  And, I mean, it basically describes

11   all different products in the Similac brand, none of which are

12   relevant in the case except NeoSure.  I mean, we've got Advance

13   Organic, Similac Sensitive, Sensitive Isomil Soy, Sensitive for

14   Spit-Up, Alimentum which is specially designed for food

15   allergies.  Then there's NeoSure.  Then there's, you know,

16   special care for diarrhea, Go and Grow.  I mean, they have

17   the -- they have the package insert and all of the information

18   relating to NeoSure and the NeoSure that's at issue in this case

19   specifically.  But these other -- these other --

20        THE COURT:  There's like one paragraph on NeoSure in

21   this --

22        MS. GHEZZI:  Right.

23        THE COURT:  -- 172 document.

24        MS. GHEZZI:  Yes.  That's correct, Your Honor.

25        MR. RATHKE:  I might want to say in closing that in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 219  Filed 10/15/14  Page 18 of 150

1   1994 Abbott introduced NeoSure in the closing argument.  I need

2   an evidentiary basis for it.

3           THE COURT:  Ask one of their witnesses.

4           MR. RATHKE:  Okay.

5           THE COURT:  Yeah.  I agree with the defense.  You

6   know, there might be some slight exceptionally marginal

7   relevance to some of the -- to something in the document, but

8   the bulk of the document is totally irrelevant, so I'm going to

9   exclude all three of them.  And if you were to be so fortunate

10  as to win, I would expect a thank-you note for my ruling.

11          Anything else?

12          MR. RATHKE:  Not from the plaintiff, Your Honor.

13          MR. REIDY:  Nothing, Your Honor.

14          THE COURT:  Okay.  We have the major issue of the case

15  to take up.  Mr. Reidy has already read my mind.  Do you want

16  the brownies at the first break or the second break?

17          MR. KING:  First break, please.

18          THE COURT:  First break, awesome.  They're good in the

19  morning.  Thank you.

20          MR. REIDY:  Thank you, Judge.

21          THE COURT:  We'll see you in five minutes.  Thanks.

22          (Recess at 8:24 a.m.)

23          THE COURT:  Please be seated.  A juror came in late,

24  so we'll give them a little bit of time to get -- are they

25  ready?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 19 of 150

1            CSO ABBE:  Not yet.

2            THE COURT:  Okay.  You just tell me when they're

3    ready, Bill.

4            (The jury entered the courtroom.)

5            THE COURT:  Good morning.  Is that bottled water, gin,

6    or vodka, huh?  The lawyers are going to assume it's bottled

7    water.

8            Okay.  Where are we, Miss Van Wyhe?  Good morning.

9            MS. VAN WYHE:  Good morning.  We are ready to call

10   Brad Puetz, Your Honor.

11           THE COURT:  Okay.  Is he here?

12           MS. VAN WYHE:  He is.

13           THE COURT:  There he is.  Sir, if you'd just come

14   forward, I'll swear you in.  Would you raise your right hand.

15              BRAD PUETZ, PLAINTIFF'S WITNESS, SWORN

16           THE COURT:  Thank you.  Please be seated in the

17   witness box, and you can adjust the chairs and the microphones

18   so you can speak directly into the microphones.  And would you

19   tell us your name and spell your last name, please.

20           THE WITNESS:  Brad Puetz, P-u-e-t-z.

21           THE COURT:  Thank you.

22           Counsel?

23           MS. VAN WYHE:  Thank you, Your Honor.

24                     DIRECT EXAMINATION

25   BY MS. VAN WYHE:

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 20 of 150

1   Q.   Mr. Puetz, where do you work?

2   A.   At the Sioux City drinking water plant.

3   Q.   And what is your title there?

4   A.   Operations supervisor.

5   Q.   How long have you worked at the water treatment plant?

6   A.   A little over ten years.

7   Q.   Do you have any special licenses or training associated

8   with your work at the Sioux City water treatment plant?

9   A.   Yes.  I currently hold the highest drinking water

10   certificate in the state of Iowa which is a grade 4.  And we are

11   also required to carry CEUs each year.

12   Q.   Does the city have to follow any state or federal

13   regulations associated with the municipal drinking water?

14   A.   The regulations that Sioux City follows are both mandated

15   by EPA and the Iowa Department of Natural Resources.  There are

16   a lot of regulations that we have to follow for Sioux City

17   drinking water.

18   Q.   Okay.  Can you describe what the city does to make sure

19   that its drinking water is safe, kind of the process that you go

20   through.

21   A.   Yeah.  We use two main processes, the first being

22   filtration.  Sioux City uses dual media filters, sand and

23   anthracite coal.  That's the first process the water goes

24   through.  The second and most important process is that of

25   disinfection.  We use chlorine gas at the Zenith water treatment

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 21 of 150

1  plant to ensure that the water is disinfected properly.

2  Q.   Are you familiar with E. sakazakii or cronobacter?

3  A.   Only from the information from this case.  I was asked to

4  provide documentation to local counsel on the case and have done

5  just very little research on that bacteria.

6  Q.   If there was E. sakazakii or cronobacter in the municipal

7  water, would the treatment that the city provides kill that

8  bacteria?

9  A.   Absolutely.

10          MR. SCANNAPIECO:  Objection.  Foundation.

11          THE COURT:  What's insufficient about the foundation?

12          MR. SCANNAPIECO:  He's being asked to provide an

13  opinion on whether water treatment would kill E. sakazakii, and

14  he just testified that he has little familiarity with the

15  bacteria.

16          THE COURT:  Overruled.

17  BY MS. VAN WYHE:

18  Q.   Go ahead and answer.

19  A.   Can you ask me the question again, please?

20  Q.   Sure.  If there was E. sakazakii cronobacter in the

21  municipal water, would the treatment that the city provides kill

22  that bacteria?

23  A.   My understanding of the bacteria is that it falls in a

24  coliform group.  All of the bacteria that is tested for in the

25  city falls in that group.  Basically when a bacteria sample is

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 22 of 150

1  run, it's -- the coliform group is an indicator test.  So the

2  individual bacteria itself would not be tested for, but the

3  disinfection process that we -- that we use at the Zenith water

4  plant would inactivate any bacteria that falls under that group.

5  So yes.

6  Q.   You're aware that the time frame when the minor child in

7  this case got sick was in April 2008; is that right?

8  A.   That's correct.

9  Q.   Did you look at the city water records for April 2008?

10  A.   Yes.

11  Q.   And was there cronobacter or E. sakazakii bacteria in the

12  city water in April 2008?

13  A.   I don't know that answer.  What I can say is the water that

14  the city treated was free of any bacteria in April of 2008.

15  Q.   Okay.  So the city water was free of any bacteria, and that

16  would include the cronobacter E. sakazakii if it was in there?

17  A.   That is correct.

18  Q.   Okay.  Because that was part of the coliform group that

19  this bacteria's part of; is that right?

20  A.   Correct.

21  Q.   And you checked the water records for every day in April

22  2008 in preparation for your testimony; is that right?

23  A.   Yes.

24  Q.   Now, you said you've been with the city water department

25  for ten and a half years?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 219  Filed 10/15/14  Page 23 of 150

1   A.   Correct.

2   Q.   During that time, has there ever been a notice sent out to

3   city residents that they needed to boil their water?

4   A.   No.

5   Q.   Are you aware of any reported case while you have been with

6   the city water department where someone got sick from the city

7   water?

8   A.   There have been no instances to my knowledge.

9          MS. VAN WYHE:  I have no further questions.

10         THE COURT:  Thank you.  You may cross-examine.

11                      CROSS-EXAMINATION

12  BY MR. SCANNAPIECO:

13  Q.   Morning, Mr. Puetz.  My name's Gabe Scannapieco.  We've

14  spoken before.

15         Now, you just testified about treatment at the water

16  plant.  You're talking about the treatment at the time the

17  water's in the plant; correct?

18  A.   That's correct.

19  Q.   And so when you speak about the safety of the water in

20  Sioux City, you're not talking about the safety of the

21  groundwater supply before it's treated, are you?

22  A.   Correct.

23  Q.   And also when you're talking about the level of treatment

24  that occurs, that's in the plant.  That doesn't necessarily

25  guarantee the quality of the water when it comes out of a faucet

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW  Document 219  Filed 10/15/14  Page 24 of 150

1   somewhere else in Sioux City; correct?

2   A.   That is correct.  The --

3   Q.   Thank you.

4   A.   Okay.

5   Q.   Now, I want to ask you a few questions about some testing

6   that was performed in April 2008 on the groundwater that was

7   being collected by the city's wells; okay?

8   A.   Okay.

9   Q.   Now, your department conducted weekly testing of the water

10  that was collected in -- I believe they're large wells that are

11  by the riverfront that collect water for the Sioux City water

12  supply, correct, in -- let me rephrase that; okay?  That was a

13  terribly misworded question.

14         Your department performed bacterial testing on the

15  city wells used to collect groundwater before that water was

16  sent to the treatment plant; correct?

17  A.   That's incorrect.

18  Q.   Okay.

19  A.   Yeah.  Normally we do not take bacteria samples from the

20  raw water.

21  Q.   Okay.  But you did do that in April 2008; isn't that right?

22  A.   Can you -- could you provide the documentation for me,

23  please?

24  Q.   Sure, if that would help you remember what you've provided.

25  A.   Okay.  Yes, the document that you have placed in front of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 25 of 150

1  me is a bacteria sample from one of our wells which is the

2  riverfront collector well which at the time would have been done

3  once weekly.

4  Q.   Okay.  And that's the one at Chris Larson Park?

5  A.   That's correct.

6  Q.   And this test shows the quality of the groundwater that's

7  going into the city wells; correct?

8  A.   That's correct.

9  Q.   And I believe that the person that went out and collected

10 that test, that was you?

11 A.   That'd be me.

12 Q.   And is it correct that all the testing of that weekly

13 testing during the month of April 2008, all of it was positive

14 for coliforms in the groundwater?

15 A.   That looks to be correct, yes.

16 Q.   Okay.  Thank you.  Now, let's talk a little bit about the

17 disinfection that the city does with the water supply.  The city

18 you said uses filtration before it uses chlorination, and the

19 filtration, that is just -- it uses sand, and the water travels

20 through the sand?

21 A.   Yes, and the anthracite coal, yes.

22 Q.   Okay.  And then you have to use chlorine to address any

23 microbes that might be in the water?

24 A.   Correct.

25 Q.   Now, in order to achieve disinfection, you have to have a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 219  Filed 10/15/14  Page 26 of 150

1    minimum level of chlorine in the water; is that correct?

2    A.    The calculation used to determine whether or not we

3    disinfect the water properly is called a CT calculation,

4    basically contact time, and it's a calculation based on the

5    chlorine residual and the temperature of the water at the time.

6    And during April of 2008, all of our CT calculations met

7    requirements.

8    Q.    Okay.  And so that was the CT requirements that you

9    measured at the plant.

10   A.    Correct, after disinfection.

11   Q.    And the residual chlorine, are you talking about something

12   called free chlorine?

13   A.    Free chlorine, that's correct.

14   Q.    And free chlorine is the amount of chlorine that's left in

15   water that can interact with microbes?

16   A.    That's correct.

17   Q.    And you don't have enough free chlorine in water, it's --

18   you wouldn't be able to disinfect any microbes that would come

19   into contact with the water; correct?

20   A.    There's a minimum amount of chlorine as you said.  The

21   disinfection process probably does happen, but we can't assure

22   that that is the case.

23   Q.    Sure.  But there is a minimum amount that is required to

24   assure that microbes are killed.

25   A.    That's -- that's correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 27 of 150

1  Q.   Okay.  And you talked about being regulated by the EPA and

2  the Iowa DNR and there being numerous regulations.  Am I correct

3  that the Iowa DNR requires a level of .3 milligrams per liter of

4  chlorine to assure disinfection?

5  A.   That is correct.

6  Q.   And if water drops below that level, it's not considered

7  potable water anymore; correct?

8  A.   It's considered inadequately disinfected.

9  Q.   Now, chlorine levels drop in Sioux City's water supply from

10  the time that it's in the water plant to the time that it

11  reaches people's homes; correct?

12  A.   That's correct.

13  Q.   And so Sioux City not only tests some of the water that's

14  from its plant, but it actually goes out, and it looks at houses

15  and different faucets across the city to see the levels of

16  chlorine that are in that water; correct?

17  A.   That's correct.

18  Q.   And that's the only way that you can know if the water

19  that's going into a specific area of town has the required level

20  of chlorine to assure disinfection of anything it encounters

21  during the distribution.

22  A.   That's correct.

23  Q.   And you performed these tests through something called -- I

24  believe there are some handwritten forms that you have at the

25  plant that show a test at the plant on a day and then show a

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 28 of 150

1    test taken somewhere out in the city; correct?

2    A.    That's correct.

3    Q.    And then there are also routine testing where about ten

4    samples are taken from a rotating schedule of locations?

5    A.    That -- at that point in time in 2008, we were required to

6    take 90 bacteria samples per month.

7    Q.    Okay.  And when that was done, it was done at -- you know,

8    in groups of about 10 to 12 at a time.

9    A.    That's correct.

10   Q.    And then lastly, the city takes tests that are called

11   special tests which is if you're interested in knowing the water

12   quality in a specific address, you have to go to that address

13   and test the water, or else you're not a hundred percent sure

14   whether the water has bacteria or sufficient levels of chlorine;

15   correct?

16   A.    That's correct.

17   Q.    Now, you talked about collecting and reviewing some

18   documents for this case.  Do you recall that those documents

19   included a handwritten plant form for the month of April 2008?

20   A.    Was that a chlorine residual imp --

21   Q.    Let me bring it to you.

22   A.    Okay.

23          MS. VAN WYHE:  Your Honor, I object to this exhibit on

24   relevance.

25          THE COURT:  Well, he's not offering it.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 29 of 150

1          MR. SCANNAPIECO:  Yeah.

2          THE COURT:  So the objection's premature.  We'll see

3   if he offers it.  I think he's using it to refresh the

4   recollection of the witness.

5   BY MR. SCANNAPIECO:

6   Q.   Mr. Puetz, have you had the opportunity to look at that?

7   A.   I did -- I did look over this information when it was

8   requested by local counsel.  I'm fairly familiar with the

9   information.

10  Q.   Okay.  So does this document refresh your memory as to when

11  we talked about there was a form that showed a test taken at the

12  plant and then a test taken somewhere out in Sioux City?  Does

13  that refresh your recollection about those tests?

14  A.   Yeah.

15  Q.   And the results of those tests?

16  A.   Yeah.

17  Q.   Now, the way that I understand it is that -- these forms

18  are filled out is that there's an entry for each day.  So if we

19  look at the top, that's April 1.  And if we move ourselves, you

20  know, down, April 2, April 3, April 4, April 5, and so on?

21  A.   That's correct.

22  Q.   Okay.  Do you recall what the results were for system

23  testing on April 17, 2008?

24  A.   I see that information, yes.

25  Q.   Okay.  And am I correct that the results for system testing

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 30 of 150

1    taken out in Sioux City on April 17, 2008, were a level of .16

2    residual chlorine; is that correct?

3    A.    That's correct.

4    Q.    And the level mandated by IDNR for potable water is .30

5    milligrams per liter; correct?

6    A.    That's correct.

7    Q.    So this is barely 50 percent of that required minimum;

8    correct?

9    A.    That's correct.

10    Q.    And that test was taken at 2404 Riverside Boulevard; is

11    that right?

12    A.    That's correct.

13    Q.    And do you know where that is?

14    A.    I don't know where the exact -- I mean, I know the area,

15    but I don't know the exact location.

16    Q.    Okay.  Am I right to assume that it's near the neighborhood

17    of Riverside?

18    A.    Yes.

19    Q.    And does this form also show if you look between the test

20    that was taken at the plant and the test that was taken at that

21    Riverside location that the amount of residual chlorine in the

22    water had dropped over 90 percent?

23    A.    That is correct, but you cannot assume because there is

24    water already in the distribution system, water that has aged,

25    so we cannot use the plant disinfection level for that day to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 31 of 150

1    determine a number of decrease for the plant or for the system

2    sample.

3    Q.   Okay.  So if I understand correctly what you just said,

4    you're saying that if we look at the levels that we have at the

5    plant, that's not going to tell us anything about the levels

6    that we would see in the city because there's older water

7    sitting in the system and there's other things that may affect

8    the quality of the water there.  When we're looking at plant

9    results that you say are in the CT inactivation ratio, that's

10   only telling us what's going on at the plant.  Is that --

11   A.   That's correct.

12   Q.   Did I understand you correctly?  I'm going to hand you some

13   more of your testing records because I have sort of a general

14   question that you may want to refer to some too.  Mr. Puetz -- I

15   mean Puetz -- I'm sorry -- after looking at the records, am I

16   correct in my assumption that the closest water sample taken in

17   the second half of the month of April 2008 to the Riverside

18   neighborhood was the test that we just talked about, that test

19   from 2404 Riverside Boulevard?  And if you need to refresh your

20   recollection as to the other tests, please let me know.

21   A.   Give me one second, please.  That seems to be accurate.

22   Q.   Thanks.  I just have one question about May two thou -- or

23   I'm sorry.  I don't want to lose my gold star, but I have a

24   couple questions about May 2008; okay?  We talked before about

25   routine testing, and that's where you go out and you check some

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 32 of 150

1  of the taps in the city to see what the levels of chlorine are.

2  Am I correct in my assumption that there was a test performed on

3  May 1, 2008, that showed that at that time, unlike April 2008,

4  the chlorine levels near the Riverside neighborhood were, again,

5  normal?

6  A.   Yes, they were normal.

7          MR. SCANNAPIECO:  No further questions.

8          THE COURT:  Any redirect?

9          MS. VAN WYHE:  No, Your Honor.

10          THE COURT:  Any questions from the jury?  Doesn't look

11  like it.

12          Thank you.  You may step down.

13          What's next?

14          MS. VAN WYHE:  Your Honor, we would call Louise

15  Deitloff.

16          THE COURT:  Okay.  Good morning.  You've been so

17  patient this whole time.

18           LOUISE DEITLOFF, PLAINTIFF'S WITNESS, SWORN

19          THE COURT:  Thank you.  Please be seated.  Adjust the

20  chair and the microphones.  And when you're ready, tell us your

21  name, please, and spell your last name.

22          THE WITNESS:  Okay.  My name is Louise Deitloff, D as

23  in David e-i-t-l-o-f-f.

24          THE COURT:  Thank you.

25                          DIRECT EXAMINATION

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 33 of 150

1  BY MS. VAN WYHE:

2  Q.    Where do you work?

3  A.    I work at Security National Bank.

4  Q.    And what is your title there?

5  A.    Wealth management advisor.

6  Q.    Is it your understanding that Security National Bank was

7  appointed by the Woodbury County District Court to be the --

8  Jeanine's conservator?

9  A.    Yes, that's correct.

10  Q.    And on January 7, 2011, did the Woodbury County District

11  Court issue an order giving permission to bring this lawsuit?

12  A.    Yes.

13  Q.    What is your understanding as to why Security National Bank

14  is the conservator for Jeanine and the plaintiff in this

15  lawsuit?

16  A.    Well, Security was asked to serve as the -- as a corporate

17  conservator for Jeanine since she's a minor child, and we bring

18  a lot of experience and continuity and things that work well

19  with looking after any financial matters that may be -- that

20  this child may need in the future.

21  Q.    To your knowledge, does Jeanine have any assets other than

22  this claim against Abbott?

23  A.    No.

24  Q.    If the jury finds for the plaintiff and awards money to

25  Security National Bank in this case, what will happen to the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 34 of 150

1  funds?

2  A.   The funds will be held at the bank, and we will manage

3  those.  Like I talked about, we have experience managing assets

4  for all kinds of clients and conservatorships and trusts and

5  things.  We will manage those, fulfill our fiduciary duties.

6  We'll work closely with the court.  We would -- we have

7  procedures so we would set up what the standard, what her needs

8  are, and the costs that are associated with those, and we would

9  provide those when they're needed.

10  Q.   How much oversight does the bank have on that account?  In

11  other words, can you explain the process that Jeanine's

12  caretakers or parents would have to go through to get funds out

13  of that account?

14  A.   Yes.  Well, like I talked about, we'd set up and get

15  approved what the standard course of her needs would be, and

16  we'd have the expenses of those, and we would get those

17  preapproved.  We have a process where we do s -- we understand

18  what the requests are, we do some independent research and, you

19  know, make sure that those are in Jeanine's best interests and

20  that she does need those.  Then we would get that approved

21  through an internal committee.

22       I would do the research, and then I would present that

23  to them.  They would maybe come back and ask me more questions

24  that I may have to do further research on.

25       Then once it's approved by our committee, it would

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:11-cv-04017-MWB-CJW  Document 219  Filed 10/15/14  Page 35 of 150

1    also need to be approved by the court.  So any monies that are

2    expended for her care would have the oversight of the court in

3    addition to our internal oversight.

4            MS. VAN WYHE:  Thank you.  I have no further

5    questions, Your Honor.

6            THE COURT:  Thank you.

7                          CROSS-EXAMINATION

8    BY MR. REIDY:

9    Q.   Is it Miss Deitloff?

10   A.   Deitloff actually.

11   Q.   Deitloff, I'm sorry.

12   A.   That's okay.

13   Q.   I'm Dan Reidy, Miss Deitloff.  We've not met before; is

14   that right?

15   A.   No.

16   Q.   The conservatorship that the bank has, you mentioned that

17   that's while Jeanine is a minor?

18   A.   Well, in this case since Jeanine will never be capable of

19   managing her own affairs, this would go on for her lifetime.

20   Q.   And at the end of her life, what happens to the

21   conservatorship?

22   A.   Well, that's a good question.  I would suppose the

23   conservatorship would end, but it's my understanding that if

24   funds are provided for Jeanine's care, then in addition to the

25   conservatorship, there would be a trust established.  The bank

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 36 of 150

1  would serve kind of a dual role as the trustee and the

2  conservator.  When this trust is created, there would be

3  provisions within the trust that the bank would have to follow.

4  And I would imagine as with the other trusts that I manage that

5  there would be a provision inside the trust for what would

6  happen with those funds at Jeanine's death.  You know, one thing

7  may be there could be a foundation or something established.

8  Q.   I don't want you to speculate.

9  A.   Okay.

10 Q.   Jeanine can't tell you what to do with the money, can she?

11 A.   No, she's not capable of that.

12 Q.   And so if the conservatorship ends, is one possibility that

13 the money would pass according to the Iowa laws of what happens

14 to money when somebody passes without a will?

15 A.   I don't know the answer to that question.

16 Q.   So do you know whether or not the money would pass to the

17 parents if they were still living as Jeanine Kunkel's heirs?

18 A.   I'm not familiar with that law.  So, you know, I would just

19 follow what the court would tell us to do.

20         MR. REIDY:  Thank you.

21         THE COURT:  Any redirect?

22         MS. VAN WYHE:  No, Your Honor.

23         THE COURT:  Okay.  Any questions from the jury?

24 Doesn't look like it.

25         Okay.  You may step down.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 37 of 150

```
 1              MR. RATHKE:  Your Honor, at this point we'd like to
 2     read the deposition of Pamela Anderson.
 3              THE COURT:  Okay.
 4              MR. RATHKE:  This is a deposition which occurred on
 5     September 10 -- or excuse me, September 30, 2011.  I was asking
 6     the questions.  Ms. Anderson was answering them.  And Attorney
 7     June Ghezzi represented Abbott.
 8              (Deposition designations of Pamela Anderson were read
 9     in open court.)
10              THE COURT:  What's next?  Why doesn't everybody take a
11     stretch break.
12              Okay.  Thank you.  Please be seated.  Another
13     deposition?
14              MR. RATHKE:  Yes, Your Honor.  This is the deposition
15     of Larry Williams which was taken on October 5, 2012, and Pat
16     Persons from our office will be playing the part of
17     Dr. Williams.  And if there's any objections by counsel, that
18     would be read -- by Abbott counsel, that would be read by
19     Ms. Van Wyhe.
20              THE COURT:  Could you move that microphone a little
21     closer to you?  Thank you.
22              MR. RATHKE:  Okay.  You all set?  All right.
23              (Deposition designations of Larry Williams were read
24     in open court.)
25              THE COURT:  What's next?
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 38 of 150

1          MR. RATHKE:  Your Honor, with the Court's permission,

2    we're ready to run the two videos that have been discussed in

3    the testimony, first the day in the life and, second, the

4    therapy video, and those should take about a total of 30

5    minutes.

6          THE COURT:  Okay.  Why don't we give everybody a

7    stretch break, and then we'll see the two videos, and then we'll

8    take our morning recess.

9          THE COURT:  Thank you.  Please be seated.

10         (Exhibit 142 was played in open court.)

11         MR. RATHKE:  Your Honor, that ends that video.  We

12   have one more video to play which is about 15 minutes.

13         THE COURT:  Okay.  Thank you.  Why doesn't everybody

14   take a stretch break while they queue up the last video.

15         MR. PERSONS:  All set, Your Honor.

16         THE COURT:  Okay.  Thank you.  Please be seated.

17         (Exhibit 143 was played in open court.)

18         THE COURT:  Mr. Rathke, does the plaintiff have any

19   additional evidence?

20         MR. RATHKE:  The Medicaid issue we've talked about, so

21   we'd be offering that, and we discussed that earlier so . . .

22         THE COURT:  Are you going to offer that at this time

23   or at some later time?

24         MR. RATHKE:  I can offer it now.

25         THE COURT:  Okay.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 39 of 150

1          MR. REIDY:  There's no objection, Judge.

2          THE COURT:  Okay.  Thank you.

3          MR. REIDY:  If that's the question.

4          MR. RATHKE:  Your Honor, ladies and gentlemen of the

5   jury, the plaintiff rests.

6          THE COURT:  Well, I thought you were going to offer

7   the document.

8          MR. RATHKE:  We have to --

9          THE COURT:  I'm not understanding what you're doing.

10         MR. RATHKE:  I'm sorry.  We have to change the

11  document.

12         THE COURT:  Oh.  Well, then I asked you if you were

13  going to -- okay.

14         MR. RATHKE:  I haven't got the document ready right

15  now.

16         THE COURT:  Well, that's what I asked you.  Okay.  So

17  you rest, but you've got an agreement on the document, and that

18  document will be coming in.

19         MR. RATHKE:  Yes, Your Honor.

20         THE COURT:  Okay.  And, Mr. Reidy, is that correct?

21         MR. REIDY:  Yes, Your Honor, that's correct.

22         THE COURT:  Okay.  Thank you.

23         MR. KING:  May I confer with counsel for one minute,

24  Your Honor?

25         THE COURT:  Yes.

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 40 of 150

1          MR. KING:  Your Honor, just one further evidentiary

2     item that counsel and I, I think, will resolve, it would be an

3     offer of evidence going to the financial condition of Abbott as

4     it might bear on punitive damages.

5          THE COURT:  Okay.

6          MR. KING:  We've agreed to work --

7          THE COURT:  And you're going to have a stipulation

8     about that?

9          MR. KING:  Yes, we've agreed to work that out for

10    later admission.

11         THE COURT:  Okay.  Okay.  For later admission.  And

12    the defense doesn't object that it will come in later.  Okay.

13    Thank you.

14         So the plaintiff has rested subject to -- there are

15    two additional pieces of evidence that the parties are just kind

16    of working out the numbers on actually.  They both involve

17    numbers, and you'll be getting that information.  But the

18    plaintiff has rested.  And we'll take a recess, let's see,

19    until -- we'll be in recess until 10 . . .

20         MS. GHEZZI:  Your Honor, if I may?

21         THE COURT:  Yes.

22         MS. GHEZZI:  We have Dr. Shulman who we thought was

23    going to get on between 9:30 and 10.  He has to be finished

24    today if that has any consideration in your . . .

25         THE COURT:  So he has to be finished today?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 41 of 150

```
 1              MS. GHEZZI:  Yes, yes, Your Honor.

 2              THE COURT:  You're not going to be able -- we're not

 3   going to be able to finish him the whole rest of the day?

 4              MS. GHEZZI:  No, no.  We -- yes.  I'm just telling you

 5   we thought he was going to be on between 9:30 and 10.

 6              THE COURT:  Well, I know you thought that, but that

 7   didn't happen, so are you telling me if I give the jury a

 8   25-minute recess --

 9              MS. GHEZZI:  No, no, no.

10              THE COURT:  -- they're not going --

11              MS. GHEZZI:  No, no, Your Honor.

12              THE COURT:  -- you're not going to get --

13              MS. GHEZZI:  No.

14              THE COURT:  Well, then why did you even -- what's the

15   purpose of what you're doing?

16              MS. GHEZZI:  Just because the schedule is a little bit

17   off, and I just wanted to share that with Your Honor.  That's

18   all.

19              THE COURT:  Okay.  Thanks for sharing.

20              Members of the jury, we'll be in recess until 10

21   minutes to 11.  Thank you.

22              (The jury exited the courtroom.)

23              (Recess at 10:22 a.m.)

24              THE COURT:  Ready to have the jury brought in?

25              MS. GHEZZI:  Yes, Your Honor.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 42 of 150

```
 1          THE COURT:  Thank you.

 2          MR. REIDY:  Thank you for the brownies, Your Honor.

 3  They were great.

 4          MS. GHEZZI:  Delicious.

 5          THE COURT:  Oh.  I imagine federal judges in Colorado

 6  probably won't be serving brownies to the lawyers.

 7          MS. GHEZZI:  That is correct.  That would be correct.

 8          MR. RATHKE:  Okay.  That went over my head.

 9          THE COURT:  Maybe if you're a state court judge you

10  would but not a federal judge; right?

11          (The jury entered the courtroom.)

12          THE COURT:  Thank you.  Please be seated.

13          And, Miss Ghezzi, you can call your first witness.

14          MS. GHEZZI:  Your Honor, the defense calls

15  Dr. Stanford Shulman.

16          THE COURT:  Thank you.  Doctor, if you'd come forward,

17  I'll swear you in, just anywhere in the middle here.  Would you

18  raise your right hand, please.

19          STANFORD SHULMAN, DEFENDANT'S WITNESS, SWORN

20          THE COURT:  Thank you.  Please be seated.  And you can

21  adjust the chair and the microphones so you can speak directly

22  into them.  And would you tell us your name, please, and spell

23  your last name.

24          THE WITNESS:  My name is Stanford T. Shulman.  That's

25  S-h-u-l-m-a-n.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 43 of 150

```
 1              THE COURT:  Thank you.

 2              Miss Ghezzi?

 3              MS. GHEZZI:  Thank you, Your Honor.

 4                        DIRECT EXAMINATION

 5  BY MS. GHEZZI:

 6  Q.    Dr. Shulman, where are you currently employed?

 7  A.    I'm currently employed at the Lurie Children's Hospital in

 8  Chicago and Northwestern University Feinberg School of Medicine

 9  in Chicago.

10  Q.    And can you tell the jury your job responsibilities at the

11  Lurie Children's Hospital of Chicago.

12  A.    Yes.  I'm the head of the division of infectious diseases

13  at the Lurie Children's Hospital, and I'm the director of the

14  hospital infection prevention and control program.

15  Q.    And do you have a role as the hospital epidemiologist?

16  A.    Yes, I am the hospital epidemiologist with respect to the

17  infection control program, yes.

18  Q.    Do you have any other titles at the hospital?

19  A.    I'm the medical director of the microbiology laboratory,

20  and I'm the past director of the fellowship program in pediatric

21  infectious diseases which I gave up after 33 years.

22  Q.    And how long have you been chief of the division of

23  infectious disease and the hospital epidemiologist at what used

24  to be Chicago -- or Children's Memorial Hospital and is now the

25  Lurie Children's Hospital of Chicago?
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the Transcript*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 44 of 150

1  A.    Thirty-five years.

2  Q.    Do you have any current teaching positions?

3  A.    I'm a professor of pediatric infectious diseases at the

4  Northwestern University Feinberg School of Medicine, and I'm

5  responsible for the education of our pediatric infectious

6  disease fellows, the pediatric residents -- we have about 90

7  pediatric residents currently -- and the Northwestern medical

8  students with respect to infectious diseases.

9  Q.    Thank you.  Could you tell the jury your educational

10  background, please?

11  A.    Yes, I graduated from University of Cincinnati, and I

12  then -- with my bachelor's degree, and then I graduated from the

13  University of Chicago Medical School with my M.D. degree.  I

14  then became a resident and chief resident at the University of

15  Chicago and -- in pediatrics.  I then did some training at the

16  Institute For Child Health in London, England, for a relatively

17  brief period of time and did training in pediatric infectious

18  diseases and immunology at the University of Florida.

19  Q.    And are you board certified in any specialty?

20  A.    Yes, I'm board certified in pediatrics and pediatric

21  infectious diseases.

22  Q.    And what does it mean -- can you tell the jury what it

23  means to be board certified?

24  A.    It means that one has completed training, nowadays three

25  years of training, in pediatric infectious diseases as well as

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 45 of 150

```
 1   three years of training in pediatrics to become board certified

 2   in those two specialties.

 3   Q.   And does it involve special testing of any kind?

 4   A.   Yes.  In addition to completing a course of education, one

 5   has to be certified by passing a test and then becoming

 6   recertified on a periodic basis, every seven to ten years.

 7   Q.   And have you kept up your board certifications?

 8   A.   Yes, I have.

 9   Q.   Can you tell the jury, please, if you have any memberships

10   in pediatric infectious disease professional or scholarly

11   associations.

12   A.   Yes.  I'm a member of the Infectious Disease Society of

13   America.  I'm a member and past president of the Pediatric

14   Infectious Disease Society which is the largest such society in

15   the world.  I'm -- yes.

16   Q.   Have you authored any books on pediatric infectious disease

17   and book chapters?

18   A.   Yes.  I've authored 6 books and about 75 book chapters.

19   Q.   And have you -- do you have any publications on infant

20   bacterial meningitis?

21   A.   Yes, I have a few publications on that topic and mostly

22   chapters.

23   Q.   And do any of them deal with in any way E. sakazakii?

24   A.   None of them deal solely with that, but in chapters on

25   bacterial meningitis in children, I believe there's some mention
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 46 of 150

1    of E. sakazakii to be complete.

2    Q.   And as an expert in the field of pediatric infectious

3    disease and infectious disease epidemiology, what were you asked

4    to do in this case?

5    A.   I was asked to review medical records, government records,

6    depositions, and other documents and to assess whether there's

7    reasonable degree with -- reasonable degree of medical and

8    scientific certainty whether Abbott's NeoSure powdered infant

9    formula was the source of the bacterium that caused meningitis

10   in the Kunkel child.

11   Q.   And did you reach an opinion as to whether or not Abbott's

12   NeoSure powdered infant formula was the cause of the infant's

13   meningitis infection to a reasonable degree of medical and

14   scientific certainty?

15   A.   Yes, I did.

16   Q.   And what was that opinion?

17   A.   That opinion is that Abbott's NeoSure powdered infant

18   formula did not cause the baby's bacterial meningitis.

19   Q.   And we're going to go into this in some detail, but can you

20   summarize, please, for the jury the bases for your opinion.

21   A.   Well, the bases are, number one, there's no microbiologic

22   evidence after extensive testing of the powdered infant formula

23   that it was contaminated with the particular organism; number

24   two, that the timing of the baby's infection I believe began --

25   the earliest symptoms began essentially simultaneous with the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 47 of 150

1  first powdered infant formula feeding; and thirdly, that because

2  enterobacter sakazakii is such a widespread, ubiquitous organism

3  in our environment that there had been inadequate or

4  insufficient testing of environment sources to rule them out as

5  the cause of this infection.

6  Q.   And did you have a chance to review the microbiological

7  testing that you mentioned just a moment ago, the results of the

8  microbiological testing?

9  A.   Yes, I did.

10  Q.   Did you review the results of the testing by the Centers

11  For Disease Control?

12  A.   Yes, I did.

13  Q.   If you look on -- can you see that?  Can you see that,

14  Dr. Shulman?

15  A.   Yes.

16  Q.   Okay.  This is Exhibit 2153, and can you tell on the first

17  line here what was the specimen that was undergoing testing by

18  the CDC in that line?

19  A.   Yes, it was the infant formula, the Similac NeoSure, with

20  that particular number and date.

21  Q.   You have to talk into the microphone.

22  A.   I'm sorry.  It was the infant formula designated Similac

23  NeoSure with particular registration number and the date, and

24  the can was opened.

25  Q.   And the can was opened you said?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 48 of 150

1    A.    Yes.

2    Q.    Okay.  And what was the test request by the CDC?

3    A.    The test was isolation of enterobacter sakazakii.

4    Q.    And what was the result of that test by the CDC?

5    A.    The result is negative.

6    Q.    Thank you.  And did you review the testing that the FDA

7    did?

8    A.    Yes, I did.

9    Q.    And do you recall how many -- how many other cans of

10   Abbott's NeoSure powdered infant formula from batch 61281RE were

11   tested?

12   A.    Yes, I think 17 additional batches were tested.

13   Q.    Doctor, I'm putting up on your screen Exhibit 1009B.  Do

14   you see that?

15   A.    Yes.

16   Q.    Can you see the lab conclusions at the end of that test?

17   A.    Yes.  Yes.  It says no enterobacter sakazakii was recovered

18   from 17 individual subs examined, and no sakazakii MMS operon

19   was detected in 17 subs using reverse transcriptase PCR.

20   Q.    Okay.  And those are the tests that were done by the FDA;

21   correct?

22   A.    Correct.

23   Q.    Do you have any reason, doctor, to doubt the results of the

24   CDC's testing on that can of NeoSure?

25   A.    No, none at all.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 49 of 150

1 Q.   Do you have any reason to doubt the FDA's testing on the 17

2 additional cans of NeoSure?

3 A.   Not at all, no.

4 Q.   Did you review any other testing data from Abbott's

5 finished product testing?

6 A.   Yes, I did.

7 Q.   Doctor, I'm putting up on the board -- I mean, I'm sorry,

8 on your screen -- I'm sorry.  Excuse me.  Pardon me one moment.

9 This is Exhibit 2052.  And, doctor, can you see on that exhibit

10 a test result for enterobacter?

11 A.   Yes.  Here listed as number 7?

12 Q.   Yes.  And what's the result of that test?

13 A.   It's all negative, negative specimen, negative in 750

14 grams.

15 Q.   Okay.  And do you see on the top that I'm going to circle

16 up there that the batch is 61 -- woops.  I'm sorry.  Sorry.  I'm

17 going to take that off, try and get the right one.

18        MS. GHEZZI:  Sorry, Your Honor.  Okay.  Thank you.

19 I'm sorry.  Now we're working.

20 Q.   Do you see 2052, page 0006?  Do you see these 2 numbers up

21 here, doctor, 61281RE00?

22 A.   Yes.

23 Q.   Okay.  And do you see on that -- for 6128100, that number

24 7, what the result of that was?

25 A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 50 of 150

1  Q.  And what was it?

2  A.  It's all negative in 750 grams.

3  Q.  And then go to the next sample at 61281RE10.

4  A.  Yes.  And that's the same result.  For E. sakazakii it's

5  negative in 750 grams.

6  Q.  Okay.  Thank you.  Now, doctor, is there any possibility in

7  your mind that all of that testing somehow just missed E. sak?

8  A.  No, I think that's really not at all possible.

9  Q.  And why do you say that?  What's the basis for that

10  statement?

11  A.  Well, we have really -- we have the testing from CDC.  We

12  have the extensive testing from the FDA on multiple batches --

13  17 batch -- 17 cans that were produced virtually simultaneously

14  or within seconds of the can that the child had been fed from,

15  and we have the additional large volume of powdered infant

16  formula that was cultured by Abbott.  All of these being

17  completely negative for E. sakazakii to me makes it virtually

18  impossible that there was any contamination of this product at

19  that time.

20  Q.  Is that at the factory?  Are you saying at the factory?

21  A.  Yes, intrinsic -- I'm sorry, intrinsic contamination would

22  be impossible to be present.

23  Q.  If there had been intrinsic contamination occurring at the

24  factory, what would you expect to see out in the real world?

25  A.  Well, out in the world we would expect to see more than a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 219  Filed 10/15/14  Page 51 of 150

1  single case of the infection, because when a food product is

2  contaminated, we generally see -- we always see really multiple

3  cases.  We all are familiar with salmonella outbreaks or E. coli

4  outbreaks which are recognized because there's a number of

5  individuals that are infected close in time.  And that did not

6  occur in this circumstance.

7  Q.  Okay.  And I want to show you Exhibit 2050 which is an

8  Abbott document after the report of the illness in Jeanine

9  Kunkel.  And do you see -- can you see the description on May 1,

10  2008, of what that indicated?

11  A.  Yes.  It indicated there was no other E. sakazakii cases

12  registered against this product.

13  Q.  And then on May 19 there was an additional?

14  A.  Additional, again, showed no other E. sakazakii or trends

15  or any sign or symptom registered against this batch.

16  Q.  And if you go down again to May 1, 2008, can you see what

17  the dates are that Abbott was looking at in terms of trying to

18  find out if there were any other E. sak cases registered

19  against --

20  A.  Yes.

21  Q.  -- this product, this entire product?

22  A.  Yes.  It runs from the 1st of May, 2006, for 2 years to the

23  1st of May, 2008.

24  Q.  Okay.  And in your experience as a pediatric infectious

25  disease expert, what does this testing data mean in terms of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 319  Filed 10/15/14  Page 52 of 150

1  ruling in or ruling out Abbott's NeoSure powdered infant formula

2  as a cause of the infant's infection?

3  A.   I believe that this really rules out the powdered infant

4  formula as a cause of the child's infection.

5  Q.   If you were treating Jeanine Kunkel as a patient in your

6  hospital knowing what you know from the records that you've seen

7  and her medical records, how confident would you be in telling

8  her parents that the product was not the source of her

9  infection?

10 A.   I would be very confident in telling them that this

11 particular product was not the source of the child's infection,

12 definitely.

13 Q.   Okay.  Now, switching gears a little bit, I want to talk a

14 little bit about bacterial meningitis in general.

15 A.   Yes.

16 Q.   And there's been some discussion of it in the case so far,

17 but it was maybe about a week ago.  Can you define bacterial

18 meningitis for the jury, please.

19 A.   Sure.  Bacterial meningitis is a infection by a germ or

20 bacterium which involves the meninges which is the lining over

21 the brain, over the spinal cord, and it's a serious infection.

22 Q.   And what are the most common types of neonatal and

23 infantile bacterial meningitis in the United States?

24 A.   The most common are what we call Group B streptococcus, and

25 the second most common would be E. coli.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 53 of 150

1  Q.   And how many of those are reported annually in the United

2  States currently?

3  A.   Approximately 1,500 to 2,000 cases total.

4  Q.   And in your practice over 43 years treating babies and

5  newborns, have you treated them for bacterial meningitis?

6  A.   Yes, many times.

7  Q.   And about how many times if you can --

8  A.   Probably about 500 cases of bacterial meningitis.

9  Q.   And were any of those cases E. sakazakii meningitis?

10 A.   No, they were not.

11 Q.   And how many cases of infant E. sakazakii meningitis are

12 there per year in the United States based on your experience and

13 research?

14 A.   There are approximately four to six cases each year in the

15 United States of E. sakazakii meningitis.

16 Q.   And what does that mean in terms of the incidence of

17 E. sakazakii meningitis in infants in the United States

18 population as a whole?

19 A.   Well, there's between four and four and a half million

20 newborn babies every year, so four to six cases out of that four

21 million would be about one out of a million.

22 Q.   Do the symptoms of bacterial meningitis in infants differ

23 depending on what kind of bacteria is at work?

24 A.   No, they don't.

25 Q.   Can you tell the jury what are the early symptoms of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 54 of 150

1  bacterial meningitis in an infant?

2  A.   The early symptoms in an infant with bacterial meningitis,

3  irritability, crying, and decreased feeding.

4  Q.   And do these symptoms occur all at once, or do they

5  progress over time or something else?

6  A.   No, they generally show up one at a time and then sort of

7  progress, in the early stages can be a little bit of waxing and

8  waning in terms of symptoms.  But overall there's a general

9  progression of severity in terms of the crying, decreased

10 feeding.

11 Q.   And can an infant with meningitis sleep in between bouts of

12 severe crying and irritability?

13 A.   Yes.  Babies -- babies who are crying and are extremely

14 irritable do get tired out and exhausted and can fall asleep for

15 a period of time and then awake and resume being inconsolable

16 and crying a lot.

17 Q.   Now, are infants the only humans who get infected by or

18 colonized with E. sakazakii bacteria?

19 A.   No.  There's many examples of infections with this

20 particular germ in noninfants, in older children, adolescents,

21 or adults.

22 Q.   Okay.  And are you familiar with the World Health

23 Organization report from 2008 that looked at a study from the

24 UK, England, and Wales?

25 A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 55 of 150

1   Q.   Are you familiar with that?  And do you remember what the

2   results of that study were?

3   A.   The results were that the large majority of isolates of

4   this particular germ in those countries was identified in

5   nonneonates.  In fact, out of some 500-plus isolates, I believe

6   there were literally a dozen or two from infants, the rest being

7   from older individuals.

8   Q.   Okay.  And have you seen -- have you seen documents from

9   Anna Bowen of the CDC where she is discussing the likelihood of

10  sources and vehicles of infection in infants other than powdered

11  infant formula?

12  A.   Yes.

13  Q.   And, doctor, I'm putting up on the screen Exhibit 1020

14  which is an e-mail from Anna Bowen from the CDC as you see at

15  the top.

16  A.   Yes.

17  Q.   Okay.  To someone at Harvard.  Oh, to Janine Jason -- I'm

18  sorry -- yeah, at her Harvard e-d-u.  And is this the document

19  that you're referring to?

20  A.   Yes.

21  Q.   And what does that show?

22  A.   It shows that -- down here near the bottom it says --

23  Q.   You have to talk into the microphones.

24  A.   I'm actually working with some data now that suggests many

25  other vehicles for human cronobacter infections exist.  I have

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 56 of 150

1  had trouble convincing anyone that we have irrefutable evidence

2  of intrinsic contamination, and I am actually working with some

3  data now that suggests many other vehicles for human cronobacter

4  infections exist.  I know that FDA has also been working on this

5  hypothesis.  Given -- okay.  The rest of this is irrelevant.

6  Q.    Thank you.  Doctor, I'm going to show you document Exhibit

7  1011.  This is actually -- well, why don't you tell the jury

8  what this is.

9  A.    This is an e-mail to the nurse epidemiologist, Mary

10  Rexroat, at the Iowa Department of Public Health reporting

11  that -- woops.

12  Q.    Sorry.  Trying to make it readable for the jury.

13  A.    At this particular hospital we had only one case of

14  E. sakazakii within the last year, but it was on a 62-year-old

15  rehabilitation patient from a cath urine specimen.  I'm assuming

16  you don't need this case.

17  Q.    And there's no indication there that on that 62-year-old

18  patient that powdered infant formula had anything to do with his

19  sample or her sample?

20  A.    That would be highly, highly unlikely to be the case.

21  Q.    Where has E. sakazakii been isolated in a hospital setting?

22  Can you tell the jury?

23  A.    Well, it's been -- it's been isolated from patients in

24  hospital settings from a variety of locations such as sputum,

25  urine, bile drainage, many other anatomic locations.  But also

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 57 of 150

1  because this is such a ubiquitous organism -- it's really found

2  in many, many areas -- it's been identified in air vents, in --

3  on flat surfaces, ceilings, floors, window sills, dust

4  particles, some equipment within the hospital.  So it's

5  extremely widespread throughout the environment even in a

6  hospital.

7  Q.   And have you -- have you seen the literature over the years

8  discussing where it has been found in homes?

9  A.   Yes.  There's several articles related to investigations in

10  homes.  Particularly this organism is found in the kitchen area

11  and in the bathroom area, particularly around sinks, drains,

12  faucets, countertops, dishrags, sponges as well as flat -- other

13  flat surfaces such as the floor.

14  Q.   Okay.  And, doctor, I'm putting up a demonstrative.  Are

15  those -- what -- can you tell -- tell the jury what are these

16  sources at the bottom, and what does this -- what does this

17  demonstrative depict?

18  A.   Well, this is a list of various substances where

19  E. sakazakii has been recovered from.  It's a summary from these

20  articles down here listed at the bottom.  In putting all that

21  information together, you can see there's a huge variety of

22  foods, every food group and then some beverages, lots of

23  environmental areas, dust, water, seeds, and plant stuff in

24  particular, lots of household locations as you can see here,

25  hospital locations as we just mentioned, both equipment as well

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 58 of 150

1　as patient and environment, as well as being recovered from a

2　large variety of animals, insects, as well as human beings.  And

3　these are various anatomic locations such as appendicitis, CSF

4　which would be meningitis, the eyes, digestive tract, et cetera,

5　et cetera, feces, wounds, et cetera.

6　Q.　Okay.  Thank you, Your Honor -- I mean thank you,

7　Dr. Shulman.  And which of these potential sources of E. sak

8　should be considered when investigating the source of an E. sak

9　infection such as this case?

10　A.　I think as many as possible that could be investigated and

11　cultured should be done in order to fully assess the situation.

12　Q.　And, doctor, in your work for this case, did you have

13　occasion to review the FDA's most recent position on

14　E. sakazakii in response to a letter from Dr. Janine Jason in

15　2012?

16　A.　Yes.

17　　　　MS. GHEZZI:  One moment, Your Honor.

18　Q.　This is Exhibit 1021.  And, doctor, I'm going to call your

19　attention to this portion of the Benson Silverman letter to

20　Dr. Jason.  And have you seen that -- have you seen that before?

21　A.　Yes, I have.

22　Q.　Okay.  And what's the import of that?

23　A.　Well, the import is that --

24　　　　MR. RATHKE:  Your Honor, I'm going to object on this

25　doctor -- well, I'm going to object as the evidence is

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 219  Filed 10/15/14  Page 59 of 150

1   irrelevant as to what he thinks.

2           THE COURT:  Overruled.

3   Q.   Go ahead.

4   A.   Well, the letter clearly says that the FDA has tested and

5   continues to test large amounts of powdered infant formula from

6   unopened cans of lots implicated in C. sakazakii cases whenever

7   available.  In some cases unopened cans have not been available.

8   We're aware that -- also that infant formula manufacturers the

9   last seven years have used stratified sampling plans to test for

10  C. sakazakii in infant formula finished product.  The results of

11  case investigations have not indicated that any particular

12  company or product is implicated in C. sakazakii cases.  It is

13  unknown how the infant formula becomes contaminated with

14  C. sakazakii, but the evidence from investigations thus far is

15  consistent with packaged powdered infant formula being negative

16  for C. sakazakii when it leaves the manufacturing plant.

17  Q.   And what is the significance of this FDA letter to you as

18  the hospital's epidemiologist for a major children's hospital?

19  A.   Well, it's very reassuring to me in that role to know that

20  the FDA is not expressing their concerns that there are -- there

21  is significant or any contamination of powdered infant formula

22  that they are able to detect currently.

23  Q.   And is powdered infant formula used in your hospital?

24  A.   Yes, there are some powdered infant formulas used in my

25  hospital.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 60 of 150

1  Q.   And are any of them used with low-birth-weight babies?

2  A.   Yes, they are.

3  Q.   And what kind are those?

4  A.   Well, in our hospital we have -- we have powdered infant

5  formulas that are used for babies with special metabolic or

6  genetic conditions who need special formulas, and they would be

7  given this -- they are given powdered infant formula.

8  Q.   And in your hospital do you use powdered formula with very

9  low-birth-weight babies?

10  A.   On occasion we do for the same reason.

11  Q.   And are these babies who are neonates or newborn?

12  A.   Yes, they are.

13  Q.   And do you have any concern as the chief of pediatric

14  infectious disease at the Children's Hospital in Chicago with

15  using powdered infant formula with these babies?

16  A.   We have really no concern about that.  Again, the FDA

17  reassurance is very helpful in that regard.

18  Q.   And you've never had a case in your hospital in the 35 or

19  36 years that you've been there?

20  A.   That's correct.

21  Q.   Now, let's move to your review of Jeanine Kunkel's medical

22  records in this case if you would.  And please feel free to

23  refer to your report.  Do you have it with you?

24  A.   Yes, I do.

25  Q.   Okay.  And, doctor, can you tell the jury what you found in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 61 of 150

1  the medical history and the feeding history in connection with

2  Jeanine Kunkel from her hospital stay April 14 to April 17 in

3  2008.

4  A.   Well, she was fed initially Abbott's Similac ready-to-feed

5  liquid until the morning of the 15th of April when her attending

6  physician prescribed the NeoSure formula.  And she was -- for

7  the rest of her hospital stay at St. Luke's was fed NeoSure

8  ready-to-feed liquid formula every 1 to 4 hours.

9  Q.   Okay.  So the doctor switched her to NeoSure?

10  A.   Yes.

11  Q.   When she was in the hospital, according to the records and

12  the depositions that you read for purposes of your opinion and

13  testimony today, did you see whether she came into contact with

14  people at the hospital?

15  A.   Well, of course, she was in contact with nurses, with

16  family members, with staff of the hospital.  Of course.

17  Q.   And what about -- and family members you said?

18  A.   Yes.

19  Q.   Okay.  And when she was discharged home, were there any

20  doctor instructions?

21  A.   The doctor instructions were for -- were for her to

22  continue to use the NeoSure formula, and she was given some

23  ready-to-feed packages as well as a large jar, bottle, of

24  ready-to-feed as well as some powdered infant -- a can of

25  powdered infant formula.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 62 of 150

1   Q.   And was there a recommend -- was there a instruction, a

2   doctor instruction, for a well baby visit 3 to 5 days after

3   discharge?

4   A.   Yes, there was.

5   Q.   And what's the purpose of a well baby visit 3 to 5 days

6   after discharge from a birth hospital?

7   A.   That's to verify that the baby is feeding well, that

8   there's no new problems, that the examination shows no sign of

9   any ongoing illness.  It's also an opportunity to weigh the baby

10  at that time.

11  Q.   Now, when this -- Jeanine -- when Jeanine was born, she

12  weighed 4 pounds, 14 ounces; is that correct?

13  A.   Correct.

14  Q.   And do new babies lose weight when they leave the hospital?

15  A.   In the first 10 to 14 days of life, babies lose a

16  substantial amount of weight.  They're born with excess water.

17  They get rid of that water, and they actually lose weight over

18  the first 10 to 14 days normally.

19  Q.   And you're referring to the food sources that she had in

20  the hospital and then what she was given by the hospital when

21  she came home.  Why is that important to your review?

22  A.   Well, that tells me what she was fed and what kind of

23  formula she was receiving and in what format.

24  Q.   Okay.  And then did you learn what contact she had with

25  what family members and friends when she got to her home after

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 63 of 150

1  discharge on April 17, the first week of her life?

2  A.   Well, I know that there was a half brother or stepbrother

3  at home.  There were visits by the grandmother, great

4  grandmother, I believe a grandmother's friend, several aunts,

5  and several friends of the family.

6  Q.   Okay.  And one of the friends of the family was a Blake

7  Verschoor who we've heard -- we've heard at the trial here.

8  What was his occupation?

9  A.   He was a landscaper.

10  Q.   Okay.  And is that -- being a landscaper, is that

11  significant to you in any way in connection with this case?

12  A.   Well, it's potentially important because enterobacter

13  sakazakii is an organism that lives in the soil, and someone who

14  is outdoors most of the time working with his hands in the

15  ground is at greater -- greater likelihood of carrying the

16  organism than someone who has no such contact at all with soil.

17  Q.   And can you tell the jury about the baby's feeding history

18  from when she arrived home on April 21 until -- I'm sorry, April

19  17 until April 21.

20  A.   Yes.  From that period of time the testimony is that she

21  received the NeoSure ready-to-feed two-ounce bottles that were

22  provided to her when she left the hospital.

23  Q.   Okay.  And after she finished those ready-to-feed, what was

24  the next -- what was the next step in the feeding process at

25  home from April 21 until April 23?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 64 of 150

1  A.    Yes.  During that period of time she received the NeoSure

2  ready-to-feed liquid out of the large bottle, I think 32-ounce

3  if I'm not mistaken bottle, the ready-to-feed.

4  Q.    And did you learn from documents in the case or depositions

5  in the case where the ready-to-feed individual bottles and the

6  32-ounce bottle was stored before opening and feeding to the

7  baby?

8  A.    Yes.  My understanding is that the testimony is that

9  this -- these feeds were stored on the floor in the bab -- in

10 the bedroom underneath the baby's crib.

11 Q.    Okay.  And also in Miss Surber's deposition, did you learn

12 how she cleaned the bottles and the nipples for the 32-ounce

13 feed, the ones that were not individual feeds but the ones that

14 she had to make up from the 32-ounce bottle?  Did you see that?

15 A.    Yes.  I believe she indicated that she had washed them,

16 washed the nipples in hot, soapy water from the tap, and then

17 rinsed them and let them dry in a rack and then put them in the

18 cabinet in the kitchen.

19 Q.    Okay.  And what's the significance of pointing out where

20 the mother stored the baby formula before opening it?

21 A.    Well, my understanding is that the room where this was

22 stored had a mold problem.  There was some evidence of a sewer

23 back-up in the house.  There was a pet dog in the house.  And

24 because where mold is is generally damp conditions and damp

25 conditions are important for the bac -- for growth of bacteria

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 65 of 150

1  and germs such as enterobacter, so to me that's of some

2  significance.  It raises the possibility that there's potential

3  for contamination at that location.

4  Q.  Okay.  And then what happened in terms of the feeding

5  history on April 23, 2008?

6  A.  I believe in the evening -- the last -- the last feeding

7  from the 32-ounce ready-to-feed formula was about 6 p.m. on the

8  23rd.  And then beginning with the 9 p.m. feeding at that time,

9  the mother, Mrs. Surber, was using for the first time the

10  powdered infant formula.

11  Q.  Okay.  And what was the baby's symptomatology at 9 p.m. or

12  around 9 p.m. when the mother first fed the baby powdered infant

13  formula?

14  A.  Well, that seems to be very close in time to when the

15  mother was concerned that the baby was crying so much that she

16  called her mother, the grandmother, to discuss the fact that the

17  baby was crying and crying excessively.

18  Q.  Okay.  And did you review any contemporaneous medical

19  records in connection with this event?

20  A.  Yes.

21  Q.  Okay.  I'm going to show you Exhibit 1000G, doctor.

22  A.  Yes.

23  Q.  Okay?  And you'll see that this is dated April 24, 2008,

24  after the baby was taken to the hospital.  What is significant

25  in this medical record in terms of the symptoms that you're

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW  Document 219  Filed 10/15/14  Page 66 of 150

1  talking about?

2  A.   Well, the symptoms -- the reason the baby was brought to

3  the hospital is fever and irritability, and this record says

4  that the mother indicated that since the previous night the

5  child has been fussier than normal and that then developed a

6  fever later on and continued to be fussy.

7  Q.   Okay.

8  A.   As well as her feeding then also not being as normal -- not

9  being normal.

10  Q.   Okay.  And then, doctor, I'm showing you Exhibit 1001A.

11  This is from the Omaha Children's Hospital after Jeanine was

12  taken there.  And just in terms of the symptomatology, what is

13  significant to you in this medical record?

14  A.   Well, this is on the 26th, and it says that the baby was

15  admitted again for fever and irritability two days ago and is

16  described as being fussy all the night prior to admission and on

17  the morning of admission had a fever.

18  Q.   Okay.  And now I'm showing you Exhibit 1000B, and I'd ask

19  you to look at the -- and that's also from the Children's

20  Hospital in Omaha.  Can you see that, doctor?

21  A.   Yes.

22  Q.   Okay.  And what does this medical record tell you in terms

23  of the reason for admission?

24  A.   Well, it says that she began not eating well in the 24

25  hours prior to her admission, then developed a fever.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 67 of 150

1  Q.   Okay.  Now, are these medical records consistent with your

2  opinion in this case?

3  A.   Yes.

4  Q.   Now, you saw some -- and are they consistent with the

5  version of the mother, Megan Surber's, deposition testimony when

6  she was first deposed in July of 2008?

7  A.   Yes.

8        MR. RATHKE:  Objection.  Relevance.  I had an

9  objection, but I didn't have my mike on on relevance of the

10  question of whether they're consistent.

11       THE COURT:  Overruled.  You may answer.

12  BY MS. GHEZZI:

13  Q.   Doctor, do you -- in your normal -- in your normal

14  practice, do you rely on contemporaneous medical records for

15  treatment of your patients?

16  A.   Yes, of course.

17  Q.   Why do you do that?

18  A.   Because those are records that are timely.  They generally

19  contain information that is very recent and families -- when a

20  history is taken from a child, families recall the events, the

21  recent events, very clearly.  And that certainly seems to be in

22  general much more reliable than what we can remember months or

23  years later.

24  Q.   And in your work for this case, I believe you said you

25  reviewed deposition testimony, right, for the medical history?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 68 of 150

1    A.    Right.

2    Q.    And did you review the medical history of the grandmother

3    in this case, Mrs. Terrell?

4    A.    Yes, I did.

5    Q.    And do you recall what she said about the evening of April

6    23, 2008?

7    A.    Yes.  She indicated that her daughter had called her

8    approximately 9 p.m. because the baby was crying so much and the

9    mother was quite upset about the degree of crying.

10   Q.    Okay.  And do you recall from your review of the records in

11   the case including the deposition testimony of the mother, Megan

12   Surber, what the baby was doing at around 4 a.m. in the morning?

13   A.    Yes.  The mother indicated in her deposition that -- I

14   think the term was really, really off-the-wall crying, so the

15   baby clearly was extremely irritable and upset and crying at 4

16   a.m.

17   Q.    Now, I'm -- you don't have the benefit of looking at it.

18   I'm looking at it here, and it says getting really, really

19   off-the-wall whiney.  Does that change your statement at all?

20   A.    Has the same meaning essentially, but it's whiney instead

21   of crying.

22   Q.    And so what was the feeding history throughout the night?

23   We talked about the 9 p.m. feeding.  What was the feeding

24   history throughout the night down to 9 a.m. on April 24, 2008?

25   A.    So the mother indicated that she gave a midnight bottle of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 69 of 150

1  2-ounces and then again at 4 a.m. when the baby was extremely

2  irritable and whiney fed the baby again at that time.  And then

3  I believe at 6 p -- 6 a.m. the child did not feed well and that

4  at 9 a.m. the child did not feed at all.

5  Q.   And do you recall any -- do you recall what -- how

6  Miss Surber described the baby's condition at 9 a.m. in the

7  morning in terms of what the sound of the cry was like at that

8  point?

9  A.   Something about a hyena-type crying, sounds of very

10  impressive degree of crying.

11  Q.   Okay.  And then what happened next in terms of -- in terms

12  of taking the baby to the hospital?  When did that occur?

13  A.   Well, the baby went to the hospital approximately 5:30 p.m.

14  as I understand after not feeding really at all during the day.

15  Q.   And the mother had tried to feed her, but the baby didn't

16  eat; is that correct?

17  A.   That's correct.

18  Q.   Okay.  When in your expert opinion did Jeanine Kunkel first

19  begin exhibiting symptoms of meningitis, doctor?

20  A.   I believe that the first symptoms were really present at 9

21  p.m. the evening of the 23rd.

22  Q.   Okay.  First of all, was there any suggestion in any

23  medical record you saw that the baby had colic?

24  A.   No, not at all.

25  Q.   And does a ten-day-old baby get colic?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 70 of 150

1   A.    No.  That's too early.

2   Q.    And let's talk about your opinion and the reasons for why

3   you say that the baby first began exhibiting symptoms of

4   meningitis.  How is it that meningitis progresses?

5   A.    So I think we're all familiar with the concept of an

6   incubation period when we're exposed to something, initially

7   infected, but then don't develop symptoms until after a period

8   of time.  So in the case of meningitis, if it's an organism

9   that's acquired orally, there are a number of steps that would

10   have to occur biologically for the germ to actually be able to

11   cause meningitis.

12   Q.    Okay.  And if the baby did not start exhibiting signs of

13   meningitis until 4 a.m. in the morning or 9 a.m. in the morning,

14   would that change your opinion about powdered infant formula

15   here being the source?

16   A.    No, it would not.

17   Q.    Okay.  Why not?

18   A.    Because the steps that are required to develop meningitis

19   after oral infection really takes days, three or more days, in

20   order for that to develop.

21   Q.    Okay.  Let's tell the jury if you would how can

22   E. sakazakii enter the body.

23   A.    So E. sakazakii can enter the body through a mucosal

24   surface such as a nose, throat, mouth, GI tract,

25   gastrointestinal tract, or through the skin through an abrasion,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 71 of 150

1  a cut, something of that kind, or through a medical device.  All

2  those are potential ways that E. sakazakii could enter the body.

3  Q.   Can it enter the body on a pacifier?

4  A.   Yes, it can.

5  Q.   And is there anything in the literature that you've

6  reviewed for this case that indicated -- that supports that

7  conclusion of yours?

8  A.   Yes.   There's at least one circumstance where a pacifier

9  has cultured out enterobacter sakazakii when cultures have been

10  done.

11  Q.   Can you tell the jury once -- let's assume the bacteria

12  enters through the mouth here.  Can you tell the jury what the

13  process is that the bacteria goes through through the body,

14  particularly of an infant ten days old about the size and weight

15  of Jeanine Kunkel?

16  A.   Yes.   The -- so if a baby ingested an organism like

17  E. sakazakii, the organism would pass into the stomach where the

18  stomach acid would kill some of the organisms.  Now, the stomach

19  acid of a ten-day-old baby is not as strong as it is in older

20  individuals, but still it has some effect.

21        And then the bacteria would move into the intestine

22  and begin a process of settling into the intestine and then

23  would -- in order to cause meningitis would have to -- some or

24  one of the bacteria would have to be able to penetrate the wall

25  of the intestine from the inside through the intestinal wall to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 72 of 150

1  gain access into the bloodstream.  And then once in the

2  bloodstream, the bacteria has to begin to multiply.

3  Q.   Okay.  And this takes time; right?

4  A.   This takes time.  So in the multiplication of the bacteria,

5  initially the bacteria has to adjust to its environment as in

6  the bloodstream.  And bacteria enter what is called the lag

7  phase where they're stationary, they're not replicating,

8  reproducing at all.  Their numbers are constant.  And this lasts

9  several hours for E. sakazakii.  At least in a test tube we know

10  clearly it's about two hours in the human body because of the

11  defenses that even a newborn baby has to try to fight -- ward

12  off infection.  It probably would take somewhat longer than two

13  hours, but we're not certain of how much longer.

14        But then the bacteria after being in this lag phase

15  move into what the microbiologists call the log phase when they

16  start to multiply.  And bacteria multiply by one cell, divides

17  into two, and then two divide into four, four divide into eight,

18  et cetera.  And the replication time or the doubling time of the

19  bacteria once they get their act together and start multiplying

20  is somewhere in the one-hour range.  The range in test tubes is

21  anywhere from 35 minutes to 85 minutes for E. sakazakii.  But if

22  you average that, it's about an hour, 60 minutes, so that each

23  60 minutes there would be a doubling of the bacteria.

24  Q.   Okay.  So the log time which we're calling the doubling

25  time for E. sakazakii in your opinion is 60 minutes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 73 of 150

1         MR. RATHKE:  Objection.

2  A.   Approximately 60 minutes.

3         MR. RATHKE:  Leading.

4         MS. GHEZZI:  I'm just re . . .

5  Q.   Did you say it was 60 minutes?

6  A.   Yes, approximately 60 minutes.  Could be longer.  Could be

7  a few minutes shorter.

8  Q.   Okay.  And how many doubling times are necessary before

9  there is enough E. sak, assuming it was ingested, until symptoms

10  of an infection like meningitis appear?

11  A.   So what's important -- to do that calculation which I have

12  done, we have to realize first for a germ that gets into the

13  bloodstream, for it to be able to pass into the central nervous

14  system, into the meninges and where the brain is, to make that

15  passage, there has to be between 100,000 and a million bacteria

16  in every cc or milliliter of blood in the baby's body.  If you

17  do those calculations, it means there has to be -- there would

18  be -- there would need to be somewhere between 18 million and

19  180 million bacteria in the baby's body as a result of all this

20  duplication, multiplication of the bacteria in order for there

21  to be a risk of transmission into the meninges to cause

22  meningitis.

23  Q.   And, doctor, because the testing indicated that there

24  wasn't bacteria in this particular product, what did you assume

25  when you were doing your calculation?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 74 of 150

1    A.    I looked at the historical information back from the '90s

2    when -- when there were reports of positive cultures from

3    powdered infant formula.  The concentration of those organisms,

4    those germs, was less than one organism per hundred grams of

5    formula.  If you calculate -- if you -- so I assume that -- for

6    purposes of a calculation I assume that level.  And that

7    actually comes out to a small fraction of a single organism in

8    the amount of powdered infant formula that the baby had ingested

9    at 9 a.m., midnight, and 4 a.m.

10              So because that was just a tiny fraction of a single

11   germ, I assumed -- I did my calculations assuming that there was

12   one germ because a fraction of a germ can't obviously replicate.

13   So just for purposes of the calculation, one germ would require

14   30 to 36 duplication times in order to reach the number of

15   bacteria that would be required in the bloodstream to cause

16   meningitis, to allow the bacteria to gain access into the

17   central nervous system.  So 30 --

18   Q.    And how many -- let me just interrupt you there.  And how

19   many hours are 30 doubling times?

20   A.    30 doubling times are very closely 30 hours.

21   Q.    Okay.  And so for purposes of your calculation, you assumed

22   a theoretical amount of bacteria.

23   A.    Correct.

24   Q.    Okay.  Of one cell.

25   A.    One cell, correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 75 of 150

1  Q.   And if the doubling period took 30 hours, how long would it

2  take then for an infant to show -- begin to show signs of

3  meningitis?

4  A.   Well, so once there's been enough doubling in the blood of

5  bacteria in the bloodstream to reach that high number of

6  concentration of organisms, of germs in the bloodstream, the

7  germs would have the potential to cross into the -- cross what

8  we call the blood brain barrier that helps to protect against

9  infections of -- like meningitis.

10         And once the bacteria gets to that location in the

11  spinal fluid and in the meninges, there would be some additional

12  doubling that would occur.  And then there has -- really the

13  number of germs in the spinal fluid has to reach a number, a

14  critical number, that then leads to the white blood cells of the

15  body and other kinds of defenses that the baby has to try to

16  fight off this infection, to come into that area.  And it's when

17  those white blood cells actually arrive is when symptoms really

18  develop of this kind of infection.

19         So all of this, all these steps, taking them all

20  together, the best estimate is that it would take three or more

21  days for bacterial meningitis to develop after oral ingestion of

22  this kind of organism.

23  Q.   Okay.  And are you aware of any authority that is

24  consistent with that opinion?

25  A.   Yes, I am.

1  Q.   And what is that?

2  A.   There's a Bowen and -- I believe it's Bowen and Braden who

3  have published an article where they estimated that it would

4  take three or more days for bacterial meningitis to occur

5  following the ingestion of an organism.

6  Q.   And who do Bowen and Braden work for?

7  A.   CDC.

8  Q.   Now, are you familiar with Janine Jason's report in this

9  case?

10  A.   Yes, I am.

11  Q.   Okay.  And her opinion that the incubation time here could

12  be less than 12 hours, maybe even as low as 7 hours?

13  A.   Yes.

14  Q.   Do you agree with that opinion?

15  A.   Absolutely not.

16  Q.   Why not?

17  A.   Well, for the reasons that I stated.  It's a complex

18  process for bacteria to be ingested and go through the steps

19  that I've outlined, reach the kinds of concentrations required

20  for meningitis to become a possibility.  This all takes days.

21  Q.   And did --

22  A.   Clearly days.

23  Q.   Sorry, Dr. Shulman.  Did she run any calculations or

24  figures like you did?

25  A.   Not to my knowledge, no.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 77 of 150

1  Q.   And she cites a study by -- maybe he's a doctor, but I'm

2  going to say "mister" because it doesn't say here, Mittal,

3  M-i-t-t-a-l.  Are you familiar with that Mittal study from 2009?

4  A.   Yes, I am.

5  Q.   And can you describe just briefly what the study was about?

6  A.   Well, that's a study of taking newborn rat pups that are

7  about an inch long, weigh about five grams, and feeding them

8  E. sakazakii and seeing if meningitis will result.

9  Q.   Okay.  Now, I'm going to show you -- zoom out.  I'll get

10  this right in a minute.  Can you see that, doctor?

11  A.   Yes, yes, I can.

12  Q.   Okay.  Thank you.  Does this study and particularly the

13  table 1 activity scores show a development of meningitis in

14  these mice or rat pups in six hours?

15  A.   They do not.

16  Q.   Okay.  And please explain why not for the jury, and feel

17  free to use your stylus.

18  A.   Sure.  So this is -- this is a table of activity scores

19  wherein it's common in studying rats and mice pups to try to

20  assess their activity after you've done something to them.  And

21  the activity -- activity score is basically shown here in this

22  footnote A where the animals are turned over on their back, and

23  the normal animal jumps -- jumps right up, flips over on his

24  feet, and runs around.

25          And so the animals were turned on their back and then

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 78 of 150

1 watched -- the observers watched what happened. And if the

2 baby -- if the pups had normal activity, they were given a score

3 of 5. If they turned upright but it took them a little bit

4 longer than normal but under 5 seconds, they received a score of

5 4. If it took them even longer to turn upright from being on

6 their back, as long as 30 seconds, they got a score of 3. And

7 they got a score of 2 if they didn't turn upright at all and 1

8 if they were either comatose or death.

9 And you can see it's 6 hours after feeding these

10 animals 10,000 germs of E. sakazakii, 6 hours later they all had

11 normal activity. That is, you put them on their back, they

12 bounced right up, they were all normal. That's not what an

13 animal that has meningitis can do.

14 Q. And, doctor, it says there CFU and you're saying -- is that

15 colony forming unit? Is that what that means?

16 A. Yes, CFU is colony forming units, and it means how many

17 individual germs there were.

18 Q. Okay. And then -- so they were all normal at six hours;

19 right?

20 A. Correct.

21 Q. And then what happened at 12 hours?

22 A. So at 12 hours, in 2 out of these 3 groups but not all 3

23 groups, the activity score dropped just a little. Again, the

24 animal's put on their buck, turn upright within 5 seconds or

25 less. And in those two groups, that was the average score

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 79 of 150

1    suggesting that maybe these animals were beginning not to feel

2    so good overall.  It doesn't necessarily mean they had

3    meningitis at that time, but they're not feeling quite as spry

4    by 12 hours.

5    Q.   Okay.  And, in fact, did Dr. Mittal reach a conclusion from

6    his study about how long it took to cause meningitis within -- I

7    mean how long it took to cause meningitis given this quantity of

8    bacterial cells in these mice pups?

9    A.   Yes.  His conclusion in his article is that giving --

10   feeding these mice pups -- I think they were rat pups -- rat

11   pups 10,000 individual organisms of E. sakazakii, that these --

12   some of the animals developed meningitis within 24 hours is his

13   conclusion.

14   Q.   Okay.  And you're familiar with what Dr. Jason wrote in her

15   report about why she thought you misunderstood the study because

16   there was some blood in the brain tissue; correct?

17   A.   Yes.

18   Q.   Okay.  Can you explain your thinking on that issue in

19   connection with this study.

20   A.   Yes.  So what the investigators did in this particular

21   study was to sacrifice animals at 6 hours, 12 hours, and 24

22   hours and grind up their various organs such as the brain, the

23   liver, et cetera, and then culture them.  And they present

24   information to the fact that low numbers but some numbers of

25   bacteria can be cultured from the various tissues that were

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 80 of 150

1    handled in this fashion as early as six hours.

2          The problem with this method is that isolating any

3    organs such as the liver, the kidney, the brain, and grinding it

4    up, there is always going to be bloodstream contamination of the

5    tissues.  And I believe clearly that the data that are expressed

6    in that particular article reflect the presence of bacteria in

7    the bloodstream rather than in the individual tissues which can

8    be shown later on to be present but not at six hours.

9    Q.   Okay.  And, doctor, I'm going to hand you a copy of the

10   Mittal article.  I'm just going to ask you if there is anything

11   in there that corroborates either by picture or graph your

12   testimony here about the 24 hours.

13   A.   Well, the investigators have shown sections of the rat

14   brain and other -- this particular figure 5 is a rat brain and

15   various portions of it at 48 hours after the feeding of these

16   rat pups.  They don't show any such pictures at earlier time

17   points.  Clearly by 48 hours there is evidence of meningitis

18   that's developed.

19   Q.   Okay.  Thank you.  Now, let's switch gears a little bit in

20   terms of any other reasons why you have concluded that Abbott's

21   infant formula could not have caused the infant's infection.

22   Did you review the statements that the mother made to the

23   investigators at the time of the incident?

24   A.   Yes, I did.

25   Q.   Okay.  And I'm going to put up for you Exhibit 2012.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 81 of 150

1   A.   Yes.

2   Q.   Okay.  And, doctor, what was significant, if anything, in

3   that particular document to you?

4   A.   Okay.  Well, down here at the bottom under comments

5   regarding the home preparation of the powdered infant formula,

6   it says boiled the water and let come back to room temperature

7   and then added the formula mix and then reheated to a boil and

8   cooled it.

9   Q.   And cooled to maybe room temperature?

10  A.   I can't read that.  Cooled to room temperature, yes.  So

11  the fact -- what's significant to me is that she indicated that

12  after adding the formula, the powdered formula, to the water she

13  reheated it again to a boil and then cooled it before using.

14  Q.   Okay.  Now, if she only did that for the 9 p.m. feeding on

15  April 23, would that change your opinion at all about incubation

16  time or infectious dose here?

17  A.   No, not at all.

18  Q.   Why not?

19  A.   Well, if -- if she -- if she boiled the formula after

20  mixing it, any bacteria that might have been present even though

21  I don't believe there was any present in the powdered infant

22  formula would be killed by boiling.  And that would make the

23  first potential exposure to powdered infant formula that wasn't

24  boiled possibly at midnight.

25  Q.   Okay.  And would it make any difference to you if the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 82 of 150

1    boiling occurred in a water bath, in other words, if there was a

2    pan of water that was heated on the stove and the bottle itself

3    was placed in it and then heated and the water around it boiled?

4    A.   No, because -- so what we know about how quickly high

5    temperatures kill off the bacteria, you can heat something to a

6    boil for a s -- formula, for example, that's mixed, you can heat

7    that to a boil for as short as a second, and it will kill all

8    the bacteria.  But at temperatures leading up to boiling -- so,

9    for example, at about 150 degrees or 70 degrees Centigrade, 150

10   degrees in Fahrenheit -- in 15 seconds the bacteria will be

11   killed.  And at -- so as -- as the bottle is being warmed, it

12   will -- even if everything inside the bottle doesn't boil, it's

13   going to be exposed for many seconds to as long as a minute or

14   more to high temperatures above 70 degrees Centigrade or 150

15   degrees Fahrenheit.

16   Q.   In any --

17   A.   So -- so that will kill off bacteria within a 15-second

18   exposure or less.

19   Q.   Fifteen seconds?

20   A.   Fifteen seconds.  And as the temperature gets higher, the

21   exposure time that's needed to kill bacteria drops off.

22   Q.   Okay.  Now, doctor, in your methodology when you're looking

23   at the possible sources of infection of Jeanine Kunkel, for the

24   bacterial meningitis of Jeanine Kunkel here, did you consider

25   some possible sources in the Kunkel family home?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 83 of 150

1  A.   Yes, I did.

2  Q.   Okay.  And I'm going to put up for you a summary document.

3  Do you see the sources on the bottom there?

4  A.   Yes.

5  Q.   It's a little hard to read right there but . . .

6       What items and environments could have been direct

7  sources of E. sak or cross-contamination of Jeanine Kunkel's --

8  either her ready-to-feed liquid infant formula feedings or

9  anything else that she came into contact with?

10 A.   Well, as I indicated earlier, this is a very ubiquitous

11 type of germ.  It's found in lots and lots of places, and among

12 the places it's found are -- is people, so the people the

13 child -- the baby was exposed to.  The father had a respiratory

14 infection we know and was coughing up sputum.  The other members

15 of the immediate family, the extended family, and all the

16 visitors, any of those could be potential sources just like any

17 of us today could be colonized with enterobacter sakazakii and

18 not know it and potentially spread it by cross-contamination, by

19 touching something, a surface that someone else touches.

20 Q.   Okay.  Is there anything on that summary list that you

21 disagree with in terms of it could be a -- some possible source

22 of E. sakazakii in the Kunkel home?

23 A.   No.  Any of these, people, foods, furnishings and

24 appliances, other items, environmental items, baby items,

25 animals, insects, any of those could be a potential source of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 84 of 150

1  this very common and ubiquitous germ.

2  Q.    Were you able to rule out any of those -- I'll put it back

3  up; I'm sorry -- any of those possible sources of E. sak in the

4  Kunkel family home?

5  A.    No, I was not.

6  Q.    And why not?

7  A.    Very, very few environmental-type cultures were obtained.

8  They were obtained something like 12 days after the fact.  And

9  they -- the only environmental cultures that were obtained was

10  water from the kitchen faucet, the faucet itself, the aerator,

11  and the counters on either side of the kitchen sink.

12  Q.    Okay.  And even the water that was tested by the CDC, do

13  you know what the results of the water test from May of 2008

14  were?

15  A.    Well, I know that there were bacteria present in the water

16  supply, but there was no identification of the enterobacter

17  sakazakii at that time.

18  Q.    And as you pointed out, that was taken -- that water sample

19  was taken some time in May 2008, like 11 or 12 days after the

20  illness began?

21  A.    That's correct.

22  Q.    Okay.  That doesn't say anything about the water content or

23  the water quality on April 23 or prior to that, the week of

24  April 17, 2008, does it?

25  A.    No, it does not.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 85 of 150

1   Q.   Now, in your report you noted -- and it is in the

2   demonstrative right here, the summary right here -- that

3   Jeanine's father had an infection at the time; correct?

4   A.   Correct.

5   Q.   Okay. And did you look at medical records of Troy Kunkel

6   in assessing his medical situation?

7   A.   Yes, I did.

8   Q.   Okay. And can you tell -- they've heard a little bit about

9   this before not from you and you haven't heard it, but can you

10   tell them a little bit about what was significant to you about

11   Troy Kunkel's medical history and his medical condition on or

12   about April 2008?

13   A.   Yes. So what's significant about his medical history is

14   that he is an immunocompromised person. He had his spleen

15   removed surgically when he was a child. When your spleen is

16   removed, that takes away a good component of your immune system.

17   In addition, he has diabetes which is a metabolic disease which

18   increases risk for infection.

19       So he's an immunocompromised person who was admitted

20   to the hospital with fever, vomiting, cough, body aches. He was

21   coughing up grayish-type sputum. The doctors taking care of

22   him, because he had body aches and neck aches, were concerned a

23   little bit about the possibility of meningitis, but they

24   ultimately concluded that he had pneumonia, and that's what the

25   medical records indicated.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 86 of 150

1    Q.    And was he hospitalized not just on -- was that on or about

2    April 25, 2008?

3    A.    Correct.

4    Q.    And was he hospitalized earlier that month as well?

5    A.    Yes, he had been in the hospital several weeks earlier with

6    complaints as well.

7    Q.    Okay.  Now, the vomiting and the sweats and that sort of --

8    that sort of symptom that he was showing on April 25, is that

9    consistent with diabetes, maybe uncontrolled diabetes?

10   A.    Yes, it could be certainly.  Uncontrolled diabetes would

11   give a lot of vomiting and fever, sweats.

12   Q.    Okay.  Was he ever tested for E. sakazakii in the hospital?

13   A.    He was not tested for that at all.

14   Q.    Was anyone who came into contact with Jeanine Kunkel in

15   terms of the medical records that you've seen and all the

16   documents in this case ever tested for E. sakazakii?

17   A.    No.

18   Q.    And, doctor, then can you rule those individuals out as a

19   potential source?

20   A.    No, they can't be ruled out as potential source.

21   Q.    Okay.  Now, is it -- what's your opinion about whether or

22   not Troy Kunkel, the father, and Jeanine Kunkel could have

23   developed an infection from the same source?

24   A.    I think it's quite possible that both of them -- first of

25   all, Mr. Kunkel might have had a C sa -- an E. sakazakii

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 87 of 150

1  infection.  We don't know that for certain because he was not

2  cultured.  But if he did, he and the baby could both have

3  acquired it from an environmental source.

4  Q.   In the home.

5  A.   In the home.

6  Q.   Okay.  Okay.  And, doctor, switching to another topic, do

7  you agree with Dr. Jason's opinion that there is an association

8  between powdered infant formula use and E. sak meningitis,

9  particularly in sporadic or isolated single cases like this one

10  with Jeanine Kunkel?

11  A.   Yes, I do have an opinion, and my opinion is that there

12  does not seem to be an association in the sporadic cases like

13  this of this kind of infection.

14  Q.   And how many outbreaks as opposed to sporadic, isolated

15  cases have there been in the United States that have been

16  reported?

17  A.   There are only two small outbreaks that have been reported

18  ever.

19  Q.   Okay.  And in your opinion was her -- was her analysis

20  based on any valid epidemiological method?

21  A.   I don't believe so, no.

22  Q.   Okay.  And what is wrong with the method that she used in

23  your opinion?

24  A.   Well, she -- a number of things, but she basically relied

25  upon reports of cases of invasive enterobacter sakazakii

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 88 of 150

infection in infants and simply tabulated how many of them had

what kind of feeding.  She did not -- to include cases -- to

implicate cases as being related to powdered infant formula, she

did not require any kind of positive culture from the formula or

anything of that sort or any other feeding.  So it's very

anecdotal.  It's nonscientific, and it's not the way to really

prove an association with a particular food stuff.

Q.   And did you have occasion to read the comments of the

reviewers, some of the reviewers, who critiqued her Pediatrics

article?

A.   Yes, I did.

Q.   And what's your recollection of what you read?

A.   My recollection is that --

          MR. RATHKE:  Objection.  Hearsay.

          THE COURT:  Sustained.

BY MS. GHEZZI:

Q.   Did you rely on -- to form your opinion about her method --

her methodology and what she did with her Pediatrics article,

was it important for you to review the criticisms that the

reviewers had made?

A.   It was not essential for that purpose.  Found it very

interesting because I think they made some very interesting

points.

          MR. RATHKE:  Your Honor, I think he's answered that.

Q.   And what points did they make?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 89 of 150

1    MR. RATHKE:  Same objection.

2    THE COURT:  Yeah.

3    MS. GHEZZI:  Your Honor, he's not stating it.  He's

4   not saying what was written.  He's saying --

5    THE COURT:  Yeah, but, see, we're in a foundation

6   problem.

7    MS. GHEZZI:  Okay.

8    THE COURT:  So you need to lay the foundation before

9   we can get into the substance of it.

10    MS. GHEZZI:  Okay.  Let me --

11   BY MS. GHEZZI:

12   Q.   I'm just going to ask you.  What do you think is wrong with

13   her epidem -- let me ask you this.  What would a proper

14   epidemiological study look like?

15   A.   Well, the best kind of epidemiologic study would be a

16   prospective cohort of babies that are followed prospectively,

17   not looking back on what happened but looking forward with a

18   group of babies who can be assessed going forward to assess

19   various risk factors and to try to identify risk factors that

20   might be associated with this particular rare infection.

21   Q.   And so what would this type of study require an

22   investigator to survey?

23   A.   You would survey a group of newborn babies -- numbers would

24   have to be fairly large -- and survey them with respect to what

25   kind of medical problems they develop over the first several

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 90 of 150

     1    months of life and what risk factors they've experienced during

     2    that period of time such as feeding type A, feeding type B, and

     3    other kinds of risk factors in their environment.

     4    Q.    And has this kind of study ever been done in connection

     5    with E. sakazakii?

     6    A.    Yes, there has been one such study that involved, I think,

     7    10,660 low-birth-weight infants.  This was performed at the

     8    National Institutes of Health.  They followed these babies

     9    forward for a period of time.  And out of those 10,660 babies,

    10    there was 1 baby who developed an infection with E. sakazakii in

    11    the bloodstream, not meningitis, but it was an invasive

    12    infection in the bloodstream.  And that baby had not received

    13    any powdered infant formula.  No other babies developed this

    14    infection in that study.

    15              MS. GHEZZI:  One moment, Your Honor?

    16              THE COURT:  Sure.  Miss Ghezzi, would now be an

    17    appropriate time for us to take our recess?

    18              MS. GHEZZI:  Yes, yes, it would.

    19              THE COURT:  Thank you.

    20              MS. GHEZZI:  Thank you.

    21              THE COURT:  Members of the jury, it's 12:15.  We'll be

    22    in recess until 20 minutes to 1.  Thank you.

    23              (The jury exited the courtroom.)

    24              THE COURT:  Thank you.

    25              (Recess at 12:16 p.m.)

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 91 of 150

1    THE COURT:  Thank you.  Ready to have the jury brought

2  in?

3    MS. GHEZZI:  Yes, Your Honor.

4    (The jury entered the courtroom.)

5    THE COURT:  Thank you.  Please be seated.

6    Miss Ghezzi, you may continue your direct examination.

7    MS. GHEZZI:  Thank you, Your Honor.

8  BY MS. GHEZZI:

9  Q.   I just want to go back over one area.  Dr. Shulman, is it

10  possible for babies who eat just ready-to-feed formula to get

11  infected with E. sak?

12  A.   Yes, it would be possible, yes.

13  Q.   Okay.  And have you seen that in the literature?

14  A.   Yes.

15  Q.   Okay.  And how is it possible?  How does it happen?

16  A.   Well, it happens because in preparing ready-to-feed

17  bottles, there's a lot of hands-on activity, lot of steps that

18  have to be taken in terms of mixing -- putting the nipples on

19  the bottles, and that's done with hands.  And without good hand

20  washing, for example, and other possible contamination in

21  circumstances, there could be inoculation of organisms on to the

22  nipple.

23  Q.   And have you seen situations where a nipple has been -- a

24  bottle nipple has been inoculated with -- as you would say, with

25  E. sak bacteria?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 92 of 150

1  A.   Yes, there are positive -- reported positive cultures in

2  that circumstance.

3  Q.   Okay.  And if the bottles are made up ahead of time and

4  placed in the refrigerator, can there be cross-contamination

5  somehow?

6  A.   It's possible if one goes into the refrigerator, touches

7  other things, and then touches the bottle, that would be one

8  possibility, yes.

9  Q.   And what if there are other foods in the refrigerator at

10 the same time like fresh vegetables or meats?

11 A.   Those are things that can be colonized with this particular

12 germ, but there would have to be touching of a surface that was

13 cross-contaminated by a particular food, let's say, earlier and

14 then a bottle being put in the same location and getting -- for

15 the potential for then getting on hands and contaminating the

16 nipple.

17 Q.   And is it possible for babies who are fed exclusively

18 breast milk to get an E. sak infection?

19 A.   Yes, there are a number of those reported, yes.

20 Q.   And switching gears just slightly, what kinds of illnesses

21 do adults with E. sakazakii infections get?

22 A.   Well, adults get a wide variety of infections that would

23 include pneumonia, bloodstream infections, wound infections,

24 bile infections.  This kind of organism is an opportunistic bug,

25 and it can cause a wide spectrum of infections.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 319   Filed 10/15/14   Page 93 of 150

1  Q.   Okay.  And so the fact that Troy Kunkel was diagnosed with

2  pneumonia, does that allow you to rule him in as a possible

3  person who was colonized with E. sakazakii?

4  A.   He is possibly colonized, but we don't know for certain

5  without a culture.

6        MS. GHEZZI:  Thank you.  I have no further questions,

7  Your Honor.

8        THE COURT:  Thank you.

9        Mr. Rathke, you may cross-examine.

10       MR. RATHKE:  Thank you.

11                   CROSS-EXAMINATION

12  BY MR. RATHKE:

13  Q.   Now, doctor, the fact that the testing of the cans, the

14  open can and the unopened cans, for E. sak was negative was a

15  pretty important factor that you considered; correct?

16  A.   Correct.

17  Q.   In fact, you thought it was so important that on January 6

18  you shared that information with the readers of the Sioux City

19  Journal; correct?

20  A.   I have no knowledge of that, sir.

21  Q.   Do you ever comment on newspaper articles?

22  A.   I'm sorry.  Do I comment on newspaper articles?

23  Q.   An article in the newspaper and then there's readers'

24  comments?

25  A.   Like a letter to the editor?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 5:11-cv-04017-MWB-CJW  Document 219  Filed 10/15/14  Page 94 of 150
*To purchase a complete copy of the transcript.*

1  Q.   Not a letter to the editor.  A comment to a newspaper

2  article.

3  A.   Not to my knowledge.  I don't know what you're talking

4  about.

5  Q.   Well, there's a person named Dr. S.  Your name's -- your

6  first name is Stanford; right?

7  A.   Correct.

8  Q.   Last time is Shulman.

9  A.   That's correct.

10 Q.   Right?  And he starts out with saying if anyone is familiar

11 with this case -- and you, of course, by June -- by January 6

12 you were familiar with the case.

13 A.   January 6 of this year?

14 Q.   Yes.

15 A.   Yes, I certainly was familiar with the case.

16 Q.   -- they know that no bacteria was found in any one of the

17 cans.  That's what the comment was from Dr. S. in the Sioux City

18 Journal of January 6, and that's a fact that you knew on January

19 6 as well; correct?

20 A.   I knew that, yes, as did you, right, so everybody -- yes.

21 Anyone involved in this case knew that.

22 Q.   Do you know anybody involved in the case that would

23 identify themselves as Dr. S.?

24 A.   No.

25 Q.   You go on to say or somebody goes on to say -- Dr. S. goes

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 95 of 150

1 on to say it is very obvious this family's out for financial

2 gain. Did you write that?

3 A. I absolutely did not write that, sir.

4 Q. Do you have any idea who Dr. S. would be who is familiar

5 with the case and on January 6 knew that bacteria was not found

6 in any of the cans?

7 A. I have no knowledge of what you're talking about, sir.

8 Q. Okay. I'm going to set before you your appendix B and a

9 number of articles that you make reference. Please keep them in

10 order because I think that would be easier.

11         The first article is -- I don't know how to pronounce

12 this, but it's Beuchat, B-e-u-c-h-a-t. He wrote an article on

13 E. sak in 2009 in the International Journal of Food

14 Microbiology. Do you see that?

15 A.   Yes.

16 Q. And you do reference that in your report; correct?

17 A.   I believe so.

18 Q. And do you have the article? Are you looking at the front

19 page of the article now?

20 A.   Yes, I am.

21 Q. Do you see where -- and I underlined this just so -- to

22 make it easier for everyone. Do you see that on the first page

23 Dr. Beuchat says reconstituted powdered infant formula and

24 powdered milk have been the most common vehicles implicated in

25 neonatal E. sakazakii infections? Do you see where it says

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW Document 219 Filed 10/15/14 Page 96 of 150

1 that?

2 A.   Yes.

3 Q.   Do you agree or disagree?

4 A.   I'm not sure I agree with that because he goes on to talk

5 about other unidentified sources of the pathogen have been

6 involved in cases of children and infants and adults.  So it's

7 incomplete as a single sentence.

8 Q.   Well, it's a sentence that he starts out that paragraph

9 stating, that reconstituted PIF and powdered milk have been the

10 most common vehicles implicated in neonatal C. sakazakii

11 infections.  That's what he says; correct?

12 A.   That's what he says, and he goes on and clarifies or

13 comments upon -- expands is the right word, expands upon that in

14 that subsequent paragraph.

15 Q.   All right.  Let's take that.  The next sentence says other

16 unidentified sources of the pathogen were involved in cases of

17 infections in infants, children, and immunocompromised adults

18 having underlying medical conditions.  That's the next sentence,

19 isn't it?

20 A.   Correct.

21 Q.   All right.  Do you agree with both of those sentences?

22 A.   In general I do but with all the qualifications --

23 qualifiers that follow beyond that, yes.

24 Q.   All right.  One of your other sources is Bowen and Braden,

25 and I think what you're referencing is chapter 4 which they

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 97 of 150

1   authored in this best-selling book called Enterobacter

2   Sakazakii; right?

3   A.   I believe so.

4   Q.   Now, I only have one book, but I'm going to read portions

5   to you and ask you if you agree or don't agree.

6        MS. GHEZZI:  Hearsay, Your Honor.  Oh, he didn't read

7   it yet.  I was just going to say hearsay.

8        MR. RATHKE:  Maybe I could lay better foundation.

9        THE COURT:  That would be -- that would be helpful.

10  BY MR. RATHKE:

11  Q.   That is the -- I mean, we're on the same page.  That's the

12  article and the reference that you use as a reference in your

13  report; correct?

14  A.   It's correct if you're on the page that starts -- the

15  article or chapter that starts on page 101.

16  Q.   Great.  I am.  And then you alluded to that chapter in

17  your -- that was the chapter you were referring to in direct

18  examination; correct?

19  A.   I believe so.

20  Q.   Okay.  I'll read this.  And if you think I'm reading it

21  wrong, I'd be happy to hand it to you.

22        MS. GHEZZI:  I have a copy if you want to give -- do

23  you want to give him a copy?

24        MR. RATHKE:  Sure.

25  Q.   I think -- look at page 106.  Do you see there's a heading

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 98 of 150

1  Reservoirs and Transmissions?

2  A.    Yes.

3  Q.    And it states there to start out with the paragraph after

4  that heading many possible sources and modes of transmission for

5  E. sakazakii infections have been debated.  However, the only

6  vehicle that has been epidemiologically and microbiologically

7  associated with infection is powdered infant formula or the

8  equipment used to prepare it.  Do you see where it says that?

9  A.    Yes.

10  Q.    Do you agree with that?

11  A.    Well, as far as it goes, not exactly because there really

12  are reports of positive cultures from pacifiers, from artificial

13  nipples that have been also identified.

14  Q.    Isn't it a fact that no case of neonatal E. sakazakii

15  infection has been proved to be from any other cause other than

16  powdered infant formula?

17  A.    I don't believe that's the case.  There are lots of

18  environmental positive cultures including from, as I said,

19  pacifier and nipples.

20  Q.    You referred to Bowen and Braden in your discussion about

21  incubation and carriage which is at page 108.  Do you want to

22  find that?  Do you have it in front of you?

23  A.    Yes.

24  Q.    What it really says there is because the route of exposure

25  is generally unclear at the time of infection, the incubation

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 219   Filed 10/15/14   Page 99 of 150

1  period is unknown.  That's what it says in that one sentence;

2  correct?

3  A.    Correct.

4  Q.    And it goes on to say, however, in outbreaks associated

5  with PIF, infants began -- or illness began as soon as three or

6  four days after initial exposure to the implicated formula

7  product.  That's what it says; correct?

8  A.    Correct.

9  Q.    Another source that you use is the article by Dr. Friedman

10  in 2009.  Do you have that in front of you?

11  A.    Yes.

12  Q.    On the first page underlined it states globally about 120

13  to 150 cases have been reported in the high-risk group of

14  infants up to 2 months of age.  Do you see where it says that?

15  A.    Yes.

16  Q.    Do you agree with that?

17  A.    Globally, yes, I think that's about right.

18  Q.    It also says at the bottom of that column in the U.S.A.,

19  incidences of 1 cronobacter infection per 100,000 infants, 8.7

20  per 100,000 low-birth-weight neonates, and 1 cronobacter

21  infection per 10,660 very-low-weight neonates have been

22  reported.  Do you see where it says that?

23  A.    Yes.

24  Q.    Do you agree with that?

25  A.    No, I don't.  I think the incidence in the U.S. is closer

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 100 of 150

1  to one cronobacter meningitis per million babies as I indicated.

2  Q.   So although you cite Dr. Friedman as a reference, you don't

3  agree with the statistics that she sets out in her article?

4  A.   Well, I certainly wouldn't agree with every sentence in

5  every article that I've cited because they're not -- there's

6  inevitably going to be some misstatements or something that's

7  not quite right.

8         THE COURT:  Well, that wasn't the question he asked

9  you, was it?

10        THE WITNESS:  Could I have the question back then,

11  please?

12        THE COURT:  Sure.

13        MR. RATHKE:  Could you read it back, please?

14        (The requested portion of the record was read.)

15  A.   So what I -- what I should say here is that I realize that

16  she's talking about all cronobacter infections, not simply

17  meningitis.  The estimate of one per million is -- per infants

18  is related to the cronobacter meningitis.  There are some other

19  cronobacter infections, so if you calculate -- include those in

20  the calculation, this is probably correct.

21  Q.   Are you saying that her statistics are different from your

22  belief because she's including cronobacter infections that are

23  not meningitis?

24  A.   Correct.  This is referring to incidence of cronobacter

25  infection, not simply meningitis.  That's why the number's

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 101 of 150

1  different.

2  Q.   If you'd go to -- I put a tab in your copy because the

3  pages don't always come through.  But you see where the tab is,

4  there's some underlining underlying text.  Do you have that in

5  front of you?

6  A.   Yes.

7  Q.   And there Dr. Friedman says the main source of neonatal

8  cronobacter infections, comma, contaminated powdered infant

9  formula, comma, has been ascertained in various outbreaks and

10  single cases.  Do you see where it says that?

11  A.   Yes.

12  Q.   Do you agree with that?

13  A.   Not completely, no, sir.

14  Q.   The -- then she goes on to say at that point the

15  environment in powdered infant formula processing facilities has

16  to be regarded as potentially contaminated.  Do you see where it

17  says that?

18  A.   Yes.

19  Q.   Do you agree with that?

20  A.   Well, I guess I do agree with that.  That's why there's

21  lots of culturing and monitoring of processing facilities.

22  Q.   Okay.  Manufacturers of powdered formula for infants and

23  young children should control the microbiological hazards in the

24  raw materials during the whole processing chain and of the final

25  products according to international recommendation and European

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 102 of 150

1   legislation.  Do you see where it says that?

2   A.    Yes.

3   Q.    Do you agree with that?

4   A.    Well, I don't think -- partially.  I don't think the

5   European legislation refers to the United States.  But

6   Dr. Friedman is writing from Germany, so that -- that would be

7   relevant to the Europeans for sure.

8   Q.    Another publication that you cite as a reference is a

9   article by Susan Joseph and Stephen Forsythe entitled Prominence

10  of Cronobacter Sakazakii Sequence Type 4 in Neonatal Infections.

11  That is an article you rely upon; correct?

12          MS. GHEZZI:  Objection, Your Honor.  Beyond the scope.

13  We didn't do anything about sequence type in the entire direct

14  examination.

15          THE COURT:  Overruled.

16  Q.    Am I correct, doctor?

17  A.    I believe it was cited, yes.  Let me check.

18  Q.    And then on the second page where I put the tabbing of that

19  article and also did some underlining, there's a sentence that

20  starts out the seven household genus for MLST analysis -- and

21  then I'm going to stop right there and ask you do you know what

22  they mean, what the two doctors mean when they say that?

23  A.    Sure.

24  Q.    What do they -- what's that mean?

25  A.    So they're talking about multilocus sequence typing which

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:11-cv-04017-MWB-CJW  Document 210  Filed 10/15/14  Page 103 of 150
to purchase a complete copy of the transcript.

1   is a modern molecular typing method for bacteria.  And the

2   bacteria are typed by assessing the genes for each germ that one

3   is going to try to do this kind of analysis.  The -- when you

4   set it up, you need to select certain housekeeping genes which

5   are genes that the bacteria needs in order to just survive and

6   replicate.  And those genes are sequenced.  And then you can use

7   those genes.  You can analyze those genes in clinical strains or

8   laboratory strains of the particular organism you're dealing

9   with in order to try to divide them up into categories.

10  Q.   Okay.  Thank you for the explanation.  The sentence

11  actually says the seven housekeeping genes for MLST analysis are

12  not virulence related.  It goes on to say but a large proportion

13  of severe neonatal infections were caused by a single sequence

14  type.  Do you see where it says that?

15  A.   Yes.

16  Q.   And, of course, the sequence type they're talking about

17  is -- the subject of the article is ST4; right?

18  A.   Yes.

19  Q.   Do you agree with their opinion with respect to the ST4

20  sequence?

21  A.   I agree with their conclusions that many --

22  Q.   Do you -- I didn't ask you that; okay?

23  A.   I'm sorry.

24  Q.   What I asked you is do you agree with the sent -- the part

25  of the sentence where he said a large proportion of severe

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 104 of 150

1 neonatal infections were caused by a single sequence type?

2 That's what the sentence says. And that makes reference to

3 sequence type 4; correct? And what I want to know is if you

4 agree with that.

5 A.  Yes, I agree that their data showed in this select group

6 that one sequence type predominates. But this doesn't encompass

7 all infections, of course.

8 Q.  The next article that I'd like to show you that you relied

9 upon is another article by the same Professor Joseph, and that's

10 entitled Diversity of the Cronobacter Genus As Revealed By

11 Multilocus Sequence Typing. Do you have that in front of you?

12 A.  I do.

13 Q.  Now, some of these articles do people the favor of making a

14 synopsis to start with, and this one does, and you see that,

15 don't you?

16 A.  Yes.

17 Q.  And the last sentence of the synopsis says the predominant

18 species from clinical sources was found to be C. sakazakii.

19 C. sakazakii sequence type 4 was the predominant sequence type

20 of cerebral spinal fluid isolates from cases of meningitis. Do

21 you agree with that statement by Dr. Joseph and others?

22 A.  Well, I'm trying to find it here. I'm sorry to delay, but

23 I'm trying to find whether they actually present the numbers so

24 that I can answer your question. I think it's going to take

25 more time to go through this and really try to analyze this with

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 105 of 150

1 that -- with respect to that specific point.

2 Q.   All right.  You can set that aside.  Why don't you go to

3 the one that I -- the Joseph article that I kind of interrupted

4 you, and I'm feeling bad about that because I think you were

5 going to talk about a conclusion of their article on sequence

6 type 4, the earlier article.  And in the synopsis in that

7 article, one of the -- it's a short one, and one of the

8 sentences says C. sakazakii ST4 appears to be a highly stable

9 clone with a high propensity for neonatal meningitis.  Do you

10 see where it says that?

11 A.   Can you give me a hand here?  It's not underlined or

12 anything, so I'm not sure where that is.  Yes, that's their

13 conclusion.  If you look at their table, it's pretty much

14 supportive of that.

15 Q.   Okay.  The next article is Mittal, and he got mentioned on

16 the subject of rats, and what I've got before you is an article

17 you relied upon entitled Brain Damage in Newborn Rats,

18 et cetera, by Professor Mittal in 2009.  And he also has a

19 synopsis.  And the second -- third sentence in the synopsis

20 which I've underlined says here we demonstrate for the first

21 time using a newborn rat model that outer membrane protein A,

22 OmpA, expression is important for the onset of meningitis by

23 E. sakazakii.  Do you see where it says that?

24 A.   Yes.

25 Q.   Do you agree with that?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 106 of 150

1    A.    I think this article did show that in the rat model.

2    Q.    All right.

3    A.    We don't know what relates to people but certainly in the

4    rat model.

5    Q.    And the last article I'm going to show you is by Eva --

6    Dr. Eva Kucerova.

7    A.    Kucerova I believe, yes.

8    Q.    Kucerova, and also joined by Dr. Joseph and Dr. Forsythe.

9    This was in the 2011-- in 2011 in Quality Assurance and Safety

10   of Crops and Foods, and it's entitled The Cronobacter Genus

11   Ubiquity and Diversity, and that's an article that you relied

12   upon.

13   A.    Yes.

14   Q.    If you go to the page that's tabbed and under the heading

15   source -- sources of infection, it states, does it not, while

16   the source of contamination in cronobacter-related outbreaks has

17   not always been confirmed, comma, breast milk substitutes,

18   paren, one group of powdered infant formula products, close

19   paren, have been epidemiologically or microbiologically

20   established as the source of infection in a number of cases.  Do

21   you see where it says that?

22   A.    Yes.

23   Q.    Do you agree with that?

24   A.    I think there are a number of cases where there's been that

25   connection made, yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 107 of 150

1  Q.   Then on the -- under the same heading, the writers state

2  that the neonate has an immature immune system and low

3  intestinal microflora density.  Consequently, if a large number

4  of cronobacter cells were ingested, they would not be

5  outcompeted by the resident intestinal flora.  Following

6  invasion of the intestinal cells, the lack of the developed

7  immune system could make the neonate more prone to systematic

8  infection.  So far do you agree with me or with the article?

9  A.   I'm sorry.  I didn't see where you were.  Now I find it.

10  Let me read it.

11  Q.   I started with the neonate has an immature --

12  A.   Yes.

13  Q.   And I stopped with systematic infection.

14  A.   Yes, I agree with their statement that -- with this

15  statement that it could make the neonate more prone.  It

16  doesn't -- they can't state that it does.  This is a hypothesis

17  that they are promoting -- proposing.

18  Q.   Well, do you agree with the hypothesis?

19  A.   I think it's a reasonable hypothesis, but it's not proven.

20  Q.   Okay.  The next sentence says no infectious dose has been

21  determined for neonates.  Do you see where it says that?

22  A.   Yes.

23  Q.   Do you agree with that?

24  A.   Yes, I think that's correct.

25  Q.   Abbott has employed you as an expert in other powdered

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 108 of 150

1   infant formula cases?

2   A.   One other I believe.

3   Q.   And what's your hourly rate for testifying here today?

4   A.   $800 an hour for testifying.

5   Q.   I want to cover a couple things you said in your testimony,

6   not a whole lot but just a few, if I can figure out what I

7   wrote.

8          You discussed the WHO report from 2008 which had a

9   table in it.  Do you remember that discussion?

10  A.   Yes.

11  Q.   Now, it's true, is it not, that the WHO report in 2008 was

12  devoted to the subject of what's called follow-up formula;

13  correct?

14  A.   I don't recall specifically that.  I'd have to review that.

15  Q.   Well, the tape -- I mean, it's a -- it's a blue book like

16  this.  Did you ever see a blue book like this?

17  A.   I've seen Xerox pages out of it.

18  Q.   Okay.  All right.  And when you were provided those pages,

19  did they provide you with the entire 2008 WHO report?

20  A.   I believe so.

21  Q.   Okay.  And do you recall that it was entirely devoted to

22  follow-up formula?

23  A.   I don't recall that term specifically, but that may be

24  correct.

25  Q.   Follow-up formula, of course, is formula for older children

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 109 of 150

1  like six months and older; correct?

2  A.   I'm not sure I recognize that term specifically to mean

3  that.

4  Q.   Do you know if it means something else?

5  A.   I do not know.

6  Q.   All right.  When you described the findings in that table,

7  you were very careful about saying majority of isolates, not

8  majority of children or cases; right?

9  A.   Well, that table included -- as I recall, the table I was

10  referring to included the number of bacterial isolates in

11  clinical microbiology laboratories in the UK and I think Wales.

12  And those isolates that were obtained from many different

13  laboratories and hospitals were broken down by age of the

14  individual from whom the cultures were obtained.  That's the

15  table I was referring to.  And the point I was making is that

16  the large majority, the very large majority, of those isolates

17  are really from adults and older children rather than from

18  newborns.

19  Q.   Because adults can get cronobacter infections; correct?

20  A.   Absolutely, sure.

21  Q.   Doesn't kill them.

22  A.   It could.  Immunocompromised host, absolutely.

23  Q.   Rarely kills them, doctor.  Very rarely kills an adult.  It

24  makes them sick; right?

25  A.   It makes them sick, very sick, potentially very sick and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 110 of 150

1  potentially fatally sick.

2  Q.   You criticized the epidemiological study and conclu --

3  well, the study that Dr. Jason provided.  Do you recall that?

4  A.   Yes.

5  Q.   And you may know that on Monday, Tuesday, and Wednesday she

6  was here in court testifying about it.

7  A.   Yes.

8  Q.   As I understand your viewpoint on this, the only study that

9  would have any validity would be one that's prospective and

10 cohort.

11 A.   That would be the best kind of study to do, yes, sir.

12 Q.   And that means that you could start like in 2014.  That'd

13 be year -- I don't know what -- the technical term, but that'd

14 be year zero, and then you would go forward in time instead of

15 looking backward in time.

16 A.   Correct.

17 Q.   And what you'd do is you'd select a whole bunch of people

18 presumably at random, and then you'd follow them for a number of

19 years.

20 A.   Well, depends what question we want to ask.  That would not

21 be correct if the question being asked is what's the frequency

22 and what are the risk factors associated with neonatal or infant

23 enterobacter sakazakii infection.  If that's the question, then

24 the patients would only need to be followed for a matter of

25 months, not years and years.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 111 of 150

1 Q. Well, the patients that you're -- the people you're talking
2 about are the people that contract the disease; correct?
3 A. No, sir. You're talking about a cohort study prospectively
4 would be to recruit a number of newborns because that's the
5 population one is concerned with and then prospectively follow
6 that group of newborns for as long as the study designers felt
7 would be appropriate such as till they're four months old, three
8 months old because it would be my -- my best effort to do that
9 because that's the period at which there's concern about
10 cronobacter meningitis in particular in young infants.
11 Q. Well, given the rarity of this disease, four to six cases
12 in the United States in a given year, if you took a whole bunch
13 of infants, it'd be blind luck if you even had one of them in
14 that group; correct?
15 A. Well, you'd have to choose your group's appropriate size.
16 That's correct.
17 Q. Now, as an epidemiologist, what you do is you're a hospital
18 epidemiologist; correct?
19 A. Correct.
20 Q. And one of your very particular expertises is in the area
21 of strep throat -- or strep?
22 A. I do a lot of research and clinical work on strep, that's
23 correct, strep throat.
24 Q. And strep is often an issue in a hospital?
25 A. Not so often fortunately.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW Document 210 Filed 10/15/14 Page 112 of 150

1  Q.   At any rate, the epidemiological work you do is within the

2  confines of the hospital; correct?

3  A.   Well, it's within the confines of the hospital and patients

4  in the hospital because very frequently I'm involved with

5  patients in whom there's an epidemiologic question as to where

6  did this infection come from, how did the child get sick,

7  et cetera.

8  Q.   I'm going to bring up Exhibit 148.  This was a -- something

9  that was shown to you during your deposition, and it's a health

10 professional letter on E. sak sent from the FDA to health

11 professionals and sent in 2002, actually twice, one in one

12 version and then one in another version.  You don't recall ever

13 seeing that, do you?

14 A.   I do not recall seeing that.  I don't recall seeing that at

15 my deposition either, but I may just be misremembering.

16 Q.   Yeah.  And your hospital is not -- as I understand it, it's

17 not a birth hospital.  It's a hospital where babies are taken

18 when they get real sick.

19 A.   Well, we're next door to a birth hospital, but we are not a

20 birth hospital.  We take care of sick children.

21 Q.   And you have a NICU unit.

22 A.   We do.

23 Q.   Is your whole hospital a NICU unit or just a portion of it?

24 A.   Just a portion of it.

25 Q.   So you as a person within -- you know, a hospital

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 113 of 150

1  epidemiologist in the NICU unit, you don't recall ever getting

2  this letter from the FDA with respect to the use of powdered

3  infant formula for NICU babies.

4  A.    I don't recall seeing that, no, sir.

5  Q.    You testified that powdered infant formula's given to

6  NICU -- NICU babies today in your hospital.

7  A.    Correct.

8  Q.    Isn't it a fact that what you're talking about is human

9  milk fortifier where a baby is so premature that her mother --

10  that the baby's mother's breast milk does not provide adequate

11  nutrition and what is given to babies in that situation is a

12  human milk fortifier which they get along with breast milk;

13  correct?

14  A.    That would be partially correct.  That would be one aspect.

15  The other aspect is what I referred to earlier about babies who

16  have a metabolic disorder that need a specialized powdered -- a

17  specialized diet that comes as a special powdered infant

18  formula.

19  Q.    And it is true, is it not, that they haven't figured out

20  how to make ready-to-feed human milk fortifier?  The only way

21  those babies can get the fortifier is the powder.

22         MS. GHEZZI:  Objection.  Lack of foundation.  No

23  testimony about human milk fortifier and how it comes.

24         MR. RATHKE:  Well, there may be in a minute.

25         THE COURT:  Just a second.  Overruled.  You may

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 114 of 150

1  answer.

2  BY MR. RATHKE:

3  Q.   Do you want the question again?

4  A.   Yes, please.

5  Q.   Isn't it a fact that in the case of human milk fortifier

6  which is needed for these premature babies, you know, very early

7  babies whose mother's milk is not sufficient, that the only way

8  they can get the human milk fortifier is in powdered form

9  because there is no alternative ready-to-feed?

10  A.   I'm sorry.  I don't under -- I don't know if that's true or

11  not.  I do not know.

12          MR. RATHKE:  You can take that off.

13  Q.   Do you agree with the notion that with respect to

14  E. sakazakii infections low-birth-weight babies are at a greater

15  risk than healthy term babies?

16  A.   Well, that's an interesting question because that used to

17  be very clear and it's not so clear anymore because there are

18  increasing reports of full-term babies so that the dominance of

19  pre-term babies doesn't -- no longer seem to exist.

20  Q.   Would you agree that no one knows the incubation period for

21  human babies?

22  A.   Well, no one knows for certain, but I think that the

23  estimates -- the best estimates are that it'd be three to four

24  days or more in terms of oral ingestion of the organism and the

25  steps required as I outlined for development of meningitis.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 115 of 150

1    Q.   Would you agree with respect to the incubation period for

2    human babies you don't think anyone knows precisely; correct?

3    A.   Yeah.  No one knows precisely, but estimates are about

4    three or four days minimum.

5    Q.   Now, in your report and your testimony you talked about

6    infectious dose, and you had a -- I don't know what you'd call

7    it -- a theory or a hypothesis with respect to the amount of

8    E. sak that might have been in the powdered infant formula if,

9    in fact, it contained E. sak.  Are you following me?

10    A.   Yes, I think so.

11    Q.   Okay.  And your basis for that is the fact that E. sak was

12    found at a low level in the 1990s.

13    A.   Correct, extremely low level, yes, sir, that's correct.

14    Q.   Actually you base that on information not only in the 1990s

15    when nobody cared but also in the early 2000s; correct?

16          MS. GHEZZI:  Objection, Your Honor.  Argumentative,

17    when nobody cared.

18          THE COURT:  Sustained.  Why don't you rephrase the

19    question.

20          MR. RATHKE:  Yes, Your Honor.

21    BY MR. RATHKE:

22    Q.   Actually in your report and what you referred to is amounts

23    found in powdered infant formula not only in the 1990s but also

24    in the 2000s; right?

25    A.   The early 2000s I believe is correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 116 of 150

1  Q.   Is one of the base -- one of the -- is some of the data

2  taken from the FDA survey?  Do you know anything about that?

3  A.   Just a little bit.  Yes, I think that it's compatible with

4  what was in the FDA survey.

5  Q.   So your assumption, if I understand this, is that if she

6  had E. sak she had E. sak at the same level as they were finding

7  E. sak in the 1990s and early 2000s; right?

8  A.   First of all, I don't believe there was any E. sak

9  whatsoever, but for purposes of trying to do a calculation, I

10 relied upon the historical concentrations of the very low

11 numbers of less than one colony forming unit per hundred grams

12 of powdered infant formula.

13 Q.   In your testimony if I remember right you made the

14 assumption that Jeanine was off-the-wall crying beginning at 4

15 a.m. that morning.

16 A.   I didn't make the assumption.  That's what was testified to

17 I believe, really, really off-the-wall whining.

18 Q.   Right.  You were read a portion of the deposition that

19 said -- where Megan Surber testified that then the 4:00 is when

20 she started getting really, really off-the-wall whiney.  That's

21 what you were read.

22 A.   Yes.

23 Q.   And --

24 A.   That's what I read, yes.

25 Q.   That's where the reading by the defense stopped; correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 117 of 150

1  A.   This morning?  Yes.  I'm sorry.

2  Q.   But that isn't where Ms. Surber stopped in her explanation;

3  correct?

4  A.   I don't recall.

5  Q.   Well, you -- I mean, you based your opinion as to what

6  happened on her deposition.

7  A.   Certainly.  There's no doubt the baby was very irritable

8  and crying and off-the-wall activity.  I mean, it's very clearly

9  stated.

10  Q.   Okay.  Here's page 294 from her deposition.  And when she

11  answered the question, she said then the 4:00 is when she

12  started really, really off-the-wall whining between 4 and 9 in

13  the morning.  That's the full answer she gave; correct?

14  A.   Yes.

15  Q.   And apparently are you just interpreting that as the really

16  off-the-wall whining started at 4:00 and ignoring her comment to

17  the effect that it -- of 4 to 9?  Is that your assumption?

18  A.   The way any -- the way any person would read this, it says

19  and then the 4:00 is when she started getting really,

20  really-off-the-wall whiney, between 4 and 9 in the morning of

21  the 24th.  To me that means it started around 4:00 and it

22  continued until 9 in the morning.  Now, I don't know that anyone

23  else would read that differently.

24  Q.   Well, are you suggesting the baby started wh -- or quit

25  whining at 9:00?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 118 of 150

1 A.   No, but she's speaking of --

2 Q.   In fact --

3 A.   She's speaking of that time period.

4 Q.   Wait a second.  That was a yes or no; okay?  No.  You know

5 that she did not stop whining at 9:00 but, in fact, whined and

6 cried and carried on all day long; correct?

7 A.   That's what I understand.  She was irritable all day long.

8 Q.   So when she said four to nine, she couldn't possibly have

9 been giving you the times when the baby was whining because, in

10 fact, they continued; correct?

11 A.   That's not the way I would interpret this, no, sir.

12 Q.   Okay.  And that's fine.  You're entitled to your

13 interpretation.

14 A.   Thank you.

15         THE COURT:  Was that a question?

16         MR. RATHKE:  No, Your Honor.  I withdraw it.

17 Q.   Now, as to the boiling of the formula, are you suggesting

18 that the only time that she boiled the formula after it was

19 reconstituted was at 9:00 in the evening?

20 A.   I think I recall that she stated later -- with her later

21 feedings that night she also boiled the formula.

22 Q.   All right.  Do you recall her stating in her deposition --

23 and I appreciate you weren't here the other day last week when

24 she testified.  But you recall in her deposition she said that

25 she warmed the bottles that she took out of the refrigerator at

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 119 of 150

1  midnight and 4 a.m.  Is that --

2  A.    I think that's correct as far as I know.

3  Q.    All right.  And since at 9 p.m. she was just making the

4  formula, she would have no reason to warm it, would she?

5  A.    Well, she was feeding the baby at 9 p.m. also, so she

6  was -- would be warming that portion of what she prepared.

7  Q.    Well, okay.  Let's talk about Troy for a moment.  A page

8  that was mentioned from his medical record which is Exhibit --

9  I'm sorry, 1005B.  Highlight this, Pat.  Now, it says meningitis

10 was effectively ruled out as far as resolution of the patient's

11 symptoms and chest X-rays was obtained to further monitor for

12 pneumonia though the chest X-ray was negative, and it kind of

13 goes on.  But you see where it says that the meningitis was

14 affectively ruled out for Troy; correct?

15 A.    Correct.

16 Q.    And you concur with that.

17 A.    Yes, I'm sure that he didn't have meningitis, yes.  He had

18 pneumonia.

19 Q.    In fact, you believe, do you not, that it is unlikely that

20 he was the source of any cronobacter infection; correct?

21 A.    Correct.  I don't think he was the source, but I think he

22 and the baby might have had a common source, but it's hard to

23 know since we don't have a culture from him to prove that he had

24 cronobacter.

25 Q.    But you've stated that it is unlikely that he was a source.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 120 of 150

1  A.   I think I said it was unlikely that he was the source.

2  Isn't that correct?

3  Q.   You're right.

4  A.   Thank you.

5  Q.   So in other words, the source could have been Jeanine, and

6  he (sic) could have gotten something from Troy?

7  A.   Say that again.  I'm sorry.

8  Q.   I withdraw the question.

9       Now, there's a list -- do you have your report in

10  front of you?

11  A.   I do.

12  Q.   All right.  Why don't you turn to page 10.  And I think

13  you'll find that there is a list of about 23 different sources

14  that you contend could have been the source of Jeanine's E. sak

15  infection.  Do you see that?

16  A.   Yes, I think there's 21 listed there.

17  Q.   21.  The first one is the St. Luke's Hospital environment.

18  A.   Yes.

19  Q.   Is there any evidence anywhere -- and you're a hospital

20  epidemiologist, so you'd be the one to ask.  Is there any

21  evidence anywhere that anything that happened at the birth

22  hospital during her birth admission would be a source for

23  cronobacter?

24  A.   There's nothing that specifically points to that, but if

25  one is making a list of the possibilities in her environment --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 121 of 150

```
1   this is where she spent the first two and a half or three days
2   of her life -- it's a possibility that she might have acquired
3   the organism in the hospital.
4   Q.   But there's no evidence, is there?
5   A.   There's no direct evidence.
6   Q.   There's no circumstantial evidence either.
7   A.   There's really no ev -- there's no evidence, but there's
8   been, you know, no -- no testing of any kind was done to help
9   evaluate that possibility.
10  Q.   You did review the birth records for Jeanine.
11  A.   I did.
12  Q.   And James.
13  A.   And James.
14  Q.   And the delivery records for Megan.  She was at the
15  hospital the same time.
16  A.   I don't recall reviewing the birth -- the mother's birth
17  records, but I may have.  I just don't recall that.
18  Q.   Then you -- the next two you cite, the single-use bottles
19  and the ready-to-feed, but those are commercially sterile;
20  correct?
21  A.   Well, they're packaged and commercially sterile, but the
22  nipples need to be handled when you're putting them on to the
23  two-ounce bottles, so if the hands are contaminated for whatever
24  reason, there's a potential for contamination of the nipple as
25  it's being applied to the bottle.  So yes, they come
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 122 of 150

1 commercially sterile initially.

2 Q.   All right.

3 A.   But they need to be handled.  That's the problem.

4 Q.   Well, of course, they need to be handled so they can be

5 opened and used.

6 A.   Correct.

7 Q.   Everyone that uses it has to handle it.

8 A.   That's correct.  That's why good hand washing and hygiene

9 is really important.

10 Q.   Did you see any evidence in Megan Surber's deposition that

11 she did not follow good hygiene?

12 A.   There was nothing mentioned in her deposition to suggest

13 that, but we never know.

14 Q.   You never know.

15 A.   Correct.

16 Q.   That's kind of where you're coming from, we never know;

17 correct?

18          MS. GHEZZI:  Objection, Your Honor.  Argumentative.

19          THE COURT:  Overruled.

20 BY MR. RATHKE:

21 Q.   The refrigerator, okay, so what would be refrigerated would

22 be the ready-to-feed.  That's the only thing that would need

23 refrigerating after it was opened; correct?

24 A.   That's correct.

25 Q.   And there might be some broccoli in the refrigerator.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 123 of 150

1    A.    Correct.

2    Q.    So the hypothesis here is what?  The cronobacter jumps from

3    the broccoli to the bottle?

4    A.    Of course not.

5    Q.    The hypothesis is the mom messes with the broccoli and then

6    opens the bottle?

7    A.    The possibility exists -- it's not extremely likely.  The

8    possibility exists that if formula bottles are on the same shelf

9    with the kinds of foods that can be contaminated that there can

10   be cross-contamination by touching one item and then touching

11   the second item or the second -- or the second item being the

12   formula bottles could be contaminated by sitting on a rack that

13   yesterday had meat or some other food stuff sitting on it so

14   that you get cross-contamination.  That's the only point.

15   Q.    Was there any evidence of that type of cross-contamination?

16   A.    In science?  Absolutely.

17   Q.    In this case.

18   A.    Well, there's no testimony that bears on that.

19   Q.    Well, there's testimony that Megan Surber washed her hands

20   every time she made formula; right?

21   A.    I think that's correct.

22   Q.    Now -- and there's no testimony that she washed her hands,

23   then went in the refrigerator and messed around with the salami,

24   and then touched the powdered -- or the ready-to-feed; correct?

25   A.    There's no testimony to that effect.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 124 of 150

```
1   Q.   The next several are the bottles, the nipples, the cabinet

2   where the bottles were, anyplace -- whole b -- the bottle brush,

3   the dish soap bottle.  All those relate to the bottle.  Isn't it

4   a fact, however, that Megan before any bottle was used she

5   boiled all of the bottles; right?

6   A.   That's -- before their first use is what I understand,

7   that's correct.

8   Q.   Okay.  And then as she would -- when she would use a bottle

9   for a particular feeding, she would take it out of the cabinet

10  and then she'd boil it again.  That's what she testified to;

11  correct?

12  A.   I don't recall that specific testimony that she boiled them

13  again.  She certainly boiled them before the initial use.

14  Q.   Well, if she boiled the bottle, the individual bottle that

15  she was going to use to feed Jeanine, if she boiled that again

16  separately, it would kill any germs that would be in the

17  universe that might be on the bottle; correct?

18  A.   Should do a good job of that.

19  Q.   All right.  And you understand that she boiled the water

20  that she added to the formula; right?

21  A.   Correct.

22  Q.   Okay.  Whatever happens to Sioux City water prior to it

23  coming out of the faucet, that problem as far as the water in

24  the formula was concerned -- is concerned with, that problem was

25  resolved by her boiling the water before she reconstituted the
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 125 of 150

1 formula; correct?

2 A.   That's correct with respect to the water that went in to

3 mix up with the powder, yes.

4 Q.   So the only water that she could have had contact with that

5 wasn't boiled would be the bath water.

6 A.   Well, no.  There's water that pools around sinks and drains

7 and faucets that splash around sinks.

8 Q.   Jeanine's ten years -- ten days old.  How is she going to

9 have contact with that water?

10 A.   I'm sorry.  I'm sorry.  I interpreted your question to mean

11 the mother's contact.  The mother's hands could have contact

12 with all kinds of water that's around the sink that can

13 contaminate the outside of the bottles and the nipples.

14 Q.   Well, it'd be city water; correct?

15 A.   I think -- I think they're on city water, yes.

16 Q.   Do you have any reason to doubt the sanitariness of the --

17 that the city of Sioux City provides for its residents?

18 A.   I've seen some information about chlorine levels and free

19 chlorine levels, but I'm not an expert in water supplies like

20 that.

21 Q.   And then, of course, you talked about the different family

22 members that would have had contact with this baby; right?

23 A.   Yes.

24 Q.   Now, if you add up all of the places that this baby had --

25 has been and all of the things that -- the way she was fed and

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 126 of 150

1  the people that had contact with her, there is absolutely

2  nothing unusual about Jeanine's contacts with things and people

3  during the time that -- until she got sick; correct?

4  A.   There's nothing terribly unusual, no, although the issue of

5  sewer back-up, mold, moldy wall that needed to be torn out, all

6  that sort of stuff is an environment where bacteria really

7  thrive so --

8  Q.   Well, mold forms within walls; correct?

9  A.   Excuse me.  And I'm concerned about the storage of the

10 formula on the floor under the crib.  But I don't know for a

11 fact that that's a pr -- that that's an etiology of this

12 infection, but I'm very concerned about that as a possibility.

13 Q.   If there was mold growing in that house in April 2008, it

14 certainly would not be the only house that babies and mold would

15 be in the same place at the same time; correct?

16 A.   I think that's correct.

17 Q.   If you take all -- you know, you got this list of 21

18 things.  You -- you -- couldn't possibly be powdered infant

19 formula, so let's look at these 21 things.  Who do you nominate

20 as number one?

21 A.   Oh, I don't know.  I told you I'm concerned about the

22 storage of the formula, where it was stored.  I'm concerned

23 about the water and the potential for splashes and hand contact

24 and dealing with the bottles and nipples and screwing the tops

25 on and all that.  Those would be my concern -- major concerns.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 127 of 150

1  Q.   Well, okay.  So is that like your top one, two, or three?

2  A.   I can't enumerate them.  Sorry.

3  Q.   James -- you're aware that when James came home from the

4  hospital on April 24 he lived in that same house.

5  A.   Correct.

6  Q.   Presumably was subjected to the same bathing in the same

7  place and the same feeding, although none of it was powdered

8  infant formula, same relatives; correct?

9  A.   I have no reason to doubt that.

10 Q.   In fact, there isn't one single thing about James that's

11 different than Jeanine except James didn't have any powdered

12 infant formula; correct?

13 A.   No, that's not correct.  James wasn't in the household

14 during the dates that Jeanine was prior to her developing her

15 infection.

16 Q.   So you're suggesting --

17 A.   And there may have been issues with the water supply during

18 that time and when he was not there, so that's all I can say

19 about that.

20 Q.   So you're suggesting if there's any cronobacter in the

21 house on April 23 it all left on April 24?

22 A.   No, I don't think I said that.

23 Q.   James didn't get sick, did he?

24 A.   Not with this particular organism, and that happens in my

25 clinical experience all the time where one child --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 128 of 150

1   Q.   I didn't --

2   A.   -- in the family gets sick, the other kids don't, the twin

3   doesn't.  We don't understand why that can happen with one of a

4   series of children becoming sick with a particular infection

5   when they all should have theoretically been exposed, but that

6   happens all the time.

7   Q.   Sure this isn't kind of a cohort study all by itself?  You

8   got two babies, practically everything is in common, same mom,

9   same birth hospital, we can go on and on.  Only one difference,

10  powdered infant formula, one gets sick and the other doesn't.

11  Cohort study?

12  A.   No, sir.

13  Q.   If babies could get sick from the broccoli and from this

14  and from that and from some sewer -- you know, some leaking in

15  the basement and the mold within the walls and God knows what,

16  why aren't more babies getting sick?

17  A.   We don't know that.  It's a good thing that they're not,

18  but we don't know why that is.

19  Q.   And as I understand it, the only way that you would be

20  satisfied that the powdered infant formula is the cause of her

21  illness, the only thing that would satisfy you, is if they found

22  cronobacter in a sealed can of powdered infant formula and it

23  was a genetic match between the cronobacter in the can and that

24  in the baby.

25  A.   That would be the best supporting evidence, certainly.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 129 of 150

1  Q.   Well, in fact, you regard that as the only way that you

2  would attribute cause to the powdered infant formula; correct?

3  A.   That's the most secure way I would feel comfortable

4  concluding that they're related, yes, from a scientific

5  standpoint, yes, sir.

6  Q.   Well, at your deposition you testified that that's the only

7  way we could prove causation; correct?

8  A.   That's -- from a scientific standpoint, that's absolutely

9  correct.

10  Q.   Even if -- let's -- let's assume -- and, of course, they

11  collected the isolate from Jeanine, but they had nothing to

12  compare it to.  Let's -- what if Abbott when it got a positive

13  test in its factory on January 8, the same day that the formula

14  that Jeanine consumed was made, what if they had saved that

15  isolate and it was compared to Jeanine's and found to be an

16  identical genetic match?  Would that convince you?

17  A.   I'm not aware that there's any isolate that was ever

18  confirmed to be cronobacter sakazakii at that time from the

19  plant.

20  Q.   Well, somewhere along the line there's some documents that

21  say they took a test and found it to be positive for E. sak, so

22  just bear with me.  Let's say that they had --

23        MS. GHEZZI:  Your Honor, that's testimony.  Can we

24  strike that, please?  Motion to strike.

25        THE COURT:  Well, I think he was trying to formulate a

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 130 of 150

1  question but . . .

2         MS. GHEZZI:  He might have been, but I don't think

3  that was it.

4         THE COURT:  Well, I think he was.  I'll go ahead and

5  strike it.  Start over again and try and form a question.

6  BY MR. RATHKE:

7  Q.  Assume for the purpose of my question that E. sak was

8  identified in the plant on the same day that this batch was

9  manufactured.  Just assume that.  Would you be satisfied if that

10 E. sak found in the factory was a genetic match to the E. sak

11 found in Jeanine?

12 A.  I would expect that if it was related there would be some

13 evidence from the powdered infant formula itself that should be

14 readily discernible.  And you haven't said that that's the case.

15 Q.  Okay.  I'm not understanding.  If E. sak from the factory

16 matched E. sak in Jeanine, would you then be satisfied that the

17 E. sak within the can of powdered infant formula was the cause

18 of her illness?

19 A.  No, I would not.  I would be suspicious.  I would want to

20 do further investigation, and that further investigation would

21 be to study -- would be to try to isolate the organism from cans

22 produced at that time.

23 Q.  Of course, as you may know, that investigation cannot occur

24 because Abbott did not keep the isolate.

25         MS. GHEZZI:  Objection, Your Honor.  Lack of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 210  Filed 10/15/14  Page 131 of 150

1  foundation, and he's testifying.

2          THE COURT:  Well, I think he was trying to formulate a

3  question but . . .

4  BY MR. RATHKE:

5  Q.   That kind of testing could not occur unless Abbott kept the

6  isolate.

7  A.   And unless there was an isolate which I have seen no

8  evidence that there's such an isolate.

9          MR. RATHKE:  I have nothing further.

10         THE COURT:  Redirect?

11         MS. GHEZZI:  Just briefly, Your Honor.

12         THE COURT:  Why don't I give everybody an opportunity,

13  including Dr. Shulman, for a stretch break.

14         Thank you.  Please be seated.  Thank you.

15         MS. GHEZZI:  Thank you, Your Honor.

16                    REDIRECT EXAMINATION

17  BY MS. GHEZZI:

18  Q.   Dr. Shulman, was Jeanine Kunkel's E. sakazakii isolate ever

19  typed for a sequence type?

20  A.   No, it was not.

21  Q.   So does anybody know what sequence type her isolate is?

22  A.   Not to my knowledge, no.

23  Q.   Okay.  And is this a case where there's been any

24  epidemiological proof, microbiological proof, linking Abbott's

25  powdered infant formula with Jeanine Kunkel's E. sak bacteria?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 132 of 150

1    MR. RATHKE: Object to leading.

2    THE COURT: Sustained.

3    MS. GHEZZI: Your Honor, it's only l -- if his answer

4    is yes. If the answer is no, it can't be leading.

5    THE COURT: That's not true.

6    BY MS. GHEZZI:

7    Q. Is there any -- is there any evidence in this case of any

8    microbiological or epidemiological proof linking Abbott's

9    powdered infant formula with Jeanine Kunkel's bacteria?

10   A. No.

11   MR. RATHKE: Object to leading.

12   THE COURT: Sustained. Rephrase it.

13   Q. Have you seen any epidemiological proof in this case

14   linking Jeanine Kunkel's bacteria with Abbott's powder?

15   A. No, I have not.

16   Q. Have you seen any microbiological evidence in this case

17   linking Jeanine Kunkel's b -- microbiological evidence linking

18   Jeanine Kunkel's bacteria with Abbott's product?

19   A. No.

20   Q. In your experience is the mother in the family the only one

21   who goes in and out of a refrigerator?

22   A. No. Of course not. Many people likely go in and out of

23   the refrigerator in virtually any household.

24   Q. And are eight-year-old children likely to go in and out of

25   a refrigerator in a home?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 133 of 150

1 A.   That's certainly my experience.

2 Q.   And in terms of the twin brother James, is it your

3 understanding that he didn't go back to the -- he did not get

4 released from the neonatal intensive care unit until the day

5 that Jeanine went to Omaha to the Children's Hospital in

6 Nebraska?

7 A.   I believe that's correct, or maybe the day before like --

8 or the same day, the same day I think.  Yes.

9 Q.   And do you have a recollection in the -- from the Megan

10 Surber deposition testimony that she and her husband then stayed

11 in Omaha with Jeanine while she was in the hospital for the next

12 two months?

13 A.   Yes.

14 Q.   Okay.  So James would not have been around his father Troy

15 Kunkel during that time; correct?

16 A.   Correct.

17 Q.   And in -- counsel read you some portion of the Megan Surber

18 deposition, and I just want to call your attention to a portion

19 of this on page 314 concerning how she washed bottles when she

20 fed the ready-to-feed in the 32-ounce jar which I believe is

21 referred to in your report, and it says, so how would you wash

22 the bottles?  Answer, hot water, soap after use.  Do you recall

23 that?

24 A.   Yes.

25 Q.   Okay.  And counsel also referred you to the 2008 World

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 134 of 150

1  Health Organization report.  Do you recall that?

2  A.    Yes.

3  Q.    And you reviewed that report at the time of your report.

4  A.    Yes.

5  Q.    And do you recall where it said from a U.S. survey that

6  more than half of the caregivers, 55 percent who were surveyed,

7  said that they did not always wash their hands before preparing

8  infant formula and about 4 to 6 percent of caregivers said they

9  sometimes use bottle nipples again without cleaning them in any

10  way and about a third of caregivers sometimes only rinsed bottle

11  nipples with water between uses?  Do you remember that?

12  A.    Yes.

13  Q.    Okay.  Now, if that had happened in this case, what would

14  you expect with respect to the bacteria load on the nipples and

15  the bottles used in the ready-to-feed feedings?

16  A.    The concentration of the germs on the nipples and bottles

17  would gradually increase with the doubling time as would be

18  appropriate for the temperature they're at and could lead to a

19  very high concentration of contamination of -- with this

20  enterobacter sakazakii.

21  Q.    Okay.  Now, doctor, in medical microbiology, do you

22  sometimes get preliminary -- what are called preliminary

23  positive results when you test a culture?

24  A.    Yes.  I'm the medical director of the microbiology

25  laboratory, and not a day goes by that we don't have a

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 135 of 150

1 preliminary report that we send out that needs to be then

2 finalized.

3 Q.   And is it standard medical microbiological practice to do

4 further testing on a preliminary positive result of a culture to

5 confirm whether or not it is a real positive or not?

6 A.   Yes.  I mean, that's the whole purpose is to send a

7 preliminary report out pending doing further testing to confirm

8 whether the report is confirmed or is erroneous.

9 Q.   And does it happen on occasion or many occasions where

10 those preliminary positive results end up being negative?

11 A.   Yes, it does.  Probably 50 percent of the time they wind up

12 being not what the laboratory initially thought it was.

13        MS. GHEZZI:  Okay.  No further questions.  Thank you,

14 Your Honor.

15        THE COURT:  Thank you.  Any recross?

16        MR. RATHKE:  Yes, Your Honor.

17                      RECROSS-EXAMINATION

18 BY MR. RATHKE:

19 Q.   Kevin, he was eight years old at the time?

20 A.   I'm sorry?

21 Q.   Kevin, he was eight years old at the time?

22 A.   Yes.

23 Q.   Are you suggesting that he might have gone into the

24 refrigerator, messed with the broccoli, and then drank some of

25 the powdered infant formula?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 136 of 150

```
1   A.   No, sir.  He may have touched the bottles.

2   Q.   Why would he do that?

3   A.   Because he's eight years old.  I mean, it's a possibility.

4   I mean --

5   Q.   He's touching the baby's formula?

6   A.   It's novel to him, so he might well want to do that.  Who

7   knows?

8   Q.   The fact is also that James -- James came home the very day

9   that Jeanine was first hospitalized at St. Luke's Hospital;

10  correct?  I think the hospital records will verify that James

11  was released on the 24th and June -- or Jeanine was hospitalized

12  on the 24th.

13  A.   That is correct.

14  Q.   All right.

15  A.   Both of those pieces of information are correct.

16  Q.   Are you familiar -- counsel asked you some questions about

17  microbiological testing.  Are you familiar with the Bar

18  decision?  Have you ever heard that before?

19  A.   The Bar decision?

20  Q.   Yeah, I'm just asking you if you ever heard of it.

21  A.   I don't think so.

22  Q.   Have you ever heard of the concept that you can't test your

23  way out of a negative or you can't test your way into

24  compliance?

25  A.   I don't have any idea what you're talking about.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 137 of 150

1  Q.   Would you agree with the proposition that if you have a

2  positive for something that you don't -- you don't want to have

3  a positive, it's a bad thing, and then you do a second test and

4  it's a negative that the negative doesn't trump the positive

5  unless there's a very good scientific basis to do so?  Does any

6  of that ring a bell?

7  A.   Sure.  That rings a bell.  But what I understand is going

8  on here for the preliminary report is that it's not a new

9  specimen that is being obtained to run the test again.   The

10  preliminary report is based upon the original specimen, and then

11  further testing is performed on that very same specimen to try

12  to confirm or not the presence of a particular germ.

13  Q.   Did you review the Abbott records relating to the

14  microbiological testing of that environmental sample?

15  A.   I think I only reviewed the report.

16  Q.   So you don't know what happened with that, do you?

17  A.   Well, I know what a preliminary report means, and a

18  preliminary report needs to be confirmed by additional -- and I

19  think the report -- preliminary report actually even says it's

20  going to be further evaluated by additional technology.

21  Q.   Do you have any idea what kind of testing was done on the

22  second round of tests?

23  A.   Some kind of molecular assay.  I know that.

24  Q.   Is that as far as I can take you on that?

25  A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 138 of 150

1  Q.   Counsel mentioned a survey of moms, and I think the point

2  was that a lot of moms aren't washing their hands and stuff?

3  A.   Correct.

4  Q.   My question on that is then why aren't babies getting sick

5  with cronobacter infections?

6  A.   Well, they're lucky.  Fortunately they're not getting sick.

7  That's a good thing.

8  Q.   And is it your test -- is it your belief that Megan simply

9  washed the bottles before she used them and that she did not

10 sterilize the individual bottle before she used it?

11 A.   My understanding is that the first time she used the

12 bottles she sterilized them but she did not repeatedly sterilize

13 them after their initial sterilization and usage.  She washed

14 them in hot, soapy water from the tap.

15 Q.   All right.  Here's page 327 from her transcript.  I'm

16 asking her -- or counsel for Abbott is asking her questions, and

17 she's answered them, and I've underlined some things.  Isn't she

18 saying that every time she used a bottle she boiled it first?

19        MS. GHEZZI:  Your Honor, I would just object that in

20 the -- it's not clear from the context of this one page or

21 several pages what it is they're talking about in terms of which

22 feedings, if he can point it out to him.

23        THE COURT:  And so what is the nature of that

24 objection?  I haven't ever heard that one before.

25        MS. GHEZZI:  It's confusing.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 139 of 150

```
 1              THE COURT:  Well, it may be confusing to you, but he
 2     didn't ask the question to you.  He asked it of the witness.
 3              MS. GHEZZI:  Okay.  Might be confusing to the witness.
 4              THE COURT:  Yeah, that's suggesting an answer which is
 5     exactly the problem I had with your depositions.
 6              MS. GHEZZI:  I would just object to the form of the
 7     question then, Your Honor.
 8              THE COURT:  That's not a proper objection, so it's
 9     overruled.
10     A.   As I read this, I can't be certain as to what exactly she's
11     referring to at what point here.
12     Q.   All right.  Here's the question.
13              THE COURT:  Just a second.  I want to see the lawyers
14     at sidebar.
15              (At sidebar on the record.)
16              THE COURT:  Don't you ever do that again, or I'm going
17     to sanction you right in front of the jury.  That's exactly the
18     problem with your deposition conduct.  You suggested an evasive
19     answer for the witness by making your speaking objection which I
20     told you at the beginning is not allowed, and then he just
21     followed up and said, well, yeah, it's confusing, I can't answer
22     that.  And that's improper.
23              MS. GHEZZI:  Your Honor, my objection was object to
24     the form.  It was confusing.  And it is because --
25              THE COURT:  It's confusing to you.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW Document 210 Filed 10/15/14 Page 140 of 150

1    MS. GHEZZI:  No, no, it's confusing because you can't

2  tell what this is.

3    THE COURT:  You did not object to the form until the

4  very end, and I'm going to file a published opinion saying

5  that's not a proper objection because it isn't in my view.  You

6  gave a speaking objection.  I don't even know what the objection

7  was.  Finally when I asked you you said it was confusing.  You

8  were educating him as to how to answer it by saying it was

9  vague.  The lawyer didn't ask you the question.  He asked the

10  witness.  It's totally improper.  And if you do it again, there

11  will be heck to pay for it.

12    (The sidebar was concluded.)

13    THE COURT:  Mr. Rathke, you may proceed.

14    MR. RATHKE:  Thank you, Your Honor.

15  BY MR. RATHKE:

16  Q.  I only have the one copy, but after I'm through reading if

17  you want to look at it again, feel free.  Question was, so do

18  you -- how long would this process take from getting ready with

19  the bottle to when you were feeding her?  Answer, half hour

20  maybe.  I would get the bottle, sterilize it first, then put it

21  in, and then boil -- put the bottle in boiled water or warm it

22  up I should say.

23    Does that suggest to you that she boiled the

24  individual bottle before she used it?

25  A.  It suggests at some point she boiled the -- boiled the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 141 of 150

 1  water -- boiled the bottles, but it isn't completely clear as to

 2  when exactly that refers to.

 3  Q.   All right.  And another question on the next page, 328,

 4  okay, and when you said you would boil the bottles, was that

 5  because they were sitting up in the cabinet for a while?  And

 6  her answer was yeah.  So they're sitting there, and you always

 7  want to sterilize them before you use them.

 8          Doesn't that tell you that after she took an

 9  individual bottle out of the cabinet that she would sterilize

10  it?

11  A.   That sounds like that, yes.

12          MR. RATHKE:  Okay.  Thank you.  Nothing further.

13          THE COURT:  Any redirect, re-redirect?

14          MS. GHEZZI:  Just a couple of questions, Your Honor.

15          THE COURT:  Thank you.

16                  FURTHER REDIRECT EXAMINATION

17  BY MS. GHEZZI:

18  Q.   Dr. Shulman, was Kevin, the half brother, ever tested for

19  E. sak?

20  A.   No.

21  Q.   And was the refrigerator ever tested for E. sak?

22  A.   No.

23  Q.   And were the contents of the refrigerator ever tested for

24  E. sak?

25  A.   No.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 142 of 150

1   Q.   And was the door handle of the refrigerator ever tested for

2   E. sak?

3   A.   No.

4   Q.   And were any of the extended family ever tested for E. sak?

5   A.   No.

6   Q.   And was Megan Surber ever tested for E. sak?

7   A.   No.

8            THE COURT:  Those are all leading.  They're all

9   stricken.  Jury's admonished to disregard all of the answers

10  that the witness has given.

11           You can now do whatever re-redirect you want, but you

12  can't ask a leading question.

13  BY MS. GHEZZI:

14  Q.   Was anybody in the home -- was anybody in the home tested

15  for E. sak?

16  A.   No.

17           MS. GHEZZI:  Thank you, Your Honor.  No further

18  questions.

19           THE COURT:  Anything further?

20           MR. RATHKE:  No, Your Honor.

21           THE COURT:  Okay.  You may step down.

22           THE WITNESS:  Thank you, Your Honor.

23           THE COURT:  Thank you.

24           MR. RATHKE:  Questions from --

25           THE COURT:  Oh, I'm sorry.  Yes.  We're going to see

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 143 of 150

 1   if we have any questions from the jury.  I'm sorry.  Thank you

 2   for reminding me.  Are there any juror questions?  Doesn't look

 3   like it.

 4           Thank you, though, Mr. Rathke.

 5           You may step down.

 6           MS. GHEZZI:  It's Dr. Shulman.

 7           THE COURT:  I was thanking Mr. Rathke --

 8           MS. GHEZZI:  Oh, I'm sorry.

 9           THE COURT:  -- for pointing out that I forgot to ask

10   the questions.

11           MS. GHEZZI:  Oh, I'm sorry, Your Honor.

12           THE COURT:  No, that's okay.

13           MS. GHEZZI:  I can barely see.

14           THE COURT:  No, no, no, that's okay.  Don't worry.

15   You thought I was talking about the witness, and I was talking

16   to counsel, so no problem.

17           Do you have another witness we could at least get

18   started on, or would you --

19           MR. REIDY:  Your Honor, I think rather than start a

20   relatively long witness, we do have a transcript we could start

21   to read.

22           THE COURT:  Okay.  That's fine.  Are you ready to go

23   with that?

24           MR. REIDY:  It might be stretch breakable, but then

25   we'll be ready to go.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 144 of 150

```
 1              THE COURT:  Okay.  Why doesn't -- thank you.  Why
 2    doesn't everybody take a stretch break.
 3              Thank you.  Please be seated.
 4              MR. SCANNAPIECO:  Your Honor, our next witness is
 5    Russell Merritt by deposition.
 6              THE COURT:  Okay.  And is Mr. Gray going to be reading
 7    that?
 8              MR. SCANNAPIECO:  He'll be reading Russ Merritt.
 9              THE COURT:  Yeah.
10              MR. SCANNAPIECO:  I will be reading Mr. Rathke, the
11    role of Mr. Rathke.
12              THE COURT:  Okay.
13              MR. RATHKE:  I'd read my own if -- that's fine.
14              (Deposition designations of Russell Merritt were read
15    in open court.)
16              THE COURT:  Mr. Scannapieco, is now a good time to
17    take our break for the day?
18              MR. SCANNAPIECO:  I believe it is, Your Honor.
19              THE COURT:  Okay.  Why don't you mark the place where
20    you're at so you'll know where to start up again.
21              Members of the jury, that concludes the testimony for
22    today.  Keep an open mind until you've heard all of the
23    evidence, and we'll see you back here tomorrow at 8:30.  Thank
24    you.
25              (The jury exited the courtroom.)
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 145 of 150

1     THE COURT:  Okay.  Please be seated.  I want to

2  clarify a couple of things.  You know, I've been a lawyer for 39

3  years.  I've never in my life heard that a leading question is

4  not leading because it suggests a no answer rather than a yes

5  answer.  And I suspect you can search the entire universe of

6  federal and state cases and never find a court that agrees with

7  that.

8     And, you know, the problem -- well, you asked nothing

9  but leading questions in that whole series which I struck.  But

10 with regard to your objection, if you want to object to the form

11 of the question, that's fine.  That's actually not what the

12 rules say.  The rules say any objection not made to a form of

13 the question is waived.  It doesn't say the form of the question

14 is a proper objection.

15     And in my view -- and I know there are courts that

16 disagree with me because I'm very familiar with the law in the

17 area.  There are a number of courts that say object to form is a

18 proper objection.  The reason why it's not is there are at least

19 nine known subparts of what that might mean, and it doesn't put

20 the opposing lawyer in a deposition or a judge on notice as to

21 what the objection is.

22     But that's not why I was upset with you.  I was upset

23 with you because you went on and on with a speaking objection

24 that coached the witness that you thought the question was too

25 vague and that he should think it was too vague.  That's exactly

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 146 of 150

1   what your speaking objection did, and that's absolutely

2   impermissible.  And that's what you repeatedly do in

3   depositions.

4         This is the -- you're a very, very fine trial lawyer.

5   And this is the first time you did it with a witness, but then

6   this is -- you know, we're just getting started in the defense

7   case.  But you cannot give a speaking objection about how vague

8   and you don't understand it and all and then the witness parrots

9   the exact same thing, oh, yeah, I think it's vague and just

10   parrots what you said.

11         MS. GHEZZI:  I understand, Your Honor.

12         THE COURT:  That's impermissible.

13         MS. GHEZZI:  I understand, Your Honor.  I was just --

14   I was just trying to explain what the basis of it was.  That was

15   all I was trying to do.  I was not trying to coach the witness.

16   I was just trying to explain so Your Honor would understand why

17   I was making objection to the form.

18         THE COURT:  How about this?  It's vague.

19         MS. GHEZZI:  That's a good one.

20         THE COURT:  Form doesn't mean anything to me at all

21   because form can be it's leading, it's compound, it's complex,

22   it's -- I mean, I think when I've researched this I found nine

23   different subject matters that come within permissible

24   objections to the form.  But saying I object to the form is just

25   like saying I object because it violates the rules of evidence.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 147 of 150

1  Yeah, really it might, but which rule?  Is it a hearsay

2  objection?  Is it a leading objection?  Is it a foundation

3  objection?  It doesn't tell the person anything.

4          So -- but I understand most courts disagree with me

5  and say objection to the form is fine.  But for the reasons I've

6  just articulated, I don't -- that's not a problem.

7          But I guarantee you on your leading question, matter

8  of fact, if you look at Black's Law Dictionary which I just did,

9  basically it says a leading question is one that contains a

10 material fact that suggests the answer which could be either yes

11 or no.  And that's exactly what all your questions were in my

12 view.  That's all.  You're free to disagree, but I thought they

13 were extremely leading.  And you're in great company because 99

14 percent of all lawyers including all of the lawyers on the other

15 table do nothing but leading questions on redirect.  They asked

16 virtually nothing but leading questions on redirect.

17          MS. GHEZZI:  Right.

18          THE COURT:  But yours was just such a strain.  So

19 anyway, anything we need to take up for tomorrow?

20          MR. RATHKE:  No, Your Honor.

21          MS. GHEZZI:  No, Your Honor.

22          THE COURT:  Are we on track witnesswise?

23          MS. GHEZZI:  We are.

24          THE COURT:  Okay.

25          MS. GHEZZI:  We are.  Thank you.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW  Document 210  Filed 10/15/14  Page 148 of 150

```
 1              THE COURT:  And it looks like -- just so you know, I

 2    mean, I hate to encourage you to spend -- to slow down your

 3    case, but we just got an e-mail that my patent case starting

 4    next Tuesday is like -- the parties have said it's likely to

 5    settle which I've kind of thought all along so . . .

 6              MR. RATHKE:  Does that mean I have to spend another

 7    weekend in Sioux City?

 8              THE COURT:  Really.  Well, you know, we can use all of

 9    next week for your rebuttal case.

10              MR. REIDY:  Judge, I think that we will still finish

11    our case this week, and I'm very hopeful we can argue the case

12    this week.

13              THE COURT:  Oh, you think we'll be able to argue it on

14    Friday?

15              MR. RATHKE:  Thursday.

16              MR. REIDY:  Yeah, I think we'll be able to argue it on

17    Friday for sure, possibly even Th -- we're still talking, giving

18    hints as to how we might narrow our case even more.

19              THE COURT:  Okay.  Great.  Appreciate it.

20              MR. REIDY:  That's our goal.

21              THE COURT:  Okay.  Thank you.  We'll be in recess.

22              (The foregoing trial was adjourned at 2:37 p.m.)
                              CERTIFICATE
23              I certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
24

25        S/Shelly Semmler                    9-5-14
          Shelly Semmler, RMR, CRR             Date
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 5:11-cv-04017-MWB-CJW   Document 210   Filed 10/15/14   Page 149 of 150

## <u>INDEX</u>

<u>WITNESS</u>:                                                    <u>PAGE</u>:

BRAD PUETZ
            MS. VAN WYHE                                  931
            MR. SCANNAPIECO                               935

LOUISE DEITLOFF
            MS. VAN WYHE                                  945
            MR. REIDY                                     947

PAMELA ANDERSON
            deposition                                   949

LARRY WILLIAMS
            deposition                                   949

STANFORD SHULMAN
            MS. GHEZZI                                    955
            MR. RATHKE                                   1005
            MS. GHEZZI                                   1043
            MR. RATHKE                                   1047
            MS. GHEZZI                                   1053

RUSSELL MERRITT
            deposition                                  1056

* * * * *